Nos. 2024-1893, 2024-1948

# United States Court of Appeals for the Federal Circuit

———————

**NETWORK-1 TECHNOLOGIES, INC.,**
*Plaintiff-Appellant*

**v.**

**GOOGLE LLC, YOUTUBE, LLC,**
*Defendants-Appellees*

———————

Appeals from the United States District Court for the
Southern District of New York in Nos. 1:14-cv-09558-PGG-
SN, 1:14-cv-02396-PGG-SN, Judge Paul G. Gardephe.

———————

**NON-CONFIDENTIAL PRINCIPAL BRIEF OF PLAINTIFF-
APPELLANT NETWORK-1 TECHNOLOGIES, INC.**

———————

Marc A. Fenster
Brian D. Ledahl
Amy E. Hayden
RUSS AUGUST & KABAT
12424 Wilshire Blvd.
12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant
Network-1 Technologies, Inc.*

October 15, 2024

# CLAIMS AT ISSUE

## U.S. Patent No. 8,205,237, Claims 33-35 (Appx133):

33. A computer-implemented method comprising:

   a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

   b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

   c) determining, by the computer system, an action based on the determined identification of the media work.

34. The method of claim 33, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

35. The method of claim 34, wherein the additional information is an advertisement.

## U.S. Patent No. 8,010,988, Claim 17 (Appx104):

15. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

   a) electronically extracting features from the electronic work;

   b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

   c) electronically determining an action based on the identification of the electronic work; and

   d) electronically performing the action.

17. The method of claim 15, wherein the non-exhaustive search is sublinear.

**U.S. Patent No. 8,904,464, Claims 1, 8, 10, 16, 18, 25, 27, and 33 (Appx163-164):**

1. A method comprising:

receiving, by a computer system including at least one computer, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

obtaining, by the computer system from the user electronic device, a request related to the associated tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

8. The method of claim 1, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another.

10. The method of claim 1, wherein the associated information is related to an advertisement.

16. The method of claim 1, wherein the machine-readable instructions comprise a hyperlink to a URL.

18. A method comprising:

  receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

  receiving, by the computer system, a first electronic media work;

  correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

  storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

  generating, by the computer system, a tag associated with the first electronic media work;

  providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

  receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

  generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at a user electronic device, the action; and

  providing, from the computer system to the first user electronic device, the machine-readable instructions to perform the action in response to the request.

25. The method of claim 18, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the first user electronic device are different from one another.

27. The method of claim 18, wherein the associated information is related to an advertisement.

33. The method of claim 18 wherein the machine-readable instructions comprise a hyperlink to a URL.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1893, 24-1948 |
| **Short Case Caption** | Network-1 Technologies, Inc. v. Google LLC |
| **Filing Party/Entity** | Network-1 Technologies, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/15/2024          Signature: /s/ Brian D. Ledahl

                          Name: Brian D. Ledahl

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Network-1 Technologies, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Adam S. Hoffman<br>Russ August & Kabat | Paul A. Kroeger<br>Russ August & Kabat | Jacob R. Buczko<br>Russ August & Kabat |
| Charles R. Macedo<br>Amster, Rothstein & Ebenstein LLP | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................i

TABLE OF AUTHORITIES..........................................................vi

TABLE OF ABBREVIATIONS ......................................................x

STATEMENT OF RELATED CASES ............................................1

STATEMENT OF JURISDICTION ...............................................3

STATEMENT OF THE ISSUES FOR APPEAL ...........................4

I.    INTRODUCTION .................................................................6

II.   STATEMENT OF THE CASE................................................9

    A.    Asserted Patents Overview ............................................9

    B.    Accused Products Overview .........................................12

        1.    LSH-Content-ID ...................................................13

        2.    Siberia-Content-ID ..............................................14

    C.    Case History.................................................................16

        1.    2014-2015: Network-1 filed suit; original *Markman* briefing. ............................................................16

        2.    2015: Litigation stayed pending PTAB proceedings, including through appeal....................16

        3.    2015-2018: PTAB proceedings and appeals confirmed patentability of the Asserted Claims; construed "non-exhaustive search" under BRI.........................17

        4.    2019: Stays ended; further *Markman* briefing; *Markman* hearing addressing one of three disputed terms. ....................................................................18

        5.    2020: Cross-summary judgment motions................19

        6.    2021-2022: Supplemental discovery and briefing on Google's motion. .................................................20

        7.    2024: District court erred in granting summary judgment of non-infringement of the 237 Asserted Claims and indefiniteness of the 988 and 464 Asserted Claims.....................................................20

III.   SUMMARY OF THE ARGUMENT .........................................26

IV.   ARGUMENT ...................................................................27

    A.   Standards of Review ...............................................27

        1.   Summary Judgment ................................................27

        2.   Definiteness ...........................................................29

    B.   Summary judgment of non-infringement should be reversed. ...........30

        1.   Network-1 presented extensive evidence that would support a jury finding that LSH-Content-ID's search is sublinear....................32

        2.   Network-1 also presented extensive evidence that would support a jury finding that Siberia-Content-ID's search is also sublinear. ...................42

    C.   The district court's finding that "non-exhaustive search" is indefinite should also be reversed.......................................51

        1.   The intrinsic evidence, when properly viewed from the perspective of a POSITA, makes clear Network-1's construction is the correct *Phillips* construction. .................................................51

        2.   If this Court considers the extrinsic record, it further supports Network-1's construction and the district court's analysis of it is fatally flawed.......................................60

VI.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT....................68

## **CONFIDENTIAL MATERIAL OMITTED**

Material has been redacted in the Non-Confidential Principal Brief of Plaintiff-Appellant Network-1 Technologies, Inc. The material omitted from pages 14, 15, 22, 23, 35, 41-47, 49, and 50 contains information regarding Google's confidential system architecture and source code, which is covered by the terms of the governing protective orders entered by the district court.

# TABLE OF AUTHORITIES

## Cases

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) ....................................................35, 36

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)....................................................................29, 36, 68

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................28, 31, 45, 67

*Applications in Internet Time, LLC v. Salesforce, Inc.*,
  No. 2024-1133, 2024 WL 4456271 (Fed. Cir. Oct. 10, 2024) ............................31

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*,
  338 F.3d 1368 (Fed. Cir. 2003) ....................................................30, 67

*Blue Calypso, LLC v. GroupOn, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .........................................................55

*Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*,
  785 F. App'x 858 (Fed. Cir. 2019) ................................................30, 67

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
  707 F.3d 1342 (Fed. Cir. 2013) .........................................................28

*Centrak, Inc. v. Sonitor Techs., Inc.*,
  915 F.3d 1360 (Fed. Cir. 2019) .........................................................27

*Continental Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) ...............................................28, 29, 34

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) .........................................................34

*Eidos Display, LLC v. AU Optronics Corp.*,
  779 F.3d 1360 (Fed. Cir. 2015) .........................................................52

*Google LLC v. Network-1 Techs., Inc.*,
  709 F. App'x 705 (Fed. Cir. 2018) .....................................................18

*Google, LLC v. Network-1 Techs., Inc.*,
   726 F. App'x 779 (Fed. Cir. 2018) ................................................................passim

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
   57 F.4th 1001 (Fed. Cir. 2023) ...........................................................30

*In re Am. Academy of Sci. Tech. Ctr.*,
   367 F.3d 1359 (Fed. Cir. 2004) ...................................................58, 59

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ....................................................27

*Maxell, Ltd. v. Amperex Tech. Ltd.*,
   94 F.4th 1369 (Fed. Cir. 2024) ...........................................................30

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   959 F.3d 1091 (Fed. Cir. 2020) ...................................................59

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ...................................................29, 56, 60, 61

*Neonode Smartphone LLC v. Samsung Electronics Co.*,
   No. 2023-2304, 2024 WL 3873566 (Fed. Cir. Aug. 20, 2024) ..........................65

*Nevro Corp. v. Boston Sci. Corp.*,
   955 F.3d 35 (Fed. Cir. 2020) ...................................................30, 60, 65

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................passim

*Rupp v. Buffalo*,
   91 F.4th 623 (2d Cir. 2024) ...........................................................31

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017) ...........................................................30

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ...........................................................53

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015) ...................................................66, 67

*Tolan v. Cotton*,
   572 U.S. 650 (2014)......................................................................................28, 51

*Travel Sentry, Inc. v. Tropp*,
   877 F.3d 1370 (Fed. Cir. 2017) ...........................................................27

*U.S. Water Servs., Inc. v. Novozymes A/S*,
   843 F.3d 1345 (Fed. Cir. 2016) ..................................................38, 39

*United States v. Rem*,
   38 F.3d 634 (2d Cir. 1994) .........................................................39, 51

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ........................................................48

**Statutes**

28 U.S.C. § 1295 .......................................................................................3

28 U.S.C. § 1331 .......................................................................................3

28 U.S.C. § 1338 .......................................................................................3

28 U.S.C. § 1291 .......................................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '988 patent | U.S. Patent No. 8,010,988 |
| '237 patent | U.S. Patent No. 8,205,237 |
| '464 patent | U.S. Patent No. 8,904,464 |
| Asserted Patents | the '988, '237, and '464 patents |
| 988 Asserted Claim | claim 17 of the '988 patent |
| 237 Asserted Claims | claims 33-35 of the '237 patent |
| 464 Asserted Claims | claims 1, 8, 10, 16, 18, 25, 27, and 33 of the '464 patent |
| Asserted Claims | 988 Asserted Claim, 237 Asserted Claims, and 464 Asserted Claims |
| Network-1 | Plaintiff-Appellant Network-1 Technologies, Inc. |
| Google | Defendants-Appellees Google LLC and YouTube, LLC |
| LSH-Content-ID | The LSH version of the accused Content ID system |
| LSH | locality-sensitive hashing |
| Siberia-Content-ID | The Siberia version of the accused Content ID system |
| IPR | *inter partes* review |
| CBM | covered business method review |
| PTAB | Patent Trial and Appeal Board |

| | |
|---|---|
| USPTO | United States Patent and Trademark Office |
| BRI | broadest reasonable interpretation |
| POSITA | person of ordinary skill in the art |
| The 2396 Case | Case No. 1:14-cv-02396-PGG-SN (S.D.N.Y) |
| The 9558 Case | Case No. 1:14-cv-09558-PGG-SN (S.D.N.Y) |

## STATEMENT OF RELATED CASES

No appeal in or from the same civil actions in the district court was previously before this or any other appellate court.

In a set of consolidated appeals from IPR proceedings before the PTAB (No. 2016-2509 (lead appeal) and Nos. 2016-2510, 2016-2511), this Court previously addressed two of the asserted patents (the '988 and '237 patents), as reported in *Google LLC v. Network-1 Technologies, Inc.*, 726 F. App'x 779 (Fed. Cir. Mar. 26, 2018) (non-precedential), with Circuit Judges Dyk, Schall, and Reyna vacating-in-part the Board's determinations and remanding for further proceedings.

In addition, in Appeal No. 2017-1379, this Court previously addressed an appeal from a CBM proceeding before the PTAB, as reported in *Google LLC v. Network-1 Technologies, Inc.*, 709 F. App'x 705 (Fed. Cir. Jan. 23, 2018) (non-precidential), with Circuit Judges Lourie, Taranto, and Chen affirming the Board's finding that Google had not shown that the challenged claims of the '464 patent are unpatentable.

Further, claim 17 of the '988 patent is the subject of *ex parte* Re-examination No. 90/019,459, currently pending before the USPTO. Aside from this re-examination proceeding and the civil actions from which this appeal is taken, counsel for Network-1 is not aware of any cases currently pending before any court

or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Network-1 filed two complaints collectively alleging infringement of the Asserted Patents. The district court had jurisdiction pursuant to 28 U.S.C §§ 1331, 1338. Network-1 appeals an April 24, 2024 summary judgment order, (1) finding Google does not infringe the 237 Asserted Claims, and (2) holding the 988 and 464 Asserted Claims invalid for indefiniteness, thus disposing of all claims and parties. Network-1 timely appealed. This Court has jurisdiction under 28 U.S.C. §§ 1291, 1295.

## STATEMENT OF THE ISSUES FOR APPEAL

1.     Did the district court err in granting summary judgment of non-infringement of the 237 Asserted Claims by ruling Network-1 failed to present evidence creating a triable factual issue as to whether LSH-Content-ID utilized a "sublinear" search, despite Network-1 presenting factual evidence and expert testimony that would have permitted a reasonable jury to conclude that it did?

2.     Did the district court err in granting summary judgment of non-infringement of the 237 Asserted Claims by ruling Network-1 failed to present evidence creating a triable factual issue as to whether Siberia-Content-ID utilized a "sublinear" search, despite Network-1 presenting factual evidence and expert testimony that would have permitted a reasonable jury to conclude that it did?

3.     Did the district court err in holding the 988 and 464 Asserted Claims invalid as indefinite, when it failed to consider, or erroneously analyzed, evidence showing a POSITA would understand "non-exhaustive search" in view of the intrinsic record to mean "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor"?

4.     If consideration of extrinsic evidence is necessary, did the district court err when it held (1) the fact that the extrinsic evidence purportedly suggests three possible constructions of "non-exhaustive search" renders the claims indefinite, and

(2) the extrinsic evidence is inconsistent with and does not support Network-1's construction?

## I.    INTRODUCTION

Google's accused Content-ID systems are used to automatically identify materials uploaded to its YouTube service, such as to determine if the uploaded videos contain copyrighted material belonging to others. The district court erred in granting summary judgment of noninfringement of the '237 Asserted Claims and finding Google's two versions of the accused Content-ID system did not utilize "sublinear" search algorithms. Network-1 presented more than sufficient evidence for a reasonable jury to conclude those algorithms are "sublinear," especially when all reasonable inferences are drawn in non-movant Network-1's favor as the law requires. Instead of following the summary judgment framework set forth by long-standing Supreme Court precedent, the district court improperly weighed the evidence, made credibility determinations, and drew factual inferences *against* Network-1.

The first accused version of Google's system, LSH-Content-ID, undisputedly uses an LSH (locality-sensitive hashing) search methodology. Technical papers and articles, as well as sworn deposition testimony, by a member of the Google research team that developed LSH-Content-ID's algorithm make clear all LSH-based searches are "sublinear." Other Google technical documents confirm the same. Based on this evidence, and his own analysis of Google's source code, Network-1's expert further offered expert testimony explaining why LSH-Content-ID utilized a

sublinear search. Rather than drawing all reasonable inferences in favor of non-movant Network-1, the district court improperly discounted the evidence of record, and drew factual inferences in favor of Google instead, including by inferring that evidence did not necessarily describe LSH-Content-ID's search algorithm, even though it is clear it does so.

For the second version, Siberia-Content-ID, Network-1 similarly presented Google technical documents, including one explicitly describing the algorithm used in the system as "sublinear." This and other technical documents, as well as fact and expert testimony, further showed Siberia-Content-ID's search is sublinear. Rather than credit this evidence as the law requires, the district court overstepped its role and weighed this evidence by relying on its own unsupported, erroneous lay expert analysis of it.

The evidence Network-1 presented in opposing Google's motion, is, at a bare minimum, enough to present triable issues of fact to overcome a motion for summary judgment. By rejecting this evidence, drawing inferences against non-movant Network-1, and making up its own (erroneous) expert analysis, the district court impinged on the province of the jury and Network-1's Seventh Amendment right to a jury trial by granting summary judgment. These rulings must be reversed.

The district court also erred in finding "non-exhaustive" as used in the 988 and 464 Asserted Claims indefinite. This ruling should also be reversed. From the

intrinsic record, considered under the proper *Phillips* standard, a POSITA would understand "non-exhaustive search" to be: "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor."

Upon reviewing the intrinsic record, a POSITA would understand the hallmark of a "non-exhaustive search" is that it is designed to locate a match (here, a "[near] neighbor") without comparing to all possible matches or records, even if no match is found. And an "exhaustive search" is designed to compare a query to all records in a dataset until a match is found or it definitively determines there is none. Under the *Phillips* framework, a POSITA would also understand the common-sense principle that neither type of search would be designed to examine extraneous, irrelevant, or any more data in a record than is needed to determine whether the record is a match, as this would consume unnecessary computing resources.

Rather than rely on a POSITA's understanding of the intrinsic record, the district court improperly held *extrinsic* evidence alone would lead to multiple possible definitions. This finding violated this Court's precedent that the mere fact that multiple definitions of a claim term are possible does not render a claim indefinite. Further, other than Network-1's proposed construction, there was no evidence of record the district court's other "possible" definitions were potentially proper in light of the intrinsic evidence. In fact, the extrinsic evidence further

supports Network-1's proposed *Phillips* construction.

The district court's indefiniteness finding should be reversed. At a minimum, factual issues regarding how a POSITA would understand the extrinsic evidence requires it be vacated and remanded for trial.

## II.    STATEMENT OF THE CASE

### A.    Asserted Patents Overview

Professor Ingemar J. Cox, the Asserted Patents' inventor, is a Professor of Computer Science at University College London, and deputy director of its Digital Health Hub for Antimicrobial Resistance; and a Professor of Computer Science at the University of Copenhagen, and part of its Centre for Artificial Intelligence. He is a well-known expert in the field of digital content identification, the author of a significant book on digital watermarking, and editor of *Partitioning Data Sets: With Applications to Psychology, Computer Vision and Target Tracking*. His scholarly work has been cited more than 40,000 times.

In September 2000, he filed a provisional application ultimately leading to the Asserted Patents (Appx79[1]), which describe identifying digital media content and taking actions based on the identification. Appx94 (5:37-55). He recognized "a need for techniques for identifying a [digital] work without the need for inserting an

---

[1] The Asserted Patents share the same specification, with minor modifications. Citations are to the '988 patent.

identification code." Appx93 (4:5-14); Appx94 (5:39-41). To do this, the Asserted Patents describe systems where a database of reference works (such as *known* recordings of songs, television programs, or movies) can be maintained, and each reference work is represented by a set of extracted features—an electronic "fingerprint." Appx95.

The Asserted Patents further explain *unknown* content can be compared to *known* reference works to see if there are any matches. Appx94-95 (6:31-7:10). To make that comparison possible, a "fingerprint" of the unknown video is generated, so it can be compared to the database of fingerprints of known videos. Appx94-95 (6:61-7:3).

Because doing so can consume excessive computing resources, the Asserted Patents use search methodologies that do not compare the unknown fingerprint to *all* reference fingerprints, such as "those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests" (Appx95-96 (8:60-9:55); Appx102 (21:23-39, 22:1-37)) and further explain such methodologies may allow the search to scale in a "sublinear" fashion (Appx102 (22:1-24)).

Comparisons of unknown and reference fingerprints need not be looking for exact matches, but for close matches ("neighbors"), because the system should identify two pieces of content as matching even though they have subtle differences between them. Appx95-96. For example, as was common at the time of the invention

in 2000, an unknown video might have been recorded from a broadcast television signal containing some static or "noise." Appx96 (9:1-3). Since it contains the reference television program (or part of it), designers would want the system to identify the unknown video as a match, even though not perfectly identical. *Id.* (9:39-52).

If the unknown work matches a reference work, the system can then determine actions associated with the reference work and apply the same actions to the unknown work, such as showing an advertisement with it. *Id.* (9:57-10:40); Appx103 (24:23-27).

Figure 1 is a flow diagram showing the processes detailed above (Appx82):



FIGURE 1

For the infringement issues related to the "sublinear" limitation, claim 33 of the '237 patent is representative (Appx133); for the definiteness issue related to the "non-exhaustive search" limitation, claim 17 of the '988 patent, which depends from non-asserted claim 15, is representative (Appx104).

## B.    Accused Products Overview

"Google's Content ID system is a set of tools that permits content owners … to control how their content is used on YouTube" by determining whether videos uploaded by YouTube users contain certain video, audio, or melody content. Appx4277 (¶¶22-23). "There have been two main versions:" older "LSH-Content-

ID" and newer "Siberia-Content-ID". Appx4278 (¶26); Appx4236.

### 1.    LSH-Content-ID

LSH-Content-ID "generated 'fingerprints'" that "corresponded to the full duration of the video, audio, or melody content of a video, while a single 'subfingerprint' corresponded to a short snippet or frame of that … content." Appx4284 (¶¶69-70). "The same process was used to generate 'query' subfingerprints corresponding to content uploaded by YouTube users and 'reference' subfingerprints corresponding to content provided or identified by copyright holders or other YouTube partners." Appx4284-4285 (¶72). These subfingerprints "were further broken down into smaller pieces called [LSH] bands," which were indexed. Appx4285 (¶¶73-74).

"The search performed by [LSH-Content-ID] involved two main stages: 'Stage I,' which began with the 'LSH index lookup,' and 'Stage II.'" *Id.* (¶79). "LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database." Appx9716.

In Stage II, "the index hits produced by the Stage I LSH index lookup were further processed to eliminate candidate reference videos that were unlikely to 'match' … the user-uploaded video," by "output[ting] zero or more 'raw matches.'" Appx4288 (¶¶94, 96). The raw matches "were passed to the claiming logic, which determined whether the match met criteria necessary for a content owner to 'claim'

13

**CONFIDENTIAL MATERIAL OMITTED**

the match[]," so it could take an action, i.e., "block," "track," or "monetize" it. Appx4288-4289 (¶¶98-100).

### 2.    Siberia-Content-ID

Siberia-Content-ID operates on the same general principles, with some technical differences. Siberia-Content-ID "generates at least one 'sequence of embeddings'"—like LSH-Content-ID's "fingerprint"—that "corresponds to the full duration of the video, audio, and melody content of a video, while a single 'embedding' corresponds to a short snippet or frame of that … content"—like LSH-Content-ID's "subfingerprint." Appx4278 (¶¶28-29). The same process is used to generate "query" and "reference" embeddings. Appx4279 (¶32).

The reference embeddings are further manipulated, ███ [manipulate], and indexed before they are searched. *Id.* (¶¶33-34). "The reference indices … are comprised of these ███ [manipulated] values," which for the reference video index, "are divided among ███ [number of] ███ [a part of the architecture], each of which has one ███ [certain type of value]'" *Id.* (¶¶35, 37). These "███ [certain types of value]" are chosen so similar ███ [manipulated] values can be "clustered" around them. *Id.* (¶38). The reference video index is divided into ███ [number of] "shards," with "[t]he same ███ [certain type of value] ███ [value] … replicated on each shard." Appx4280 (¶¶39-41).

Siberia-Content-ID's search "involves three main stages: 'Index Lookup,' 'Sparse,' and 'Verifier.'" *Id.* (¶43). Index Lookup, sometimes referred to as "ScaM" because it was developed by Google's Scalable Matching team, begins by comparing

**CONFIDENTIAL MATERIAL OMITTED**

query embeddings to all [*certain type of values* ██████]. Appx4280, Appx4282 (¶¶44-45, ¶58). For the reference video index, when the parties' filed summary judgment motions, "the [*certain type of values* ██████████] (out of [*number* ██████]) that are most similar to [each] query embedding" were output. Appx4281 (¶48). Each "query embedding is then compared to all of the [*manipulated* ██] values that reside on each of the [*a part of the architecture* ██████]that were output at the preceding step," such that "from each shard the top [*manipulated* ██ ██] values that are most similar to the query embedding" are output. Appx4280 (¶¶49, 52).

"The [*manipulated* ██] values that are output from the index lookup stage … are subject to further consideration, including through a process known as 'sparse.'" Appx4282-4283 (¶¶59-60). "The verifier [ultimately] determines whether … references passed from the sparse stage should be classified as matching." Appx4283 (¶¶61-62).

All three stages are designed to be "tunable" such that parameters can readily be changed, such as the number of shards or [*a part of the architecture* ██████], the number of [*a part of the architecture* ██████] scanned, the number of "top" [*manipulated* ██] values output from each shard, as well as sparse and verifier settings. Appx9790; Appx9812. To reduce computational burden and maintain sublinear scaling, Google undisputedly reduced the number of [*a part of the architecture* ██████] scanned from [*number* ██] to [*number* ██]. Appx10331; Appx10335.

"Any matches generated by the verifier are passed to … the claiming logic, which determines whether the match meets criteria necessary for a content owner to 'claim' the match[]" so it can take action (i.e., "block," "track," or "monetize" it).

15

Appx4283 (¶¶63-65).

### C.    Case History

#### 1.    2014-2015: Network-1 filed suit; original *Markman* briefing.

On April 4, 2014, Network-1 filed the 2396 Case alleging infringement of four patents, including the '988 and '237 patents. Appx1001-1010. Several months later, Network-1 filed the 9558 Case alleging infringement of the '464 patent. Appx1140-1147.

In 2015, the parties submitted *Markman* briefing in the 2396 Case, including addressing "non-exhaustive search." Appx1160; Appx1176-1182; Appx1651; Appx1661-1667; Appx2223; Appx2229-2234; Appx2698; Appx2705-2708. Network-1 proposed "non-exhaustive search" be construed as "[a] search using an algorithm designed to locate a match without requiring the query to be compared to every record in the reference data set until a match is identified." Appx1176-1177. Google contended this term was indefinite (Appx1661), *despite proposing an alternative definition earlier in the litigation consistent with Network's proposed construction*: "A search that is not guaranteed to find a match, if one exists" (Appx1155; Appx1157; Appx1176-1177).

#### 2.    2015: Litigation stayed pending PTAB proceedings, including through appeal.

Prior to any *Markman* hearing or ruling, the district court stayed the 2396 Case pending IPRs, including those concerning the '988 and '237 patents. Appx2714. It

likewise stayed the 9558 Case pending a CBM on the '464 patent. Appx2713; Appx2715. At Google's request, it continued both stays pending appeals from those PTAB proceedings. Appx2716-2719.

### 3. 2015-2018: PTAB proceedings and appeals confirmed patentability of the Asserted Claims; construed "non-exhaustive search" under BRI.

The PTAB held the 988 and 237 Asserted Claims "ha[d] not been shown to be unpatentable," and adopted Network-1's proposed construction of "non-exhaustive search"—"a search that locates a match without a comparison of all possible matches." Appx5831; Appx5835-5836; Appx5848; Appx5712; Appx5717; Appx5719; Appx5735.

Google appealed as to claims other than the 988 and 237 Asserted Claims, and this Court held the PTAB's construction of "non-exhaustive search" was too narrow under BRI, instead adopting Google's proposal ("a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*"[2]) because it "is both broader than the Board's and is reasonable" and because nothing in the specification "draw[s] a clear line … in terms of how much data within a record a search must consider." *Google, LLC v. Network-1 Techs., Inc.*, 726 F. App'x 779, 785-86 (Fed. Cir. 2018) (non-precedential). In reaching this construction, this Court expressly recognized: "In order to be found

---

[2] All emphases added unless otherwise indicated.

reasonable [under BRI], it is not necessary that a claim be given its *correct* construction under the framework laid out in *Phillips* ….." *Id.* at 784 (emphasis in original). The panel remanded to the PTAB. *Id.* at 786.

In the CBM, all '494 patent claims were upheld; this Court affirmed. *Google LLC v. Network-1 Techs., Inc.*, 709 F. App'x 705 (Fed. Cir. 2018) (non-precedential). Although the '464 patent claims contain "non-exhaustive search," its meaning was not at issue in the CBM because neither party proposed the term for construction. Appx3763-3752; Appx3976-4063. Google also did not contend "non-exhaustive search" is indefinite, despite being able to do so. Appx3763-3852.

### 4.    2019: Stays ended; further *Markman* briefing; *Markman* hearing addressing one of three disputed terms.

After three-and-a-half years, the district court lifted the stay. Appx2722-2730. The parties agreed Network-1 would only assert claim 17 of the '988 patent and claims 33-35 of the '237 patent in the 2396 Case (Appx2724), and Google agreed to terminate the remanded PTAB proceedings related to these patents (Appx2727).

A few months later, the parties submitted updated *Markman* briefing[3] in both cases, again addressing "non-exhaustive search," taking into account the PTAB and appellate proceedings. Appx2736; Appx2749-2757; Appx3132; Appx3146-3154;

---

[3] The same *Markman* and summary judgment briefing, as well as various other filings and orders, were filed in both proceedings. Citations are to the 2396 Case unless otherwise indicated.

Appx3705; Appx3710-3721; Appx3955; Appx3959-3969. Network-1 proposed "non-exhaustive search" be construed as "[a] search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor." Appx2749. Google alleged indefiniteness. Appx3146.

On November 21, 2019, the district court held a *Markman* hearing; only arguments on "non-exhaustive search" were heard. Appx4093; Appx4124-4208. The district court stated it would be "adjourn[ing] until our next date to continue the remaining issues for purposes of claim construction." Appx4208. It neither held a subsequent *Markman* hearing nor issued a *Markman* order. Over six months later, the district court indicated it "will decide claim construction and summary judgment simultaneously." Appx4209.

### 5.     2020: Cross-summary judgment motions.

In 2020, the parties filed cross-summary judgment motions: (1) Google on non-infringement of the 237 and 988 Asserted Claims and indefiniteness of the 988 and 464 Asserted Claims (Appx4223-4302; Appx6444-6477; Appx10280-10301; Appx5125-5150); and (2) Network-1 on Google's invalidity theories (Appx5156-5197; Appx5954-6000; Appx5872-5898). Both sides requested oral argument. Appx10302-10303.

**6.      2021-2022: Supplemental discovery and briefing on Google's motion.**

In 2021, long after the close of discovery and full summary judgment briefing, Google served supplemental interrogatory responses, providing new information concerning Siberia-Content-ID. Despite Network-1's objection to these untimely new contentions, the district court permitted additional discovery and supplemental briefing relating to whether Siberia-Content-ID's search is "sublinear." Appx10319-10327; Appx10412-10415; Appx10398-10409.

**7.      2024: District court erred in granting summary judgment of non-infringement of the 237 Asserted Claims and indefiniteness of the 988 and 464 Asserted Claims.**

While the case dragged on for a decade with no substantive action by the district court, Network-1 made multiple inquiries about the long-pending status of the summary judgment motions, including contacting Chief Judge Swain. Appx10318; Appx10410-10420. On April 24, 2024, without conducting the requested oral hearing, the district court issued an order (Appx1-77) holding (1) Google is "entitled to summary judgment on Plaintiff's infringement claim premised on the asserted claims of the '237 Patent," and (2) "the asserted claims of the '988 and '464 Patents are invalid as indefinite." Appx1. It denied Network-1's summary judgment motion as moot (Appx2) and entered judgment against Network-1 (Appx78). Network-1 timely appealed. Appx10582-10585.

###### a. District court erroneously granted summary judgment of non-infringement of the 237 Asserted Claims despite genuine issues of material fact.

<u>LSH-Content-ID</u>

In holding "Network-1 has not presented evidence sufficient to create a material issue of fact as to whether [LSH-Content-ID] meets the 'sublinear' limitation" (Appx55-56), the district court discussed the various evidence Network-1 presented in opposition to Google's motion, and dismissed each piece by weighing the evidence against *non-movant* Network-1, contrary to established summary judgment law. It characterized Network-1's expert Dr. Michael Mitzenmacher's report as "quite sparse" and "conclusory and lack[ing] an adequate factual basis," but omitted and ignored much of his analysis and the extensive evidence he cited in support of his conclusions. Appx56-57 (selectively quoting Appx4429-4433 (¶¶209-213)).

The district court discounted the evidence and testimony explaining LSH-Content-ID's "inverted index is designed to be a sublinear data structure" and "is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset." Appx56 (quoting Appx4429-4430 (¶¶210-211)). Despite Mitzenmacher unequivocally stating the "search of [LSH-Content-ID] is sublinear" (*id.* (citing Appx4429 (¶209)), the district court chose to draw inferences against Network-1, by inaccurately positing what Mitzenmacher meant by

**CONFIDENTIAL MATERIAL OMITTED**

"sublinear data structure" and "sublinear subset" was not clear and Mitzenmacher allegedly "conflated the resource efficiency of a search with the scaling of the resource costs as a dataset grows." Appx57-61. The district court also summarily rejected Mitzenmacher's three-page description of Google's code (Appx4430-4433 (¶212)) as not supporting his opinion, without any explanation as to why and without citation to any contrary evidence. Appx60-61.

The district court went on to further criticize Mitzenmacher and Network-1's reliance on a document explaining "[t]he match system described in this document would use 'LSH … Tables'" structured as an "inverted index," and erroneously opined this document "does not purport to describe the [LSH-Content-ID] that Google ultimately implemented." Appx58; Appx62-65. The district court also opined even if it does, the document did not "demonstrate that [LSH-Content-ID] *necessarily* performed a sublinear search." Appx58. As discussed below, "necessarily" is not the correct burden to impose on Network-1 for direct infringement *at trial*, let alone as the non-movant on *summary judgment*.

Finally, the district court discounted as irrelevant scientific papers and testimony from Google employee Dr. Shumeet Baluja, who even the district court recognized "was part of the Google research team that developed the core matching technology utilized in [LSH-Content-ID]." Appx65-68. One discounted paper stated "LSH … and other mathematical functions are sublinear in the number of elements examined

**CONFIDENTIAL MATERIAL OMITTED**

compared to the size of the database." Appx66 (quoting Appx9716). Discounted Baluja testimony confirmed "this LSH approach allows scaling of the system to be sublinear." Appx66-67 (quoting Appx7362). Rather than draw all reasonable inferences in favor Network-1, the district court instead improperly weighed the evidence and concluded "Baluja's references to sublinearity … do not demonstrate that [LSH-Content-ID] performs sublinear searches" because he "has no role in the commercial applications resulting from his research." Appx67-68.

Siberia-Content-ID

With Siberia-Content-ID, the district court again mischaracterized the evidence and failed to draw reasonable inferences in Network-1's favor.

The district court erroneously discarded (1) text in a Google document describing Siberia-Content-ID's search algorithm explicitly stating: "█████████ continues sub-linearity of the █████ cost-curve for multi-machine datasets" (Appx72 (quoting Appx9842) (emphasis in district court order)); and (2) Mitzenmacher's testimony that this document and a graph contained in it demonstrates Siberia-Content-ID's search scales sublinearly" (*id.*). Rather than recognizing a reasonable juror could rely upon Mitzenmacher's expert analysis of this document, the district court instead engaged in its own lay "technical" analysis, substituting it for that of an actual expert. It erroneously concluded the "[t]he graph does not suggest that any search performed by [Siberia-Content-ID] is sublinear

'assuming computing power is held constant,' because what it shows is an increase in the total amount of computing resources as the size of the dataset increase." Appx73. The district court cited no evidence supporting this wrong conclusion. The graph shows no such thing, and in any event at most raises a triable issue for the jury to ultimately resolve.

And although the district court recognized "[t]he evidence … shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database," it erroneously disregarded this evidence as irrelevant because the specification does not explicitly describe an algorithm that can be adjusted in this manner. Appx71. Unsurprisingly, the district court cited no authority that the specification must describe all potential infringing embodiments because such a requirement is contrary to this Court's precedents.

In addition, the district court also erroneously discounted Mitzenmacher's testimony that the three steps of Siberia-Content-ID's search, when considered collectively, are sublinear. Appx74-76. The testimony is premised on the notion that if the first (Index Lookup) step scales sublinearly, and the second (Sparse) and third (Verifier) steps take roughly a constant amount of time, as a matter of logic the overall search scales sublinearly. Appx75 (citing Appx4448 (¶230 n.197)). The district court first stated incorrectly that Mitzenmacher's testimony concerning Sparse and Verifier is "not supported by any citations to evidence," and further

24

erroneously opined (without evidence in support) that other of Mitzenmacher's opinions contradicted his "constant amount of time" assertion. Appx75-76.

### b. District court erroneously held the 988 and 464 Asserted Claims invalid for indefiniteness.

In analyzing "non-exhaustive search," the district court first examined the intrinsic record, erroneously concluding it "does not shed light on the correct interpretation of 'non-exhaustive search,'" noting the specification uses neither "exhaustive" nor "non-exhaustive." Appx25-27. It further discounted and largely ignored Mitzenmacher's testimony explaining how a POSITA would understand the term in view of the intrinsic record. Appx32-34.

The district court then concluded extrinsic academic articles "are of limited value here" and are inconsistent with Network-1's construction. Appx34-37. It also stated "the *extrinsic evidence* suggests that a [POSITA] might reasonably define 'non-exhaustive search' in multiple ways, including": (1) Network-1's proposed construction, (2) this Court's BRI from the IPR appeal, and (3) a "definition" the district court plucked from an article submitted by Network-1. Appx38. But it failed to address evidence of record indicating the second option is not the proper *Phillips* construction and was not meant to be as noted by this Court. And no party ever proposed the third option. Nevertheless, the district court concluded, contrary to controlling precedent, the term is indefinite "because different search algorithms could be considered 'exhaustive' or 'non-exhaustive' depending on which definition

is applied." *Id.*

## III.   SUMMARY OF THE ARGUMENT

1.    The district court erred when it granted summary judgment of non-infringement of the 237 Asserted Claims by <u>LSH</u>-Content-ID by failing to draw all reasonable inferences in favor of non-moving party Network-1, and improperly acting as the factfinder by weighing the evidence and evaluating expert credibility. When the technical writings and deposition testimony on the subject by Baluja, part of the Google research team that developed the LSH algorithm, other Google technical documents describing the LSH-Content-ID system, and Mitzenmacher's analysis of these documents and Google's source code are construed in the light most favorable to non-movant Network-1, summary judgment was clearly improperly granted, in contravention of a district court's limited role on summary judgment.

2.    The district court similarly erred when it granted summary judgment of non-infringement of the 237 Asserted Claims by <u>Siberia</u>-Content-ID by, again, failing to draw all reasonable inferences in favor of Network-1, and again improperly acting as the factfinder, weighing the evidence, and evaluating expert credibility. The district court improperly substituted its own erroneous technical analysis of Google technical documentation for that of non-movant Network-1's technical expert, and also improperly discarded evidence illustrating Siberia-Content-ID's search has design features that ensure it scales sublinearly, and that Google took

26

advantage of these sublinear design features.

3.    The district court also erred when it held "non-exhaustive search" rendered the 988 and 464 Asserted Claims invalid as indefinite. The proper construction clear from the intrinsic record alone, and the district court also failed to address critical evidence of record concerning how a POSITA would understand this term in view of the intrinsic evidence.

4.    If consideration of extrinsic evidence is needed, the district court likewise erred by (1) making numerous clearly erroneous factual findings concerning it, and (2) by holding the extrinsic evidence suggested there were three possible *Phillips* constructions of "non-exhaustive search" because such a holding is contrary to controlling precedent, and both the intrinsic and extrinsic evidence counseled to the contrary.

## IV.    ARGUMENT

### A.    Standards of Review

#### 1.    Summary Judgment

"A district court's grant of summary judgment is reviewed under the law of the regional circuit." *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019). "The Second Circuit reviews the grant of summary judgment de novo." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1377 (Fed. Cir. 2017) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)).

"Summary judgment is appropriate [only] if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (quoting Rule 56(a)). The movant must meet this burden "even if all material factual inferences are drawn in favor of the non-movant." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991); *see Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (It is a "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Supreme Court has long made clear "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when "he is ruling on a motion for summary judgment." *Id.* at 255. This is because "[t]he right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for

jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all of the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J. concurring).

This Court has similarly recognized "[t]he purpose of the summary process is to avoid a clearly unnecessary trial …; it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial." *Continental Can*, 948 F.2d at 1265. "While facilitating the disposition of legally meritless suits, when summary judgment is improvidently granted the effect is to prolong litigation and increase its burdens." *Id.* at 1265-66.

## 2.    Definiteness

For a patent claim to be definite, it must, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art." *Id.* at 908.

"Indefiniteness must be proven by clear and convincing evidence" (*Maxell,*

*Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1372 (Fed. Cir. 2024)), including "any fact critical to a holding on indefiniteness" (*Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (cleaned up)).

This Court "review[s] indefiniteness determinations *de novo*, except necessary subsidiary fact findings, which we review for clear error." *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 37 (Fed. Cir. 2020). "To trigger clear error review, it is not enough that the district court may have heard extrinsic evidence during a claim construction proceeding – rather, the district court must have made a factual finding." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (cleaned up).

"[I]ndefiniteness 'is amenable to resolution by the jury where the issues are factual in nature.'" *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019) (non-precedential) (quoting *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003)).

### B. Summary judgment of non-infringement should be reversed.

The issues on appeal are whether Network-1 presented sufficient evidence for a reasonable juror to conclude, making all reasonable inferences in favor of non-movant Network-1, LSH-Content-ID and Siberia-Content-ID's search algorithms are "sublinear" as construed: "[a] search whose execution time scales with less than linear relationship to the size of the data set to be searched, assuming computing

power is held constant." Appx22. Network-1 presented extensive evidence that could lead a reasonable jury to conclude both are "sublinear." Nonetheless, the district court granted summary judgment of non-infringement in Google's favor. Appx 1, Appx50-77.

Rather than considering such evidence in the light most favorable to non-movant Network-1, the district court improperly acted as the fact-finder, weighing the evidence against Network-1, making adverse credibility determinations regarding Network-1's expert, and substituting its own lay technical analysis for that of an actual expert. The entire analysis is in contravention of a district court's long-established role on summary judgment: "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see Rupp v. Buffalo*, 91 F.4th 623, 636 (2d Cir. 2024) ("When the issue is whether a party is entitled to summary judgment, determinations of credibility, choices between permissible inferences, and the weighing of the evidence are beyond the authority of the court."); *Applications in Internet Time, LLC v. Salesforce, Inc.*, No. 2024-1133, 2024 WL 4456271, at *4-7 (Fed. Cir. Oct. 10, 2024) (non-precedential) (reversing summary judgment because "the district court failed to grant every reasonable inference in [the non-moving party]'s favor").

**1. Network-1 presented extensive evidence that would support a jury finding that LSH-Content-ID's search is sublinear.**

*a. Google's technical documentation and witness testimony create a triable factual issue.*

Google's own documents and fact witness testimony, individually or collectively, would support a jury finding that LSH-Content-ID's search is "sublinear," including (i) technical papers and testimony from a Google researcher undisputedly involved in development of the search algorithm; and (ii) design documents expressly discussing LSH-Content-ID. Each is addressed in turn below.

**i. Dr. Baluja's technical papers and testimony**

First, it is undisputed LSH-Content-ID uses LSH, the reference work LSH bands are indexed, and the reference video index is queried using LSH bands of user-uploaded videos. Appx4284-4286 (¶¶72-74, ¶¶80-82). And a full-length technical paper (Appx9714-9751) co-authored by Baluja, who the district court recognized "was part of the Google research team that developed the core matching technology utilized in Content ID" (Appx66), states: "***LSH and other hash functions are sublinear*** in the number of elements examined compared to the size of the database." Appx9716. This statement was not about a particular LSH system, but all LSH systems. Baluja explained his work in this paper was "motivated by the need to retrieve similar audio, image, and video data from extensive corpora of data," and

was "ground[ed] … in a real-world task[ of] determin[ing] from which song [an] audio snippet came." Appx9715. In a second paper (Appx9690-9703), he again describes an LSH audio identification methodology that "provides good scaling characteristics. ***When the database size is increased by 50%***, we see that we can have a ***sub-linear computation increase*** …." Appx9702; Appx9694-9696.

When asked what his second paper meant by "sub-linear computation increase," Baluja explained "using this LSH approach allows ***scaling of the system to be sublinear***" (Appx7362 (138:3-18); Appx7225), just as that term is defined in the agreed-upon construction (Appx22). He further confirmed he intended the same use of "sublinear" in the first paper. Appx7404-7405 (180:23-181:6). This evidence alone would support a reasonable jury finding LSH-Content-ID's search scales sublinearly. But the district court dismissed Baluja's papers and testimony because he "has no role in the commercial applications resulting from his research." Appx67.

Baluja, who developed the search algorithm used in LSH-Content-ID, wrote and testified about LSH in the "real-world" context of digital content recognition. Appx9715. Baluja also made clear LSH methodologies' computation time scales sublinearly as dataset size increases. Appx9716; Appx9702; Appx9694-9696; Appx7362 (138:3-18); Appx7404-7405 (180:23-181:6). It is a perfectly reasonable inference for a fact-finder to conclude Baluja's admissions that any LSH system scales sublinearly applies to LSH-Content-ID.

33

And nothing in the record indicates or suggests otherwise. But, even if it did, such evidence would also not justify granting summary judgment here. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1313-20 (Fed. Cir. 2005) (reversing summary judgment of infringement because even though reasonable inferences could be drawn in the favor of the *moving* party leading to the conclusion defendant infringed, reasonable inferences could also be drawn in favor of the *non-moving* party leading to the opposite conclusion); *Continental Can*, 948 F.2d at 1267 (vacating summary judgment because district court "found disputed facts adversely to the nonmovant"). The district court's fact-finding on this issue constitutes a clear example of impermissible weighing the evidence, and drawing inferences in favor of Google and against Network-1.

### ii. Google design documents

Network-1 also presented internal Google design documents describing LSH-Content-ID's search algorithm, including that its index is an "inverted index of LSH bands" with sublinear search scaling. Although one such document concerns a system called "CoverCat" (Appx9380-9389), the relevant discussion describes LSH-Content-ID itself because "[i]t is intended that this [CoverCat] system follows the same high level architecture as the ContentID fingerprinting service." Appx9380. The document indicates "[i]n cases where the design or implementation may diverge [from ContentID], a remark is made about the reason for the divergence."

**CONFIDENTIAL MATERIAL OMITTED**

Appx9382.

This document also explains an "██████" implementation is preferable, because with "██████" LSH tables, "*(CPU, RAM) will scale sublinearly*" and as such has "*good scaling characteristics for reference set growth*." Appx9387. Here, both CPU and RAM resources undisputedly reflect the amount of computing power. Appx63. Moreover, an internal Google presentation indicates LSH-Content-ID's LSH tables were in fact "cached *on local disk* for speed." Appx9602; Appx9673. And there are no "remarks" about "divergence" from LSH-Content-ID concerning preference for an ██████ solution. Appx9387. Google did not argue, let alone present any evidence, this document does not accurately describe relevant aspects of LSH-Content-ID.

Rather than accept all reasonable inferences in non-movant Network-1's favor, as required, the district court concluded this document "does not constitute 'specific evidence of direct infringement,' nor does it show [LSH-Content-ID] '*necessarily* infringes the patent[s] in suit.'" Appx65 (quoting *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007)). It held this is so because the document is "marked 'draft,' and Plaintiff has not proffered evidence demonstrating that the design(s) outlined in the document were ever implemented." Appx63.

The district court's analysis is flawed both factually, in misinterpreting the

document as irrelevant to LSH-Content-ID, and legally, by improperly imposing a "necessarily infringes" burden of proof on non-movant Network-1 at the summary judgment stage. Indeed, the cited authority for requiring proof of "necessarily infringing" is entirely inapplicable here. *ACCO* is an appeal from a jury trial reversing an induced infringement verdict. 504 F.3d at 1311-14. In the context of inducement, "a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Id.* at 1313. But Network-1 only alleges *direct* infringement. And perhaps more importantly, not only would such a requirement exceed the preponderance of evidence standard of proof at a civil trial, *as well as the reasonable doubt standard of proof at a criminal trial*, but it would also fly in the face of long-standing Supreme Court precedent requiring evidence "be viewed in the light most favorable to the opposing party" at the summary judgment stage. *Adickes*, 398 U.S. at 157.

> **b.      *Mitzenmacher's testimony also creates a triable factual issue concerning whether LSH-Content-ID's search is sublinear.***

Mitzenmacher, a professor of computer science at Harvard, also provided detailed expert testimony concerning why LSH-Content-ID's search is sublinear. Appx4429-4433 (¶¶209-212); Appx4317. Mitzenmacher unequivocally opines the "***search of the Content ID LSH Version is sublinear***," citing Baluja's testimony and articles, the CoverCat design document, and Google's code in support.

Appx4429-Appx4433 (¶¶209-212, citing Appx7362 (138:15-18); Appx7404-7405 (180:23-181:6); Appx9716; Appx7372-7373 (148:21-149:5); Appx9387; numerous code files). Only by discounting the details of Mitzenmacher's analysis and omitting all cited materials could the district court conclude Mitzenmacher's testimony as "quite sparse" and "conclusory and lack[ing] an adequate factual basis." Appx56-57.

He explains: "Starting from the first step, [LSH-Content-ID] is ***designed to determine*** a very small subset of the reference works in the database, in particular ***a sublinear subset***, that could be possible matches to the input work being queried. This is through the creation of what is commonly referred to as an 'inverted index' data structure, based on the LSH bands; only reference works that match in terms of the LSH bands are subject to further analysis." Appx4429-4430 (¶210). In support, Mitzenmacher cites the design document describing LSH-Content-ID's "inverted index of LSH bands" (Appx9381) and explains "[t]he inverted index is designed to be a ***sublinear data structure***" (Appx4430 (¶211)). Finally, he provides a detailed code description and opines the code confirms LSH-Content-ID's search is sublinear. Appx4430-4433 (¶212).

Second, the district court claims he does not opine LSH-Content-ID search is sublinear "by virtue of its 'inverted index' structure," apparently because he does not use the exact same words as in the claim construction. Appx57 (criticizing

Mitzenmacher's use of "sublinear data structure" and "sublinear subset"). However, the district court's criticism over word choice ignores the full context of Mitzenmacher's opinions and is not proper on summary judgment. Mitzenmacher makes clear he is applying the parties' agreed construction (Appx4327-4328 (¶37); Appx8689 (166:3-17); Appx8524), and under that construction, the "search of the Content ID LSH Version is sublinear" (Appx4429 (¶209); Appx8689-8691 (166:18-168:7)). That alone is enough to deny summary judgment.

Moreover, contrary to the district court's analysis, it is clear from the context of the report alone that a "sublinear data structure" is a data structure that allows a search to scale sublinearly, and a "sublinear subset" is that search's output. Appx4429-4430 (¶¶210-211). At his deposition, when asked what he meant by "sublinear subset," Mitzenmacher explained "the [computational] work going in to … the number of things in the subset … grow[s] sublinearly in the setting in the context of the claim construction," which is "as the number of references grows." Appx8691-8693 (168:19-170:3). The district court improperly weighed this testimony against non-movant Network-1, deriding it as "gibberish." Appx61. If the district court simply did not believe the testimony, it impinged on the province of the jury by making credibility determinations on summary judgment. *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1351-52 (Fed. Cir. 2016) (vacating summary judgment of anticipation because district court disregarded expert

testimony going to the heart of the anticipation issue).

Third, the district court criticizes Mitzenmacher's reliance on the design document because "this document is a draft from 2010 that does not purport to describe [LSH-Content-ID] that Google ultimately implemented." Appx58. That is Google's argumentative characterization of the document, not one a fact-finder is obliged to accept. Appx5138. The face of the document refutes Google's characterization, because as described above, it explicitly states it describes numerous aspects of LSH-Content-ID as implemented. Appx9380-9381; Appx9386-87. The district court cannot simply choose to ignore evidence requiring denial of summary judgment by falsely describing it. *U.S. Water*, 843 F.3d at 1351-52 (reversing summary judgment in part because district court ignored evidence that would support a reasonable jury finding in favor of the non-moving party); *United States v. Rem*, 38 F.3d 634, 645 (2d Cir. 1994) (same).

Fourth, the district court states "[e]ven assuming *arguendo* [LSH-Content-ID] is structured as an inverted index, that … does not demonstrate [LSH-Content-ID] ***necessarily*** performed a sublinear search." Appx58. But again, it cannot be non-movant Network-1's burden at the summary judgment stage to prove LSH-Content-ID "necessarily" does anything. Mitzenmacher explained the inverted index nature of LSH is sublinear and Google's design documents support that conclusion—that is more than enough evidence, even standing alone, to create a triable issue of fact.

Fifth, the district court criticizes Mitzenmacher's citation of an "inverted index" Wikipedia entry, despite no party relying on it on summary judgment. Appx58-60. The district court conducted its own lay "technical" analysis of this entry, concluding it purportedly shows "Plaintiff has conflated the resource efficiency of a search with the scaling of resource costs as a dataset grows" because a portion of it explains a search of an inverted index is more efficient than a search of a different structure called a forward index. Appx59. Besides being the wrong inquiry, more importantly, comparison of an inverted index to a forward index is not a reason Mitzenmacher contends inverted indexes are sublinear data structures. Rather, Mitzenmacher's opinion is rooted in Google documents, witness testimony, and his analysis of Google's source code. Appx4429-4433 (¶¶209-212).

Sixth, the district court claims Mitzenmacher's assertion that "'review of [Google's] source code confirm[ed]' his view that [LSH-Content-ID] meets the sublinear limitation … is devoid of analysis," and nothing in his code description suggests LSH-Content-ID's search is sublinear. Appx60-61 (quoting Appx4430-4433 (¶212)). But this is refuted by the cited paragraph itself, where Mitzenmacher quotes a code comment stating LSH-Content-ID "*uses the lsh indexes* to find likely references and offsets which might match," discusses functions and values further confirming LSH-Content-ID uses LSH, and also describes how the code uses LSH indexes to find potential candidates and determines whether or not they are

40

**CONFIDENTIAL MATERIAL OMITTED**

ultimately "matches" across both Stages I and II of the algorithm. Appx4430-4433 (¶212).

Finally, the district court also held "another and independent reason" summary judgment is appropriate is "[i]n arguing [LSH-Content-ID] performs a sublinear search, Plaintiff addresses only Stage I of that system," not both Stages I and II. Appx68 (n.20). Not so. Mitzenmacher explicitly discusses both Stages I and II. Appx4430-4433 (¶212). He confirmed at deposition "the first step it reduces things to a sublinear number of items to consider and then subsequent to that, … you're dealing with a sublinear size data set, and so the total work remains sublinear." Appx8695-8696 (172:9-173:3); Appx8699-8700 (176:19-177:5) ("[What] I'm looking at is the entire system or the entire process sublinear with respect to the number of references in the data set."); Appx8698 (175:7-14).

>    **c.    That the parties' disagreement over operation of LSH code had already been resolved in Network-1's favor provides further evidence of sublinearity.**

As the district court recognized, Google's expert Bhattacharjee opined LSH-Content-ID's search is not sublinear because he claimed the code shows it iterates over every ▮▮▮▮ certain portion of the LSH indexes, and Mitzenmacher disagreed because the code showed it does *not* do so. Appx62 (n.19). The district court recognized Bhattacharjee was wrong and Mitzenmacher was correct. *Id.* Mitzenmacher's testimony on this code provides further evidence from which a jury could conclude

**CONFIDENTIAL MATERIAL OMITTED**

that LSH-Content-ID's search is sublinear.

But the district court stated "[t]he fact that a search of the LSH index iterates only over [certain] portions ███████ … does not ***necessarily*** mean that a search of the index is sublinear," and faulted Network-1 for not "explain[ing] why that would ***necessarily*** be the case." *Id.* Another application of the legally improper "necessarily infringes" standard further highlights the district court's approach flies in the face of summary judgment precedent.

> **2.     Network-1 also presented extensive evidence that would support a jury finding that Siberia-Content-ID's search is also sublinear.**
>
> > **a.     *Google's technical documentation and witness testimony create a triable factual issue.*****

Google's own documents and fact witness testimony alone would support a jury finding that Siberia-Content-ID's search is sublinear. During its development, Google recognized: "Given the size of the dataset, it is clear that we will need a (customized) distributed searching service and a ***sublinear search*** with a certain mathematical ████ representation." Appx10265. It was necessary to use a "***sublinear structure of searching***" for a "speed reason." *Id.* This is consistent with Siberia-Content-ID as implemented. Section II.B.2. The district court did not address this document, despite Network-1 citing it in opposition to Google's motion. Appx6456.

Moreover, Google employee Sanjiv Kumar testified Siberia-Content-ID uses a name of ████ algorithm for Index Lookup. Appx9290 (157:6-15); Appx9133. And

**CONFIDENTIAL MATERIAL OMITTED**

other Google documentation describes that algorithm as scaling sublinearly. For example, the following graph illustrates both "███████" (lighter grey stepped line) and "███████" (darker grey line) scale sublinearly (less than "Linear Cost" (dashed line)) (Appx9842; Appx9838):



The y-axis, labelled "Query Cost (CPU)," corresponds to the amount of ***computing power*** required to perform a search—the "computing power" of the agreed construction of "sublinear." The x-axis, labelled "Dataset Scale (# of machines)," corresponds to the ***size of the dataset to be searched*** of the construction. The number of machines thus refers to machines used to store the reference data set; those are not the "computing resources" of the agreed construction.

The graph illustrates the computing resources required by both ███████ (used by Siberia-Content-ID Appx9290 (157:6-15)) and ███████ scale with less than a linear relationship (less than "Linear Cost") to the Dataset Scale (the size of the

**CONFIDENTIAL MATERIAL OMITTED**

dataset to be searched). Thus, this document explicitly shows Siberia-Content-ID uses an algorithm for which the time to conduct the search scales with less than a linear relationship to the size of the dataset to be searched, as required by the "sublinear" claim construction. Appx22. Indeed, text immediately preceding this graph confirms: "███████ … has ***query-costs that grow sub-linearly for increases in database size***" and "███████ continues the sublinearity of the ███████ cost-curve for multi-machine datasets." Appx9482.

Mitzenmacher confirmed this understanding, explaining this graph "illustrat[es] that as the size of the reference index increases, assuming more shards are added, the search scales sublinearly" because "[t]he x-axis of the graph is equivalent to the number of shards in a given index because each shard is stored on a different machine," and "[t]he y-axis of the graph illustrates the total amount of computing power needed for searching the dataset"—the "computing power" of the agreed construction Appx4449 (¶¶232-234). He recognized Kumar indicated Siberia-Content-ID uses ███████, but concluded "[r]egardless of whether [Siberia-Content-ID] is using what is labeled '███████' or '███████,' according to the graph above, the search scales sublinearly." Appx4449-4450 (¶¶235-236).

The district court ignored both the plain text of this document and Mitzenmacher's testimony concerning it, instead engaging in its own improper, and ultimately incorrect, "expert" analysis by accepting Google's argumentative

**CONFIDENTIAL MATERIAL OMITTED**

characterization of this evidence. *Compare* Appx72-73 *with* Appx5131. Without citation to any supporting evidence, the district court concluded "[t]he graph cited by Plaintiff plainly contemplates that as the dataset grows, so does the number of 'machines,'" and as such, "[t]he graph does not suggest that any search performed by [Siberia-Content-ID] is sublinear 'assuming computing power is held constant,' because what it shows is an increase in the total amount of computing resources as the size of the dataset increases." Appx72-73. But the district court incorrectly equated the "# of machines" that store the dataset (what is shown on the x-axis) with the computing power required for a query (what is shown on the y-axis). In other words, the "increase" the district court identified was the *increase in the storage* required to contain an increasing reference dataset, not an *increase in computing resources* required to conduct a search or query. This erroneous "expert" analysis is a perfect illustration of why the Supreme Court repeatedly holds "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

        **b.**    ***That Google capitalized on Siberia-Content-ID's sublinear design provides further evidence of sublinear scaling.***

The evidence also shows Siberia-Content-ID's search algorithm has different "tunable knobs," including "how many ███████," "how many shards," and "how

**CONFIDENTIAL MATERIAL OMITTED**



many ██████ [part of architecture] to scan." Appx9812 (cleaned up). Before Google took advantage of any of these "tunable knobs," Mitzenmacher provided, as an example, a detailed analysis of why increasing the number of ██████ [part of architecture] leads to sublinear scaling (Appx4450-4451 (¶¶237-240)), and explained he was not proposing a hypothetical system, but rather Siberia-Content-ID's "algorithm itself is sublinear because it has this ability to change and adapt to these situations" of growing dataset size. Appx8652 (129:1-8).

Google capitalized on this sublinear design. At one point Index Lookup undisputedly "output[] the ██████ [certain types of values] (out of ██████ [number]) that are most similar to the query embedding" and "the query embedding [wa]s compared to all of the ██████ [maniputed] values that reside on the ██ [number] most similar ██████ [part of architecture]." Appx4281 (¶¶48, 50). Later, Google undisputedly reduced the ██████ [part of architecture] figure to ██ [number]. Appx10335; Appx10378 (30:12-23); Appx10349. Google engineer Matthias Konrad confirmed "[t]hese were changes making the resource costs lower."[4] Appx10379 (31:17-23). Mitzenmacher explained why reducing the number of ██████ [part of architecture] scanned, as Google did, results in sublinear scaling. Appx10395-10396 (¶¶22-24); Appx10390.

---

[4] The district court concluded "[t]here is no evidence that Google adjusted the number of ██████ [part of architecture] examined in the second step of Index Lookup to account for an increase in the number of references in the database." Appx70 (n.21). But the evidence confirmed the dataset continuously grows over time. Appx7535 (91:14-17); Appx7444. More importantly, the agreed claim construction does not require an actual increase in dataset size over time or otherwise; it merely expresses how the search scales in relation to database size.

**CONFIDENTIAL MATERIAL OMITTED**

Despite recognizing "[t]he evidence … shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database" (Appx71), the district court ignored that evidence, and instead focused on the irrelevant undisputed fact "that if additional references were added *to the existing shard/*███████ *structure*, the [Index Lookup] portion of the search would scale linearly." Appx69 (quoting Appx4316 (¶229) (emphasis in original, alternation in district court order)). But the proper inquiry is whether the algorithm *when used as designed* scales sublinearly, and the evidence would allow a reasonable jury to conclude it does. This is yet another example of the district court impermissibly weighing the evidence and drawing inferences in favor of Google, rather than in favor of Network-1 as required.

To make matters worse, it appeared to do so for reasons contrary to this Court's precedents concerning the scope of patent claims. It concluded the specification "lists exemplary sublinear search algorithms," but does not describe a "search algorithm that can be adapted to the problem using parameters – 'tunable knobs' – that can be periodically adjusted to improve the search's consumption of resources." Appx71. But there is, of course, no requirement the specification describe Google's infringing embodiment. Rather, "this court has repeatedly cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Williamson v. Citrix Online, LLC*, 792 F.3d

1339, 1346-47 (Fed. Cir. 2015) (cleaned up). If the district court restricted the claims to the examples in the specification, that was error.

> **c.** **Evidence supports that the overall search algorithm of Siberia-Content-ID, not just Index Lookup, is sublinear.**

Siberia-Content-ID's search undisputedly has three stages: Index Lookup, Sparse, and Verifier. Section II.B.2. There is more than sufficient evidence for a reasonable jury to conclude Index Lookup scales sublinearly. Sections IV.B.2.a-b. Mitzenmacher further explained the "*amount of time the latter two steps take would remain roughly constant* since the number of index hits [that] comes out of the ScaM step would remain the same." Appx4448 (¶230 n.197). That the Sparse and Verifier steps take a roughly constant amount of time (rather than an amount related to the dataset size) is relevant here because it is undisputed that "a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly." Appx74. In other words, Network-1 submitted extensive evidence that no steps of the search scaled linearly, but rather involve a sublinear step (Index Lookup) and two functionally constant steps (Sparse and Verifier). As such, the overall search scales sublinearly. As explained below, the district court substituted its own erroneous mathematical understanding of this evidence for that of an actual expert in mathematics and search algorithms: Mitzenmacher.

It first faulted Mitzenmacher's analysis as "not supported by any citations to

48

**CONFIDENTIAL MATERIAL OMITTED**

evidence." Appx75. But he provides a detailed discussion with many citations to Google documents and testimony concerning the number of index hits subjected to further consideration in the Sparse and Verifier stages. Appx4440-4445 (¶¶223-226). His additional conclusions in the cited footnote are his expert opinions following from that evidence. Appx4448 (¶230 n.197).

Next, the district court concluded "other portions of Dr. Mitzenmacher's opinion contradict his assertion that the amount of time the Sparse and Verifier steps would take 'would remain roughly constant.'" Appx75. But this statement is based on nothing more than the district court's disbelief in Mitzenmacher's conclusion that Index Lookup scales sublinearly. Indeed, it agreed "the time necessary to execute the Sparse and Verifier steps would be 'constant' such that if the Index Lookup portion is sublinear, the entire Siberia search would also be sublinear." *Id.*

The court takes issue with Mitzenmacher's analysis of Index Lookup and mischaracterizes his opinions concerning it, claiming his "premise for arguing … the Index Lookup step is sublinear, however, is that 'doubling the size of the reference index by simply adding those references to the existing shards[] is not what would be done. … [A]s the size of the reference index increases, so would the number of shards and ▮▮▮▮▮▮▮.'" Appx76 (citing Appx4448 (¶230)). Of course, this was far from the only reason Mitzenmacher offered for why Siberia-Content-ID's search is sublinear, as explained in detail above. Sections IV.B.2.a-b. Moreover,

**CONFIDENTIAL MATERIAL OMITTED**

as reflected in the cited paragraph, Mitzenmacher was discussing a specific "hypothetical" example (doubling the reference index size), not generally opining the number of shards and ██████ would necessarily grow with any increase in reference index size.

Based on its misunderstanding of Mitzenmacher's opinions, the district court concluded: "If the number of shards in the index increased, so would the number of references output by the Index Lookup step – ████ embeddings per shard – and examined by the Sparse and Verifier steps." Appx76. No evidence supported this fabricated conclusion. Rather, the evidence indicates the number of embeddings output per shard is a "tunable knob" that can be adjusted to maintain and improve upon sublinearity. Appx9812 ("N in top N"); *see* Appx76 (recognizing same). There is thus nothing "internally inconsistent" about Mitzenmacher's opinions, particularly when viewed in light of the uncontroverted evidence that Siberia-Content-ID's search was ***designed to be sublinear***. Section IV.B.2.a.[5]

---

[5] The district court held "because the Index Lookup stage outputs from each shard the top ████ values that are most similar to the query embedding – regardless of how similar the embeddings are – it does not involve the uses of a 'defined threshold' as required under the parties' agreed-upon construction of 'nearest neighbor search.'" Appx74 (n.22) (cleaned up). If the district court intended this as a separate reason to grant summary judgment, there is extensive evidence indicating Siberia-Content-ID's search is "an approximate nearest neighbor search" as required by the 237 Asserted Claims. *E.g.*, Appx9935 ("Instead of LSH, ScaM is used to do Approximate Nearest Neighbor Search."); Appx9932 Appx4434-4435 (¶216). Moreover, the district court also ignored Mitzenmacher identified and analyzed numerous "defined thresholds." Appx4439-4445 (¶¶222-226). At a bare minimum,

\* \* \*

At bottom, Network-1 presented extensive evidence that the searches of both LSH-Content-ID and Siberia-Content-ID are "sublinear." "Instead of drawing inferences that were favorable to [non-moving party Network-1], this ruling appears to have weighed the evidence and drawn inferences against [it]." *Rem*, 38 F.3d at 645. Indeed, "[c]onsidered together, the[] facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge evidence offered by the party opposing that motion." *Tolan*, 572 U.S. at 659. Because "the opinion below reflects a clear misapprehension of summary judgment standards in light of [Supreme Court] precedents" (*id.*), summary judgment of non-infringement of the 237 Asserted Claims must be reversed.

### C. The district court's finding that "non-exhaustive search" is indefinite should also be reversed.

#### 1. The intrinsic evidence, when properly viewed from the perspective of a POSITA, makes clear Network-1's construction is the correct *Phillips* construction.

"To the extent the district court considered extrinsic evidence in its … summary judgment order, that evidence is ultimately immaterial to the outcome because the intrinsic record is clear." *Eidos Display, LLC v. AU Optronics Corp.*,

---

this evidence creates a triable factual issue on whether Siberia-Content-ID's search is an "approximate nearest neighbor search."

779 F.3d 1360, 1365 (Fed. Cir. 2015) (reversing indefiniteness finding "because [plaintiff's] proposed construction … reflects how a [POSITA] would have understood the limitation after reading the intrinsic record"). Here, because the meaning of "non-exhaustive search" is clear to a POSITA from the intrinsic record alone, this Court should reverse the indefiniteness determination and construe the term as "a search designed to locate a [near] neighbor[6] without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor."

> **a.** ***The specification makes clear to a POSITA "exhaustive" searches are designed to compare to all possible matches, and "non-exhaustive" searches are designed to <u>not</u> do so.***

The specification describes both exhaustive and non-exhaustive searches and differences between them in the context of the invention. The specification explains: "In previous work, it was not uncommon to perform a linear ***search of <u>all</u> N entries***, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive." Appx96 (9:24-28); Appx102 (21:24-56) (describing exhaustive searches with millions and billions of comparisons). Mitzenmacher explained a POSITA would understand these portions of the specification as describing exhaustive searches.

---

[6] The district court replaced "[near] neighbor" in this construction with "match." Appx25-26. Because the "match" the "non-exhaustive" search may locate is a "[near] neighbor," this substitution does not change the construction's meaning.

Appx2781-2782 (¶¶41-42); 2764.

The specification then contrasts these exhaustive approaches with "[o]ther forms of matching includ[ing] those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests." Appx96 (9:29-32). Mitzenmacher explained these are all non-exhaustive searches and "[t]he common feature of these different examples … is that they do not potentially require comparing a query to all of the records in the data set" because "they are search strategies that narrow the number of comparisons that must be performed." Appx2783 (¶43).

This conclusion is further supported by books and articles the specification incorporates by reference.[7] Appx95 (7:38-43); Appx96 (9:13-18) ("Duda & Hart"; "Fukunaga"); *id.* (9:32-38) ("Yianilos"). Like the specification, these books and articles are part of the intrinsic record. *E.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).

Duda & Hart describe how "clustering" techniques can be used when "an exhaustive search is completely infeasible." Appx2871-2872; Appx2830-2831. Like the specification, Duda & Hart also describe an exhaustive search in terms of a huge number of potential comparisons, and explain this "approach is unthinkable for all but the simplest problems." Appx2872. As Mitzenmacher explained, "[t]he authors

---

[7] This Court did not discuss the materials incorporated by reference in its prior decision. *Google*, 726 F. A'ppx 779. Neither did the district court. Appx1-77.

distinguish exhaustive and non-exhaustive search methodologies based on whether all records potentially need to be searched." Appx2783 (¶44).

Similarly, also in the context of clustering, Fukunaga explains "an exhaustive search of all … subsets is not computationally feasible. Instead, we will settle for the minimum *J* subsets …."—a non-exhaustive search. Appx2961; Appx2912; Appx2783 (¶45).

Yianilos similarly describes how kd-trees, vantage point trees, and excluded middle vantage point forests have the ability to perform searches without comparing to all records in the dataset. Appx1400-1411; Appx1413-1422; Appx2783-2784 (¶46).

The intrinsic evidence alone thus makes clear the salient difference to a POSITA between exhaustive and non-exhaustive searches is the former is a "search of all N entries"—all records in the dataset—and the latter is not. Appx2781-2782 (¶41) ("[T]he difference between exhaustive and non-exhaustive searches turns on the number of comparisons that must be performed between the query and the reference data set to be searched."); Appx3946 (¶8); Appx3442. This Mitzenmacher testimony provides additional clarity about how the intrinsic evidence is understood by skilled artisans.

The district court thus erred when it held "the specification does not shed light on the correct interpretation of 'non-exhaustive search,'" relying heavily on the fact

the specification does not use this exact phrase. Appx27. But "the exact terms appearing in the claim need not be used *in haec verba*" in the specification. *E.g.*, *Blue Calypso, LLC v. GroupOn, Inc.*, 815 F.3d 1331, 1345 (Fed. Cir. 2016) (quotation marks omitted).

The district court further held "the specification does not state that 'linear correlation' or 'a linear[8] search of all N entries' should not be used." Appx29 (quoting Appx96 (9:1-25)). But the specification contrasts "a linear ***search of all N entries***," which "[i]n previous work … was not uncommon" but was "computationally very expensive" (exhaustive searches), with search methodologies not requiring a "search of all N entries" and such computational intensity (non-exhaustive searches). Appx96 (9:24-32). Moreover, it is unclear why the district court mentions "linear correlation." No party or expert raised it because it is irrelevant, as it "provide[s] a statistical measure of the confidence of the match." Appx96 (9:3-9). This is yet another example of the district court conducting its own erroneous technical analysis, despite it being inconsistent with the face of the

---

[8] The district court conflates whether a search is exhaustive or non-exhaustive with whether it scales linearly or sublinearly, and whether it searches for exact matches or "neighbors." Appx27-31. Here, "linear search" refers to a type of exhaustive search that examines records in a "fixed order," and has nothing to do with how the search scales. Appx3586 (202:15-204:10); Appx3534. Moreover, that the specification discusses "sublinear" and "neighbor" aspects of searches is unsurprising; there are claim limitations directed to such characteristics. What "sublinear" and "neighbor" searches entail are separate issues addressed by agreed-upon constructions of those terms. Appx22.

document itself. This also illustrates how it did not conduct its analysis from the viewpoint of a POSITA, as required under *Nautilus*, 572 U.S. at 908.

The district court claims "[i]t is also not clear that certain embodiments listed in the specification and claims would meet Plaintiff's proposed construction of 'non-exhaustive search'" because that construction "appears to exclude search methodologies that will always locate a neighbor." Appx30. But the plain language of Network-1's proposed construction—"a search designed to locate a neighbor … *even if* the search does not locate a neighbor"—makes clear it includes both non-exhaustive searches that will always locate a neighbor, and those that do not.

Finally, the district court claims that because certain search methodologies discussed in the specification may "visit[] essentially the entire dataset" for "a worst case query," they may not fall within Network-1's construction. Appx31. But again, the language of the proposed construction—"a search *designed to* locate a neighbor without comparing to all possible matches"—belies the district court's position. The critical aspect is that a non-exhaustive search is *designed to* not look at all possible records; that it may need to come close to doing so in rare cases does not transform it into an exhaustive search.

> **b.      *A POSITA would understand "non-exhaustive search" to turn on the number of records the search is designed to examine, not how much data within each record is examined.***

In the IPR appeal, this Court held the ***BRI construction*** of "non-exhaustive

search" was "a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*." *Google*, 726 F. App'x at 786. That panel also made clear under BRI, "it is not necessary that a claim be given its *correct* construction under the framework laid out in *Phillips*." *Id.* at 784 (emphasis in original). Here, the evidence demonstrates a POSITA would understand the BRI construction is not the proper *Phillips* construction, and Network-1's construction is. This is because, to avoid wasting computing resources, a "skilled artisan would have known not to compare against extraneous, irrelevant, or any data [in a record] beyond what is sufficient to reach a conclusion about the record," regardless of whether that search compared to all records in the dataset (exhaustive) or not (non-exhaustive). Appx3946-3947 (¶9). The district court erred by failing to address this issue in its order.

It is helpful to take a step back and understand the reasoning behind this Court's BRI in the prior appeal. There, the panel explained:

> [T]he linchpin of the claim construction analysis in this case is determining what an "exhaustive search" is. … That is so because a "non-exhaustive" search necessarily is a search that is not "exhaustive." … As a result, in terms of claim construction, what must be determined is the meaning of the word "exhaustive."

*Google*, 726 F. App'x at 782. Under BRI, the panel needed to determine the broadest possible construction for which there are no "***expressions of manifest exclusion or restriction***, representing a clear disavowal of claim scope" in the specification. *In re*

*Am. Academy of Sci. Tech. Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004). This differs from the *Phillips* standard under which the proper construction is "the meaning that the term would have to a [POSITA] … not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Applying BRI, the panel reasoned "the broadest construction of 'non-exhaustive' searching corresponds to the *narrowest* construction of 'exhaustive searching.'" *Google*, 726 F. App'x at 783 (emphasis in original). It then set out to find the narrowest meaning for "exhaustive," and determined such a definition "requires considering the entirety of each potential match." *Id.* The panel found the BRI of "non-exhaustive" search to be the opposite—"a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*." *Id.* at 786.

The panel did not determine what the proper *Phillips* construction is or rule Network-1's construction was incorrect under *Phillips*. Thus, contrary to the district court's conclusion (Appx26-29), the panel did not reject Network-1's analysis of the intrinsic record presented in Section IV.C.1a. Rather, it merely found, in applying BRI, the specification does not "draw a clear line between 'exhaustive' and 'non-exhaustive' searching in terms of how much data within a record a search must

consider in order to qualify as one or the other." *Google*, 726 F. App'x at 785. The panel was simply looking for, as it had to under BRI, "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" in the specification. *Am. Academy*, 367 F.3d at 1365.

Network-1 agrees the specification does not include an explicit disclaimer regarding how much data *within a record* any search must consider. But testimony before the district court (but not before the PTAB or IPR appeal panel) makes clear a POSITA "would have recognized there is no reason the specification should do so." Appx3946-3947 (¶9). Mitzenmacher further explained the common-sense proposition:

> To avoid examining unnecessary data and using more computer resources than necessary, the skilled artisan would have known not to compare against extraneous, irrelevant, or any data beyond what is sufficient to reach a conclusion about the record—such searches are simply not conducted and therefore are of course not described in the literature.

*Id.* (¶9); *see also* Appx3948-3949 (¶11); Appx3952-3953 (¶16); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1102 (Fed. Cir. 2020) ("A patent need not teach, and preferably omits, what is well known in the art.") (cleaned up). Google presented no evidence showing a POSITA would waste computational resources by comparing extraneous, irrelevant, or any data beyond what is sufficient to reach a conclusion about a given record. The evidence thus illustrates a POSITA would have known "[t]he amount of data in each record compared to the query is

not the relevant distinction; the relevant distinction is the number of records compared." Appx3946-3947 (¶9).

Because the proper *Phillips* construction is clear from a POSITA's understanding of the intrinsic record alone, the Court should reverse the district court's indefiniteness finding, and construe "non-exhaustive search" as proposed by Network-1.

> **2. If this Court considers the extrinsic record, it further supports Network-1's construction and the district court's analysis of it is fatally flawed.**

The district court's indefiniteness finding is premised on the legally erroneous conclusion that because "the ***extrinsic evidence*** suggests that a [POSITA] might reasonably define 'non-exhaustive search' in multiple ways," "non-exhaustive search" is indefinite. Appx38. But even assuming there are multiple possible *Phillips* constructions (there are not), that formulation is contrary to controlling precedent. "The test for indefiniteness is whether the claims, viewed in light of the specification and prosecution history, 'inform those skilled in the art about the scope of the invention with reasonable certainty.' ***The test is not merely whether a claim is susceptible to different interpretations. Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction.***" *Nevro*, 955 F.3d at 41 (quoting *Nautilus*, 572 U.S. at 910). *Nautilus* "declin[ed] to adopt a test rendering a patent invalid 'when a claim is ambiguous,

such that reasonably could interpret the claim's scope differently.'" *Id.* (quoting *Nautilus*, 572 U.S. at 909).

Here, the district court posited three "reasonable" constructions in view of the extrinsic evidence: (1) Network-1's proposed *Phillips* construction; (2) this Court's BRI construction from the IPR appeal; and (3) a "definition" from the extrinsic source "Denny," which neither party proposed: "search strategies that traverse the search space more or less at random and thus certain states may never be examined." Appx38 (cleaned up). But only the first definition (Network-1's proposal) is supported by both the intrinsic and extrinsic records; the second definition was determined under a different legal framework (Section IV.C.1.b); and the third "definition" is not a definition at all, but rather a description of how a non-exhaustive search algorithm may operate.

### a. *Extrinsic references offer the same distinction between "exhaustive" and "non-exhaustive" searches as the Asserted Patents.*

Network-1 presented numerous extrinsic references, none of which was before this Court in the prior IPR appeal. For example, Denny explains "***non-exhaustive search*** strategies … traverse the search space more or less at random and thus ***certain states may never be examined***." Appx3011; Appx3003. Denny additionally describes two techniques as "non-exhaustive because it ***cannot be guaranteed that every state within the search space will be examined***." Appx3010;

Appx2786 (¶52). Like the intrinsic record, Denny makes clear the difference between exhaustive and non-exhaustive searches is whether all "states" are examined or not. The district court ignored this relevant point, instead focusing on Denny's description of non-exhaustive searches "travers[ing] the search space more or less at random" (Appx3011), concluding this is a possible construction despite no party or expert proposing it (Appx38), and finding Network-1's proposal "inconsistent" with Denny because it does not contain similar language (Appx35). But this language simply describes *how* a non-exhaustive search may operate, not what it is or what it is designed to do. If the district court's conclusion that "traversing the search space more or less at random" is a possible construction amounts to fact-finding, that was clear error. Section IV.C.2.b.

The district court also points to Denny's "backtracking"/"pruning" and Mitzenmacher's testimony concerning it, concluding both are inconsistent with Network-1's construction. Appx33-36. But Denny states "[b]acktracking is a general term representing a technique for performing an ***exhaustive search***," and describes that backtracking algorithms can "use intelligent pruning techniques, such as rejecting partial feasible solutions which either cannot extend to valid solutions or are equivalent in some way to feasible solutions already considered." Appx3012. Mitzenmacher explained this "search is still exhaustive because … you're implicitly or even in some sense explicitly ***doing the comparison of the [query] against every***

*item*." Appx3579 (175:14-176:8); Appx3582 (186:3-12). Thus, "Denny's 'pruning' relates to the length of time needed for individual comparisons …, not the number of comparisons needing to be performed." Appx2786 (¶52 n.3). If the district court's conclusion that Denny's "backtracking"/"pruning" meets Plaintiff's proposed construction of "<u>non</u>-exhaustive search" amounted to fact-finding, that was also clear error. Section IV.C.2.b.

As another example, Orwant explains "[t]he technique of generating and analyzing all of the possible states of a situation is called an *exhaustive search*. An exhaustive search is the generative analog of linear search—try everything until you succeed or run out of things to try." Appx3017 (emphasis in original); Appx3015. The district court acknowledged "Orwant's definition of exhaustive search appears similar to Plaintiff's," but then points to a portion of Orwant, a reference focused on searches relevant to computer gaming, stating "the definition of exhaustive search is vague. The exact meaning of 'try everything' depends upon the particular problem. Each problem has its own way of trying everything, and often many different ways." Appx36 (quoting Appx3020); Appx2787 (¶53). These statements concern nothing more than the unremarkable proposition that two searches with different goals or applications, even if both exhaustive, may be performed in different ways. Appx3950-3951 (¶¶12-13). They do not indicate that "try everything" (the salient feature of an exhaustive search) is "vague."

Separately, Google's own patents also use this terminology consistent with the Asserted Patents. U.S. Patent No. 7,831,438 states "an ***exhaustive search*** may be performed ***over all $2^n$ T's***," where T corresponds to a dataset of titles. Appx3060 (8:1-18); Appx3041. This is akin to the Asserted Patents' description of a "search of all *N* entries." Appx96 (9:24-28); Appx2787-2788 (¶54). And like the Asserted Patents, U.S. Patent No. 8,065,733 describes applications where the "solution 'space' is too large to perform an exhaustive search over" because "the number of possible numerical solutions to a given problem exceeds an available or allowed computation capacity." Appx3082 (9:7-12); Appx3067; Appx2787-2788 (¶54). The district court ignored the plain text of these patents, and Mitzenmacher's testimony concerning them, when it held, without explanation, "the use of [exhaustive search] in Google's patents sheds no light on the proper construction of 'non-exhaustive search.'" Appx37 (n.14). If this amounts to fact-finding, this was clear error. Section IV.C.2.b.

> ### b.    *The district court's fact-finding on the extrinsic evidence should be vacated for clear error.*

The only fact-finding the district court arguably did was conclude (1) Denny's "traverse the search space more or less at random" was a viable construction (*supra* at 62); (2) Denny's exhaustive "backtracking" algorithm would fall within the scope of Network-1's construction of "non-exhaustive search" (*supra* at 62-63); (3) Google patents that use "exhaustive search" "shed[] no light on the proper

construction of 'non-exhaustive search'" (*supra* at 64); and (4) "the *extrinsic evidence* demonstrates that the term 'non-exhaustive search' has multiple possible meanings" (Appx41). The first three findings were clearly erroneous. *Supra* at 62-64.

The "multiple possible meanings" finding was also clearly erroneous. The alleged "possible meanings" are Network-1's *Phillips* construction, this Court's BRI construction, and Denny's "traverse the search space more or less at random" language. Appx38. But the BRI construction is not the correct *Phillips* construction (Section IV.C.1.b) and the conclusion this language from Denny could be is clearly erroneous (*supra* at 62).

But even if there were three possible constructions, that is not the proper test for indefiniteness. *Nevro*, 955 F.3d at 41; *supra* at 60-61. This Court recently rejected this exact reasoning. In *Neonode Smartphone LLC v. Samsung Electronics Co.*, Samsung argued a term was indefinite because it "has three possible meanings, with no way to choose among them." No. 2023-2304, 2024 WL 3873566, at *4 (Fed. Cir. Aug. 20, 2024). The panel explained "Samsung cannot establish indefiniteness by merely identifying different ways one could interpret the [disputed] limitation. Such a test would render nearly every claim term indefinite so long as a party would manufacture a plausible construction." *Id.* (cleaned up). The panel also found they could "quickly dispose of Samsung's second and third proposed meanings as

65

inconsistent with the intrinsic record." *Id.* at *5. The Court can do the same here. Section IV.C.1.b; *supra* at 62. The "multiple possible meanings" finding should be vacated for clear error.

> ### c.    If this Court remands the definiteness issue, it should remand for a jury trial because there are factual issues concerning the extrinsic evidence that preclude summary judgment.

The district court's grant of summary judgment of indefiniteness was inappropriate because there are triable issues of disputed fact requiring resolution by a jury. The district court held that "Plaintiff's citation to pre-*Teva* case law for the proposition that the submission of extrinsic evidence creates an issue of fact for the jury is unpersuasive." Appx40-41 (n.16).

First, it is not Network-1's position that mere submission of extrinsic evidence creates triable factual issues. Rather, as with any summary judgment issue, the extrinsic evidence must create genuine disputes of fact. In this case it does. Section IV.C.2.a-b.

Second, the district court's reliance on *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) to imply indefiniteness cannot be a jury issue is, at best, misplaced. In *Teva*, a Hatch-Waxman case in which there is no right to a jury trial, the Supreme Court held subsidiary fact determinations in claim construction orders are reviewed for clear error, not *de novo*. *Id.* at 322. It did not address whether

genuine issues of fact preclude summary judgment of indefiniteness in a jury case because that issue was not before it.

This Court has, post-*Teva*, rejected the argument that indefiniteness cannot be a jury issue, confirming "indefiniteness 'is amenable to resolution by the jury where the issues are factual in nature.'" *Bombardier*, 785 F. App'x at 867 (quoting *BJ Servs.*, 338 F.3d at 1372). Here, disputed factual issues concerning the extrinsic record are, for example, (1) whether a POSITA would have understood whether "backtracking"/"pruning" is an "exhaustive" or "non-exhaustive" search; and (2) whether a POSITA would have understood Google's use of "exhaustive search" in its patents as informative of the differences between "exhaustive" and "non-exhaustive" searches.

As in *Bombardier*, "[t]he evidence presented on these topics was almost exclusively extrinsic, in large part encompassing warring expert testimony." *Id.* Indeed, Google's expert James Storer expressly disagreed with Mitzenmacher on how the extrinsic evidence should be viewed. *Compare* Appx3179-Appx3195 (¶¶42-80); Appx3161 *with* Appx2786-Appx2788 (¶¶51-55); Appx3948-3953 (¶¶11-17).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when "he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

Rather, Network-1 has "[t]he right to confront, cross-examine and impeach adverse witnesses" like Storer because this "is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases." *Adickes*, 398 U.S. at 176. If this Court finds evaluation of extrinsic evidence necessary, it should remand for a jury trial on this issue.

## VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

This Court should reverse the district court's grant of summary judgment of non-infringement of the 237 Asserted Claims because Network-1 presented more than enough evidence concerning the "sublinear" limitation, for both versions of Content-ID, for the issue to go to the jury.

This Court should also reverse the district court's holding that "non-exhaustive" renders the 988 and 464 Asserted Claims indefinite, and construe it as "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor," as it is clear from the intrinsic record that is the proper construction. Alternatively, if this Court finds consideration of extrinsic evidence necessary, it should vacate the district court's clearly erroneous fact-finding and remand for a jury trial, as disputed issues of fact concerning the extrinsic evidence preclude summary judgment, including competing expert testimony.

October 15, 2024                    Respectfully submitted,

                                   */s/ Brian D. Ledahl*
                                   Marc A. Fenster
                                   mfenster@raklaw.com
                                   Brian D. Ledahl
                                   bledahl@raklaw.com
                                   Amy E. Hayden
                                   ahayden@raklaw.com
                                   Russ, August & Kabat
                                   12424 Wilshire Blvd., 12th Floor
                                   Los Angeles, CA 90025
                                   Tel: (310) 826-7474

                                   *Counsel for Appellant*
                                   *Network-1 Technologies, Inc.*

## **ADDENDUM**

## **Addendum Table of Contents**

| Page No. | Document |
|---|---|
| i-xvi | Stipulated Confidentiality Agreement and Protective Order, 2396 Case, Dkt. No. 48 (Oct. 29, 2014) |
| xvii-xxx | Stipulated Supplemental Protective Order Governing Source Code, 2396 Case, Dkt. No. 168 (Aug. 19, 2019) |
| Appx1-77 | Claim Construction and Summary Judgment Memorandum Opinion and Order (Dkt. No. 303) |
| Appx78 | Judgment (Dkt. No. 309) |
| Appx79-105 | U.S. Patent No. 8,010,988 ("the '988 patent") |
| Appx106-134 | U.S. Patent No. 8,205,237 ("the '237 patent") |
| Appx135-163 | U.S. Patent No. 8,904,464 ("the '464 patent") |
| Appx165-217 | Docket sheet for the 2396 Case |
| Appx218-260 | Docket sheet for the 9558 Case |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

NETWORK-1 TECHNOLOGIES, INC.,   §
   §
   Plaintiff,   §
   §   Case No. 1:14-cv-02396-PGG
v.   §
   §
GOOGLE, INC. and YOUTUBE, LLC   §
   §
   §
   Defendants.   §
-------------------------------------------------------------X

10/29/14

## STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER

PAUL G. GARDEPHE, U.S.D.J.:

      WHEREAS, all the parties to this action (collectively the "Parties" and individually a "Party") request that this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect the confidentiality of nonpublic and competitively sensitive information that they may need to disclose in connection with discovery in this action;

      WHEREAS, the Parties, through counsel, agree to the following terms; and

      WHEREAS, this Court finds good cause exists for issuance of an appropriately tailored confidentiality order governing the pretrial phase of this action,

      IT IS HEREBY ORDERED that any person subject to this Order – including without limitation the Parties to this action (including their respective corporate parents, successors, and assigns), their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Order— will adhere to the following terms, upon pain of contempt:

i

1. With respect to "Discovery Material" (i.e., information of any kind produced or disclosed in the course of discovery in this action) that a person has designated as "Confidential" or "Confidential Outside Counsel Only" (collectively "Protected Discovery Material") pursuant to this Order, no person subject to this Order may disclose such Protected Discovery Material to anyone else except as this Order expressly permits.

2. The Party or person producing or disclosing Discovery Material (the "Producing Party") to another party (the "Receiving Party") may designate as "Confidential" only the portion of such material that it reasonably and in good faith believes consists of:

> (a) previously non-publicly disclosed financial information (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins);
>
> (b) previously non-publicly disclosed material relating to ownership or control of any non-public company;
>
> (c) previously non-publicly disclosed business, product-development, technical, sales, marketing, financial, or other commercially sensitive  information;
>
> (d) any information of a personal or intimate nature regarding any individual; or
>
> (e) any other category of information this Court subsequently affords confidential status.

3. The Producing Party may designate as "Confidential Outside Counsel Only" only the portion of such material that it reasonably and in good faith believes consists of:

> (a) non-public, confidential information that provides a commercial advantage to the Producing Party and describes with particularity the technical implementation of the Producing Party's proprietary products or services,

2

ii

which the Producing Party believes in good faith would cause it competitive

harm if disclosed to the Receiving Party; or

(b) non-public, confidential information that provides a commercial advantage to

the Producing Party and describes with particularity strategic financial or

business information related to existing and prospective customers, clients, and

partners, which the Producing Party believes in good faith would cause it

competitive harm if disclosed to the Receiving Party.

4. With respect to the confidential portion of any Discovery Material other than

deposition transcripts and exhibits, the Producing Party or its counsel may designate such portion

as Protected Discovery Material by: (a) stamping or otherwise clearly marking as "Confidential"

or "Confidential Outside Counsel Only" the protected portion in a manner that will not interfere

with legibility or audibility.

5. A Producing Party or its counsel may designate deposition exhibits or portions

of deposition transcripts as Protected Discovery Material either by: (a) indicating on the record

during the deposition that a question calls for "Confidential" or "Confidential Outside Counsel

Only" information, in which case the reporter will bind the transcript of the designated testimony

in a separate volume and mark it as "Confidential" or "Confidential Outside Counsel Only" or (b)

notifying all counsel of record in writing, within 24 hours after a deposition has concluded if the

Producing Party contends that the deposition contained "Confidential" or "Confidential Outside

Counsel Only" material, in which event, the Producing Party must request an expedited transcript

of the deposition and identify the specific pages and lines of the transcript that are to be so

designated within 48 hours of receipt of such transcript.  During the 24-hour period following a

deposition, all Parties will treat the entire deposition transcript as if it had been designated "Confidential Outside Counsel Only."

6. If at any time before the trial of this action a Producing Party realizes that it should have designated as "Confidential" or "Confidential Outside Counsel Only" some portion(s) of Discovery Material that it previously produced without limitation, the Producing Party may so designate such material by so apprising all prior recipients in writing. Thereafter, this Court and all persons subject to this Order will treat such designated portion(s) as Protected Discovery Material.

7. Nothing contained in this Order will be construed as: (a) a waiver by a Party or person of its right to object to any discovery request; (b) a waiver of any privilege or protection; or (c) a ruling regarding the admissibility at trial of any document, testimony, or other evidence.

8. Where a Producing Party has designated Discovery Material as "Confidential," other persons subject to this Order may disclose such information only to the following persons:

> (a) outside counsel retained specifically for this action, including any paralegal, clerical, or other assistant that such outside counsel employs and assigns to this matter;
>
> (b) outside vendors or service providers (such as copy-service providers and document-management consultants) that counsel hire and assign to this matter;
>
> (c) any mediator or arbitrator that the Parties engage in this matter or that this Court appoints, provided such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto in accordance with paragraph 11;

(d) as to any document, its author, its recipient, and any other person indicated on the face of the document as having received a copy;

(e) any person a Party retains to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action, provided such person is an independent, outside consultant (i.e., not an employee of a party), and has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto in accordance with paragraph 11;

(f) stenographers engaged to transcribe depositions the Parties conduct in this action;

(g) this Court, including any appellate court, its support personnel, and court reporters; and

(h) up to three employees of the Parties, provided each such person has first executed a Non-Disclosure Agreement in the form annexed as an Exhibit hereto in accordance with paragraph 11.

9. Where a Producing Party has designated Discovery Material as "Confidential Outside Counsel Only," other persons subject to this Order may disclose such information only to the persons or entities listed in paragraphs 8(a)-(g) subject to any terms set forth or incorporated therein and not any person or entity listed in paragraph 8(h).

10. Upon entry of a protective order in this action and prior to the deadline for substantial completion of document production, the parties will make productions of confidential documents. After reviewing these productions, the parties will work together to determine whether production of source code material will be necessary in this case and, if so, will submit a second protective order governing the inspection of such material. If the parties are unable to

reach agreement regarding a protective order governing the inspection of source code, they will address their dispute to this Court in accordance with paragraph 4(E) of this Court's Individual Rules.

11. Before disclosing any Protected Discovery Material to any person referred to in subparagraphs 8(c), (e), or (h) above ("Covered Individuals"), counsel must provide a copy of this Order to such Covered Individual, who must sign a Non-Disclosure Agreement in the form annexed as an Exhibit hereto stating that he or she has read this Order and agrees to be bound by its terms. Said counsel must provide a copy of each signed Non-Disclosure Agreement; the Covered Individual's name, address, curriculum vitae, current employer, employment history for the past ten years; a listing of cases in which the Covered Individual has testified as an expert at trial or by deposition within the preceding five years; and an identification of any patents or patent applications in which the Covered Individual is identified as an inventor or applicant, is involved in prosecuting or maintaining, or has any pecuniary interest to the Producing Party, who shall have ten business days after such notice is given to object in writing to the disclosure. No Protected Discovery Material shall be disclosed to such Covered Individual until after the expiration of the foregoing notice period and resolution of any objection.

(a) A party objecting to disclosure of Protected Information to a Covered Individual shall state with particularity the ground(s) of the objection and the specific bates ranges of documents that are the subject of the objection. The objecting party's consent to the disclosure of Protected Information to a Covered Individual shall not be unreasonably withheld, and its objection must be based on that party's good faith belief that disclosure of its Protected Information to

the Covered Individual will result in specific business or economic harm to that

party.

(b) If after consideration of the objection, the party desiring to disclose the

Protected Information to a Covered Individual refuses to withdraw the Covered

Individual, that party shall provide notice to the objecting party. Thereafter, the

objecting party shall move the Court, within ten business days of receiving such

notice, for a ruling on its objection. A failure to file a motion within the ten

business day period, absent an agreement of the parties to the contrary or for an

extension of such ten business day period, shall operate as an approval of

disclosure of the identified bates ranges of Protected Information to the Covered

Individual. The parties agree to cooperate in good faith to shorten the time

frames set forth in this paragraph if necessary to abide by any discovery or

briefing schedules.

(c) The objecting party shall have the burden of showing to the Court "good

cause" for preventing the disclosure of its Protected Information to the Covered

Individual. This "good cause" shall include a particularized showing that: (1)

the Protected Information is confidential commercial information, (2) disclosure

of the Protected Information likely would result in a clearly defined and serious

injury to the objecting party's business, (3) the Covered Individual is in a

position to allow the Protected Information to be disclosed to or become known

by the objecting party's competitors, and (4) that the Covered Individual's access

to Protected Information may create other confidentiality or legal risks in

connection with other patent-related activities or interests tied to the Covered Individual.

(d) A party who has not previously objected to disclosure of Protected Information to a Covered Individual or whose objection has been resolved with respect to previously produced information shall not be precluded from raising an objection to a Covered Individual at a later time with respect to materials or information that are produced after the time for objecting to such a Covered Individual has expired. Any such objection shall be handled in accordance with the provisions set forth above in paragraphs 11(a)-(c).

12. In accordance with paragraph 2 of this Court's Individual Rules, any party filing documents under seal must simultaneously file with the Court a letter brief and supporting declaration justifying – on a particularized basis – the continued sealing of such documents. The parties should be aware that the Court will unseal documents if it is unable to make "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006).

13. The Court also retains discretion whether to afford confidential treatment to any Discovery Material designated as "Confidential," or "Confidential Outside Counsel Only" and submitted to the Court in connection with any motion, application, or proceeding that may result in an order and/or decision by the Court.

14. A party shall provide a minimum of two business days' notice to the Producing Party in the event that a party intends to use any Protected Information during trial. In addition, the parties will not oppose any request by the Producing Party that the courtroom

should be sealed, if allowed by the Court, during the presentation of any testimony relating to or involving the use of any Protected Information.

15. In filing Protected Discovery Material with this Court, or filing portions of any pleadings, motions, or other papers that disclose such Protected Discovery Material ("Confidential Court Submission"), the Parties shall publicly file a redacted copy of the Confidential Court Submission via the Electronic Case Filing System. The Parties shall file an unredacted copy of the Confidential Court Submission under seal with the Clerk of this Court, and the Parties shall serve this Court and opposing counsel with unredacted courtesy copies of the Confidential Court Submission.

16. Any Party who objects to any designation of confidentiality may at any time before the trial of this action serve upon counsel for the Producing Party a written notice stating with particularity the grounds of the objection. If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with paragraph 4(E) of this Court's Individual Rules.

17. Any Party who requests additional limits on disclosure, may at any time before the trial of this action serve upon counsel for the recipient Parties a written notice stating with particularity the grounds of the request. If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with paragraph 4(E) of this Court's Individual Rules.

18. Recipients of Protected Discovery Material under this Order may use such material solely for the prosecution and defense of this action and any appeals thereto, and not for any business, commercial, or competitive purpose or in any other litigation proceeding. Nothing

contained in this Order, however, will affect or restrict the rights of any Party with respect to its own documents or information produced in this action.

19. Each person who has access to Discovery Material designated as Confidential pursuant to this Order must take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

20. Nothing in this Order will prevent any Party from producing any Protected Discovery Material in its possession in response to a lawful subpoena or other compulsory process, or if required to produce by law or by any government agency having jurisdiction, provided that such Party gives written notice to the Producing Party as soon as reasonably possible, and if permitted by the time allowed under the request, at least 10 business days before any disclosure. Upon receiving such notice, the Producing Party will bear the burden to oppose compliance with the subpoena, other compulsory process, or other legal notice if the Producing Party deems it appropriate to do so.

21. Within 60 days of the final disposition of this action – including all appeals – all recipients of Protected Discovery Material must either return it – including all copies thereof – to the Producing Party, or, upon permission of the Producing Party, destroy such material – including all copies thereof. In either event, by the 60-day deadline, the recipient must certify its return or destruction by submitting a written certification to the Producing Party that affirms that it has not retained any copies, abstracts, compilations, summaries, or other forms of reproducing or capturing any of the Protected Discovery Material. Notwithstanding this provision, the outside attorneys that the Parties have specifically retained for this action may retain an archival copy of all pleadings, motion papers, transcripts, expert reports, legal memoranda, correspondence, or attorney work product, even if such materials contain Protected Discovery Material. Any such

archival copies that contain or constitute Protected Discovery Material remain subject to this
Order.

        22. The Producing Party may further designate materials within the scope of
paragraph 3(a) as "Prosecution/Acquisition Bar Materials" where such materials describe the
current or any contemplated future implementation of the Producing Party's proprietary products
or services. Any person reviewing any of another party's materials that are designated as
"Prosecution/Acquisition Bar Materials" shall not, for a period commencing upon receipt of such
information and ending two years following the conclusion of this case (including any appeals)
engage in any Prosecution Activity. Prosecution Activity shall mean the drafting or amending of
patent claims or advising clients on the drafting or amending of patent claims relating to the use
of extracted features to automatically identify or recognize audio or video content. Nothing in
this paragraph shall prevent any attorney from sending non-confidential prior art to an attorney
involved in patent prosecution for purposes of ensuring that such prior art is submitted to the
U.S. Patent and Trademark Office (or any similar agency of a foreign government) to assist a
patent applicant in complying with its duty of candor. Nothing in this provision shall prohibit any
attorney of record in this litigation from discussing any aspect of this case that is reasonably
necessary for the prosecution or defense of any claim or counterclaim in this litigation with
his/her client.

        23. Any person reviewing any of another party's materials that are designated as
"Prosecution/Acquisition Bar Materials" shall not, for a period commencing upon receipt of such
information and ending two years following the conclusion of this case (including any appeals)
engage in any Acquisition Activity on behalf of a party or related entity asserting a patent in this
case. Acquisition Activity shall mean any activity related to: (i) the acquisition of patents or

patent applications claiming the use of extracted features to automatically identify or recognize audio or video content; or (ii) advising or counseling clients regarding the same. Acquisition Activity shall not mean activities involved in acting as, advising, or representing the seller of patents or patent applications.

24. Nothing in this Protective Order shall require production of information that a party contends is protected from disclosure by the attorney-client privilege, the work product immunity or other privilege, doctrine, right, or immunity. Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privilege or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or any other federal or state proceeding. A Producing Party may assert privilege or protection over produced documents at any time by notifying the Receiving Party in writing of the assertion of privilege or protection. In addition, information that contains privileged matter or attorney work product shall be immediately returned if such information appears on its face to have been inadvertently produced.

25. Inadvertent or unintentional production of documents or things containing Protected Information which are not designated as one or more of the three categories of Protected Information at the time of production shall not be deemed a waiver in whole or in part of a claim for confidential treatment. With respect to documents, the Producing Party shall immediately upon discovery notify the other parties of the error in writing and provide replacement pages bearing the appropriate confidentiality legend. In the event of any disclosure of Protected Information other than in a manner authorized by this Protective Order, including any unintentional or inadvertent disclosure, counsel for the party responsible for the disclosure

shall immediately notify opposing counsel of all of the pertinent facts, and make every effort to further prevent unauthorized disclosure including, retrieving all copies of the Protected Information from the recipient(s) thereof, and securing the agreement of the recipients not to further disseminate the Protected Information in any form. Compliance with the foregoing shall not prevent the Producing Party from seeking further relief from the Court.

26. A nonparty producing information or material voluntarily or pursuant to a subpoena or a court order may designate such material or information as Protected Information pursuant to the terms of this Protective Order. A nonparty's use of this Protective Order to protect its Protected Information does not entitle that nonparty access to the Protected Information produced by any party in this case.

27. Testifying experts shall not be subject to discovery of any draft of their reports in this case and such draft reports, notes, outlines, or any other writings leading up to an issued report(s) in this litigation are exempt from discovery. In addition, all communications between counsel for a party and that party's testifying expert, and all materials generated by a testifying expert with respect to that person's work, are exempt from discovery unless they relate to the expert's compensation or identify facts, data or assumptions relied upon by the expert in forming any opinions in this litigation and such information is not already disclosed in the expert's report.

28. No party shall be required to identify on their respective privilege log any document or communication dated on or after the filing of the lawsuit, which absent this provision, the party would have been obligated to so identify on said privilege log.

29. This Order will survive the termination of the litigation and will continue to be binding upon all persons to whom Protected Discovery Material is produced or disclosed.

30. This Court will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

Case 1:14-cv-02396-PGG-MHD   Document 17   Page: 101   Filed: 10/15/2024
Case 1:14-cv-02396-PGG-MHD   Document 46   Filed 10/29/14   Page 15 of 16
Case 1:14-cv-02396-PGG-MHD   Document 46-1   Filed 10/28/14   Page 15 of 16

SO STIPULATED AND AGREED.

Dated:  October 27, 2014                              Respectfully submitted,

/s/ Charles R. Macedo                                /s/ Douglas R. Nemec

Charles R. Macedo                                    Douglas R. Nemec
AMSTER, ROTHSTEIN & EBENSTEIN LLP                    Marti A. Johnson
                                                     Andrew D. Gish
90 Park Avenue                                       SKADDEN ARPS SLATE
New York, New York 10016                                MEAGHER & FLOM LLP
(212) 336-8074                                       Four Times Square
(212) 336-8001                                       New York, NY 10036
cmacedo@arelaw.com                                   Tel: (212) 735-3000
                                                     Fax: (917) 777-2419
Marc A. Fenster (pro hac vice)                       Douglas.Nemec@skadden.com
Brian D. Ledahl (pro hac vice)                       Marti.Johnson@skadden.com
Benjamin T. Wang (pro hac vice)                      Andrew.Gish@skadden.com
RUSS AUGUST & KABAT
12424 Wilshire Boulevard 12th Floor                  OF COUNSEL:
Los Angeles, California 90025                        James J. Elacqua
(310) 826-7474                                       Ian Chen
(310) 826-6991                                       SKADDEN ARPS SLATE
mfenster@raklaw.com                                     MEAGHER & FLOM LLP
bledahl@raklaw.com                                   525 University Avenue, Ste. 1100
bwang@raklaw.com                                     Palo Alto, CA 94301
                                                     Tel: (650) 470-4500
Attorneys for Network-1                              Fax: (650) 470-4570
Technologies, Inc.                                   James.Elacqua@skadden.com
                                                     Ian.Chen@skadden.com

                                                     Attorneys for Defendants
                                                     Google Inc. and YouTube, LLC


                              SO ORDERED.                    10/28/14

                              _____
                              Hon. Michael H. Dolinger
                              United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NETWORK-1 TECHNOLOGIES, INC.,              §
                                           §
                 Plaintiff,                §
                                           §        Case No. 1:14-cv-02396-PGG
v.                                         §
                                           §
GOOGLE, INC. and YOUTUBE, LLC              §
                                           §
                                           §
                 Defendants.               §
-------------------------------------------------------------X

## NON-DISCLOSURE AGREEMENT

I, _____, acknowledge that I have read and understand the Protective Order in this action governing the non-disclosure of those portions of Discovery Material that have been designated as Confidential. I agree that I will not disclose such Protected Discovery Material to anyone other than for purposes of this litigation and that at the conclusion of the litigation I will return all discovery information to the Party or attorney from whom I received it. By acknowledging these obligations under the Protective Order, I understand that I am submitting myself to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Protective Order could subject me to punishment for contempt of Court.  I have attached my resume, curriculum vitae, or other information to this executed Confidentiality Agreement sufficient to identify my current employer and employment history for the past ten years, and the cases in which I have testified as an expert at trial or by deposition within the preceding five years.

_____

Dated:

16

xvi

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK-1 TECHNOLOGIES, INC. | |
| Plaintiff, | 14 Civ. 2396 (PGG) |
| - against - | 14 Civ. 9558 (PGG) |
| GOOGLE LLC and YOUTUBE, LLC | |
| Defendants. | |

## STIPULATED SUPPLEMENTAL
## PROTECTIVE ORDER GOVERNING SOURCE CODE

PAUL G. GARDEPHE, U.S.D.J.:

WHEREAS, on October 29, 2014, this Court entered a Stipulated Confidentiality Agreement and Protective Order (No. 1:14-cv-02396, Dkt. No. 48) (the "Standing Protective Order");

WHEREAS, the parties agreed in related Case No. 1:14-cv-09558, which has since been consolidated with Case No. 1:14-cv-02396, that the Standing Protective Order applies to that case as well (No. 1:14-cv-09558, Dkt. No. 23.1 ¶ 10);

WHEREAS, the Standing Protective Order stated that the parties will work together to determine whether source code material will be necessary in this case and, if so, will submit a second protective order governing the inspection of such material (No. 1:14-cv-02396, Dkt. No. 48 ¶ 10);

WHEREAS, both cases referenced above were stayed pending proceedings before the U.S. Patent and Trademark Office and the U.S. Court of Appeals for the Federal Circuit;

WHEREAS, following the lifting of the stays and the consolidation of the cases, all the parties to this action (collectively the "Parties" and individually a "Party") now request that this Court issue a supplemental protective order pursuant to paragraph 10 of the Standing Protective Order and Federal Rule of Civil Procedure 26(c) to protect the confidentiality of any nonpublic and competitively sensitive source code information they disclose;

WHEREAS, the Parties, through counsel, agree to the following terms; and

WHEREAS, this Court finds good cause exists for issuance of an appropriately tailored confidentiality order governing source code,

IT IS HEREBY ORDERED that any person subject to this Order—including without limitation the Parties to this action (and their respective corporate parents, successors, and assigns), their representatives, agents, experts, and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this Order—will adhere to the following terms, upon pain of contempt:

1.      This Order supplements the Standing Protective Order, and incorporates by reference the terms of the Standing Protective Order.

2.      To the extent production of source code becomes necessary in this case, a Producing Party may designate material as "HIGHLY CONFIDENTIAL – SOURCE CODE" if it contains or substantively relates to a Party's "Source Code," which shall mean documents containing or substantively relating to confidential, proprietary, and/or trade secret text that defines software, firmware, or electronic hardware descriptions written in human-readable programming languages, including but not limited to C, C++, Java, assembler, VHDL, Verilog, and SQL. In the event that a document contains both information that may be properly designated "HIGHLY CONFIDENTIAL – SOURCE CODE" and information that may not be

2

properly designated "HIGHLY CONFIDENTIAL – SOURCE CODE," if the "HIGHLY
CONFIDENTIAL – SOURCE CODE" information comprises less than seventy-five percent
(75%) of such document, then such document will be produced (1) in the ordinary manner (i.e.,
electronically), but with the "HIGHLY CONFIDENTIAL – SOURCE CODE" information
redacted; and (2) in unredacted form, designated as "HIGHLY CONFIDENTIAL – SOURCE
CODE, on a Source Code Computer (defined below). For avoidance of doubt, documents that
do not contain or substantively relate to Source Code shall not be designated as "HIGHLY
CONFIDENTIAL – SOURCE CODE."

3.    Discovery Material designated as "HIGHLY CONFIDENTIAL – SOURCE
CODE" shall be subject to all of the protections afforded to "Confidential Outside Counsel
Only" information and "Prosecution/Acquisition Bar Materials" by the Standing Protective
Order. For the avoidance of doubt, where "Confidential Outside Counsel Only" information is
entitled to a lesser degree of protection than "HIGHLY CONFIDENTIAL – SOURCE CODE,"
the greater protections applicable to "HIGHLY CONFIDENTIAL – SOURCE CODE" shall
apply. For the avoidance of doubt, all Discovery Material designated as "HIGHLY
CONFIDENTIAL – SOURCE CODE" shall be considered "Prosecution/Acquisition Bar
Materials."

4.    Unless otherwise ordered by the Court or permitted in writing by the Producing
Party, a Receiving Party may disclose any information or item designated "HIGHLY
CONFIDENTIAL – SOURCE CODE" only to:

(a) the Receiving Party's outside counsel of record in this action (excluding any
counsel of record affiliated with Amster Rothstein & Ebenstein LLP), as well as employees of
said outside counsel of record to whom it is reasonably necessary to disclose the information for

3

xix

this litigation (excluding any employees of Amster Rothstein & Ebenstein LLP);

(b) up to three (3) outside experts or consultants per party, pre-approved in accordance with paragraph 11 of the Standing Protective Order, provided that such persons first additionally execute the "Non-Disclosure Agreement Governing Source Code" (in the form annexed as an Exhibit hereto) and provide an executed copy to the Producing Party at least three (3) business days prior to accessing Source Code;

(c) the Court and its personnel;

(d) stenographic reporters, videographers, and their respective staff who are transcribing or videotaping a deposition wherein "HIGHLY CONFIDENTIAL – SOURCE CODE" information is being discussed, provided that such reporters and videographers shall not retain or be given copies of any portions of the Source Code, which if used during a deposition, will not be attached as an exhibit to the transcript but instead shall be identified only by its production numbers; and

(e) while testifying at deposition or trial in this action only: (i) any current or former officer, director, or employee of the Producing Party; (ii) any person designated by the Producing Party to provide testimony pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure; (iii) any person who authored, previously received (other than in connection with this litigation), or was directly involved in creating, modifying, or editing the "HIGHLY CONFIDENTIAL – SOURCE CODE" information, as evident from its face or reasonably certain in view of other testimony or evidence; and/or (iv) any outside expert or consultant who has been approved to access Source Code as set forth in paragraph 4(b). Persons authorized to view "HIGHLY CONFIDENTIAL – SOURCE CODE" information pursuant to this sub-paragraph shall not retain or be given copies of the "HIGHLY CONFIDENTIAL – SOURCE

4

XX

CODE" information except while so testifying. Only printed copies of the Source Code will be provided to testifying witnesses during their testimony.

5.     Any Source Code, including unredacted versions of documentation containing "HIGHLY CONFIDENTIAL – SOURCE CODE" information as described in paragraph 2, produced in discovery shall only be made available for inspection, not produced except as set forth below, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at the office of the Producing Party's primary outside counsel of record. The Source Code shall be made available for inspection on a secured computer (the "Source Code Computer") in a secured, locked room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the Source Code onto any recordable media or recordable device. The secured computer shall have disk encryption and be password protected. Use or possession of any input/output device (e.g., USB memory stick, mobile phone or tablet, camera or any camera-enabled device, CD, floppy disk, portable hard drive, laptop, or any device that can access the Internet or any other network or external system, etc.) is prohibited while accessing the computer containing the Source Code (other than the non-networked computer and storage device described in paragraph 6 below for purposes of taking notes). All persons entering the locked room containing the Source Code must agree to submit to reasonable security measures to ensure they are not carrying any prohibited items before they will be given access to the locked room. The computer containing Source Code will be made available for inspection during regular business hours, upon reasonable notice to the Producing Party, which shall not be less than 3 business days in advance of the requested inspection. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any Source Code

review, but only to ensure that there is no unauthorized recording, copying, or transmission of the Source Code, but the Producing Party shall not listen in on, or otherwise inhibit the Receiving Party's privileged communications in the room.

6.     The Receiving Party's outside counsel of record and/or outside experts or consultants shall be entitled to take notes relating to the Source Code; provided, however, that such notes shall not copy, remove, or otherwise transfer any portions of the Source Code. The Producing Party shall provide a non-networked computer ("Notetaking Computer") for the Receiving Party to take typewritten notes during Source Code review. Such typewritten notes are permitted to include but are not limited to the following information: file names, line numbers, method/variable names, narrative thoughts on how different modules interact, and general descriptions of functions that may be called. The Receiving Party shall be prohibited from accessing the Internet on the Notetaking Computer, or using the Notetaking Computer for any purpose other than taking notes during the Source Code review.

7.     The Parties agree that Jennifer B. Maisel, Esq., of Rothwell, Figg, Ernst & Manbeck, P.C. ("the Third-Party Note Reviewer") shall perform a visual scan of the notes taken on the Notetaking Computer.[1] The Parties hereby agree to the Court's entry of an order under Federal Rule of Evidence 502(d) providing that no privilege or protection covering the Receiving Party's notes taken on the Notetaking Computer will be waived in this pending litigation by disclosure to the Third-Party Note Reviewer, and that such disclosure also is not a waiver in any other federal or state proceeding. The Parties further agree that the role of Third-Party Note Reviewer will not create an attorney-client relationship between any Party and the Third-Party Note Reviewer or his or her law firm.

---

[1] The Parties may agree on an additional Third-Party Note Reviewer should the need arise.

6

8. At the end of each day that the Receiving Party reviews Source Code, the Third-Party Note Reviewer will have the opportunity to perform a visual scan of the notes taken on the Notetaking Computer ("the Scan"). The purpose of the Scan is solely to confirm that the Receiving Party has not copied Source Code in violation of this Order. The Producing Party will not attempt to discover from the Third-Party Note Reviewer or from the Notetaking Computer the Receiving Party's attorney-client privileged information or work product (e.g., legal strategy). No other scan or review of the notes taken on the Notetaking Computer shall be permitted. The Third-Party Note Reviewer shall have no involvement in this action except for performing the Scan, and will not discuss the case or the notes taken on the Notetaking Computer with any attorney working on the matter.[2] However, should a dispute arise regarding any part of the notes taken on the Notetaking Computer, the Third-Party Note Reviewer is permitted to communicate the details of the dispute to one of the Producing Party's Outside Counsel of Record working on the action. The Scan shall not result in a waiver of the work-product protection or any other privilege or protection from disclosure, as will be confirmed by the entry of a Rule 502(d) order as provided above. In the event that, after performing the Scan, the Third-Party Note Reviewer has no objections to the notes taken on the Notetaking Computer, the notes shall be transferred to the Receiving Party by USB drive or similar storage device transfer ("the USB Drive"). The USB Drive shall be encrypted and subject to all the same protections provided in this Order for information designated as "HIGHLY CONFIDENTIAL – SOURCE CODE." Such typewritten notes shall be deleted from the Notetaking Computer upon

---

[2] This Order does not prevent the Parties from compensating the Third-Party Note Reviewer for his or her time performing the Scan and addressing any disputes that should arise. The Parties agree that Google will compensate the Third-Party Note Reviewer at his or her standard hourly rate for time spent performing his or her duties in this litigation.

7

transfer to the Receiving Party.

     9.     Except as otherwise provided herein, no person shall copy, e-mail, transmit, upload, download, print, photograph, or otherwise duplicate any portion of the designated "HIGHLY CONFIDENTIAL – SOURCE CODE" material, except that the Receiving Party may request paper copies of limited portions of Source Code, but only if and to the extent reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial. In no event may the Receiving Party print more than 25 consecutive pages, or an aggregate total of more than 500 pages, of Source Code during the duration of the case without prior written approval by the Producing Party. The Receiving Party shall not request paper copies for the purposes of reviewing the Source Code other than electronically as set forth in paragraph 4 in the first instance. Within 5 business days or such additional time as necessary due to volume requested, the Producing Party will provide the requested material on watermarked or colored paper bearing Bates numbers and the legend "HIGHLY CONFIDENTIAL – SOURCE CODE" unless objected to as discussed below. At the Receiving Party's request, up to two additional sets (or subsets) of printed Source Code may be requested and provided by the Producing Party in a timely fashion. In the event that the Receiving Party wishes to use additional sets of the printed Source Code at a deposition, it shall give the Producing Party at least three (3) days' notice of its intent to use such additional sets of the printed Source Code at the deposition. Upon receiving such request, the Producing Party shall bring up to two (2) additional sets of printed Source Code to the deposition, exclusively for use at the deposition. Such additional sets of the printed Source Code shall remain in the custody of the Producing Party after the deposition is complete. Even if within the limits described, the Producing Party may challenge the amount of Source Code requested in hard copy form or

8

xxiv

whether the Source Code requested in hard copy form is reasonably necessary to any case preparation activity pursuant to the dispute resolution procedure set forth in paragraph 16 of the Standing Protective Order. A Receiving Party may request Source Code printouts in excess of the limits described. The parties shall meet and confer concerning any such request, and if agreement cannot be reached, they shall follow the dispute resolution procedure set forth in paragraph 17 of the Standing Protective Order. Contested printouts do not need to be produced to the Receiving Party until the matter is resolved by the Court.

10. The Receiving Party shall maintain a record of any individual who has inspected any portion of the Source Code in electronic or paper form. The Receiving Party shall maintain all printed portions of the Source Code in a secured, locked area under the direct control of counsel responsible for maintaining the security and confidentiality of the designated materials. Any paper copies designated "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be stored or viewed only at (i) the offices of outside counsel for the Receiving Party; (ii) the offices of outside experts or consultants who have been approved to access Source Code; (iii) the site where any deposition is taken; (iv) the Court; or (v) any intermediate location necessary to transport the information to a hearing, trial, or deposition. Except as provided in paragraph 12, the Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. Any printed pages of Source Code, and any other documents or things reflecting Source Code that have been designated by the Producing Party as "HIGHLY CONFIDENTIAL – SOURCE CODE" may not be copied, digitally imaged, or otherwise duplicated, except in limited excerpts necessary to attach as exhibits to depositions, expert reports, or court filings as discussed below. Any such excerpts shall be redacted from any publicly filed documents. Any paper copies used

9

during a deposition shall be retrieved by the Receiving Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.[3]

11. The Receiving Party's outside counsel and/or expert shall be entitled to take notes relating to the Source Code but may not copy any portion of the Source Code into the notes. No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein. Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein.

12. A list of names of persons who will view the Source Code will be provided to the Producing Party in conjunction with any written (including email) notice requesting inspection. The Receiving Party shall maintain a daily log of the names of persons who enter the locked room to view the Source Code and when they enter and depart. The Producing Party shall be entitled to a copy of the log.

13. The Receiving Party's outside counsel shall maintain a log of all copies of the Source Code (received from a Producing Party) that are delivered by the Receiving Party to any person. The log shall include the names of the recipients and reviewers of copies and locations where the copies are stored. Upon request by the Producing Party, the Receiving Party shall provide reasonable assurances and/or descriptions of the security measures employed by the Receiving Party and/or person that receives a copy of any portion of the Source Code.

14. Except as provided in this paragraph, the Receiving Party may not create electronic images, or any other images, of the Source Code from the paper copy for use on a

---

[3] The nature of the Source Code at issue may warrant additional protections or restrictions. For example, it may be appropriate under certain circumstances to require the Receiving Party to provide notice to the Producing Party before including "HIGHLY CONFIDENTIAL – SOURCE CODE" information in a court filing, pleading, or expert report.

10

computer (e.g., may not scan the Source Code to a PDF, or photograph the code). The Receiving

Party may create an electronic copy or image of limited excerpts of Source Code only to the

extent necessary for it to be used in a pleading, exhibit, expert report, discovery document,

deposition transcript, other Court document, or any drafts of these documents ("SOURCE CODE

DOCUMENTS"). The Receiving Party shall only include such excerpts as are reasonably

necessary for the purposes for which such part of the Source Code is used. Images or copies of

Source Code shall not be included in correspondence between the parties (references to

production numbers shall be used instead) and shall be omitted from pleadings and other papers

except to the extent permitted herein. The Receiving Party may create an electronic image of a

selected portion of the Source Code only when the electronic file containing such image has been

encrypted using commercially reasonable encryption software including password protection.

The communication and/or disclosure of electronic files containing any portion of Source Code

shall at all times be limited to individuals who are authorized to see Source Code under the

provisions of this Protective Order. Additionally, all electronic copies must be labeled

"HIGHLY CONFIDENTIAL – SOURCE CODE."

15.     To the extent portions of Source Code are quoted in a SOURCE CODE

DOCUMENT, either (1) the entire document will be stamped and treated as "HIGHLY

CONFIDENTIAL – SOURCE CODE" or (2) those pages containing quoted Source Code will be

separately bound, and stamped and treated as "HIGHLY CONFIDENTIAL – SOURCE CODE."

16.     The Receiving Party shall maintain a log of all electronic images and paper copies

of Source Code Material in its possession or in the possession of its retained consultants,

including the names of the recipients and reviewers of any electronic or paper copies and the

locations where the copies are stored.

11

SO STIPULATED AND AGREED.

Dated: August 14, 2019

Marc A. Fenster (*pro hac vice*)
Brian D. Ledahl (*pro hac vice*)
Adam S. Hoffman (*pro hac vice*)
Paul A. Kroeger (*pro hac vice*)
Amy E. Hayden (*pro hac vice*)
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474

Charles R. Macedo
AMSTER ROTHSTEIN & EBENSTEIN LLP
90 Park Avenue
New York, NY 10016
(212) 336-8000

*Attorneys for Plaintiff Network-1 Technologies, Inc.*

Kevin Hardy (*pro hac vice*)
Samuel Bryant Davidoff
Andrew V. Trask
Christopher A. Suarez (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005
(202) 434-5000

For Matters in New York:
WILLIAMS & CONNOLLY LLP
650 Fifth Avenue, Suite 1500
New York, NY 10019

*Attorneys for Defendants Google LLC and YouTube, LLC*

SO ORDERED.

Hon. Paul G. Gardephe

August 19, 2019

12

xxviii

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK-1 TECHNOLOGIES, INC. | |
| Plaintiff, | 14 Civ. 2396 (PGG) |
| - against - | 14 Civ. 9558 (PGG) |
| GOOGLE LLC and YOUTUBE, LLC | |
| Defendants. | |

## NON-DISCLOSURE AGREEMENT GOVERNING SOURCE CODE

I, _____, acknowledge that I have read and understand the Stipulated Supplemental Protective Order Governing Source Code in this action governing the non-disclosure of those portions of Discovery Material that have been designated as HIGHLY CONFIDENTIAL – SOURCE CODE, and the underlying Stipulated Confidentiality Agreement and Protective Order (No. 1:14-cv-02396, Dkt. No. 48) (the "Standing Protective Order"). I agree that I will strictly adhere to the terms of the Stipulated Supplemental Protective Order Governing Source Code and the Standing Protective Order. I agree that I will not disclose such Discovery Material designated as HIGHLY CONFIDENTIAL – SOURCE CODE to anyone other than for purposes of this litigation and that at the conclusion of the litigation I will return all discovery information to the Party or attorney from whom I received it. By acknowledging these obligations under the Stipulated Supplemental Protective Order Governing Source Code, I understand that I am submitting myself to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Stipulated

13

Supplemental Protective Order Governing Source Code could subject me to punishment for

contempt of Court. I have attached my resume, curriculum vitae, or other information to this

executed Non-Disclosure Agreement Governing Source Code sufficient to identify my current

employer and employment history for the past ten years, and the cases in which I have testified

as an expert at trial or by deposition within the preceding five years.

Dated: _____                           _____

14

XXX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NETWORK-1 TECHNOLOGIES, INC.,

Plaintiff,

-against-

GOOGLE LLC and YOUTUBE, LLC,

Defendants.

**MEMORANDUM
OPINION & ORDER**

14 Civ. 2396 (PGG)
14 Civ. 9558 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Network-1 Technologies, Inc. alleges that Defendants Google LLC and YouTube LLC (collectively, "Defendants" or "Google") have infringed three of Plaintiff's patents in connection with Defendants' "Content ID system and its implementation . . . [on] the YouTube [web]site."  (Cmplt. (Dkt. No. 2) ¶¶ 28, 34; 14 Civ. 9558 Cmplt. (Dkt. No. 1) ¶ 28)[1] Plaintiff alleges that Defendants have infringed the following patents:  United States Patent No. 8,010,988 (the "'988 Patent"); U.S. Patent No. 8,205,237 (the "'237 Patent"); and U.S. Patent No. 8,904,464 (the "'464 Patent").

Pending before the Court are (1) the parties' proposed construction of claims; (2) Defendants' motion for summary judgment on grounds of non-infringement; (3) Plaintiff's cross-motion for summary judgment as to certain affirmative defenses; and (4) Plaintiff's appeal from an October 14, 2022 discovery order issued by Magistrate Judge Sarah Netburn.

For the reasons stated below, the Court concludes that the asserted claims of the '988 and '464 Patents are invalid as indefinite, and that Defendants are entitled to summary judgment on Plaintiff's infringement claim premised on the asserted claims of the '237 Patent.

---

[1]  Unless otherwise noted, all citations refer to the docket in 14 Civ. 2396.

Plaintiff's cross-motion for summary judgment will be denied, and Plaintiff's appeal from Judge

Netburn's discovery order will be denied as moot.

I.    <u>FACTS</u>[2]

A.    <u>Plaintiff's Patents</u>

All three patents at issue were originally issued to Dr. Ingemar Cox, a professor of

computer science at University College London.  These patents are now owned by Plaintiff.

(<u>See</u> Cmplt. (Dkt. No. 2) ¶¶ 7-10)

The patents at issue "link[] traditional media to new interactive media, such as

that provided over the [i]nternet," and address the "identif[ication] [of] a [media] work without

the need of inserting an identification code into a [media] work."  ('988 Patent (Dkt. No. 148-4)

col. 1, 4); '237 Patent (Dkt. No. 148-5) col. 1, 4 (same); '464 Patent (Dkt. No. 148-6) col. 1, 4

(same))[3]  "[E]mbodiments consistent with the [patents at issue] provide a computer-implemented

method, apparatus, or computer-executable programs for linking a media work to an action.

Such embodiments might (a) extract features from the media work, (b) determine an

identification of the media work based on the features extracted using a sub-linear time search,

such as an approximate nearest neighbor search for example, and (c) determine an action based

---

[2]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  <u>See</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  <u>See</u> <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)
[3]  Except as to deposition transcripts and patents, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  With respect to deposition transcripts, the Court cites to the page numbers originally assigned by the court reporter.  With respect to patents, the Court cites to the internal sheet, figure, and column numbers.

on the identification of the media work determined." ('237 Patent (Dkt. No. 148-5) col. 4; '464

Patent (Dkt. No. 148-6) col. 4 (same); '988 Patent (Dkt. No. 148-4) col. 4 (same))

Claim 15 of the '988 Patent concerns:

A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting features from the electronic work;

b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

('988 Patent (Dkt. No. 148-4) col. 25-26)

Claim 17 of the '988 Patent concerns "[t]he method of claim **15**, wherein the

non-exhaustive search is sublinear." (Id. at col. 26 (emphasis in original))

Claim 33 of the '237 Patent concerns:

A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined identification of the media work.

('237 Patent (Dkt. No. 148-5) col. 28)

3

Appx3

Claim 34 of the '237 Patent concerns "[t]he method of claim **33**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work." (Id. (emphasis in original))

Claim 35 of the '237 Patent concerns "[t]he method of claim **34** wherein the additional information is an advertisement." (Id. (emphasis in original))

Claim 1 of the '464 Patent concerns:

A method comprising:

receiving, by a computer system including at least one computer, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

obtaining, by the computer system from the user electronic device, a request related to the associated tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

('464 Patent (Dkt. No. 148-5) col. 24-25)

4

Claim 8 of the '464 Patent concerns "[t]he method of claim **1**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another." (Id. at col. 25 (emphasis in original))

Claim 10 of the '464 Patent concerns "[t]he method of claim **1**, wherein the associated information is related to an advertisement." (Id. (emphasis in original))

Claim 16 of the '464 Patent concerns "[t]he method of claim **1**, wherein the machine-readable instructions comprise a hyperlink to a URL." (Id. (emphasis in original))

Claim 18 of the '464 patent concerns:

A method comprising:

receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

receiving, by the computer system, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

5

providing, from the computer system to the first user electronic device, the
machine-readable instructions to perform the action in response to the request.

(Id. at col. 25-26).

Claim 25 of the '464 Patent concerns "[t]he method of claim **18**, wherein the first

electronic media work is received from a first electronic device, the associated information is

received from a second electronic device, and the first electronic device, the second electronic

device, and the user electronic device are different from one another."  (Id. at col. 26 (emphasis

in original))

Claim 27 of the '464 Patent concerns "[t]he method of claim **18**, wherein the

associated information is related to an advertisement."  (Id. (emphasis in original))

Claim 33 of the '464 Patent concerns "[t]he method of claim **18**, wherein the

machine-readable instructions comprise a hyperlink to a URL."  (Id. (emphasis in original))

### C.    **Defendants' Websites**

Defendants operate the website www.youtube.com and the mobile website

m.youtube.com and related mobile applications (collectively, "YouTube").  (See Def. R. 56.1

Stmt. (Dkt. No. 225) ¶ 21)  YouTube allows internet users to upload content – whether video,

audio, or melody – to the internet, where content is generally viewable by the public.  (See id. ¶¶

22-24)

Google employs a "Content ID" system in connection with YouTube.  The

Content ID system allows content owners – "e.g., individuals and entities that own rights to

music, television shows, and movies" – to control how their content is used on YouTube.  (Id.

¶ 22)  The Content ID system determines "whether videos uploaded by YouTube users contain []

video, audio, or melody content" that "belongs" to another person – for example, a copyright

holder.  (Id. ¶¶ 23-24; Pltf. R.56.1 Counterstmt. (Dkt. No. 240-61) ¶ 23)  "For example, if a

6

Appx6

**CONFIDENTIAL MATERIAL OMITTED**

YouTube user uploads a video of herself dancing to a popular song, then the Content ID system may generate a match between the . . . user-uploaded video and . . . the popular song (<u>i.e.</u>, the reference work)" and take some predetermined action based on that match.  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 25)  The Content ID system generates matches by comparing uploaded videos ("query works") to a database of reference works.  The reference works may have been uploaded to YouTube by users, or otherwise provided to YouTube by the reference work's author or owner, or another rightsholder.  (<u>See id.</u> ¶¶ 28, 32)

According to Plaintiff, there are two versions of Google's Content ID system that infringe on Plaintiff's patents:  an "older" version known as the "LSH" version, and a "newer" version known as "Siberia."  (<u>See id.</u> ¶¶ 26-27)  Implementation of the Siberia system began in approximately 2014.  (<u>See</u> Pasula Dep. (Dkt. No. 240-5) at 11)

### 1.    <u>The LSH Version of Content ID</u>

The LSH version of Google's Content ID system generates "fingerprints" that each represent an individual piece of "video, audio, [or] melody content . . . uploaded or otherwise provided to YouTube."  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 69-70)  Each fingerprint is comprised of several "subfingerprints" corresponding to short snippets of that content.  (<u>Id.</u> ¶ 70)  Subfingerprints for both query works and reference works are generated in the same manner. (<u>Id.</u> ¶¶ 71-72)  For indexing purposes, subfingerprints are organized into ▮▮▮▮▮▮▮ called "locality sensitive hashing" ("LSH") bands.  (<u>Id.</u> ¶¶ 73-75)  "The number of unique LSH bands is finite; specifically, there are▮▮ ▮▮▮▮▮▮▮▮▮▮▮"  and the same LSH band could be associated with multiple videos.  (<u>Id.</u> ¶¶ 77-78)

"[T]he LSH index [can] be visualized as a 'table' in which each unique LSH band is assigned its own 'row' and each reference video is assigned its own 'column.'"  (<u>Id.</u> ¶ 84)

7

Indeed, the structure used to store the LSH bands for reference videos is known as Big Table. (Pltf. R. 56.1 Counterstmt (Dkt. No. 240-61) ¶ 159; Erbo Dep. (Dkt. No. 240-3) at 75 ("[The LSH Version of Content ID was] implemented in terms of a Google Technology called Big Table, which is a distributed key value store.")) Each new reference video added to the LSH index represents a new column in the table, reflecting the LSH bands associated with the new reference video. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 91-93)

"Stage I of the LSH version of the Content ID system [begins] by searching [the] index . . . for any LSH bands [associated with reference works] that are exact matches to any of the [query] LSH bands of the user-uploaded video." (Id. ¶ 80) "A search of the LSH index using a particular query LSH band searched only the row assigned to that particular LSH band and did not search any of the other rows in the conceptual table." (Id. ¶ 85) In other words, a search of the LSH index returns only the references associated with a particular LSH band, and ███████████████████████████████████████████████████ ███████████████████████████████ (Pltf. R. 56.1 Counterstmt (Dkt. No. 240-61) ¶¶ 159-62)

The output for a Stage I search of the LSH version of Content ID is a list of all of the reference videos associated with the query LSH bands of a newly uploaded video, "as well as the pertinent point(s) in time in each reference video with which the LSH band[s] are associated." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 87) "A typical user-uploaded or reference video ███████████████████████████████████████████ ███████████████, and one subfingerprint corresponds to only a short snippet or frame of video, audio, or melody content." (Id. ¶ 90)

8

**CONFIDENTIAL MATERIAL OMITTED**

The "index hits" returned by a Stage I search are then further processed "to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from reference work to features extracted from the [query video]." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 201; see also Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 94) The "projection filter" first analyzes the videos by ███████████████████ ███ to determine whether the query video and a particular reference video share sufficient similarities over time – that is, over enough time of the reference video – to be considered a match.[4]  (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 202)

Stage II of the LSH search compares full fingerprints of query videos to each reference video to determine the number of "raw matches." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 96)

The raw matches are then passed through the "claiming logic" to determine whether the owner of the relevant reference video could "claim" the matching portion of the query work and which "match policy" should be applied to the query work. (Id. ¶¶ 97-99)

### 2.   **The Siberia Version of Content ID**

The Siberia version of Google's Content ID system generates "embeddings" corresponding "to a short snippet or frame of [the] video, audio, or melody content" uploaded to YouTube. (Id. ¶ 29)  As explained by Google, each embedding represents a single frame in a video, and represents a point in a ████████████████. (Id. ¶ 30; Pasula Dep. (Dkt. No. 240-

---

[4]  The Court understands "Hamming similarities" to refer to a form of "Hamming distance," which generally measures "the number of . . . places in which [works] differ from one another." Andrew Butterfield, et al., A Dictionary of Computer Science (7th ed. 2016). Here, "Hamming similarities" refer to the number of places in which works are similar. (See Mitzenmacher Dep. (Dkt. No. 240-9) at 292 ("[T]he [H]amming similarity . . . essentially counts the number of matching positions. . . . [I]n this case, the score is meant to correspond to a level of similarity between the two objects specifically.")).

9

5) at 22-24 ("[An embedding] . . . is a point in a ███████████[,] . . . a vector which is a description of a point in space. . . . [A]n individual embedding     . . . [is] a single frame [in a video].")) For each video uploaded to YouTube, Siberia generates a "'sequence of embeddings' corresponding to the [work's] video, audio, and melody content." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 28 (quoting Pasula Dep. (Dkt. No. 240-5) at 29)) The embeddings are generated by a ███████████ that is part of a Google artificial intelligence project. (Id. ¶ 31) The same process is used to create both the "query" embeddings "corresponding to videos uploaded by YouTube users" and the "reference" embeddings "corresponding to content . . . provided or identified by copyright holders or other YouTube partners." (Id. ¶ 32)

The reference embeddings are then "further manipulated" into uniformly structured ███████████████ which are in turn stored in multiple references indices for searching. (Id. ¶¶ 33-35; Pasula Dep. (Dkt. No. 240-5) at 45-46 ███████████ ███████████)) The hashing enables the Siberia system to store the reference embeddings in a smaller form and to search the reference indices more quickly. (See Pasula Dep. (Dkt. No. 240-5) at 47, 56 ███████████████ ████████████████████████████ ███████████)) "The reference indices that are searched as part of the Siberia Version of the Content ID system are ███████████ ███████"[5] (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 35)

---

[5] Plaintiff denies that the indices store only "hash values," and contends that "complete embeddings for the reference work are also retained in the reference index and are used for comparisons as part of the Siberia system search algorithm." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 35) In support of this assertion, Plaintiff cites an excerpt from a report prepared by Dr. Michael Mitzenmacher, its expert witness. The excerpt cited by Plaintiff states, however, that "[t]he ███████████ of each embedding is what is stored in the reference index."

**CONFIDENTIAL MATERIAL OMITTED**

The Siberia Content ID system contains multiple indices that are organized primarily by content type, for example, video as opposed to audio.  (<u>See</u> Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 220 ("Each of the reference indices (video, audio, and melody) is comprised of ▮▮▮▮▮▮▮ of the embeddings."); <u>see also</u> Pasula Dep. (Dkt. No. 240-5) at 32-33 ("A. . . . ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . . There is one index for melody . . . Q.  How many indexes for video are there?  A.  For this copyrighted content, just one. . . . [There are also] ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮"))

Each of the reference indices is structured in the same manner.  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 36)  Each index is "sharded," meaning that the index is "divided into a bunch of smaller indexes," known as shards, "that can each fit on one [computer]."  (Pasula Dep. (Dkt. No. 240-5) at 39; <u>see</u> Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 39)  For example, the large ▮▮▮▮▮▮▮▮▮▮▮▮ (the "Video Index") has ▮▮▮▮▮.  (Pasula Dep. (Dkt. No. 240-5) at 39; Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 39-40)  An index for different content might have a different number of shards.  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 39-40) ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 219; <u>see also</u> <u>id.</u> ¶ 220 ("Each of the reference indices (video, audio, and melody) is comprised of ▮▮▮▮▮▮ of the embeddings."))  And while the Dr. Mitzenmacher states that, at the final step of the search process, query embeddings are compared directly to reference embeddings – rather than to ▮▮▮▮▮▮ as in earlier stages of the search (<u>id.</u> ¶¶ 225-26) – that does not mean the indices "retain" "complete embeddings" in addition to hash values for each reference work.  (Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 35)  The original query embeddings can be recovered from the indexed hashes.  (<u>See</u> Pasula Dep. (Dkt. No. 240-5) at 46-47 ("A. . . . ▮▮▮▮▮▮▮▮▮▮▮ . . . ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A.  Yes."))

11

(Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 42)  Within the Video Index, for example, 

(See Pasula Dep. (Dkt. No. 240-5) at 40)

Within each shard, the hash values are further

(Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 37)

(Pasula Dep. (Dkt. No. 240-5) at 43-44

Each shard has . (Id.;

Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 221))

The search performed by the Siberia Content ID system has "three main stages:

'Index Lookup,' 'Sparse,' and 'Verifier.'"  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 43)  As

discussed above, when a new video is uploaded to YouTube, the Siberia system generates a

sequence of embeddings, with each individual embedding corresponding "to a short snippet or

frame of that . . . content."  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 29)  Those embeddings may be

referred to as the

(See

Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 219)

Using the Video Index as an example, at the Index Lookup stage – sometimes

referred to as the "ScaM" algorithm stage, because it was developed by Google's "Scalable

Matching [] research team" team (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 58) – query embeddings

12

**CONFIDENTIAL MATERIAL OMITTED**

are compared ███████████████████████████████████████████
██████████████. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 222-223 ("To be clear, the
system examines ██████████████████████████████████."); Def. R. 56.1 Stmt. (Dkt.
No. 225) ¶¶ 45-47; Pasula Dep. (Dkt. No. 240-5) at 54 ("[U]p to ███████████████ or
something like that would be passed ███████████████████")) The Index Lookup
then "████████████████████████████████████████████████
█████████████" for each shard, and then compares the query embeddings to all of the hash values
in each of those ████████████████. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 48-49;
Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223 ("The Content ID Siberia Version then examines
each of the █████████████████████████████████"))

In or about August 2020, Google modified the Index Lookup step for one of its
indexes to ████████████████████████ in a YouTube-wide effort to cut costs.
(See Pltf. Ex. 86 (Dkt. No. 274-2) at 6 (YouTube presentation indicating ████████████
████████████████; Supp. Konrad Dep. (Dkt. No. 274-3) at 30-31 (discussing an
internal Google document that ████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████))

The Index Lookup step outputs the ██ ██-████████████
████████████████████████████████████████████████████
████████████████████████████████████. (Def. R.
56.1 Stmt. (Dkt. No. 225) ¶¶ 51-52) Accordingly, for a search in the Video Index, the Index
Lookup step outputs a total of 12,500 hash values. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223)

13

**CONFIDENTIAL MATERIAL OMITTED**

At the "Sparse" stage, these ███████████████ – also referred to as "index hits" – are then further analyzed through a process called "sparse refiner," or "[S]parse." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 59, 60) ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ (Id. ¶ 60; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 224) Some reference works may have ████████████████████████████████████████████ ████████████████████████. (See Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 224) The Sparse process ████████████████████████████████████████████████████ ████████████████████████████. (See id.; Pasula Dep. (Dkt. No. 240-5) at 60, 63, 239-240 (noting that there ██████████████████████████████████████████ █████████████████████))

Finally, the reference videos that pass the Sparse process proceed to the "Verifier" stage, where "██████████████████████████████████████████████ ████████████████████████████████████████████████████████." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 61) "The [V]erifier determines whether a portion of any one or more of the references ████████████████████████████████████████████████████████ ████████████████████" (Id. ¶ 62)

Google has utilized "at least two versions of the [V]erifier." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 226) An earlier version ████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████. (Id.) The more recent version █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████' (Id.) The final matches output

14

from the Verifier are assigned a 

. (Id. ¶ 228)

The Siberia Contact ID's "claiming system" then determines whether

. (Id.)

## II.   **PROCEDURAL HISTORY**

The Complaint in 14 Civ. 2396 was filed on April 4, 2014, and alleges that

Defendants' Content ID system infringes on the '988 and '237 Patents.[6]  (Cmplt. (Dkt. No. 2))

The Complaint in 14 Civ. 9558 was filed on December 3, 2014, and alleges that Defendants'

Content ID system infringes on the '464 Patent.  (14 Civ. 9558, Cmplt. (Dkt. No. 1))  Defendants

filed their Answer in 14 Civ. 2396 on May 23, 2014, and filed their Answer in 14 Civ. 9558 on

January 23, 2015.  (Ans. (Dkt. No. 22); 14 Civ. 9558 Ans. (Dkt. No. 11))  On June 9, 2014, this

Court entered a civil case management plan in 14 Civ. 2396.  (Dkt. No. 31)

### A.   _**Inter Partes** Review_

In a June 30, 2015, joint letter, the parties informed the Court that Google had

petitioned the U.S. Patent and Trademark Office (the "PTO") to institute inter partes review

("IPR") of, inter alia, the '237 Patent and the '988 Patent.[7]  (Dkt. No. 83)  Accordingly, on July

---

[6] The Complaint also alleges claims regarding two other patents, but Plaintiff's claims regarding those patents were later dismissed by stipulation.  (Dkt. No. 134)

[7] "'[I]nter partes review[]' . . . allows private parties to challenge previously issued patent claims in an adversarial process before the Patent Office that mimics civil litigation."  SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1352 (2018).  "Once inter partes review is instituted, the Patent Trial and Appeal Board [the "PTAB"] – an adjudicatory body within the [PTO] created to conduct inter partes review – examines the patent's validity. . . . The [PTAB] sits in three-member panels of administrative patent judges. . . . During the inter partes review, the petitioner and the patent owner are entitled to certain discovery . . . ; to file affidavits, declarations, and written memoranda . . . ; and to receive an oral hearing before the Board. . . ."  Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC, 138 S. Ct. 1365, 1371 (2018) (citing 35 U.S.C. §§ 6, 316).

15

2, 2015, this Court stayed both actions pending resolution of the PTAB's IPR proceedings.  (Dkt.

No. 85; 14 Civ. 9558 Dkt. No. 35)

   The proceedings before the PTAB turned on the disputed claim term "non-

exhaustive search":

> In its decision instituting review of the '179 patent, the [PTAB] construed a "non-exhaustive search" as "a search that locates a match <u>without</u> a comparison of all possible matches."  <u>Google Inc. v. Network-1 Techs., Inc.</u>, IPR2015-00343, 2015 WL 3902007, at *3–4 (P.T.A.B. June 23, 2015) ("<u>Institution Decision</u>") (emphasis added).  In so doing, the Board declined to adopt Google's construction of the term:  "a search that locates a match without conducting a brute force comparison of all possible matches, and all data within all possible matches."  <u>Institution Decision</u> at *3.  Thereafter, in its final decision with respect to the '179 patent, the Board maintained its construction of "non-exhaustive search."  <u>Final Decision</u> at *2.  Based upon that construction, the Board determined that Google had failed to demonstrate that the cited prior art rendered the challenged claims of the '179 patent unpatentable as either anticipated or obvious.

<u>Google LLC v. Network-1 Techs., Inc.</u>, 726 F. App'x 779, 781 (Fed. Cir. 2018) (emphasis in

original).[8]

   Google appealed the PTAB's decision to the Federal Circuit.  In a March 26, 2018

decision, the Federal Circuit vacated the PTAB's decision, adopted Google's construction of the

claim term "non-exhaustive search," and remanded to the PTAB for further proceedings.  <u>Id.</u> at

786-87.

   The Federal Circuit began its analysis by noting that the parties agreed that, "in

conducting its inter partes review of the Network-1 Patents, the Board was required by its rules

---

[8] The Federal Circuit and the PTAB considered four of Plaintiff's patents:  the '988 Patent and '237 Patent at issue here, as well as Patent Nos. 8,640,179 (the "'179 Patent") and 8,656,441 (the "'441 Patent").  <u>See id.</u> at 780.  Because the parties "agree[d] that the written description of the '179 patent is representative, and that [the Federal Circuit's] determination of the correct construction of 'non-exhaustive search,' as it appears in claim 1 of the '179 patent, disposes of the claim construction issue in all four of the Network-1 Patents," the Federal Circuit "focus[ed] [its] discussion on the '179 patent."  <u>Id.</u> at 781.

to apply the broadest reasonable construction of the term 'non-exhaustive search' in light of the

patents' specifications." <u>Id.</u> at 782.

      The Federal Circuit also noted that the parties agreed,

> as they did before the [PTAB], that the linchpin of the claim construction analysis in this
> case is determining what an "exhaustive search" is. . . . That is so because a "non-
> exhaustive" search necessarily is a search that is not "exhaustive." Put another way, the
> claim limitation at issue does not require a search that <u>employs</u> a stated method (an
> "exhaustive" search). Rather, it requires a search that <u>does not employ</u> a stated method (a
> "non-exhaustive" search). As a result, in terms of claim construction, what must be
> determined is the meaning of the word "exhaustive." In that regard, before the Board, the
> parties agreed, and the Board concurred, that, generally, an "exhaustive" search means a
> "brute-force" search that sequentially considers all possible matches revealed in a search.
> <u>Institution Decision</u> at *3. Further, in the <u>Institution Decision</u>, the Board stated that a
> "non-exhaustive" search "encompasses anything other than a 'brute-force' search." <u>Id.</u> at
> *4. Where the parties part company is with respect to <u>the degree of exhaustion</u> required
> in order for a search to be "exhaustive."
>
> Google argues that the Board erred in accepting Network-1's contention that a search
> qualifies as "exhaustive" as long as it considers "any portion of each potential match—
> even a single bit of a long string." . . . As it did before the Board, Google urges that,
> instead, an "exhaustive" search must consider all data within each potential match,
> because only such a search will ensure "find[ing] the correct answer." . . . For example,
> consider a musical identification system in which each known piece in a database
> contains two parts, an introduction and a chorus. If the system compares an unknown
> melody to every known work in the database, but does so only on the basis of the
> database songs' introductions, the search is not "exhaustive" because it ignores the
> choruses. Thus, Google would argue, both the introduction (first part) and the chorus
> (second part) of each song in the database must be checked in order for a search to be
> "exhaustive."
>
> Google's argument is based upon the proposition that the broadest construction of "non-
> exhaustive" searching corresponds to the <u>narrowest</u> construction of "exhaustive"
> searching. According to Google, the narrowest construction of "exhaustive" searching
> requires considering the entirety of each potential match, not just a single part of it.

<u>Id.</u> at 782-83 (footnotes omitted) (emphases in original).[9]

---

[9] The Federal Circuit offered another illustration of the Board's construction v. Google's
construction: "[A] database of court names contains a potential match 'Court of Appeals for the
Federal Circuit,' and the query is 'Federal Circuit.' The Board's construction would find a
search 'exhaustive' if it looked at the first letter of the query, 'F,' determined that it did not
match 'C,' and moved on – even if the search was a neighbor search rather than a search for

17

The Federal Circuit concluded that "[o]f the two competing constructions, Google's is, in fact, broader." Id. at 784. "That is because Google's construction (through its narrower construction of 'exhaustive') necessarily encompasses all of the searches covered by the Board's construction. The Board's construction (through its broader construction of 'exhaustive'), on the other hand, does not necessarily encompass all of the searches covered by Google's construction." Id. The Federal Circuit went on to find that because the "intrinsic and extrinsic evidence" was "inconclusive as to the broader or narrower construction," Google's construction was the broadest reasonable interpretation of "non-exhaustive search." Id. at 786.

### B.    *Markman* Hearing

On January 2, 2019, the Court entered a stipulation and order lifting the stays that had been in place since July 2, 2015. (Dkt. No. 134; 14 Civ. 9558 Dkt. No. 79)  The parties agreed to terminate the IPR proceedings and narrow the claims asserted by Plaintiff in 14 Civ. 2396 to claim 17 of the '988 Patent and claims 33-35 of the '237 Patent. (Dkt. No. 134; 14 Civ. 9558 Dkt. No. 79)

On April 30, 2019, the parties filed an Amended Joint Claim Construction Chart. (Dkt. No. 146)  The parties claim construction briefing was fully submitted on August 9, 2019. (See Def. Claim Construction Sur-Reply (Dkt. No. 163))

On November 21, 2019, the Court conducted a Markman hearing. (Markman Tr. (Dkt. No. 204))  In a June 29, 2020 order, the Court informed the parties that it would "decide claim construction and summary judgment simultaneously," and directed the parties to "submit a

---

exact matches only. Similarly, if the query were 'Federal Circuit' and the database entry were 'First Circuit,' considering only the first letter would produce a false positive under the Board's construction. . . . Google's construction avoids false positives and false negatives by considering all the data within a match." Id. at 786.

18

joint letter that includes an agreed-upon briefing schedule for summary judgment." (Dkt. No. 219)

### C.   Summary Judgment

The parties' cross motions for summary judgment were initially fully briefed on November 11, 2020.  (Dkt. Nos. 223-241)  On July 11, 2022, the Court ordered the parties to provide additional briefing addressing the impact of supplemental discovery conducted by the parties after their cross-motions for summary judgment had been filed.  (Dkt. No. 266)  Plaintiff filed a supplemental brief in opposition to Defendants' motion for summary judgment on September 23, 2022, and Defendants' filed a response on September 30, 2022.  (Dkt. Nos. 274, 278)

### DISCUSSION

## I.   CLAIM CONSTRUCTION

### A.   Legal Standards

Claim construction is a question of law to be determined by the Court.  See Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-89 (1996).  When determining the scope of a patent, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."  Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable

the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention"); Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

There are two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner, 669 F.3d at 1365. Neither exception is relevant here.

The "ordinary and customary meaning" of a claim term should first be determined by the intrinsic evidence, which consists of the claims, the specification, and the prosecution history. See, e.g., Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 847-48 (Fed. Cir. 2006); Kinik Co. v. ITC, 362 F.3d 1359, 1365 (Fed. Cir. 2004). The patent specification is an important guide to claim construction. See, e.g., Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive."); Phillips, 415 F.3d at 1315–16 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.") (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998)). "A fundamental rule of claim construction is that terms . . . are construed with the meaning with which they are presented in the patent document. Thus[,] claims must be construed so as to be consistent with the specification." Merck & Co., Inc. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1370 (Fed. Cir. 2003) (citations omitted).

"Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and

20

articles." Vitronics, 90 F.3d at 1584. While a district court may consult extrinsic evidence as part of the claim construction analysis, such evidence is considered less reliable than the intrinsic evidence. See, e.g., Phillips, 415 F.3d at 1319 ("[T]he court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly.").

"A claim is invalid for indefiniteness if its language, read in light of the specification and prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" HZNP Medicines LLC v. Actavis Labs. UT, Inc., 940 F.3d 680, 688 (Fed. Cir. 2019) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014)). "The 'reasonable certainty' standard established in Nautilus reflects a delicate balance between the inherent limitations of language and providing clear notice of what is claimed." Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n, 936 F.3d 1353, 1359 (Fed. Cir. 2019) (internal quotation marks omitted). "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement[, however]." Id. (internal quotation marks omitted). "At bottom, the indefiniteness test 'mandates clarity, while recognizing that absolute precision is unattainable.'" Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co., Inc., 15 Civ. 10154 (PAE), 2018 WL 3773986, at *7 (S.D.N.Y. Aug. 9, 2018) (quoting One-E-Way, Inc. v. Int'l Trade Comm'n, 859 F.3d 1059, 1063 (Fed. Cir. 2017)). The party asserting indefiniteness has "the burden of proving indefiniteness by clear and convincing evidence." BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017).

**B.** **Agreed-Upon Constructions**

The parties having agreed to the following constructions of claim terms in the asserted patents and claims, this Court adopts these constructions for purposes of this action:

21

Appx21

| Claim Term | Agreed Construction | Asserted Claims in which Term Appears[10] |
|---|---|---|
| "sublinear" [search] | "A search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." | '988 patent: **17** '237 patent: **33**, 34, 35 |
| "neighbor" "near neighbor" | "A close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '988 patent: **(15)**, 17 '464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "near neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "approximate nearest neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or  the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '237 patent: **33**, 34, 35 |
| "machine-readable instructions" | "code or pseudocode that is executed using a computer processor, _i.e._, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors" | '464 patent: **1**, 8, 10, **16**, **18**, 25, 27, **33** |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2)

---

[10] "Bold numbers indicate claims explicitly reciting the claim term.  Non-bold numbers indicate claims depending from claims that explicitly recite the claim term.  Numbers in parentheses indicate a claim that is not currently asserted [that] recites the claim term, and a claim depending from that non-asserted claim is asserted."  (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2 n.2)

C.    **Disputed Terms**

The parties dispute four claim terms:  (1) "non-exhaustive search"; (2)

"correlation information"; (3) "extracted features"; and (4) "extracting features."

As discussed below, Plaintiff proposes constructions for all four terms.

Defendants propose constructions for "extracted features" and "extracting features," but contend

that "non-exhaustive search" and "correlation information" are indefinite.

| Claim Terms | Plaintiff's Construction | Defendants' Construction | Asserted Claims in which Term Appears[11] |
|---|---|---|---|
| "non-exhaustive search" "non-exhaustive . . . search" | "A search designed to locate a [near] neighbor without comparing to all possible matches (i.e., all records in the reference data set), even if the search does not locate a [near] neighbor." | Indefinite | '988 patent: **(15)**, 17<br><br>'464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "correlation information" | Ordinary meaning.<br><br>Alternatively: "information that associates the first electronic media work with an electronic media work identifier" | Indefinite. | '464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "extracted features" | "Electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work." | "Electronic data derived from a work itself, as opposed to from information added or appended to the work." | '988 patent: **(15)**, 17<br><br>'237 patent: **33**, 34, 35 |
| "extracting features" | "Sampling, calculating, or otherwise deriving electronic data from a work itself, as opposed to from information added or appended to the work." | "Deriving electronic data from a work itself, as opposed to from information added or appended to the work." | '988 patent: **(15)**, 17 |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

---

[11]  See supra n.10.

1.    "Non-Exhaustive Search"

The chart below depicts the various constructions of "non-exhaustive search" at issue here:

| Claim Term | Plaintiff's Construction | Defendants' Construction | Federal Circuit's "Broadest Reasonable Construction" |
|---|---|---|---|
| "non-exhaustive search" "non-exhaustive . . . search" | "A search designed to locate a [near] neighbor without comparing to all possible matches (i.e., all records in the reference data set), even if the search does not locate a [near] neighbor." | Indefinite | "A search that locates a match without conducting a brute force comparison of all possible matches, and all data within all possible matches." |

The disputed term "non-exhaustive search" is used in (1) independent claim 15 of the '988 patent, which is not asserted in this case; (2) dependent claim 17 of the '988 patent; and (3) all asserted claims of the '464 patent.  (See Pltf. Am. Infringement Contentions (Dkt. No. 226-2) at 2; Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

The relevant claims from the '988 patent, with the disputed term underlined, are as follows:

15.  A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:
   a) electronically extracting features from the electronic work;
   b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;
   c) electronically determining an action based on the identification of the electronic work; and
   d) electronically performing the action

17.  The method of claim 15, wherein the non-exhaustive search is sublinear.

('988 Patent (Dkt. No. 148-4) at 27)

24

Appx24

Defendants argue that "non-exhaustive search" is indefinite because the term "fails to 'provide objective boundaries for those of skill in the art'" in that (1) the intrinsic evidence does not "define the term's contours" and (2) the extrinsic evidence cited by Plaintiff "only amplifies the ambiguity inherent in the phrase 'non-exhaustive search.'" (Def. Claim Construction Br. (Dkt. No. 151) at 15-16 (quoting Interval Licensing, 766 F.3d at 1371))

### a.    **Intrinsic Evidence**

#### (i)    **Claim Language**

While neither side has discussed the claim language, frequently "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314. Here, claim 15 refers to a "non-exhaustive search identifying a neighbor" and claim 17 refers to a "non-exhaustive search [that] is sublinear." ('988 Patent (Dkt. No. 148-4) at 27) The use of this language "strongly implies that the term ['non-exhaustive search'] does not inherently mean" a search that identifies a neighbor or is sublinear. Phillips, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."); see also Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1334 (Fed. Cir. 2010) ("'Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.'" (quoting AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1242 (Fed.Cir. 2003)).

Omitting the "neighbor" limitation from the definition of "non-exhaustive search," Plaintiff's proposed construction is "[a] search designed to locate a [match] . . . without comparing to all possible matches (i.e., all records in the reference data set), even if the search

does not locate a [match]. . . ."  (Pltf. Claim Construction Br. (Dkt. No. 148) at 14)  Aside from

this insight, the claims do not shed light on the meaning of "non-exhaustive search."

<div align="center">

**(ii)**    <u>**Specification**</u>

</div>

As to the specification, Plaintiff cites the following language:

> The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**.  It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary.  Since the extracted vectors contain noise or distortions, binary search might not be possible.  Instead, a statistical comparison is often made between an extracted vector and each stored vector.  Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. . . .

> If binary search was possible, then a database containing N vectors would require at most log(N) comparisons.  Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal.  This problem is one of nearest neighbor search in a (high dimensional) feature space.  In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found.  On average, this will require N/2 comparisons.  If N is large, this search can be computationally very expensive.

> Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later.

> . . . .

> If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods.  Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found.  On average, this will require N/2 comparisons. If N is large, this can be computationally expensive.  Consider a situation in which one out of 100,000 possible commercials is to be identified.  Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000.  Even if only every 10th video frame is stored in the database, its size is still nine million.  While databases of this size are now common, they rely on efficient search to access entries, i.e., they do not perform a linear search.  A

<div align="center">

26

</div>

> binary search of a 90,000,000-item database requires less than 20 comparisons.
> In contrast, a linear search will require an average of 45,000,000!
>
> . . . .
>
> The recognition system described can be considered to be a form of nearest
> neighbor search in a high dimensional feature space. This problem has been very
> well studied and is known to be very difficult as the dimensionality of the vectors
> increases. A number of possible data structures are applicable including kd-trees
> and vantage point trees. These data structures and associated search algorithms
> organize a N-point dataset (N=90,000,000 in our previous example) so that
> sublinear time searches can be performed on average. However, worst-case
> search times can be considerably longer. Recently, Yianilos proposed an
> excluded middle vantage point forest for nearest neighbor search. See, e.g., the
> Yianilos reference. This data structure guarantees sub-linear worst-case search
> times, but where the search is now for a nearest neighbor within a fixed radius, T.
> The fixed radius search means that if the database contains a vector that is within
> X of the query, then there is a match. Otherwise, no match is found. In contrast,
> traditional vantage point trees will always return a nearest neighbor, even if the
> distance between the neighbor and the query is very large. In these cases, if the
> distance between the query and the nearest neighbor exceeds a threshold, then
> they are considered not to match. This is precisely what the excluded middle
> vantage point forest implicitly does.

('988 Patent (Dkt. No. 148-8) at col. 8-9, 21-22 (citations omitted))

       While the specification states that the "problem . . . of nearest neighbor search in a

(high dimensional) feature space" is best solved by application of a search method that is not

"computationally very expensive," these descriptions are addressed by the "nearest neighbor"

and "sublinear" limitations on which the parties have agreed-to constructions. (Id.)

       The Court concludes that the specification does not shed light on the correct

interpretation of "non-exhaustive search." Indeed, the words "exhaustive" and "non-exhaustive"

do not appear in the specification. And contrary to Plaintiff's arguments, the specification does

not list "binary search, clustering, kd-trees, vantage point trees, excluded middle vantage point

forests, and searches for neighbors" as "examples of non-exhaustive search methodologies."

(See Pltf. Claim Construction Br. (Dkt. No. 148) at 15) Nor does the specification "explain[]

27

that an exhaustive search potentially requires comparing the query to every record in a data set to be searched" (id.) when discussing a "linear search of all N entries." ('988 Patent (Dkt. No. 148-4) col. 9:25-27)  As Google points out, Network-1 made these same arguments during the IPR appeal, and the Federal Circuit rejected them.[12]  See Google LLC, 726 F. App'x at 785 ("We do

_____

[12]  The parties dispute the significance of the Federal Circuit decision to this Court's analysis.

Defendants argue that the "Federal Circuit addressed" the appropriate construction of "non-exhaustive search" in the IPR appeal, "which involved the same claim term and specifications . . . [and] intrinsic record that Network-1 relies upon here."  (Def. Claim Construction Br. (Dkt. No. 151) at 16 (citing Google LLC, 726 F. App'x at 780))  According to Defendants, the "Federal Circuit's opinion expressly rejected Network-1's argument that the specification 'identified' a 'non-exhaustive search' through its description of binary search, clustering, kd-trees, and other search techniques."  (Id.)  While the Court agrees with that characterization, that ruling is not dispositive here, because a different standard applies.

The Federal Circuit reversed the PTAB's construction of the term "non-exhaustive search" under the "broadest reasonable interpretation standard."  Google LLC, 726 F. App'x at 782 ("[T]he Board was required by its rules to apply the broadest reasonable construction of the term 'non-exhaustive search' in light of the patents' specifications.") (citing 37 C.F.R. § 42.100(b)).  "[U]nder the broadest reasonable construction standard, where two claim constructions are reasonable, the broader construction governs."  Id. at 784.  And in order for a broader construction "to be found reasonable, it is not necessary that a claim be given its correct construction under the framework laid out in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc)."  Id. (emphasis in original).

Under the Phillips framework, however, where two or more "reasonable" constructions of a term exist, it is possible that a "person of ordinary skill in the art" would find the narrower reasonable construction to be "the [claim term's] ordinary and customary meaning."  Phillips, 415 F.3d 1303.  The Federal Circuit's analysis of the patent's claims and specification, and its conclusion that they do not render Google's broader construction of "non-exhaustive search" unreasonable, is thus not per se incompatible with a different construction under the Phillips standard.  See, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, 815 F.3d 747, 756 (Fed. Cir. 2016) ("If we were tasked with reviewing the Board's construction according to Phillips, and in fact if the Board had applied the Phillips standard rather than the broadest reasonable construction, this case would be straight-forward.  PPC Broadband's construction is the only construction of the term consistent with the use of the same term throughout the specification.  But this case is much closer under the broadest reasonable interpretation standard given the ordinary meanings attributable to the term at issue."); Convolve, Inc. v. Compaq Comput. Corp., 812 F.3d 1313, 1325 (Fed. Cir. 2016) ("Our task is to interpret the scope of the claims per the

not agree, however, that these parts of the specification draw a clear line between 'exhaustive'

and 'non-exhaustive' searching in terms of how much data within a record a search must

consider in order to qualify as one or the other.").

        Finally, it is worth noting that the specification undermines – rather than supports

– Plaintiff's proposed construction. While Claims 15 and 17 require a search that "<u>does not</u>

<u>employ</u>" an "exhaustive" method, <u>Google LLC</u>, 726 F. App'x at 782, the specification does not

state that "linear correlation" or "a linear search of all N entries" should not be used. ('988

Patent (Dkt. No. 148-4) col. 9:1-25)  Indeed, the specification describes "linear correlation" as

among the "[c]ommon statistical measures" used to compare "an extracted vector [to] each

stored vector" (<u>id.</u> col. 9:3-5, 23-25 ("[In solving the] problem . . . of nearest neighbor search in a

(high-dimensional) feature space[] . . . it was not uncommon to perform a linear search of all N

---

<u>Phillips</u> standard. . . . Thus, the examiner's finding under the broadest reasonable interpretation .
. . cannot be dispositive.); <u>Personal Audio, LLC v. Google LLC</u>, 2019 WL 1150576, at *11 (D.
Del. Mar. 13, 2019) ("[W]hile construing the algorithm at issue to encompass any 'conditional'
algorithm might be acceptable under the [broadest reasonable interpretation] standard, it may not
be appropriate under the <u>Phillips</u> standard.").

This Court must thus undertake its own review of the intrinsic and extrinsic evidence to
determine whether "non-exhaustive search" "fail[s] to inform, with reasonable certainty, those
skilled in the art about the scope of the invention."  <u>Nautilus</u>, 572 U.S. at 901.

To the extent that Google argues that the "Federal Circuit's decision compels the conclusion that
the term is indeed indefinite" (Def. Claim Construction Br. (Dkt. No. 151) at 13), it is mistaken,
as a footnote in the <u>Google LLC</u> decision makes clear:

    In the district court, Google has advanced the argument that the claim term "non-exhaustive
    search" is indefinite.  <u>See</u> <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, – U.S. – , 134 S.Ct. 2120,
    2124, 189 L.Ed.2d 37 (2014) ("a patent is invalid for indefiniteness if its claims, read in light
    of the specification delineating the patent, and the prosecution history, fail to inform, with
    reasonable certainty, those skilled in the art about the scope of the invention").  In an IPR, the
    Board cannot declare claims indefinite.  <u>See</u> 35 U.S.C. § 311(b). The issue of indefiniteness
    is therefore not before us, and we express no view on it.

<u>Google LLC</u>, 726 Fed. App'x. at 782 n.3.

<div align="center">29</div>

entries.")), and states that a linear search "may be performed." (Id. col. 21:23-27)  And the specification states that a "binary search" – which Plaintiff cites as an exemplary "non-exhaustive" search methodology (Pltf. Claim Construction Br. (Dkt. No. 148) at 15) – is not "possible" in the context of the invention.  ('988 Patent (Dkt. No. 148-4) col. 21:23-27)  Similarly, the specification discusses the searches that Plaintiff describes as "non-exhaustive" as "[o]ther forms of matching," without stating that these searches should be used to the exclusion of linear correlation or any other methodology.  (Id. col. 9:29-32)

It is also not clear that certain of the embodiments listed in the specification and claims would meet Plaintiff's proposed construction of "non-exhaustive search."  A "search designed to locate a [near] neighbor without comparing to all possible matches[,] . . . even if the search does not locate a [near] neighbor," (Pltf. Claim Construction Br. (Dkt. No. 148) at 14), appears to exclude search methodologies that will always locate a neighbor, regardless of how dissimilar the "matched" stored vector is from the query.

The specification notes that in contrast to "an excluded middle vantage point forest[,] . . . traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large."  ('988 Patent (Dkt. No. 148-4) col. 22 (emphasis added))  And two of the academic papers that Plaintiff contends are incorporated by reference into the '988 Patent (see Pltf. Claim Construction Br. (Dkt. No. 148) at 15-16 & n.6, n.7) state that, "[f]or a worst case query, kd-tree search visits essentially the entire dataset." (Pltf. Claim Construction Br., Ex. 6, Peter N. Yianilos, Excluded Middle Vantage Point Forests for Nearest Neighbor Search, DIMACS Implementation Challenge: Near Neighbor Searches Workshop (1999) (Dkt. No. 148-17) at 2 ("Yianilos I") (Dkt. No. 148-17) at 3; see also id. Ex. 7 Peter N. Yianilos, Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search,

30

Symposium on Discrete Algorithms (SODA, 2000) ("Yianilos II") (Dkt. No. 148-18) at 3

("[Under certain circumstances] the kd-tree can confidently prune almost nothing." (emphasis in

original)))  "Traditional vantage point trees" and "kd-trees" are claimed as forms of "non-

exhaustive" searches in claims 18 and 19 ('988 Patent (Dkt. No. 148-4) col. 26) despite

potentially requiring "visiting essentially the entire dataset" for "a worst case query."  (Yianilos I

(Dkt. No. 148-17) at 3)

      "[T]here is a strong presumption against a claim construction that excludes a

disclosed embodiment."  In re Katz Interactive Call Processing Pat. Litig., 639 F.3d 1303, 1324

(Fed. Cir. 2011).  While it is not entirely clear that Plaintiff's construction excludes these

embodiments, nothing in the specification suggests that these embodiments fall within Plaintiff's

proposed construction – i.e., that they do not require comparing a query "to all possible matches"

at least some of the time, under "worst case" circumstances.  Indeed, the specification states that

these search methodologies may be useful because "on average" they lead to "sub-linear time

searches."  (See '988 Patent (Dkt. No. 148-4) col. 22)  Sublinearity thus is their salient feature,

not "non-exhaustiveness."

      In sum, to the extent the specification distinguishes some types of searches from

others, the relevant fault line is not "exhaustiveness" as defined in Plaintiff's briefing and

proposed construction.

      **b.**    **Extrinsic Evidence**

      Having concluded that the intrinsic evidence does not suggest a particular

construction of "non-exhaustive search," the Court turns to the extrinsic evidence proffered by

the parties.

Plaintiff cites first to the declaration of Dr. Michael Mitzenmacher, its expert witness. "Extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318 (collecting cases). "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Id.

Here, Dr. Mitzenmacher opines that "'non-exhaustive search' is a term that is well understood by skilled artisans in the field . . . [and that] Network-1's proposed definition accurately reflects the ordinary meaning of this term that would have been understood by persons of ordinary skill in the art at the time of the patents." (Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 40-41) The Mitzenmacher declaration repeats the arguments made in Plaintiff's brief, including that the '988 Patent's specification distinguishes between exhaustive and non-exhaustive searches in its comparison of "linear search" to "several examples of non-exhaustive . . . searches," such as binary search, kd-trees, vantage point trees, and excluded middle vantage point forests. (Id. ¶¶ 42-47) Dr. Mitzenmacher concludes that "the difference between exhaustive and non-exhaustive searches turns on the number of comparisons that must be performed between the query and the reference data set to be searched," and "that an exhaustive search may involve comparing a query to every record in the data set," whereas a non-exhaustive search does not. (Id. ¶¶ 41-43)

Because Dr. Mitzenmacher's declaration largely rehashes arguments made in Plaintiff's briefing, it is of little value as extrinsic evidence. See Bushnell Hawthorne, LLC v.

32

Cisco Sys., Inc., 18 Civ. 760, 2019 WL 2745735, at *5 n.5 (E.D. Va. July 1, 2019), aff'd, 813 F.

App'x 522 (Fed. Cir. 2020) ("[P]laintiff's expert declaration in large part simply repeats

arguments that plaintiff makes in its brief, which do not require the aid of an expert to consider

and resolve here.  Accordingly, plaintiff's expert declaration is not entitled to any significant

weight.").  Moreover, Dr. Mitzenmacher's "ultimate opinion about the meaning of [non-

exhaustive search] is a legal opinion, which is outside his area of expertise."  IBSA Institut

Biochimique, S.A. v. Teva Pharms. USA, Inc., 18 Civ. 555 (RGA), 2019 WL 3936656, at *6 n.5

(D. Del. Aug. 20, 2019), aff'd, 966 F.3d 1374 (Fed. Cir. 2020); id. ("That is why expert opinions

on claim construction are usually worthless.").

       In any event, Dr. Mitzenmacher's opinion regarding the meaning of non-

exhaustive search – as set forth in his declaration – is undermined by his deposition testimony.

       As discussed above, in his declaration Dr. Mitzenmacher states that "an

exhaustive search may involve comparing a query to every record in the data set."

(Mitzenmacher Decl. (Dkt. No. 148-1) ¶ 42)  At his deposition, however, Dr. Mitzenmacher

testified that a search that "prunes" potential matches from a dataset without directly comparing

the query to those entries is nonetheless "exhaustive":

> Q.  You used the term "pruning" before.  What did you mean by that?
>
> A. . . . [S]o one way of viewing an exhaustive search is by looking at it as a tree[.]
> . . . And so if you were saying . . . I need an exact match, I need a word that starts
> with C, and you said, Okay, well, I'm starting at the dictionary and this page of
> the dictionary, you know, is the first branch, and all it has are A's on it, then I
> could say, A-ha, well, I've actually done a comparison against every word on that
> page because I know that every word on that page starts with A.  But I don't need
> to actually do . . . 1,000 A comparisons to determine that [a word that starts with
> C will not appear on that page].  That corresponds to a pruning and then a
> backtracking approach, where the backtracking means, I can move to the next
> page.  That's still exhaustive.
>
> Q.  Would that still be exhaustive?

A. Yes. Yes.

Q. That example you just gave is an exhaustive search?

A. Yes. According to Denny. And that's also how I would describe it also.

(Mitzenmacher Dep. (Dkt. No. 153-12) at 174-75)

Dr. Mitzenmacher's testimony – that an exhaustive search may not "need to actually do . . . 1,000 [] comparisons" to eliminate 1,000 potential matches – is inconsistent with Plaintiff's proposed construction of "non-exhaustive" search.  (Id.)  Because pruning algorithms can "locate a [match] without comparing to all possible matches (i.e., all records in the reference data set)," (Pltf. Claim Construction Br. (Dkt. No. 148) at 14), they would fall within Network-1's definition of "non-exhaustive" rather than exhaustive searches.  Dr. Mitzenmacher's testimony thus highlights the uncertain boundaries between exhaustive and non-exhaustive search methods.

Because (1) Dr. Mitzenmacher's declaration does little more than repeat the arguments in Plaintiff's claim construction briefing; and (2) Dr. Mitzenmacher's deposition testimony undermines Plaintiff's proposed construction and the assertions in Dr. Mitzenmacher's declaration, Dr. Mitzenmacher's opinion is entitled to little weight.

Plaintiff also cites to several academic papers that provide definitions of "exhaustive search" and "non-exhaustive search."  These definitions are of limited value here, but it is worth noting that they differ from Plaintiff's proposed construction.

For example, the Denny excerpt – cited by Dr. Mitzenmacher at deposition – defines exhaustive search and non-exhaustive search as follows:

> Exhaustive search is a technique for constructing or examining all possible states within a given search space. . . . In contrast, non-exhaustive search strategies, such as the probabilistic algorithms studied in the previous chapter, traverse the search space more or less at random and thus certain states may never be examined.

34

(Pltf. Claim Construction Br., Ex. 8, Paul C. Denny, <u>Search and Enumeration Techniques for Incidence Structures</u> ("Denny") (Dkt. No. 148-19) at 10)

   Plaintiff's proposed construction is inconsistent with Denny's in that it does not require that the claimed search methods "traverse the search space more or less at random." (<u>Id.</u>) There is no evidence in the record that binary search, or any of the other search methodologies discussed in the specification, proceed in this fashion. The Denny excerpt proffered by Network-1 also describes "backtracking" as a "technique for performing exhaustive search," wherein partial "feasible solutions" are examined systematically to determine if a dataset contains a match. (<u>Id.</u> at 10-12) Once a "partial solution . . . has been constructed and the feasibility property $F_k(a_1, a_2, \ldots, a_k) = false$, then it is known . . . [that] no extension of the partial solution $(a_1, a_2, \ldots, a_k)$ can possibly form a valid complete solution. As soon as this situation is detected, it is then possible to eliminate from consideration [other] infeasible solutions." (<u>Id.</u> at 12) Denny thus describes as "exhaustive" a search technique that can "eliminate from consideration" certain solutions in a dataset without directly comparing them to the search query.[13]

   Using as an example a dictionary search regarding the query word "cube," Denny describes a search that could eliminate from the list of possible solutions every word in the

---

[13] Plaintiff attempts to disclaim Denny's description of such "pruning techniques" as exhaustive. According to Plaintiff, "Denny's 'pruning' relates to the length of time needed for individual comparisons (which Denny explains could be stopped early when the search determines that there is no match based on that comparison), not the number of comparisons needing to be performed." (Pltf. Claim Construction Br. (Dkt. No. 148) at 13-14 n.10) Plaintiff's characterization of Denny's "pruning" is incorrect. Denny plainly states that pruning "significantly reduce[s] the required execution time of [backtracking] algorithm[s]" by considering "partial feasible solutions" and eliminating "infeasible solutions," without considering each individual solution. (<u>See</u> Denny (Dkt. No. 148-19) at 11-12) This search – which Denny describes as "exhaustive" – would be considered "non-exhaustive" under Plaintiff's construction, because it does "not potentially require a comparison to all records in a data set." (Pltf. Claim Construction Br. (Dkt. No. 148) at 15-19)

dictionary beginning with the letters A or B, without any comparison of the query word with a word that begins with one of those letters. The search would likewise eliminate every word beginning with "ca," without comparing the cube query word with, for example, the words "candy" or "crabapple." While Denny would describe this search as exhaustive, it would be "non-exhaustive" under Plaintiff's proposed construction.

Another article cited by Plaintiff in support of its proposed construction defines "exhaustive search" as "[t]he technique of generating and analyzing all of the possible states of a situation." (Pltf. Claim Construction Br., Ex. 9, Jon Orwant et al., Mastering Algorithms with Perl (1999) ("Orwant") (Dkt. No. 148-20) at 4) Orwant's definition of exhaustive search appears similar to Plaintiff's – a search that "potentially requires comparing the query to every record in a data set to be searched." (Pltf. Claim Construction Br. (Dkt. No. 148) at 15) Orwant notes, however, that "the definition of exhaustive search is vague. The exact meaning of 'try everything' depends upon the particular problem. Each problem has its own way of trying everything, and often many different ways." (Orwant (Dkt. No. 148-20) at 7) Orwant's analysis highlights that while the term "exhaustive search" might, in a general sense, mean "try everything" (id.), the '988 and '464 Patents do not discuss what "exhaustive" or "non-exhaustive" search means in the context of a "nearest neighbor search in a high dimensional feature space." ('988 Patent (Dkt. No. 148-4) col. 22)

In sum, the extrinsic evidence does not support Plaintiff's proposed construction. As discussed above, Dr. Mitzenmacher's declaration merely parrots the arguments in Plaintiff's briefing, and the opinions expressed in the declaration are undermined by his testimony that pruning search algorithms are exhaustive, even though these searches do not search the entirety of the reference set, and thus fall within Plaintiff's proposed construction of "non-exhaustive

36

search." The limited external sources Plaintiff cites likewise do not support Plaintiff's

construction. Indeed, the extrinsic evidence merely highlight the vague nature of "exhaustive

search" and "non-exhaustive search."[14]

<p style="text-align:center">*      *      *      *</p>

The Supreme Court and the Federal Circuit have instructed that "there is an

indefiniteness problem if the claim language 'might mean several different things and no

informed and confident choice is available among the contending definitions.'" Interval

Licensing, 766 F.3d at 1371 (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898,

911 (2014)). Consistent with this guidance, district courts have found claim terms indefinite

where multiple reasonable definitions exist and the evidence does not provide reasonable

certainty as to which definition is correct. See dunnhumby USA, LLC v. emnos USA Corp., 13

Civ. 399, 2015 WL 1542365, at *18 (N.D. Ill. Apr. 1, 2015) ("Based on the lack of guidance in

the intrinsic evidence and the additional meanings of the term in the extrinsic evidence, the Court

finds the term 'selection of a query type' to be indefinite."); Honeywell Int'l Inc. v. ICM Controls

Corp., 45 F. Supp. 3d 969, 985 (D. Minn. 2014) ("Since the two options [for interpreting the

claim] entail differing limitations for the claim, the missing language in claim 1 results in a lack

of reasonable certainty as to its scope."); Light Transformation Techs. LLC v. Lighting Science

Grp. Corp., et al., 12 Civ. 826 (MHS) (RSP), 2014 WL 3402125, at *9 (E.D. Tex. July 11, 2014)

(finding claims indefinite where (1) the term "axis of light direction" was subject to multiple

---

[14] Although Plaintiff cites the use of "exhaustive search" in two Google patents (Pltf. Claim
Construction Br. (Dkt. No. 148) at 18-19), the use of this term in Google's patents sheds no light
on the proper construction of "non-exhaustive search" as used in Plaintiff's patents. "Exhaustive
search" is used once in each of the Google patents in a highly specific context, and the term is
not defined in either patent. (U.S. Patent No. 7,831,438 (Dkt. No. 148-21) col. 7-8; U.S. Patent
No. 8,065,733 (Dkt. No. 148-22) col. 9) As such, the use of this term in the Google patents does
not assist the Court in determining the scope of Plaintiff's asserted patents.

<p style="text-align:center">37</p>

plausible constructions, and (2) dictionary definitions of axis contradicted plaintiff's proposed

construction).

    Here, the intrinsic evidence provides no definition of the term "non-exhaustive

search," and the extrinsic evidence suggests that a person skilled in the art might reasonably

define "non-exhaustive search" in multiple ways, including (1) Plaintiff's proposed construction

(modified to remove the reference to locating a "near neighbor") – "[a] search designed to locate

a [match] without comparing to all possible matches (i.e., all records in the reference data set),

even if the search does not locate a [match]" (Pltf. Claim Construction Br. (Dkt. No. 148) at 14);

(2) the Federal Circuit's broadest reasonable interpretation construction – "[a] search that locates

a match without conducting a brute force comparison of all possible matches, and all data within

all possible matches," Google Inc., 726 F. App'x at 780; and (3) Denny – "search strategies[]

[that] . . . traverse the search space more or less at random and thus certain states may never be

examined." (Denny (Dkt. No. 148-19) at 10)

    The differences in these reasonable definitions are material to the scope of the

asserted claims because different search algorithms could be considered "exhaustive" or "non-

exhaustive" depending on which definition is applied. As discussed above, Dr. Mitzenmacher

testified that pruning was an exhaustive search method – and it would be under Denny's

definition. But pruning would not be an exhaustive search method under Plaintiff's proposed

construction.

    The scope of the asserted claims using the term "non-exhaustive search" is thus

uncertain; a reader seeking to avoid infringement would not have the understanding necessary to

be reasonably certain that a given search algorithm is exhaustive rather than non-exhaustive

within the meaning of the asserted claims.

<div align="center">38</div>

Plaintiff argues, however, that "[e]ven if the term 'non-exhaustive search' did render unasserted claim 15 indefinite[,] . . . it does not follow that dependent claim 17 is indefinite[,] [because] claim 17 narrows 'non-exhaustive search' by specifying [that] its 'non-exhaustive search' is 'sublinear.'" (Pltf. Claim Construction Reply (Dkt. No. 158) at 15) According to Plaintiff, "[b]ecause the execution time of any search that compares to all records N scales linearly with the size of the data set, a sublinear search necessarily compares to less than all records in the data set." (Id. at 16)

As an initial matter, the only case that Plaintiff cites in support of this proposition is not analogous. In Signal IP v. Am. Honda Motor Co., 2015 WL 5768344, at *34 (C.D. Cal. Apr. 17, 2015), the district court found that several claims that used the term "relative weight parameter" were indefinite, because the claims – in using the term "relative" – did not disclose the basis for comparison. Id. The court further concluded, however, that certain dependent claims that used the term "relative weight parameter" were not indefinite, because they provided "detailed embodiments of possible relative weight parameters (the total force, long term average of sensor outputs, and total load rating, respectively)." Id.

Here, dependent Claim 17 does not do this. Instead, Claim 17 introduces an additional limitation "wherein the claimed non-exhaustive search is sublinear." ('988 Patent (Dkt. No. 148-4) col. 26)

And the addition of the sublinear limitation does not clarify the definition of "non-exhaustive." Denny states that "pruning" algorithms – which, as discussed above, Denny and Dr. Mitzenmacher categorize as "exhaustive" – "can significantly reduce the required

execution time of [backtracking algorithms in general]."[15]  (See Denny (Dkt. No. 148-19) at 11;

see also id. (stating in chapter addressing "exhaustive construction of incidence structures" that

"defining intelligent pruning heuristics to speed up the search can result in an exponential saving

in the required running time"))  Plaintiff's extrinsic evidence thus demonstrates that search

methodologies that would qualify, under at least some definitions, as exhaustive can exhibit

sublinear time and resource scaling.

        In sum, the phrase "non-exhaustive search" is indefinite, because "read in light of

the specification and prosecution history, [it] 'fail[s] to inform, with reasonable certainty, those

skilled in the art about the scope of the invention.'"  HZNP Medicines LLC v. Actavis Labs. UT,

Inc., 940 F.3d 680, 688 (Fed. Cir. 2019) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572

U.S. 898, 901 (2014)).  Accordingly, the asserted claims of the '988 and '464 patent are invalid

as indefinite.[16]

---

[15]  In their Local Rule 56.1 Statements, the parties do not dispute that, "[u]nder the parties'
agreed-upon construction of the term 'sublinear,' there are examples of searches that compare to
less than all of the records in a data set that scale linearly, rather than sublinearly," further
suggesting that one limitation has nothing to do with the other.  (See Def. R. 56.1 Stmt. (Dkt. No.
225) ¶ 109; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 109 ("Undisputed."))

[16]  Plaintiff argues that "there are material factual disputes" that preclude a finding that the term
"non-exhaustive search" is indefinite as a matter of law.  (Pltf. Claim Construction Reply (Dkt.
No. 158) at 16)  According to Plaintiff, the material issues of fact "includ[e] how one of skill
would (1) understand the specification; (2) view the extrinsic references; and (3) more generally,
understand this phrase."  (Id.)  Plaintiff is mistaken.  The parties' disagreements about the
intrinsic evidence and the meaning of a claim term are ultimately legal in nature.  See Teva
Pharms. USA, Inc. v. Sandoz, Inc. ("Teva II"), 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("A party
cannot transform into a factual matter the internal coherence and context assessment of the patent
simply by having an expert offer an opinion on it.  The internal coherence and context
assessment of the patent [and the intrinsic evidence], and whether it conveys claim meaning with
reasonable certainty, are questions of law.").  Moreover, district courts are permitted to make
"factual findings about extrinsic evidence relevant to the question, such as evidence about
knowledge of those skilled in the art."  BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360,
1365 (Fed. Cir. 2017); see also Teva I, 574 U.S. at 332 (noting in the context of a dispute

2.    "Correlation Information"[17]

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "correlation information" | Ordinary meaning.<br><br>Alternatively: "information that associates the first electronic media work with an electronic media work identifier" | Indefinite. |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

As an initial matter, Plaintiff argues that the Court need not construe the term "correlation information" because the "ordinary meaning of this term would have been clear to not only persons of skill in the art, but also to lay persons reading the claims." (Pltf. Claim Construction Br. Dkt. (No. 148) at 23-24) "'In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting Phillips, 415 F.3d at 1312-13 (Fed.Cir.2005)). "However, in many

_____

regarding indefiniteness that "[i]n cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence."); see also Teva II, 789 F.3d at 1339 ("If a district court needs to consult extrinsic evidence, for example, to understand the meaning of a term in the relevant art at the relevant time, the court may need to make subsidiary factual findings about that extrinsic evidence.").

Here, this Court has determined that the extrinsic evidence demonstrates that the term "non-exhaustive search" has multiple possible meanings such that a person skilled in the art could not be reasonably certain as to the scope of the asserted claims. This conclusion flowed from the evidence that Plaintiff proffered, without regard to competing evidence. Plaintiff's citation to pre-Teva case law for the proposition that the submission of extrinsic evidence creates an issue of fact for the jury is unpersuasive. See Rembrandt Data Techs., LP v. AOL, LLC, 641 F.3d 1331, 1335 (Fed. Cir. 2011) (affirming district court's finding of indefiniteness as to eight claims).

[17] This term appears only in the '464 Patent. Although the Court has concluded that all of the asserted claims of the '464 Patent are invalid as indefinite, in the interest of completeness, the Court considers below whether this term is likewise indefinite.

41

cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." Id.

For example, in O2 Micro, the Federal Circuit concluded that the district court had erred in not construing the term "only if." While this phrase has a "well understood definition" amongst lay people, the parties had "presented a dispute to the district court regarding the scope of [that claim term]," and the district court – in failing to construe the term – had not resolved the dispute. Id. ("[T]he parties agreed that 'only if' has a common meaning, but then proceeded to dispute the scope of that claim term.").

"Correlation information," unlike "only if," is not a phrase that has a "well understood definition." See id. And contrary to Plaintiff's argument, it matters not that "correlation" and "information" are each well understood words. (See Pltf. Claim Construction Br. (Dkt. No. 148) at 24 (citing dictionary definitions); see also O2 Micro, 521 F.3d at 1361 ("In deciding that '"only if" needs no construction' because the term has a 'well-understood definition,' the district court failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language.").

Here, as in O2 Micro, the parties have presented a dispute as to claim scope. As discussed above, Plaintiff argues for ordinary meaning or, failing that, the following construction: "information that associates the first electronic media work with an electronic media work identifier." (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3) Defendants argue that the claim term is indefinite (id.), i.e., that "correlation information" fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." Nautilus, 572 U.S. at 910. Accordingly, the Court must construe the claim term. See O2 Micro, 521 F.3d at

42

1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court . . . must resolve that dispute.").

In arguing that this Court should construe "correlation information" to mean "information that associates the first electronic media work with an electronic media work identifier" (Pltf. Claim Construction Br. (Dkt. No. 148) at 24-25), Plaintiff contends that this definition "is rooted in the claim language itself," in that the '464 patent "states that the 'correlation information associat[es] the first electronic media work and the electronic media work identifier.'"  (Id. at 25 (alteration in original))

Defendants counter that the term is indefinite because there is a "complete absence of intrinsic evidence" as to the meaning of "correlation information."  (Def. Claim Construction Br. (Dkt. No. 151) at 23-25; id. (arguing that the term "correlation information" does not appear in the specification and that the patent "does not describe the creation or 'storing' of 'correlation information' at all"))  Defendants further argue that reference to the preceding element of the asserting claims

> only raises more questions about the scope of the claims.  Does the "correlation information" referenced in the next element consist of whichever data is created by "correlating" the "electronic media work" and the "identifier"?  Or must the "correlation information" be distinct from the byproducts of the "correlating" step, given that the "storing" step was drafted as a separate element of the claims?  Relatedly, does the "correlation information" need to be represented by a distinct and identifiable entry in a database, such as an alphanumeric code indicating that an unknown "electronic media work" has been "correlated" with an "identifier"?  And, if not, how and where is the "correlation information" stored?

(Id. at 24-25)

As an initial matter, Defendants err in asserting that there is a "complete absence of intrinsic evidence" (id. at 23), because a patent's claims are a critical component of intrinsic evidence.  Immunex Corp. v. Sanofi-Aventis U.S. LLC, 977 F.3d 1212, 1218 (Fed. Cir. 2020) ("When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence,

43

including the claims themselves. . . .'" (quoting Personalized Media Commc'ns, LLC v. Apple Inc., 952 F.3d 1336, 1340 (Fed. Cir. 2020))).

Moreover, the questions posed by Defendants merely reflect an effort to inject uncertainty where none exists on the face of the '464 Patent. "'Mathematical precision'" is not required to avoid invalidation. See Interval Licensing, 766 F.3d at 1370 (quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1384 (Fed.Cir. 2005)). Because the second element provides that an electronic media work must be "correlate[d]" with an electronic media work identifier, it follows logically that the "correlation information" is information that was generated by the previous step. ('464 Patent (Dkt. No. 148-6) col. 24-26) Moreover, the language that immediately follows instructs that the information to be stored "associat[es] the first electronic media work and the electronic media work identifier." (Id. col. 24-25)

Defendants have not responded to Plaintiff's argument that the clause immediately following "correlation information" defines the term. (See Def. Claim Construction Br. (Dkt. No. 151); Def. Claim Construction Sur-Reply (Dkt. No. 163)) The patent clearly teaches that after the two works are correlated, the information "associating the first electronic media work and the electronic media work identifier" should be stored, and the claim refers to that information as "correlation information." ('464 Patent (Dkt. No. 146-6) col. 24-26)

In sum, Defendants have not demonstrated that the term "correlation information" is indefinite. The Court adopts Plaintiff's proposed construction.

44

### 3. "Extracting Features" and "Extracted Features"[18]

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "Extracted features" | "Electronic data **sampled, calculated, or otherwise** derived from a work itself, as opposed to from information added or appended to the work." | "Electronic data derived from a work itself, as opposed to from information added or appended to the work." |
| "Extracting features" | "**Sampling, calculating, or otherwise** deriving electronic data from a work itself, as opposed to from information added or appended to the work." | "Deriving electronic data from a work itself, as opposed to from information added or appended to the work." |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3 (emphasis added))

The disputed terms appear in the following independent claims:

15. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically <u>extracting features</u> from the electronic work;

b) electronically determining an identification of the electronic work based on the <u>extracted features</u>, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

('988 Patent (Dkt. No. 148-4) col. 26)

33. A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work <u>extracted features</u> that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work <u>extracted features</u> to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined identification of the media work.

---

[18] "Extracted features" appears in the '988 patent and the '237 patent. "Extracting features" appears in the '988 Patent. Although the Court has concluded that the asserted claims of the '988 Patent are invalid as indefinite, in the interest of completeness, the Court considers below whether these terms are likewise indefinite.

('237 Patent (Dkt. No. 148-5) col. 28)

        At an earlier point in this litigation, the parties agreed to the construction of "extracted features" that Defendants propose now: "[e]lectronic data derived from a work itself, as opposed to from information added or appended to the work." (See Jt. Claim Construction Chart (Dkt. No. 53) at 2)

        Plaintiff now argues, however, that "it became clear from discovery . . . that the parties have differing views on the scope of 'derived' in the context of 'extracted features' and 'extracting features,'" and that Plaintiff's new proposed construction clarifies "how the 'features' are 'extracted' from a work using computer technology." (Pltf. Claim Construction Br. (Dkt. No. 148) at 25-26 (emphasis in original))

        Defendants complain that Plaintiff seeks to renege on the agreed-upon constructions "to broaden the meaning of a claim term after it has engaged in extensive discovery regarding Defendants' Content ID system, out of fear that, under the originally agreed construction, Defendants' Content ID system does not infringe." (Def. Claim Construction Br. (Dkt. No. 151) at 26) According to Defendants, "there is no basis in the specification for regarding 'calculating' as an example of 'extracting' a feature or 'deriving electronic data from a work.'" (Id. at 27 (emphases omitted))

        Plaintiff maintains that its proposed construction is consistent with the following language from the '988 Patent's specification, which explains that feature extraction operations derive a representation of the work by, for example, sampling the work or performing a calculation:

> "The purpose of the feature extraction operation is to **derive** a compact electronic representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random **sample** of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a

> frequency-based decomposition of the signal, such as produced by the **Fourier, wavelet and or discrete cosine transforms**. It might involve **principal component analysis**. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible."

(Pltf. Claim Construction Br. (Dkt. No. 148) at 26 (quoting '988 Patent (Dkt. No. 148-4) col. 7) (emphasis in Plaintiff's brief); see also '237 Patent (Dkt. No. 148-5) col. 19-20 (containing substantively identical language))

      According to Plaintiff, its "proposed constructions make clear for the fact-finder that the sampling actions and mathematical calculations, as disclosed in the specification, are ways in which an electronic representation can be derived from a media work itself." (Pltf. Claim Construction Br. (Dkt. No. 148) at 27)

      Defendants counter that the "previously agreed-upon construction is firmly rooted in the specifications, which state that '[t]he purpose of the feature extraction process is to derive a compact representation of the work that can subsequently be used for the purpose of recognition.'" (Def. Claim Construction Br. (Dkt. No. 151) at 26 (quoting '988 Patent (Dkt. No. 148-4) col. 7) (emphasis omitted)) Defendants maintain that "countless examples of 'calculations'. . . would not create an 'extracted feature' in the eyes of a person of skill in the art." (Id. at 27) Although calculations are sometimes part of the extraction operation process, the noteworthy aspect of these operations is not the calculations themselves but the process of deriving information from the work. (Id.)

      As an initial matter, the specification excerpts set forth above clearly contemplate that the extracting features process may require sampling from a media work. Indeed, the specification provides as an example a "pseudo-random sample of pixels from the frame" of a

video uploaded to YouTube. ('237 Patent (Dkt. No. 148-5) col. 19-20)  It is likewise clear even to a lay person that "sampling" is a method for "extracting" features from a work.  A pixel that is "sampled" from a video frame is also "extracted" from that frame.  Defendants do not offer any argument as to why the inclusion of the term "sampling" is overbroad in light of the intrinsic or extrinsic evidence.  Accordingly, the Court concludes that its inclusion in the construction is appropriate.

While the specification does not use the word "calculate," it discloses other "feature extraction operation[s]," including "Fourier, wavelet and or discrete cosine transforms" and "principal component analysis."  (Id. col. 6)  As to whether these operations constitute "calculations," Plaintiff's expert – Dr. Mitzenmacher – offers the following in his declaration:

> A person of skill in the art would have understood that both Fourier, wavelet, and discrete cosine transforms/decompositions and principal component analyses are types of mathematical operations or calculations that can be performed on an electronic work to extract features from it to create a "sketch" or "fingerprint" of the work.  Each of these calculations uses computer technology to create a simplified electronic representation of the media work at issue, and do so using data from the work itself.
>
> . . . .
>
> The above computational methods share roughly the same basic framework in terms of generating "sketches" or "fingerprints" of an electronic work such as an audio or video file.  These methods involve taking large multi-dimensional data and, using computer technology, transforming that data into a different representation so that the most important aspects of the data correspond to values for a small number of dimensions; these numbers correspond to the sketch or fingerprint.  As an example, for images, the discrete cosine transform described in the specification is used in the well-known JPEG compression algorithm.  The JPEG compression algorithm takes 8 by 8 blocks of pixels, which can be represented as 64 color values (one for each pixel), and transforms them into another collection of 64 values that represent the same block of pixels in a different, more compact way that conveys the critical information about the file.

(Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 64-65 (footnote omitted))

In response, Defendants have submitted a declaration from Dr. James Storer, Professor of Computer Science at Brandeis University. (Storer Decl. (Dkt. No. 152)) Dr. Storer states that these paragraphs of the Mitzenmacher declaration demonstrate that

> the defining characteristic of "extracting features" is not that it entails "sampling or calculating" from a work. Rather, the process of "extracting features" is defined by the way in which it entails "creat[ing] a simplified electronic representation of the media work at issue . . . using data from the work itself," such "that the most important aspects of the data correspond to values for a small number of dimensions."

(Id. ¶ 131 (quoting Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 64-65) (alteration in original))

But Dr. Storer's response does not explain how the addition of the word "calculation" broadens the scope of the claim, or why Dr. Mitzenmacher's explanation of how a calculation can be used to extract features from a media work is incorrect. Nor does Dr. Storer's declaration address Dr. Mitzenmacher's opinion that the specification explicitly contemplates the utilization of "calculations" in order to extract features from a media work.

The Court concludes that Defendants have not rebutted Plaintiff's extrinsic evidence that "extracting features" can include "calculating . . . electronic data from a work" (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3), and finds no merit in Defendants' argument that there "is no support in the patents or Network-1's own declaration for its proposed broadening of the construction of 'extracting features' and 'extracted features.'" (See Def. Claim Construction Br. (Dkt. No. 151) at 28)

Indeed, Defendants implicitly concede that "calculating" may be a method for extracting features. (See Def. Claim Construction Br. (Dkt. No. 151) at 27 ("[E]very operation performed by a computer entails performing a variety of calculations.") (internal quotation marks omitted)) Defendants argue, however, that "[t]here are countless examples of 'calculations' that could be performed 'on data comprising a work' that would not create an 'extracted feature' in

49

the eyes of a person of skill in the art." (Id.)  For example, "a computer might perform 'calculations on data comprising a work' by (1) determining the number of bits in an image file and (2) multiplying by zero." (Id.)  Acknowledging that this hypothetical calculation would both be meaningless and not represent extracted features – because any number multiplied by zero would sum to zero – Defendants' example is not sufficient to rebut the intrinsic and extrinsic evidence demonstrating that the feature extraction process detailed in the specification contemplates "calculations."  Moreover, Plaintiff's proposed construction provides that extracted features are "sampled, calculated, or otherwise derived" from the underlying media work.  (Pltf. Claim Construction Reply (Dkt. No. 158) at 18 (emphasis in original))  This language ties the "sample" or "calculation" to the underlying work.

The Court concludes that Plaintiff's proposed construction of "extracted features" and "extracting features" is consistent with the intrinsic and extrinsic evidence.  Accordingly, the Court adopts Plaintiff's proposed construction.

## II.    SUMMARY JUDGMENT

Having concluded that the asserted claims of the '988 and '464 Patents are invalid as indefinite, the Court considers whether Defendants are entitled to summary judgment on Plaintiff's claims of infringement as to the '237 Patent.

### A.    Legal Standards

#### 1.    Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480

50

F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

51

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

### 2.    Patent Infringement

While a patent "[i]nfringement [claim presents] a question of fact," Apple Inc. v. Samsung Elecs. Co., 839 F.3d 1034, 1040 (Fed. Cir. 2016), "a court may grant summary judgment if it concludes that no reasonable jury could find infringement." Kewazinga Corp. v. Microsoft Corp., 558 F. Supp. 3d 90, 102 (S.D.N.Y. 2021), reconsideration denied, 2022 WL 4236301 (S.D.N.Y. Sept. 14, 2022).  "The infringement analysis 'entails two steps,' the first of which is construing the claims, and the second of which 'is comparing the properly construed claims to the' accused products." Philip Morris Prod. S.A. v. Int'l Trade Comm'n, 63 F.4th 1328, 1348 (Fed. Cir. 2023) (quoting Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1360 (Fed. Cir. 2019)).  "To prove literal infringement, the patentee must show that the accused device contains each and every limitation of the asserted claims." Ericsson, Inc. v. D-Link Systems, Inc., 773 F.3d 1201, 1215 (Fed. Cir. 2014) (emphasis omitted).  "For infringement, [Network-1] as the patentee has the burden of persuasion." SIMO Holdings Inc. v. Hong Kong Cloudlink Network Tech. Ltd., 983 F.3d 1367, 1380–81 (Fed. Cir. 2021); Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191, 198-99, (2014) ("[T]he burden of persuasion is with the patentee . . . [in] an infringement suit.").

Case: 24-1893    Document: 17    Page: 169    Filed: 10/15/2024

Case 1:14-cv-02396-PGG-SN    Document 303    Filed 04/24/24    Page 53 of 77

"[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device." Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1047 (Fed. Cir. 2000). Rather, "[t]o satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement[,] . . . with all reasonable inferences drawn in favor of the non-movant." Intellectual Sci. & Technology, Inc. v. Sony Elecs., Inc., 589 F.3d 1179, 1183 (Fed. Cir. 2009); see also SIMO Holdings, 983 F.3d at 1380-81 (same; applying Second Circuit procedural law); Garcia v. Hartford Police Dep't, 706 F.3d 120, 128 (2d Cir. 2013) (expert reports containing "speculative or conclusory" assertions are "inappropriate for consideration on summary judgment"; to defeat summary judgment, an expert report must "add . . . facts to the record that create a genuine dispute as to any material fact" (emphasis omitted)).

**B.    Analysis**

The parties do not dispute how the LSH and Siberia systems function. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶¶ 28-68) Instead, the parties' dispute centers on whether those systems meet the limitations of step b of claim 33 of the '237 Patent.

Claim 33 of the '237 Patent concerns:

A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined
identification of the media work.

('237 Patent (Dkt. No. 148-5) col. 28)

Google claims that it is entitled to summary judgment on Plaintiff's infringement
claim because "neither [the LSH nor the Siberia] version of Google's Content ID system
performs [a] 'sublinear' search," and accordingly that limitation of Claim 33 is not met.  (Def.
Sum. J. Br. (Dkt. No. 224) at 21)  Google further argues that – to the extent that a portion of
either version of its Content ID system meets the sublinear limitation of the '237 Patent –
Plaintiff has not offered evidence that either version of Content ID as a whole performs a search
that is at once (1) "sublinear"; (2) an "approximate nearest neighbor search"; and (3) of
"reference extracted features."  (See id. at 30-37)

As to the construction of "'sublinear' [search]," the parties agree that it "is [a]
search whose execution time scales with a less than linear relationship to the size of the data set
to be searched, assuming computing power is held constant."  (Am. Jt. Claim Construction Stmt.
(Dkt. No. 146) at 2)  The parties further agree that "a search whose execution time scales
proportionately with the size of the data set to be searched scales linearly, rather than
sublinearly."  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 111; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-
61) ¶ 111); see also Linear, McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed.
2003) ("[Linear][:] . . . Having an output that varies in proportion to the input.").  Accordingly,
the accused versions of Google's Content ID system meet the sublinear limitation if the
execution time of the searches they perform scales in a less than proportional relationship to the
size of the reference set.

54

1. <u>**Whether the LSH Version of Content ID Performs a Sublinear Search**</u>

Defendants say that "whenever a new reference was added to the LSH index, the LSH bands associated with that video were populated in the index," such that each new reference constituted a new "potential match." (Def. Sum. J. Br. (Dkt. No. 224) at 27)  As a result, the LSH version is not sublinear. (Id. at 26-27)  According to Defendants, "Network-1 has not presented any argument or evidence that the number of matches scales in a way that is less than proportional to the number of references to be searched." (Id. at 28 (emphasis omitted))  Google further argues that Dr. Mitzenmacher's report and testimony demonstrate that "the number of matches is a function of the number of references to be searched because each reference is associated with some of the existing finite set of LSH bands." (Id. (emphasis omitted))  "Dr. Mitzenmacher's statement that the LSH lookup returns its results 'in time proportional to the number of matches' is no different from the observation that it returns its results in time proportional to the number of references to be searched." (Id. (quoting Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 211) (emphasis omitted))  Finally, Google argues that Network-1's other evidence "consists of isolated uses of [the] term ['sublinear'] by a Google witness and in Google documents that are uninformed by the parties' agreed construction[,] and thus do[es] not shed light on whether the LSH version is 'sublinear' under the meaning of that term in this case." (Id. at 29)

While the Court does not agree with Defendants' observation that Dr. Mitzenmacher's report and testimony "lead[] to the ineluctable conclusion that the LSH version of the Content ID system did not meet the 'sublinear' limitation" (see Def. Sum. J. Br. (Dkt. No. 224) at 27), for the reasons explained below, the Court concludes that Network-1 has not presented evidence sufficient to create a material issue of fact as to whether the LSH version of

Content ID meets the "sublinear" limitation in claim 17 of the '988 Patent and claim 33 of the '237 Patent.

In opposing Defendants' summary judgment motion, Plaintiff cites the following evidence: (1) Dr. Mitzenmacher's report and testimony; (2) a Google 2010 draft document describing a potential update to the Content ID system; and (3) the academic work and testimony of Google research scientist Dr. Shumeet Baluja. (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-12)

    **a.**    **The Mitzenmacher Report**

The Mitzenmacher Report's analysis of whether the LSH version of Content ID performed a sublinear search is quite sparse. Omitting references, the entirety of the analysis is as follows:

> 209. The approximate nearest neighbor (or neighbor or near neighbor) search of the Content ID LSH Version is sublinear.
>
> 210. Starting from the first step, the Content ID LSH Version system is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset, that could be possible matches to the input work being queried. This is through the creation of what is commonly referred to as an "inverted index data structure, based on LSH bands: only reference works that match in terms of the LSH bands are subject to further analysis.
>
> 211. The inverted index is designed to be a sublinear data structure; that is, the inverted index on a query. Rather in this setting, when given an LSH band, the inverted index can directly return a list of the reference works that match that LSH band, in time proportional to the number of matches. Hence the work done by the inverted index corresponds to the number of index hits, not the number of references. This is a general property of inverted indexes.
>
> 212. Review of source code produced by the Defendants in this case confirms my analysis of this claim element . . . [description of Content ID Source Code]
>
> 213. It is my opinion that the Content ID LSH Version meets claim element 33b) literally. . . .

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 209-13 (addressing Claim 33 of the '237 Patent); see also id. ¶¶ 144-47 (Claim 17 of the '988 Patent))

These paragraphs do not state that the LSH version of Content ID, by virtue of its "inverted index" structure, performed a "search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2)  Rather, Dr. Mitzenmacher contends that the LSH version was an "inverted index[, ] designed to be a sublinear data structure," and to "determine a very small subset of the reference works in the database, in particular a sublinear subset."  (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 210-211)  But the asserted claims require that the LSH version of Content ID perform a sublinear search, not that it "determine" a "sublinear subset" of the total reference works.  Indeed, the "sublinear" claim limitation construed by the parties specifically references a "search."  (See Am. Jt. Claim Construction Stmt. (Dkt. No. 146) at 2 (reflecting parties' agreed construction that a "'sublinear search' is [a] search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant"))  Dr. Mitzenmacher does not explain in his report or in his testimony what he means in positing a "sublinear subset [of data]."

In any event, to the extent that the Mitzenmacher Report can be read as stating that the LSH version of Content ID performed a sublinear search, any such assertion is – as discussed below – conclusory and lacks an adequate factual basis.  See Intellectual Sci. & Technology, Inc., 589 F.3d at 1183 ("To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement[,] . . . with all reasonable inferences drawn in favor of the non-movant.").

57

**CONFIDENTIAL MATERIAL OMITTED**

According to Dr. Mitzenmacher, the LSH version of Content ID is structured as an "inverted index." For this proposition, Dr. Mitzenmacher relies on a draft document produced in discovery by Google. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 210 (citing Pltf. Ex. 40 (Dkt. No. 240-15) at 3 ███████████████████████████████████████

████████████████████████████████████████████████

██████████ As discussed below, this document is a draft from 2010 that does not purport to describe the LSH version of Content ID that Google ultimately implemented. Even assuming <u>arguendo</u> that the accused LSH version of Content ID is structured as an inverted index, that characteristic does not explain what a "sublinear subset" of a dataset is, nor does it demonstrate that the LSH version of Content ID necessarily performed a sublinear search.

In asserting – in Paragraph 211 of his report – that an "inverted index is designed to be a sublinear data structure," and that it "is a general property of inverted indexes" that "the work done by the inverted index corresponds to the number of index hits, not the number of references," Dr. Mitzenmacher cites only to a Wikipedia entry. (<u>See</u> Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 211)

The Wikipedia entry states that

> an inverted index . . . is a database index storing a mapping from content, such as words or numbers, to its locations in a table, or in a document or a set of documents (named in contrast to a forward index, which maps from documents to content). . . .
>
> The inverted index data structure is a central component of a typical search engine indexing algorithm. A goal of a search engine implementation is to optimize the speed of the query:  find the documents where word X occurs. Once a forward index is developed, which stores lists of words per document, it is next inverted to develop an inverted index. Querying the forward index would require sequential iteration through each document and to each word to verify a matching document. The time, memory, and processing resources to perform such a query are not always technically realistic. Instead of listing the words per document in the forward index, the inverted index data structure is developed which lists the documents per word.

<div align="center">58</div>

> With the inverted index created, the query can be resolved by jumping to the word
> ID (via random access) in the inverted index.

Inverted Index, Wikipedia.org, https://en.wikipedia.org/wiki/Inverted_index (last visited Apr. 23,

2024).

Accepting the Wikipedia entry's representation that the use of inverted indices is

far more efficient in terms of "time, memory, and processing resources" than the use of forward

indices for word queries, see id., it does not follow that as the size of the reference set increases,

the number of index hits – and thus resources expended on a search of the index – does not also

grow proportionally.  Indeed, the Wikipedia entry states that inverted indices are designed to

"allow fast full-text searches, at a cost of increased processing when a document is added to the

database." Id.  The Wikipedia entry thus acknowledges that – as the size of the reference set

increases – the number of index hits, and the resources expended on a search of the index, will

likewise increase.  And nothing in the Wikipedia entry suggests that the resources expended will

grow at anything less than a linear rate.  See id.  Finally, the Wikipedia entry does not use the

terms "sublinear search" or "sublinear subset." See id.

Plaintiff has conflated the resource efficiency of a search with the scaling of

resource costs as a dataset grows.  The Wikipedia entry tells us that a query directed to an

inverted index structure – such as that allegedly employed in the LSH system – is more efficient

(in terms of time and computing resources) at retrieving matches than a query directed to a

forward index.  But the Wikipedia entry tells us nothing about whether a search of an inverted

index is "sublinear" under the parties' agreed upon construction.

Consider the following:  assume that a search of an inverted index with 5 million

reference records takes 5 minutes.  Further assume that computing power is held constant.  Does

a search of the same index with 10 million records take 10 minutes, and thus scaling linearly, or

does the search of the 10 million records take between 5 and 9 minutes, thus scaling sublinearly? The fact that a search of a traditional forward index containing 5 million records might take five hours instead of five minutes is irrelevant to this question. And "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a search can scale linearly, rather than sublinearly, even if it 'is designed to determine a very small subset of the reference works in the database.'" (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 110 (quoting Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 210); Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 110) In short, the Wikipedia entry cited in the Mitzenmacher Report does not support Plaintiff's assertion that the LSH version of Content ID meets the sublinear limitation.

As to Dr. Mitzenmacher's assertion in paragraph 212 that his "review of [Google's] source code . . . confirm[ed]" his view that the LSH version of Content ID meets the sublinear limitation, Dr. Mitzenmacher's assertion is devoid of analysis. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 212) He merely describes the steps the source code takes to complete a search, listing out each function as it is called. As to Stage I of the search – the LSH index lookup portion of the LSH version on which the Mitzenmacher Report focuses – Dr. Mitzenmacher states only that



**CONFIDENTIAL MATERIAL OMITTED**



(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 212)  Nothing in this recitation suggests that the LSH

version of Content ID performed a "search whose execution time scales with a less than linear

relationship to the size of the data set to be searched, assuming computing power is held

constant."  (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2)

        Plaintiff argues, however, that Dr. Mitzenmacher explained at deposition that "it

logically follows from [his discussion of source code in the Mitzenmacher Report] . . . that the

number of matches scales in a sublinear (and not in a proportional or linear) fashion as the

number of references to be searched increases."  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 9)

Plaintiff cites the following testimony in support of this assertion:

    Q.  So just explain to me what you mean – what does it mean to say that the
    Content ID LSH version system determines a sublinear subset [of matches]?

    A.  So I think the point is that the work going in to like the number of things in
    the subset were sublinearly with the corresponding work or execution time to
    handle such objects, while also grow sublinearly in the setting of the context of
    claim construction.

(Id. (quoting Mitzenmacher Dep. (Dkt. No. 240-9) at 169)  This gibberish does not clarify

anything in the Mitzenmacher Report, nor does it provide a factual basis for concluding that the

LSH version of Content ID meets the sublinear limitation.

        In sum, nothing in the Mitzenmacher Report, in Dr. Mitzenmacher's testimony, or

in the record as a whole would permit a reasonable jury to conclude that the LSH version of

61

Content ID performed the required sublinear search.[19]  See Arthur A. Collins, Inc., 216 F.3d at

1047 ("[A] party may not avoid summary judgment simply by offering an opinion of an expert

that states, in effect, that the critical claim limitation is found in the accused device. . . . [T]he

affidavit of an expert submitted in opposition to a motion for summary judgment must do more

by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'") (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986)).

        **b.**        **The CoverCat Draft**

        In opposing Defendants' summary judgment motion, Network-1 also cites a

January 5, 2010 Google "draft" document entitled ███████████████████████████

---

[19]  Plaintiff argues that the varying testimony of the parties' experts presents a material issue of
fact.  In this regard, Plaintiff notes that Defendants' expert, Dr. Samrat Bhattacharjee, opines that
"'[t]he search performed by the LSH Version of the Content ID system is not sublinear because
the system searches the LSH index ████████████████████████████████████████████,'
(Pltf. Sum. J. Opp. (Dkt. No. 240) at 10 (quoting Bhattacharjee Decl. (Dkt. No. 240-59) ¶ 290)),
while Dr. Mitzenmacher testified that the LSH version's ███████████████████████████████
████████████████████████████.  (Id. at 11)  Testimony
from David Erb – the "tech lead and manager of Content ID" since December 2011 – confirms
that Dr. Mitzenmacher's understanding is correct.  See Erb Dep. (Dkt. No. 240-3) at 77 ("The
BigTable is actually a sparse key value store, meaning that the only columns that actually exist
for that row are the ones that have content in them.  And the content of each column . . . [is the
reference] video ID.")

For purposes of their summary judgment motion, Defendants do not dispute Plaintiff's assertion
that "[a] search of the LSH index using a particular LSH band ███████████████████████
██████████████████████████."  (Pltf. R. 56.1
Counterstmt (Dkt. No. 240-61) ¶¶ 159-62; Def. Reply R. 56.1 Stmt. (Dkt. No. 232) ¶¶ 159-62
("Undisputed . . . ."))  The fact that a search of the LSH index ███████████████████████
████████████████████████ does not necessarily mean that a search of the
index is sublinear as that term has been construed by the parties, however.  (See Def. R. 56.1
Stmt. Dkt. No. 225) ¶ 109 ("Under the parties' agreed-upon construction of the term 'sublinear,'
there are examples of searches that compare to less than all of the records in a data set that scale
linearly, rather than sublinearly."); id. ¶ 110 ("Under the parties' agreed-upon construction of the
term 'sublinear,' a search can scale linearly, rather than sublinearly, even if it 'is designed to
determine a very small subset of the reference works in the database.'") (quoting Mitzenmacher
Rpt. (Dkt. No. 226-6) ¶ 210); Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶¶ 109-10
("Undisputed."))  Nor has Plaintiff attempted to explain why that would necessarily be the case.

**CONFIDENTIAL MATERIAL OMITTED**



██████ (Pltf. Sum. J. Opp. (Dkt. No. 240) at 7 (citing Pltf. Ex. 40 (Dkt. No. 240-15)))  The stated purpose of this project is to ████████████████████████████ ████████████████████████████████████ ██████████████████ (Pltf. Ex. 40 (Dkt. No. 240-15) at 2 (emphasis omitted))  The document proposes ████████████████████████ ████████████████████' (Id.)  The match system described in this document would use ████████████████████' (Id. at 3)

Plaintiff highlights the following language in this Google document:

(Pltf. Sum. J. Opp. (Dkt. No. 240) at 7 (quoting Pltf. Ex. 40 (Dkt. No. 240-15) at 9) (emphasis in Pltf. Sum. J. Opp.))  Plaintiff argues, and Defendants do not dispute, that "CPU (central processing unit) and RAM (random access memory) resources are related to the amount of computing power" used by a particular search method.  (Id.)  The more computing resources that are used, the less time that is required to complete a search.

As an initial matter, the Google document quoted by Plaintiff is marked "draft," and Plaintiff has not proffered evidence demonstrating that the design(s) outlined in the document were ever implemented, and if so, to what extent.  (Pltf. Ex. 40 (Dkt. No. 240-15) at 1; see MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 816 F.3d 1374, 1379 (Fed. Cir. 2016) ("As to the CAD drawing, there is no evidence that it represented the actual product marketed and sold."))

Moreover, Plaintiff has quoted this document out of context.  When the relevant language from this 2010 draft document is considered as a whole, it becomes clear that Google

**CONFIDENTIAL MATERIAL OMITTED**

was considering two design options, ███████████████████████████████
████████████████████████████████████. The record is
silent as to whether either of these options was chosen, or whether Google pursued an entirely
different option.

       As to scaling, the document states that ██████████████████████
███████████████████████████████████████████████
████████████████████████ (Pltf. Ex. 40 (Dkt. No. 240-15) at 9)  The
document's next sentence – omitted by Plaintiff – states that, █████████████████
██████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ (Id.)  By
contrast, if the █████████████████████████████████
█████████████████████████████████████████████
██████████████████████." (Id. (emphasis added))  The document
thus identifies a tradeoff between (1) ████████████████████████
████████████████████████████ and (2) █████████████
█████████████████████████████████████████████
██████████). (See id.)  The document concludes by stating that ████████████
████████████████████████ between these two options. (Id.)
██████████████████████████████████████
███████████████████████████ (Id.)
███████████████████████████████████ (Id.)  But Plaintiff has not

proffered evidence that either version of Content ID described in the draft document was actually implemented, much less that the ███████ version was implemented instead of the ████ ███████ version.

      Given these circumstances, the Google document cited by Plaintiff does not show that the LSH version of Content ID is "capable of infringing," see ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 520 (Fed. Cir. 2012), much less actual infringement. Even where there is "no dispute" that an accused device is "technically capable" of infringing, the patentee must present evidence that it is "more likely than not [that] . . . the accused system[] [] perform[s] the [specific claim limitation]." See id. "Unless the claim language only requires the capacity to perform a particular claim element, . . . it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1329 (Fed. Cir. 2010); see also ACCO Brands, Inc. v. ABA Locks Mfrs. Co., 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit.").

      For the reasons explained above, the CoverCat draft does not constitute evidence of "specific instances of direct infringement," nor does it show that the LSH system "necessarily infringes the patent[s] in suit." Acco Brands, 501 F.3d at 1313.

      c.    **Dr. Baluja's Scientific Papers and Deposition Testimony**

      In arguing that there are material issues of fact as to whether the LSH version of the Content ID system performs a sublinear search, Plaintiff also cites to a scientific abstract written by two Google employees, Drs. Shumeet Baluja and Michele Covell, entitled "Learning to Hash:  Forgiving Hash Functions and Applications," and to Dr. Baluja's deposition testimony.

65

(Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-8)  The abstract – published in 2008 – addresses the problem of "retriev[ing] examples from a database that are similar to a [query] example in a manner that is [] efficient."  (Pltf. Ex. 56 (Dkt. No. 240-31) at 4; Baluja Dep. (Dkt. No. 240-4) at 178-81)  The paper discusses several then-existing forms of hashing and notes that "LSH [locality-sensitive hashing] and other hash functions are sublinear in the number of elements examined compared to the size of the database."  (Pltf. Ex. 56 (Dkt. No. 240-31) at 4)

Dr. Baluja has been employed at Google since 2003 as a staff research scientist. (Baluja Dep. (Dkt. No. 240-4) at 10, 16)  He holds a bachelor's degree in computer science and philosophy from the University of Virginia, and a Ph.D from Carnegie Mellon in computer science and robotics.  (Id. at 10-11)  He held a variety of research and scientific positions at tech companies prior to joining Google.  (Id. at 12-16)  At Google, Dr. Baluja has held a variety of basic research positions in the areas of wireless communications, image processing, social networks advertising, and video recognition.  (Id. at 16-26, 135)  Dr. Baluja was part of the Google research team that developed the core matching technology utilized in Content ID.  (Id. at 116)  Dr. Baluja is not involved in the commercial applications resulting from his research. (Id. at 26 ("One could always hope that your research is used in the real world, but that's not my concern."))

At deposition, Dr. Baluja was first asked about a 2008 paper he and Covell published in the scientific journal Pattern Recognition in May 2008.  The paper is entitled "Waveprint:  Efficient Wavelet-based Audio Fingerprinting."  (Pltf. Ex. 54 (Dkt. No. 240-29)) Baluja testified that the locality sensitive hashing approach in matching technology permits the scaling of the matching system to be sublinear:

Q  Toward the end of the first paragraph, it says, "The system also provides good scaling characteristics.  When the database size is increased by 50 percent, we see

66

that we can have a sublinear computation increase while having no significant impact on recognition." Do you see that?

A Yes, yes.

Q What does that mean?

A So what that means is we will still consider all the elements in our repository without having to examine them in detail.

Q So using this LSH approach allows the scaling of the system to be sublinear in that sense? Is that what you're saying?

A Yes.

(Baluja Dep. (Dkt. No. 240-4) at 138)

Dr. Baluja was then questioned about the 2008 abstract entitled "Learning to Hash: Forgiving Hash Functions and Applications," in which he states that "LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database." (Pltf. Ex. 56 (Dkt. No. 240-31) at 4; Baluja Dep. (Dkt. No. 240-4) at 180-181) Dr. Baluja confirmed that this reference to sublinear is "the same sublinearity that we discussed earlier." (Id. at 181)

Plaintiff argues that Dr. Baluja's references to sublinearity in the abstract and journal article, as well as his deposition testimony, create a material issue of fact as to whether the LSH version of the Content ID system performs a sublinear search. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-8)

As an initial matter, while Dr. Baluja was part of the Google research team that developed the core matching technology utilized in Content ID (Baluja Dep. (Dkt. No. 240-4) at 116), he is a scientist who does basic research. He is not an engineer and has no role in the commercial applications resulting from his research. At deposition, he was not asked about – and did not testify regarding – the functioning of the LSH version of Content ID. (See id. at 99 ("But I'm not an engineer. . . . [I]f I wrote a system for Google, it would probably crash entire

Google. So that's why I do research."))  Similarly, the journal article and abstract that he was questioned about at deposition do not address or describe the LSH version of Content ID (see Pltf. Ex. 56 (Dkt. No. 240-31) at 4 (proposing a hashing system that "far surpasses, in terms of both efficiency and accuracy, a state-of-the-art Locality-Sensitive-Hashing-based technique for the same problem and data set")), and say nothing about whether the LSH version of Content ID performed a "search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant."  (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2)

For these reasons, Dr. Baluja's references to sublinearity in his scientific papers do not demonstrate that the LSH version of Content ID performs sublinear searches.

\*       \*       \*       \*

In sum, the evidence cited by Plaintiff does not create a material issue of fact as to whether the LSH version of Content ID performs a sublinear search.[20]  Accordingly, Defendants

---

[20]  Plaintiff's infringement claim fails for another and independent reason.  In arguing that the LSH version of Content ID performs a sublinear search, Plaintiff addresses only Stage I of that system.  It is undisputed, however, that there are two stages in the LSH version of the Content ID system, and that it is the combination of these two stages that result in a complete search.  (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 24-25 ("The search algorithm of the LSH version of the system has two main stages referred to as 'Stage I' and 'Stage II.' . . . Defendants' documents explain the combination of these stages as a complete search. . . .")) And "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly."  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 107; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 107 ("Undisputed."))  Accordingly, in order for this Court to conclude that the LSH version of Content ID performs a sublinear search, there would have to be evidence that at both Stage I and Stage II the system performs a sublinear search.  There is no such evidence.

While Plaintiff argues that paragraph 209 of the Mitzenmacher Report "explains that the entire search (involving two stages) is sublinear" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 24), Paragraph 209 merely states that "[t]he approximate nearest neighbor (or neighbor or near neighbor) search of the Content ID LSH Version is sublinear."  (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 209)  The

are entitled to summary judgment on Plaintiff's infringement claim to the extent it is premised on the LSH version of Content ID.

### 2.    Siberia Version of Content ID

#### a.    Whether the Siberia Version of Content ID Performs a Sublinear Search at the Index Lookup Stage

The parties dispute whether the Siberia version of Content ID meets the sublinear limitation. Google argues that Dr. Mitzenmacher "admitted in his report and confirmed at his deposition that the Siberia search algorithms scale linearly, rather than sublinearly." (Def. Sum. J. Br. (Dkt. No. 224) at 21) Plaintiff responds that Dr. Mitzenmacher testified that the "'the [Siberia] algorithm [] is sublinear because it has [the] ability to change and adapt'" by adjusting the number of shards and partitions as the data set size grows. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 12-13 (quoting Mitzenmacher Dep. (Dkt. No. 240-9) at 128-29) (emphasis omitted))

In his report, Dr. Mitzenmacher states that he "generally agree[s]" "that if additional references were added to the existing shard/partition structure, the [Index Lookup] portion of the search would scale linearly." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 229

---

subsequent paragraphs in the Mitzenmacher Report – which are discussed above – address only the Index Lookup portion of Stage I, and the evidence cited in Paragraph 209 does not concern the issue of whether Stage II performs a linear or sublinear search. (See id. (citing Dr. Baluja's deposition and the CoverCat draft document)) Accordingly, to the extent that Dr. Mitzenmacher expresses an opinion in his report that the entire search conducted by the LSH Version of Content ID is sublinear, any such opinion is unsupported and conclusory. See Arthur A. Collins, Inc., 216 F.3d at 1047 ("[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device. . . . [T]he affidavit of an expert submitted in opposition to a motion for summary judgment must do more by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'") (quoting Celotex, 477 U.S. at 323, 325). Nor has Plaintiff articulated any theory for why, even assuming Stage I of the LSH Version performs a sublinear search, Stage II must likewise be found to perform a sublinear search. Because Plaintiff has offered no evidence that the entire search performed by the LSH version of Content ID is sublinear, Defendants are entitled to summary judgment on Plaintiff's infringement claim to the extent it is premised on the LSH version of Content ID.

**CONFIDENTIAL MATERIAL OMITTED**

(emphasis in original))  Dr. Mitzenmacher further acknowledges that "doubling the size of a reference index by simply adding references to the existing shards . . . could result in the [Index Lookup] portion of the search taking approximately twice as long."  (Id. ¶ 230)  Despite these concessions, Plaintiff contends that "the search algorithm Content ID Siberia Version was designed to be used" in a way that makes the entire system sublinear, and that the number of partitions per shard is a "turnable knob" that makes "the search algorithm Content ID Siberia Version" sublinear.  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 14-16; see also Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 ("[D]oubling the size of a reference index by simply adding those references to the existing [structure] is not what would be done."); id. ¶¶ 238-39 ("[I]ncreasing the ███████████████ as the size of the data set [] increases would result in sublinear scaling."))

        Plaintiff also points to an ███████████████████████████ ████████████████████████████████████████████ ██████.  (See Pltf. Supp. Sum. J. Opp. (Dkt. No. 274) at 3-5)  According to Plaintiff, this development "confirms that the Siberia version of Google's Content ID system uses a sublinear search."  (Id. at 3 (capitalization altered))

        Plaintiff is mistaken.  Assuming arguendo that reducing the ███████████ ██████████ also reduced the time or computing resources needed to perform a search,[21] Plaintiff does not dispute that if additional references were added to the index as it existed as of

---

[21] There is no evidence that Google ████████████████████████████ ███████████████████████████████████████████████ Accordingly, standing alone, ██████████ does not demonstrate that the Siberia Version of Content ID performs a sublinear search.

**CONFIDENTIAL MATERIAL OMITTED**

██████████████████████, search execution time would still scale linearly. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 229)

   The '237 Patent teaches that the invention must perform a "sublinear . . . search." ('237 Patent (Dkt. No. 148-5) col. 28)  The specification states that "a linear search of all N entries" in a database is "computationally expensive," and lists exemplary sublinear search algorithms and data structures with sublinear search times, including binary search, kd-trees, vantage point trees, and middle vantage point forest.  (Id. col. 21)  The specification does not suggest, however, that a linear search algorithm can be adapted to the problem using parameters – "turnable knobs" – that can be periodically adjusted to improve the search's consumption of resources.  Indeed, Plaintiff conflates the Siberia system as a whole – which conceptually encompasses multiple steps that map onto the '237 Patent, including indexing and taking an action after finding a match – with the required search step.  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 16 (referring to the entirety of the Siberia Version of Content ID as "the search algorithm Content ID Siberia Version"))

   In sum, the undisputed evidence is that the Siberia version of Content ID uses search algorithms that scale linearly as the size of the database increases.  The evidence also shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database.  But that fact does not transform a linear search algorithm or database architecture into a sublinear one.

**CONFIDENTIAL MATERIAL OMITTED**

In arguing to the contrary, Plaintiff places great weight on the following graph and similar documents produced by Google during discovery:



(Id. at 14; Pltf. Ex. 67 (Dkt. No. 240-42) at 6)  Plaintiff asserts that the graph depicts



(Pltf. Sum. J. Opp. (Dkt. No. 240) at 14)  The two solid lines represent ▮▮▮▮. According to Dr. Mitzenmacher, the currently implemented version ▮▮▮▮' algorithm.  But "[r]egardless" of which algorithm is used, the graph demonstrates that "the search scales sublinearly."  (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 157-58)

The graph cited by Plaintiff plainly contemplates that as the dataset grows, so does the number of "machines."  As discussed above, in the Siberia system, data is stored in shards on individual "machines," or computers.  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 39; Pasula Dep. (Dkt. No. 240-5) at 39, 77; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 153 ▮▮▮▮

72

## CONFIDENTIAL MATERIAL OMITTED

████████████████████████████████████████████

████████████████) The graph does not suggest that any search performed by the Siberia system is sublinear "assuming computing power is held constant," because what it shows is an increase in the total amount of computing resources as the size of the dataset increases. (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2) Plaintiff does not address the fact that – in the graph it cites – computing power is not "held constant," nor does Plaintiff attempt to explain why the Court should ignore this fact. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 14) Nor does the mere use of the term "sublinear" on the graph demonstrate that the claim limitation is meant. Finally, because Dr. Mitzenmacher, Plaintiff's expert witness, concedes that the index-lookup algorithm scales linearly, the graph and other documents containing the word "sublinear" are not sufficient to create a material issue of fact.

### b.   Whether the Siberia Version Performs the Required Nearest Neighbor Search

Defendants argue that even that assuming the Index Lookup portion of the search is sublinear, Plaintiff has not shown that "the allegedly sublinear Siberia Index Lookup uses media work extracted features to perform an 'approximate nearest neighbor search of reference extracted features.'" (Def. Sum. J. Br. (Dkt. No. 224) at 30-31) According to Defendants, "Dr. Mitzenmacher admits that the Index Lookup does not meet those limitations and, instead, [impermissibly] tries to mix and match different aspects of the Siberia system to show infringement." (Id. (emphasis omitted))

The parties agree that the Siberia version of Content ID "has three main stages": Index Lookup, Sparse, and Verifier. (See Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 43; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 43) Neither side has argued that any one stage constitutes a single "search" for purposes of proving infringement. And Plaintiff does not argue that an

73

"approximate nearest neighbor search" is performed at the Index Lookup stage.[22]  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 17-23)  Similarly, Defendants do not contend that an "approximate nearest neighbor search" is performed at the Sparse and Verifier stages, whether separately or together.  (See Def. Sum. J. Reply (Dkt. No. 227))

Moreover, and as discussed above, "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly."  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 107; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 107; Mitzenmacher Dep. (Dkt. No. 240-9) at 105-09 (noting that a function with a linear term and a logarithmic term scales linearly))

According to Plaintiff, the Mitzenmacher Report "explains that the entire, three stage, search algorithm of" the Siberia Version of Content ID "is a sublinear search algorithm."  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 17-18)

The Mitzenmacher Report addresses the alleged sublinearity of the Sparse and Verifier stages as follows:

> The time that the overall search takes (e.g., the combination of [Index Lookup], Sparse, and Verifier steps) would increase by less than a factor of two if the number of hashed embeddings in the reference index were doubled.  This is because the amount the latter two steps take would remain roughly constant since the number of index hits [coming] out of the [Index Lookup] step would remain the same.  In other words, the data set size and the search time of the Content ID Version do not have a one to one relationship.

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 n.197)  The remainder of Dr. Mitzenmacher's report is directed to the Index Lookup stage.  (Id. ¶¶ 229-46)

---

[22]  Because the Index Lookup stage ███████████████████████████████████ ████████████████████████████████████████████████████████████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 52) – it does not involve the use of a "defined threshold" as required under the parties agreed-upon construction of "nearest neighbor search."  (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2)

74

**CONFIDENTIAL MATERIAL OMITTED**

As an initial matter – because Dr. Mitzenmacher's remarks concerning the Sparse and Verifier stages are not supported by any citations to evidence – he has not "set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement." Intell. Sci. & Tech., Inc., 589 F.3d at 1183.

Moreover, other portions of Dr. Mitzenmacher's opinion contradict his assertion that the amount of time the Sparse and Verifier steps would take "would remain roughly constant." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 n.197) As discussed above, it is undisputed that for the Video Index, the Index Lookup step ███████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 48-49; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223)) The system then ████████████████████████████████ █████████████████████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 51-52) Accordingly, for a search of the Video Index, the Index Lookup step outputs ███████ █████████████████████████ and passes those on to the Sparse and Verifier steps. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223; see Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 59, 60) It is correct that in the example given above –██████████████████████████ ████████████████████████████████████████████ ███████████████████████████ Thus, the time necessary to execute the Sparse and Verifier steps would be "constant" such that if the Index Lookup portion is sublinear, the entire Siberia search would also be sublinear. (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 18-19 (explaining the "basic mathematical principle" that "y = $\sqrt{x} + 1 + 1$ is still a sublinear function"

**CONFIDENTIAL MATERIAL OMITTED**

where "y" is the time it takes to execute a search, "x" is the number of references in the data set, "√x" is the time it takes to complete the Index Lookup step for a given search, and "1 + 1" represents the time taken to complete the Sparse and Verifier steps))

Dr. Mitzenmacher's premise for arguing in his Report that the Index Lookup step is sublinear, however, is that "doubling the size of the reference index by simply adding those references to the existing shards[] is not what would be done. . . . [A]s the size of the reference index increases, so would the number of shards and partitions." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230) If the number of shards in the index increased, so would the number of references output by the Index Lookup step – ███████████████ – and examined by the Sparse and Verifier steps. Moreover, to the extent that the number of shards and partitions examined at various stages of Siberia's search are "turnable knob[s]" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 15) the number *k* of embeddings per shard output by the Index Lookup step is also presumably "turnable." The Mitzenmacher Report's assertion that the time necessary to complete the Sparse and Verifier portions of the search is a constant in thus not only unsupported, but internally inconsistent with the argument that as the size of the data set increases so would the number of partitions and shards.

In sum, even if the Court concluded that the evidence demonstrated that the Index Lookup portion of the Siberia search is sublinear, that evidence itself would preclude an inference that the Sparse and Verifier portions of the search are "constants" for purposes of sublinearity.

The unsupported, conclusory, and internally inconsistent assertion in footnote 197 of the Mitzenmacher Report is insufficient to create a material issue of fact as to the alleged sublinearity of the three-stage Siberia search. *See* Power Integrations, Inc. v. ON Semiconductor

76

Corp., 396 F. Supp. 3d 851, 886 (N.D. Cal. 2019) (rejecting expert witness's "conclusory" and "internally inconsistent statements" at summary judgment).

## <u>CONCLUSION</u>

For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied.[23] The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223, 233), to enter judgment for Defendants, and to close this case.

Dated: New York, New York
       April 24, 2024

                              SO ORDERED.

                              _Paul S. Gardephe_
                              Paul G. Gardephe
                              United States District Judge

---

[23]  As noted above, Plaintiff has appealed Magistrate Judge Netburn's October 14, 2022 order striking portions of Plaintiff's Supplemental Expert Report concerning a "late-proposed non-infringing alternative that Google was allowed to introduce through [] supplemental discovery." According to Plaintiff, its Supplemental Expert Report demonstrates that Google's "non-infringing alternative . . . is not viable." (See Oct. 14, 2022 Discovery Order (Dkt. No. 283); Pltf. Discovery Appeal Br. (Dkt. No. 235) at 4)  Plaintiff states, however, that "neither the Magistrate's Order, nor [Plaintiff's] Objection, bear on the parties' [] motions for summary judgment." (Pltf. Discovery Appeal Br. (Dkt. No. 235) at 4)  Given this Court's decision granting Defendants' motion for summary judgment, Plaintiff's appeal of the magistrate judge's discovery order is denied as moot.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
NETWORK-1 TECHNOLOGIES, INC.,

                        Plaintiff,

        -against-                                                        14 **CIVIL** 2396 (PGG)
                                                                         14 **CIVIL** 9558 (PGG)

                                                                         **<u>JUDGMENT</u>**

GOOGLE, LLC and YOUTUBE, LLC,

                        Defendants.

--------------------------------------------------------------------X


        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum Opinion & Order dated April 26, 2024, the asserted claims of

the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are

construed as set forth in the order. Defendants' motion for summary judgment is granted as to

Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to

indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims

in this case. Plaintiff's cross-motion for summary judgement is denied. Judgment is entered for

Defendants; accordingly, the case is closed.

**Dated:**  New York, New York

        April 26, 2024

                                                        **RUBY J. KRAJICK**

                                                _____
                                                        **Clerk of Court**

                                BY:             *K. mango*
                                                _____
                                                        **Deputy Clerk**



US008010988B2

(12) **United States Patent**

Cox

(10) Patent No.: **US 8,010,988 B2**
(45) Date of Patent: **Aug. 30, 2011**

(54) **USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK**

(76) Inventor: **Ingemar J. Cox**, London (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 797 days.

(21) Appl. No.: **11/445,928**

(22) Filed: **Jun. 2, 2006**

(65) **Prior Publication Data**

US 2007/0041667 A1    Feb. 22, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
*H04N 7/173*    (2011.01)

(52) **U.S. Cl.** ...................................... 725/110

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,919,479 A | 11/1975 | Moon et al. |
| 4,230,990 A | 10/1980 | Lert, Jr. et al. |
| 4,450,531 A | 5/1984 | Kenyon et al. |
| 4,495,526 A | 1/1985 | Baranoff-Rossine |
| 4,499,601 A | 2/1985 | Matthews |
| 4,511,917 A | 4/1985 | Kohler et al. |
| 4,547,804 A | 10/1985 | Greenberg |
| 4,634,966 A | 1/1987 | Nakatani et al. |
| 4,639,779 A | 1/1987 | Greenberg |
| 4,677,455 A | 6/1987 | Okajima |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. |
| 4,682,370 A | 7/1987 | Matthews |
| 4,697,209 A | 9/1987 | Kiewit et al. |
| 4,739,398 A | 4/1988 | Thomas et al. |
| 4,776,017 A | 10/1988 | Fujimoto |
| 4,805,020 A | 2/1989 | Greenberg |
| 4,843,562 A | 6/1989 | Kenyon et al. |
| 4,918,730 A | 4/1990 | Schulze |
| 5,210,820 A | 5/1993 | Kenyon |
| 5,283,819 A | 2/1994 | Glick et al. |
| 5,437,050 A | 7/1995 | Lamb et al. |
| 5,481,294 A | 1/1996 | Thomas et al. |
| 5,581,658 A | 12/1996 | O'Hagan et al. |
| 5,594,934 A | 1/1997 | Lu et al. |

(Continued)

OTHER PUBLICATIONS

Peter N. Yianilos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.*

(Continued)

*Primary Examiner* — Brian T Pendleton
*Assistant Examiner* — Cai Chen
(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57)    **ABSTRACT**

Information about an audio or video file played on a device is provided by (a) extracting features from the audio or video file, (b) communicating the features to a database, and (c) receiving the information about the audio or video file from the database. The information might include a song title, an album title, and/or a performer name. The information might include a title of a video work, a director of the video work, and/or names of performers in the video work. The information might be rendered on an output of the device. The information might be stored (e.g., persistently) locally on the device.

52 Claims, 10 Drawing Sheets



US 8,010,988 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,629,739 A | 5/1997 | Dougherty | |
| 5,692,213 A | 11/1997 | Godberg et al. | |
| 5,701,452 A | 12/1997 | Siefert | |
| 5,701,542 A | 12/1997 | Seifert | |
| 5,724,605 A | 3/1998 | Wissner | |
| 5,745,900 A | 4/1998 | Burrows | |
| 5,798,785 A * | 8/1998 | Hendricks et al. | 725/46 |
| 5,850,490 A | 12/1998 | Johnson | |
| 5,918,223 A | 6/1999 | Blum et al. | |
| 5,953,415 A | 9/1999 | Nielsen | |
| 6,006,256 A | 12/1999 | Zdepski et al. | |
| 6,011,758 A | 1/2000 | Dockes et al. | |
| 6,026,439 A | 2/2000 | Chowdhury et al. | |
| 6,044,402 A | 3/2000 | Jacobson et al. | |
| 6,052,693 A | 4/2000 | Smith et al. | |
| 6,061,056 A | 5/2000 | Menard et al. | |
| 6,088,455 A | 7/2000 | Logan et al. | |
| 6,088,707 A | 7/2000 | Bates et al. | |
| 6,118,450 A | 9/2000 | Proehl et al. | |
| 6,119,124 A | 9/2000 | Broder et al. | |
| 6,169,986 B1 | 1/2001 | Bowman | |
| 6,173,406 B1 | 1/2001 | Wang | |
| 6,240,409 B1 | 5/2001 | Aiken | |
| 6,243,725 B1 | 6/2001 | Hempleman et al. | |
| 6,247,133 B1 | 6/2001 | Palage et al. | |
| 6,253,193 B1 | 6/2001 | Ginter et al. | |
| 6,263,348 B1 | 7/2001 | Kathrow et al. | |
| 6,330,593 B1 | 12/2001 | Roberts et al. | |
| 6,345,256 B1 | 2/2002 | Milsted et al. | |
| 6,349,296 B1 | 2/2002 | Broder et al. | |
| 6,360,215 B1 | 3/2002 | Judd et al. | |
| 6,363,377 B1 | 3/2002 | Kravets et al. | |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. | |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. | |
| 6,385,596 B1 | 5/2002 | Wiser et al. | |
| 6,408,128 B1 * | 6/2002 | Abecassis | 386/68 |
| 6,418,421 B1 | 7/2002 | Hurtado et al. | |
| 6,449,226 B1 | 9/2002 | Kumagai | |
| 6,452,874 B1 | 9/2002 | Otsuka et al. | |
| 6,477,704 B1 | 11/2002 | Cremia | |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. | |
| 6,505,160 B1 | 1/2003 | Levy et al. | |
| 6,550,001 B1 | 4/2003 | Corwin et al. | |
| 6,550,011 B1 | 4/2003 | Sims, III | |
| 6,577,746 B1 | 6/2003 | Evans et al. | |
| 6,591,245 B1 | 7/2003 | Klug | |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. | |
| 6,609,105 B2 | 8/2003 | Van Zoest et al. | |
| 6,654,757 B1 | 11/2003 | Stern | |
| 6,665,661 B1 | 12/2003 | Crow et al. | |
| 6,675,174 B1 | 1/2004 | Bolle et al. | |
| 6,834,308 B1 * | 12/2004 | Ikezoye et al. | 709/231 |
| 6,873,982 B1 | 3/2005 | Bates et al. | |
| 6,931,451 B1 * | 8/2005 | Logan et al. | 709/231 |
| 6,941,275 B1 | 9/2005 | Swierczek | |
| 6,973,461 B1 | 12/2005 | Fleming, III et al. | |
| 6,978,419 B1 | 12/2005 | Kantrowitz | |
| 6,990,453 B2 | 1/2006 | Wang et al. | |
| 7,013,301 B2 | 3/2006 | Holm et al. | |
| 7,058,223 B2 * | 6/2006 | Cox | 382/190 |
| 7,106,904 B2 | 9/2006 | Shima | |
| 7,155,449 B2 | 12/2006 | Pingel et al. | |
| 7,158,929 B2 | 1/2007 | Wouters et al. | |
| 7,168,083 B2 | 1/2007 | Kalker et al. | |
| 7,302,574 B2 | 11/2007 | Conwell et al. | |
| 7,366,718 B1 | 4/2008 | Pugh et al. | |
| 7,421,723 B2 | 9/2008 | Harkness et al. | |
| 7,477,739 B2 | 1/2009 | Haitsma et al. | |
| 7,523,312 B2 | 4/2009 | Kalker et al. | |
| 7,587,728 B2 | 9/2009 | Wheeler et al. | |
| 7,647,604 B2 | 1/2010 | Ramaswamy | |
| 7,650,616 B2 | 1/2010 | Lee | |
| 7,757,248 B2 | 7/2010 | Harkness et al. | |
| 2001/0001160 A1 * | 5/2001 | Shoff et al. | 725/51 |
| 2001/0003818 A1 | 6/2001 | Pingel et al. | |
| 2002/0023020 A1 | 2/2002 | Kenyon et al. | |
| 2002/0032698 A1 | 3/2002 | Cox | |
| 2002/0120925 A1 * | 8/2002 | Logan | 725/9 |
| 2002/0156760 A1 | 10/2002 | Lawrence et al. | |
| 2003/0106017 A1 | 6/2003 | Kanchirayappa et al. | |
| 2003/0146940 A1 * | 8/2003 | Ellis et al. | 345/811 |
| 2004/0199387 A1 * | 10/2004 | Wang et al. | 704/243 |
| 2005/0160363 A1 | 7/2005 | Bhogal et al. | |
| 2006/0101069 A1 | 5/2006 | Bell et al. | |
| 2006/0206462 A1 | 9/2006 | Barber | |
| 2007/0041667 A1 | 2/2007 | Cox | |
| 2007/0083510 A1 | 4/2007 | McArdle | |
| 2007/0118375 A1 | 5/2007 | Kenyon et al. | |
| 2008/0091684 A1 | 4/2008 | Ellis et al. | |
| 2008/0250241 A1 | 10/2008 | Ginter et al. | |

## OTHER PUBLICATIONS

Baum, L., et al., "A Maximation Technique Occurring in the Statistical Analysis of Probabilistic Functions of Markov Chains", *The Annals of Mathematical Statistics*, vol. 41, No. 1, pp. 164-171 (1970).

Dempster, A. P., et al., "Maximum Likelihood from Incomplete Data via the SEMS Algorithm", *Journal of the Royal Statistical Society*, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).

Reynolds, D., et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models", *IEEE Transactions on Speech and Audio Processing*, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

Nievergelt, J., et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," *ACM Transactions on Database Systems*, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Heintze, N., "Scalable Document Fingerprinting," *Proc. USENIX Workshop on Electronic Commerce* (1996).

Wold, E., et al., "Content-Based Classification, Search, and Retrieval of Audio," *IEEE Multimedia*, vol. 3, Issue 3, pp. 27-63 (1996).

Bhanu, B., et al., "Learning Feature Relevance and Similarity Metrics in Image Databases", *Proceedings of the IEEE Workshop on Content—Based Access of Image and Video Libraries*, pp. 14-19 (1998).

Del Bimbo, A., et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents", *Image Description and Retrieval*, pp. 161-192 (1998).

Indyk, P., and Motwani, R., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality," *Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing*, pp. 604-613 (1998).

La Cascia, M., et al., "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web", *Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries*, pp. 24-29 (1998).

Yianilos, N. P., "Excluded Middle Vantage Point Forests for Nearest Neighbor Search," *DIMACS Implementation Challenge*, ALENEX'99 (1999).

Yoshitaka, A., et al., "A Survey on Content-Based Retrieval for Multimedia Databases", *IEEE Transactions on Knowledge and Data Engineering*, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Lawrence, S., et al., "Digital Libraries and Autonomous Citation Indexing," *IEEE Computer*, pp. 67-71 (Jun. 1999).

Yianilos, N. P., "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search," *Symposium on Discrete Algorithms, Proceeding of the Eleventh Annual ACM-SIAM symposium on Discrete Algorithms*, pp. 361-370 (2000).

Kimura, A., et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," *IEEE Conf. on Acoustics, Speech and Signal Processing*, (ICASSP '01), vol 3, pp. 1429-1432 (2001).

Chavez, E., et al., "Searching in Metric Spaces", (Sep. 2001) *ACM Computing Surveys*, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Haitsma, J., et al., "Robust Audio Hashing for Content Identification, Int." *Workshop on Content Based Multimedia Indexing*, Brescia, Italy (Sep. 19-21, 2001).

Haitsma, J., and Walker, T., "A Highly Robust Audio Fingerprinting System," *Journal of New Music Research*, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Schleimer, Saul, et al., "Winnowing: Local Algorithms for Document Fingerprinting ACM SIGMOD" (Jun. 9-12, 2003).

"Searching Near-Replicas of Images via Clustering" Edward Chang, Chen Li, James Wang, Peter Mork, Gio Wiederhold Proc. SPIE Symposium of Voice, Video, and Data Communications, 1999.

US 8,010,988 B2

Page 3

"Rime: A Replicated Image Detector for the World-Wide Web" Edward Y. Chang, James Ze Wang, Chen Li, and Gio Wiederhold, SPIE 1998.

"Safeguarding and charging for information on the internet," H. Garcia-Molina, S. Ketchpel, and N. Shivakumar, Proceedings of ICDE, 1998.

"Copy detection mechanisms for digital documents," S. Brin and H. Garcia-Molina, Proceedings of ACM SIG-MOD, May 1995.

"The x-tree: An index structure for high-dimensional data," S. Berchtold, Proceedings of the 22nd VLDB, Aug. 1996.

"The sr-tree: An index structure for high-dimensional nearest neighbor queries," N. Katayama and S. Satoh, Proceedings of ACM SIGMOD, May 1997.

"The k-d-b-tree: A search structure for large multidimensional dynamic indexes," J. T. Robinson, Proceedings of ACM SIGMOD, Apr. 1981.

"Query by image and video content: the QBIC system," M. Flickner, H. Sawhney, W. Niblack, J. Ashley, Q. Huang, and et al, IEEE Computer 28(9), pp. 23{32, 1995.

"Visual information retrieval," A. Gupta and R. Jain, Communications of the ACM 40(5), pp. 69-79, 1997.

"Visualseek: A fully automated content-based image query system," J. R. Smith and S.-F. Chang, ACM Multimedia Conference, 1996.

"Similarity indexing: Algorithms and performance," D. A. White and R. Jain, Proc. SPIE vol. 2670, San Diego, 1996.

"The r*-tree: an efficient and robust access method for points and rectangles," N. Beckmann, H.-P. Kriegel, R. Schneider, and B. Seeger, Proceedings of ACM Sigmod, May 1990.

"R-trees: a dynamic index structure for spatial searching," A. Guttman, Proceedings of ACM Sigmod, Jun. 1984.

"Similarity indexing with the ss-tree," D. A. White and R. Jain, Proceedings of the 12th ICDE, Feb. 1996.

"The tv-tree: an index structure for high-dimensional data," K.-L. Lin, H. V. Jagadish, and C. Faloutsos, VLDB Journal 3 (4), 1994.

"M-tree: An efficient access method for similarity search in metric spaces," P. Ciaccia, M. Patella, and P. Zezula, Proceedings of the 23rd VLDB, Aug. 1997.

"Nearest neighbor queries," N. Roussopoulos, S. Kelley, and F. Vincent, Proceedings of ACM Sigmod , May 1995.

"An extensible hashing index for high-dimensional similarity search," C. Li, E. Chang, and J. Z. Wang, Stanford Technical Report , Aug. 1998. [NOT AVAILABLE].

"Two algorithms for nearest-neighbor search in high dimensions" J. M. Kleinberg, Proc 29th STOC, 1997.

"A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise" Martin Ester, Hans-Peter Kriegel, Jörg Sander, Xiaowei Xu Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

"Adaptive Color Image Embeddings for Database Navigation" Yossi Rubner, Carlo Tomasi and Leonidas J. Guibas, Proceedings of the 1998 IEEE Asian Conference on Computer Vision.

A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces R. Weber, H-J Schek, S. Blott Proc., 24th VLDB Conf. 1998.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8

Case: 24-1893    Document: 17    Page: 206    Filed: 10/15/2024



FIGURE 9



UNIQUE ID: 15642 ～ 1010

PRODUCT: COCA COLA ～ 1020

CATEGORY: SODA ～ 1030

MANUFACTURER: COCA COLA ～ 1040

URL http://www.cocacola.com ～ 1050

OTHER DATA ～ 1060

1000

# FIGURE 10

US 8,010,988 B2

**1**

## USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK

### §0. RELATED APPLICATIONS

The present application is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference), titled "IDENTIFYING WORKS FOR INITI-ATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001 now U.S. Pat. No. 7,058,223, and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorpo-rated herein by reference), titled "Identifying and linking television, audio, print and other media to the Internet", filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

### §1. BACKGROUND OF THE INVENTION

#### §1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement deliv-ered via print media, or via a radio or television broadcast) without the need to modify the work.

#### §1.2 Related Art

##### §1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request dis-count vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applica-tions also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be auto-matically enabled using the invention described herein.

In the context of facilitating audience interaction or par-ticipation, there is much interest in the convergence of tele-vision and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also

**2**

interest in enhancing the television viewing experience. To this end, there have been a number of experiments with inter-active television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the com-petition.

##### §1.2.2 Embedding Work Identifying Code or Signals within Works

Known techniques of linking works delivered via tradi-tional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such tradi-tional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) water-marks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed imple-mentations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be con-sidered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a propri-etary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technol-ogy and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blank-ing interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to tele-vision viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-caption-ing information as well as other information, while in the UK, the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking inter-val is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, OR embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of broad-cast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It

US 8,010,988 B2

**3**

should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, UT embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of barcode and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic and fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naïve user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed directly into a sound card in a PC. This requires a physical

**4**

connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

### §1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §2. SUMMARY OF THE INVENTION

This patent application describes an alternative solution that does not suffer from the problems outlined above. The solution is based on direct or indirect recognition of the media itself. Direct or indirect recognition refers to the fact that a number of possible configurations are possible, some of which directly recognize the work on the equipment in a user's home while other configurations perform this recognition indirectly by transmitting work-specific information to one or more remote sites. Neither technique requires the embedding of any form of active signal. Instead, when media in the form of music, print, television or multimedia is presented to a personal computer (PC), set-top-box or other device, such devices directly or indirectly recognize the media and initiate an action. The set of possible actions is potentially infinite and includes, for example, retrieving further information, interacting with a live broadcast, registering the user for a service or product, purchasing a product or service and/or receiving discount coupons or certificates that can be used towards a purchase.

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio (or video) file played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video

US 8,010,988 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

### §4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

### §4.1 FUNCTIONS

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work informa-

tion to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §4.2 EMBODIMENTS

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

#### §4.2.1 Embodiments in which Work is Recognized Based on Intra-Work Information, Such as a Feature Vector

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

#### §4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK$_{@t1}$), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK$_{@t2}$), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a

US 8,010,988 B2

7

8

matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

### §4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also K. Fukunaga, *Introduction to Statistical Pattern Recognition,* 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480× 720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or bare a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," *IEEE Transactions on Image Processing* (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518,

5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

### §4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

### §4.2.1.1.3 Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent

US 8,010,988 B2

9

to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", *Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop*, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.)

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a work's feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

§4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database **130** that contains information **136** associated with the particular work **134**. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such

10

as initiating an e-commerce transaction. After looking up the work identifier **134** in the WIDAT database **130**, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database **130** allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive the advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

§4.2.1.2 Exemplary Architectures

Three alternative architectural embodiments in which the first technique may be employed are now described with reference to FIGS. **2**, **3**, and **4**.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device **210**, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer **210** performs the operations **140***a*, **150***a*, **160***a* and **170***a*, such as those shown in FIG. **1**. To reiterate, these operations include a feature extraction operation(s) **140***a*, feature vector lookup or matching operation(s) **150***a* in connection with items or records **112***a* in a work-identification (WID) database **110***a*. If a matching feature vector **114***a* is found, the work-associated information lookup operation(s) **160***a* can use the associated work identifier **116***a* to accessing a work identification-action translation (WIDAT) database **130***a* to retrieve associated information **136***a*, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

US 8,010,988 B2

11

An example illustrating operations that can occur in the first embodiment of FIG. **1**, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database **110a**. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Estimates of the size of the WIDAT database **130a** depend on what associated information (recall fields **136**) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database **130a** would be less than 1 Mbyte.

The configuration just described with reference to FIG. **2** places all of the processing and data on each user's local machine **210**. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider **240** must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet **230** in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer **210** might also transmit information to a central monitoring center **240** informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. **2**, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database **130b** is at a remote location **340**. In this arrangement, illustrated in FIG. **3**, after the local computer **310** identifies the work, it sends a query to the remote WIDAT database **130b**. The query may contain the work identifier. The remote site **340** may then return the associated information **136**. Although the remote WIDAT database **130b** needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers **310**.

12

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database **130b** might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, overloading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database is small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1 Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally **410**, the one or more vectors are transmitted to a central site **440** at which is stored the WID and WIDAT databases **110c** and **130c** together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. **4**. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation **140c** that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site **440** which can resolve the request.

After successfully matching the feature vector, the central site **440** can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site **440** might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction **140c** in digital set-top-boxes and in video recorders **410**. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement,

US 8,010,988 B2

**13**

the video recorder would extract one or more feature vectors and transmit them to a central site **440**. This site **440** would determine if a match existed between the query vector and the database of pre-stored vectors **110**c. If a match is found, the central server **440** would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device **410**. Of course, a consumer device **410** such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device **410** could store the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

### §4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCR's. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information").

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) **210/310/410** to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

### §4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, pref-

**14**

erably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action information (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT) information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. Such information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market) **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

### §4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be

US 8,010,988 B2

**15**

necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

### §4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database **510** maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140**d, as well as the work identification operation(s) **150**d and other databases **110**d, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4×35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophis-

**16**

ticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

### §4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, or which TV's do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

### §4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540**a may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510**a, **530**a, and **110**e, as well as the database generation operation(s) **520**a/**538**a, the lookup operation(s) **550**a and the work-associated information lookup operation(s) **560**a may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to

US 8,010,988 B2

**17**

the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740***a* and query resolution center **740***b* are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and especially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which point to sites of interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

**18**

§4.2.3 Exemplary Apparatus for Audience Member (User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. **6** and **7**, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This information can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCR's and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. **6** and **7**, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities. Of course, the two-way commu-

US 8,010,988 B2

**19**

nication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

### §4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §4.3 OPERATIONAL EXAMPLES

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in

### §4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

### §4.3.1 Operational Example where Intra-Work Information Is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed.

**20**

The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of $n \times n$ blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and/or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the $n \times n$ blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of $480 \times 720$ pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with $16 \times 16$ blocks, then the number of blocks per frame is 345, $600/256=1350$. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 $16 \times 16$ blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the $100 \times 10=1000$ DCT coefficients. Many other variations are also possible. In many media applications, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the

US 8,010,988 B2

**21**

transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000,000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

**22**

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sublinear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, T. The fixed radius search means that if the database contains a vector that is within X of the query, then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10×50× 30 queries per second.

§4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840***a*. These centers **840***a* may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840***a* is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840***a* update one or more database centers **840***b*, informing them of the time, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840***b* updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840***b* can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a

US 8,010,988 B2

**23**

classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840a**. The database centers **840b** are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries in memory. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to $3600 \times 100 \times 100 = 36,000,000$ entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work.

An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**, the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840b**. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840b**. This might happen hours or even days later.

**24**

The query contains information that the database center **840b** uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840b** receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840b** may simply function as a form of proxy server, mapping the audience member's initial query into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840b** may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840b** to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, CA or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840b** using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840a** where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840b** is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

### §4.4 CONCLUSIONS

None of the embodiments of the invention require modification to the work or content, i.e. no active signal is embed-

US 8,010,988 B2

25

ded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

What is claimed is:

**1**. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

   a) electronically extracting within a portable client device features from the electronic work;

   b) transmitting the extracted features from the portable client device to one or more servers;

   c) receiving at the portable client device from the one or more servers an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

   d) electronically determining an action based on the identification of the electronic work; and

   e) electronically performing the action on the portable client device.

**2**. A method of claim **1**, wherein the identification is based on a non-exhaustive search identifying a neighbor within a fixed radius.

**3**. The method of claim **1**, wherein the non-exhaustive search is sublinear.

**4**. The method of claim **1**, wherein the non-exhaustive search is based on kd-trees.

**5**. The method of claim **1**, wherein the non-exhaustive search is based on vantage point trees.

**6**. The method of claim **1**, wherein the non-exhaustive search is based on excluded middle vantage point forest.

**7**. The method of claim **1**, wherein the electronic work is an audio work.

**8**. The method of claim **7**, wherein the audio work is obtained from at least one of a broadcast and an audio file format.

**9**. The method of claim **7**, wherein the identification includes at least one of a song title, an album title, and a performer name.

**10**. The method of claim **1**, wherein the electronic work is a video work.

**11**. The method of claim **10**, wherein the video work is obtained from at least one of a broadcast and a video file format.

**12**. The method of claim **10**, wherein the identification includes at least one of a title of the video work, a director of the video work, and names of performers in the video work.

**13**. The method of claim **1**, wherein the step of electronically determining the action includes receiving at the portable client device an action based on the identification of the electronic work from the one or more servers.

**14**. The method of claim **1**, wherein the step of electronically extracting the features is performed by at least one of a microprocessor of the portable client device and a digital signal processor of the portable client device.

**15**. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

26

   a) electronically extracting features from the electronic work;

   b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

   c) electronically determining an action based on the identification of the electronic work; and

   d) electronically performing the action.

**16**. A method of claim **15**, wherein the identification is based on a non-exhaustive search identifying a neighbor within a fixed radius.

**17**. The method of claim **15**, wherein the non-exhaustive search is sublinear.

**18**. The method of claim **15**, wherein the non-exhaustive search is based on kd-trees.

**19**. The method of claim **15**, wherein the non-exhaustive search is based on vantage point trees.

**20**. The method of claim **15**, wherein the non-exhaustive search is based on excluded middle vantage point forest.

**21**. The method of claim **15**, wherein the electronic work is an audio work.

**22**. The method of claim **21**, wherein the audio work is obtained from at least one of a broadcast and an audio file format.

**23**. The method of claim **21**, wherein the identification includes at least one of a song title, an album title, and a performer name.

**24**. The method of claim **15**, wherein the electronic work is a video work.

**25**. The method of claim **24**, wherein the video work is obtained from at least one of a broadcast and a video file format.

**26**. The method of claim **24**, wherein the identification includes at least one of a title of the video work, a director of the video work, and names of performers in the video work.

**27**. The method of claim **15**, wherein the action promotes e-commerce.

**28**. The method of claim **15**, wherein the action promotes interaction.

**29**. The method of claim **1**, wherein the action promotes e-commerce.

**30**. The method of claim **1**, wherein the action promotes interaction.

**31**. The method of claim **15**, wherein the action comprises providing and/or displaying additional information in association with the electronic work.

**32**. The method of claim **31**, wherein the additional information is an advertisement.

**33**. The method of claim **32**, wherein the action comprises providing a link to a site on the World Wide Web associated with the advertisement.

**34**. The method of claim **32**, wherein the action comprises electronically registering a user with at least one of a service and a product related to the advertisement.

**35**. The method of claim **32**, wherein the action comprises electronically providing at least one of a coupon and a certificate related to the advertisement.

**36**. The method of claim **32**, wherein the action comprises automatically dialing a telephone number associated with the advertisement.

**37**. The method of claim **32**, wherein the action comprises collecting competitive market research data related to the advertisement.

**38**. The method of claim **32**, wherein the action comprises purchasing a product or service related to the advertisement.

US 8,010,988 B2

27

**39**. The method of claim **32**, wherein the action comprises allowing a user to interact with a live broadcast related to the advertisement.

**40**. The method of claim **1**, wherein the action comprises providing and/or displaying additional information in association with the electronic work.

**41**. The method of claim **40**, wherein the additional information is an advertisement.

**42**. The method of claim **41**, wherein the action comprises providing a link to a site on the World Wide Web associated with the advertisement.

**43**. The method of claim **41**, wherein the action comprises electronically registering a user with at least one of a service and a product related to the advertisement.

**44**. The method of claim **41**, wherein the action comprises electronically providing at least one of a coupon and a certificate related to the advertisement.

**45**. The method of claim **41**, wherein the action comprises automatically dialing a telephone number associated with the advertisement.

**46**. The method of claim **41**, wherein the action comprises collecting competitive market research data related to the advertisement.

28

**47**. The method of claim **41**, wherein the action comprises purchasing a product or service related to the advertisement.

**48**. The method of claim **41**, wherein the action comprises allowing a user to interact with a live broadcast related to the advertisement.

**49**. The method of claim **40**, wherein the electronic work is an audio work and the additional information comprises at least one of a song title, an album title, and a performer name.

**50**. The method of claim **40**, wherein the electronic work is a video work and the additional information comprises at least one of a title of the video work, a director of the video work, and names of performers in the video work.

**51**. The method of claim **31**, wherein the electronic work is an audio work and the additional information comprises at least one of a song title, an album title, and a performer name.

**52**. The method of claim **31**, wherein the electronic work is a video work and the additional information comprises at least one of a title of the video work, a director of the video work, and names of performers in the video work.

*    *    *    *    *



US008205237B2

## (12) United States Patent
### Cox

(10) Patent No.: **US 8,205,237 B2**

(45) Date of Patent: *Jun. 19, 2012

(54) **IDENTIFYING WORKS, USING A SUB-LINEAR TIME SEARCH, SUCH AS AN APPROXIMATE NEAREST NEIGHBOR SEARCH, FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET**

(76) Inventor: **Ingemar J. Cox**, London (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 594 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/977,202**

(22) Filed: **Oct. 23, 2007**

(65) **Prior Publication Data**

US 2008/0060036 A1    Mar. 6, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 11/445,928, filed on Jun. 2, 2006, which is a continuation-in-part of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
      *H04N 7/173*      (2011.01)
(52) **U.S. Cl.** ...................................... 725/110
(58) **Field of Classification Search** ........................ None
      See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,919,479 | A | 11/1975 | Moon et al. |
| 4,230,990 | A | 10/1980 | Lert, Jr. et al. |
| 4,450,531 | A | 5/1984 | Kenyon et al. |
| 4,495,526 | A | 1/1985 | Baranoff-Rossine |
| 4,499,601 | A | 2/1985 | Matthews |
| 4,511,917 | A | 4/1985 | Kohler et al. |
| 4,547,804 | A | 10/1985 | Greenberg |
| 4,634,966 | A | 1/1987 | Nakatani et al. |
| 4,639,779 | A | 1/1987 | Greenberg |
| 4,677,455 | A | 6/1987 | Okajima |
| 4,677,466 | A | 6/1987 | Lert, Jr. et al. |
| 4,682,370 | A | 7/1987 | Matthews |
| 4,697,209 | A | 9/1987 | Kiewit |
| 4,739,398 | A | 4/1988 | Thomas et al. |
| 4,776,017 | A | 10/1988 | Fujimoto |
| 4,805,020 | A | 2/1989 | Greenberg |

(Continued)

OTHER PUBLICATIONS

Peter N. Yianilos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.*

(Continued)

*Primary Examiner* — Brian Pendleton

*Assistant Examiner* — Cai Chen

(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57)      **ABSTRACT**

A media work may be associated with an action by (a) extracting features from the media work, (b) determining an identification of the media work, based on the features extracted, using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determining an action based on the identification of the media work determined. The media work may be an audio work. The features extracted from the work may include (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and/or (D) information from frequencies of the audio work.

**40 Claims, 10 Drawing Sheets**



US 8,205,237 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,843,526 A | 6/1989 | Price, III | |
| 4,843,562 A | 6/1989 | Kenyon et al. | |
| 4,918,730 A | 4/1990 | Schulze | |
| 5,210,820 A | 5/1993 | Kenyon | |
| 5,283,819 A | 2/1994 | Glick et al. | |
| 5,437,050 A | 7/1995 | Lamb et al. | |
| 5,481,294 A | 1/1996 | Thomas et al. | |
| 5,581,658 A | 12/1996 | O'Hagan et al. | |
| 5,594,934 A | 1/1997 | Lu et al. | |
| 5,629,739 A | 5/1997 | Dougherty | |
| 5,692,213 A | 11/1997 | Goldberg et al. | |
| 5,701,452 A | 12/1997 | Siefert | |
| 5,701,542 A | 12/1997 | Sasayama | |
| 5,724,605 A | 3/1998 | Wissner | |
| 5,745,900 A | 4/1998 | Burrows | |
| 5,798,785 A | 8/1998 | Hendricks et al. | |
| 5,850,490 A | 12/1998 | Johnson | |
| 5,918,223 A | 6/1999 | Blum et al. | |
| 5,953,415 A | 9/1999 | Nielsen | |
| 6,006,256 A | 12/1999 | Zdepski et al. | |
| 6,011,758 A | 1/2000 | Dockes et al. | |
| 6,026,439 A | 2/2000 | Chowdhury et al. | |
| 6,044,402 A | 3/2000 | Jacobson et al. | |
| 6,052,693 A | 4/2000 | Smith et al. | |
| 6,061,056 A * | 5/2000 | Menard et al. | 715/704 |
| 6,088,455 A | 7/2000 | Logan et al. | |
| 6,088,707 A | 7/2000 | Bates et al. | |
| 6,118,450 A | 9/2000 | Proehl et al. | |
| 6,119,124 A | 9/2000 | Broder et al. | |
| 6,169,986 B1 | 1/2001 | Bowman et al. | |
| 6,173,406 B1 | 1/2001 | Wang et al. | |
| 6,240,409 B1 | 5/2001 | Aiken | |
| 6,243,725 B1 | 6/2001 | Hempleman et al. | |
| 6,247,133 B1 | 6/2001 | Palage et al. | |
| 6,253,193 B1 | 6/2001 | Ginter et al. | |
| 6,263,348 B1 | 7/2001 | Kathrow et al. | |
| 6,330,593 B1 | 12/2001 | Roberts et al. | |
| 6,345,256 B1 | 2/2002 | Milsted et al. | |
| 6,349,296 B1 | 2/2002 | Broder | |
| 6,360,215 B1 | 3/2002 | Judd et al. | |
| 6,363,377 B1 | 3/2002 | Kravets et al. | |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. | |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. | |
| 6,385,596 B1 | 5/2002 | Wiser et al. | |
| 6,408,128 B1 | 6/2002 | Abecassis | |
| 6,418,421 B1 | 7/2002 | Hurtado et al. | |
| 6,446,068 B1 | 9/2002 | Kortge | |
| 6,449,226 B1 | 9/2002 | Kumagai | |
| 6,452,874 B1 | 9/2002 | Otsuka et al. | |
| 6,477,704 B1 | 11/2002 | Cremia | |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. | |
| 6,505,160 B1 | 1/2003 | Levy | |
| 6,550,001 B1 | 4/2003 | Corwin et al. | |
| 6,550,011 B1 | 4/2003 | Sims, III | |
| 6,577,746 B1 | 6/2003 | Evans et al. | |
| 6,591,245 B1 | 7/2003 | Klug | |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. | |
| 6,609,105 B2 | 8/2003 | Van Zoest et al. | |
| 6,654,757 B1 | 11/2003 | Stern | |
| 6,665,661 B1 | 12/2003 | Crow et al. | |
| 6,675,174 B1 | 1/2004 | Bolle et al. | |
| 6,834,308 B1 * | 12/2004 | Ikezoye et al. | 709/231 |
| 6,873,982 B1 | 3/2005 | Bates et al. | |
| 6,931,451 B1 | 8/2005 | Logan et al. | |
| 6,941,275 B1 | 9/2005 | Swierczek | |
| 6,978,419 B1 | 12/2005 | Kantrowitz | |
| 6,978,461 B2 | 12/2005 | Shapiro et al. | |
| 6,990,453 B2 | 1/2006 | Wang et al. | |
| 7,013,301 B2 | 3/2006 | Holm et al. | |
| 7,058,223 B2 | 6/2006 | Cox | |
| 7,106,904 B2 | 9/2006 | Shima | |
| 7,155,449 B2 | 12/2006 | Pingel et al. | |
| 7,158,929 B2 | 1/2007 | Wouters et al. | |
| 7,168,083 B2 | 1/2007 | Kalker et al. | |
| 7,302,574 B2 | 11/2007 | Conwell et al. | |
| 7,366,718 B1 | 4/2008 | Pugh et al. | |
| 7,421,723 B2 | 9/2008 | Harkness et al. | |
| 7,477,739 B2 | 1/2009 | Haitsma et al. | |

| | | | |
|---|---|---|---|
| 7,523,312 B2 | 4/2009 | Kalker et al. | |
| 7,587,728 B2 | 9/2009 | Wheeler et al. | |
| 7,647,604 B2 | 1/2010 | Ramaswamy | |
| 7,650,616 B2 | 1/2010 | Lee | |
| 7,757,248 B2 | 7/2010 | Harkness et al. | |
| 2001/0001160 A1 * | 5/2001 | Shoff et al. | 725/51 |
| 2001/0003818 A1 | 6/2001 | Pingel et al. | |
| 2002/0023020 A1 | 2/2002 | Kenyon et al. | |
| 2002/0032698 A1 | 3/2002 | Cox | |
| 2002/0120925 A1 | 8/2002 | Logan | |
| 2002/0156760 A1 | 10/2002 | Lawrence et al. | |
| 2003/0106017 A1 | 6/2003 | Kanchirayappa et al. | |
| 2003/0146940 A1 | 8/2003 | Ellis | |
| 2004/0199387 A1 * | 10/2004 | Wang et al. | 704/243 |
| 2005/0160363 A1 | 7/2005 | Bhogal et al. | |
| 2006/0101069 A1 | 5/2006 | Bell et al. | |
| 2006/0206462 A1 | 9/2006 | Barber | |
| 2007/0041667 A1 | 2/2007 | Cox | |
| 2007/0083510 A1 | 4/2007 | McArdle | |
| 2007/0118375 A1 | 5/2007 | Kenyon et al. | |
| 2008/0091684 A1 | 4/2008 | Ellis et al. | |
| 2008/0250241 A1 | 10/2008 | Ginter et al. | |

## OTHER PUBLICATIONS

Peter N. Yianlos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.*

P.N. Yianilos, "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search" SODA 2000, pp. 361-370.

Baum, L., et al., "A Maximation Technique Occurring in the Statistical Analysis of Probabilistic Functions of Markov Chains", The Annals of Mathematical Statistics, vol. 41, No. 1, pp. 164-171 (1970).

Dempster, A. P., et al., "Maximum Likelihood from Incomplete Data via the SEMS Algorithm", Journal of the Royal Statistical Society, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).

Reynolds, D., et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models", IEEE Transactions on Speech and Audio Processing, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

Nievergelt, J. et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," ACM Transactions on Database Systems, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Heintze, N, "Scalable Document Fingerprinting," Proc. USENIX Workshop on Electronic Commerce (1996).

Wold, E., et al., "Content-Based Classification, Search, and Retrieval of Audio," IEEE Multimedia, vol. 3, Issue 3, pp. 27-63 (1996).

Bhanu, B., et al., "Learning Feature Relevance and Similarity Metrics in Image Databases", Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 14-19 (1998).

Del Bimbo, A., et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents", Image Description and Retrieval, pp. 161-192 (1998).

Indyk, P., and Motwani, R., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality," Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing, pp. 604-613 (1998).

La Cascia, M., et al., "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web", Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 24-29 (1998).

Yoshitaka, A., et al., "A Survey on Content-Based Retrieval for Multimedia Databases", IEEE Transactions on Knowledge and Data Engineering, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Lawrence, S., et al., "Digital Libraries and Autonomous Citation Indexing," IEEE Computer, pp. 67-71 (Jun. 1999).

Kimura, A, et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," IEEE Conf on Acoustics, Speech and Signal Processing, (ICASSP '01), vol. 3, pp. 1429-1432 (2001).

Chavez, E., et al., "Searching in Metric Spaces", ACM Computing Surveys, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Haitsma, J., et al., "Robust Audio Hashing for Content Identification, Int' Workshop on Content Based Multimedia Indexing, Brescia, Italy (Sep. 19-21, 2001).

US 8,205,237 B2
Page 3

Haitsma, J., and Walker, T, "A Highly Robust Audio Fingerprinting System," Journal of New Music Research, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Schleimer, Saul, et al., "Winnowing: Local Algorithms for Document Fingerprinting ACM SIGMOD" (Jun. 9-12, 2003).

"Searching Near-Replicas of Images via Clustering" Edward Chang, Chen Li, James Wang, Peter Mork, Gio Wiederhold Proc. SPIE Symposium of Voice, Video, and Data Communications, 1999.

"RIME: A Replicated Image Detector for the World-Wide Web" Edward Y. Chang, James Ze Wang, Chen Li, and Gio Wiederhold, SPIE 1998.

"Safeguarding and charging for information on the internet," H. Garcia-Molina, S. Ketchpel, and N. Shivakumar, Proceedings of ICDE , 1998.

"Detection mechanisms for digital documents," S. Brin and H. Garcia-Molina, Proceedings of the ACM SIG-MOD , May 1995.

"The x-tree: An index structure for high-dimensional data," S. Berchtold, Proceedings of the 22nd VLDB , Aug. 1996.

"The sr-tree: An index structure for high-dimensional nearest neighbor queries," N. Katayama and S. Satoh, Proceedings of ACM SIGMOD , May 1997.

"The k-d-b-tree: A search structure for large multidimensional dynamic indexes," J. T. Robinson, Proceedings of ACM SIGMOD , Apr. 1981.

"Query by image and video content: The QBIC system," M. Flickner, H. Sawhney, W. Niblack, J. Ashley, Q. Huang, and et al, IEEE Computer 28(9), pp. 23{32, 1995.

"Visual information retrieval," A. Gupta and R. Jain, Communications of the ACM 40(5), pp. 69-79, 1997.

"Visualseek: A fully automated content-based image query system," J. R. Smith and S.-F. Chang, ACM Multimedia Conference , 1996.

"Similarity indexing: Algorithms and performance," D. A. White and R. Jain, Proc. SPIE vol. 2670, San Diego, 1996.

"The r*-tree: an efficient and robust access method, for points and rectangles," N. Beckmann, H.-P. Kriegel, R. Schneider, and B. Seeger, Proceedings of ACM Sigmod , May 1990.

"R-trees: a dynamic index structure for spatial searching," A. Guttman, Proceedings of ACM Sigmod , Jun. 1984.

"Similarity indexing with the ss-tree," D. A. White and R. Jain, Proceedings of the 12th ICDE , Feb. 1996.

"The tv-tree: an index structure for high-dimensional data," K.-I. Lin, H. V. Jagadish, and C. Faloutsos, VLDB Journal 3 (4), 1994.

"M-tree: An efficient access method for similarity search in metric spaces," P. Ciaccia, M. Patella, and P. Zezula, Proceedings of the 23rd VLDB , Aug. 1997.

"Nearest neighbor queries," N. Roussopoulos, S. Kelley, and F. Vincent, Proceedings of ACM Sigmod , May 1995.

"An extensible hashing index for high-dimensional similarity search," C. Li, E. Chang, and J. Z. Wang, Stanford Technical Report , Aug. 1998.

"Two algorithms for nearest-neighbor search in high dimensions" J. M. Kleinberg, Proc 29th STOC, 1997.

"A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise" Martin Ester, Hans-Peter Kriegel, Jörg Sander, Xiaowei Xu Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

"Adaptive Color Image Embeddings for Database Navigation" Yossi Rubner, Carlo Tomasi and Leonidas J. Guibas, Proceedings of the 1998 IEEE Asian Conference on Computer Vision.

A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces R. Weber, H-J Schek, S. Blott Proc., 24th VLDB Conf. 1998.

Bouktache, D, "A fast algorithm for the nearest neighbor classifier", IEEE Transactions on Pattern Analysis and Machine Intelligence, Mar. 1997, pp. 277-282.

Nene et al., "A simple algorithm for nearest neighbor search in high dimensions", IEEE Transactions on Pattern Analysis and Machine Intelligence; Sep. 1997, pp. 989-1003.

Arya et al. "Approximate nearest neighbor queries in fixed dimensions", Proceedings of the 4th annual ACM-SIAM Symposium on Discrete algorithms, 1993; pp. 271-280.

K. Fukunaga and P. M. Narendra. A branch and bound algorithm for computing k-nearest neighbors. IEEE Trans. Comput., C-24:750{753, Jul. 1975.

C.D. Feustel and L. G. Shapiro. The nearest neighbor problem in an abstract metric space. Pattern Recognition Letters, pp. 125{128, Dec. 1982.

Dennis Shasha and Tsong-Li Wang. New techniques for best-match retrieval. ACM Transactions on Information Systems, 8(2):140{158, Apr. 1990.

J. Uhlmann. Satisfying general proximity/similarity queries with metric trees. Information Processing Letters, 40 (4):175{9, Nov. 1991.

Sergey Brin, "Near Neighbor Search in Large Metric Spaces", Proceedings of the 21st VLDB Conference, Zurich, Switzerland, Sep. 1995.

D. P. Huttenlocher, et al. Comparing images using the hausdorff distance. IEEE Transactions on Pattern Analysis and Machine Intelligence, 15(3):850{63, Sep. 1993.

Seidl et al. "Optimal multi-step k-nearest neighbor search", Proceedings of ACM SIGMOD international conference on Managemet of data, 1998, pp. 154-165.

W.A. Burkhard and R.M. Keller. Some Approaches to Best-Match File Searching. Communications of the ACM. vol. 16, No. 4, Apr. 1973.

Kushilevitz et al. "Efficient search for approximate nearest neighbor in high dimensional spaces", Proceedings of the 30th annual ACM Symposium on Theory of computing, 1998, pp. 614-623.* ;annual ACM Symposium on Theory of computing, 1998, pp. 614-623.

Yianilos, P, "Data structures and algorithms for nearest neighbor search in general metric spaces", Proceedings of the ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 311-321.

Ardizzone, Edoardo et al., "Motion and Color-Based Video Indexing and Retrieval," Universita di palermo, Departimento di Ingegneria Elettrica, pp. 135-139, Viale delle Scienze, Palermo, Italy, IEEE 1996.

Deng, Yining et al., "Content-based Search of Video Using Color, Texture, and Motion," Dept. of Electrical and Computer Engineering, University of California, Santa Barbara, CA, pp. 534-537, IEEE 1997.

Fang, Min et al., "Computing Iceberg Queries Efficiently," Dept. of Computer Science, Stanford, CA, Paper No. 234, pp. 1-25.

Flickner, Myron et al., "Query by Image and Video Content: The QBIC System," IBM Almaden Research Center, pp. 23-32, IEEE 1995.

Gargi, U et al., "Performance Characterization and Comparison of Video Indexing Algorithms," Dept. of Computer Science and Engineering, The Pennsylvania State University, University Park, PA.

Gionis, Aristides et al., "Similarity Search in High Demensions via Hashing," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 518-529, Proceeding the 25th VLDB Conference, Edinburgh, Scotland, 1999.

Indyk, Piotr et al., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality" (preliminary version) Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13 & i-vii, Jul. 21, 1999.

Iyengar, Giridharan et al., "Models for automatic classification of video sequences," MIT Media Laboratory, Cambridge, MA.

Jain, Anil K., et al., "Image Retrieval using Color and Shape," Dept. of Computer Science, Michigan State University, Eas Lansing, MI, pp. 1-24, May 15, 1995.

Ogle, Virginia E., et al., "Chabot: Retrieval from a Relational Database of Images," University of California at Berkeley, Computer pp. 40-48, IEEE 1995.

Pentland, A. et al., "Photobook: Content-Based Manipulation of Image Databases," Perceptual Computing Section, The Media Laboratory, Massachusetts Institute of Tech., International Jorunal of Computer Vision 18(3), pp. 233-254 (1996), 1996 Kluwer Academic Publishers. Manuf. in The Netherlands.

Shivakumar, Narayanan et al., "SCAM: A Copy Detection Mechanism for Digital Documents," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13.

**US 8,205,237 B2**

Page 4

Shivakumar, Narayanan et al., "Building a Scalable and Accurate Copy Detection Mechanism," Dept. of Computer Science, Stanford University, Stanford, CA.

Srihari, Rohiini K., "Automatic Indexing and Content-Based Retrieval of Captioned Images," State University of New York, Buffalo, Theme Feature, pp. 49-56, Sep. 1995, IEEE 1995.

Swain, Michael and Ballard, Dana H., "Color Indexing," International Journal of Computer Vision 7:1, p. 11-32 (1991), 1991 Kluwer Academic Publishers. Manuf. in The Netherlands.

Wactlar, Howard D. et al., "Intelligence Access to Digital Video: Informedia Project," Carnegie Mellon University, Digital Library Initiative: Carnegie Mellon University, Computer, pp. 46-52, IEEE 1996.

Yeo, Boon-Lock et al., "Rapid Scene Analysis on Compressed Video," IEEE Transactions on Circuits and Systems for Video Technology, vol. 5, No. 6, pp. 533-544, Dec. 1995, Dept. of Electrical Engineering, Princeton University, Princeton, NJ, IEEE Log No. 9415901.

Indyk, Piotr et al., "Finding pirated video sequences on the Internet," Dept. of Computer Science, Stanford University, Palo Alto, CA, Paper No. 199.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



| | |
|---|---|
| UNIQUE ID: 15642 | 1010 |
| PRODUCT: COCA COLA | 1020 |
| CATEGORY: SODA | 1030 |
| MANUFACTURER: COCA COLA | 1040 |
| URL http://www.cocacola.com | 1050 |
| OTHER DATA | 1060 |

1000

# FIGURE 10

US 8,205,237 B2

<div style="column-count:2">

**1**

IDENTIFYING WORKS, USING A
SUB-LINEAR TIME SEARCH, SUCH AS AN
APPROXIMATE NEAREST NEIGHBOR
SEARCH, FOR INITIATING A WORK-BASED
ACTION, SUCH AS AN ACTION ON THE
INTERNET

§0. RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 11/445,928 (incorporated herein by reference), titled "USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK," filed on Jun. 2, 2006, and listing Ingemar J. Cox as the inventor, which is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference, issued as U.S. Pat. No. 7,058,223 on Jun. 6, 2006), titled "IDENTIFYING WORKS FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001, now U.S. Pat. No. 7,058,223 and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorporated herein by reference), titled "Identifying and linking television, audio, print and other media to the Internet," filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

§1. BACKGROUND OF THE INVENTION

§1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement delivered via print media, or via a radio or television broadcast) without the need to modify the work.

§1.2 Related Art

§1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request discount vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applications also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be automatically enabled using the invention described herein.

In the context of facilitating audience interaction or participation, there is much interest in the convergence of tele-

**2**

vision and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also interest in enhancing the television viewing experience. To this end, there have been a number of experiments with interactive television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the competition.

§1.2.2 Embedding Work Identifying Code or Signals Within Works

Known techniques of linking works delivered via traditional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such traditional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) watermarks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed implementations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be considered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a proprietary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technology and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blanking interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to television viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-captioning information as well as other information, while in the UK, the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking interval is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, Oreg. embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of

</div>

US 8,205,237 B2

**3**

broadcast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, Utah embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of bar code and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic or fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naïve user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed

**4**

directly into a sound card in a PC. This requires a physical connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

§1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

§2. SUMMARY OF THE INVENTION

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

§3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

US 8,205,237 B2

5

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

§4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

§4.1 FUNCTIONS

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work information to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

§4.2 EMBODIMENTS

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

§4.2.1 Embodiments in Which Work is Recognized Based on Intra-Work Information

Such as a Feature Vector

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

6

§4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK$_{@t1}$), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK$_{@t2}$), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

§4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of

US 8,205,237 B2

**7**

feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also K. Fukunaga, *Introduction to Statistical Pattern Recognition,* 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480× 720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or bare a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," *IEEE Transactions on Image Processing* (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518, 5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

### §4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These

**8**

possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

### §4.2.1.1.3. Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage

Point Forests for nearest Neighbor Search", *Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop*, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" *SODA* 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" *SODA* 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. A nearest neighbor search always finds the closest point to the query. An approximate nearest neighbor search does not always find the closest point to the query. For example, it might do so with some probability, or it might provide any point within some small distance of the closest point.

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a work's feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

### §4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database **130** that contains information **136** associated with the particular work **134**. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such as initiating an e-commerce transaction. After looking up the work identifier **134** in the WIDAT database **130**, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database **130** allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive the advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do

so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

### §4.2.1.2 Exemplary Architectures

Three alternative architectural embodiments in which the first technique may be employed are now described with reference to FIGS. **2**, **3**, and **4**.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device **210**, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer **210** performs the operations **140**a, **150**a, **160**a and **170**a, such as those shown in FIG. **1**. To reiterate, these operations include a feature extraction operation(s) **140**a, feature vector lookup or matching operation(s) **150**a in connection with items or records **112**a in a work-identification (WID) database **110**a. If a matching feature vector **114**a is found, the work-associated information lookup operation(s) **160**a can use the associated work identifier **116**a to accessing a work identification-action translation (WIDAT) database **130**a to retrieve associated information **136**a, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

An example illustrating operations that can occur in the first embodiment of FIG. **1**, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database **110**a. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neigh-

US 8,205,237 B2

**11**

bor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" *SODA* 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. Estimates of the size of the WIDAT database $130a$ depend on what associated information (recall fields **136**) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database $130a$ would be less than 1 Mbyte.

The configuration just described with reference to FIG. **2** places all of the processing and data on each user's local machine **210**. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider **240** must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet **230** in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer **210** might also transmit information to a central monitoring center **240** informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. **2**, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database $130b$ is at a remote location **340**. In this arrangement, illustrated in FIG. **3**, after the local computer **310** identifies the work, it sends a query to the remote WIDAT database $130b$. The query may contain the work identifier. The remote site **340** may then return the associated information **136**. Although the remote WIDAT database $130b$ needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers **310**.

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database $130b$ might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, over-

**12**

loading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database may be small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1 Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally **410**, the one or more vectors are transmitted to a central site **440** at which is stored the WID and WIDAT databases $110c$ and $130c$ together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. **4**. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation $140c$ that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site **440** which can resolve the request.

After successfully matching the feature vector, the central site **440** can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site **440** might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction $140c$ in digital set-top-boxes and in video recorders **410**. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement, the video recorder would extract one or more feature vectors and transmit them to a central site **440**. This site **440** would determine if a match existed between the query vector and the database of pre-stored vectors $110c$. If a match is found, the central server **440** would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device **410**. Of course, a consumer device **410** such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device **410** could store

US 8,205,237 B2

13

14

the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

### §4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCR's. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information")

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) 210/310/410 to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

### §4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, preferably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action information (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT)

information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. Such information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market) **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

### §4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

### §4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database

US 8,205,237 B2

**15**

510 maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140***d*, as well as the work identification operation(s) **150***d* and other databases **110***d*, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4×35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophisticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

### §4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with

**16**

information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, and most TV's do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

### §4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540***a* may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510***a*, **530***a*, and **110***e*, as well as the database generation operation(s) **520***a*/**538***a*, the lookup operation(s) **550***a* and the work-associated information lookup operation(s) **560***a* may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740***a* and query resolution center **740***b* are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and espe-

US 8,205,237 B2

17

cially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which are sold to interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

### §4.2.3 Exemplary Apparatus for Audience Member (User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. **6** and **7**, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This infor-

18

mation can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCR's and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. **6** and **7**, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities of course, the two-way communication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

### §4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or com-

US 8,205,237 B2

**19**

puter-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §4.3 OPERATIONAL EXAMPLES

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in §4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

#### §4.3.1 Operational Example where Intra-Work Information is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed. The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average

**20**

intensities of nxn blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the nxn blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of $480 \times 720$ pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with $16 \times 16$ blocks, then the number of blocks per frame is 345,$600/256 = 1350$. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 $16 \times 16$ blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the $100 \times 10 = 1000$ DCT coefficients. Many other variations are also possible. In many media applications, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not yet present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and

US 8,205,237 B2

| 21 | 22 |

Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000,000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sub-linear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, τ. The fixed radius search means that if the database contains a vector that is within τ of the query,

then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10×50× 30 queries per second.

### §4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840***a*. These centers **840***a* may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840***a* is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840***a* update one or more database centers **840***b*, informing them of the time, date, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840***b* updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840***b* can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840***a*. The database centers **840***b* are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create

US 8,205,237 B2

**23**

a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries in memory. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to 3600×100×100=36,000,000 entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work.

An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**, the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840**b. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840**b. This might happen hours or even days later.

The query contains information that the database center **840**b uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840**b receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840**b may simply function as a form of proxy server, mapping the audience member's initial query

**24**

into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840**b may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840**b to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, Calif. or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840**b using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840**a where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840**b is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

§4.4 CONCLUSIONS

None of the embodiments of the invention require modification to the work or content, i.e., no active signal is embedded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

US 8,205,237 B2

<table>
<tr><td>25</td><td>26</td></tr>
</table>

What is claimed is:

**1**. A computer-implemented method comprising:

a) receiving, by a computer system including at least one computer, features that were extracted from a media work by a client device;

b) determining, by the computer system, an identification of the media work using the received features extracted from the media work to perform a sub-linear time search of extracted features of identified media works to identify a neighbor; and

c) transmitting, by the computer system, information about the identified media work to the client device.

**2**. The computer-implemented method of claim **1** wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and

wherein the audio work is one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

**3**. The computer-implemented method of claim **1** wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

**4**. The computer-implemented method of claim **1** further comprising performing an action including at least one of promoting commerce or enhancing interest in the work.

**5**. Apparatus comprising:

a) at least one processor; and

b) at least one storage device storing processor-executable instructions which, when executed by the at least one processor, perform a method of

1) receiving features that were extracted from a media work by a client device,

2) determining, by the computer system, an identification of the media work using the features extracted from the media work to perform a sub-linear time search of extracted features of identified media works to identify a neighbor, and

3) transmitting information about the identified media work to the client device.

**6**. The apparatus of claim **5** wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and

wherein the audio work is one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

**7**. The apparatus of claim **5** wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

**8**. The apparatus of claim **5** wherein the method further includes performing an action including at least one of promoting commerce or enhancing interest in the work.

**9**. A computer-implemented method comprising:

a) receiving, by a computer system including at least one computer, features that were extracted from media work by a client device;

b) determining, by the computer system, an identification of the media work using the received features extracted

from the media work to perform an approximate nearest neighbor search of extracted features of identified media works; and

c) transmitting, by the computer system, information about the identified media work to the client device.

**10**. The method of claim **9** wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and

wherein the audio work one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

**11**. The method of claim **9** wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

**12**. The method of claim **9** further comprising performing an action including at least one of promoting commerce or enhancing interest in the work.

**13**. Apparatus comprising:

a) at least one processor; and

b) at least one storage device storing processor-executable instructions which, when executed by the at least one processor, perform a method of

1) receiving features what were extracted from a media work by a client device,

2) determining, by the computer system, an identification of the media work using the received features extracted from the media work to perform an approximate nearest neighbor search of extracted features of identified media works, and

3) transmitting information about the identified media work to the client device.

**14**. The apparatus of claim **13** wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and

wherein the audio work is one of (A) a broadcast, (8) a digital file, or (C) an MP3 file.

**15**. The apparatus of claim **13** information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

**16**. The apparatus of claim **13** wherein the method further includes performing an action including at least one of promoting commerce or enhancing interest in the work.

**17**. The computer-implemented method of claim **1** wherein the media work is a video signal.

**18**. The computer-implemented method of claim **17** wherein the video signal is obtained from at least one of (A) a broadcast or (B) a video file format.

**19**. The computer-implemented method of claim **9** wherein the media work is a video signal.

**20**. The computer-implemented method of claim **19** wherein the video signal is obtained from at least one of (A) a broadcast or B) a video file format.

**21**. The computer-implemented method of claim **1** wherein at least one of the acts of receiving or transmitting is performed via a direct communication between the client device and the computer system.

**22**. The computer-implemented method of claim **1** wherein at least one of the acts of receiving or transmitting is per-

US 8,205,237 B2

27

formed via an indirect communication between the client device and the computer system.

**23**. The computer-implemented method of claim **9** wherein at least one of the acts of receiving or transmitting is performed via a direct communication between the client device and the computer system.

**24**. The computer-implemented method of claim **9** wherein at least one of the acts of receiving or transmitting is performed via an indirect communication between the client device and the computer system.

**25**. A computer-implemented method comprising:
a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;
b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a nonexhaustive search of reference extracted features of reference media works to identify a near neighbor; and
c) determining, by the computer system, an action based on the determined identification of the media work.

**26**. The method of claim **25**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

**27**. The method of claim **26**, wherein the additional information is an advertisement.

**28**. The method of claim **25**, wherein the action comprises providing a coupon.

**29**. The method of claim **25**, wherein the action comprises providing a link to a Web site.

**30**. The method of claim **25**, wherein the action comprises initiating an e-commerce transaction.

28

**31**. The method of claim **25**, wherein the action comprises initiating a telephone call.

**32**. The method of claim **25**, wherein the action comprises logging an event relating to competitive market research data.

**33**. A computer-implemented method comprising:
a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;
b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and
c) determining, by the computer system, an action based on the determined identification of the media work.

**34**. The method of claim **33**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

**35**. The method of claim **34**, wherein the additional information is an advertisement.

**36**. The method of claim **33**, wherein the action comprises providing a coupon.

**37**. The method of claim **33**, wherein the action comprises providing a link to a Website.

**38**. The method of claim **33**, wherein the action comprises initiating an e-commerce transaction.

**39**. The method of claim **33**, wherein the action comprises initiating a telephone call.

**40**. The method of claim **33**, wherein the action comprises logging an event relating to competitive market research data.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,205,237 B2                                  Page 1 of 1
APPLICATION NO.  : 11/977202
DATED             : June 19, 2012
INVENTOR(S)     : Cox

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 25, line 64, claim 9, "what" should read --that--.

Column 26, line 14, claim 10, "work one" should read --work is one--.

Column 26, line 27, claim 13, "what" should read --that--.

Column 26, line 44, claim 14, "(8)" should read --(B)--.

Column 26, line 46, claim 15, "claim 13 information" should read --claim 13 wherein information--.

Column 26, line 61, claim 20, "B)" should read --(B)--.

Signed and Sealed this
Sixth Day of May, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*



US008904464B1

(12) **United States Patent**
     Cox

(10) **Patent No.:**     **US 8,904,464 B1**
(45) **Date of Patent:**     **\*Dec. 2, 2014**

(54) **METHOD FOR TAGGING AN ELECTRONIC MEDIA WORK TO PERFORM AN ACTION**

(71) Applicant: **Network-1 Security Solutions, Inc.**, New York, NY (US)

(72) Inventor: **Ingemar J. Cox**, London (GB)

(73) Assignee: **Network-1 Technologies, Inc.**, New York, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/800,573**

(22) Filed: **Mar. 13, 2013**

**Related U.S. Application Data**

(63) Continuation of application No. 13/338,079, filed on Dec. 27, 2011, which is a continuation of application No. 11/977,202, filed on Oct. 23, 2007, now Pat. No. 8,205,237, which is a continuation of application No. 11/445,928, filed on Jun. 2, 2006, now Pat. No. 8,010,988, which is a continuation of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
     *H04N 7/173*     (2011.01)
     *G06Q 30/02*     (2012.01)

(52) **U.S. Cl.**
     CPC .................................. *G06Q 30/0256* (2013.01)
     USPC ............ **725/115**; 725/110; 725/114; 725/116

(58) **Field of Classification Search**
     None
     See application file for complete search history.

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,919,479 | A | 11/1975 | Moon et al. |
| 4,230,990 | A | 10/1980 | Lert, Jr. et al. |
| 4,450,531 | A | 5/1984 | Kenyon et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0849946 A2 | 6/1998 |
| EP | 1 354 276 B1 | 12/2007 |

(Continued)

OTHER PUBLICATIONS

Martin Ester et al., "A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise," Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

(Continued)

*Primary Examiner* — Cai Chen
(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57)     **ABSTRACT**

A computer-implemented method comprising the steps of receiving, by a computer system including at least one computer, a media work; receiving, by the computer system, a tag associated with the media work having a media work identifier; storing, by the computer system, the media work identifier and the associated tag; obtaining, by the computer system from a user electronic device, a query related to the associated tag; correlating, by the computer system, the query with associated information related to an action to be performed; and providing, from the computer system to the user electronic device, the associated information to be used in performing the action.

**34 Claims, 10 Drawing Sheets**



**US 8,904,464 B1**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,454,594 A | 6/1984 | Heffron et al. |
| 4,495,526 A | 1/1985 | Baranoff-Rossine |
| 4,499,601 A | 2/1985 | Matthews |
| 4,511,917 A | 4/1985 | Kohler et al. |
| 4,547,804 A | 10/1985 | Greenberg |
| 4,634,966 A | 1/1987 | Nakatani et al. |
| 4,639,779 A | 1/1987 | Greenberg |
| 4,677,455 A | 6/1987 | Okajima |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. |
| 4,682,370 A | 7/1987 | Matthews |
| 4,697,209 A | 9/1987 | Kiervit et al. |
| 4,739,398 A | 4/1988 | Thomas et al. |
| 4,776,017 A | 10/1988 | Fujimoto |
| 4,805,020 A | 2/1989 | Greenberg |
| 4,843,526 A | 6/1989 | Price, III |
| 4,843,562 A | 6/1989 | Kenyon et al. |
| 4,918,730 A | 4/1990 | Schulze |
| 5,210,820 A | 5/1993 | Kenyon |
| 5,283,819 A | 2/1994 | Glick et al. |
| 5,437,050 A | 7/1995 | Lamb et al. |
| 5,438,355 A | 8/1995 | Palmer |
| 5,465,353 A | 11/1995 | Hull et al. |
| 5,481,294 A | 1/1996 | Thomas et al. |
| 5,504,518 A | 4/1996 | Ellis et al. |
| 5,550,735 A | 8/1996 | Slade et al. |
| 5,581,658 A | 12/1996 | O'Hagan et al. |
| 5,594,934 A | 1/1997 | Lu et al. |
| 5,607,356 A | 3/1997 | Schwartz |
| 5,629,739 A | 5/1997 | Dougherty |
| 5,634,012 A | 5/1997 | Stefik et al. |
| 5,638,443 A | 6/1997 | Stefik et al. |
| 5,692,213 A | 11/1997 | Goldberg et al. |
| 5,701,452 A | 12/1997 | Siefert |
| 5,701,542 A | 12/1997 | Sasayama |
| 5,706,364 A | 1/1998 | Kopec et al. |
| 5,724,605 A | 3/1998 | Wissner |
| 5,745,900 A | 4/1998 | Burrows |
| 5,748,783 A | 5/1998 | Rhoads |
| 5,768,426 A | 6/1998 | Rhoads |
| 5,798,785 A | 8/1998 | Hendricks et al. |
| 5,809,471 A | 9/1998 | Brodsky |
| 5,818,441 A | 10/1998 | Throckmorton et al. |
| 5,818,935 A | 10/1998 | Maa |
| 5,822,436 A | 10/1998 | Rhoads |
| 5,832,119 A | 11/1998 | Rhoads |
| 5,832,182 A | 11/1998 | Zhang et al. |
| 5,841,978 A | 11/1998 | Rhoads |
| 5,850,490 A | 12/1998 | Johnson |
| 5,855,008 A | 12/1998 | Goldhaber et al. |
| 5,862,260 A | 1/1999 | Rhoads |
| 5,874,686 A | 2/1999 | Ghias et al. |
| 5,892,536 A | 4/1999 | Logan et al. |
| 5,903,816 A | 5/1999 | Broadwin et al. |
| 5,905,865 A | 5/1999 | Palmer et al. |
| 5,905,988 A | 5/1999 | Schwartz et al. |
| 5,907,322 A | 5/1999 | Kelly et al. |
| 5,918,223 A | 6/1999 | Blum et al. |
| 5,929,849 A | 7/1999 | Kikinis |
| 5,929,850 A | 7/1999 | Broadwin et al. |
| 5,931,908 A | 8/1999 | Gerba et al. |
| 5,937,331 A | 8/1999 | Kalluri et al. |
| 5,953,415 A | 9/1999 | Nielsen |
| 5,961,603 A | 10/1999 | Kunkel et al. |
| 5,963,966 A | 10/1999 | Mitchell et al. |
| 5,973,685 A | 10/1999 | Schaffa et al. |
| 5,973,723 A | 10/1999 | DeLuca |
| 5,978,791 A | 11/1999 | Farber et al. |
| 5,983,176 A | 11/1999 | Hoffert et al. |
| 5,983,176 A | 11/1999 | Yokoyama et al. |
| 5,999,689 A | 12/1999 | Iggulden |
| 6,006,256 A | 12/1999 | Zdepski et al. |
| 6,006,265 A | 12/1999 | Rangan et al. |
| 6,009,410 A * | 12/1999 | LeMole et al. ............ 705/14.54 |
| 6,011,758 A | 1/2000 | Dockes et al. |
| 6,021,433 A | 2/2000 | Payne et al. |

| | | | |
|---|---|---|---|
| 6,023,693 A | 2/2000 | Masuoka et al. |
| 6,026,439 A | 2/2000 | Chowdhury et al. |
| 6,044,376 A | 3/2000 | Kurtzman, II |
| 6,044,402 A | 3/2000 | Jacobson et al. |
| 6,047,327 A | 4/2000 | Tso et al. |
| 6,052,693 A | 4/2000 | Smith et al. |
| 6,057,872 A * | 5/2000 | Candelore ...................... 725/23 |
| 6,061,056 A | 5/2000 | Menard et al. |
| 6,067,369 A | 5/2000 | Kamei |
| 6,088,455 A | 7/2000 | Logan et al. |
| 6,088,707 A | 7/2000 | Bates et al. |
| 6,096,961 A | 8/2000 | Bruti et al. |
| 6,098,106 A | 8/2000 | Philyaw et al. |
| 6,118,450 A | 9/2000 | Proehl et al. |
| 6,119,124 A | 9/2000 | Broder et al. |
| 6,121,530 A | 9/2000 | Sonoda |
| 6,154,737 A | 11/2000 | Inaba et al. |
| 6,169,986 B1 | 1/2001 | Bowman et al. |
| 6,173,406 B1 | 1/2001 | Wang et al. |
| 6,188,010 B1 | 2/2001 | Iwamura |
| 6,195,693 B1 | 2/2001 | Berry et al. |
| 6,201,176 B1 | 3/2001 | Yourlo |
| 6,215,483 B1 | 4/2001 | Zigmond |
| 6,229,922 B1 | 5/2001 | Sasakawa et al. |
| 6,233,682 B1 | 5/2001 | Fritsch |
| 6,236,758 B1 | 5/2001 | Sodagar et al. |
| 6,240,409 B1 | 5/2001 | Aiken |
| 6,243,725 B1 | 6/2001 | Hempleman et al. |
| 6,247,133 B1 | 6/2001 | Palage et al. |
| 6,253,193 B1 | 6/2001 | Ginter et al. |
| 6,263,348 B1 | 7/2001 | Kathrow et al. |
| 6,263,505 B1 | 7/2001 | Walker et al. |
| 6,269,275 B1 | 7/2001 | Slade |
| 6,279,010 B1 | 8/2001 | Anderson |
| 6,285,407 B1 | 9/2001 | Yasuki et al. |
| 6,317,885 B1 | 11/2001 | Fries |
| 6,326,982 B1 | 12/2001 | Wu et al. |
| 6,330,593 B1 | 12/2001 | Roberts et al. |
| 6,345,256 B1 | 2/2002 | Milsted et al. |
| 6,349,296 B1 | 2/2002 | Broder et al. |
| 6,360,215 B1 | 3/2002 | Judd et al. |
| 6,363,377 B1 | 3/2002 | Kravets et al. |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. |
| 6,374,260 B1 | 4/2002 | Hoffert et al. |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. |
| 6,385,596 B1 | 5/2002 | Wiser et al. |
| 6,400,407 B1 | 6/2002 | Zigmond et al. |
| 6,407,680 B1 | 6/2002 | Lai et al. |
| 6,408,128 B1 | 6/2002 | Abecassis |
| 6,415,280 B1 | 7/2002 | Farber et al. |
| 6,415,438 B1 | 7/2002 | Blackketter et al. |
| 6,418,421 B1 | 7/2002 | Hurtado et al. |
| 6,438,556 B1 | 8/2002 | Malik et al. |
| 6,446,068 B1 | 9/2002 | Kortge |
| 6,449,226 B1 | 9/2002 | Kumagai |
| 6,452,874 B1 | 9/2002 | Otsuka et al. |
| 6,453,252 B1 | 9/2002 | Laroche |
| 6,460,050 B1 | 10/2002 | Pace et al. |
| 6,460,180 B1 | 10/2002 | Park et al. |
| 6,469,749 B1 | 10/2002 | Dimitrova |
| 6,473,804 B1 | 10/2002 | Kaiser et al. |
| 6,477,704 B1 | 11/2002 | Cremia |
| 6,490,279 B1 | 12/2002 | Chen et al. |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. |
| 6,496,857 B1 | 12/2002 | Dustin et al. |
| 6,505,160 B1 | 1/2003 | Levy et al. |
| 6,542,869 B1 | 4/2003 | Foote |
| 6,550,001 B1 | 4/2003 | Corwin et al. |
| 6,550,011 B1 | 4/2003 | Sims, III |
| 6,552,254 B2 | 4/2003 | Hasegawa et al. |
| 6,563,515 B1 | 5/2003 | Reynolds et al. |
| 6,564,379 B1 | 5/2003 | Knudson et al. |
| 6,567,982 B1 | 5/2003 | Howe et al. |
| 6,571,392 B1 | 5/2003 | Zigmond et al. |
| 6,577,746 B1 | 6/2003 | Evans et al. |
| 6,591,245 B1 | 7/2003 | Klug |
| 6,597,405 B1 | 7/2003 | Iggulden |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. |
| 6,604,242 B1 | 8/2003 | Weinstein et al. |

**US 8,904,464 B1**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,609,105 | B2 | 8/2003 | Van Zoest et al. |
| 6,615,408 | B1 | 9/2003 | Kaiser et al. |
| 6,631,523 | B1 | 10/2003 | Matthews, III et al. |
| 6,636,247 | B1 | 10/2003 | Hamzy et al. |
| 6,654,757 | B1 | 11/2003 | Stern |
| 6,658,423 | B1 | 12/2003 | Pugh et al. |
| 6,665,661 | B1 | 12/2003 | Crow et al. |
| 6,668,378 | B2 | 12/2003 | Leak et al. |
| 6,675,174 | B1 | 1/2004 | Bolle et al. |
| 6,675,385 | B1 | 1/2004 | Wang |
| 6,693,236 | B1 | 2/2004 | Gould et al. |
| 6,698,020 | B1 | 2/2004 | Zigmond et al. |
| 6,766,523 | B2 | 7/2004 | Herley |
| 6,774,926 | B1 * | 8/2004 | Ellis et al. ................. 348/14.01 |
| 6,785,902 | B1 | 8/2004 | Zigmond et al. |
| 6,810,388 | B1 | 10/2004 | Sato |
| 6,833,865 | B1 | 12/2004 | Fuller et al. |
| 6,834,308 | B1 | 12/2004 | Ikezoye et al. |
| 6,850,252 | B1 | 2/2005 | Hoffberg |
| 6,871,200 | B2 | 3/2005 | MacQueen et al. |
| 6,871,231 | B2 | 3/2005 | Morris |
| 6,873,982 | B1 | 3/2005 | Bates et al. |
| 6,912,571 | B1 | 6/2005 | Serena |
| 6,928,423 | B1 | 8/2005 | Yamanaka |
| 6,928,442 | B2 | 8/2005 | Farber et al. |
| 6,931,451 | B1 | 8/2005 | Logan et al. |
| 6,937,766 | B1 | 8/2005 | Wilf et al. |
| 6,938,270 | B2 | 8/2005 | Blackketter et al. |
| 6,941,275 | B1 | 9/2005 | Swierczek |
| 6,941,574 | B1 | 9/2005 | Broadwin et al. |
| 6,944,632 | B2 | 9/2005 | Stern |
| 6,968,337 | B2 | 11/2005 | Wold |
| 6,970,886 | B1 | 11/2005 | Conwell et al. |
| 6,978,419 | B1 | 12/2005 | Kantrowitz |
| 6,978,461 | B2 | 12/2005 | Shapiro et al. |
| 6,983,371 | B1 | 1/2006 | Hurtado et al. |
| 6,990,453 | B2 | 1/2006 | Wang et al. |
| 6,999,111 | B2 | 2/2006 | McIntyre et al. |
| 7,013,301 | B2 | 3/2006 | Holm et al. |
| 7,020,635 | B2 | 3/2006 | Hamilton et al. |
| 7,035,914 | B1 | 4/2006 | Payne et al. |
| 7,039,935 | B2 | 5/2006 | Knudson et al. |
| 7,043,473 | B1 | 5/2006 | Rassool et al. |
| 7,058,223 | B2 | 6/2006 | Cox |
| 7,065,709 | B2 | 6/2006 | Ellis et al. |
| 7,092,953 | B1 | 8/2006 | Haynes |
| 7,096,486 | B1 | 8/2006 | Ukai et al. |
| 7,103,906 | B1 | 9/2006 | Katz et al. |
| 7,106,904 | B2 | 9/2006 | Shuma |
| 7,140,033 | B1 | 11/2006 | Durden et al. |
| 7,146,631 | B1 | 12/2006 | Tanaka et al. |
| 7,152,236 | B1 | 12/2006 | Wugofski et al. |
| 7,155,449 | B2 | 12/2006 | Pingel et al. |
| 7,158,929 | B2 | 1/2007 | Wouters et al. |
| 7,165,266 | B2 | 1/2007 | Zigmond |
| 7,168,083 | B2 | 1/2007 | Kalker et al. |
| 7,171,016 | B1 | 1/2007 | Rhoads |
| 7,174,293 | B2 | 2/2007 | Kenyon et al. |
| 7,181,756 | B1 | 2/2007 | Zigmond et al. |
| 7,184,100 | B1 | 2/2007 | Wilf et al. |
| 7,188,353 | B1 | 3/2007 | Crinon |
| 7,191,190 | B2 | 3/2007 | Debique et al. |
| 7,225,455 | B2 | 5/2007 | Bennington et al. |
| 7,237,253 | B1 | 6/2007 | Blackketter et al. |
| 7,243,139 | B2 | 7/2007 | Ullman |
| 7,243,153 | B2 | 7/2007 | McIntyre et al. |
| 7,251,475 | B2 | 7/2007 | Kawamoto |
| 7,254,829 | B1 | 8/2007 | Brown et al. |
| 7,272,788 | B2 | 9/2007 | Anderson et al. |
| 7,302,574 | B2 | 11/2007 | Conwell et al. |
| 7,305,693 | B2 | 12/2007 | Blackketter et al. |
| 7,308,413 | B1 | 12/2007 | Tota et al. |
| 7,313,805 | B1 | 12/2007 | Rosin et al. |
| 7,334,250 | B2 | 2/2008 | Blackketter et al. |
| 7,340,763 | B1 | 3/2008 | Harris |
| 7,346,472 | B1 | 3/2008 | Moskowitz et al. |
| 7,349,668 | B2 | 3/2008 | Ilan et al. |
| 7,363,278 | B2 | 4/2008 | Schmelzer et al. |
| 7,366,718 | B1 | 4/2008 | Pugh et al. |
| 7,366,787 | B2 | 4/2008 | Salas et al. |
| 7,369,677 | B2 | 5/2008 | Petrovic et al. |
| 7,370,017 | B1 | 5/2008 | Lindeman et al. |
| 7,386,512 | B1 | 6/2008 | Allibhoy et al. |
| 7,404,200 | B1 | 7/2008 | Hailey et al. |
| 7,409,437 | B2 | 8/2008 | Ullman et al. |
| 7,421,723 | B2 | 9/2008 | Harkness et al. |
| 7,423,771 | B2 | 9/2008 | Ohata et al. |
| 7,426,558 | B1 | 9/2008 | Allibhoy et al. |
| 7,444,353 | B1 | 10/2008 | Chen et al. |
| 7,477,739 | B2 | 1/2009 | Haitsma et al. |
| 7,483,958 | B1 | 1/2009 | Elabbady et al. |
| 7,487,527 | B2 | 2/2009 | Ellis et al. |
| 7,493,643 | B2 | 2/2009 | Ellis |
| 7,500,007 | B2 | 3/2009 | Ikezoye et al. |
| 7,506,352 | B2 | 3/2009 | Blackketter et al. |
| 7,523,312 | B2 | 4/2009 | Kalker et al. |
| 7,523,478 | B2 | 4/2009 | Blackketter et al. |
| 7,529,659 | B2 | 5/2009 | Wold |
| 7,562,012 | B1 | 7/2009 | Wold et al. |
| 7,562,392 | B1 | 7/2009 | Rhoads et al. |
| 7,565,327 | B2 | 7/2009 | Schmelzer |
| 7,587,728 | B2 | 9/2009 | Wheeler et al. |
| 7,595,914 | B2 | 9/2009 | Haining |
| 7,606,883 | B1 | 10/2009 | Allibhoy et al. |
| 7,624,337 | B2 | 11/2009 | Sull et al. |
| 7,631,072 | B2 | 12/2009 | Allibhoy et al. |
| 7,647,604 | B2 | 1/2010 | Ramaswamy |
| 7,650,616 | B2 | 1/2010 | Lee |
| 7,660,700 | B2 | 2/2010 | Moskowitz et al. |
| 7,707,088 | B2 | 4/2010 | Schmelzer |
| 7,711,652 | B2 | 5/2010 | Schmelzer |
| 7,712,125 | B2 | 5/2010 | Herigstad et al. |
| 7,738,704 | B2 | 6/2010 | Lienhart et al. |
| 7,743,092 | B2 | 6/2010 | Wood |
| 7,757,248 | B2 | 7/2010 | Harkness et al. |
| 7,757,254 | B2 | 7/2010 | Shoff et al. |
| 7,765,575 | B2 | 7/2010 | Zigmond |
| 7,783,489 | B2 | 8/2010 | Kenyon et al. |
| 7,797,249 | B2 | 9/2010 | Schmelzer et al. |
| 7,802,281 | B1 | 9/2010 | Tani et al. |
| 7,818,768 | B2 | 10/2010 | Blackketter et al. |
| 7,840,975 | B2 | 11/2010 | Matheny et al. |
| 7,849,226 | B2 | 12/2010 | Zigmond et al. |
| 7,853,664 | B1 | 12/2010 | Wang et al. |
| 7,861,275 | B1 | 12/2010 | Vellaikal et al. |
| 7,870,088 | B1 | 1/2011 | Chen et al. |
| 7,877,438 | B2 | 1/2011 | Schrempp et al. |
| 7,882,518 | B2 | 2/2011 | Finseth et al. |
| 7,917,645 | B2 | 3/2011 | Ikezoye et al. |
| 7,930,719 | B2 | 4/2011 | Ellis et al. |
| 7,941,816 | B2 | 5/2011 | Harkness et al. |
| 7,949,494 | B2 | 5/2011 | Moskowitz et al. |
| 7,949,749 | B2 | 5/2011 | Allibhoy et al. |
| 7,962,414 | B1 | 6/2011 | Allibhoy et al. |
| 7,996,565 | B2 | 8/2011 | Allibhoy et al. |
| 8,001,569 | B2 | 8/2011 | Marler et al. |
| 8,006,264 | B2 | 8/2011 | Reynolds et al. |
| 8,006,314 | B2 | 8/2011 | Wold |
| 8,065,615 | B2 | 11/2011 | Murray et al. |
| 8,082,150 | B2 | 12/2011 | Wold |
| 8,086,445 | B2 | 12/2011 | Wold et al. |
| 8,090,605 | B2 | 1/2012 | Tota et al. |
| 8,094,949 | B1 | 1/2012 | Rhoads |
| 8,108,886 | B1 | 1/2012 | Murahashi et al. |
| 8,112,776 | B2 | 2/2012 | Schein et al. |
| 8,171,509 | B1 | 5/2012 | Girouard et al. |
| 8,171,510 | B2 | 5/2012 | Kamen et al. |
| 8,185,923 | B2 | 5/2012 | Slaney et al. |
| 8,214,175 | B2 | 7/2012 | Moskowitz et al. |
| RE43,578 | E | 8/2012 | Sorensen |
| 8,255,952 | B2 | 8/2012 | Boylan, III et al. |
| RE43,671 | E | 9/2012 | Sorensen |
| 8,272,011 | B2 | 9/2012 | Yuen et al. |
| 8,296,792 | B2 | 10/2012 | Sahota et al. |

**US 8,904,464 B1**

Page 4

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,301,758 | B2 | 10/2012 | Allibhoy et al. |
| 8,340,994 | B2 | 12/2012 | Tota et al. |
| 8,479,233 | B2 | 7/2013 | Ellis et al. |
| 8,572,279 | B2 | 10/2013 | Payne et al. |
| 8,601,154 | B2 | 12/2013 | Payne et al. |
| 2001/0001160 | A1 | 5/2001 | Shoff et al. |
| 2001/0003818 | A1 | 6/2001 | Pingel et al. |
| 2001/0037376 | A1 | 11/2001 | Ullman |
| 2001/0047298 | A1 | 11/2001 | Moore et al. |
| 2001/0049625 | A1 | 12/2001 | Mowry |
| 2002/0023020 | A1 | 2/2002 | Kenyon et al. |
| 2002/0026369 | A1 | 2/2002 | Miller et al. |
| 2002/0032698 | A1 | 3/2002 | Cox |
| 2002/0035600 | A1 | 3/2002 | Ullman |
| 2002/0035601 | A1 | 3/2002 | Ullman |
| 2002/0035614 | A1 | 3/2002 | Ullman |
| 2002/0035615 | A1 | 3/2002 | Ullman |
| 2002/0038296 | A1 | 3/2002 | Margolus et al. |
| 2002/0038383 | A1 | 3/2002 | Ullman et al. |
| 2002/0042813 | A1 | 4/2002 | Ullman et al. |
| 2002/0049832 | A1 | 4/2002 | Ullman et al. |
| 2002/0056091 | A1* | 5/2002 | Bala et al. ...................... 725/34 |
| 2002/0056123 | A1 | 5/2002 | Liwerant et al. |
| 2002/0056129 | A1 | 5/2002 | Blackketter et al. |
| 2002/0059610 | A1* | 5/2002 | Ellis .............................. 725/58 |
| 2002/0082731 | A1 | 6/2002 | Pitman et al. |
| 2002/0083005 | A1 | 6/2002 | Lowenstein et al. |
| 2002/0087885 | A1 | 7/2002 | Peled et al. |
| 2002/0088336 | A1 | 7/2002 | Stahl |
| 2002/0099555 | A1 | 7/2002 | Pitman et al. |
| 2002/0112002 | A1 | 8/2002 | Abato |
| 2002/0120925 | A1 | 8/2002 | Logan |
| 2002/0133499 | A1 | 9/2002 | Ward et al. |
| 2002/0150164 | A1 | 10/2002 | Felts et al. |
| 2002/0156760 | A1 | 10/2002 | Lawrence et al. |
| 2002/0156909 | A1 | 10/2002 | Harrington |
| 2002/0178276 | A1 | 11/2002 | McCartney et al. |
| 2002/0186887 | A1 | 12/2002 | Rhoads |
| 2002/0188699 | A1 | 12/2002 | Ullman et al. |
| 2003/0005151 | A1 | 1/2003 | Ullman et al. |
| 2003/0028489 | A1 | 2/2003 | Williamson |
| 2003/0037010 | A1 | 2/2003 | Schmelzer |
| 2003/0061490 | A1 | 3/2003 | Abajian |
| 2003/0065719 | A1 | 4/2003 | Ullman |
| 2003/0088674 | A1 | 5/2003 | Ullman |
| 2003/0093790 | A1 | 5/2003 | Logan et al. |
| 2003/0095660 | A1 | 5/2003 | Lee et al. |
| 2003/0101144 | A1 | 5/2003 | Moreno |
| 2003/0101232 | A1 | 5/2003 | Ullman |
| 2003/0106017 | A1 | 6/2003 | Kanchirayappa et al. |
| 2003/0146940 | A1 | 8/2003 | Ellis et al. |
| 2003/0167300 | A1 | 9/2003 | Ullman |
| 2003/0182113 | A1 | 9/2003 | Huang |
| 2003/0202660 | A1 | 10/2003 | Zhou et al. |
| 2003/0233930 | A1 | 12/2003 | Ozick |
| 2004/0003398 | A1 | 1/2004 | Donian et al. |
| 2004/0001602 | A1 | 1/2004 | Van Vleck et al. |
| 2004/0015608 | A1 | 1/2004 | Ellis et al. |
| 2004/0025174 | A1 | 2/2004 | Cerrato |
| 2004/0030759 | A1 | 2/2004 | Hidary |
| 2004/0163106 | A1 | 8/2004 | Schrempp et al. |
| 2004/0170335 | A1 | 9/2004 | Pearlman et al. |
| 2004/0199387 | A1* | 10/2004 | Wang et al. .................... 704/243 |
| 2004/0221118 | A1 | 11/2004 | Slater et al. |
| 2004/0236865 | A1 | 11/2004 | Ullman |
| 2004/0243540 | A1 | 12/2004 | Moskowitz et al. |
| 2005/0015815 | A1* | 1/2005 | Shoff et al. .................... 725/135 |
| 2005/0044189 | A1 | 2/2005 | Ikezoye et al. |
| 2005/0080846 | A1 | 4/2005 | McCleskey et al. |
| 2005/0097622 | A1 | 5/2005 | Zigmond et al. |
| 2005/0102515 | A1 | 5/2005 | Jaworski et al. |
| 2005/0154892 | A1 | 7/2005 | Mihcak et al. |
| 2005/0160363 | A1 | 7/2005 | Bhogal et al. |
| 2005/0193016 | A1 | 9/2005 | Seet et al. |
| 2005/0213826 | A1 | 9/2005 | Neogi |

| | | | |
|---|---|---|---|
| 2005/0246752 | A1 | 11/2005 | Liwerant et al. |
| 2005/0289065 | A1 | 12/2005 | Weare |
| 2006/0031870 | A1 | 2/2006 | Jarman et al. |
| 2006/0080356 | A1 | 4/2006 | Burges et al. |
| 2006/0085816 | A1 | 4/2006 | Funk et al. |
| 2006/0101069 | A1 | 5/2006 | Bell et al. |
| 2006/0110137 | A1 | 5/2006 | Tsuda et al. |
| 2006/0187358 | A1 | 8/2006 | Lienhart et al. |
| 2006/0195859 | A1 | 8/2006 | Konig et al. |
| 2006/0195860 | A1 | 8/2006 | Eldering et al. |
| 2006/0206462 | A1 | 9/2006 | Barber |
| 2006/0212927 | A1 | 9/2006 | Riku et al. |
| 2006/0271947 | A1 | 11/2006 | Lienhart et al. |
| 2007/0041667 | A1 | 2/2007 | Cox |
| 2007/0071330 | A1 | 3/2007 | Oostveen et al. |
| 2007/0083510 | A1 | 4/2007 | McArdle |
| 2007/0101360 | A1 | 5/2007 | Gutta et al. |
| 2007/0118375 | A1 | 5/2007 | Kenyon et al. |
| 2007/0124698 | A1 | 5/2007 | Majumder |
| 2007/0130580 | A1 | 6/2007 | Covell et al. |
| 2007/0180537 | A1 | 8/2007 | He et al. |
| 2007/0203911 | A1 | 8/2007 | Chiu |
| 2007/0282472 | A1 | 12/2007 | Seldman |
| 2007/0288518 | A1 | 12/2007 | Crigler et al. |
| 2007/0294173 | A1 | 12/2007 | Levy et al. |
| 2008/0052783 | A1 | 2/2008 | Levy |
| 2008/0091684 | A1 | 4/2008 | Ellis et al. |
| 2008/0162478 | A1 | 7/2008 | Pugh et al. |
| 2008/0250241 | A1 | 10/2008 | Ginter et al. |
| 2009/0052784 | A1 | 2/2009 | Covell et al. |
| 2009/0328236 | A1 | 12/2009 | Schmelzer |
| 2010/0211969 | A1 | 8/2010 | Schein et al. |
| 2010/0290666 | A1 | 11/2010 | Rhoads |
| 2011/0167449 | A1 | 7/2011 | Klosterman et al. |
| 2011/0173660 | A1 | 7/2011 | Schein et al. |
| 2012/0078871 | A1 | 3/2012 | Pugh et al. |
| 2013/0086608 | A1 | 4/2013 | Slaney et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1354276 B1 | 12/2007 |
| EP | 1 485 815 B1 | 7/2009 |
| GB | 2369203 A | 5/2002 |
| JP | 2003-242281 | 8/2003 |
| WO | 94/06084 A1 | 3/1994 |
| WO | 9841020 A1 | 9/1998 |
| WO | 9904568 A1 | 1/1999 |
| WO | 99/50778 A1 | 10/1999 |
| WO | WO0122730 A1 | 3/2001 |
| WO | WO 02/11033 A1 | 2/2002 |
| WO | WO 02/103968 A1 | 12/2002 |

OTHER PUBLICATIONS

Yossi Rubner et al., "Adaptive Color Image Embeddings for Database Navigation," Proceedings of the 1998 IEEE Asian Conference on Computer Vision.
Roger Weber et al., "A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces," Proceedings of 24th VLDB Conference, 1998.
P. Yianilos, "Data Structures and Algorithms for Nearest Neighbor Search in General Metric Spaces," Proceedings of the ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 311.321.
U.S. Appl. No. 60/222,023, filed Jul. 31, 2000; Avery Li-Chun Wang and Julius O. Smith III, Inventors; Palo Alto, CA.
Peter N. Yianilos, Excluded Middle Vantage Point Forests for Nearest Neighbor Search, Jul. 20, 1998, pp. 1-12.
Peter N. Yianilos "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search" SODA 2000, pp. 361-370.
L. Baum et al., "A Maximation Technique Occuring in the Statistical Analysis of Probabilistic Functions of Markov Chains," The Annals of Mathematical Statistics, vol. 41, No. 1, pp. 164-171 (1970).
A. P. Dempster et al., "Maximum Likelihood from Incomplete Data via the SEMS Algorithm," Journal of the Royal Statistical Society, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).
D. Reynolds et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models," IEEE Transactions on Speech and Audio Processing, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

US 8,904,464 B1

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

D. Bouktache, "A fast Algorithm for the nearest neighbor classifier," IEEE Transactions on Pattern Analysis and Machine Intelligence, Mar. 1997, pp. 277-282.

Nene et al., "A simple algorithm for nearest neighbor search in high dimensions," IEEE Transactions on Pattern Analysis and Machine Intelligence, Sep. 1997, pp. 989-1003.

Sunil Arya et al., "Approximate Nearest Neighbor Queries in Fixed Dimensions," Proceedings of the 4th annual ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 271-280.

K. Fukunaga et al., A branch and bound algorithm for computing k-nearest neighbors, IEEE Trans. Comput., C24:750-753, Jul. 1975.

Charles D. Feustel et al., "The nearest neighbor problem in an abstract metric space," Pattern Recognition Letters, pp. 125-128, Dec. 1982.

Dennis Shasha et al., "New Techniques for Best-Match Retrieval," ACM Transactions on Information Systems, 8(2); 140{158, Apr. 1990.

J. Uhlmann, "Satisfying general proximity / similarity queries with metric trees," Information Processing Letters, 40 (4): 175{9, Nov. 1991.

Sergey Brin, "Near Neighbor Search in Large Metric Spaces," Proceedings of the 21st VLDB Conference, Zurich, Switzerland, Sep. 1995.

Daniel P. Huttenlocher, et al., "Comparing Images Using the Hausdorff Distance," IEEE Transactions on Pattern Analysis and Machine Intelligence, vol. 15, No. 9, pp. 850-863, Sep. 1993.

Thomas Seidl et al., "Optimal Multi-Step K-Nearest Neighbor Search," Proceedings of ACM SIGMOD International Conference of Management of Data, Jun. 1998, pp. 154-165.

W. A. Burkhard et al., "Some Approaches to Best-Match File Searching," Communications of the ACM, vol. 16, No. 4, Apr. 1973.

Eyal Kushilevitz et al., "Efficient Search for Approximate Nearest Neighbor in High Dimensional Spaces," Proceedings of the 30th annual ACM Symposium on Theory of computing, 1998, pp. 457-474, vol. 30, No. 2.

J. Nievergelt et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," ACM Transactions on Database Systems, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Nevin Heintze, "Scalable Document Fingerprinting," Proc. USENIX Workshop on Electronic Commerce (1996).

Erling Wold et al., "Content-Based Classification, Search, and Retrieval of Audio," IEEE Multimedia, vol. 3, Issue 3, pp. 27-63 (1996).

Bir Bhanu et al., "Learning Feature Relevance and Similarity Metrics in Image Databases," Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 14-19 (1998).

A. Del Bimbo et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents," Image Description and Retrieval, pp. 161-192 (1998).

P. Indyk et al "Approximate Nearest Neighbors: Towards Removing The Curse of Dimensionality," Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing, pp. 604-613 Jul. 21, 1999.

Marco La Cascia, "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web," Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 24-29 (1998).

Atsuo Yoshitaka et al., "A Survey on Content-Based Retrieval for Multimedia Databases," IEEE Transactions on Knowledge and Data Engineering, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Steve Lawrence et al., "Digital Libraries and Autonomous Citation Indexing," IEEE Computer, pp. 67-71 (Jun. 1999).

Akisato Kimura et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," IEEE Conf on Acoustics, Speech and Signal Processing, (ICASSP '01), vol. 3, pp. 1429-1432, 2001.

Edgar Chavez et al., "Searching in Metric Spaces," ACM Computing Surveys, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Jaap Haitsma et al., "Robust Audio Hashing for Content Identification," Workshop on Content Based Multimedia Indexing, Brescia, Italy (Sep. 19-21, 2001).

Jaap Haitsma et al., "A Highly Robust Audio Fingerprinting System," Journal of New Music Research, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Saul Schleimer et al., "Winnowing: Local Algorithms for Document Fingerprinting," ACM SIGMOD, Jun. 9-12, 2003.

Edward Chang et al., "Searching Near-Replicas of Images via Clustering," SPIE Symposium of Voice, Video and Data Communications, 1999.

Edward Y. Chang et al., "RIME: A Replicated Image Detector for the World-Wide Web," SPIE, 1998.

Hector Garcia-Molina et al., "Safeguarding and Charging for Information on the Internet," Proceedings of ICDE, 1998.

Sergey Brin et al., "Copy Detection Mechanisms for Digital Documents," Proceedings of ACM SIG-MOD, May 1995.

Stefan Berchtold "The x-tree: An Index Structure for High-Dimensional Data," Proceedings of the 22nd VLDB, Aug. 1996.

Norio Katayama et al., "The SR-tree: An Index Structure for High-Dimensional Nearest Neighbor Queries," Proceedings of ACM SIGMOD, May 1997.

John T. Robinson, "The K-D-B-Tree: A Search Structure for Large Multidimensional Dynamic Indexes," Proceedings of ACM SIGMOD, Apr. 1981.

Myron Flickner et al., "Query by Image and Video Content: The QBIC System," IEEE Computer 28(9), pp. 23-32, 1995.

Amarnath Gupta et al., "Visual Information Retrieval," Communications of the ACM, vol. 40, No. 5, pp. 69-79, May 1997.

John R. Smith et al., "VisualSEEk: A fully automated content-based image query system," ACM Multimedia Conference, 1996.

David A. White et al., "Similarity Indexing: Algorithms and Performance," Proc. SPIE, vol. 2670, San Diego, 1996.

Norbert Beckmann et al., "The R*-tree: An Efficient and Robust Access Method for Points and Rectangles," Proceedings of ACM Sigmod, May 1990.

A. Guttman, "R-Trees: A Dynamic Index Structure for Spatial Searching," Proceedings of ACM Sigmod, Jun. 1984.

David A. White et al., "Similarity Indexing with the SS-tree*," Proceedings of the 12th ICDE, Feb. 1996.

King Lin et al., "The TV-Tree: An Index Structure for High-Dimensional Data," VLDB, Journal 3, No. 4, 1994, pp. 517-542.

Paolo Ciaccia et al., "M-tree: An Efficient Access Method for Similarity Search in Metric Spaces," Proceedings of the 23rd VLDB, Aug. 1997.

Nick Roussopoulos et al., Nearest Neighbor Queries, Proceedings of ACM Sigmod, May 1995.

C. Li et al., "An extensible hashing index for high-dimensional similarity search," Stanford Technical Report, Aug. 1998.

Jon M. Kleinberg, "Two Algorithms for Nearest-Neighbor Search in High Dimensions," Proc 29th STOC, Feb. 9, 1997.

Liu et al., "An Investigation of Practical Approximate Nearest Neighbor Algorithms", Advances in Neural Information Processing Systems (NIPS) 2004.

K. L. Clarkson, "Nearest-Neighbor Searching and Metric Space Demensions", Nearest-Neighbor Methods for Learning and Vision: Theory and Practice: Apr. 2005.

Swaminathan et al., "Robust an Secure Image Hashing", IEEE Transactions on Information Forensics and Security, Jun. 2006, pp. 215-230, vol. 1, No. 2.

Burges et al., "Duplicate Detection and Audio Thumbnails with Audio Fingerprinting" [online]. 2004, [retrieved on Nov. 11, 2006]. Retrieved on the internet: <URL: www.research.microsoft.com/~cburges/tech_reports/tr-2004-19.pdf>, 5 pages.

Cano et al., "A Review of Algorithms for Audio Fingerprinting" [online]. 2002, [retrieved on Nov. 21, 2006], Retrieved from the Internet: <URL: www.iua.upl.es/mtg/publications/MMSP-2002-pcano.pdf>, 5 pages.

Haitsama and Kalker, "A Highly Robus Audio Fingerprinting System" [online]. 2002, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <url: www.ismir2002.ismir.net/proceedings/02-FP04-2.pdf>, 9 pages.

**US 8,904,464 B1**

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

Jacobs et al., "Fast Multiresolution Image Querying" [online]. 1995, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.grail.cs.washington.edu/projects/query.pdf>, 10 pages.

Ke et al., "Computer Vision for Music Identification" [online]. 2005, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.cs.cmu.edu/~yke/musicretrieval/cvpr2005-mr.pdf>, 8 pages.

Shazam, Shazam Entertainment Brings Music Recognition to Windows 5.U Powered Smartphones [retrieved on Nov. 16, 2006]. Retrieved from the Internet. <URL: www.shazam.com/music/portals/p/s/media-type/html/user/anon/pages/default/template/pages/p/company_release30.html>, 1 page.

Stanford, "CS276 Information Retrieval and Web Mining" [online], 2005, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <URL: www.stanford.edu/class/cs276/handouts/lecture19.pdf>, 8 pages.

Stanford, "Data Mining: Associations" [online]. 2002, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <URL: www.stanford.edu/class/cs206/cs206-2.pdf>, 11 pages.

Stollinz et al., Wavelets for Computer Graphics: A Primer, Part 1: [online], 1995, [retrieved on Nov. 21, 2006]. Retrieved from the internet: <URL: www.grail.cs.washington.edu/pub/stoll/wavelet1.pdf>, 8 pages.

Stollnitz et al., Wavelets for Computer Graphics: A Primer, Part 2: [online]. 1995, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.grail.cs.washington.edu/pub/stoll/wavelet2.pdf>, 9 pages.

Yang, "MACS: Music Audio Characteristic Sequence Indexing for Similarity Retrieval", Oct. 21-24, 2001, New Paltz, New York.

Viola and Jones, Robust Real-Time Object Detection, Int. J. Computer Vision, 2002.

Burges et al., "Using Audio Fingerprinting for Duplicate Detection and Thumbnail Generation," Mar. 2005, 4 pages.

Lin et al., Input Data Representation for Self-Organizing Map in Software Classification, Knowledge Acquisition and Modeling, 2009. KAM '09. Second International Symposium on vol. 2, Digital Object Identified: 10.11 09/KAM.2009.151 Publication Year: 2009, pp. 360-353.

Baluja et al., "Content Fingerprinting Using Wavelets", 3rd European Conference on Visual Media Production, 2006, pp. 198-207.

Cohen et al., "Finding Interesting Associations without Support Pruning", IEEE Transactions on Knowledge and Data Engineering, 2001, pp. 64-78, vol. 13, Issue 1.

Yang, Efficient Video Identification based on locality sensitive hashing and triangle inequality, National University of Singapore, 2005, pp. 1-64.

U.S. Appl. No. 60/304,647, filed Jul. 10, 2001.

U.S. Appl. No. 60/281,881, filed Apr. 5, 2001.

Metadata Mediation: Representation and Protocol, Tsuyoshi Sakata, Hiroyuki Tada, Tomohisa Ohtake, Digital Vision Laboratories, 7-3-37 Akasaka, Minato, Tokyo, Japan.

U.S. Appl. No. 13/800,573, filed Mar. 13, 2013.

U.S. Appl. No. 13/800,890, filed Mar. 13, 2013.

U.S. Appl. No. 13/829,717, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,447, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,626, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,986, filed Mar. 14, 2013.

U.S. Appl. No. 13/842,068, filed Mar. 15, 2013.

U.S. Appl. No. 13/338,079, filed Dec. 27, 2011.

U.S. Appl. No. 60/134,782, filed May 19, 1999.

U.S. Appl. No. 60/193,948, filed Mar. 31, 2000.

U.S. Appl. No. 60/195,535, filed Apr. 7, 2000.

U.S. Appl. No. 60/206,384, filed May 23, 2000.

U.S. Appl. No. 60/221,843, filed Jul. 28, 2000.

Ardizzone, Edoardo et al., "Motion and Color-Based Video Indexing and Retrieval," Universita di palermo, Departimento di Ingegneria Elettrica, pp. 135-139, Viale delle Scienze, Palermo, Italy, IEEE 1996.

Deng, Yining et al., "Content-based Search of Video Using Color, Texture, and Motion," Dept. of Electrical and Computer Engineering, University of California, Santa Barbara, CA, pp. 534-537, IEEE 1997.

Fang, Min et al., "Computing Iceberg Queries Efficiently," Dept. of Computer Science, Stanford, CA, Paper No. 234, pp. 1-25.

Flickner, Myron et al., "Query by Image and Video Content: The QBIC System," IBM Almaden Research Center, Sep. 1995, pp. 23-32, IEEE 1995.

Gargi, U et al., "Performance Characterization and Comparison of Video Indexing Algorithms," Dept. of Computer Science & Engineering, The Pennsylvania State University, University Park, PA.

Gionis, Aristides et al., "Similarity Search in High Dimensions via Hashing," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 518-529, Proceeding of the 25th VLDB Conference, Edinburgh, Scotland, 1999.

Indyk, Piotr et al., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality" (preliminary version) Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13 & i-vii, Jul. 21, 1999.

Iyengar, Giridharan et al., "Models for automatic classification of video sequences," MIT Media Laboratory, Cambridge, MA.

Jain, Anil K., et al., "Image Retrieval using Color and Shape," Dept. of Computer Science, Michigan State University, Eas Lansing, MI, pp. 1-24, May 15, 1995.

Ogle, Virginia E., et al., "Chabot: Retrieval from a Relational Database of Images," University of California at Berkeley, Computer pp. 40-48, IEEE 1995.

Pentland, A. et al., "Photobook: Content-Based Manipulation of Image Databases," Perceptual Computing Section, The Media Laboratory, Massachusetts Institute of Tech., International Journal of Computer Vision 18(3), pp. 233-254 (1996), 1996 Kluwer Academic Publishers. Manuf. in The Netherlands.

Shivakumar, Narayanan et al., "SCAM: A Copy Detection Mechanism for Digital Documents," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13.

Shivakumar, Narayanan et al., "Building a Scalable and Accurate Copy Detection Mechanism," Dept. of Computer Science, Stanford University, Stanford, CA.

Srihari, Rohini K., "Automatic Indexing and Content-Based Retrieval of Captioned Images," State University of New York, Buffalo, Theme Feature, pp. 49-56, Sep. 1995, IEEE 1995.

Swain, Michael and Ballard, Dana H., "Color Indexing," International Journal of Computer Vision 7:1, p. 11-32 (1991), 1991 Kluwer Academic Publishers. Manuf. in The Netherlands.

Wactlar, Howard D. et al., "Intelligent Access to Digital Video: Informedia Project," Carnegie Mellon University, Digital Library Initiative: Carnegie Mellon University, Computer, pp. 46-52, IEEE 1996.

Yeo, Boon-Lock et al., "Rapid Scene Analysis on Compressed Video," IEEE Transactions on Circuits and Systems for Video Technology, vol. 5, No. 6, pp. 533-544, Dec. 1995, Dept. of Electrical Engineering, Princeton University, Princeton, NJ, IEEE Log No. 9415901.

Indyk, Piotr et al., "Finding pirated video sequences on the Internet," Dept. of Computer Science, Stanford University, Palo Alto, CA, Paper No. 199.

U.S. Appl. No. 60/133,247, filed May 5, 1999.

U.S. Appl. No. 60/155,064, filed Sep. 21, 1999.

U.S. Appl. No. 60/218,824, filed Jul. 18, 2000.

Indyk, Piotr et al., "Locality-Preserving Hashing in Multidimensional Spaces," Feb. 25, 1997.

Gibson, David, "Name That Clip: Music retrieval using audio clips," Aug. 19, 1999.

Declaration of David A. Gibson, Inter Partes Review of U.S. Patent 7,174,293, Aug. 30, 2013.

Declaration of David A. Gibson, Inter Partes Review of U.S. Patent 7,783,489, Aug. 30, 2013.

Intersil, "Glossary of Communication Terms," Dec. 1996.

Declaration of Dr. Ton Kalker, Inter Partes Review of U.S. Patent 7,174,293, Aug. 30, 2013.

Declaration of Dr. Ton Kalker, Inter Partes Review of U.S. Patent 7,783,489, Aug. 30, 2013.

**US 8,904,464 B1**

Page 7

(56)    **References Cited**

OTHER PUBLICATIONS

Brin Sergey et al. "Copy Detection Mechanisms for Digital Documents" Proc. of ACM SIGMOD 44 Annual Conf. (San Jose 1995) http://www-db.stanford.edu!~sergey/copy.html on Nov. 27, 2000 21 pages.

Broder Andrei Z. "Some applications of Rabin's fingerprinting method" R. Capocelli A. 47 DeSantis U. Vaccaro Eds; Sequences II: Methods in Communications Security and Computer Science pp. 143-152 (Springer-Verlag 1993) 10 pages.

U.S. Appl. No. 60/230,931, filed Sep. 13, 2000.

*Network-1 Technologies, Inc.* v. *Google, Inc. et al*, No. 1:14-cv-02396 (S.D.N.Y. filed Apr. 4, 2014).

Turau, Volker, "Fixed-Radius Near Neighbors Search", Information Processing Letters, Aug. 30, 1991, 201-203, vol. 39.

Uitdenbogerd, Alexandra L. et al, "Manipulation of Music for Melody Making", MULTIMEDIA '98 Proceedings of the sixth ACM international conference on Multimedia, 1998, pp. 235-240.

Fuller, Chuck, "Deploying Video on the Web", Web Techniques, Dec. 1999, 67-71, 4(12), United Business Media LLC, San Francisco.

"ImaginOn to Showcase Instant Interactive Internet 'Television Station in a Box' at PC EXPO 2000!," Business Wire, Jun. 22, 2000.

Jacso, Peter et al., "Now Featuring . . . Movie Databases, Part II:The Software," Database, Apr./May 1995, pp. 29-39; 18(2); ProQuest Technology Collection.

"Smarter TV to Add $25B in Revenues:Holy Grail of Advertising Coming in the Form of Metadata," Broadcaster, Aug. 2000; 8(59), Business Information Group, Canada.

"The Future of Internet Multimedia on Display at Streaming Media West '99," Business Wire, Nov. 30, 1999; 11 (27), Business Wire, San Jose, California.

Bohm, Christian, et al., "Efficient Similarity Search in Digital Libraries," IEEE Advances in Digital Libraries, ADL May 22-24, 2000, Washington DC.

Hall, Patrick, et al., "Approximate String Matching," ACM Computing Surveys, Dec. 1980, 12(4).

Arya, Sunil, et al., "An Optimal Algorithm for Approximate Nearest Neighbor Searching in Fixed Dimensions," Journal of the ACM, Nov. 1998, 891-923, 45(6).

Berchtold, Stefan, et al., "Using Extended Feature Objects for Partial Similarity Retrieval," The VLDB Journal, Mar. 28, 1997, 333-348 (6).

Schwartz, David M., "ImaginOn Technology and Interactive Television," Imaginon—White Papers, May 11, 1998, available at http://www.imaginon.com/nn/content/white_papers/i_tv.html (last accessed Sep. 29, 2014).

Schwartz, David M. et al., "Internet Television The Economics of Webcasting," Imaginon—White Papers, Mar. 14, 2000, available at http://www.imaginon.com/nn/content/white_papers/econ_web.html (last accessed Sep. 29, 2014).

"ImaginAuthor—Streaming Video Branching Seamlessly From Clip to Clip," ImaginOn, Inc., available at http://www.imaginon.com/imon/page5.html (last accessed Sep. 29, 2014).

"ImOn.comTV Internet Television," ImOn.comTV, available at http://www.imaginon.com/imon/page4.html (last accessed Sep. 29, 2014).

"ImOn.comTV TurnKey Package," ImOn.comTV, available at http://www.imaginon.com/imon/page1.html (last accessed Sep. 29, 2014).

"ImaginOn presents ImOn.comTV," ImOn.comTV, available at http://www.imaginon.com/imon/index1.html (last accessed Sep. 29, 2014).

Alvear, Jose., "ImOn.comTV To Debut Webcasting Solution," Streaming Media Magazine, Apr. 10, 2000, available at http://www.streamingmedia.com/Articles/ReadArticle.aspx?ArticleID=62301 (last accessed Sep. 29, 2014).

"Press Release—ImOn.comTV Technology Will Change Television Advertising Forever," ImOn.comTV, available at http://www.imaginon.com/pressrel/p1999/advertising.html (last accessed Sep. 29, 2014).

*Google Inc. and YouTube, LLC's Corrected Preliminary Invalidity Contentions, Network-1 Technologies, Inc.,* v. *Google, Inc. and YouTube, LLC,* No. 1:14-cv-02396-PGG (S.D.N.Y. Sep. 8, 2014).

Appendix 1 to Google's Responses to Network-1's Second Interrogatories dated Oct. 20, 2014.

Google Inc. and YouTube, LLC'S Responses and Objections to Plaintiffs Second Set of Interrogatories (Nos. 7-13) dated Oct. 20, 2014.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10

US 8,904,464 B1

**1**

## METHOD FOR TAGGING AN ELECTRONIC MEDIA WORK TO PERFORM AN ACTION

### §0. RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 13/338,079 (incorporated herein by reference), titled "METHOD FOR USING EXTRACTED FEATURES FROM AN ELECTRONIC WORK," filed on Dec. 27, 2011, and listing Ingemar J. Cox as the inventor, which is a continuation of U.S. patent application Ser. No. 11/977,202 (incorporated herein by reference) as U.S. Pat. No. 8,205,237 on Jun. 19, 2012), titled "IDENTIFYING WORKS, USING A SUB-LINEAR TIME SEARCH, SUCH AS AN APPROXIMATE NEAREST NEIGHBOR SEARCH, FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET", filed Oct. 23, 2007, and listing Ingemar J. Cox as the inventor, which is a continuation of U.S. patent application Ser. No. 11/445,928 (incorporated herein by reference, issued as U.S. Pat. No. 8,010,988 on Aug. 30, 2011), titled "USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK," filed on Jun. 2, 2006, and listing Ingemar J. Cox as the inventor, which is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference, issued as U.S. Pat. No. 7,058,223 on Jun. 6, 2006), titled "IDENTIFYING WORKS FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001, and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorporated herein by reference), titled "IDENTIFYING AND LINKING TELEVISION, AUDIO, PRINT AND OTHER MEDIA TO THE INTERNET," filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

### §1. BACKGROUND OF THE INVENTION

#### §1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement delivered via print media, or via a radio or television broadcast) without the need to modify the work.

#### §1.2 Related Art

§1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request discount vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applications also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi

**2**

brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be automatically enabled using the invention described herein.

In the context of facilitating audience interaction or participation, there is much interest in the convergence of television and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also interest in enhancing the television viewing experience. To this end, there have been a number of experiments with interactive television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the competition.

§1.2.2 Embedding Work Identifying Code or Signals within Works

Known techniques of linking works delivered via traditional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such traditional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) watermarks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed implementations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be considered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a proprietary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technology and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blanking interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to television viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-captioning information as well as other information, while in the UK,

US 8,904,464 B1

3

the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking interval is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, Oreg. embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of broadcast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, Utah embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of barcode and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic or fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naive user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the

4

equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed directly into a sound card in a PC. This requires a physical connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

§1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

§2. SUMMARY OF THE INVENTION

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

§3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. 2 is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. 3 is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. 4 is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

US 8,904,464 B1

**5**

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

§4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

§4.1 Functions

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work information to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

§4.2 Embodiments

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

§4.2.1 Embodiments in which Work is Recognized Based on Intra-Work Information, Such as a Feature Vector

**6**

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

§4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK.sub.@t1), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK.sub.@t2), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

§4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n.times.n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many dif-

US 8,904,464 B1

**7**

ferent representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, Pattern Classification and Scene Analysis (Wiley-Interscience, New York, 1973). See also K. Fukunaga, Introduction to Statistical Pattern Recognition, 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480.times.720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, features of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or have a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," IEEE Transactions on Image Processing (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518, 5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

§4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the

**8**

image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

§4.2.1.1.3. Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and L.p-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, Pattern Classification and Scene Analysis (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these ref-

US 8,904,464 B1

**9**

erences is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. An approximate nearest neighbor search always finds the closest point to the query. An approximate nearest neighbor search does not always find the closest point to the query. For example, it might do so with some probability, or it might provide any point within some small distance of the closest point.

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a works feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

§4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database **130** that contains information **136** associated with the particular work **134**. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such as initiating an e-commerce transaction. After looking up the work identifier **134** in the WIDAT database **130**, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database **130** allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive the advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy

**10**

density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

§4.2.1.2 Exemplary Architectures

Three architectural embodiments in which the first technique may be employed are now described with reference to FIGS. **2**, **3**, and **4**.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device **210**, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer **210** performs the operations **140**a, **150**a, and **170**a, such as those shown in FIG. **1**. To reiterate, these operations include a feature extraction operation(s) **140**a, feature vector lookup or matching operation(s) **150**a in connection with items or records **112**a in a work-identification (WID) database **110**a. If a matching feature vector **114**a is found, the work-associated information lookup operation(s) **160**a can use the associated work identifier **116**a to accessing a work identification-action translation (WIDAT) database **130**a to retrieve associated information **136**a, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

An example illustrating operations that can occur in the first embodiment of FIG. **1**, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database **110**a. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are not two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of

US 8,904,464 B1

**11**

Dimensionality for nearest Neighbor Search" SODA 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. Estimates of the size of the WIDAT database **130***a* depend on what associated information (recall fields **136**) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database **130***a* would be less than 1 Mbyte.

The configuration just described with reference to FIG. **2** places all of the processing and data on each user's local machine **210**. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider **240** must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet **230** in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer **210** might also transmit information to a central monitoring center **240** informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. **2**, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database **130***b* is at a remote location **340**. In this arrangement, illustrated in FIG. **3**, after the local computer **310** identifies the work, it sends a query to the remote WIDAT database **130***b*. The query may contain the work identifier **136**. The remote site **340** may then return the associated information **136**. Although the remote WIDAT database **130***b* needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers **310**.

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database **130***b* might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, overloading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database may be small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1

**12**

Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally **410**, the one or more vectors are transmitted to a central site **440** at which is stored the WID and WIDAT databases **110***c* and **130***c* together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. **4**. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation **140***c* that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site **440** which can resolve the request.

After successfully matching the feature vector, the central site **440** can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site **440** might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction **140***c* in digital set-top-boxes and in video recorders **410**. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement, the video recorder would extract one or more feature vectors and transmit them to a central site **440**. This site **440** would determine if a match existed between the query vector and the database of pre-stored vectors **110***c*. If a match is found, the central server **440** would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device **410**. Of course, a consumer device **410** such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device **410** could store the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

US 8,904,464 B1

**13**

§4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCRs. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information")

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) **210/310/410** to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

§4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, preferably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT) information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

**14**

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a pre-determined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. This information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

§4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

§4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database **510** maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140**$d$, as well as the work identification operation(s) **150**$d$ and other databases **110**$d$, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is

US 8,904,464 B1

**15**

unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4.times.35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophisticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

§4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, and most TVs do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm

**16**

Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

§4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540a** may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510a**, **530a**, and **110e**, as well as the database generation operation(s) **520a/538a**, the lookup operation(s) **550a** and the work-associated information lookup operation(s) **560a** may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740a** and query resolution center **740b** are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and especially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which are sold to interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for

US 8,904,464 B1

**17**

the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

§4.2.3 Exemplary Apparatus for Audience Member (User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. 6 and 7, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This information can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web

**18**

browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCRs and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. 6 and 7, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities of course, the two-way communication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

§4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

§4.3 Operational Examples

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in §4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

§4.3.1 Operational Example where Intra-Work Information is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed. The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n.times.n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the n.times.n blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of 480.times.720 pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with 16.times.16 blocks, then the number of blocks per frame is 345,600/256=1350. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 16.times.16 blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the 100.times.10=1000 DCT coefficients. Many other variations are also possible. In many media applica-

tions, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not yet present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search is possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10.sup.th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000, 000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this

US 8,904,464 B1

**21**

capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sub-linear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, $\tau$. The fixed radius search means that if the database contains a vector that is within $\tau$ of the query, then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10.times.50.times.30 queries per second.

**22**

§4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840***a*. These centers **840***a* may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840***a* is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840***a* update one or more database centers **840***b*, informing them of the time, place, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840***b* updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840***b* can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840***a*. The database centers **840***b* are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries in memory. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to 3600.times.100.times.100=36,000,000 entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work.

An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**,

23                                                                                    24

the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840***b*. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840***b*. This might happen hours or even days later.

The query contains information that the database center **840***b* uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840***b* receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840***b* may simply function as a form of proxy server, mapping the audience member's initial query into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840***b* may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840***b* to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, Calif. or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840***b* using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840***a* where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840***b* is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

§4.4 Conclusions

None of the embodiments of the invention require modification to the work or content, i.e., no active signal is embedded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

What is claimed is:

**1**. A method comprising:

receiving, by a computer system including at least one computer, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

obtaining, by the computer system from the user electronic device, a request related to the associated tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

US 8,904,464 B1

<table>
<tr><td>25</td><td>26</td></tr>
</table>

providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

**2**. The method of claim **1**, wherein the associated information is related to one or more products or services.

**3**. The method of claim **2**, wherein the associated information is related to names of the one or more products or services.

**4**. The method of claim **2**, wherein the associated information is related to a product category associated with the one or more products or services.

**5**. The method of claim **2**, wherein the associated information is related to a manufacturer of the one or more products or services.

**6**. The method of claim **2**, wherein the associated information is related to a website associated with the one or more products or services.

**7**. The method of claim **1**, wherein the first electronic media work comprises at least one of an audio, a video, or an image.

**8**. The method of claim **1**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another.

**9**. The method of claim **1**, wherein the user electronic device is at least one of a television, a set-top-box, a video recorder, a computer, a cell phone, a remote control, or a portable device.

**10**. The method of claim **1**, wherein the associated information is related to an advertisement.

**11**. The method of claim **10**, wherein the action comprises electronically registering a user associated with the user electronic device with at least one of a service or a product related to the advertisement.

**12**. The method of claim **10**, wherein the action comprises electronically providing at least one of a coupon or a certificate related to the advertisement.

**13**. The method of claim **10**, wherein the action comprises allowing a user associated with the user electronic device to interact with a video stream related to the advertisement.

**14**. The method of claim **1**, wherein the action comprises presenting a user associated with the user electronic device questions about the media work.

**15**. The method of claim **1**, wherein the action comprises displaying additional information on the user electronic device.

**16**. The method of claim **1**, wherein the machine-readable instructions comprise a hyperlink to a URL.

**17**. The method of claim **1**, wherein the machine-readable instructions comprise instructions to dial a telephone number.

**18**. A method comprising:

receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

receiving, by the computer system, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at a user electronic device, the action; and

providing, from the computer system to the first user electronic device, the machine-readable instructions to perform the action in response to the request.

**19**. The method of claim **18**, wherein the associated information is related to one or more products or services.

**20**. The method of claim **19**, wherein the associated information is related to names of the one or more products or services.

**21**. The method of claim **19**, wherein the associated information is related to a product category associated with the one or more products or services.

**22**. The method of claim **19**, wherein the associated information is related to a manufacturer of the one or more products or services.

**23**. The method of claim **19**, wherein the associated information is related to a website associated with the one or more products or services.

**24**. The method of claim **18**, wherein the first electronic media work comprises at least one of an audio, a video, or an image.

**25**. The method of claim **18**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the first user electronic device are different from one another.

**26**. The method of claim **18**, wherein the first user electronic device is at least one of a television, a set-top-box, a video recorder, a computer, a cell phone, a remote control, or a portable device.

**27**. The method of claim **18**, wherein the associated information is related to an advertisement.

**28**. The method of claim **27**, wherein the action comprises electronically registering a user associated with the first user electronic device with at least one of a service or a product related to the advertisement.

**29**. The method of claim **27**, wherein the action comprises electronically providing at least one of a coupon or a certificate related to the advertisement.

**30**. The method of claim **27**, wherein the action comprises allowing a user associated with the first user electronic device to interact with a video stream related to the advertisement.

**31**. The method of claim **18**, wherein the action comprises presenting a user associated with the first user electronic device questions about the media work.

**32**. The method of claim **18**, wherein the action comprises displaying additional information on the first user electronic device.

**33**. The method of claim **18** wherein the machine-readable instructions comprise a hyperlink to a URL.

**34**. The method of claim **18**, wherein the machine-readable instructions comprise instructions to dial a telephone number.

\* \* \* \* \*

CLOSED,APPEAL,CASREF,COMPLEX-CSMGMT,ECF,MOTREF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-02396-PGG-SN

Network-1 Technologies, Inc. v. Google, L.L.C. et al
Assigned to: Judge Paul G. Gardephe
Referred to: Magistrate Judge Sarah Netburn
Related Case: 1:14-cv-09558-PGG-SN
Case in other court: USCA Federal Circuit, 24-01948
Cause: 35:271 Patent Infringement

Date Filed: 04/04/2014
Date Terminated: 04/24/2024
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Network-1 Technologies, Inc.**                represented by     **Adam S Hoffman**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
310-826-7474
Email: ahoffman@raklaw.com
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth Hayden**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: ahayden@raklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian D. Ledahl**
Russ August & Kabat
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: bledahl@raklaw.com
*ATTORNEY TO BE NOTICED*

**Charles Robert Macedo**
Amster Rothstein & Ebenstein
405 Lexington Avenue

Ste 48th Floor
New York, NY 10174
212-336-8000
Fax: 212-336-8001
Email: cmacedo@arelaw.com
*ATTORNEY TO BE NOTICED*

**Jacob R Buczko**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
(310)-826-7474
Fax: (310)-826-6991
Email: jbuczko@raklaw.com
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
Russ, August,& Kabat
12424 Wilshire Blvd.,
Suite 1200
Los Angeles, CA 90025
(310)-979-8278
Fax: (310)-826-6991
Email: mafenster@raklaw.com
*ATTORNEY TO BE NOTICED*

**Paul A Kroeger**
Russ, August,& Kabat
12424 Wilshire Blvd.,
Suite 1200
Los Angeles, CA 90025
(310)-826-7474
Fax: (310)-826-6991
Email: pkroeger@raklaw.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Movant</u>**

**Audible Magic Corporation**          represented by **Kayvan Ghaffari**
Kayvan Ghaffari
Crowell & Moring LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
408-679-1576
Email: kghaffari@orrick.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Joshua M. Rychlinski**
Crowell & Moring LLP (DC)
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2688
Email: jrychlinski@crowell.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google L.L.C**                     represented by  **Bruce R. Genderson**
Williams & Connolly
725 Twelfth Street N.W.
Washington, DC 20005
(202)-434-5999
Fax: (202)-434-5029
Email: bgenderson@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas R. Nemec**
Skadden, Arps, Slate, Meagher & Flom,
LLP
One Manhattan West
New York, NY 10001-8602
212-735-2419
Fax: 917-777-2419
Email: dnemec@skadden.com
*TERMINATED: 02/25/2019*
*LEAD ATTORNEY*

**Samuel Bryant Davidoff**
MFB Technologies, Inc.
712 H Street NE
Pmb 90579
Washington, DC 20002
202-579-9757
Email: sam@davidoffs.com
*TERMINATED: 12/12/2023*
*LEAD ATTORNEY*

**Andrew D Gish**
Gish PLLC
41 Madison Avenue, Floor 31

Appx167

New York, NY 10010
212-518-7380
Email: andrew@gishpllc.com
*TERMINATED: 02/25/2019*

**Andrew Trask**
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5023
Email: atrask@wc.com
*ATTORNEY TO BE NOTICED*

**Christopher Alan Suarez**
Steptoe LLP
1330 Connecticut Ave. NW
Washington, DC 20036
202-429-8131
Email: csuarez@steptoe.com
*TERMINATED: 08/28/2019*

**Daniel P. Shanahan**
Williams & Connolly LLP
725 Twelfth Street, North West
Washington, DC 20005
(202) 434-5174
Fax: (202) 434-5029
Email: dshanahan@wc.com
*ATTORNEY TO BE NOTICED*

**Eli S Schlam**
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202)-434-5754
Email: eschlam@wc.com
*ATTORNEY TO BE NOTICED*

**Ian Chen**
Skadden, Arps, Slate, Meagher & Flom,
LLP(CA)
525 University Avenue
Palo Alto, CA 94301
(650)-470-4559
Fax: (650)-798-6563
Email: ian.chen@skadden.com
*TERMINATED: 12/26/2017*

**James J Elacqua**
Skadden, Arps, Slate, Meagher & Flom,
LLP(CA)
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
Fax: (650) 798-6564
Email: james.elacqua@skadden.com
*TERMINATED: 12/26/2017*
*PRO HAC VICE*

**Jessica Bodger Rydstrom**
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
(202) 434-5567
Fax: (202) 434-5029
Email: jrydstrom@wc.com
*ATTORNEY TO BE NOTICED*

**Kevin Hardy**
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I ST NW
Suite 900
Washington, DC 20005
202-538-8240
Fax: 202-538-8100
Email: kevinhardy@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Marti Alan Johnson**
Gish PLLC
41 Madison Ave
New York, NY 10010
212-518-2000
Email: marti@gishpllc.com
*TERMINATED: 02/25/2019*

**Melissa B. Collins**
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
202-434-5000
Email: mcollins@wc.com
*ATTORNEY TO BE NOTICED*

**Thomas H.L. Selby**
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC 20024
202-758-7161
Fax: 202-434-5029
Email: tselby@wc.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Youtube, LLC**                    represented by **Bruce R. Genderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas R. Nemec**
(See above for address)
*TERMINATED: 02/25/2019*
*LEAD ATTORNEY*

**Samuel Bryant Davidoff**
(See above for address)
*TERMINATED: 12/12/2023*
*LEAD ATTORNEY*

**Andrew D Gish**
(See above for address)
*TERMINATED: 02/25/2019*

**Andrew Trask**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Alan Suarez**
(See above for address)
*TERMINATED: 08/28/2019*

**Daniel P. Shanahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eli S Schlam**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ian Chen**

(See above for address)
*TERMINATED: 12/26/2017*

**James J Elacqua**
(See above for address)
*TERMINATED: 12/26/2017*
*PRO HAC VICE*

**Jessica Bodger Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Hardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marti Alan Johnson**
(See above for address)
*TERMINATED: 02/25/2019*

**Melissa B. Collins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas H.L. Selby**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/04/2014 | 1 | CIVIL COVER SHEET filed. (lcu) (Entered: 04/08/2014) |
| 04/04/2014 | 2 | COMPLAINT against Google, Inc., Youtube, LLC. (Filing Fee $ 350.00, Receipt Number 465401091724)Document filed by Network-1 Technologies, Inc.(lcu) (Entered: 04/08/2014) |
| 04/04/2014 |  | SUMMONS ISSUED as to Google, Inc., Youtube, LLC. (lcu) (Entered: 04/08/2014) |
| 04/04/2014 |  | Magistrate Judge Michael H. Dolinger is so designated. (lcu) (Entered: 04/08/2014) |
| 04/04/2014 |  | Case Designated ECF. (lcu) (Entered: 04/08/2014) |
| 04/04/2014 | 3 | STANDING ORDER IN RE PILOT PROJECT REGARDING CASE MANAGEMENT TECHNIQUES FOR COMPLEX CIVIL CASES IN THE SOUTHERN DISTRICT OF NEW YORK (See M-10-468 Order filed November 1, 2011). This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the Pilot Project), unless the judge to whom this case is assigned determines |

| | | |
|---|---|---|
| | | otherwise. This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950. The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project. The description of the Pilot Project, including procedures to be followed, is attached to this Order. (Signed by Judge Loretta A. Preska on 10/31/2011) (lcu) (Entered: 04/08/2014) |
| 04/04/2014 | | Case Eligible for Patent Pilot Program. (lcu) (Entered: 04/08/2014) |
| 04/04/2014 | | Mailed notice to Commissioner of Patents and Trademarks to report the filing of this action. (moh) (Entered: 03/24/2015) |
| 04/08/2014 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Network-1 Technologies, Inc..(Macedo, Charles) (Entered: 04/08/2014) |
| 04/11/2014 | 5 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Marc Aaron Fenster to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9561215. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Text of Proposed Order)(Fenster, Marc) Modified on 4/14/2014 (wb). (Entered: 04/11/2014) |
| 04/11/2014 | 6 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Brian David Ledahl to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9561216. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Text of Proposed Order)(Ledahl, Brian) Modified on 4/14/2014 (wb). (Entered: 04/11/2014) |
| 04/14/2014 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice regarding Document No. 6 MOTION for Brian David Ledahl to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9561216. Motion and supporting papers to be reviewed by Clerk's Office staff., 5 MOTION for Marc Aaron Fenster to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-9561215. Motion and supporting papers to be reviewed by Clerk's Office staff.. Certificate of Good Standing Must be issued from Supreme Court of California with a Clerk of Court Signature. Re-file the document as a Corrected Motion to Appear Pro Hac Vice and attach a valid Certificate of Good Standing, issued within the past 30 days. (wb)** (Entered: 04/14/2014) |
| 04/16/2014 | 7 | NOTICE OF PRETRIAL CONFERENCE: Initial Conference set for 6/5/2014 at 11:00 AM in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 4/16/2014) (ft) (Entered: 04/16/2014) |
| 04/24/2014 | 8 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION to Amend/Correct *Brian Ledahl Motion for Admission Pro Hac Vice*. |

| | | |
|---|---|---|
| | | Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit CA Supreme Court Certicate of Good Standing, # 2 Text of Proposed Order)(Ledahl, Brian) Modified on 4/25/2014 (ldi). (Entered: 04/24/2014) |
| 04/24/2014 | 9 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION to Amend/Correct *Marc A. Fenster Motion for Admission Pro Hac Vice*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit CA Supreme Court Certicate of Good Standing, # 2 Text of Proposed Order)(Fenster, Marc) Modified on 4/25/2014 (ldi). (Entered: 04/24/2014) |
| 04/24/2014 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Brian D. Ledahl to RE-FILE Document 8 MOTION to Amend/Correct *Brian Ledahl Motion for Admission Pro Hac Vice*. Use the event type Appear Pro Hac Vice found under the event list Motions. (ldi)** (Entered: 04/25/2014) |
| 04/24/2014 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Marc A. Fenster to RE-FILE Document 9 MOTION to Amend/Correct *Marc A. Fenster Motion for Admission Pro Hac Vice*. Use the event type Appear Pro Hac Vice found under the event list Motions. (ldi)** (Entered: 04/25/2014) |
| 04/25/2014 | 10 | MOTION for Marc Aaron Fenster to Appear Pro Hac Vice. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Good Standing Certificate, # 2 Text of Proposed Order)(Fenster, Marc) (Entered: 04/25/2014) |
| 04/25/2014 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 10 MOTION for Marc Aaron Fenster to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 04/25/2014) |
| 04/25/2014 | 11 | MOTION for Brian David Ledahl to Appear Pro Hac Vice. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Good Standing Certificate, # 2 Text of Proposed Order)(Ledahl, Brian) (Entered: 04/25/2014) |
| 04/25/2014 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Brian David Ledahl to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 04/25/2014) |
| 04/28/2014 | 12 | ORDER FOR ADMISSION PRO HAC VICE granting 10 Motion for Marc A. Fenster to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 4/28/2014) (kgo) (Entered: 04/28/2014) |
| 04/28/2014 | 13 | ORDER FOR ADMISSION PRO HAC VICE granting 11 Motion for Brian D. Ledahl to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 4/28/2014) (kgo) (Entered: 04/28/2014) |
| 04/28/2014 | 14 | AFFIDAVIT OF SERVICE of Summons and Complaint. Youtube, LLC served on |

| | | |
|---|---|---|
| | | 4/18/2014, answer due 5/9/2014. Service was accepted by PAUL MATHEWS, LITIGATION MANAGEMENT REPRESENTATIVE. Document filed by Network-1 Technologies, Inc.. (Fenster, Marc) (Entered: 04/28/2014) |
| 04/28/2014 | 15 | AFFIDAVIT OF SERVICE of Summons and Complaint. Google, Inc. served on 4/18/2014, answer due 5/9/2014. Service was accepted by Amy Mclaren, Process Specialist. Document filed by Network-1 Technologies, Inc.. (Fenster, Marc) (Entered: 04/28/2014) |
| 04/30/2014 | 16 | JOINT STIPULATION TO EXTEND TIME FOR DEFENDANTS GOOGLE INC., AND YOUTUBE, LLC TO RESPOND TO THE COMPLAINT: The parties hereby stipulate and agree that, subject to the approval of the Court, the Defendants' time to move, answer, or otherwise respond to the Complaint is extended to May 23, 2014. (Signed by Judge Paul G. Gardephe on 4/30/2014) (kgo) (Entered: 05/01/2014) |
| 04/30/2014 | | Set/Reset Deadlines: All Defendants' answers due 5/23/2014. (kgo) (Entered: 05/01/2014) |
| 05/19/2014 | 17 | NOTICE OF APPEARANCE by Douglas R. Nemec on behalf of Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 05/19/2014) |
| 05/19/2014 | 18 | NOTICE OF APPEARANCE by Andrew D Gish on behalf of Google, Inc., Youtube, LLC. (Gish, Andrew) (Entered: 05/19/2014) |
| 05/19/2014 | 19 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent None for Google, Inc.; Corporate Parent Google Inc. for Youtube, LLC. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 05/19/2014) |
| 05/20/2014 | 20 | NOTICE OF APPEARANCE by Marti Alan Johnson on behalf of Google, Inc., Youtube, LLC. (Johnson, Marti) (Entered: 05/20/2014) |
| 05/22/2014 | 21 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Ian Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-9702875. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Chen, Ian) Modified on 5/27/2014 (bcu) (Entered: 05/22/2014) |
| 05/23/2014 | 22 | ANSWER to 2 Complaint with JURY DEMAND. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 05/23/2014) |
| 05/27/2014 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice regarding Document No. 21 MOTION for Ian Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-9702875. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): Missing Certificate of Good Standing. Certificates of Good Standing must be issued from the Supreme Court of California and not from a State Bar Association.. Re-file the document as a Corrected Motion to Appear Pro Hac Vice and attach a valid Certificate of Good Standing, issued within the past 30 days. (bcu)** (Entered: 05/27/2014) |
| 05/27/2014 | 23 | JOINT STIPULATION FOR SECOND EXTENSION OF TIME FOR |

| | | |
|---|---|---|
| | | DEFENDANTS GOOGLE INC. AND YOUTUBE, LLC TO RESPOND TO THE COMPLAINT: The parties hereby stipulate and agree that, subject to the approval of the Court, the Defendants' time to move, answer, otherwise respond to the Complaint is extended to May 29, 2014, NOW THEREFORE, the parties respectfully request that the deadline for Defendants to submit a courtesy copy of Defendants' responsive pleading to Chambers be extended to May 29, 2014. NOW THEREFORE, the parties hereby stipulate and agree that the Pretrial Conference set for June 5, 2014 will remain on calendar, and the parties will submit the joint letter and jointly proposed Case Management Plan called for in the Court's April 16, 2014 Order not later than May 29, 2014. (Signed by Judge Paul G. Gardephe on 5/27/2014) (kgo) (Entered: 05/27/2014) |
| 05/27/2014 | | Set/Reset Deadlines: All Defendants' answers due 5/29/2014. (kgo) (Entered: 05/27/2014) |
| 05/27/2014 | 24 | MEMO ENDORSEMENT on NOTICE OF WITHDRAWAL OF ATTORNEYS: To the Clerk of this Court, all parties and their counsel of record: PLEASE TAKE NOTICE that Kevin X. McGann and Aaron Chase are hereby withdrawn as counsel of record for Defendants Google Inc. and YouTube, LLC ("Defendants") in this matter and that White & Case LLP no longer serves as counsel for Defendants. Mr. McGann and Mr. Chase served as counsel for Defendants for the sole purposes of negotiating, drafting and filing the Joint Stipulation To Extend Time For Defendants Google Inc. And YouTube, LLC To Respond To The Complaint, Docket No. 16, entered May 1, 2014. ENDORSEMENT: SO ORDERED (Signed by Judge Paul G. Gardephe on 5/27/2014) (kgo) Modified on 5/30/2014 (kgo). (Entered: 05/27/2014) |
| 05/27/2014 | 25 | ORDER FOR ADMISSION PRO HAC VICE for Ian Chen to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 5/27/2014) (kgo) (Entered: 05/27/2014) |
| 05/29/2014 | 26 | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster and Douglas R. Nemec dated May 29, 2014 re: Proposed Civil Case Management Plan and Scheduling Order. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Text of Proposed Order Civil Case Management Plan and Scheduling Order) (Ledahl, Brian) (Entered: 05/29/2014) |
| 05/30/2014 | 27 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for James J. Elacqua to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-9730696. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing - Texas, # 2 Certificate of Good Standing - California, # 3 Text of Proposed Order) (Elacqua, James) Modified on 6/2/2014 (bcu). (Entered: 05/30/2014) |
| 06/02/2014 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice regarding Document No. 27 MOTION for James J. Elacqua to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-9730696. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): Missing Certificate of Good Standing. Certificate of Good Standing must be issued from the Supreme Court of Texas and not from a State Bar Association. Re-file the document as a Corrected Motion to Appear Pro Hac Vice and attach a valid Certificate of Good Standing,** |

| | | |
|---|---|---|
| | | **issued within the past 30 days. (bcu)** (Entered: 06/02/2014) |
| 06/04/2014 | 28 | MOTION for James J. Elacqua to Appear Pro Hac Vice *(Corrected).* **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit Texas Certificate of Good Standing, # 2 Exhibit California Certificate of Good Standing, # 3 Text of Proposed Order)(Elacqua, James) (Entered: 06/04/2014) |
| 06/04/2014 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 28 MOTION for James J. Elacqua to Appear Pro Hac Vice *(Corrected).* Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 06/04/2014) |
| 06/06/2014 | 29 | ORDER: It is hereby ORDERED that a telephone conference will take place on June 6, 2014, at 2:30 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. (Telephone Conference set for 6/6/2014 at 02:30 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 6/6/2014) (kgo) (Entered: 06/06/2014) |
| 06/06/2014 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Telephone Conference held on 6/6/2014. (mr) (Entered: 06/10/2014) |
| 06/09/2014 | 30 | ORDER FOR ADMISSION PRO HAC VICE granting 28 Motion for James J. Elacqua to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 6/8/2014) (kgo) (Entered: 06/09/2014) |
| 06/09/2014 | 31 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial. This case is to be tried to a jury. Deposition due by 3/19/2015. Fact Discovery due by 3/19/2015. Telephone Conference set for 10/2/2014 at 05:00 PM before Judge Paul G. Gardephe. Counsel for the parties have conferred and their present best estimate of the length of trial is: 6 to 8 days. (Signed by Judge Paul G. Gardephe on 6/8/2014) (kgo) (Entered: 06/09/2014) |
| 07/01/2014 | 32 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated July 1, 2014 re: Proposed Protective Order and Electronically Stored Information. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Defendants Proposed Protective Order, # 2 Blackline of Defendants Proposed Protective Order Against The Courts Model Protective Order, # 3 Defendants Proposed ESI Order, # 4 Plaintiffs Proposed Protective Order, # 5 Blackline of Plaintiffs Proposed Protective Order Against The Courts Model Protective Order, # 6 Plaintiffs Proposed ESI Order, # 7 Printout of http://research.google.com/pubs/author85.html)(Nemec, Douglas) (Entered: 07/01/2014) |
| 08/13/2014 | 33 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated 08/13/2014 re: Proposed Protective Orders and Proposed Orders Regarding the Production of Electronically Stored Information. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 08/13/2014) |
| 10/03/2014 | 34 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred |

| | | |
|---|---|---|
| | | to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Dkt. Nos. 32, 33. Referred to Magistrate Judge Michael H. Dolinger. (Signed by Judge Paul G. Gardephe on 10/3/2014) (rjm) (Entered: 10/03/2014) |
| 10/03/2014 | 35 | ORDER: It is hereby ORDERED that the June 8, 2014 Case Management Plan is modified to provide that the parties must complete substantial production of documents by December 3, 2014. It is further ORDERED that the Court will hold a telephone conference on December 4, 2014, at 5:00 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. SO ORDERED. ( Telephone Conference set for 12/4/2014 at 05:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 10/03/2014) (ama) (Entered: 10/03/2014) |
| 10/10/2014 | 36 | JOINT LETTER addressed to Magistrate Judge Michael H. Dolinger from Brian D. Ledahl dated October 10, 2014 re: Joint Letter Regarding Court Conference. Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 10/10/2014) |
| 10/14/2014 | 37 | MEMO ENDORSEMENT on re: 36 Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: Since defendants seek on substance a protective order under Rule 26(c), they are required to show "good cause." Any fact assertions on counsel's letters or briefs must be based on competent evidence in the form of affidavits, declarations and/or exhibits. (Signed by Magistrate Judge Michael H. Dolinger on 10/14/2014) Copies Faxed By Chambers. (ama) (Entered: 10/14/2014) |
| 10/14/2014 | 38 | JOINT LETTER addressed to Magistrate Judge Michael H. Dolinger from Brian D. Ledahl dated October 14, 2014 re: Joint Letter Regarding Court Conference. Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 10/14/2014) |
| 10/17/2014 | 39 | MEMO ENDORSEMENT on re: 38 Letter filed by Network-1 Technologies, Inc.. ENDORSEMENT: Application granted. (Signed by Magistrate Judge Michael H. Dolinger on 10/17/2014) (kgo) (Entered: 10/17/2014) |
| 10/17/2014 | | Set/Reset Hearings: Status Conference set for 10/24/2014 at 10:00 AM before Magistrate Judge Michael H. Dolinger. (kgo) (Entered: 10/17/2014) |
| 10/17/2014 | 40 | LETTER addressed to Magistrate Judge Michael H. Dolinger from Douglas R. Nemec dated October 17, 2014 re: Google's Proposed Protective Order and ESI Order. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Nemec, Douglas) (Entered: 10/17/2014) |
| 10/17/2014 | 41 | DECLARATION of David Rosenstein re: 40 Letter, *Regarding Google's Proposed Protective Order and ESI Order*. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Nemec, Douglas) (Entered: 10/17/2014) |
| 10/21/2014 | 42 | LETTER addressed to Magistrate Judge Michael H. Dolinger from Brian D. Ledahl dated October 21, 2014 re: Response To Defendants' Request For A Protective Order and ESI Order. Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) |

| | | |
|---|---|---|
| | | (Entered: 10/21/2014) |
| 10/21/2014 | 43 | DECLARATION of Corey M. Horowitz re: 42 Letter *in Response to Defendants' Request For A Protective Order and ESI Order*. Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 10/21/2014) |
| 10/21/2014 | 44 | DECLARATION of Brian D. Ledahl re: 42 Letter *in Response to Defendants' Request For A Protective Order and ESI Order*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U)(Ledahl, Brian) (Entered: 10/21/2014) |
| 10/27/2014 | 45 | JOINT LETTER addressed to Magistrate Judge Michael H. Dolinger from Brian D. Ledahl dated October 27, 2014 re: Terms of the proposed Protective Order. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Ledahl, Brian) (Entered: 10/27/2014) |
| 10/28/2014 | 46 | JOINT LETTER addressed to Magistrate Judge Michael H. Dolinger from Brian D. Ledahl dated October 28, 2014 re: Corrected Protective Order. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A)(Ledahl, Brian) (Entered: 10/28/2014) |
| 10/28/2014 | 47 | MEMO ENDORSEMENT on STIPULATION AND ORDER REGARDING THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION re: 45 Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: SO ORDERED. (Signed by Magistrate Judge Michael H. Dolinger on 10/28/2014) (ama) (Entered: 10/28/2014) |
| 10/29/2014 | 48 | STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER: Regarding procedures to be followed that shall govern the handling of confidential material. SO ORDERED. (Signed by Magistrate Judge Michael H. Dolinger on 10/28/2014) (ama) (Entered: 10/29/2014) |
| 11/03/2014 | 49 | TRANSCRIPT of Proceedings re: conference held on 10/24/2014 before Magistrate Judge Michael H. Dolinger. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2014. Redacted Transcript Deadline set for 12/8/2014. Release of Transcript Restriction set for 2/4/2015.(McGuirk, Kelly) (Entered: 11/03/2014) |
| 11/03/2014 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 10/24/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 11/03/2014) |
| 11/11/2014 | 51 | JOINT STIPULATION TO MODIFY THE DEADLINES FOR CLAIM |

| | | |
|---|---|---|
| | | CONSTRUCTION AND CLOSE OF FACT DISCOVERY: NOW THEREFORE, the parties hereto, by and through their respective counsel of record hereby stipulate and agree as follows: The parties shall exchange a list of those claim terms that they believe need construction and their proposed claim construction of those terms by January 9, 2015; The parties shall cooperate and jointly file a Joint Claim Construction Chart listing the disputed claim terms and each party's proposed constructions on or before February 6, 2015; The party asserting infringement must serve and file an opening claim construction brief and all supporting evidence and testimony on March 6, 2015; The opposing party must serve and file a response to the opening claim construction brief and all supporting evidence and testimony by April 6, 2015; The opening party may serve and file a reply solely rebutting the opposing party's response by April 20, 2015; The opposing party may serve and file a sur-reply brief solely in response to new arguments raised in the opening party's reply brief by May 4, 2015; The parties must complete fact discovery no later than May 14, 2015. SO ORDERED. ( Fact Discovery due by 5/14/2015., Motions due by 3/6/2015., Responses due by 4/6/2015, Replies due by 4/20/2015., Sur-replies due by 5/4/2015.) (Signed by Judge Paul G. Gardephe on 11/10/2014) (ama) (Entered: 11/12/2014) |
| 11/24/2014 | 52 | ORDER: In light of the modifications to the June 8, 2014 Case Management Plan, it is hereby ORDERED that the telephone conference in this action previously scheduled for December 4, 2014, is adjourned to May 15, 2015, at 5:00 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. SO ORDERED. ( Telephone Conference set for 5/15/2015 at 05:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 11/21/2014) (ama) (Entered: 11/24/2014) |
| 02/06/2015 | 53 | JOINT CLAIM CONSTRUCTION STATEMENT. Document filed by Google, Inc., Network-1 Technologies, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 02/06/2015) |
| 02/10/2015 | 54 | JOINT STIPULATION TO MODIFY CERTAIN DISCOVERY DEADLINES: NOW THEREFORE, the parties hereto, by and through their undersigned counsel of record hereby stipulate and agree as follows: The parties shall serve requests to admit by April 9, 2015. The parties shall complete depositions of fact witnesses by May 14, 2015. SO ORDERED.( Deposition due by 5/14/2015.) (Signed by Judge Paul G. Gardephe on 2/10/2015) (ama) Modified on 3/3/2015 (ama). (Entered: 02/10/2015) |
| 03/03/2015 | 55 | JOINT STIPULATION TO MODIFY THE DEADLINES FOR CLAIM CONSTRUCTION BRIEFING: NOW THEREFORE, the parties hereto, by and through their respective counsel of record hereby stipulate and agree as follows: 1. The party asserting infringement must serve and file an opening claim construction brief and all supporting evidence and testimony on March 27, 2015; 2. The opposing party must serve and file a response to the opening claim construction brief and all supporting evidence and testimony by April 27, 2015; 3. The opening party may serve and file a reply solely rebutting the opposing party's response by May 11, 2015; 4. The opposing party may serve and file a sur-reply brief solely in response to new arguments raised in the opening party's reply brief by May 26, 2015. SO ORDERED. ( Motions due by 3/27/2015., Responses due by 4/27/2015, Replies due by 5/11/2015., Surreplies due by 5/26/2015.) (Signed by Judge Paul G. Gardephe on 3/02/2015) (ama) (Entered: 03/03/2015) |

| 03/10/2015 | 56 | LETTER MOTION to Adjourn Conference addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated 3/10/2015., LETTER MOTION for Extension of Time addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated 3/10/2015. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 03/10/2015) |
|---|---|---|
| 03/11/2015 | 57 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated March 11, 2015 re: Defendants' letter seeking extension. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) (Entered: 03/11/2015) |
| 03/12/2015 | 58 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated March 12, 2015 re: Reply to response to letter request for suspension of calendar deadlines. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 03/12/2015) |
| 03/24/2015 | 59 | MOTION for Adam S. Hoffman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737822. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order)(Hoffman, Adam) (Entered: 03/24/2015) |
| 03/24/2015 | 60 | MOTION for Paul A. Kroeger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737973. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order)(Kroeger, Paul) (Entered: 03/24/2015) |
| 03/25/2015 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 60 MOTION for Paul A. Kroeger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737973. Motion and supporting papers to be reviewed by Clerk's Office staff., 59 MOTION for Adam S. Hoffman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737822. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/25/2015) |
| 03/25/2015 | 61 | ORDER FOR ADMISSION PRO HAC VICE granting 60 Motion for Paul A. Kroeger to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/25/2015) (ama) (Entered: 03/25/2015) |
| 03/25/2015 | 62 | ORDER FOR ADMISSION PRO HAC VICE granting 59 Motion for Adam S. Hoffman to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/25/2015) (ama) (Entered: 03/25/2015) |
| 03/27/2015 | 63 | BRIEF *NETWORK-1 TECHNOLOGIES, INC.S OPENING CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26)(Ledahl, Brian) (Entered: |

| | | |
|---|---|---|
| | | 03/27/2015) |
| 03/27/2015 | 64 | DECLARATION of Dorian S. Berger in Support re: 63 Brief,,. Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 03/27/2015) |
| 03/27/2015 | 65 | DECLARATION of PROFESSOR GEORGE KARYPIS in Support re: 63 Brief,,. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A) (Ledahl, Brian) (Entered: 03/27/2015) |
| 04/17/2015 | 66 | ORDER denying 56 Letter Motion to Adjourn Conference; denying 56 Letter Motion for Extension of Time. For the reasons stated in open court, Defendants' request to stay this case for three months is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 56). SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/16/2015) (ama) (Entered: 04/17/2015) |
| 04/17/2015 | 67 | ORDER: It is hereby ORDERED that the following schedule will apply to Defendants' motion to consolidate this case with Network-I Technologies, Inc. v. Google, Inc. et al., No. 14 Civ. 2396 (PGG): Motions due by 4/20/2015., Responses due by 4/27/2015, Replies due by 4/29/2015. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/17/2015) (ama) (Entered: 04/17/2015) |
| 04/27/2015 | 68 | BRIEF *(Claim Construction Response)*. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 04/27/2015) |
| 04/27/2015 | 69 | DECLARATION of Douglas R. Nemec in Support re: 68 Brief. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25)(Nemec, Douglas) (Entered: 04/27/2015) |
| 04/27/2015 | 70 | DECLARATION of Dr. Pierre Moulin in Support re: 68 Brief. Document filed by Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 04/27/2015) |
| 04/29/2015 | 71 | MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 04/29/2015) |
| 04/29/2015 | 72 | MEMORANDUM OF LAW in Support re: 71 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 04/29/2015) |
| 04/29/2015 | 73 | DECLARATION of Marti A. Johnson in Support re: 71 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 .. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit A - Part I, # 2 Exhibit A - Part II, # 3 Exhibit B)(Johnson, Marti) (Entered: 04/29/2015) |
| 04/29/2015 | 74 | MEMORANDUM OF LAW in Opposition re: 71 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 04/29/2015) |

| | | |
|---|---|---|
| 04/29/2015 | 75 | DECLARATION of Brian D. Ledahl in Opposition re: 71 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 .. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Ledahl, Brian) (Entered: 04/29/2015) |
| 04/29/2015 | 76 | REPLY MEMORANDUM OF LAW in Support re: 71 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 04/29/2015) |
| 05/07/2015 | 77 | ORDER. It is hereby ORDERED that the telephone conference in this action previously scheduled for May 15, 2015 is adjourned to June 30, 2015 at 5:00 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. (Telephone Conference set for 6/30/2015 at 05:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 5/7/2015) (rjm) (Entered: 05/07/2015) |
| 05/11/2015 | 78 | BRIEF *NETWORK-1 TECHNOLOGIES, INC.S REPLY CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 05/11/2015) |
| 05/11/2015 | 79 | DECLARATION of Brian Ledahl in Support re: 78 Brief. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A)(Ledahl, Brian) (Entered: 05/11/2015) |
| 05/14/2015 | 80 | JOINT STIPULATION TO PARTIALLY MODIFY THE DEADLINE FOR THE CLOSE OF FACT DISCOVERY: The parties shall complete previously noticed depositions of fact witnesses by June 30, 2015. No other fact discovery deadline will be extended by this order. SO ORDERED.( Deposition due by 6/30/2015.) (Signed by Judge Paul G. Gardephe on 5/13/2015) (ama) (Entered: 05/14/2015) |
| 05/26/2015 | 81 | DECLARATION of Douglas R. Nemec In Support Of Google INC.'s And YouTube, LLC's Claim Construction Sur-Reply Brief . Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Nemec, Douglas) (Entered: 05/26/2015) |
| 05/26/2015 | 82 | BRIEF *(Claim Construction Sur-Reply Brief)*. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 05/26/2015) |
| 06/30/2015 | 83 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec and Marc A. Fenster dated June 30, 2015 re: Status update regarding pending deadlines. Document filed by Google, Inc., Network-1 Technologies, Inc., Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Nemec, Douglas) (Entered: 06/30/2015) |
| 07/01/2015 | 84 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec and Marc A. Fenster dated July 1, 2015 re: withdrawal of consolidation motion. Document filed by Google, Inc., Network-1 Technologies, Inc., Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Nemec, Douglas) (Entered: 07/01/2015) |
| 07/02/2015 | | ***DELETED DOCUMENT. Deleted document number 85 Order Staying All Deadlines Pending Resolution of Inter Partes Review Proceedings. The document was incorrectly filed in this case. (tn)** (Entered: 07/02/2015) |

| 07/02/2015 | 85 | ORDER STAYING ALL DEADLINES PENDING RESOLUTION OF INTER PARTES REVIEW PROCEEDINGS: that, pursuant to agreement between the parties, all matters in this case shall be stayed until further order of this Court following the issuance of the Patent Trial and Appeal Board's ("PTAB's") final written decisions in inter partes review proceedings IPR2015-00343; IPR2015-00345; IPR2015-00347; and IPR2015-00348. Within 14 days of entry of the last final written decision in the above inter partes review proceedings, the parties are instructed to contact the Court to schedule a status conference to determine further scheduling or whether a stay of the proceedings should continue. The parties are to update the Court every 90 days as to the status of the PTAB proceedings. (Signed by Judge Paul G. Gardephe on 7/2/2015) (tn) (Entered: 07/02/2015) |
| --- | --- | --- |
| 07/02/2015 | 86 | ORDER WITHDRAWING DEFENDANTS' MOTION TO CONSOLIDATE withdrawing 71 Motion to Consolidate Cases: that, in view of the parties' agreement that this case shall be stayed until further order of this Court following the issuance of the Patent Trial and Appeal Board's ("PTAB's") final written decisions in inter partes review proceedings IPR2015-00343; IPR2015-00345; IPR2015-00347; and IPR2015-00348, Defendants' Motion to Consolidate this case with related case 1:14-cv-09558-PGG (Docket Entry 72) is hereby withdrawn without prejudice. The Clerk will terminate the motion. (Signed by Judge Paul G. Gardephe on 7/2/2015) (tn) (Entered: 07/02/2015) |
| 09/30/2015 | 87 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 09/30/2015) |
| 10/13/2015 | 88 | AMENDED RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Alphabet Inc. for Google, Inc., Youtube, LLC. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 10/13/2015) |
| 12/28/2015 | 89 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 12/28/2015) |
| 03/23/2016 | 90 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 03/23/2016) |
| 06/21/2016 | 91 | STATUS REPORT. *REGARDING PROCEEDINGS BEFORE THE PATENT TRIAL AND APPEALS BOARD* Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 06/21/2016) |
| 06/24/2016 | 92 | ORDER. It is hereby ORDERED that there shall be a conference in this matter on August 18, 2016 at 11:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The parties are instructed to submit a joint letter by August 4, 2016, proposing a new case management schedule in light of the Patent Trial and Appeals Board's June 20, 2016 decision. (Conference set for 8/18/2016 at 11:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 6/22/2016) (rjm) (Entered: 06/24/2016) |

| 06/29/2016 | 93 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec dated 6/29/2016 re: Reschedule Conference. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order Rescheduling Conference) (Nemec, Douglas) (Entered: 06/29/2016) |
|---|---|---|
| 07/12/2016 | 94 | ORDER: It is hereby ORDERED that the telephone conference in this action previously scheduled for 8/18/2016 is adjourned to 9/27/2016 at 12:30 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. (Telephone Conference set for 9/27/2016 at 12:30 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 7/8/2016) (tro) (Entered: 07/12/2016) |
| 09/13/2016 | 95 | JOINT LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec and Charles R. Macedo dated 09-13-2016 re: Stay and Case Management. Document filed by Google, Inc..(Nemec, Douglas) (Entered: 09/13/2016) |
| 09/23/2016 | 96 | STATUS REPORT. *(Joint Status Update Regarding Proceedings Before The Patent Trial And Appeals Board)* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 09/23/2016) |
| 09/26/2016 | 97 | ORDER: It is hereby ORDERED that the telephone conference in this action previously scheduled for September 27, 2016 is adjourned to October 6, 2016 at 11:00 a.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. SO ORDERED. (Telephone Conference set for 10/6/2016 at 11:00 AM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 9/26/2016) (kl) (Entered: 09/26/2016) |
| 10/05/2016 | 98 | ORDER: It is hereby ORDERED that the telephone conference in this action previously scheduled for October 6, 2016 is adjourned to October 27, 2016 at 5:00 p.m. Once both sides are on the line, counsel should contact Chambers at 212-805-0224. (Telephone Conference set for 10/27/2016 at 05:00 PM before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 10/5/2016) (cf) (Entered: 10/05/2016) |
| 10/24/2016 | 99 | NOTICE OF APPEARANCE by Samuel Bryant Davidoff on behalf of Google, Inc., Youtube, LLC. (Davidoff, Samuel) (Entered: 10/24/2016) |
| 10/24/2016 | 100 | MOTION for Bruce R. Genderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909007. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing - DC, # 2 Certificate of Good Standing - Maryland, # 3 Text of Proposed Order)(Genderson, Bruce) (Entered: 10/24/2016) |
| 10/24/2016 | 101 | MOTION for Kevin Hardy to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909093. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing - DC, # 2 Certificate of Good Standing - Maryland, # 3 Text of Proposed Order)(Hardy, Kevin) (Entered: 10/24/2016) |
| 10/24/2016 | 102 | MOTION for Daniel P. Shanahan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt |

| | | |
|---|---|---|
| | | number 0208-12909174. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing - DC, # 2 Certificate of Good Standing - Maryland, # 3 Text of Proposed Order)(Shanahan, Daniel) (Entered: 10/24/2016) |
| 10/25/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 100 MOTION for Bruce R. Genderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909007. Motion and supporting papers to be reviewed by Clerk's Office staff., 101 MOTION for Kevin Hardy to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909093. Motion and supporting papers to be reviewed by Clerk's Office staff., 102 MOTION for Daniel P. Shanahan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909174. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 10/25/2016) |
| 10/26/2016 | 103 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 100 Motion for Bruce R. Genderson to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 10/25/2016) (cf) (Entered: 10/26/2016) |
| 10/26/2016 | 104 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE: granting 102 Motion for Daniel P. Shanahan to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 10/25/2016) (ama) (Entered: 10/26/2016) |
| 10/26/2016 | 105 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE: granting 101 Motion for Kevin Hardy to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 10/25/2016) (ama) (Entered: 10/26/2016) |
| 10/26/2016 | | Terminate Transcript Deadlines (ama) (Entered: 10/26/2016) |
| 10/27/2016 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Telephone Conference held on 10/27/2016. (Court Reporter Carol Ganley) (mr) (Entered: 10/28/2016) |
| 11/01/2016 | 106 | ORDER: that the Parties in the above-captioned case submit letters addressing whether to continue the stay in this action and in the related matter, Network-1 Technologies, Inc. v. Google, Inc. et al. (14 Civ. 9558 (PGG)). The following schedule will apply to the Parties' letters: Defendant's letter is due on November 3, 2016; and Plaintiff's letter is due on November 10, 2016. (Signed by Judge Paul G. Gardephe on 10/28/2016) (tn) (Entered: 11/01/2016) |
| 11/01/2016 | 107 | MOTION for Christopher A. Suarez to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12940956. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing - DC, # 3 Certificate of Good Standing - Illinois)(Suarez, Christopher) (Entered: 11/01/2016) |
| 11/02/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 107 MOTION for Christopher A. Suarez to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12940956. Motion and supporting papers to be** |

10/14/24, 4:59 PM

| | | |
|---|---|---|
| | | **reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 11/02/2016) |
| 11/02/2016 | [108](#) | MOTION for Jessica Bodger Rydstrom to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945026. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # [1](#) Proposed Order, # [2](#) Certificate of Good Standing - California, # [3](#) Certificate of Good Standing - DC)(Rydstrom, Jessica) (Entered: 11/02/2016) |
| 11/02/2016 | [109](#) | MOTION for Eli S. Schlam to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945994. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # [1](#) Proposed Order, # [2](#) Certificate of Good Standing - DC, # [3](#) Certificate of Good Standing - NY)(Schlam, Eli) (Entered: 11/02/2016) |
| 11/03/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. [109](#) MOTION for Eli S. Schlam to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945994. Motion and supporting papers to be reviewed by Clerk's Office staff., [108](#) MOTION for Jessica Bodger Rydstrom to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945026. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 11/03/2016) |
| 11/03/2016 | [110](#) | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson dated November 3, 2016 re: Whether to Continue Stay. Document filed by Google, Inc., Youtube, LLC.(Genderson, Bruce) (Entered: 11/03/2016) |
| 11/04/2016 | [111](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [109](#) Motion for Eli S. Schlam to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/3/2016) (cf) (Entered: 11/04/2016) |
| 11/04/2016 | [112](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [108](#) Motion for Jessica Bodger Rydstrom to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/3/2016) (cf) (Entered: 11/04/2016) |
| 11/04/2016 | [113](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [107](#) Motion for Christopher A. Suarez to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/4/2016) (cf) (Entered: 11/04/2016) |
| 11/10/2016 | [114](#) | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 11/10/16 re: Current Stay. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) (Entered: 11/10/2016) |
| 11/10/2016 | [115](#) | AMENDED LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 11/10/16 re: Current Stay. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit 1)(Fenster, Marc) (Entered: 11/10/2016) |
| 11/17/2016 | [116](#) | MEMO ENDORSEMENT on re: (55 in 1:14-cv-09558-PGG) Letter filed by Youtube, LLC, Google, Inc., (110 in 1:14-cv-02396-PGG-MHD) Letter filed by Youtube, LLC, Google, Inc. ENDORSEMENT: The Application is granted. The parties will advise the Court every 90 days as to the status of the Federal Circuit Appeals. (Signed by |

| | | Judge Paul G. Gardephe on 11/16/2016) (cf) (Entered: 11/17/2016) |
|---|---|---|
| 12/01/2016 | 117 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/27/2016 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Carol Ganley, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/22/2016. Redacted Transcript Deadline set for 1/1/2017. Release of Transcript Restriction set for 3/1/2017.(McGuirk, Kelly) (Entered: 12/01/2016) |
| 12/01/2016 | 118 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/27/16 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 12/01/2016) |
| 02/14/2017 | 119 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated 2/14/2017 re: Joint Update re: Federal Circuit Appeals. Document filed by Google, Inc..(Suarez, Christopher) (Entered: 02/14/2017) |
| 05/15/2017 | 120 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson and Brian Ledahl dated May 15, 2017 re: Second Joint Update re: Federal Circuit Appeals. Document filed by Google, Inc., Youtube, LLC.(Suarez, Christopher) (Entered: 05/15/2017) |
| 08/15/2017 | 121 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson dated August 15, 2017 re: Status of Federal Circuit Appeals. Document filed by Google, Inc., Youtube, LLC.(Suarez, Christopher) (Entered: 08/15/2017) |
| 10/18/2017 | 122 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson dated October 18, 2017 re: Notice of Google's Name Change and Request to Change Caption. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Updated Rule 7.1 Statement)(Suarez, Christopher) (Entered: 10/18/2017) |
| 10/19/2017 | 123 | MEMO ENDORSEMENT on re: (65 in 1:14-cv-09558-PGG) Letter, filed by Youtube, LLC, Google, Inc., (122 in 1:14-cv-02396-PGG-MHD) Letter, filed by Youtube, LLC, Google, Inc. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 10/19/2017) (cf) (Entered: 10/19/2017) |
| 12/15/2017 | 124 | MOTION for James J. Elacqua and Ian Chen to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Text of Proposed Order) (Nemec, Douglas) (Entered: 12/15/2017) |
| 12/15/2017 | 125 | DECLARATION of Douglas R. Nemec in Support re: 124 MOTION for James J. Elacqua and Ian Chen to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, LLC. (Nemec, Douglas) (Entered: 12/15/2017) |
| 12/26/2017 | 126 | ORDER WITHDRAWING COUNSEL: granting 124 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's |

|  |  | Unopposed Motion to Withdraw Counsel is GRANTED. James J. Elacqua and Ian Chen are hereby terminated as counsel for Google LLC and YouTube, LLC. Attorney Ian Chen and James J Elacqua terminated. (Docketed in 14cv2396 and 14cv9558) (Signed by Judge Paul G. Gardephe on 12/26/2017) (ap) (Entered: 12/26/2017) |
|---|---|---|
| 02/13/2018 | 127 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson dated February 13, 2018 re: Status Update - Network-1 Technologies v. Google Inc.. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 02/13/2018) |
| 03/29/2018 | 128 | JOINT LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated March 29, 2018 re: Joint Update Regarding Consolidated IPR Appeals. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 03/29/2018) |
| 05/14/2018 | 129 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated May 14, 2018 re: Status Update - Network-1 Technologies v. Google Inc.. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 05/14/2018) |
| 08/13/2018 | 130 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson and Brian Ledahl dated August 13, 2018 re: Status Update -- Network-1 Technologies v. Google LLC. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 08/13/2018) |
| 11/13/2018 | 131 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated November 13, 2018 re: Status Update - Network-1 Technologies v. Google Inc.. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 11/13/2018) |
| 12/17/2018 | 132 | JOINT LETTER addressed to Judge Paul G. Gardephe dated December 17, 2018 re: Status of Matter. Document filed by Network-1 Technologies, Inc..(Macedo, Charles) (Entered: 12/17/2018) |
| 12/17/2018 | 133 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Macedo, Charles) (Entered: 12/17/2018) |
| 01/02/2019 | 134 | JOINT STIPULATION AND ORDER REGARDING LIFTING OF STAYS: Pursuant to the foregoing stipulation of the parties, the Court hereby ORDERS that the stipulation is GRANTED. The stay of proceedings in Case No. 1:14-cv-02396-PGG, and in Case No. 1:14-cv-09558-PGG is hereby lifted. The Court sets a status conference to address further scheduling in these matters for January 24, 2019 at 10:00 A.M. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/28/2018) ( Status Conference set for 1/24/2019 at 10:00 AM before Judge Paul G. Gardephe.) (ks) (Entered: 01/02/2019) |
| 01/03/2019 | 135 | MOTION for Andrew V. Trask to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16135079. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit Affidavit under Local Rule 1.3, # 2 Cert. Good Standing (DC), # 3 Cert. Good Standing (NY), # 4 Text of Proposed Order Proposed Order)(Trask, Andrew) (Entered: 01/03/2019) |

| | | |
|---|---|---|
| 01/03/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 135 MOTION for Andrew V. Trask to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16135079. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 01/03/2019) |
| 01/11/2019 | 136 | MOTION for Amy E. Hayden to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16180687. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Amy E. Hayden, # 2 CA State Bar Good Standing Certificate, # 3 CA Supreme Court Good Standing Certificate, # 4 Proposed Order)(Hayden, Amy) (Entered: 01/11/2019) |
| 01/14/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 136 MOTION for Amy E. Hayden to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16180687. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/14/2019) |
| 01/17/2019 | 137 | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated January 17, 2019 re: Case Management Plan and Scheduling Order. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Proposed Scheduling Order)(Fenster, Marc) (Entered: 01/17/2019) |
| 01/24/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference held on 1/24/2019, ( Claim Construction Hearing set for 8/26/2019 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe., Status Conference set for 5/23/2019 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.). (Court Reporter Martha Drevis) (mr) (Entered: 01/24/2019) |
| 01/24/2019 | 138 | ORDER: It is hereby ORDERED that Counts III and IV of the Complaint in Case No. 14 Civ. 2396 (PGG) are dismissed without prejudice on consent. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/24/2019) (jca) (Entered: 01/24/2019) |
| 02/08/2019 | 139 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/24/2019 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/1/2019. Redacted Transcript Deadline set for 3/11/2019. Release of Transcript Restriction set for 5/9/2019.(McGuirk, Kelly) (Entered: 02/08/2019) |
| 02/08/2019 | 140 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/24/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... |

| | | |
|---|---|---|
| | | (McGuirk, Kelly) (Entered: 02/08/2019) |
| 02/22/2019 | 141 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 135 Motion for Andrew V. Trask to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 2/22/2019) (ne) (Entered: 02/22/2019) |
| 02/22/2019 | 142 | ORDER FOR ADMISSION PRO HAC VICE granting 136 Motion for Amy E. Hayden to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 2/22/2019) (jca) (Entered: 02/22/2019) |
| 02/22/2019 | 143 | MOTION for Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Text of Proposed Order)(Nemec, Douglas) (Entered: 02/22/2019) |
| 02/22/2019 | 144 | DECLARATION of Douglas R. Nemec in Support re: 143 MOTION for Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, LLC. (Nemec, Douglas) (Entered: 02/22/2019) |
| 02/25/2019 | 145 | ORDER WITHDRAWING COUNSEL granting 143 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson are hereby terminated as counsel for Google LLC and YouTube, LLC. SO ORDERED. Attorney Douglas R. Nemec; Andrew D Gish and Marti Alan Johnson terminated. (Signed by Judge Paul G. Gardephe on 2/25/2019) (jca) (Entered: 02/25/2019) |
| 04/30/2019 | 146 | AMENDED CLAIM CONSTRUCTION STATEMENT. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) (Entered: 04/30/2019) |
| 05/23/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference held on 5/23/2019. (Court Reporter Elizabeth Chan) (mr) (Entered: 05/23/2019) |
| 05/30/2019 | 147 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE 148 Brief) -** BRIEF *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S OPENING CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) Modified on 6/3/2019 (db). (Entered: 05/30/2019) |
| 05/30/2019 | 148 | BRIEF *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S OPENING CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Michael Mitzenmacher, # 2 Exhibit A, # 3 Affidavit of Amy Hayden, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4 Part 1 of 8, # 8 Exhibit 4 Part 2 of 8, # 9 Exhibit 4 Part 3 of 8, # 10 Exhibit 4 Part 4 of 8, # 11 Exhibit 4 Part 5 of 8, # 12 Exhibit 4 Part 6 of 8, # 13 Exhibit 4 Part 7 of 8, # 14 Exhibit 4 Part 8 of 8, # 15 Exhibit 5 Part 1 of 2, # 16 Exhibit 5 Part 2 of 2, # 17 Exhibit 6, # 18 Exhibit 7, # 19 Exhibit 8, # 20 Exhibit 9, # 21 Exhibit 10, # 22 Exhibit 11, # 23 Exhibit 12, # 24 Exhibit 13, # 25 Exhibit 14, # 26 Exhibit 15, # 27 Exhibit 16)(Fenster, Marc) (Entered: 05/30/2019) |
| 06/28/2019 | 149 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/23/2019 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Elizabeth Chan, (212) 805-0300. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/19/2019. Redacted Transcript Deadline set for 7/29/2019. Release of Transcript Restriction set for 9/26/2019.(McGuirk, Kelly) (Entered: 06/28/2019) |
| 06/28/2019 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/23/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 06/28/2019) |
| 06/28/2019 | 151 | BRIEF *Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service)(Trask, Andrew) (Entered: 06/28/2019) |
| 06/28/2019 | 152 | BRIEF re: 151 Brief *Declaration of Professor James A. Storer in Support of Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A)(Trask, Andrew) (Entered: 06/28/2019) |
| 06/28/2019 | 153 | BRIEF re: 151 Brief *Declaration of Samuel Bryant Davidoff in Support of Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C., Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S)(Trask, Andrew) (Entered: 06/28/2019) |
| 07/09/2019 | 154 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 07/09/2019) |
| 07/12/2019 | 155 | JOINT STIPULATION TO MODIFY THE DEADLINES FOR CLAIM CONSTRUCTION BRIEFING: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. Network-I may serve and file a reply claim construction brief solely rebutting Defendants' response brief by July 19, 2019; and I 2. Defendants may serve and file a sur-reply claim construction brief solely in response to new arguments raised in Network-1's reply brief by August 9, 2019. SO ORDERED. (Replies due by 7/19/2019, Surreplies due by 8/9/2019.) (Signed by Judge Paul G. Gardephe on 7/12/2019) (jca) (Entered: 07/12/2019) |
| 07/16/2019 | 156 | JOINT LETTER MOTION for Leave to File Excess Pages addressed to Judge Paul G. Gardephe from Amy E. Hayden dated 07/16/2019. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 JOINT STIPULATION TO MODIFY THE PAGE LIMITS FOR CLAIM CONSTRUCTION BRIEFING)(Hayden, Amy) (Entered: 07/16/2019) |
| 07/19/2019 | 157 | JOINT STIPULATION TO MODIFY THE PAGE LIMITS FOR CLAIM |

| | | |
|---|---|---|
| | | CONSTRUCTION BRIEFING: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. Network-1 may serve and file a reply claim construction brief solely rebutting Defendants' response brief by July 19, 2019 that is no more than 15 pages in length; and 2. Defendants may serve and file a sur-reply claim construction brief solely in response to new arguments raised in Network-1's reply brief by August 9, 2019 that is no more than 15 pages in length. SO ORDERED. (Replies due by 7/19/2019. Surreplies due by 8/9/2019.) (Signed by Judge Paul G. Gardephe on 7/18/2019) (anc) (Entered: 07/19/2019) |
| 07/19/2019 | 158 | BRIEF re: 148 Brief,,, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S REPLY CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Declaration of A. Hayden, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Declaration of M. Mitzenmacher)(Fenster, Marc) (Entered: 07/19/2019) |
| 07/29/2019 | 159 | MOTION for Graham W. Safty to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332554. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit of Graham Safty, # 2 Texas Certificate of Good Standing, # 3 D.C. Certificate of Good Standing, # 4 Proposed Order, # 5 Certificate of Service)(Trask, Andrew) (Entered: 07/29/2019) |
| 07/29/2019 | 160 | MOTION for Sumeet P. Dang to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332732. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit of Sumeet Dang, # 2 D.C. Certificate of Good Standing, # 3 Proposed Order, # 4 Certificate of Service)(Trask, Andrew) (Entered: 07/29/2019) |
| 07/30/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 160 MOTION for Sumeet P. Dang to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332732. Motion and supporting papers to be reviewed by Clerk's Office staff., 159 MOTION for Graham W. Safty to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332554. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 07/30/2019) |
| 08/05/2019 | 161 | ORDER FOR ADMISSION PRO HAC VICE granting 159 MOTION for Graham W. Safty to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 8/5/2019) (jca) (Entered: 08/05/2019) |
| 08/05/2019 | 162 | ORDER FOR ADMISSION PRO HAC VICE granting 160 MOTION for Sumeet P. Dang to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 8/5/2019) (jca) (Entered: 08/05/2019) |
| 08/09/2019 | 163 | BRIEF *Defendants' Sur-Reply Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service)(Trask, Andrew) (Entered: 08/09/2019) |
| 08/09/2019 | 164 | BRIEF re: 163 Brief *Declaration of Samuel Bryant Davidoff*. Document filed by |

| | | Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A) (Trask, Andrew) (Entered: 08/09/2019) |
|---|---|---|
| 08/14/2019 | 165 | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for August 26, 2019 is adjourned to October 25, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York., Claim Construction Hearing set for 10/25/2019 at 10:00 AM in Courtroom 705, 40 Foley Square, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 8/13/2019) (rj) (Entered: 08/14/2019) |
| 08/14/2019 | 166 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** PROPOSED ORDER. Document filed by Network-1 Technologies, Inc.. Related Document Number: [Dkt. No. 48]. (Ledahl, Brian) **Proposed Order to be reviewed by Clerk's Office staff.** Modified on 8/14/2019 (km). (Entered: 08/14/2019) |
| 08/14/2019 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Notice to Attorney Brian Ledahl to RE-FILE Document 166 Proposed Order. Use the event type Other Filings, Proposed Orders, Proposed Stipulation and Order. The stipulation also needs to have handwritten signatures of the parties. (km)** (Entered: 08/14/2019) |
| 08/14/2019 | 167 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 08/14/2019) |
| 08/19/2019 | 168 | STIPULATED SUPPLEMENTAL PROTECTIVE ORDER GOVERNING SOURCE CODE...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/19/2019) (jca) (Entered: 08/19/2019) |
| 08/19/2019 | 169 | LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden; Andrew V. Trask dated 08/19/2019 re: The Claim Construction Hearing. Document filed by Network-1 Technologies, Inc..(Hayden, Amy) (Entered: 08/19/2019) |
| 08/20/2019 | 170 | MEMO ENDORSEMENT on re: (169 in 1:14-cv-02396-PGG-MHD) Letter filed by Network-1 Technologies, Inc., (109 in 1:14-cv-09558-PGG) Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: The proposed procedure set forth in this letter is acceptable to the Court. SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/20/2019) (jca) (Entered: 08/20/2019) |
| 08/23/2019 | 171 | MOTION for Christopher A. Suarez to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Text of Proposed Order)(Suarez, Christopher) (Entered: 08/23/2019) |
| 08/23/2019 | 172 | DECLARATION of Samuel B. Davidoff in Support re: 171 MOTION for Christopher A. Suarez to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, LLC. (Suarez, Christopher) (Entered: 08/23/2019) |
| 08/28/2019 | 173 | ORDER WITHDRAWING COUNSEL granting 171 MOTION for Christopher A. Suarez to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and |

| | | |
|---|---|---|
| | | YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Christopher A. Suarez is hereby terminated as counsel for Google LLC and YouTube, LLC. SO ORDERED. Attorney Christopher Alan Suarez terminated. (Signed by Judge Paul G. Gardephe on 8/28/2019) (jca) (Entered: 08/28/2019) |
| 09/12/2019 | 174 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 09/12/2019) |
| 09/18/2019 | 175 | JOINT STIPULATION TO MODIFY THE DEADLINE FOR COMPLETION OF DEPOSITIONS OF FACT WITNESSES: 1. Network-I and Defendants will complete both party and non-party written discovery by September 30, 2019; 2. Network-I and Defendants will complete depositions of fact witnesses by November 1, 2019; and 3. Counsel for Network-I and Defendants will meet face-to-face for at least one hour to discuss settlement no later than November 15, 2019. (As further set forth in this order.) (Deposition due by 11/1/2019., Discovery due by 9/30/2019.) (Signed by Judge Paul G. Gardephe on 9/16/2019) (cf) (Entered: 09/18/2019) |
| 10/01/2019 | 176 | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc Fenster dated 10/01/2019 re: Google's Supplemental Invalidity Contentions. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Fenster, Marc) (Entered: 10/01/2019) |
| 10/02/2019 | 177 | MOTION for Melissa B. Collins to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17705952. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit in Support, # 2 Certificates of Good Standing, # 3 Proposed Order, # 4 Certificate of Service)(Collins, Melissa) (Entered: 10/02/2019) |
| 10/03/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 177 MOTION for Melissa B. Collins to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17705952. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 10/03/2019) |
| 10/03/2019 | 178 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Jacob R. Buczko to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17714157. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Jacob R Buczko, # 2 CA Supreme Court Certificate of Good Standing, # 3 CD California Certificate of Good Standing, # 4 NY State Bar Registration Receipt, # 5 Text of Proposed Order)(Buczko, Jacob) Modified on 10/4/2019 (vba). (Entered: 10/03/2019) |
| 10/04/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 178 MOTION for Jacob R. Buczko to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17714157. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of New York;. Re-file the motion as a Motion to Appear Pro Hac** |

| | | |
|---|---|---|
| | | **Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (vba)** (Entered: 10/04/2019) |
| 10/10/2019 | [179](#) | NOTICE OF APPEARANCE by Kayvan Ghaffari on behalf of Audible Magic Corporation. (Ghaffari, Kayvan) (Entered: 10/10/2019) |
| 10/11/2019 | [180](#) | JOINT LETTER MOTION for Discovery *on Non-Party Audible Magic Corp*. addressed to Judge Paul G. Gardephe from Kayvan Ghaffari dated 10/11/2019. Document filed by Audible Magic Corporation.(Ghaffari, Kayvan) (Entered: 10/11/2019) |
| 10/15/2019 | [181](#) | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for October 25, 2019 is adjourned to November 25, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. Claim Construction Hearing set for 11/25/2019 at 10:00 AM in Courtroom 705, 40 Foley Square, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 10/15/2019) (rj) (Entered: 10/16/2019) |
| 10/15/2019 | [182](#) | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute Dkt. No. 180 (14-cv-2396) Dkt. No. 119 (14-cv-9558). Referred to Magistrate Judge Sarah Netburn. Motions referred to Sarah Netburn. So Ordered. (Signed by Judge Paul G. Gardephe on 10/15/19) (yv) (Main Document 182 replaced on 10/16/2019) (jca). Modified on 10/16/2019 (jca). (Entered: 10/16/2019) |
| 10/16/2019 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Sarah Netburn. Please note that this is a reassignment of the designation only. (wb) (Entered: 10/16/2019) |
| 10/16/2019 | [183](#) | MOTION for Jacob R. Buczko to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Affidavit of Jacob R Buczko, # [2](#) CD Cal Certificate of Good Standing, # [3](#) CA Supreme Court Certificate of Good Standing, # [4](#) NY Certificate of Good Standing, # [5](#) Text of Proposed Order)(Buczko, Jacob) (Entered: 10/16/2019) |
| 10/16/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. [183](#) MOTION for Jacob R. Buczko to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 10/16/2019) |
| 10/16/2019 | [184](#) | MEMO ENDORSEMENT on re: (176 in 1:14-cv-02396-PGG-SN) Letter, (116 in 1:14-cv-09558-PGG-SN) Letter. ENDORSEMENT: The application to stay the deposition is denied. The Court will address the parties' dispute concerning Google's Second Supplemental Individuality Contentions in a separate order. (Signed by Judge Paul G. Gardephe on 10/16/2019) (jwh) (Entered: 10/17/2019) |

| 10/17/2019 | 185 | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for November 25, 2019 is re-scheduled for November 21, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Claim Construction Hearing set for 11/21/2019 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 10/17/2019) (jca) (Entered: 10/17/2019) |
| --- | --- | --- |
| 10/17/2019 | 186 | ORDER FOR ADMISSION PRO HAC VICE granting 183 MOTION for Jacob R. Buczko to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 10/16/2019) (jca) (Entered: 10/17/2019) |
| 10/17/2019 | 187 | DISCOVERY CONFERENCE ORDER: A discovery conference is scheduled for Wednesday, November 06, 2019, at 10:00 a.m. in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. Counsel for movant Audible Magic Corporation is ordered to appear. Plaintiff is ordered to serve this Order on Audible, through its counsel. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. SO ORDERED. (Discovery Hearing set for 11/6/2019 at 10:00 AM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/17/2019) (js) (Entered: 10/18/2019) |
| 10/21/2019 | 188 | ORDER FOR ADMISSION PRO HAC VICE granting 177 Motion for Melissa B. Collins to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 10/21/2019) (rjm) (Entered: 10/21/2019) |
| 10/21/2019 | 189 | JOINT CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. No additional parties may be joined except with leave of the Court. Except for good cause shown, any motion to join additional parties must be filed within 30 days from the date of this Order. The parties must complete fact discovery no later than November 1, 2019. Complete depositions of fact witnesses by November 1, 2019. The party asserting infringement must serve and file an opening claim construction brief and all supporting evidence and testimony on May 30, 2019. The opposing party must serve and file a response to the opening claim construction brief and all supporting evidence and testimony by June 28, 2019. The opening party may serve and file a reply solely rebutting the opposing partys response by July 19, 2019. The opening party may serve and file a reply solely rebutting the opposing partys response by July 19, 2019. The parties must complete expert discovery no later than February 7, 2020. Counsel for the parties have conferred and their present best estimate of the length of trial is: 6-8 days. (Expert Discovery due by 2/7/2020). (Signed by Judge Paul G. Gardephe on 10/21/2019) (rjm) (Main Document 189 replaced on 10/25/2019) (rro). Modified on 10/25/2019 (rro). (Entered: 10/22/2019) |
| 10/21/2019 | | Set/Reset Deadlines: Deposition due by 11/1/2019. Expert Discovery due by 2/7/2020. Fact Discovery due by 11/1/2019. (rro) (Entered: 10/25/2019) |
| 10/22/2019 | 190 | ORDER: The discovery conference currently scheduled for Wednesday, November 06, |

| | | |
|---|---|---|
| | | 2019, at 10:00 a.m. is RESCHEDULED for Thursday, November 07, 2019, at 10:00 a.m. in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. (Discovery Hearing set for 11/7/2019 at 10:00 AM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/22/2019) (ras) (Entered: 10/22/2019) |
| 11/01/2019 | 191 | JOINT LETTER MOTION to Compel Amster Rothstein & Ebenstein, LLP to Produce *Documents Withheld as Privileged and/or Work Product* addressed to Judge Paul G. Gardephe from Andrew Trask dated November 1, 2019. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Collins, Melissa) (Entered: 11/01/2019) |
| 11/04/2019 | 192 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute; Dkt. No. 191 (14-cv-2396) Referred to Magistrate Judge Sarah Netburn. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/4/2019) (jca) (Entered: 11/04/2019) |
| 11/04/2019 | 193 | ORDER: The issues raised in the joint letter, ECF No. 191, will be addressed at the discovery conference scheduled for November 7, 2019. (Signed by Magistrate Judge Sarah Netburn on 11/4/2019) (ras) (Entered: 11/04/2019) |
| 11/04/2019 | 194 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17893874. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Audible Magic Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Rychlinski, Joshua) Modified on 11/5/2019 (aea). (Entered: 11/04/2019) |
| 11/05/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 194 MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17893874. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Michigan;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (aea)** (Entered: 11/05/2019) |
| 11/05/2019 | 195 | MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Audible Magic Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Rychlinski, Joshua) Modified on 11/5/2019 (aea). Modified on 11/5/2019 (aea). (Entered: 11/05/2019) |
| 11/05/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 195 MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has** |

| | | |
|---|---|---|
| | | **been reviewed and there are no deficiencies. (aea)** (Entered: 11/05/2019) |
| 11/06/2019 | 196 | ORDER granting 195 Motion for Joshua M. Rychlinski to Appear Pro Hac Vice. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 11/06/2019) |
| 11/06/2019 | 197 | ORDER FOR ADMISSION PRO HAC VICE on re: (133 in 1:14-cv-09558-PGG-SN) MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice. **Motion and supporting papers to be reviewed by Clerk's Office staff.** filed by Audible Magic Corporation, (195 in 1:14-cv-02396-PGG-SN) MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice. **Motion and supporting papers to be reviewed by Clerk's Office staff.** filed by Audible Magic Corporation. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/6/2019) (rj) (Entered: 11/06/2019) |
| 11/07/2019 | 198 | ORDER denying 180 Letter Motion for Discovery. For the reasons set forth at today's conference, the subpoenas issued upon attorneys Wilbar, Brisson, and Ramsey are QUASHED. The subpoena issued upon Wold is QUASHED without prejudice to renewal if Network-1 can establish a good faith basis for the deposition based on both the merits and the failure to ask the necessary questions during Wold's deposition as the Rule 30(b)(6) witness. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (Netburn, Sarah) (Entered: 11/07/2019) |
| 11/07/2019 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Discovery Hearing held on 11/7/2019. (ras) (Entered: 12/03/2019) |
| 11/13/2019 | 199 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 11/13/2019) |
| 11/14/2019 | 200 | JOINT STIPULATION TO MODIFY EXPERT DISCOVERY DEADLINES, The parties hereby stipulate and agree as follows: 1. The parties may serve opening expert reports by December 20, 2019; 2. The parties may serve rebuttal expert reports by February 14, 2020; 3. Any application for leave to serve a reply expert report must be filed by February 21, 2020; 4. The parties must complete expert discovery, including depositions of experts, by March 13, 2020; 5. Any letter seeking leave to file dispositive motions must be filed by March 27, 2020, and any opposition letters must be filed by April 3, 2020. SO ORDERED. (Deposition due by 3/13/2020., Expert Discovery due by 3/13/2020., Motions due by 2/21/2020.) (Signed by Judge Paul G. Gardephe on 11/13/19) (yv) (Entered: 11/14/2019) |
| 11/14/2019 | | **\*\*\*DELETED DOCUMENT. Deleted document number 201 CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER. The document was incorrectly filed in this case. (jca)** (Entered: 11/15/2019) |
| 11/21/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Claim Construction Hearing held on 11/21/2019. (Court Reporter Kelly Surina) (mr) (Entered: 11/21/2019) |
| 11/26/2019 | 201 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated November 26, 2019 re: November 21, 2019 claim construction hearing. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fenster, Marc) (Entered: 11/26/2019) |

| 11/27/2019 | 202 | LETTER addressed to Judge Paul G. Gardephe from Kevin Hardy dated November 27, 2019 re: November 21, 2019 Claim Construction Hearing. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A) (Trask, Andrew) (Entered: 11/27/2019) |
|---|---|---|
| 12/09/2019 | 203 | ORDER: After in camera review of the documents selected by the parties, Defendants' request is GRANTED in part and DENIED in part. In summary, the common interest privilege does not apply to communications between ARE and Network-1 or between ARE and Mark Lucier. Accordingly, the attorney-client privilege is waived as to documents that ARE shared with Lucier and Network-1, including billing statements. Materials prepared for purposes of a patent application, rather than in anticipation of litigation, are not protected by the work product doctrine. Similarly, communications created to provide business or negotiation advice are not protected work product. Within fourteen days from this order, ARE shall produce communications specified in this order as non-privileged and not protected by the work product doctrine and shall review its privilege log to produce any additional documents in accordance with this order. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 191 in 14-cv-02396. Motions terminated: (191 in 1:14-cv-02396-PGG-SN) JOINT LETTER MOTION to Compel Amster Rothstein & Ebenstein, LLP to Produce *Documents Withheld as Privileged and/or Work Product* addressed to Judge Paul G. Gardephe from Andrew Trask dated November 1, 2019, filed by Google L.L.C, Youtube, LLC. (Signed by Magistrate Judge Sarah Netburn on 12/9/2019) (ras) (Entered: 12/09/2019) |
| 12/18/2019 | 204 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/21/2019 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Kelly Surina, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2020. Redacted Transcript Deadline set for 1/21/2020. Release of Transcript Restriction set for 3/17/2020.(McGuirk, Kelly) (Entered: 12/18/2019) |
| 12/18/2019 | 205 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/21/2019 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 12/18/2019) |
| 12/18/2019 | 206 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/7/2019 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2020. Redacted Transcript Deadline set for 1/21/2020. Release of Transcript Restriction set for 3/17/2020.(McGuirk, Kelly) (Entered: 12/18/2019) |

| 12/18/2019 | 207 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/7/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 12/18/2019) |
|---|---|---|
| 03/04/2020 | 208 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 03/04/2020) |
| 03/05/2020 | 209 | JOINT STIPULATION TO MODIFY DEADLINES RELATING TP THE CLOSE OF EXPERT DISCOVERY AND DISPOSITIVE MOTIONS. NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. The currently applicable deadlines for the completion of expert discovery and for the submission of letters seeking or opposing leave to file dispositive motions shall be suspended; 2. The parties must complete expert discovery, including depositions of experts, by April 24, 2020; 3. The parties shall attempt in good faith to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto and shall submit either a joint stipulation reflecting their agreement or a joint letter setting forth their respective positions on the issue for resolution by the Court. SO ORDERED. (Deposition due by 4/24/2020. Expert Discovery due by 4/24/2020.) (Signed by Magistrate Judge Sarah Netburn on 3/5/2020) (rjm). (Entered: 03/06/2020) |
| 03/26/2020 | 210 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 03/26/2020) |
| 03/27/2020 | 211 | JOINT STIPULATION TO MODIFY THE DEADLINE FOR THE CLOSE OF EXPERT DISCOVERY: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. The parties must complete expert discovery, including depositions of experts, by June 30, 2020; 2. The parties have not been able to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto, and therefore shall submit a joint letter setting forth their respective positions on the issue for resolution by the Court no later than one month before the close of expert discovery. ( Deposition due by 6/30/2020., Expert Discovery due by 6/30/2020.) (Signed by Magistrate Judge Sarah Netburn on 3/27/2020) (js) (Entered: 03/27/2020) |
| 05/26/2020 | 212 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 05/26/2020) |
| 05/27/2020 | 213 | JOINT STIPULATION TO MODIFY THE DEADLINE FOR THE CLOSE OF EXPERT DISCOVERY: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. The parties must complete expert discovery, including depositions of experts, by July 31, 2020; 2. The parties have not been able to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto, and therefore shall submit a joint letter setting forth their respective positions on the issue for resolution by the |

|  |  |  |
|---|---|---|
|  |  | Court no later than 45 days before the close of expert discovery. So Ordered. (Deposition due by 7/31/2020., Expert Discovery due by 7/31/2020.) (Signed by Magistrate Judge Sarah Netburn on 5/27/2020) (js) (Entered: 05/28/2020) |
| 06/16/2020 | 214 | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden and Samuel Bryant Davidoff dated June 16, 2020 re: Courts Guidance In Setting A Deadline For Filing Letters Describing The Grounds For Proposed Dispositive Motions. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Hayden, Amy) (Entered: 06/16/2020) |
| 06/16/2020 | 215 | NOTICE OF CHANGE OF ADDRESS by Kevin Hardy on behalf of Google L.L.C, Youtube, LLC. New Address: Quinn Emanuel Urquhart & Sullivan, LLP, 1300 Eye ST NW, Suite 900, Washington, DC, USA 20005, (202) 538-8000..(Hardy, Kevin) (Entered: 06/16/2020) |
| 06/22/2020 | 216 | MOTION for Thomas H. L. Selby to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20357489. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit of Thomas H. L. Selby, # 2 Texas Certificate of Good Standing, # 3 D.C. Certificate of Good Standing, # 4 Virginia Certificate of Good Standing, # 5 Proposed Order, # 6 Certificate of Service).(Selby, Thomas) (Entered: 06/22/2020) |
| 06/22/2020 |  | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 216 MOTION for Thomas H. L. Selby to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20357489. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq)** (Entered: 06/22/2020) |
| 06/23/2020 | 217 | ORDER FOR ADMISSION PRO HAC VICE granting 216 Motion for Thomas H. L. Selby to Appear Pro Hac Vice. The motion of Thomas H. L. Selby for admission to practice pro hac vice in the above-captioned actions is GRANTED. IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above-captioned cases in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Paul G. Gardephe on 6/23/20) (yv) (Entered: 06/23/2020) |
| 06/26/2020 | 218 | JOINT LETTER addressed to Judge Paul G. Gardephe from Brian Ledahl and Samuel Bryant Davidhoff dated June 26, 2020 re: In-Person Claim Construction Proceedings. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 06/26/2020) |
| 06/29/2020 | 219 | MEMO ENDORSEMENT on re: (214 in 1:14-cv-02396-PGG-SN) Letter, filed by Network-1 Technologies, Inc. ENDORSEMENT: The Court will decide claim construction and summary judgment simultaneously. See Briggs & Stratton Corp. v. Chongqing Rato Power Co., No. 5:13-CV-0316 LEK/ATB, 2014 WL 4888266, at *2 (N.D.N.Y. Sept. 30, 2014), on reconsideration in part, 2015 WL 4603553 (N.D.N.Y. July 30, 2015) ("courts often simultaneously undertake a complete claim construction and decide summary judgment motions"); Bedgear, LLC v. Fredman Bros. Furniture |

| | | |
|---|---|---|
| | | Co., No. 2:15-CV-6759 (KAM), 2019 WL 911301, at *10 (E.D.N.Y. Feb. 25, 2019) (finding it "more appropriate" to address "indefiniteness" arguments at the summary judgment phase). By August 7, 2020, the parties should submit a joint letter that includes an agreed-upon briefing schedule for summary judgment. Alternatively, to the extent that the parties believe that a settlement conference before Magistrate Judge Netburn would be productive, the parties may request a settlement conference in their August 7 letter, and the Court will defer briefing until after a settlement conference takes place. SO ORDERED. (Signed by Judge Paul G. Gardephe on 6/29/2020) (va) (Entered: 06/29/2020) |
| 08/07/2020 | 220 | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden and Samuel Bryant Davidoff dated August 7, 2020 re: Briefing Schedule For Summary Judgment. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 08/07/2020) |
| 08/10/2020 | 221 | MEMO ENDORSEMENT on re: (155 in 1:14-cv-09558-PGG-SN) Letter filed by Network-1 Technologies, Inc., (220 in 1:14-cv-02396-PGG-SN) Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: The application is granted. So Ordered (Signed by Judge Paul G. Gardephe on 8/10/2020) (js) (Entered: 08/10/2020) |
| 11/11/2020 | 222 | LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Certificate of Service).(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 223 | MOTION for Summary Judgment . Document filed by Google L.L.C, Youtube, LLC.. (Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 224 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.. Motion or Order to File Under Seal: 222 .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 225 | ***SELECTED PARTIES*** BRIEF re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Statement of Material Facts in Support of Defendants' Motion for Summary Judgment*. Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc..Motion or Order to File Under Seal: 222 .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 226 | ***SELECTED PARTIES*** BRIEF re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Appendix to Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment*. Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # |

| | | |
|---|---|---|
| | | 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Certificate of Service)Motion or Order to File Under Seal: 222 . (Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 227 | ***SELECTED PARTIES*** REPLY MEMORANDUM OF LAW in Support re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.. Motion or Order to File Under Seal: 222 .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 228 | MEMORANDUM OF LAW in Support re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 229 | BRIEF re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Statement of Material Facts in Support of Defendants' Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 230 | BRIEF re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Appendix to Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Certificate of Service).(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 231 | REPLY MEMORANDUM OF LAW in Support re: 223 MOTION for Summary Judgment ., 222 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 232 | BRIEF re: 223 MOTION for Summary Judgment . *Defendants' Reply to the Additional Factual Assertions in Plaintiff's Response to Defendants' Statement of Material Facts*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 233 | ***SELECTED PARTIES*** MOTION for Summary Judgment . Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Motion for Summary Judgement, # [2](#) Affidavit of Brian Ledahl, # [3](#) Exhibit 1, # [4](#) Exhibit 2, # [5](#) Exhibit 3, # [6](#) Exhibit 4, # [7](#) Exhibit 5, # [8](#) Exhibit 6, # [9](#) Exhibit 7, # [10](#) Exhibit 8, # [11](#) Exhibit 9, # [12](#) Exhibit 10, # [13](#) Exhibit 11, # [14](#) Exhibit 12, # [15](#) Exhibit 13, # [16](#) Exhibit 14, # [17](#) Exhibit 15, # [18](#) Exhibit 16, # [19](#) Exhibit 17, # [20](#) Exhibit 18, # [21](#) Statement of Material Facts)Motion or Order to File Under Seal: [222](#) . (Ledahl, Brian) (Entered: 11/11/2020) |
| 11/11/2020 | [234](#) | MOTION for Summary Judgment . Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Motion for Summary Judgement, # [2](#) Affidavit of Brian Ledahl, # [3](#) Exhibit 1, # [4](#) Exhibit 2, # [5](#) Exhibit 3, # [6](#) Exhibit 4, # [7](#) Exhibit 5, # [8](#) Exhibit 6, # [9](#) Exhibit 7, # [10](#) Exhibit 8, # [11](#) Exhibit 9, # [12](#) Exhibit 10, # [13](#) Exhibit 11, # [14](#) Exhibit 12, # [15](#) Exhibit 13, # [16](#) Exhibit 14, # [17](#) Exhibit 15, # [18](#) Exhibit 16, # [19](#) Exhibit 17, # [20](#) Exhibit 18, # [21](#) Statement of Material Facts).(Ledahl, Brian) (Entered: 11/11/2020) |
| 11/11/2020 | [235](#) | REPLY MEMORANDUM OF LAW in Support re: [234](#) MOTION for Summary Judgment . . Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Appendix, # [2](#) Exhibit 68, # [3](#) Reply Statement of Facts).(Ledahl, Brian) (Entered: 11/11/2020) |
| 11/12/2020 | [236](#) | MEMORANDUM OF LAW in Opposition re: [233](#) MOTION for Summary Judgment ., [234](#) MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | [237](#) | BRIEF re: [236](#) Memorandum of Law in Opposition to Motion *Defendants' Responsive Statement of Material Facts in Support of Their Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | [238](#) | ***SELECTED PARTIES*** BRIEF re: [222](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [236](#) Memorandum of Law in Opposition to Motion *Appendix to Defendants' Statement of Material Facts in Support of Their Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit 19, # [2](#) Exhibit 20, # [3](#) Exhibit 21, # [4](#) Exhibit 22, # [5](#) Exhibit 23, # [6](#) Exhibit 24, # [7](#) Exhibit 25, # [8](#) Exhibit 26, # [9](#) Exhibit 27, # [10](#) Exhibit 28, # [11](#) Exhibit 29, # [12](#) Exhibit 30, # [13](#) Exhibit 31, # [14](#) Exhibit 32, # [15](#) Exhibit 33, # [16](#) Exhibit 34, # [17](#) Exhibit 35, # [18](#) Exhibit 36, # [19](#) Exhibit 37, # [20](#) Exhibit 38, # [21](#) Exhibit 39, # [22](#) Exhibit 40, # [23](#) Exhibit 41, # [24](#) Exhibit 42, # [25](#) Exhibit 43, # [26](#) Exhibit 44, # [27](#) Exhibit 45, # [28](#) Exhibit 46, # [29](#) Exhibit 47, # [30](#) Exhibit 48, # [31](#) Exhibit 49, # [32](#) Exhibit 50, # [33](#) Exhibit 51, # [34](#) Exhibit 52, # [35](#) Exhibit 53, # [36](#) Exhibit 54, # [37](#) Exhibit 55, # [38](#) Exhibit 56, # [39](#) Exhibit 57, # [40](#) Exhibit 58, # [41](#) Exhibit 59, # [42](#) Exhibit 60, # [43](#) Exhibit 61, # [44](#) Exhibit 62, # [45](#) Exhibit 63, # [46](#) Exhibit 64, # [47](#) Exhibit 65, # [48](#) Exhibit 66, # [49](#) Exhibit 67)Motion or Order to File Under Seal: [222](#) .(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | [239](#) | BRIEF re: [222](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, |

| | | |
|---|---|---|
| | | 2020., [236](#) Memorandum of Law in Opposition to Motion *Appendix to Defendants' Statement of Material Facts in Support of Their Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Exhibit 19, # [2](#) Exhibit 20, # [3](#) Exhibit 21, # [4](#) Exhibit 22, # [5](#) Exhibit 23, # [6](#) Exhibit 24, # [7](#) Exhibit 25, # [8](#) Exhibit 26, # [9](#) Exhibit 27, # [10](#) Exhibit 28, # [11](#) Exhibit 29, # [12](#) Exhibit 30, # [13](#) Exhibit 31, # [14](#) Exhibit 32, # [15](#) Exhibit 33, # [16](#) Exhibit 34, # [17](#) Exhibit 35, # [18](#) Exhibit 36, # [19](#) Exhibit 37, # [20](#) Exhibit 38, # [21](#) Exhibit 39, # [22](#) Exhibit 40, # [23](#) Exhibit 41, # [24](#) Exhibit 42, # [25](#) Exhibit 43, # [26](#) Exhibit 44, # [27](#) Exhibit 45, # [28](#) Exhibit 46, # [29](#) Exhibit 47, # [30](#) Exhibit 48, # [31](#) Exhibit 49, # [32](#) Exhibit 50, # [33](#) Exhibit 51, # [34](#) Exhibit 52, # [35](#) Exhibit 53, # [36](#) Exhibit 54, # [37](#) Exhibit 55, # [38](#) Exhibit 56, # [39](#) Exhibit 57, # [40](#) Exhibit 58, # [41](#) Exhibit 59, # [42](#) Exhibit 60, # [43](#) Exhibit 61, # [44](#) Exhibit 62, # [45](#) Exhibit 63, # [46](#) Exhibit 64, # [47](#) Exhibit 65, # [48](#) Exhibit 66, # [49](#) Exhibit 67, # [50](#) Certificate of Service).(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | [240](#) | ***SELECTED PARTIES*** RESPONSE in Opposition to Motion re: [223](#) MOTION for Summary Judgment . . Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Appendix, # [2](#) Exhibit 27, # [3](#) Exhibit 28, # [4](#) Exhibit 29, # [5](#) Exhibit 30, # [6](#) Exhibit 31, # [7](#) Exhibit 32, # [8](#) Exhibit 33, # [9](#) Exhibit 34, # [10](#) Exhibit 35, # [11](#) Exhibit 36, # [12](#) Exhibit 37, # [13](#) Exhibit 38, # [14](#) Exhibit 39, # [15](#) Exhibit 40, # [16](#) Exhibit 41, # [17](#) Exhibit 42, # [18](#) Exhibit 43, # [19](#) Exhibit 44, # [20](#) Exhibit 45, # [21](#) Exhibit 46, # [22](#) Exhibit 47, # [23](#) Exhibit 48, # [24](#) Exhibit 49, # [25](#) Exhibit 50, # [26](#) Exhibit 51, # [27](#) Exhibit 52, # [28](#) Exhibit 53, # [29](#) Exhibit 54, # [30](#) Exhibit 55, # [31](#) Exhibit 56, # [32](#) Exhibit 57, # [33](#) Exhibit 58, # [34](#) Exhibit 59, # [35](#) Exhibit 60, # [36](#) Exhibit 61, # [37](#) Exhibit 62, # [38](#) Exhibit 63, # [39](#) Exhibit 64, # [40](#) Exhibit 65, # [41](#) Exhibit 66, # [42](#) Exhibit 67, # [43](#) Exhibit 68, # [44](#) Exhibit 69, # [45](#) Exhibit 70, # [46](#) Exhibit 71, # [47](#) Exhibit 72, # [48](#) Exhibit 73, # [49](#) Exhibit 74, # [50](#) Exhibit 75, # [51](#) Exhibit 76, # [52](#) Exhibit 77, # [53](#) Exhibit 78, # [54](#) Exhibit 79, # [55](#) Exhibit 80, # [56](#) Exhibit 81, # [57](#) Exhibit 82, # [58](#) Exhibit 83, # [59](#) Exhibit 84, # [60](#) Exhibit 85, # [61](#) Opposition to Statement of Facts)Motion or Order to File Under Seal: [222](#) .(Ledahl, Brian) (Entered: 11/12/2020) |
| 11/12/2020 | [241](#) | RESPONSE in Opposition to Motion re: [223](#) MOTION for Summary Judgment ., [222](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Appendix, # [2](#) Exhibit 27, # [3](#) Exhibit 28, # [4](#) Exhibit 29, # [5](#) Exhibit 30, # [6](#) Exhibit 31, # [7](#) Exhibit 32, # [8](#) Exhibit 33, # [9](#) Exhibit 34, # [10](#) Exhibit 35, # [11](#) Exhibit 36, # [12](#) Exhibit 37, # [13](#) Exhibit 38, # [14](#) Exhibit 39, # [15](#) Exhibit 40, # [16](#) Exhibit 41, # [17](#) Exhibit 42, # [18](#) Exhibit 43, # [19](#) Exhibit 44, # [20](#) Exhibit 45, # [21](#) Exhibit 46, # [22](#) Exhibit 47, # [23](#) Exhibit 48, # [24](#) Exhibit 49, # [25](#) Exhibit 50, # [26](#) Exhibit 51, # [27](#) Exhibit 52, # [28](#) Exhibit 53, # [29](#) Exhibit 54, # [30](#) Exhibit 55, # [31](#) Exhibit 56, # [32](#) Exhibit 57, # [33](#) Exhibit 58, # [34](#) Exhibit 59, # [35](#) Exhibit 60, # [36](#) Exhibit 61, # [37](#) Exhibit 62, # [38](#) Exhibit 63, # [39](#) Exhibit 64, # [40](#) Exhibit 65, # [41](#) Exhibit 66, # [42](#) Exhibit 67, # [43](#) Exhibit 68, # [44](#) Exhibit 69, # [45](#) Exhibit 70, # [46](#) Exhibit 71, # [47](#) Exhibit 72, # [48](#) Exhibit 73, # [49](#) Exhibit 74, # [50](#) Exhibit 75, # [51](#) Exhibit 76, # [52](#) Exhibit 77, # [53](#) Exhibit 78, # [54](#) Exhibit 79, # [55](#) Exhibit 80, # [56](#) Exhibit 81, # [57](#) Exhibit 82, # [58](#) Exhibit 83, # [59](#) Exhibit 84, # [60](#) Exhibit 85, # [61](#) Opposition to Statement of Facts).(Ledahl, Brian) |

| | | |
|---|---|---|
| | | (Entered: 11/12/2020) |
| 11/19/2020 | [242](#) | LETTER addressed to Judge Paul G. Gardephe from Brian D Ledahl dated November 19, 2020 re: Summary Judgment Oral Argument. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 11/19/2020) |
| 11/19/2020 | [243](#) | LETTER addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 19, 2020 re: Oral Argument on Motions for Summary Judgment. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/19/2020) |
| 01/05/2021 | [244](#) | LETTER addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated January 5, 2020 re: Supplemental Authority. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit A).(Ledahl, Brian) (Entered: 01/05/2021) |
| 01/12/2021 | [245](#) | LETTER addressed to Judge Paul G. Gardephe from Andrew V. Trask dated January 12, 2021 re: Supplemental Authority. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 01/12/2021) |
| 02/17/2021 | [246](#) | LETTER addressed to Judge Paul G. Gardephe from Brian Ledahl dated February 17, 2021 re: Summary Judgment Status. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 02/17/2021) |
| 04/07/2021 | [247](#) | LETTER MOTION to Seal *Certain Exhibits* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 7, 2021. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Exhibit A, # [2](#) Certificate of Service).(Trask, Andrew) (Entered: 04/07/2021) |
| 04/07/2021 | [248](#) | ***SELECTED PARTIES***JOINT LETTER MOTION for Discovery addressed to Judge Paul G. Gardephe from Amy Hayden and Andrew Trask dated 4/7/2021. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I, # [10](#) Exhibit J, # [11](#) Exhibit K)Motion or Order to File Under Seal: [247](#) .(Hayden, Amy) (Entered: 04/07/2021) |
| 04/07/2021 | [249](#) | JOINT LETTER MOTION for Discovery addressed to Judge Paul G. Gardephe from Amy Hayden and Andrew Trask dated 4/7/2021. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I, # [10](#) Exhibit J, # [11](#) Exhibit K).(Hayden, Amy) (Entered: 04/07/2021) |
| 04/12/2021 | [250](#) | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Referred to Magistrate Judge Sarah Netburn. Dkt. Nos. 222, 247, 248, 249 (14-cv-2396) and Dkt. Nos. 157, 182, 183, 184 (14-cv-9558) Motions referred to Sarah Netburn. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/12/2021) (ks) Modified on 4/12/2021 (ks). (Entered: 04/12/2021) |
| 04/12/2021 | [251](#) | ORDER: On April 12, 2021, the Honorable Judge Gardephe referred several motions in the above-captioned cases to my docket for resolution. Two of those motions were |

| | | |
|---|---|---|
| | | for discovery. See 14-cv-02396 at ECF Nos. 248, 249; 14-cv-09558 at ECF Nos. 183, 184. In an effort to maximize efficiencies, the Court has scheduled a telephonic discovery conference for April 22, 2021, at 10:00 a.m. at which to discuss the pending discovery motions. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key., (Telephone Conference set for 4/22/2021 at 10:00 AM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 4/12/2021) (nb) (Entered: 04/12/2021) |
| 04/22/2021 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 4/22/2021. (ras) (Entered: 04/26/2021) |
| 04/23/2021 | 252 | ORDER granting (222 in case 1:14-cv-02396-PGG-SN, 157 in case 1:14-cv-09558-PGG-SN), Letter Motion to Seal; granting (247 in case 1:14-cv-02396-PGG-SN, 182 in case 1:14-cv-09558-PGG-SN), Letter Motion to Seal; denying (248 in case 1:14-cv-02396-PGG-SN, 183 in case 1:14-cv-09558-PGG-SN), Letter Motion for Discovery; denying (249 in case 1:14-cv-02396-PGG-SN, 184 in case 1:14-cv-09558-PGG-SN), Letter Motion for Discovery. As discussed at the April 22, 2021 Conference, the Court DENIES Network-1's motion to strike Google's supplemental discovery responses. The scope of this limited discovery shall be determined by the parties through a meet-and-confer process. In addition, the Court GRANTS the parties' requests to file certain documents under seal related to the discovery dispute, and GRANTS on an interim basis the parties' request to file certain documents under seal related to the summary judgment briefing. This interim sealing ruling may be revisited by Judge Gardephe in connection with his ruling on the motions for summary judgment. The parties shall file a status letter on May 6, 2021, indicating if there are any outstanding discovery disputes. Respectfully, the Clerk of Court is directed to GRANT the motions at 14-cv-02396, ECF Nos. 222, 247; and at 14-cv-09558, ECF Nos. 157, 182, and DENY the motions at 14-cv-02396, ECF Nos. 248, 249; and at 14-cv-09558, ECF Nos. 183, 184. (Signed by Magistrate Judge Sarah Netburn on 4/23/2021) (ras) (Entered: 04/23/2021) |
| 04/28/2021 | 253 | TRANSCRIPT of Proceedings re: Telephone Conference held on 4/22/2021 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2021. Redacted Transcript Deadline set for 6/1/2021. Release of Transcript Restriction set for 7/27/2021. (vfr) (Entered: 04/28/2021) |
| 04/28/2021 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Telephone Conference proceeding held on 4/22/2021 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (vfr) (Entered: 04/28/2021) |
| 05/06/2021 | 255 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 05/06/2021) |

| 05/07/2021 | 256 | JOINT STIPULATION FOR LIMITED DISCOVERY AFTER THE CLOSE OF FACT DISCOVERY: (See document.) SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 5/7/2021) (ras) (Entered: 05/07/2021) |
| --- | --- | --- |
| 05/09/2022 | 257 | NOTICE OF CHANGE OF ADDRESS by Andrew Trask on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Trask, Andrew) (Entered: 05/09/2022) |
| 05/09/2022 | 258 | NOTICE OF CHANGE OF ADDRESS by Thomas H.L. Selby on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Selby, Thomas) (Entered: 05/09/2022) |
| 05/09/2022 | 259 | NOTICE OF CHANGE OF ADDRESS by Melissa B. Collins on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 2024345000..(Collins, Melissa) (Entered: 05/09/2022) |
| 05/13/2022 | 260 | NOTICE OF CHANGE OF ADDRESS by Bruce Roger Genderson on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Genderson, Bruce) (Entered: 05/13/2022) |
| 05/13/2022 | 261 | NOTICE OF CHANGE OF ADDRESS by Samuel Bryant Davidoff on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Davidoff, Samuel) (Entered: 05/13/2022) |
| 05/13/2022 | 262 | NOTICE OF CHANGE OF ADDRESS by Daniel Shanahan on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Shanahan, Daniel) (Entered: 05/13/2022) |
| 05/13/2022 | 263 | NOTICE OF CHANGE OF ADDRESS by Jessica Bodger Rydstrom on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Rydstrom, Jessica) (Entered: 05/13/2022) |
| 06/30/2022 | 264 | ORDER terminating [199 in 14cv9558] Letter Motion for Conference re: 199 LETTER MOTION for Conference *Status Conference* addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated 06/28/2022. The parties will submit a joint letter by July 7, 2022 setting forth their respective positions as to whether the stipulated supplemental discovery authorized by Judge Netburn's May 7, 2021 order (Case No. 2396, Dkt. No. 256; Case No. 9558, Dkt. No. 191), including any supplemental expert reports, has any impact on the parties' pending cross-motions for summary judgment. (Signed by Judge Paul G. Gardephe on 6/30/2022) (tro) (Entered: 07/01/2022) |
| 07/07/2022 | 265 | JOINT LETTER MOTION for Discovery *Pursuant to the Courts Memorandum Order (Case No. 2396, Dkt. # 264)* addressed to Judge Paul G. Gardephe from Brian D. Ledahl and Andrew V. Trask dated 07/07/22. Document filed by Network-1 |

| | | Technologies, Inc...(Ledahl, Brian) (Entered: 07/07/2022) |
|---|---|---|
| 07/11/2022 | [266](#) | ORDER granting [265](#) Letter Motion for Discovery. Google will provide Network-1 with the updated financial data referenced in this letter by August 5, 2022. Network-1 will provide Google with any supplemental expert reports by August 26, 2022. Google will provide Network-1 with any supplemental rebuttal expert reports by September 16, 2022. Network-1 will file any supplemental briefing not to exceed 10 pages double-spaced regarding Google's pending motion for summary judgment by September 23, 2022. Google will file any responsive supplemental briefing not to exceed 10 pages double-spaced by September 30, 2022. SO ORDERED.. (Signed by Judge Paul G. Gardephe on 7/11/2022) (ks) (Entered: 07/11/2022) |
| 09/07/2022 | [267](#) | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/07/2022) |
| 09/07/2022 | [268](#) | ***SELECTED PARTIES***JOINT LETTER MOTION for Discovery *Regarding Network-1's Supplemental Expert Report* addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F)Motion or Order to File Under Seal: [267](#) .(Trask, Andrew) (Entered: 09/07/2022) |
| 09/07/2022 | [269](#) | REDACTION to [267](#) LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. by Google L.L.C, Youtube, LLC (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F).(Trask, Andrew) (Entered: 09/07/2022) |
| 09/15/2022 | [270](#) | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Referred to Magistrate Judge Sarah Netburn. Motions referred to Sarah Netburn. Case No. 14-cv-2396: Dkt. Nos. 267, 268 Case No. 14-cv-9558: Dkt. Nos. 203, 204 SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/15/2022) (ks) (Entered: 09/15/2022) |
| 09/15/2022 | [271](#) | MOTIONS REFERRED: [267](#) LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022., [268](#) JOINT LETTER MOTION for Discovery *Regarding Network-1's Supplemental Expert Report* addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022.. Motions referred to Sarah Netburn. (ks) (Entered: 09/15/2022) |
| 09/22/2022 | 272 | ORDER granting [267](#) Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 09/22/2022) |
| 09/23/2022 | [273](#) | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated September 23, 2022. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 09/23/2022) |
| 09/23/2022 | [274](#) | ***SELECTED PARTIES*** RESPONSE in Opposition to Motion re: [273](#) LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated |

SDNY CM/ECF NextGen Version 1.7                                   10/14/24, 4:59 PM

| | | |
|---|---|---|
| | | September 23, 2022. *SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT*. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Appendix Appendix, # [2](#) Exhibit 86, # [3](#) Exhibit 87, # [4](#) Exhibit 88)Motion or Order to File Under Seal: [273](#) . (Ledahl, Brian) (Entered: 09/23/2022) |
| 09/26/2022 | [275](#) | LETTER addressed to Judge Paul G. Gardephe from Andrew Trask dated September 26, 2022 re: Partial Sealing of Plaintiff's September 23, 2022 Filing (ECF No. 274). Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/26/2022) |
| 09/26/2022 | [276](#) | REDACTION to [274](#) Response in Opposition to Motion, by Network-1 Technologies, Inc. (Attachments: # [1](#) Exhibit 86 FUS, # [2](#) Exhibit 87 Redacted, # [3](#) Exhibit 88 Redacted).(Ledahl, Brian) (Entered: 09/26/2022) |
| 09/30/2022 | [277](#) | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 30, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/30/2022) |
| 09/30/2022 | [278](#) | ***SELECTED PARTIES*** BRIEF re: [274](#) Response in Opposition to Motion, *Defendants' Response to Plaintiff's Supplemental Brief Regarding Defendants' Motion for Summary Judgment*. Document filed by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc..Motion or Order to File Under Seal: [277](#) .(Trask, Andrew) (Entered: 09/30/2022) |
| 09/30/2022 | [279](#) | REDACTION to [278](#) Brief, *Defendants' Response to Plaintiff's Supplemental Brief Regarding Defendants' Motion for Summary Judgment* by Google L.L.C, Youtube, LLC.(Trask, Andrew) (Entered: 09/30/2022) |
| 10/03/2022 | [280](#) | DISCOVERY CONFERENCE ORDER: A discovery conference to discuss the issues raised by the parties' joint letter at 14-cv-02396 ECF No. 268 and 14cv-09558 ECF No. 204 is scheduled for Thursday, October 06, 2022, at 3:00 p.m. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. (Discovery Hearing set for 10/6/2022 at 03:00 PM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/3/2022) (ras) (Entered: 10/03/2022) |
| 10/06/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Discovery Hearing held on 10/6/2022. (ras) (Entered: 10/14/2022) |
| 10/14/2022 | [281](#) | TRANSCRIPT of Proceedings re: TELEPHONE CONFERENCE held on 10/6/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/4/2022. Redacted Transcript Deadline set for 11/14/2022. Release of Transcript Restriction set for 1/12/2023.(js) (Entered: 10/14/2022) |

| 10/14/2022 | [282](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TELEPHONE CONFERENCE proceeding held on 10/6/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(js) (Entered: 10/14/2022) |
|---|---|---|
| 10/14/2022 | [283](#) | ORDER granting [268](#) Letter Motion for Discovery. On October 7, 2022, the Court held a discovery conference to hear arguments regarding Defendants' motion to strike the portions of Plaintiff's supplemental expert report that relate to "the '216 patent." Under Rule 26(a)(1), a party has a continuing duty to supplement its production with documents it "may use to support its claims or defenses." Plaintiff's failure to affirmatively identify the '216 patent, especially during the supplemental discovery period, violated that duty. Defendants relied on Plaintiff's silence and would be unduly prejudiced by being made to challenge the '216 patent without the aid of additional discovery. Plaintiff may not now interject information relating to the '216 patent through its expert, and therefore Defendants' motion to strike paragraphs 38-147 of the Supplemental Expert Report prepared by Dr. Michael Mitzenmacher is GRANTED. (Signed by Magistrate Judge Sarah Netburn on 10/14/2022) (ras) (Entered: 10/14/2022) |
| 10/28/2022 | [284](#) | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022. Document filed by Network-1 Technologies, Inc... (Hayden, Amy) (Entered: 10/28/2022) |
| 10/28/2022 | [285](#) | ***SELECTED PARTIES*** BRIEF re: [283](#) Order on Motion for Discovery,,,, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S OBJECTIONS TO THE MAGISTRATES ORDER STRIKING PORTIONS OF ITS EXPERTS SUPPLEMENTAL EXPERT REPORT*. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Affidavit of Amy Hayden, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C)Motion or Order to File Under Seal: [284](#) .(Hayden, Amy) (Entered: 10/28/2022) |
| 11/01/2022 | [286](#) | LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden dated November 1, 2022 re: October 28, 2022 under seal filing. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 11/01/2022) |
| 11/01/2022 | [287](#) | BRIEF re: [285](#) Brief, *Plaintiff Network-1 Technologies, Inc.'s Objections to Order Striking Expert Report [Redacted]*. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Affidavit of Amy E. Hayden, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C).(Hayden, Amy) (Entered: 11/01/2022) |
| 11/11/2022 | [288](#) | OPPOSITION BRIEF re: [285](#) Brief, *Defendants' Response to Plaintiff's Objections to the Order Striking Portions of Plaintiff's Supplemental Expert Report*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2022) |
| 11/18/2022 | [289](#) | BRIEF re: [287](#) Brief, [285](#) Brief, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S REPLY IN SUPPORT OF ITS OBJECTIONS TO THE MAGISTRATES ORDER* |

| | | |
|---|---|---|
| | | *STRIKING PORTIONS OF ITS EXPERTS SUPPLEMENTAL EXPERT REPORT.* Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Amy Hayden, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F).(Hayden, Amy) (Entered: 11/18/2022) |
| 11/18/2022 | 290 | LETTER MOTION for Conference *Judicial Settlement Conference* addressed to Magistrate Judge Sarah Netburn from Andrew Trask dated November 18, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/18/2022) |
| 11/22/2022 | 291 | LETTER addressed to Magistrate Judge Sarah Netburn from Brian D. Ledahl dated 11/22/22 re: 290 LETTER MOTION for Conference Judicial Settlement Conference. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 11/22/2022) |
| 11/28/2022 | 292 | ORDER denying 290 Letter Motion for Conference addressed to Magistrate Judge Sarah Netburn from Andrew Trask dated November 18, 2022. Defendants' request is DENIED without prejudice. A brief conference is scheduled for Tuesday, November 29, 2022, at 4:00 p.m. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. The purpose of the conference is to discuss the potential for settlement in this matter and the appropriate venue in which to continue those discussions. If feasible, the parties are directed to meet and confer in advance of the conference. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 11/28/2022) |
| 11/28/2022 | | Set/Reset Hearings: Telephone Conference set for 11/29/2022 at 04:00 PM before Magistrate Judge Sarah Netburn. (ras) (Entered: 11/28/2022) |
| 11/29/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 11/29/2022. (ras) (Entered: 12/07/2022) |
| 01/06/2023 | 293 | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden dated January 6, 2023 re: Supplemental Summary Judgment Briefing. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 01/06/2023) |
| 03/14/2023 | 294 | LETTER MOTION for Conference *at the Courts earliest convenience to set a firm schedule for resolution of the remaining motions and trial* addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 03/14/2023. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 03/14/2023) |
| 09/15/2023 | 295 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 9/15/2023 re: Scheduling for Network-1 Technologies, Inc. v. Google, Inc., et al., Case No. 1:14-cv- 02396-PGG; Network-1 Technologies, Inc. v. Google, Inc., Case No. 1:14-cv-09558-PGG. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 09/15/2023) |
| 09/21/2023 | 296 | MEMO ENDORSEMENT: on re: (222 in 1:14-cv-09558-PGG-SN) Letter filed by Network-1 Technologies, Inc., (286 in 1:14-cv-02396-PGG-SN) Letter filed by |

SDNY CM/ECF NextGen Version 1.7                                                    10/14/24, 4:59 PM

| | | |
|---|---|---|
| | | Network-1 Technologies, Inc. ENDORSEMENT: The Clerk of Court is directed to terminate the motions pending at Dkt. No. 284 in Case No. 14 Civ. 2396 and at Dkt. No. 220 in Case No. 14 Civ. 9558 as withdrawn by the Plaintiff. SO ORDERED. Motions terminated: (284 in 1:14-cv-02396-PGG-SN) LETTER MOTION to Seal. addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022. filed by Network-1 Technologies, Inc., (220 in 1:14-cv-09558-PGG-SN) LETTER MOTION to Seal. addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022 filed by Network-1 Technologies, Inc. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 09/21/2023 | 297 | ORDER: granting 273 Letter Motion to Seal. The application is granted. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 273 in 14 Civ. 2396 and Dkt. No. 209 in 14 Civ. 9558. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 09/21/2023 | 298 | ORDER: granting 277 Letter Motion to Seal. The application is granted. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 277 in 14 Civ. 2396 and Dkt. No. 213 in 14 Civ. 9558. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 10/11/2023 | 299 | MEMO ENDORSEMENT on re: (295 in 1:14-cv-02396-PGG-SN) Letter, filed by Network-1 Technologies, Inc. ENDORSEMENT The court is aware of the pending motions and is working on them now. The court does not have the option to transfer the case to another judge. While the delay in resolving the pending motions is regrettable it is not accurate to say that the motions have been fully briefed for 33 months. At the court's request the parties filed supplemental briefing in September 2022. The parties should also be aware that the court has more than 350 other civil cases, as well as a substantial criminal docket, and that substantial time was lost during the pandemic. Having said that the Court is presently engaged with this case and will to issue decisions on the pending matters as soon as possible. The application for a scheduling conference is denied, because it is not clear was purpose such a conference would serve. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/11/2023) (jca) (Entered: 10/11/2023) |
| 12/11/2023 | 300 | CONSENT MOTION for Samuel Bryant Davidoff to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit DECLARATION OF ANDREW TRASK IN SUPPORT OF GOOGLE LLCS AND YOUTUBE, LLCS UNOPPOSED MOTION TO WITHDRAW COUNSEL, # 2 Proposed Order Proposed Order).(Trask, Andrew) (Entered: 12/11/2023) |
| 12/12/2023 | 301 | ORDER WITHDRAWING COUNSEL granting 300 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Samuel Bryant Davidoff is hereby terminated as counsel for Google LLC and YouTube, LLC. SO ORDERED. Attorney Samuel Bryant Davidoff terminated. (Signed by Judge Paul G. Gardephe on 12/12/2023) (tg) (Entered: 12/13/2023) |
| 04/02/2024 | 302 | ENDORSED LETTER addressed to Mr. Fenster from Judge Laura Taylor Swain dated 4/2/2024 re: I have received Network-1's March 28, 2024 letter, in connection with |

| | | |
|---|---|---|
| | | two related cases currently pending before Judge Gardephe. Judge Gardephe has confirmed that the relevant motions are under active consideration. Thank you for your letter. (Signed by Judge Laura Taylor Swain on 4/2/2024) (vfr) Modified on 4/22/2024 (vfr). (Entered: 04/02/2024) |
| 04/24/2024 | 303 | ***STRICKEN DOCUMENT. Document number 303 has been stricken from the case record. The document was stricken from this case pursuant to 307 Order . MEMORANDUM OPINION & ORDER re: (233 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Network-1 Technologies, Inc., (223 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Google L.L.C, Youtube, LLC. For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiffs claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiffs cross-motion for summary judgement is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223,233), to enter judgment for Defendants, and to close this case. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/24/2024) (ks) Transmission to Orders and Judgments Clerk for processing. Modified on 4/26/2024 (rro). (Entered: 04/24/2024) |
| 04/24/2024 | 304 | CLERK'S JUDGMENT re: 303 Memorandum Opinion & Order. in favor of Google L.L.C, Youtube, LLC against Network-1 Technologies, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Opinion and Order dated April 24, 2024, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiffs claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiffs cross-motion for summary judgement is denied; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 4/24/2024) (Attachments: # 1 Notice of Right to Appeal) (nd) (Entered: 04/24/2024) |
| 04/25/2024 | 305 | LETTER MOTION to Seal *Portions of Memorandum Opinion and Order* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 25, 2024. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit Certificate of Service).(Trask, Andrew) (Entered: 04/25/2024) |
| 04/25/2024 | 306 | ***SELECTED PARTIES***REDACTION to 305 LETTER MOTION to Seal *Portions of Memorandum Opinion and Order* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 25, 2024. *Highlighted Version of ECF No. 305-1* by Youtube, LLC, Google L.L.C, Network-1 Technologies, Inc.Motion or Order to File Under Seal: 305 .(Trask, Andrew) (Entered: 04/25/2024) |
| 04/25/2024 | 307 | ORDER granting 305 Letter Motion to Seal. The application is granted, except as to the proposed redaction on page 63, paragraph 15-17. The proposed redactions are limited to technical information. Coverting the Context Id. system, and the Court find that Commercial interests and desire to avoid competitive harm and outweigh the presumption of access. The Clerk of Court is directed to strike 14civ2396, Dkt. 303 |

| | | |
|---|---|---|
| | | and 14Civ.9558, Dkt No. 240 from the public docket and replace these documents with the redacted version to be supplied by Defendants. (Signed by Judge Paul G. Gardephe on 4/25/2024) (rro) Modified on 4/26/2024 (rro). (Entered: 04/26/2024) |
| 04/26/2024 | 308 | MEMORANDUM OPINION & ORDER re: (233 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Network-1 Technologies, Inc., (223 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Google L.L.C, Youtube, LLC. For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223, 233), to enter judgment for Defendants, and to close this case. (Signed by Judge Paul G. Gardephe on 4/24/2024) (rro) Transmission to Orders and Judgments Clerk for processing. (Entered: 04/26/2024) |
| 04/26/2024 | 309 | CLERK'S JUDGMENT re: 308 Memorandum & Opinion in favor of Google L.L.C, Youtube, LLC against Network-1 Technologies, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Opinion & Order dated April 26, 2024, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth in the order. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied. Judgment is entered for Defendants; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 4/26/2024) (Attachments: # 1 Appeal Package) (km) (Entered: 04/26/2024) |
| 04/26/2024 | | Terminate Transcript Deadlines (km) (Entered: 04/26/2024) |
| 04/29/2024 | 310 | SEALED DOCUMENT placed in vault..(jus) (Entered: 04/29/2024) |
| 05/14/2024 | 311 | NOTICE OF APPEAL from 304 Clerk's Judgment,,,. Document filed by Network-1 Technologies, Inc.. Filing fee $ 605.00, receipt number ANYSDC-29354429. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Ledahl, Brian) Modified on 5/15/2024 (km). (Entered: 05/14/2024) |
| 05/15/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 311 Notice of Appeal.(km) (Entered: 05/15/2024) |
| 05/15/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 311 Notice of Appeal, filed by Network-1 Technologies, Inc. were transmitted to the U.S. Court of Appeals.(km) (Entered: 05/15/2024) |
| 05/24/2024 | 312 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** CORRECTED NOTICE OF APPEAL re: 311 Notice of Appeal,. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) Modified on 5/24/2024 (tp). (Entered: 05/24/2024) |

| | | |
|---|---|---|
| 05/24/2024 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Brian Ledahl to RE-FILE Document No. 312 Corrected Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Corrected Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp)** (Entered: 05/24/2024) |
| 05/24/2024 | 313 | CORRECTED NOTICE OF APPEAL re: 311 Notice of Appeal, 304 Clerk's Judgment,,,,. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 05/24/2024) |
| 05/24/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 313 Corrected Notice of Appeal. (tp) (Entered: 05/24/2024) |
| 05/24/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 313 Corrected Notice of Appeal filed by Network-1 Technologies, Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/24/2024) |
| 05/28/2024 | 314 | MANDATE of USCA (Certified Copy) as to 311 Notice of Appeal, filed by Network-1 Technologies, Inc. USCA Case Number 24-1422. On May 14, 2024, the appellant filed a notice of appeal to this court from an order and judgment entered on the district court docket on April 26, 2024. However, this case is a patent infringement case over which the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction. 28 U.S.C. §1292(c)(2). On May 24, 2024, this court opened the appeal in error. Also on May 24, 2024, after this court opened the appeal, the appellant filed a corrected notice of appeal on the district court docket, taking the appeal to the proper court. The Court of Appeals for the Second Circuit, having opened an appeal in error and lacking jurisdiction over such appeals, IT IS HEREBY ORDERED that the appeal is administratively closed. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 5/28/2024. (km) (Entered: 05/28/2024) |
| 05/28/2024 | | Transmission of USCA Mandate/Order to the District Judge re: 314 USCA Mandate. (km) (Entered: 05/28/2024) |
| 06/10/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals Federal Circuit re: 311 Notice of Appeal, 313 Corrected Notice of Appeal, 314 Mandate of USCA. (tp) Modified on 6/10/2024 (tp). (Entered: 06/10/2024) |
| 06/10/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 311 Notice of Appeal, filed by Network-1 Technologies, Inc., 314 USCA Mandate, 313 Corrected Notice of Appeal filed by Network-1 Technologies, Inc. were transmitted to the U.S. Court of Appeals for the Federal Circuit. (tp) (Entered: 06/10/2024) |
| 06/14/2024 | 315 | Notice of Docketing and USCA Case Number 24-1948 from the USCA Federal Circuit assigned to 311 Notice of Appeal, filed by Network-1 Technologies, Inc.. (tp) (Entered: 06/14/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/14/2024 19:59:03 | | | |
| **PACER Login:** | Amyliz569 | **Client Code:** | 3482-2 |
| **Description:** | Docket Report | **Search Criteria:** | 1:14-cv-02396-PGG-SN |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

SDNY CM/ECF NextGen Version 1.7                                    10/14/24, 4:59 PM

CLOSED,APPEAL,CASREF,ECF,MOTREF,RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:14-cv-09558-PGG-SN

| | |
|---|---|
| Network-1 Technologies, Inc. v. Google, L.L.C. et al | Date Filed: 12/03/2014 |
| Assigned to: Judge Paul G. Gardephe | Date Terminated: 04/24/2024 |
| Referred to: Magistrate Judge Sarah Netburn | Jury Demand: Both |
| Related Case: 1:14-cv-02396-PGG-SN | Nature of Suit: 830 Patent |
| Case in other court: USCA - Fed. Circuit, 24-01893 | Jurisdiction: Federal Question |
| Cause: 28:1338pt Patent Infringement | |

**Plaintiff**

**Network-1 Technologies, Inc.**          represented by    **Charles Robert Macedo**
Amster Rothstein & Ebenstein
405 Lexington Avenue
Ste 48th Floor
New York, NY 10174
212-336-8000
Fax: 212-336-8001
Email: cmacedo@arelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
Russ, August,& Kabat
12424 Wilshire Blvd.,
Suite 1200
Los Angeles, CA 90025
(310)-979-8278 ?
Fax: (310)-826-6991
Email: mafenster@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam S Hoffman**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
310-826-7474
Email: ahoffman@raklaw.com
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth Hayden**

Appx218

Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: ahayden@raklaw.com
*ATTORNEY TO BE NOTICED*

**Brian D. Ledahl**
Russ August & Kabat
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: bledahl@raklaw.com
*ATTORNEY TO BE NOTICED*

**Jacob R Buczko**
Russ August & Kabat
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025
(310)-826-7474
Fax: (310)-826-6991
Email: jbuczko@raklaw.com
*ATTORNEY TO BE NOTICED*

**Paul A Kroeger**
Russ, August,& Kabat
12424 Wilshire Blvd.,
Suite 1200
Los Angeles, CA 90025
(310)-826-7474
Fax: (310)-826-6991
Email: pkroeger@raklaw.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Movant</u>**

**Audible Magic Corporation**            represented by **Kayvan Ghaffari**
Kayvan Ghaffari
Crowell & Moring LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
408-679-1576
Email: kghaffari@orrick.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua M. Rychlinski**
Crowell & Moring LLP (DC)
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2688
Email: jrychlinski@crowell.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google L.L.C**                    represented by **Bruce R. Genderson**
Williams & Connolly
725 Twelfth Street N.W.
Washington, DC 20005
(202)-434-5999
Fax: (202)-434-5029
Email: bgenderson@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas R. Nemec**
Skadden, Arps, Slate, Meagher & Flom,
LLP
One Manhattan West
New York, NY 10001-8602
212-735-2419
Fax: 917-777-2419
Email: dnemec@skadden.com
*TERMINATED: 02/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel Bryant Davidoff**
MFB Technologies, Inc.
712 H Street NE
Pmb 90579
Washington, DC 20002
202-579-9757
Email: sam@davidoffs.com
*TERMINATED: 12/12/2023*
*LEAD ATTORNEY*

**Andrew D Gish**

Appx220

Gish PLLC
41 Madison Avenue, Floor 31
New York, NY 10010
212-518-7380
Email: andrew@gishpllc.com
*TERMINATED: 02/25/2019*
*ATTORNEY TO BE NOTICED*

**Andrew Trask**
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5023
Email: atrask@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Suarez**
Steptoe LLP
1330 Connecticut Ave. NW
Washington, DC 20036
202-429-8131
Email: csuarez@steptoe.com
*TERMINATED: 08/28/2019*

**Daniel P. Shanahan**
Williams & Connolly LLP
725 Twelfth Street, North West
Washington, DC 20005
(202) 434-5174
Fax: (202) 434-5029
Email: dshanahan@wc.com
*ATTORNEY TO BE NOTICED*

**Eli S Schlam**
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202)-434-5754
Email: eschlam@wc.com
*ATTORNEY TO BE NOTICED*

**Ian Chen**
Skadden, Arps, Slate, Meagher & Flom,
LLP(CA)
525 University Avenue
Palo Alto, CA 94301

(650)-470-4559
Fax: (650)-798-6563
Email: ian.chen@skadden.com
*TERMINATED: 12/26/2017*

**James J Elacqua**
Skadden, Arps, Slate, Meagher & Flom,
LLP(CA)
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500
Email: james.elacqua@skadden.com
*TERMINATED: 12/26/2017*

**Jessica Bodger Rydstrom**
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
(202) 434-5567
Fax: (202) 434-5029
Email: jrydstrom@wc.com
*ATTORNEY TO BE NOTICED*

**Kevin Hardy**
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I ST NW
Suite 900
Washington, DC 20005
202-538-8240
Fax: 202-538-8100
Email: kevinhardy@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Marti Alan Johnson**
Gish PLLC
41 Madison Ave
New York, NY 10010
212-518-2000
Email: marti@gishpllc.com
*TERMINATED: 02/25/2019*
*ATTORNEY TO BE NOTICED*

**Thomas H.L. Selby**
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC 20024
202-758-7161

Appx222

Fax: 202-434-5029
Email: tselby@wc.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Youtube, LLC**                    represented by    **Bruce R. Genderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas R. Nemec**
(See above for address)
*TERMINATED: 02/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel Bryant Davidoff**
(See above for address)
*TERMINATED: 12/12/2023*
*LEAD ATTORNEY*

**Andrew D Gish**
(See above for address)
*TERMINATED: 02/25/2019*
*ATTORNEY TO BE NOTICED*

**Andrew Trask**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Alan Suarez**
(See above for address)
*TERMINATED: 08/28/2019*

**Daniel P. Shanahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eli S Schlam**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ian Chen**
(See above for address)
*TERMINATED: 12/26/2017*

Appx223

**James J Elacqua**
(See above for address)
*TERMINATED: 12/26/2017*

**Jessica Bodger Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Hardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marti Alan Johnson**
(See above for address)
*TERMINATED: 02/25/2019*
*ATTORNEY TO BE NOTICED*

**Thomas H.L. Selby**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2014 | 1 | COMPLAINT against Google, Inc., Youtube, LLC. (Filing Fee $ 350.00, Receipt Number 01111217)Document filed by Network-1 Technologies, Inc..(tk) (Additional attachment(s) added on 12/8/2014: # 1 exh a) (laq). (Entered: 12/08/2014) |
| 12/03/2014 | | SUMMONS ISSUED as to Google, Inc., Youtube, LLC. (tk) (Entered: 12/08/2014) |
| 12/03/2014 | 2 | CIVIL COVER SHEET filed. (tk) (Entered: 12/08/2014) |
| 12/03/2014 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 14-cv-2396. Document filed by Network-1 Technologies, Inc..(tk) (Entered: 12/08/2014) |
| 12/03/2014 | | Case Eligible for Patent Pilot Program. (moh) (Entered: 03/27/2015) |
| 12/03/2014 | | Mailed notice to Commissioner of Patents and Trademarks to report the filing of this action. (moh) (Entered: 03/27/2015) |
| 12/04/2014 | | Case Designated ECF. (tk) (Entered: 12/08/2014) |
| 12/17/2014 | 4 | MOTION for Marc Aaron Fenster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10421888. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Supplement Supreme Court Certificate, # 2 Text of Proposed Order)(Fenster, Marc) (Entered: 12/17/2014) |
| 12/17/2014 | 5 | MOTION for Brian David Ledahl to Appear Pro Hac Vice . Filing fee $ 200.00, |

| | | |
|---|---|---|
| | | receipt number 0208-10421914. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Supplement CA Supreme Court Certificate, # 2 Text of Proposed Order)(Ledahl, Brian) (Entered: 12/17/2014) |
| 12/18/2014 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 5 MOTION for Brian David Ledahl to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10421914. Motion and supporting papers to be reviewed by Clerk's Office staff., 4 MOTION for Marc Aaron Fenster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10421888. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 12/18/2014) |
| 12/23/2014 | 6 | NOTICE OF APPEARANCE by Douglas R. Nemec on behalf of Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 12/23/2014) |
| 12/23/2014 | 7 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Google Inc, for Youtube, LLC; Corporate Parent None for Google, Inc.. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 12/23/2014) |
| 12/23/2014 | 8 | NOTICE OF APPEARANCE by Marti Alan Johnson on behalf of Google, Inc., Youtube, LLC. (Johnson, Marti) (Entered: 12/23/2014) |
| 12/24/2014 | 9 | JOINT STIPULATION FOR EXTENSION OF TIME FOR DEFENDANTS GOOGLE INC. AND YOUTUBE, LLC TO RESPOND TO THE COMPLAINT: NOW THEREFORE, the parties hereby stipulate and agree that, subject to the approval of the Court, the Defendants' time to move, answer, otherwise respond to the Complaint is extended to January 23, 2015. SO ORDERED. (See Order.) Google, Inc. answer due 1/23/2015; Youtube, LLC answer due 1/23/2015. (Signed by Judge Vernon S. Broderick on 12/24/2014) (ajs) (Entered: 12/24/2014) |
| 01/05/2015 | | CASE ACCEPTED AS RELATED. Create association to 1:14-cv-02396-PGG-MHD. Notice of Assignment to follow. (pgu) (Entered: 01/05/2015) |
| 01/05/2015 | | NOTICE OF CASE ASSIGNMENT to Judge Paul G. Gardephe. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 01/05/2015) |
| 01/05/2015 | | Magistrate Judge Michael H. Dolinger is so designated. (pgu) (Entered: 01/05/2015) |
| 01/20/2015 | 10 | NOTICE OF APPEARANCE by Andrew D Gish on behalf of Google, Inc., Youtube, LLC. (Gish, Andrew) (Entered: 01/20/2015) |
| 01/23/2015 | 11 | ANSWER to 1 Complaint with JURY DEMAND. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 01/23/2015) |
| 02/10/2015 | 12 | ORDER FOR ADMISSION PRO HAC VICE granting 4 Motion for Marc Aaron Fenster to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 2/10/2015) (kl) (Entered: 02/10/2015) |
| 02/10/2015 | 13 | ORDER FOR ADMISSION PRO HAC VICE granting 5 Motion for Brian D. Ledahl to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 2/10/2015) (kl) (Entered: 02/10/2015) |

| | | |
|---|---|---|
| 02/20/2015 | 14 | MOTION for Ian Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10620052. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Chen, Ian) (Entered: 02/20/2015) |
| 02/20/2015 | 15 | NOTICE OF PRETRIAL CONFERENCE: Counsel for all parties are directed to appear before the Court for an initial pretrial conference in accordance with Rule 16 of the Federal Rules of Civil Procedure on Thursday, April 16, at 12:30 p.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. Initial Conference set for 4/16/2015 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 2/20/2015) (ama) (Entered: 02/24/2015) |
| 02/23/2015 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 14 MOTION for Ian Chen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10620052. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 02/23/2015) |
| 02/24/2015 | 16 | MOTION for James Elacqua to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10630500. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Certificates of Good Standing, # 2 Text of Proposed Order)(Elacqua, James) (Entered: 02/24/2015) |
| 02/24/2015 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 16 MOTION for James Elacqua to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10630500. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sdi)** (Entered: 02/24/2015) |
| 03/04/2015 | 17 | ORDER FOR ADMISSION PRO HAC VICE granting 14 Motion for Ian Chen to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/4/2015) (tn) (Entered: 03/04/2015) |
| 03/23/2015 | 18 | ORDER FOR ADMISSION PRO HAC VICE granting 16 Motion for Jim Elacqua to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/23/2015) (spo) (Entered: 03/23/2015) |
| 03/24/2015 | 19 | MOTION for Adam S. Hoffman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737870. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order)(Hoffman, Adam) (Entered: 03/24/2015) |
| 03/24/2015 | 20 | MOTION for Paul A. Kroeger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737946. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order)(Kroeger, Paul) (Entered: |

SDNY CM/ECF NextGen Version 1.7                                               10/14/24, 4:59 PM

| | | |
|---|---|---|
| | | 03/24/2015) |
| 03/25/2015 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Paul A. Kroeger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737946. Motion and supporting papers to be reviewed by Clerk's Office staff., 19 MOTION for Adam S. Hoffman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-10737870. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/25/2015) |
| 03/25/2015 | 21 | ORDER FOR ADMISSION PRO HAC VICE granting 20 Motion for Paul A. Kroeger to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/25/2015) (ama) (Entered: 03/25/2015) |
| 03/25/2015 | 22 | ORDER FOR ADMISSION PRO HAC VICE granting 19 Motion for Adam S. Hoffman to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 3/25/2015) (ama) (Entered: 03/25/2015) |
| 04/09/2015 | 23 | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster and Douglas R. Nemec dated April 9, 2015 re: Joint Proposed Case Management Plan. Document filed by Google, Inc., Network-1 Technologies, Inc., Youtube, LLC. (Attachments: # 1 Text of Proposed Order)(Fenster, Marc) (Entered: 04/09/2015) |
| 04/14/2015 | 24 | ORDER: It is hereby ORDERED that the conference in this action previously scheduled for April 16, 2015 at 12:30 p.m. will take place on April 16, 2015 at 10:30 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. ( Initial Conference set for 4/16/2015 at 10:30 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 4/14/2015) (ama) (Entered: 04/14/2015) |
| 04/16/2015 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Initial Pretrial Conference held on 4/16/2015. (Court Reporter Linda Fisher) (mr) (Entered: 04/16/2015) |
| 04/17/2015 | 25 | ORDER: It is hereby ORDERED that the following schedule will apply to Defendants' motion to consolidate this case with Network-I Technologies, Inc. v. Google, Inc. et al., No. 14 Civ. 2396 (PGG): Motions due by 4/20/2015., Responses due by 4/27/2015, Replies due by 4/29/2015. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/17/2015) (ama) (Entered: 04/17/2015) |
| 04/29/2015 | 26 | MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 04/29/2015) |
| 04/29/2015 | 27 | MEMORANDUM OF LAW in Support re: 26 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 04/29/2015) |
| 04/29/2015 | 28 | DECLARATION of Marti A. Johnson in Support re: 26 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 .. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Exhibit A - Part I, # 2 Exhibit A - Part II, # 3 Exhibit B)(Johnson, |

| | | |
|---|---|---|
| | | Marti) (Entered: 04/29/2015) |
| 04/29/2015 | 29 | MEMORANDUM OF LAW in Opposition re: 26 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 04/29/2015) |
| 04/29/2015 | 30 | DECLARATION of Brian D. Ledahl in Opposition re: 26 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 .. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Ledahl, Brian) (Entered: 04/29/2015) |
| 04/29/2015 | 31 | REPLY MEMORANDUM OF LAW in Support re: 26 MOTION to Consolidate Cases 14-cv-2396, 14-cv-9558 . . Document filed by Google, Inc., Youtube, LLC. (Nemec, Douglas) (Entered: 04/29/2015) |
| 04/30/2015 | 32 | TRANSCRIPT of Proceedings re: conference held on 4/16/2015 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Linda Fisher, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/26/2015. Redacted Transcript Deadline set for 6/4/2015. Release of Transcript Restriction set for 8/3/2015.(McGuirk, Kelly) (Entered: 04/30/2015) |
| 04/30/2015 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 4/16/2015 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (McGuirk, Kelly) (Entered: 04/30/2015) |
| 07/02/2015 | 34 | ORDER WITHDRAWING DEFENDANTS' MOTION TO CONSOLIDATE withdrawing 26 Motion to Consolidate Cases: that, in view of the parties' agreement that this case shall be stayed until further order of this Court following the issuance of the Patent Trial and Appeal Board's ("PTAB's") institution decision in covered business method review proceeding CBM2015-00113, Defendants' Motion to Consolidate this case with related case 1:14-cv-02396-PGG-MHD (Docket Entry 26) is hereby withdrawn without prejudice. The Clerk will terminate the motion. (Signed by Judge Paul G. Gardephe on 7/2/2015) (tn) (Entered: 07/02/2015) |
| 07/02/2015 | 35 | ORDER STAYING ALL DEADLINES PENDING INSTITUTION DECISION ON COVERED BUSINESS METHOD REVIEW PROCEEDINGS: that, pursuant to agreement between the parties, all matters in this case shall be stayed until further order of this Court following the issuance of the Patent Trial and Appeal Board's ("PTAB's") institution decision in covered business method review proceeding CBM2015-00113. Within 14 days of entry of the PTAB's institution decision in the above covered business method review proceeding, the parties are instructed to contact the Court to schedule a status conference to determine further scheduling or whether a stay of the proceedings should continue. The parties are directed to update this Court every 90 days as to the status of the PTAB proceedings. (Signed by Judge |

| | | |
|---|---|---|
| | | Paul G. Gardephe on 7/2/2015) (tn) (Entered: 07/02/2015) |
| 09/30/2015 | 36 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 09/30/2015) |
| 10/09/2015 | 37 | AMENDED RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Alphabet Inc., Corporate Parent Google Inc. for Youtube, LLC; Corporate Parent Alphabet Inc. for Google, Inc.. Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 10/09/2015) |
| 11/02/2015 | 38 | LETTER addressed to Judge Paul G. Gardephe from Douglas R. Nemec and Marc A. Fenster dated November 2, 2015 re: Advise the Court of the PTAB's Decision and Maintaining Stay of Proceedings. Document filed by Google, Inc., Network-1 Technologies, Inc., Youtube, LLC. (Attachments: # 1 Text of Proposed Order)(Nemec, Douglas) (Entered: 11/02/2015) |
| 11/03/2015 | 39 | ORDER: It is hereby ORDERED that, pursuant to agreement between the parties, all matters in this case shall be stayed pending the Patent Trial and Appeal Board ("PTAB's") final written decision in covered business method review proceeding CBM2015-00113. Within seven days of entry of the final written decision in the PTAB proceeding, the parties are instructed to contact the Court to schedule a status conference to determine further scheduling. The parties are directed to update this Court every 90 days as to the status of the PTAB proceedings. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/02/2015) (ama) (Entered: 11/03/2015) |
| 12/28/2015 | 40 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 12/28/2015) |
| 03/23/2016 | 41 | STATUS REPORT. *(Joint) Regarding Proceedings Before The Patent Trial And Appeals Board* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 03/23/2016) |
| 06/21/2016 | 42 | STATUS REPORT. *REGARDING PROCEEDINGS BEFORE THE PATENT TRIAL AND APPEALS BOARD* Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 06/21/2016) |
| 09/26/2016 | 43 | STATUS REPORT. *(Joint Status Update Regarding Proceedings Before The Patent Trial And Appeals Board)* Document filed by Google, Inc., Youtube, LLC.(Nemec, Douglas) (Entered: 09/26/2016) |
| 10/21/2016 | 44 | STATUS REPORT. Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 10/21/2016) |
| 10/24/2016 | 45 | NOTICE OF APPEARANCE by Samuel Bryant Davidoff on behalf of Google, Inc., Youtube, LLC. (Davidoff, Samuel) (Entered: 10/24/2016) |
| 10/24/2016 | 46 | MOTION for Bruce R. Genderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909053. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # |

| | | |
|---|---|---|
| | | [1](#) Certificate of Good Standing - DC, # [2](#) Certificate of Good Standing - Maryland, # [3](#) Text of Proposed Order)(Genderson, Bruce) (Entered: 10/24/2016) |
| 10/24/2016 | [47](#) | MOTION for Kevin Hardy to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909137. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # [1](#) Certificate of Good Standing - DC, # [2](#) Certificate of Good Standing - Maryland, # [3](#) Text of Proposed Order)(Hardy, Kevin) (Entered: 10/24/2016) |
| 10/24/2016 | [48](#) | MOTION for Daniel P. Shanahan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909208. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # [1](#) Certificate of Good Standing - DC, # [2](#) Certificate of Good Standing - Maryland, # [3](#) Text of Proposed Order)(Shanahan, Daniel) (Entered: 10/24/2016) |
| 10/25/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. [47](#) MOTION for Kevin Hardy to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909137. Motion and supporting papers to be reviewed by Clerk's Office staff., [48](#) MOTION for Daniel P. Shanahan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909208. Motion and supporting papers to be reviewed by Clerk's Office staff., [46](#) MOTION for Bruce R. Genderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12909053. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 10/25/2016) |
| 10/26/2016 | [49](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [46](#) Motion for Bruce R. Genderson to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 10/25/2016) (cf) (Entered: 10/26/2016) |
| 10/26/2016 | [50](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [47](#) Motion for Kevin Hardy to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 10/25/2016) (cf) (Entered: 10/26/2016) |
| 10/26/2016 | [51](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [48](#) Motion for Daniel P. Shanahan to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 10/25/2016) (cf) (Entered: 10/26/2016) |
| 11/01/2016 | [52](#) | MOTION for Christopher A. Suarez to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12940959. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # [1](#) Proposed Order, # [2](#) Certificate of Good Standing - DC, # [3](#) Certificate of Good Standing - Illinois)(Suarez, Christopher) (Entered: 11/01/2016) |
| 11/02/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. [52](#) MOTION for Christopher A. Suarez to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12940959. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 11/02/2016) |

| | | |
|---|---|---|
| 11/02/2016 | 53 | MOTION for Jessica Bodger Rydstrom to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945052. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing - California, # 3 Certificate of Good Standing - DC)(Rydstrom, Jessica) (Entered: 11/02/2016) |
| 11/02/2016 | 54 | MOTION for Eli S. Schlam to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945998. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing - DC, # 3 Certificate of Good Standing - NY)(Schlam, Eli) (Entered: 11/02/2016) |
| 11/03/2016 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 54 MOTION for Eli S. Schlam to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number 0208-12945998. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 11/03/2016) |
| 11/03/2016 | 55 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson dated November 3, 2016 re: Whether to Continue Stay. Document filed by Google, Inc., Youtube, LLC.(Genderson, Bruce) (Entered: 11/03/2016) |
| 11/04/2016 | 56 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 53 Motion for Jessica Bodger Rydstrom to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/3/2016) (cf) (Entered: 11/04/2016) |
| 11/04/2016 | 57 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 52 Motion for Christopher A. Suarez to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/4/2016) (cf) (Entered: 11/04/2016) |
| 11/07/2016 | 58 | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting 54 Motion for Eli S. Schlam to Appear Pro Hac Vice. (As further set forth in this Order.) (Signed by Judge Paul G. Gardephe on 11/7/2016) (cf) (Entered: 11/09/2016) |
| 11/10/2016 | 59 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 11/10/16 re: Current Stay. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) (Entered: 11/10/2016) |
| 11/10/2016 | 60 | AMENDED LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 11/10/16 re: Current Stay. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 1)(Fenster, Marc) (Entered: 11/10/2016) |
| 11/17/2016 | 61 | MEMO ENDORSEMENT on re: (55 in 1:14-cv-09558-PGG) Letter filed by Youtube, LLC, Google, Inc., (110 in 1:14-cv-02396-PGG-MHD) Letter filed by Youtube, LLC, Google, Inc. ENDORSEMENT: The Application is granted. The parties will advise the Court every 90 days as to the status of the Federal Circuit Appeals. (Signed by Judge Paul G. Gardephe on 11/16/2016) (cf) (Entered: 11/17/2016) |
| 02/14/2017 | 62 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated 2/14/2017 re: Joint Update re: Federal Circuit Appeals. Document filed by Google, Inc..(Suarez, Christopher) (Entered: 02/14/2017) |

| 05/15/2017 | 63 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson and Brian Ledahl dated May 15, 2017 re: Second Joint Update re: Federal Circuit Appeals. Document filed by Google, Inc., Youtube, LLC.(Suarez, Christopher) (Entered: 05/15/2017) |
| --- | --- | --- |
| 08/15/2017 | 64 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson dated August 15, 2017 re: Status of Federal Circuit Appeals. Document filed by Google, Inc., Youtube, LLC.(Suarez, Christopher) (Entered: 08/15/2017) |
| 10/18/2017 | 65 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson dated October 18, 2017 re: Notice of Google's Name Change and Request to Change Caption. Document filed by Google, Inc., Youtube, LLC. (Attachments: # 1 Updated Rule 7.1 Statement)(Suarez, Christopher) (Entered: 10/18/2017) |
| 10/19/2017 | 66 | MEMO ENDORSEMENT on re: (65 in 1:14-cv-09558-PGG) Letter, filed by Youtube, LLC, Google, Inc., (122 in 1:14-cv-02396-PGG-MHD) Letter, filed by Youtube, LLC, Google, Inc. ENDORSEMENT: The Application is granted. (Signed by Judge Paul G. Gardephe on 10/19/2017) (cf) (Entered: 10/19/2017) |
| 12/15/2017 | 67 | MOTION for James J. Elacqua and Ian Chen to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Text of Proposed Order) (Nemec, Douglas) (Entered: 12/15/2017) |
| 12/15/2017 | 68 | DECLARATION of Douglas R. Nemec in Support re: 67 MOTION for James J. Elacqua and Ian Chen to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, LLC. (Nemec, Douglas) (Entered: 12/15/2017) |
| 12/26/2017 | 69 | ORDER WITHDRAWING COUNSEL: granting 67 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. James J. Elacqua and Ian Chen are hereby terminated as counsel for Google LLC and YouTube, LLC. Attorney Ian Chen and James J Elacqua terminated. (Docketed in 14cv2396 and 14cv9558) (Signed by Judge Paul G. Gardephe on 12/26/2017) (ap) (Entered: 12/26/2017) |
| 02/13/2018 | 70 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson dated February 13, 2018 re: Status Update - Network-1 Technologies v. Google Inc.. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 02/13/2018) |
| 03/09/2018 | 71 | STATUS REPORT. *JOINT STATUS UPDATE REGARDING PROCEEDINGS BEFORE THE PATENT TRIAL AND APPEALS BOARD* Document filed by Network-1 Technologies, Inc..(Ledahl, Brian) (Entered: 03/09/2018) |
| 03/29/2018 | 72 | JOINT LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated March 29, 2018 re: Joint Update Regarding Consolidated IPR Appeals. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 03/29/2018) |
| 05/14/2018 | 73 | JOINT LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated May 14, 2018 re: Status Update - Network-1 Technologies v. Google Inc.. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 05/14/2018) |

| 08/13/2018 | 74 | LETTER addressed to Judge Paul G. Gardephe from Bruce Genderson and Brian Ledahl dated August 13, 2018 re: Status Update -- Network-1 Technologies v. Google LLC. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 08/13/2018) |
|---|---|---|
| 11/13/2018 | 75 | LETTER addressed to Judge Paul G. Gardephe from Bruce R. Genderson and Brian Ledahl dated November 13, 2018 re: Status Update - Network-1 Technologies v. Google LLC. Document filed by Google L.L.C, Youtube, LLC.(Suarez, Christopher) (Entered: 11/13/2018) |
| 12/17/2018 | 76 | JOINT LETTER addressed to Judge Paul G. Gardephe dated December 17, 2018 re: Status of Matter. Document filed by Network-1 Technologies, Inc..(Macedo, Charles) (Entered: 12/17/2018) |
| 12/17/2018 | 77 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Macedo, Charles) (Entered: 12/17/2018) |
| 01/02/2019 | 78 | ORDER re: 76 Letter filed by Network-1 Technologies, Inc. It is hereby ORDERED that there shall be a conference in this matter on Thursday, January 24, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The parties shall submit a proposed Case Management Plan and a joint letter updating the Court on the status of the proceedings by January 17, 2019. SO ORDERED. (Status Conference set for 1/24/2019 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 12/28/2018) (kv) (Entered: 01/02/2019) |
| 01/02/2019 | 79 | JOINT STIPULATION AND ORDER REGARDING LIFTING OF STAYS: Pursuant to the foregoing stipulation of the parties, the Court hereby ORDERS that the stipulation is GRANTED. The stay of proceedings in Case No. 1:14-cv-02396-PGG, and in Case No. 1:14-cv-09558-PGG is hereby lifted. The Court sets a status conference to address further scheduling in these matters for January 24, 2019 at 10:00 A.M. SO ORDERED. (Signed by Judge Paul G. Gardephe on 12/28/2018) ( Status Conference set for 1/24/2019 at 10:00 AM before Judge Paul G. Gardephe.) (ks) (Entered: 01/02/2019) |
| 01/03/2019 | 80 | MOTION for Andrew V. Trask to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16135205. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit Affidavit under Local Rule 1.3, # 2 Cert. Good Standing (DC), # 3 Cert. Good Standing (NY), # 4 Text of Proposed Order Proposed Order)(Trask, Andrew) (Entered: 01/03/2019) |
| 01/03/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 80 MOTION for Andrew V. Trask to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16135205. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 01/03/2019) |

| 01/11/2019 | [81](#) | MOTION for Amy E. Hayden to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16180701. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Affidavit of Amy E. Hayden, # [2](#) CA State Bar Good Standing Certificate, # [3](#) CA Supreme Court Good Standing Certificate, # [4](#) Proposed Order)(Hayden, Amy) (Entered: 01/11/2019) |
| 01/14/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 81 MOTION for Amy E. Hayden to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16180701. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 01/14/2019) |
| 01/16/2019 | [82](#) | ORDER ON MOTION FOR ADMISSION PRO HAC VICE granting [80](#) Motion for Andrew V. Trask to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 1/16/2019) (jca) (Entered: 01/16/2019) |
| 01/16/2019 | [83](#) | ORDER granting [81](#) Motion for Amy E. Hayden to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 1/16/2019) (ks) (Entered: 01/16/2019) |
| 01/17/2019 | [84](#) | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated January 17, 2019 re: Case Management Plan and Scheduling Order. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Proposed Scheduling Order)(Fenster, Marc) (Entered: 01/17/2019) |
| 01/24/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference held on 1/24/2019, ( Claim Construction Hearing set for 8/26/2019 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe., Status Conference set for 5/23/2019 at 12:30 PM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.). (Court Reporter Martha Drevis) (mr) (Entered: 01/24/2019) |
| 01/24/2019 | [85](#) | ORDER: It is hereby ORDERED that Counts III and IV of the Complaint in Case No. 14 Civ. 2396 (PGG) are dismissed without prejudice on consent. SO ORDERED. (Signed by Judge Paul G. Gardephe on 1/24/2019) (jca) (Entered: 01/24/2019) |
| 02/22/2019 | [86](#) | MOTION for Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Text of Proposed Order)(Nemec, Douglas) (Entered: 02/22/2019) |
| 02/22/2019 | [87](#) | DECLARATION of Douglas R. Nemec in Support re: [86](#) MOTION for Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, LLC. (Nemec, Douglas) (Entered: 02/22/2019) |
| 02/25/2019 | [88](#) | ORDER WITHDRAWING COUNSEL granting [86](#) Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Douglas R. Nemec, Andrew D. Gish, and Marti A. Johnson are hereby terminated as counsel for Google LLC and YouTube, LLC. SO ORDERED. Attorney Douglas R. Nemec; Andrew D Gish and Marti Alan Johnson terminated. (Signed by Judge Paul G. Gardephe on 2/25/2019) (jca) (Entered: 02/25/2019) |

| | | |
|---|---|---|
| 04/30/2019 | 89 | AMENDED CLAIM CONSTRUCTION STATEMENT. Document filed by Network-1 Technologies, Inc..(Fenster, Marc) (Entered: 04/30/2019) |
| 05/23/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Status Conference held on 5/23/2019. (Court Reporter Elizabeth Chan) (mr) (Entered: 05/23/2019) |
| 05/30/2019 | 90 | BRIEF *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S OPENING CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Michael Mitzenmacher, # 2 Exhibit A, # 3 Affidavit of Amy Hayden, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4 Part 1 of 8, # 8 Exhibit 4 Part 2 of 8, # 9 Exhibit 4 Part 3 of 8, # 10 Exhibit 4 Part 4 of 8, # 11 Exhibit 4 Part 5 of 8, # 12 Exhibit 4 Part 6 of 8, # 13 Exhibit 4 Part 7 of 8, # 14 Exhibit 4 Part 8 of 8, # 15 Exhibit 5 Part 1 of 2, # 16 Exhibit 5 Part 2 of 2, # 17 Exhibit 6, # 18 Exhibit 7, # 19 Exhibit 8, # 20 Exhibit 9, # 21 Exhibit 10, # 22 Exhibit 11, # 23 Exhibit 12, # 24 Exhibit 13, # 25 Exhibit 14, # 26 Exhibit 15, # 27 Exhibit 16)(Fenster, Marc) (Entered: 05/30/2019) |
| 06/28/2019 | 91 | BRIEF *Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service)(Trask, Andrew) (Entered: 06/28/2019) |
| 06/28/2019 | 92 | BRIEF re: 91 Brief *Declaration of Professor James A. Storer in Support of Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A)(Trask, Andrew) (Entered: 06/28/2019) |
| 06/28/2019 | 93 | BRIEF re: 91 Brief *Declaration of Samuel Bryant Davidoff in Support of Defendants' Response Claim Construction Brief*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S)(Trask, Andrew) (Entered: 06/28/2019) |
| 07/09/2019 | 94 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 07/09/2019) |
| 07/12/2019 | 95 | JOINT STIPULATION TO MODIFY THE DEADLINES FOR CLAIM CONSTRUCTION BRIEFING: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. Network-I may serve and file a reply claim construction brief solely rebutting Defendants' response brief by July 19, 2019; and I 2. Defendants may serve and file a sur-reply claim construction brief solely in response to new arguments raised in Network-1's reply brief by August 9, 2019. SO ORDERED. (Replies due by 7/19/2019, Surreplies due by 8/9/2019.) (Signed by Judge Paul G. Gardephe on 7/12/2019) (jca) (Entered: 07/12/2019) |
| 07/16/2019 | 96 | JOINT LETTER MOTION for Leave to File Excess Pages addressed to Judge Paul G. Gardephe from Amy E. Hayden dated 07/16/2019. Document filed by Network-1 |

| | | |
|---|---|---|
| | | Technologies, Inc.. (Attachments: # 1 JOINT STIPULATION TO MODIFY THE PAGE LIMITS FOR CLAIM CONSTRUCTION BRIEFING)(Hayden, Amy) (Entered: 07/16/2019) |
| 07/19/2019 | 97 | JOINT STIPULATION TO MODIFY THE PAGE LIMITS FOR CLAIM CONSTRUCTION: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. Network-1 may serve and file a reply claim construction brief solely rebutting Defendants' response brief by July 19, 2019 that is no more than 15 pages in length; and 2. Defendants may serve and file a sur-reply claim construction brief solely in response to new arguments raised in Network-l's reply brief by August 9, 2019 that is no more than 15 pages in length. SO ORDERED. (Replies due by 7/19/2019. Surreplies due by 8/9/2019.) (Signed by Judge Paul G. Gardephe on 7/18/2019) (anc) (Entered: 07/19/2019) |
| 07/19/2019 | 98 | BRIEF re: 90 Brief,,, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S REPLY CLAIM CONSTRUCTION BRIEF*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Declaration of A. Hayden, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Declaration of M. Mitzenmacher)(Fenster, Marc) (Entered: 07/19/2019) |
| 07/29/2019 | 99 | MOTION for Graham W. Safty to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332652. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C., Youtube, LLC. (Attachments: # 1 Affidavit of Graham Safty, # 2 Texas Certificate of Good Standing, # 3 D.C. Certificate of Good Standing, # 4 Proposed Order, # 5 Certificate of Service)(Trask, Andrew) (Entered: 07/29/2019) |
| 07/29/2019 | 100 | MOTION for Sumeet P. Dang to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17333033. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C., Youtube, LLC. (Attachments: # 1 Affidavit of Sumeet Dang, # 2 D.C. Certificate of Good Standing, # 3 Proposed Order, # 4 Certificate of Service)(Trask, Andrew) (Entered: 07/29/2019) |
| 07/30/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 100 MOTION for Sumeet P. Dang to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17333033. Motion and supporting papers to be reviewed by Clerk's Office staff., 99 MOTION for Graham W. Safty to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17332652. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 07/30/2019) |
| 08/05/2019 | 101 | ORDER FOR ADMISSION PRO HAC VICE granting 99 MOTION for Graham W. Safty to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 8/5/2019) (jca) (Entered: 08/05/2019) |
| 08/05/2019 | 102 | ORDER FOR ADMISSION PRO HAC VICE granting 100 MOTION for Sumeet P. Dang to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 8/5/2019) (jca) (Entered: 08/05/2019) |
| 08/09/2019 | 103 | BRIEF *Defendants' Sur-Reply Claim Construction Brief*. Document filed by Google |

| | | |
|---|---|---|
| | | L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service)(Trask, Andrew) (Entered: 08/09/2019) |
| 08/09/2019 | 104 | BRIEF re: 103 Brief *Declaration of Samuel Bryant Davidoff*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Certificate of Service, # 2 Exhibit A) (Trask, Andrew) (Entered: 08/09/2019) |
| 08/14/2019 | 105 | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for August 26, 2019 is adjourned to October 25, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York., Claim Construction Hearing set for 10/25/2019 at 10:00 AM in Courtroom 705, 40 Foley Square, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 8/13/2019) (rj) (Entered: 08/14/2019) |
| 08/14/2019 | 106 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** PROPOSED ORDER. Document filed by Network-1 Technologies, Inc.. Related Document Number: [Dkt. No. 23.1 10]. (Ledahl, Brian) **Proposed Order to be reviewed by Clerk's Office staff.** Modified on 8/14/2019 (km). (Entered: 08/14/2019) |
| 08/14/2019 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Notice to Attorney Brian Ledahl to RE-FILE Document 106 Proposed Order. Use the event type Other Filings, Proposed Orders, Proposed Stipulation and Order. The stipulation also needs to have handwritten signatures of the parties. (km)** (Entered: 08/14/2019) |
| 08/14/2019 | 107 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 08/14/2019) |
| 08/19/2019 | 108 | STIPULATED SUPPLEMENTAL PROTECTIVE ORDER GOVERNING SOURCE CODE...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/19/2019) (jca) (Entered: 08/19/2019) |
| 08/19/2019 | 109 | LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden; Andrew V. Trask dated 08/19/2019 re: The Claim Construction Hearing. Document filed by Network-1 Technologies, Inc..(Hayden, Amy) (Entered: 08/19/2019) |
| 08/20/2019 | 110 | MEMO ENDORSEMENT on re: (169 in 1:14-cv-02396-PGG-MHD) Letter filed by Network-1 Technologies, Inc., (109 in 1:14-cv-09558-PGG) Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: The proposed procedure set forth in this letter is acceptable to the Court. SO ORDERED. (Signed by Judge Paul G. Gardephe on 8/20/2019) (jca) (Entered: 08/20/2019) |
| 08/23/2019 | 111 | MOTION for Christopher A. Suarez to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Text of Proposed Order)(Suarez, Christopher) (Entered: 08/23/2019) |
| 08/23/2019 | 112 | DECLARATION of Samuel B. Davidoff in Support re: 111 MOTION for Christopher A. Suarez to Withdraw as Attorney .. Document filed by Google L.L.C, Youtube, |

| | | |
|---|---|---|
| | | LLC. (Suarez, Christopher) (Entered: 08/23/2019) |
| 08/28/2019 | 113 | ORDER WITHDRAWING COUNSEL granting 111 MOTION for Christopher A. Suarez to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Christopher A. Suarez is hereby terminated as counsel for Google LLC and YouTube, LLC. Attorney Christopher Alan Suarez terminated. (Signed by Judge Paul G. Gardephe on 8/28/2019) (jca) (Entered: 08/28/2019) |
| 09/12/2019 | 114 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Hayden, Amy) (Entered: 09/12/2019) |
| 09/18/2019 | 115 | JOINT STIPULATION TO MODIFY THE DEADLINE FOR COMPLETION OF DEPOSITIONS OF FACT WITNESSES: 1. Network-I and Defendants will complete both party and non-party written discovery by September 30, 2019; 2. Network-I and Defendants will complete depositions of fact witnesses by November 1, 2019; and 3. Counsel for Network-I and Defendants will meet face-to-face for at least one hour to discuss settlement no later than November 15, 2019. (As further set forth in this order.) (Deposition due by 11/1/2019., Discovery due by 9/30/2019.) (Signed by Judge Paul G. Gardephe on 9/16/2019) (cf) (Entered: 09/18/2019) |
| 10/01/2019 | 116 | JOINT LETTER addressed to Judge Paul G. Gardephe from Marc Fenster dated 10/01/2019 re: Google's Supplemental Invalidity Contentions. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Fenster, Marc) (Entered: 10/01/2019) |
| 10/03/2019 | 117 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Jacob R. Buczko to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17714188. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Jacob R Buczko, # 2 CA Supreme Court Certificate of Good Standing, # 3 CD California Certificate of Good Standing, # 4 NY State Bar Registration Receipt, # 5 Text of Proposed Order)(Buczko, Jacob) Modified on 10/4/2019 (vba). (Entered: 10/03/2019) |
| 10/04/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 117 MOTION for Jacob R. Buczko to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17714188. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of New York;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (vba)** (Entered: 10/04/2019) |
| 10/10/2019 | 118 | NOTICE OF APPEARANCE by Kayvan Ghaffari on behalf of Audible Magic Corporation. (Ghaffari, Kayvan) (Entered: 10/10/2019) |

| 10/11/2019 | 119 | JOINT LETTER MOTION for Discovery *on Non-Party Audible Magic Corp.* addressed to Judge Paul G. Gardephe from Kayvan Ghaffari dated 10/11/2019. Document filed by Audible Magic Corporation.(Ghaffari, Kayvan) (Entered: 10/11/2019) |
| --- | --- | --- |
| 10/15/2019 | 120 | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for October 25, 2019 is adjourned to November 25, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. Claim Construction Hearing set for 11/25/2019 at 10:00 AM in Courtroom 705, 40 Foley Square, New York, NY 10007 before Judge Paul G. Gardephe. (Signed by Judge Paul G. Gardephe on 10/15/2019) (rj) (Entered: 10/16/2019) |
| 10/15/2019 | 121 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute Dkt. No. 180 (14-cv-2396) Dkt. No. 119 (14-cv-9558). Referred to Magistrate Judge Sarah Netburn. Motions referred to Sarah Netburn. So Ordered. (Signed by Judge Paul G. Gardephe on 10/15/19) (yv) (Main Document 182 replaced on 10/16/2019) (jca). Modified on 10/16/2019 (jca). (Main Document 121 replaced on 10/16/2019) (jca). (Entered: 10/16/2019) |
| 10/16/2019 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Sarah Netburn. Please note that this is a reassignment of the designation only. (wb) (Entered: 10/16/2019) |
| 10/16/2019 | 122 | MOTION for Jacob R Buczko to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Jacob R Buczko, # 2 CD Cal Certificate of Good Standing, # 3 CA Supreme Court Certificate of Good Standing, # 4 NY Certificate of Good Standing, # 5 Text of Proposed Order Proposed Order) (Buczko, Jacob) (Entered: 10/16/2019) |
| 10/16/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 122 MOTION for Jacob R Buczko to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 10/16/2019) |
| 10/16/2019 | 123 | MEMO ENDORSEMENT on re: (176 in 1:14-cv-02396-PGG-SN) Letter, (116 in 1:14-cv-09558-PGG-SN) Letter. ENDORSEMENT: The application to stay the deposition is denied. The Court will address the parties' dispute concerning Google's Second Supplemental Individuality Contentions in a separate order. (Signed by Judge Paul G. Gardephe on 10/16/2019) (jwh) (Entered: 10/17/2019) |
| 10/17/2019 | 124 | ORDER: It is hereby ORDERED that the claim construction hearing in this action previously scheduled for November 25, 2019 is re-scheduled for November 21, 2019 at 10:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Claim Construction Hearing set for 11/21/2019 at 10:00 AM in Courtroom 705, 40 Centre Street, New York, NY 10007 before Judge Paul G. Gardephe.) (Signed by Judge Paul G. Gardephe on 10/17/2019) (jca) (Entered: 10/17/2019) |

| 10/17/2019 | 125 | ORDER FOR ADMISSION PRO HAC VICE granting 122 MOTION for Jacob R Buczko to Appear Pro Hac Vice. (Signed by Judge Paul G. Gardephe on 10/16/2019) (jca) (Entered: 10/17/2019) |
|---|---|---|
| 10/17/2019 | 126 | DISCOVERY CONFERENCE ORDER: A discovery conference is scheduled for Wednesday, November 06, 2019, at 10:00 a.m. in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. Counsel for movant Audible Magic Corporation is ordered to appear. Plaintiff is ordered to serve this Order on Audible, through its counsel. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. SO ORDERED. (Discovery Hearing set for 11/6/2019 at 10:00 AM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/17/2019) (js) (Entered: 10/18/2019) |
| 10/21/2019 | 127 | JOINT CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. No additional parties may be joined except with leave of the Court. Except for good cause shown, any motion to join additional parties must be filed within 30 days from the date of this Order. The parties must complete fact discovery no later than November 1, 2019. Complete depositions of fact witnesses by November 1, 2019. The party asserting infringement must serve and file an opening claim construction brief and all supporting evidence and testimony on May 30, 2019. The opposing party must serve and file a response to the opening claim construction brief and all supporting evidence and testimony by June 28, 2019. The opening party may serve and file a reply solely rebutting the opposing partys response by July 19, 2019. The opening party may serve and file a reply solely rebutting the opposing partys response by July 19, 2019. The parties must complete expert discovery no later than February 7, 2020. Counsel for the parties have conferred and their present best estimate of the length of trial is: 6-8 days. (Expert Discovery due by 2/7/2020). (Signed by Judge Paul G. Gardephe on 10/21/2019) (rjm). Modified on 10/25/2019 (rro). (Main Document 127 replaced on 10/25/2019) (rro). Modified on 10/25/2019 (rro). (Entered: 10/22/2019) |
| 10/21/2019 | | Set/Reset Deadlines: Deposition due by 11/1/2019. Expert Discovery due by 2/7/2020. Fact Discovery due by 11/1/2019. (rro) (Entered: 10/25/2019) |
| 10/22/2019 | 128 | ORDER: The discovery conference currently scheduled for Wednesday, November 06, 2019, at 10:00 a.m. is RESCHEDULED for Thursday, November 07, 2019, at 10:00 a.m. in Courtroom 219, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. (Discovery Hearing set for 11/7/2019 at 10:00 AM in Courtroom 219, 40 Centre Street, New York, NY 10007 before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/22/2019) (ras) (Entered: 10/22/2019) |
| 10/29/2019 | 129 | ORDER FOR ADMISSION PRO HAC VICE: The motion of Melissa B. Collins for admission to practice pro hac vice in the above-captioned actions is GRANTED. (Signed by Judge Paul G. Gardephe on 10/29/2019) (ama) (Entered: 10/29/2019) |
| 11/04/2019 | 130 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific |

| | | |
|---|---|---|
| | | Non-Dispositive Motion/Dispute; Dkt. No. 191 (14-cv-2396) Referred to Magistrate Judge Sarah Netburn. SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/4/2019) (jca) (Entered: 11/04/2019) |
| 11/04/2019 | 131 | ORDER: The issues raised in the joint letter, ECF No. 191, will be addressed at the discovery conference scheduled for November 7, 2019. (Signed by Magistrate Judge Sarah Netburn on 11/4/2019) (ras) (Entered: 11/04/2019) |
| 11/04/2019 | 132 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17894068. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Audible Magic Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Rychlinski, Joshua) Modified on 11/5/2019 (aea). (Entered: 11/04/2019) |
| 11/05/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 132 MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17894068. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Michigan;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (aea)** (Entered: 11/05/2019) |
| 11/05/2019 | 133 | MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Audible Magic Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Rychlinski, Joshua) Modified on 11/5/2019 (aea). Modified on 11/5/2019 (aea). (Entered: 11/05/2019) |
| 11/05/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 133 MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 11/05/2019) |
| 11/06/2019 | 134 | ORDER granting 133 Motion for Joshua M. Rychlinski to Appear Pro Hac Vice. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 11/06/2019) |
| 11/06/2019 | 135 | ORDER FOR ADMISSION PRO HAC VICE on re: (133 in 1:14-cv-09558-PGG-SN) MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** filed by Audible Magic Corporation, (195 in 1:14-cv-02396-PGG-SN) MOTION for Joshua M. Rychlinski to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** filed by Audible Magic Corporation. ENDORSEMENT: SO ORDERED. (Signed by Judge Paul G. Gardephe on 11/6/2019) (rj) (Entered: 11/06/2019) |
| 11/07/2019 | 136 | ORDER denying 119 Letter Motion for Discovery. For the reasons set forth at today's conference, the subpoenas issued upon attorneys Wilbar, Brisson, and Ramsey are |

Appx241

| | | |
|---|---|---|
| | | QUASHED. The subpoena issued upon Wold is QUASHED without prejudice to renewal if Network-1 can establish a good faith basis for the deposition based on both the merits and the failure to ask the necessary questions during Wold's deposition as the Rule 30(b)(6) witness. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (Netburn, Sarah) (Entered: 11/07/2019) |
| 11/07/2019 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Discovery Hearing held on 11/7/2019. (ras) (Entered: 12/03/2019) |
| 11/13/2019 | 137 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc.. (Ledahl, Brian) (Entered: 11/13/2019) |
| 11/14/2019 | 138 | JOINT STIPULATION TO MODIFY EXPERT DISCOVERY DEADLINES, The parties hereby stipulate and agree as follows: 1. The parties may serve opening expert reports by December 20, 2019; 2. The parties may serve rebuttal expert reports by February 14, 2020; 3. Any application for leave to serve a reply expert report must be filed by February 21, 2020; 4. The parties must complete expert discovery, including depositions of experts, by March 13, 2020; 5. Any letter seeking leave to file dispositive motions must be filed by March 27, 2020, and any opposition letters must be filed by April 3, 2020. SO ORDERED. (Deposition due by 3/13/2020., Expert Discovery due by 3/13/2020., Motions due by 2/21/2020.) (Signed by Judge Paul G. Gardephe on 11/13/19) (yv) (Entered: 11/14/2019) |
| 11/14/2019 | 139 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. No additional parties may be joined except with leave of the Court. Except for good cause shown, any motion to join additional parties must be filed within 30 days from the date of this Order. A party may not amend its pleadings except with leave of the Court. Except for good cause shown, any motion to amend pleadings must be filed within 30 days from the date of this Order. The hearing on the issue of claim construction is scheduled for November 21, 2019. The parties must complete expert discovery no later than February 7, 2020. No later than 14 days following the close of fact discovery, all counsel must meet face-to-face for at least one hour to discuss settlement. Parties seeking to make post-discovery dispositive motions should submit a letter to the Court in accordance with Rule 4(A) of the Court's Individual Practices no later than February 21, 2020. Opposition letters are due February 28, 2020. Counsel for the parties have conferred and their present best estimate of the length of trial is: 6-8 days. Expert Discovery due by 2/7/2020. (And as further set forth in this Order.) SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/21/2019) (jca) (Entered: 11/14/2019) |
| 11/21/2019 | | Minute Entry for proceedings held before Judge Paul G. Gardephe: Claim Construction Hearing held on 11/21/2019. (Court Reporter Kelly Surina) (mr) (Entered: 11/21/2019) |
| 11/26/2019 | 140 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated November 26, 2019 re: November 21, 2019 claim construction hearing. Document filed by |

| | | |
|---|---|---|
| | | Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(Fenster, Marc) (Entered: 11/26/2019) |
| 11/27/2019 | [141](#) | LETTER addressed to Judge Paul G. Gardephe from Kevin Hardy dated November 27, 2019 re: November 21, 2019 Claim Construction Hearing. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Certificate of Service, # [2](#) Exhibit A) (Trask, Andrew) (Entered: 11/27/2019) |
| 12/09/2019 | [142](#) | ORDER: After in camera review of the documents selected by the parties, Defendants' request is GRANTED in part and DENIED in part. In summary, the common interest privilege does not apply to communications between ARE and Network-1 or between ARE and Mark Lucier. Accordingly, the attorney-client privilege is waived as to documents that ARE shared with Lucier and Network-1, including billing statements. Materials prepared for purposes of a patent application, rather than in anticipation of litigation, are not protected by the work product doctrine. Similarly, communications created to provide business or negotiation advice are not protected work product. Within fourteen days from this order, ARE shall produce communications specified in this order as non-privileged and not protected by the work product doctrine and shall review its privilege log to produce any additional documents in accordance with this order. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 191 in 14-cv-02396. Motions terminated: (191 in 1:14-cv-02396-PGG-SN) JOINT LETTER MOTION to Compel Amster Rothstein & Ebenstein, LLP to Produce *Documents Withheld as Privileged and/or Work Product* addressed to Judge Paul G. Gardephe from Andrew Trask dated November 1, 2019, filed by Google L.L.C, Youtube, LLC. (Signed by Magistrate Judge Sarah Netburn on 12/9/2019) (ras) (Entered: 12/09/2019) |
| 03/04/2020 | [143](#) | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 03/04/2020) |
| 03/05/2020 | [144](#) | JOINT STIPULATION TO MODIFY DEADLINES RELATING TP THE CLOSE OF EXPERT DISCOVERY AND DISPOSITIVE MOTIONS. NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. The currently applicable deadlines for the completion of expert discovery and for the submission of letters seeking or opposing leave to file dispositive motions shall be suspended; 2. The parties must complete expert discovery, including depositions of experts, by April 24, 2020; 3. The parties shall attempt in good faith to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto and shall submit either a joint stipulation reflecting their agreement or a joint letter setting forth their respective positions on the issue for resolution by the Court. SO ORDERED. (Deposition due by 4/24/2020. Expert Discovery due by 4/24/2020.) (Signed by Magistrate Judge Sarah Netburn on 3/5/2020) (rjm) (Entered: 03/06/2020) |
| 03/26/2020 | [145](#) | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 03/26/2020) |
| 03/27/2020 | [146](#) | JOINT STIPULATION TO MODIFY THE DEADLINE FOR THE CLOSE OF EXPERT DISCOVERY: NOW THEREFORE, the parties hereby stipulate and agree |

| | | |
|---|---|---|
| | | as follows: 1. The parties must complete expert discovery, including depositions of experts, by June 30, 2020; 2. The parties have not been able to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto, and therefore shall submit a joint letter setting forth their respective positions on the issue for resolution by the Court no later than one month before the close of expert discovery. ( Deposition due by 6/30/2020., Expert Discovery due by 6/30/2020.) (Signed by Magistrate Judge Sarah Netburn on 3/27/2020) (js) (Entered: 03/27/2020) |
| 05/26/2020 | [147](#) | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 05/26/2020) |
| 05/27/2020 | [148](#) | JOINT STIPULATION TO MODIFY THE DEADLINE FOR THE CLOSE OF EXPERT DISCOVERY: NOW THEREFORE, the parties hereby stipulate and agree as follows: 1. The parties must complete expert discovery, including depositions of experts, by July 31, 2020; 2. The parties have not been able to resolve their disagreement concerning the appropriate deadlines for submission of letters seeking leave to file dispositive motions and oppositions thereto, and therefore shall submit a joint letter setting forth their respective positions on the issue for resolution by the Court no later than 45 days before the close of expert discovery. So Ordered. (Deposition due by 7/31/2020., Expert Discovery due by 7/31/2020.) (Signed by Magistrate Judge Sarah Netburn on 5/27/2020) (js) (Entered: 05/28/2020) |
| 06/16/2020 | [149](#) | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden and Samuel Bryant Davidoff dated June 16, 2020 re: Courts Guidance In Setting A Deadline For Filing Letters Describing The Grounds For Proposed Dispositive Motions. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B).(Hayden, Amy) (Entered: 06/16/2020) |
| 06/16/2020 | [150](#) | NOTICE OF CHANGE OF ADDRESS by Kevin Hardy on behalf of Google L.L.C, Youtube, LLC. New Address: Quinn Emanuel Urquhart & Sullivan, LLP, 1300 Eye ST NW, Suite 900, Washington, DC, USA 20005, (202) 538-8000..(Hardy, Kevin) (Entered: 06/16/2020) |
| 06/22/2020 | [151](#) | MOTION for Thomas H. L. Selby to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20357732. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Affidavit of Thomas H. L. Selby, # [2](#) Texas Certificate of Good Standing, # [3](#) D.C. Certificate of Good Standing, # [4](#) Virginia Certificate of Good Standing, # [5](#) Proposed Order, # [6](#) Certificate of Service).(Selby, Thomas) (Entered: 06/22/2020) |
| 06/22/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. [151](#) MOTION for Thomas H. L. Selby to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20357732. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq)** (Entered: 06/22/2020) |
| 06/23/2020 | [152](#) | ORDER FOR ADMISSION PRO HAC VICE granting [151](#) Motion for Thomas H. L. |

| | | |
|---|---|---|
| | | Selby to Appear Pro Hac Vice. The motion of Thomas H. L. Selby for admission to practice pro hac vice in the above-captioned actions is GRANTED. IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above-captioned cases in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Paul G. Gardephe on 6/23/20) (yv) (Entered: 06/23/2020) |
| 06/26/2020 | [153](#) | JOINT LETTER addressed to Judge Paul G. Gardephe from Brian Ledahl and Samuel Bryant Davidhoff dated June 26, 2020 re: In-Person Claim Construction Proceedings. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 06/26/2020) |
| 06/29/2020 | [154](#) | MEMO ENDORSEMENT on re: (214 in 1:14-cv-02396-PGG-SN) Letter, filed by Network-1 Technologies, Inc. ENDORSEMENT: The Court will decide claim construction and summary judgment simultaneously. See Briggs & Stratton Corp. v. Chongqing Rato Power Co., No. 5:13-CV-0316 LEK/ATB, 2014 WL 4888266, at *2 (N.D.N.Y. Sept. 30, 2014), on reconsideration in part, 2015 WL 4603553 (N.D.N.Y. July 30, 2015) ("courts often simultaneously undertake a complete claim construction and decide summary judgment motions"); Bedgear, LLC v. Fredman Bros. Furniture Co., No. 2:15-CV-6759 (KAM), 2019 WL 911301, at *10 (E.D.N.Y. Feb. 25, 2019) (finding it "more appropriate" to address "indefiniteness" arguments at the summary judgment phase). By August 7, 2020, the parties should submit a joint letter that includes an agreed-upon briefing schedule for summary judgment. Alternatively, to the extent that the parties believe that a settlement conference before Magistrate Judge Netburn would be productive, the parties may request a settlement conference in their August 7 letter, and the Court will defer briefing until after a settlement conference takes place. SO ORDERED. (Signed by Judge Paul G. Gardephe on 6/29/2020) (va) (Entered: 06/29/2020) |
| 08/07/2020 | [155](#) | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden and Samuel Bryant Davidhoff dated August 7, 2020 re: Briefing Schedule For Summary Judgment. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 08/07/2020) |
| 08/10/2020 | [156](#) | MEMO ENDORSEMENT on re: (155 in 1:14-cv-09558-PGG-SN) Letter filed by Network-1 Technologies, Inc., (220 in 1:14-cv-02396-PGG-SN) Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: The application is granted. So Ordered (Signed by Judge Paul G. Gardephe on 8/10/2020) (js) (Entered: 08/10/2020) |
| 11/11/2020 | [157](#) | LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Certificate of Service).(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [158](#) | MOTION for Summary Judgment . Document filed by Google L.L.C, Youtube, LLC.. (Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [159](#) | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Support re: [157](#) |

| | | |
|---|---|---|
| | | LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [158](#) MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.. Motion or Order to File Under Seal: [157](#) .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [160](#) | ***SELECTED PARTIES*** BRIEF re: [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [158](#) MOTION for Summary Judgment . *Statement of Material Facts in Support of Defendants' Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc..Motion or Order to File Under Seal: [157](#) .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [161](#) | ***SELECTED PARTIES*** BRIEF re: [158](#) MOTION for Summary Judgment ., [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Appendix to Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3, # [4](#) Exhibit 4, # [5](#) Exhibit 5, # [6](#) Exhibit 6, # [7](#) Exhibit 7, # [8](#) Exhibit 8, # [9](#) Exhibit 9, # [10](#) Exhibit 10, # [11](#) Exhibit 11, # [12](#) Exhibit 12, # [13](#) Exhibit 13, # [14](#) Exhibit 14, # [15](#) Exhibit 15, # [16](#) Exhibit 16, # [17](#) Exhibit 17, # [18](#) Exhibit 18, # [19](#) Exhibit 19, # [20](#) Exhibit 20, # [21](#) Exhibit 21, # [22](#) Exhibit 22, # [23](#) Exhibit 23, # [24](#) Exhibit 24, # [25](#) Exhibit 25, # [26](#) Exhibit 26, # [27](#) Certificate of Service)Motion or Order to File Under Seal: [157](#) .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [162](#) | ***SELECTED PARTIES*** REPLY MEMORANDUM OF LAW in Support re: [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [158](#) MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.. Motion or Order to File Under Seal: [157](#) .(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [163](#) | MEMORANDUM OF LAW in Support re: [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [158](#) MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [164](#) | BRIEF re: [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., [158](#) MOTION for Summary Judgment . *Statement of Material Facts in Support of Defendants' Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | [165](#) | BRIEF re: [158](#) MOTION for Summary Judgment ., [157](#) LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. *Appendix to Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit |

| | | |
|---|---|---|
| | | 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Certificate of Service).(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 166 | REPLY MEMORANDUM OF LAW in Support re: 157 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., 158 MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 167 | BRIEF re: 158 MOTION for Summary Judgment . *Defendants' Reply to the Additional Factual Assertions in Plaintiff's Response to Defendants' Statement of Material Facts*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 168 | ***SELECTED PARTIES*** MOTION for Summary Judgment . Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # 1 Motion for Summary Judgement, # 2 Affidavit of Brian Ledahl, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Statement of Material Facts)Motion or Order to File Under Seal: 157 . (Ledahl, Brian) (Entered: 11/11/2020) |
| 11/11/2020 | 169 | MOTION for Summary Judgment . Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Motion for Summary Judgement, # 2 Affidavit of Brian Ledahl, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Statement of Material Facts).(Ledahl, Brian) (Entered: 11/11/2020) |
| 11/11/2020 | 170 | REPLY MEMORANDUM OF LAW in Support re: 169 MOTION for Summary Judgment . . Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Appendix, # 2 Exhibit 68, # 3 Reply Statement of Facts).(Ledahl, Brian) (Entered: 11/11/2020) |
| 11/12/2020 | 171 | MEMORANDUM OF LAW in Opposition re: 169 MOTION for Summary Judgment ., 168 MOTION for Summary Judgment . . Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | 172 | BRIEF re: 171 Memorandum of Law in Opposition to Motion *Defendants' Responsive Statement of Material Facts in Support of Their Opposition to Plaintiff's Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/12/2020) |

| | | |
|---|---|---|
| 11/12/2020 | 173 | ***SELECTED PARTIES*** BRIEF re: 157 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., 171 Memorandum of Law in Opposition to Motion *Appendix to Defendants' Statement of Material Facts in Support of Their Opposition to Network-1's Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit 19, # 2 Exhibit 20, # 3 Exhibit 21, # 4 Exhibit 22, # 5 Exhibit 23, # 6 Exhibit 24, # 7 Exhibit 25, # 8 Exhibit 26, # 9 Exhibit 27, # 10 Exhibit 28, # 11 Exhibit 29, # 12 Exhibit 30, # 13 Exhibit 31, # 14 Exhibit 32, # 15 Exhibit 33, # 16 Exhibit 34, # 17 Exhibit 35, # 18 Exhibit 36, # 19 Exhibit 37, # 20 Exhibit 38, # 21 Exhibit 39, # 22 Exhibit 40, # 23 Exhibit 41, # 24 Exhibit 42, # 25 Exhibit 43, # 26 Exhibit 44, # 27 Exhibit 45, # 28 Exhibit 46, # 29 Exhibit 47, # 30 Exhibit 48, # 31 Exhibit 49, # 32 Exhibit 50, # 33 Exhibit 51, # 34 Exhibit 52, # 35 Exhibit 53, # 36 Exhibit 54, # 37 Exhibit 55, # 38 Exhibit 56, # 39 Exhibit 57, # 40 Exhibit 58, # 41 Exhibit 59, # 42 Exhibit 60, # 43 Exhibit 61, # 44 Exhibit 62, # 45 Exhibit 63, # 46 Exhibit 64, # 47 Exhibit 65, # 48 Exhibit 66, # 49 Exhibit 67, # 50 Certificate of Service)Motion or Order to File Under Seal: 157 .(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | 174 | BRIEF re: 157 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020., 171 Memorandum of Law in Opposition to Motion *Appendix to Defendants' Statement of Material Facts in Support of Their Opposition to Network-1's Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit 19, # 2 Exhibit 20, # 3 Exhibit 21, # 4 Exhibit 22, # 5 Exhibit 23, # 6 Exhibit 24, # 7 Exhibit 25, # 8 Exhibit 26, # 9 Exhibit 27, # 10 Exhibit 28, # 11 Exhibit 29, # 12 Exhibit 30, # 13 Exhibit 31, # 14 Exhibit 32, # 15 Exhibit 33, # 16 Exhibit 34, # 17 Exhibit 35, # 18 Exhibit 36, # 19 Exhibit 37, # 20 Exhibit 38, # 21 Exhibit 39, # 22 Exhibit 40, # 23 Exhibit 41, # 24 Exhibit 42, # 25 Exhibit 43, # 26 Exhibit 44, # 27 Exhibit 45, # 28 Exhibit 46, # 29 Exhibit 47, # 30 Exhibit 48, # 31 Exhibit 49, # 32 Exhibit 50, # 33 Exhibit 51, # 34 Exhibit 52, # 35 Exhibit 53, # 36 Exhibit 54, # 37 Exhibit 55, # 38 Exhibit 56, # 39 Exhibit 57, # 40 Exhibit 58, # 41 Exhibit 59, # 42 Exhibit 60, # 43 Exhibit 61, # 44 Exhibit 62, # 45 Exhibit 63, # 46 Exhibit 64, # 47 Exhibit 65, # 48 Exhibit 66, # 49 Exhibit 67, # 50 Certificate of Service).(Trask, Andrew) (Entered: 11/12/2020) |
| 11/12/2020 | 175 | ***SELECTED PARTIES*** RESPONSE in Opposition to Motion re: 158 MOTION for Summary Judgment . . Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # 1 Appendix, # 2 Exhibit 27, # 3 Exhibit 28, # 4 Exhibit 29, # 5 Exhibit 30, # 6 Exhibit 31, # 7 Exhibit 32, # 8 Exhibit 33, # 9 Exhibit 34, # 10 Exhibit 35, # 11 Exhibit 36, # 12 Exhibit 37, # 13 Exhibit 38, # 14 Exhibit 39, # 15 Exhibit 40, # 16 Exhibit 41, # 17 Exhibit 42, # 18 Exhibit 43, # 19 Exhibit 44, # 20 Exhibit 45, # 21 Exhibit 46, # 22 Exhibit 47, # 23 Exhibit 48, # 24 Exhibit 49, # 25 Exhibit 50, # 26 Exhibit 51, # 27 Exhibit 52, # 28 Exhibit 53, # 29 Exhibit 54, # 30 Exhibit 55, # 31 Exhibit 56, # 32 Exhibit 57, # 33 Exhibit 58, # 34 Exhibit 59, # 35 Exhibit 60, # 36 Exhibit 61, # 37 Exhibit 62, # 38 Exhibit 63, # 39 Exhibit 64, # 40 Exhibit 65, # 41 Exhibit 66, # 42 Exhibit 67, # 43 Exhibit 68, # 44 Exhibit 69, # 45 Exhibit 70, # 46 Exhibit 71, # 47 Exhibit 72, # 48 Exhibit 73, # 49 Exhibit 74, # 50 Exhibit 75, # 51 Exhibit 76, # 52 Exhibit 77, # 53 Exhibit 78, # 54 Exhibit 79, # 55 |

| | | |
|---|---|---|
| | | Exhibit 80, # 56 Exhibit 81, # 57 Exhibit 82, # 58 Exhibit 83, # 59 Exhibit 84, # 60 Exhibit 85, # 61 Opposition to Statement of Facts)Motion or Order to File Under Seal: 157 .(Ledahl, Brian) (Entered: 11/12/2020) |
| 11/12/2020 | 176 | RESPONSE in Opposition to Motion re: 158 MOTION for Summary Judgment ., 157 LETTER MOTION to Seal *Certain Summary Judgment Materials* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 11, 2020. . Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Appendix, # 2 Exhibit 27, # 3 Exhibit 28, # 4 Exhibit 29, # 5 Exhibit 30, # 6 Exhibit 31, # 7 Exhibit 32, # 8 Exhibit 33, # 9 Exhibit 34, # 10 Exhibit 35, # 11 Exhibit 36, # 12 Exhibit 37, # 13 Exhibit 38, # 14 Exhibit 39, # 15 Exhibit 40, # 16 Exhibit 41, # 17 Exhibit 42, # 18 Exhibit 43, # 19 Exhibit 44, # 20 Exhibit 45, # 21 Exhibit 46, # 22 Exhibit 47, # 23 Exhibit 48, # 24 Exhibit 49, # 25 Exhibit 50, # 26 Exhibit 51, # 27 Exhibit 52, # 28 Exhibit 53, # 29 Exhibit 54, # 30 Exhibit 55, # 31 Exhibit 56, # 32 Exhibit 57, # 33 Exhibit 58, # 34 Exhibit 59, # 35 Exhibit 60, # 36 Exhibit 61, # 37 Exhibit 62, # 38 Exhibit 63, # 39 Exhibit 64, # 40 Exhibit 65, # 41 Exhibit 66, # 42 Exhibit 67, # 43 Exhibit 68, # 44 Exhibit 69, # 45 Exhibit 70, # 46 Exhibit 71, # 47 Exhibit 72, # 48 Exhibit 73, # 49 Exhibit 74, # 50 Exhibit 75, # 51 Exhibit 76, # 52 Exhibit 77, # 53 Exhibit 78, # 54 Exhibit 79, # 55 Exhibit 80, # 56 Exhibit 81, # 57 Exhibit 82, # 58 Exhibit 83, # 59 Exhibit 84, # 60 Exhibit 85, # 61 Opposition to Statement of Facts).(Ledahl, Brian) (Entered: 11/12/2020) |
| 11/19/2020 | 177 | LETTER addressed to Judge Paul G. Gardephe from Brian D Ledahl dated November 19, 2020 re: Summary Judgment Oral Argument. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 11/19/2020) |
| 11/19/2020 | 178 | LETTER addressed to Judge Paul G. Gardephe from Andrew V. Trask dated November 19, 2020 re: Oral Argument on Motions for Summary Judgment. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/19/2020) |
| 01/05/2021 | 179 | LETTER addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated January 5, 2021 re: Supplemental Authority. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A).(Ledahl, Brian) (Entered: 01/05/2021) |
| 01/12/2021 | 180 | LETTER addressed to Judge Paul G. Gardephe from Andrew V. Trask dated January 12, 2021 re: Supplemental Authority. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 01/12/2021) |
| 02/17/2021 | 181 | LETTER addressed to Judge Paul G. Gardephe from Brian Ledahl dated February 17, 2021 re: Summary Judgment Status. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 02/17/2021) |
| 04/07/2021 | 182 | LETTER MOTION to Seal *Certain Exhibits* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 7, 2021. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Certificate of Service).(Trask, Andrew) (Entered: 04/07/2021) |
| 04/07/2021 | 183 | ***SELECTED PARTIES***JOINT LETTER MOTION for Discovery addressed to Judge Paul G. Gardephe from Amy Hayden and Andrew Trask dated 4/7/2021. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. |

| | | |
|---|---|---|
| | | (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F, # [7] Exhibit G, # [8] Exhibit H, # [9] Exhibit I, # [10] Exhibit J, # [11] Exhibit K)Motion or Order to File Under Seal: [182] .(Hayden, Amy) (Entered: 04/07/2021) |
| 04/07/2021 | [184] | JOINT LETTER MOTION for Discovery addressed to Judge Paul G. Gardephe from Amy Hayden and Andrew Trask dated 4/7/2021. Document filed by Network-1 Technologies, Inc.. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F, # [7] Exhibit G, # [8] Exhibit H, # [9] Exhibit I, # [10] Exhibit J, # [11] Exhibit K).(Hayden, Amy) (Entered: 04/07/2021) |
| 04/12/2021 | [185] | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Referred to Magistrate Judge Sarah Netburn. Dkt. Nos. 222, 247, 248, 249 (14-cv-2396) and Dkt. Nos. 157, 182, 183, 184 (14-cv-9558) Motions referred to Sarah Netburn. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/12/2021) (ks) Modified on 4/12/2021 (ks). (Entered: 04/12/2021) |
| 04/12/2021 | [186] | ORDER: On April 12, 2021, the Honorable Judge Gardephe referred several motions in the above-captioned cases to my docket for resolution. Two of those motions were for discovery. See 14-cv-02396 at ECF Nos. 248, 249; 14-cv-09558 at ECF Nos. 183, 184. In an effort to maximize efficiencies, the Court has scheduled a telephonic discovery conference for April 22, 2021, at 10:00 a.m. at which to discuss the pending discovery motions. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key., (Telephone Conference set for 4/22/2021 at 10:00 AM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 4/12/2021) (nb) (Entered: 04/12/2021) |
| 04/22/2021 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 4/22/2021. (ras) (Entered: 04/26/2021) |
| 04/23/2021 | [187] | ORDER granting (222 in case 1:14-cv-02396-PGG-SN, 157 in case 1:14-cv-09558-PGG-SN), Letter Motion to Seal; granting (247 in case 1:14-cv-02396-PGG-SN, 182 in case 1:14-cv-09558-PGG-SN), Letter Motion to Seal; denying (248 in case 1:14-cv-02396-PGG-SN, 183 in case 1:14-cv-09558-PGG-SN), Letter Motion for Discovery; denying (249 in case 1:14-cv-02396-PGG-SN, 184 in case 1:14-cv-09558-PGG-SN), Letter Motion for Discovery. As discussed at the April 22, 2021 Conference, the Court DENIES Network-1's motion to strike Google's supplemental discovery responses. The scope of this limited discovery shall be determined by the parties through a meet-and-confer process. In addition, the Court GRANTS the parties' requests to file certain documents under seal related to the discovery dispute, and GRANTS on an interim basis the parties' request to file certain documents under seal related to the summary judgment briefing. This interim sealing ruling may be revisited by Judge Gardephe in connection with his ruling on the motions for summary judgment. The parties shall file a status letter on May 6, 2021, indicating if there are any outstanding discovery disputes. Respectfully, the Clerk of Court is directed to GRANT the motions at 14-cv-02396, ECF Nos. 222, 247; and at 14-cv-09558, ECF Nos. 157, 182, and DENY the motions at 14-cv-02396, ECF Nos. 248, 249; and at 14-cv-09558, ECF Nos. 183, 184. |

|  |  | (Signed by Magistrate Judge Sarah Netburn on 4/23/2021) (ras) (Entered: 04/23/2021) |
|---|---|---|
| 04/28/2021 | 188 | TRANSCRIPT of Proceedings re: Telephone Conference held on 4/22/2021 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/19/2021. Redacted Transcript Deadline set for 6/1/2021. Release of Transcript Restriction set for 7/27/2021. (vfr) (Entered: 04/28/2021) |
| 04/28/2021 | 189 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Telephone Conference proceeding held on 4/22/2021 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days... (vfr) (Entered: 04/28/2021) |
| 05/06/2021 | 190 | PROPOSED STIPULATION AND ORDER. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 05/06/2021) |
| 05/07/2021 | 191 | JOINT STIPULATION FOR LIMITED DISCOVERY AFTER THE CLOSE OF FACT DISCOVERY: (See document.) SO ORDERED. (Signed by Magistrate Judge Sarah Netburn on 5/7/2021) (ras) (Entered: 05/07/2021) |
| 05/09/2022 | 192 | NOTICE OF CHANGE OF ADDRESS by Andrew Trask on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Trask, Andrew) (Entered: 05/09/2022) |
| 05/09/2022 | 193 | NOTICE OF CHANGE OF ADDRESS by Thomas H.L. Selby on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Selby, Thomas) (Entered: 05/09/2022) |
| 05/09/2022 | 194 | NOTICE OF CHANGE OF ADDRESS by Melissa B. Collins on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Collins, Melissa) (Entered: 05/09/2022) |
| 05/13/2022 | 195 | NOTICE OF CHANGE OF ADDRESS by Bruce Roger Genderson on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Genderson, Bruce) (Entered: 05/13/2022) |
| 05/13/2022 | 196 | NOTICE OF CHANGE OF ADDRESS by Samuel Bryant Davidoff on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Davidoff, Samuel) (Entered: 05/13/2022) |
| 05/13/2022 | 197 | NOTICE OF CHANGE OF ADDRESS by Daniel Shanahan on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Shanahan, Daniel) (Entered: |

| | | |
|---|---|---|
| | | 05/13/2022) |
| 05/13/2022 | 198 | NOTICE OF CHANGE OF ADDRESS by Jessica Bodger Rydstrom on behalf of Google L.L.C, Youtube, LLC. New Address: Williams & Connolly LLP, 680 Maine Avenue, S.W., Washington, DC, 20024, 202-434-5000..(Rydstrom, Jessica) (Entered: 05/13/2022) |
| 06/28/2022 | 199 | LETTER MOTION for Conference *Status Conference* addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated 06/28/2022. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 06/28/2022) |
| 06/30/2022 | 200 | ORDER terminating 199 Letter Motion for Conference re: 199 LETTER MOTION for Conference *Status Conference* addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated 06/28/2022. The parties will submit a joint letter by July 7, 2022 setting forth their respective positions as to whether the stipulated supplemental discovery authorized by Judge Netburn's May 7, 2021 order (Case No. 2396, Dkt. No. 256; Case No. 9558, Dkt. No. 191), including any supplemental expert reports, has any impact on the parties' pending cross-motions for summary judgment. (Signed by Judge Paul G. Gardephe on 6/30/2022) (tro) (Entered: 07/01/2022) |
| 07/07/2022 | 201 | JOINT LETTER MOTION for Discovery *Pursuant to the Courts Memorandum Order (Case No. 2396, Dkt. # 264)* addressed to Judge Paul G. Gardephe from Brian D. Ledahl and Andrew V. Trask dated 07/07/22. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 07/07/2022) |
| 07/11/2022 | 202 | ORDER granting 201 Letter Motion for Discovery. Google will provide Network-1 with the updated financial data referenced in this letter by August 5, 2022. Network-1 will provide Google with any supplemental expert reports by August 26, 2022. Google will provide Network-1 with any supplemental rebuttal expert reports by September 16, 2022. Network-1 will file any supplemental briefing not to exceed 10 pages double-spaced regarding Google's pending motion for summary judgment by September 23, 2022. Google will file any responsive supplemental briefing not to exceed 10 pages double-spaced by September 30, 2022. SO ORDERED.. (Signed by Judge Paul G. Gardephe on 7/11/2022) (ks) (Entered: 07/11/2022) |
| 09/07/2022 | 203 | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/07/2022) |
| 09/07/2022 | 204 | ***SELECTED PARTIES***JOINT LETTER MOTION for Discovery *Regarding Network-1's Supplemental Expert Report* addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)Motion or Order to File Under Seal: 203 .(Trask, Andrew) (Entered: 09/07/2022) |
| 09/07/2022 | 205 | REDACTION to 203 LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022. by Google L.L.C, Youtube, LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 |

| | | Exhibit E, # 6 Exhibit F).(Trask, Andrew) (Entered: 09/07/2022) |
|---|---|---|
| 09/15/2022 | 206 | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Referred to Magistrate Judge Sarah Netburn. Motions referred to Sarah Netburn. Case No. 14-cv-2396: Dkt. Nos. 267, 268 Case No. 14-cv-9558: Dkt. Nos. 203, 204 SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/15/2022) (ks) (Entered: 09/15/2022) |
| 09/15/2022 | 207 | MOTIONS REFERRED: 203 LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022., 204 JOINT LETTER MOTION for Discovery *Regarding Network-1's Supplemental Expert Report* addressed to Judge Paul G. Gardephe from Andrew Trask dated September 7, 2022.. Motions referred to Sarah Netburn. (ks) (Entered: 09/15/2022) |
| 09/22/2022 | 208 | ORDER granting 203 Letter Motion to Seal. (HEREBY ORDERED by Magistrate Judge Sarah Netburn)(Text Only Order) (Netburn, Sarah) (Entered: 09/22/2022) |
| 09/23/2022 | 209 | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Brian D. Ledahl dated September 23, 2022. Document filed by Network-1 Technologies, Inc... (Ledahl, Brian) (Entered: 09/23/2022) |
| 09/23/2022 | 210 | ***SELECTED PARTIES*** RESPONSE in Opposition to Motion re: 158 MOTION for Summary Judgment . *SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT*. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # 1 Appendix Appendix, # 2 Exhibit 86, # 3 Exhibit 87, # 4 Exhibit 88)Motion or Order to File Under Seal: 209 .(Ledahl, Brian) (Entered: 09/23/2022) |
| 09/26/2022 | 211 | LETTER addressed to Judge Paul G. Gardephe from Andrew Trask dated September 26, 2022 re: Partial Sealing of Plaintiff's September 23, 2022 Filing (ECF No. 210). Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/26/2022) |
| 09/26/2022 | 212 | REDACTION to 210 Response in Opposition to Motion, by Network-1 Technologies, Inc. (Attachments: # 1 Exhibit 86 FUS, # 2 Exhibit 87 Redacted, # 3 Exhibit 88 Redacted).(Ledahl, Brian) (Entered: 09/26/2022) |
| 09/30/2022 | 213 | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Andrew Trask dated September 30, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 09/30/2022) |
| 09/30/2022 | 214 | ***SELECTED PARTIES*** BRIEF re: 210 Response in Opposition to Motion, *Defendants' Response to Plaintiff's Supplemental Brief Regarding Defendants' Motion for Summary Judgment*. Document filed by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc..Motion or Order to File Under Seal: 213 .(Trask, Andrew) (Entered: 09/30/2022) |
| 09/30/2022 | 215 | REDACTION to 214 Brief, *Defendants' Response to Plaintiff's Supplemental Brief Regarding Defendants' Motion for Summary Judgment* by Google L.L.C, Youtube, |

| | | LLC.(Trask, Andrew) (Entered: 09/30/2022) |
|---|---|---|
| 10/03/2022 | 216 | DISCOVERY CONFERENCE ORDER: A discovery conference to discuss the issues raised by the parties' joint letter at 14-cv-02396 ECF No. 268 and 14cv-09558 ECF No. 204 is scheduled for Thursday, October 06, 2022, at 3:00 p.m. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. (Discovery Hearing set for 10/6/2022 at 03:00 PM before Magistrate Judge Sarah Netburn.) (Signed by Magistrate Judge Sarah Netburn on 10/3/2022) (ras) (Entered: 10/03/2022) |
| 10/06/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Discovery Hearing held on 10/6/2022. (ras) (Entered: 10/14/2022) |
| 10/14/2022 | 217 | TRANSCRIPT of Proceedings re: TELEPHONE CONFERENCE held on 10/6/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/4/2022. Redacted Transcript Deadline set for 11/14/2022. Release of Transcript Restriction set for 1/12/2023.(js) (Entered: 10/14/2022) |
| 10/14/2022 | 218 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a TELEPHONE CONFERENCE proceeding held on 10/6/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(js) (Entered: 10/14/2022) |
| 10/14/2022 | 219 | ORDER granting 204 Letter Motion for Discovery. On October 7, 2022, the Court held a discovery conference to hear arguments regarding Defendants' motion to strike the portions of Plaintiff's supplemental expert report that relate to "the '216 patent." Under Rule 26(a)(1), a party has a continuing duty to supplement its production with documents it "may use to support its claims or defenses." Plaintiff's failure to affirmatively identify the '216 patent, especially during the supplemental discovery period, violated that duty. Defendants relied on Plaintiff's silence and would be unduly prejudiced by being made to challenge the '216 patent without the aid of additional discovery. Plaintiff may not now interject information relating to the '216 patent through its expert, and therefore Defendants' motion to strike paragraphs 38-147 of the Supplemental Expert Report prepared by Dr. Michael Mitzenmacher is GRANTED. (Signed by Magistrate Judge Sarah Netburn on 10/14/2022) (ras) (Entered: 10/14/2022) |
| 10/28/2022 | 220 | LETTER MOTION to Seal addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022. Document filed by Network-1 Technologies, Inc... (Hayden, Amy) (Entered: 10/28/2022) |

| 10/28/2022 | 221 | ***SELECTED PARTIES*** BRIEF re: 219 Order on Motion for Discovery,,,, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S OBJECTIONS TO THE MAGISTRATES ORDER STRIKING PORTIONS OF ITS EXPERTS SUPPLEMENTAL EXPERT REPORT*. Document filed by Network-1 Technologies, Inc., Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit of Amy Hayden, # 2 Exhibit A, # 3 Exhibit B, # 4 Errata C)Motion or Order to File Under Seal: 220 .(Hayden, Amy) (Entered: 10/28/2022) |
| --- | --- | --- |
| 11/01/2022 | 222 | LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden dated November 1, 2022 re: October 28, 2022 under seal filing. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 11/01/2022) |
| 11/01/2022 | 223 | BRIEF re: 221 Brief, *Plaintiff Network-1 Technologies, Inc.'s Objections to Order Striking Expert Report [Redacted]*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Amy E. Hayden, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C).(Hayden, Amy) (Entered: 11/01/2022) |
| 11/11/2022 | 224 | OPPOSITION BRIEF re: 221 Brief, *Defendants' Response to Plaintiff's Objections to the Order Striking Portions of Plaintiff's Supplemental Expert Report*. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/11/2022) |
| 11/18/2022 | 225 | BRIEF re: 223 Brief, 221 Brief, *PLAINTIFF NETWORK-1 TECHNOLOGIES, INC.S REPLY IN SUPPORT OF ITS OBJECTIONS TO THE MAGISTRATES ORDER STRIKING PORTIONS OF ITS EXPERTS SUPPLEMENTAL EXPERT REPORT*. Document filed by Network-1 Technologies, Inc.. (Attachments: # 1 Affidavit of Amy Hayden, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F).(Hayden, Amy) (Entered: 11/18/2022) |
| 11/18/2022 | 226 | LETTER MOTION for Conference *Judicial Settlement Conference* addressed to Magistrate Judge Sarah Netburn from Andrew Trask dated November 18, 2022. Document filed by Google L.L.C, Youtube, LLC..(Trask, Andrew) (Entered: 11/18/2022) |
| 11/22/2022 | 227 | LETTER addressed to Magistrate Judge Sarah Netburn from Brian D. Ledahl dated 11/22/22 re: 226 LETTER MOTION for Conference Judicial Settlement Conference. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 11/22/2022) |
| 11/28/2022 | 228 | ORDER denying 226 Letter Motion for Conference addressed to Magistrate Judge Sarah Netburn from Andrew Trask dated November 18, 2022. Defendants' request is DENIED without prejudice. A brief conference is scheduled for Tuesday, November 29, 2022, at 4:00 p.m. At that time the parties should dial into the Court's dedicated teleconferencing line at (877) 402-9757 and enter Access Code 7938632, followed by the pound (#) key. The purpose of the conference is to discuss the potential for settlement in this matter and the appropriate venue in which to continue those discussions. If feasible, the parties are directed to meet and confer in advance of the conference. If this date is unavailable for any party, they must contact Courtroom Deputy Rachel Slusher immediately at (212) 805-0286. (HEREBY ORDERED by Magistrate Judge Sarah Netburn) (Text Only Order) (ras) (Entered: 11/28/2022) |

| | | |
|---|---|---|
| 11/28/2022 | | Set/Reset Hearings: Telephone Conference set for 11/29/2022 at 04:00 PM before Magistrate Judge Sarah Netburn. (ras) (Entered: 11/28/2022) |
| 11/29/2022 | | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Telephone Conference held on 11/29/2022. (ras) (Entered: 12/07/2022) |
| 01/06/2023 | 229 | JOINT LETTER addressed to Judge Paul G. Gardephe from Amy E. Hayden dated January 6, 2023 re: Supplemental Summary Judgment Briefing. Document filed by Network-1 Technologies, Inc...(Hayden, Amy) (Entered: 01/06/2023) |
| 03/14/2023 | 230 | LETTER MOTION for Conference *to request a scheduling conference at the Courts earliest convenience to set a firm schedule for resolution of the remaining motions and trial* addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 3/14/2023. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 03/14/2023) |
| 09/15/2023 | 231 | LETTER addressed to Judge Paul G. Gardephe from Marc A. Fenster dated 9/15/2023 re: Scheduling for Network-1 Technologies, Inc. v. Google, Inc., et al., Case No. 1:14-cv- 02396-PGG; Network-1 Technologies, Inc. v. Google, Inc., Case No. 1:14-cv- 09558-PGG. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 09/15/2023) |
| 09/21/2023 | 232 | MEMO ENDORSEMENT: on re: (222 in 1:14-cv-09558-PGG-SN) Letter filed by Network-1 Technologies, Inc., (286 in 1:14-cv-02396-PGG-SN) Letter filed by Network-1 Technologies, Inc. ENDORSEMENT: The Clerk of Court is directed to terminate the motions pending at Dkt. No. 284 in Case No. 14 Civ. 2396 and at Dkt. No. 220 in Case No. 14 Civ. 9558 as withdrawn by the Plaintiff. SO ORDERED. Motions terminated: (284 in 1:14-cv-02396-PGG-SN) LETTER MOTION to Seal. addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022. filed by Network-1 Technologies, Inc., (220 in 1:14-cv-09558-PGG-SN) LETTER MOTION to Seal. addressed to Judge Paul G. Gardephe from Amy E. Hayden dated October 28, 2022 filed by Network-1 Technologies, Inc. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 09/21/2023 | 233 | ORDER: granting 209 Letter Motion to Seal. The application is granted. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 273 in 14 Civ. 2396 and Dkt. No. 209 in 14 Civ. 9558. SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 09/21/2023 | 234 | ORDER: granting 213 Letter Motion to Seal. The application is granted. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 277 in 14 Civ. 2396 and Dkt. No. 213 in 14 Civ. 9558.SO ORDERED. (Signed by Judge Paul G. Gardephe on 9/21/2023) (ama) (Entered: 09/21/2023) |
| 10/11/2023 | 235 | MEMO ENDORSEMENT on re: (295 in 1:14-cv-02396-PGG-SN) Letter, filed by Network-1 Technologies, Inc. ENDORSEMENT The court is aware of the pending motions and is working on them now. The court does not have the option to transfer the case to another judge. While the delay in resolving the pending motions is regrettable it is not accurate to say that the motions have been fully briefed for 33 months. At the court's request the parties filed supplemental briefing in September |

| | | |
|---|---|---|
| | | 2022. The parties should also be aware that the court has more than 350 other civil cases, as well as a substantial criminal docket, and that substantial time was lost during the pandemic. Having said that the Court is presently engaged with this case and will to issue decisions on the pending matters as soon as possible. The application for a scheduling conference is denied, because it is not clear was purpose such a conference would serve. SO ORDERED. (Signed by Judge Paul G. Gardephe on 10/11/2023) (jca) (Entered: 10/11/2023) |
| 12/11/2023 | 236 | CONSENT MOTION for Samuel Bryant Davidoff to Withdraw as Attorney . Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Affidavit DECLARATION OF ANDREW TRASK IN SUPPORT OF GOOGLE LLCS AND YOUTUBE, LLCS UNOPPOSED MOTION TO WITHDRAW COUNSEL, # 2 Proposed Order Proposed Order).(Trask, Andrew) (Entered: 12/11/2023) |
| 12/12/2023 | 237 | ORDER WITHDRAWING COUNSEL granting 236 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED that Google LLC's and YouTube, LLC's Unopposed Motion to Withdraw Counsel is GRANTED. Samuel Bryant Davidoff is hereby terminated as counsel for Google LLC and YouTube, LLC. SO ORDERED. Attorney Samuel Bryant Davidoff terminated. (Signed by Judge Paul G. Gardephe on 12/12/2023) (tg) (Entered: 12/13/2023) |
| 03/28/2024 | 238 | LETTER addressed to Judge Laura Taylor Swain from Marc A. Fenster dated March 28, 2024 re: Network-1 Technologies, Inc. v. Google, Inc., et al., Case No. 1:14-cv-02396-PGG; Network-1 Technologies, Inc. v. Google, Inc., Case No. 1:14-cv-09558-PGG. Document filed by Network-1 Technologies, Inc...(Fenster, Marc) (Entered: 03/28/2024) |
| 04/02/2024 | 239 | ENDORSED LETTER addressed to Mr. Fenster from Judge Laura Taylor Swain dated 4/2/2024 re: I have received Network-1's March 28, 2024 letter, in connection with two related cases currently pending before Judge Gardephe. Judge Gardephe has confirmed that the relevant motions are under active consideration. Thank you for your letter. (Signed by Judge Laura Taylor Swain on 4/2/2024) (vfr) Modified on 4/22/2024 (vfr). (Entered: 04/02/2024) |
| 04/24/2024 | 240 | ***STRICKEN DOCUMENT. Document number 240 has been stricken from the case record. The document was stricken from this case pursuant to 244 Order . MEMORANDUM OPINION & ORDER re: (233 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Network-1 Technologies, Inc., (223 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Google L.L.C, Youtube, LLC. For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiffs claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiffs cross-motion for summary judgement is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223,233), to enter judgment for Defendants, and to close this case. SO ORDERED. (Signed by Judge Paul G. Gardephe on 4/24/2024) (ks) Transmission to Orders and Judgments Clerk for processing. Modified on 4/26/2024 (rro). (Entered: 04/24/2024) |

| 04/24/2024 | 241 | CLERK'S JUDGMENT re: 240 Memorandum Opinion & Order. in favor of Google L.L.C, Youtube, LLC against Network-1 Technologies, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Opinion and Order dated April 24, 2024, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiffs claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiffs cross-motion for summary judgement is denied; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 4/24/2024) (Attachments: # 1 Notice of Right to Appeal) (nd) (Entered: 04/24/2024) |
|---|---|---|
| 04/25/2024 | 242 | LETTER MOTION to Seal *Portions of Memorandum Opinion and Order* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 25, 2024. Document filed by Google L.L.C, Youtube, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit Certificate of Service).(Trask, Andrew) (Entered: 04/25/2024) |
| 04/25/2024 | 243 | ***SELECTED PARTIES***REDACTION to 242 LETTER MOTION to Seal *Portions of Memorandum Opinion and Order* addressed to Judge Paul G. Gardephe from Andrew V. Trask dated April 25, 2024. *Highlighted Version of ECF No. 242-1* by Google L.L.C, Youtube, LLC, Network-1 Technologies, Inc.Motion or Order to File Under Seal: 242 .(Trask, Andrew) (Entered: 04/25/2024) |
| 04/25/2024 | 244 | ORDER granting 242 Letter Motion to Seal. The application is granted, except as to the proposed redaction on page 63, paragraph 15-17. The proposed redactions are limited to technical information. Coverting the Context Id. system, and the Court find that Commercial interests and desire to avoid competitive harm and outweigh the presumption of access. The Clerk of Court is directed to strike 14civ2396, Dkt. 303 and 14Civ.9558, Dkt No. 240 from the public docket and replace these documents with the redacted version to be supplied by Defendants. (Signed by Judge Paul G. Gardephe on 4/25/2024) (rro) (Entered: 04/26/2024) |
| 04/26/2024 | 245 | MEMORANDUM OPINION & ORDER re: (233 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Network-1 Technologies, Inc., (223 in 1:14-cv-02396-PGG-SN) MOTION for Summary Judgment . filed by Google L.L.C, Youtube, LLC. For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223, 233), to enter judgment for Defendants, and to close this case. (Signed by Judge Paul G. Gardephe on 4/24/2024) (rro) Transmission to Orders and Judgments Clerk for processing. (Entered: 04/26/2024) |
| 04/26/2024 | 246 | CLERK'S JUDGMENT re: 245 Memorandum & Opinion in favor of Google L.L.C, Youtube, LLC against Network-1 Technologies, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's |

| | | |
|---|---|---|
| | | Memorandum Opinion & Order dated April 26, 2024, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth in the order. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied. Judgment is entered for Defendants; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 4/26/2024) (Attachments: # 1 Appeal Package) (km) (Entered: 04/26/2024) |
| 04/26/2024 | | Terminate Transcript Deadlines (km) (Entered: 04/26/2024) |
| 05/14/2024 | 247 | NOTICE OF APPEAL from 241 Clerk's Judgment,,,,. Document filed by Network-1 Technologies, Inc.. Filing fee $ 605.00, receipt number ANYSDC-29354470. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Ledahl, Brian) Modified on 5/15/2024 (km). (Entered: 05/14/2024) |
| 05/15/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 247 Notice of Appeal.(km) (Entered: 05/15/2024) |
| 05/15/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 247 Notice of Appeal, filed by Network-1 Technologies, Inc. were transmitted to the U.S. Court of Appeals. (km) (Entered: 05/15/2024) |
| 05/24/2024 | 248 | CORRECTED NOTICE OF APPEAL re: 247 Notice of Appeal, 241 Clerk's Judgment,,,,. Document filed by Network-1 Technologies, Inc...(Ledahl, Brian) (Entered: 05/24/2024) |
| 05/29/2024 | | Transmission of Corrected Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals For the Federal Circuit re: 248 Corrected Notice of Appeal. (tp) (Entered: 05/29/2024) |
| 05/29/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 248 Corrected Notice of Appeal filed by Network-1 Technologies, Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 05/29/2024) |
| 06/03/2024 | 249 | NOTICE OF DOCKETING & USCA Case Number 24-1893 from the USCA - Fed. Circuit assigned to 247 Notice of Appeal, filed by Network-1 Technologies, Inc...(nd) (Entered: 06/03/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/14/2024 19:59:31 | | |
| **PACER Login:** | Amyliz569 | **Client Code:** | 3482-2 |
| **Description:** | Docket Report | **Search Criteria:** | 1:14-cv-09558-PGG-SN |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

Appx260

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

The undersigned hereby certifies that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and the Federal Circuit Rules because the brief has been prepared using a proportionally-spaced typeface using Microsoft Word in 14-point or larger Times New Roman font or another proportionally-spaced typeface with serifs and includes 13,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), Federal Circuit Rule 32(b)(2), and Federal Circuit Rule 28(a)(12).

October 15, 2024

*/s/ Brian D. Ledahl*
Marc A. Fenster
mfenster@raklaw.com
Brian D. Ledahl
bledahl@raklaw.com
Amy E. Hayden
ahayden@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant*
*Network-1 Technologies, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on October 15, 2024, the foregoing Principal Brief of Plaintiff-Appellant Network-1 Technologies, Inc. was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Appellees' counsel, who are registered CM/ECF users, will thus be served the Non-Confidential Principal brief by the appellate CM/ECF system.

The undersigned further certifies that on this same date that the Confidential Principal Brief will be served by electronic mail to the following:

Andrew V. Trask
Michael Xun Liu
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.
Washington, DC 20024
Tel: (202) 434-5023
atrask@wc.com
mliu@wc.com
GoogleNetwork1@wc.com

Kevin Hardy
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
Tel: (202) 538-8240
kevinhardy@quinnemanuel.com

*Counsel for Appellees Google LLC and YouTube, LLC*

The undersigned additionally certifies that on October 2, 2024, Appellees' counsel consented in writing to electronic service at the above email addresses.


October 15, 2024                         */s/ Brian D. Ledahl*

Marc A. Fenster
mfenster@raklaw.com
Brian D. Ledahl
bledahl@raklaw.com
Amy E. Hayden
ahayden@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant*
*Network-1 Technologies, Inc.*