Nos. 2024-1893, 2024-1948

# United States Court of Appeals for the Federal Circuit

_____

**NETWORK-1 TECHNOLOGIES, INC.,**
*Plaintiff-Appellant*

**v.**

**GOOGLE LLC, YOUTUBE, LLC,**
*Defendants-Appellees*

_____

Appeals from the United States District Court for the
Southern District of New York in Nos. 1:14-cv-09558-PGG-
SN, 1:14-cv-02396-PGG-SN, Judge Paul G. Gardephe.

_____

## 2ND CORRECTED NON-CONFIDENTIAL PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT NETWORK-1 TECHNOLOGIES, INC.

_____

Marc A. Fenster
Brian D. Ledahl
Amy E. Hayden
RUSS AUGUST & KABAT
12424 Wilshire Blvd.
12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant
Network-1 Technologies, Inc.*

November 5, 2024

## CLAIMS AT ISSUE

**U.S. Patent No. 8,205,237, Claims 33-35 (Appx133):**

33. A computer-implemented method comprising:

    a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

    b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

    c) determining, by the computer system, an action based on the determined identification of the media work.

34. The method of claim 33, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

35. The method of claim 34, wherein the additional information is an advertisement.

**U.S. Patent No. 8,010,988, Claim 17 (Appx104):**

15. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

    a) electronically extracting features from the electronic work;

    b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

    c) electronically determining an action based on the identification of the electronic work; and

    d) electronically performing the action.

17. The method of claim 15, wherein the non-exhaustive search is sublinear.

**U.S. Patent No. 8,904,464, Claims 1, 8, 10, 16, 18, 25, 27, and 33 (Appx163-164):**

1. A method comprising:

   receiving, by a computer system including at least one computer, a first electronic media work;

   correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

   storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

   accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

   generating, by the computer system, a tag associated with the first electronic media work;

   providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

   obtaining, by the computer system from the user electronic device, a request related to the associated tag;

   generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

   providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

8. The method of claim 1, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another.

10. The method of claim 1, wherein the associated information is related to an advertisement.

16. The method of claim 1, wherein the machine-readable instructions comprise a hyperlink to a URL.

18. A method comprising:

  receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

  receiving, by the computer system, a first electronic media work;

  correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

  storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

  generating, by the computer system, a tag associated with the first electronic media work;

  providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

  receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

  generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at a user electronic device, the action; and

  providing, from the computer system to the first user electronic device, the machine-readable instructions to perform the action in response to the request.

25. The method of claim 18, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the first user electronic device are different from one another.

27. The method of claim 18, wherein the associated information is related to an advertisement.

33. The method of claim 18 wherein the machine-readable instructions comprise a hyperlink to a URL.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 24-1893, 24-1948

**Short Case Caption** Network-1 Technologies, Inc. v. Google LLC

**Filing Party/Entity** Network-1 Technologies, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/05/2024

Signature: /s/ Brian D. Ledahl

Name: Brian D. Ledahl

i

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Network-1 Technologies, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐        Additional pages attached

ii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Adam S. Hoffman<br>Russ August & Kabat | Paul A. Kroeger<br>Russ August & Kabat | Jacob R. Buczko<br>Russ August & Kabat |
| Charles R. Macedo<br>Amster, Rothstein & Ebenstein LLP | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................ vi

TABLE OF ABBREVIATIONS ............................................................ x

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES FOR APPEAL ................................... 4

I.      INTRODUCTION ................................................................... 6

II.     STATEMENT OF THE CASE .................................................. 9

        A.      Asserted Patents Overview ........................................... 9

        B.      Accused Products Overview ......................................... 12

                1.      LSH-Content-ID ................................................ 13

                2.      Siberia-Content-ID ........................................... 14

        C.      Case History .............................................................. 16

                1.      2014-2015: Network-1 filed suit; original *Markman*
                        briefing. ........................................................... 16

                2.      2015: Litigation stayed pending PTAB
                        proceedings, including through appeal. .............. 16

                3.      2015-2018: PTAB proceedings and appeals
                        confirmed patentability of the Asserted Claims;
                        construed "non-exhaustive search" under BRI ....... 17

                4.      2019: Stays ended; further *Markman* briefing;
                        *Markman* hearing addressing one of three disputed
                        terms. ............................................................... 18

                5.      2020: Cross-summary judgment motions. ............. 19

                6.      2021-2022: Supplemental discovery and briefing on
                        Google's motion. ............................................... 20

                7.      2024: District court erred in granting summary
                        judgment of non-infringement of the 237 Asserted
                        Claims and indefiniteness of the 988 and 464
                        Asserted Claims. ............................................... 20

III.    SUMMARY OF THE ARGUMENT ..........................................26

IV.    ARGUMENT ..........................................................................27

    A.    Standards of Review ....................................................27

        1.    Summary Judgment ..............................................27

        2.    Definiteness ..........................................................29

    B.    Summary judgment of non-infringement should be reversed. ...........30

        1.    Network-1 presented extensive evidence that would support a jury finding that LSH-Content-ID's search is sublinear ..............................................32

        2.    Network-1 also presented extensive evidence that would support a jury finding that Siberia-Content-ID's search is also sublinear. ................................42

    C.    The district court's finding that "non-exhaustive search" is indefinite should also be reversed.....................................................51

        1.    The intrinsic evidence, when properly viewed from the perspective of a POSITA, makes clear Network-1's construction is the correct *Phillips* construction. ..........................................................51

        2.    If this Court considers the extrinsic record, it further supports Network-1's construction and the district court's analysis of it is fatally flawed. ......................................60

VI.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................68

## <u>CONFIDENTIAL MATERIAL OMITTED</u>

Material has been redacted in the Corrected Non-Confidential Principal Brief of Plaintiff-Appellant Network-1 Technologies, Inc. The material omitted from pages 14, 15, 22, 23, 35, 41-47, 49, and 50 of the brief and pages Appx7-15, Appx58, Appx60-65, and Appx70-76 of the addendum contains information regarding Google's confidential system architecture and source code, which is covered by the terms of the governing protective orders entered by the district court.

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) ........................................................35, 36

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)........................................................29, 36, 68

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................28, 31, 45, 67

*Applications in Internet Time, LLC v. Salesforce, Inc.*,
No. 2024-1133, 2024 WL 4456271 (Fed. Cir. Oct. 10, 2024) ...........................31

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*,
338 F.3d 1368 (Fed. Cir. 2003) ........................................................30, 67

*Blue Calypso, LLC v. GroupOn, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ........................................................55

*Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*,
785 F. App'x 858 (Fed. Cir. 2019) ........................................................30, 67

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ........................................................28

*Centrak, Inc. v. Sonitor Techs., Inc.*,
915 F.3d 1360 (Fed. Cir. 2019) ........................................................27

*Continental Can Co. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) ........................................................28, 29, 34

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ........................................................34

*Eidos Display, LLC v. AU Optronics Corp.*,
779 F.3d 1360 (Fed. Cir. 2015) ........................................................52

*Google LLC v. Network-1 Techs., Inc.*,
709 F. App'x 705 (Fed. Cir. 2018) ........................................................18

*Google, LLC v. Network-1 Techs., Inc.*,
726 F. App'x 779 (Fed. Cir. 2018) ................................................................passim

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
57 F.4th 1001 (Fed. Cir. 2023) ................................................................30

*In re Am. Academy of Sci. Tech. Ctr.*,
367 F.3d 1359 (Fed. Cir. 2004) ................................................................58, 59

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ................................................................27

*Maxell, Ltd. v. Amperex Tech. Ltd.*,
94 F.4th 1369 (Fed. Cir. 2024) ................................................................30

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
959 F.3d 1091 (Fed. Cir. 2020) ................................................................59

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)................................................................29, 56, 60, 61

*Neonode Smartphone LLC v. Samsung Electronics Co.*,
No. 2023-2304, 2024 WL 3873566 (Fed. Cir. Aug. 20, 2024) ..........................65

*Nevro Corp. v. Boston Sci. Corp.*,
955 F.3d 35 (Fed. Cir. 2020) ................................................................30, 60, 65

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................passim

*Rupp v. Buffalo*,
91 F.4th 623 (2d Cir. 2024) ................................................................31

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ................................................................30

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ................................................................53

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)................................................................66, 67

*Tolan v. Cotton,*
  572 U.S. 650 (2014)......................................................28, 51

*Travel Sentry, Inc. v. Tropp,*
  877 F.3d 1370 (Fed. Cir. 2017) .......................................27

*U.S. Water Servs., Inc. v. Novozymes A/S,*
  843 F.3d 1345 (Fed. Cir. 2016) ....................................38, 39

*United States v. Rem,*
  38 F.3d 634 (2d Cir. 1994) .........................................39, 51

*Williamson v. Citrix Online, LLC,*
  792 F.3d 1339 (Fed. Cir. 2015) .......................................48

**Statutes**

28 U.S.C. § 1295 .........................................................3

28 U.S.C. § 1331 .........................................................3

28 U.S.C. § 1338 .........................................................3

28 U.S.C. § 1291 .........................................................3

**Rules**

Fed. R. Civ. P. 56(a).....................................................28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '988 patent | U.S. Patent No. 8,010,988 |
| '237 patent | U.S. Patent No. 8,205,237 |
| '464 patent | U.S. Patent No. 8,904,464 |
| Asserted Patents | the '988, '237, and '464 patents |
| 988 Asserted Claim | claim 17 of the '988 patent |
| 237 Asserted Claims | claims 33-35 of the '237 patent |
| 464 Asserted Claims | claims 1, 8, 10, 16, 18, 25, 27, and 33 of the '464 patent |
| Asserted Claims | 988 Asserted Claim, 237 Asserted Claims, and 464 Asserted Claims |
| Network-1 | Plaintiff-Appellant Network-1 Technologies, Inc. |
| Google | Defendants-Appellees Google LLC and YouTube, LLC |
| LSH-Content-ID | The LSH version of the accused Content ID system |
| LSH | locality-sensitive hashing |
| Siberia-Content-ID | The Siberia version of the accused Content ID system |
| IPR | *inter partes* review |
| CBM | covered business method review |
| PTAB | Patent Trial and Appeal Board |

| | |
|---|---|
| USPTO | United States Patent and Trademark Office |
| BRI | broadest reasonable interpretation |
| POSITA | person of ordinary skill in the art |
| The 2396 Case | Case No. 1:14-cv-02396-PGG-SN (S.D.N.Y) |
| The 9558 Case | Case No. 1:14-cv-09558-PGG-SN (S.D.N.Y) |

<u>**STATEMENT OF RELATED CASES**</u>

No appeal in or from the same civil actions in the district court was previously before this or any other appellate court.

In a set of consolidated appeals from IPR proceedings before the PTAB (No. 2016-2509 (lead appeal) and Nos. 2016-2510, 2016-2511), this Court previously addressed two of the asserted patents (the '988 and '237 patents), as reported in *Google LLC v. Network-1 Technologies, Inc.*, 726 F. App'x 779 (Fed. Cir. Mar. 26, 2018) (non-precedential), with Circuit Judges Dyk, Schall, and Reyna vacating-in-part the Board's determinations and remanding for further proceedings.

In addition, in Appeal No. 2017-1379, this Court previously addressed an appeal from a CBM proceeding before the PTAB, as reported in *Google LLC v. Network-1 Technologies, Inc.*, 709 F. App'x 705 (Fed. Cir. Jan. 23, 2018) (non-precidential), with Circuit Judges Lourie, Taranto, and Chen affirming the Board's finding that Google had not shown that the challenged claims of the '464 patent are unpatentable.

Further, claim 17 of the '988 patent is the subject of *ex parte* Re-examination No. 90/019,459, currently pending before the USPTO. Aside from this re-examination proceeding and the civil actions from which this appeal is taken, counsel for Network-1 is not aware of any cases currently pending before any court

or agency that will directly affect or be directly affected by this Court's decision in

the pending appeal.

# STATEMENT OF JURISDICTION

Network-1 filed two complaints collectively alleging infringement of the Asserted Patents. The district court had jurisdiction pursuant to 28 U.S.C §§ 1331, 1338. Network-1 appeals an April 24, 2024 summary judgment order, (1) finding Google does not infringe the 237 Asserted Claims, and (2) holding the 988 and 464 Asserted Claims invalid for indefiniteness, thus disposing of all claims and parties. Network-1 timely appealed. This Court has jurisdiction under 28 U.S.C. §§ 1291, 1295.

## STATEMENT OF THE ISSUES FOR APPEAL

1.    Did the district court err in granting summary judgment of non-infringement of the 237 Asserted Claims by ruling Network-1 failed to present evidence creating a triable factual issue as to whether <u>LSH</u>-Content-ID utilized a "sublinear" search, despite Network-1 presenting factual evidence and expert testimony that would have permitted a reasonable jury to conclude that it did?

2.    Did the district court err in granting summary judgment of non-infringement of the 237 Asserted Claims by ruling Network-1 failed to present evidence creating a triable factual issue as to whether <u>Siberia</u>-Content-ID utilized a "sublinear" search, despite Network-1 presenting factual evidence and expert testimony that would have permitted a reasonable jury to conclude that it did?

3.    Did the district court err in holding the 988 and 464 Asserted Claims invalid as indefinite, when it failed to consider, or erroneously analyzed, evidence showing a POSITA would understand "non-exhaustive search" in view of the intrinsic record to mean "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor"?

4.    If consideration of extrinsic evidence is necessary, did the district court err when it held (1) the fact that the extrinsic evidence purportedly suggests three possible constructions of "non-exhaustive search" renders the claims indefinite, and

4

(2) the extrinsic evidence is inconsistent with and does not support Network-1's construction?

## I.   INTRODUCTION

Google's accused Content-ID systems are used to automatically identify materials uploaded to its YouTube service, such as to determine if the uploaded videos contain copyrighted material belonging to others. The district court erred in granting summary judgment of noninfringement of the '237 Asserted Claims and finding Google's two versions of the accused Content-ID system did not utilize "sublinear" search algorithms. Network-1 presented more than sufficient evidence for a reasonable jury to conclude those algorithms are "sublinear," especially when all reasonable inferences are drawn in non-movant Network-1's favor as the law requires. Instead of following the summary judgment framework set forth by long-standing Supreme Court precedent, the district court improperly weighed the evidence, made credibility determinations, and drew factual inferences *against* Network-1.

The first accused version of Google's system, LSH-Content-ID, undisputedly uses an LSH (locality-sensitive hashing) search methodology. Technical papers and articles, as well as sworn deposition testimony, by a member of the Google research team that developed LSH-Content-ID's algorithm make clear all LSH-based searches are "sublinear." Other Google technical documents confirm the same. Based on this evidence, and his own analysis of Google's source code, Network-1's expert further offered expert testimony explaining why LSH-Content-ID utilized a

6

sublinear search. Rather than drawing all reasonable inferences in favor of non-movant Network-1, the district court improperly discounted the evidence of record, and drew factual inferences in favor of Google instead, including by inferring that evidence did not necessarily describe LSH-Content-ID's search algorithm, even though it is clear it does so.

For the second version, Siberia-Content-ID, Network-1 similarly presented Google technical documents, including one explicitly describing the algorithm used in the system as "sublinear." This and other technical documents, as well as fact and expert testimony, further showed Siberia-Content-ID's search is sublinear. Rather than credit this evidence as the law requires, the district court overstepped its role and weighed this evidence by relying on its own unsupported, erroneous lay expert analysis of it.

The evidence Network-1 presented in opposing Google's motion, is, at a bare minimum, enough to present triable issues of fact to overcome a motion for summary judgment. By rejecting this evidence, drawing inferences against non-movant Network-1, and making up its own (erroneous) expert analysis, the district court impinged on the province of the jury and Network-1's Seventh Amendment right to a jury trial by granting summary judgment. These rulings must be reversed.

The district court also erred in finding "non-exhaustive" as used in the 988 and 464 Asserted Claims indefinite. This ruling should also be reversed. From the

intrinsic record, considered under the proper *Phillips* standard, a POSITA would understand "non-exhaustive search" to be: "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor."

Upon reviewing the intrinsic record, a POSITA would understand the hallmark of a "non-exhaustive search" is that it is designed to locate a match (here, a "[near] neighbor") without comparing to all possible matches or records, even if no match is found. And an "exhaustive search" is designed to compare a query to all records in a dataset until a match is found or it definitively determines there is none. Under the *Phillips* framework, a POSITA would also understand the common-sense principle that neither type of search would be designed to examine extraneous, irrelevant, or any more data in a record than is needed to determine whether the record is a match, as this would consume unnecessary computing resources.

Rather than rely on a POSITA's understanding of the intrinsic record, the district court improperly held *extrinsic* evidence alone would lead to multiple possible definitions. This finding violated this Court's precedent that the mere fact that multiple definitions of a claim term are possible does not render a claim indefinite. Further, other than Network-1's proposed construction, there was no evidence of record the district court's other "possible" definitions were potentially proper in light of the intrinsic evidence. In fact, the extrinsic evidence further

supports Network-1's proposed *Phillips* construction.

The district court's indefiniteness finding should be reversed. At a minimum, factual issues regarding how a POSITA would understand the extrinsic evidence requires it be vacated and remanded for trial.

## II. STATEMENT OF THE CASE

### A. Asserted Patents Overview

Professor Ingemar J. Cox, the Asserted Patents' inventor, is a Professor of Computer Science at University College London, and deputy director of its Digital Health Hub for Antimicrobial Resistance; and a Professor of Computer Science at the University of Copenhagen, and part of its Centre for Artificial Intelligence. He is a well-known expert in the field of digital content identification, the author of a significant book on digital watermarking, and editor of *Partitioning Data Sets: With Applications to Psychology, Computer Vision and Target Tracking*. His scholarly work has been cited more than 40,000 times.

In September 2000, he filed a provisional application ultimately leading to the Asserted Patents (Appx79[1]), which describe identifying digital media content and taking actions based on the identification. Appx94 (5:37-55). He recognized "a need for techniques for identifying a [digital] work without the need for inserting an

---

[1] The Asserted Patents share the same specification, with minor modifications. Citations are to the '988 patent.

identification code." Appx93 (4:5-14); Appx94 (5:39-41). To do this, the Asserted Patents describe systems where a database of reference works (such as *known* recordings of songs, television programs, or movies) can be maintained, and each reference work is represented by a set of extracted features—an electronic "fingerprint." Appx95.

The Asserted Patents further explain *unknown* content can be compared to *known* reference works to see if there are any matches. Appx94-95 (6:31-7:10). To make that comparison possible, a "fingerprint" of the unknown video is generated, so it can be compared to the database of fingerprints of known videos. Appx94-95 (6:61-7:3).

Because doing so can consume excessive computing resources, the Asserted Patents use search methodologies that do not compare the unknown fingerprint to *all* reference fingerprints, such as "those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests" (Appx95-96 (8:60-9:55); Appx102 (21:23-39, 22:1-37)) and further explain such methodologies may allow the search to scale in a "sublinear" fashion (Appx102 (22:1-24)).

Comparisons of unknown and reference fingerprints need not be looking for exact matches, but for close matches ("neighbors"), because the system should identify two pieces of content as matching even though they have subtle differences between them. Appx95-96. For example, as was common at the time of the invention

in 2000, an unknown video might have been recorded from a broadcast television signal containing some static or "noise." Appx96 (9:1-3). Since it contains the reference television program (or part of it), designers would want the system to identify the unknown video as a match, even though not perfectly identical. *Id.* (9:39-52).

If the unknown work matches a reference work, the system can then determine actions associated with the reference work and apply the same actions to the unknown work, such as showing an advertisement with it. *Id.* (9:57-10:40); Appx103 (24:23-27).

Figure 1 is a flow diagram showing the processes detailed above (Appx82):



FIGURE 1

For the infringement issues related to the "sublinear" limitation, claim 33 of the '237 patent is representative (Appx133); for the definiteness issue related to the "non-exhaustive search" limitation, claim 17 of the '988 patent, which depends from non-asserted claim 15, is representative (Appx104).

## B.    Accused Products Overview

"Google's Content ID system is a set of tools that permits content owners … to control how their content is used on YouTube" by determining whether videos uploaded by YouTube users contain certain video, audio, or melody content. Appx4277 (¶¶22-23). "There have been two main versions:" older "LSH-Content-

12

ID" and newer "Siberia-Content-ID". Appx4278 (¶26); Appx4236.

### 1. LSH-Content-ID

LSH-Content-ID "generated 'fingerprints'" that "corresponded to the full duration of the video, audio, or melody content of a video, while a single 'subfingerprint' corresponded to a short snippet or frame of that … content." Appx4284 (¶¶69-70). "The same process was used to generate 'query' subfingerprints corresponding to content uploaded by YouTube users and 'reference' subfingerprints corresponding to content provided or identified by copyright holders or other YouTube partners." Appx4284-4285 (¶72). These subfingerprints "were further broken down into smaller pieces called [LSH] bands," which were indexed. Appx4285 (¶¶73-74).

"The search performed by [LSH-Content-ID] involved two main stages: 'Stage I,' which began with the 'LSH index lookup,' and 'Stage II.'" *Id.* (¶79). "LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database." Appx9716.

In Stage II, "the index hits produced by the Stage I LSH index lookup were further processed to eliminate candidate reference videos that were unlikely to 'match' … the user-uploaded video," by "output[ting] zero or more 'raw matches.'" Appx4288 (¶¶94, 96). The raw matches "were passed to the claiming logic, which determined whether the match met criteria necessary for a content owner to 'claim'

13

the match[]," so it could take an action, i.e., "block," "track," or "monetize" it. Appx4288-4289 (¶¶98-100).

### 2.  Siberia-Content-ID

Siberia-Content-ID operates on the same general principles, with some technical differences. Siberia-Content-ID "generates at least one 'sequence of embeddings'"—like LSH-Content-ID's "fingerprint"—that "corresponds to the full duration of the video, audio, and melody content of a video, while a single 'embedding' corresponds to a short snippet or frame of that … content"—like LSH-Content-ID's "subfingerprint." Appx4278 (¶¶28-29). The same process is used to generate "query" and "reference" embeddings. Appx4279 (¶32).

The reference embeddings are further manipulated, ▮▮▮ [manipulate], and indexed before they are searched. *Id.* (¶¶33-34). "The reference indices … are comprised of these ▮ [manipulated] values," which for the reference video index, "are divided among ▮▮ [number of] ▮▮ [a part of the architecture], each of which has one ▮▮▮ [certain type of value]'" *Id.* (¶¶35, 37). These "▮▮ [certain types of value]" are chosen so similar ▮ [manipulated] values can be "clustered" around them. *Id.* (¶38). The reference video index is divided into ▮ [number of] "shards," with "[t]he same ▮▮ [certain type of value] … replicated on each shard." Appx4280 (¶¶39-41).

Siberia-Content-ID's search "involves three main stages: 'Index Lookup,' 'Sparse,' and 'Verifier.'" *Id.* (¶43). Index Lookup, sometimes referred to as "ScaM" because it was developed by Google's Scalable Matching team, begins by comparing

14



query embeddings to all ████████ [certain type of values]. Appx4280, Appx4282 (¶¶44-45, ¶58). For the reference video index, when the parties' filed summary judgment motions, "the ████████████ [certain type of values] (out of ██████ [number]) that are most similar to [each] query embedding" were output. Appx4281 (¶48). Each "query embedding is then compared to all of the ████ [manipulated] values that reside on each of the ████████ [a part of the architecture] that were output at the preceding step," such that "from each shard the top ████ ████ [manipulated] values that are most similar to the query embedding" are output. Appx4280 (¶¶49, 52).

"The ████ [manipulated] values that are output from the index lookup stage … are subject to further consideration, including through a process known as 'sparse.'" Appx4282-4283 (¶¶59-60). "The verifier [ultimately] determines whether … references passed from the sparse stage should be classified as matching." Appx4283 (¶¶61-62).

All three stages are designed to be "tunable" such that parameters can readily be changed, such as the number of shards or ████████ [a part of the architecture], the number of ████████ [a part of the architecture] scanned, the number of "top" ████ [manipulated] values output from each shard, as well as sparse and verifier settings. Appx9790; Appx9812. To reduce computational burden and maintain sublinear scaling, Google undisputedly reduced the number of ████████ [a part of the architecture] scanned from ██ [number] to ██ [number]. Appx10331; Appx10335.

"Any matches generated by the verifier are passed to … the claiming logic, which determines whether the match meets criteria necessary for a content owner to 'claim' the match[]" so it can take action (i.e., "block," "track," or "monetize" it).

Appx4283 (¶¶63-65).

### C.    Case History

#### 1.    2014-2015: Network-1 filed suit; original *Markman* briefing.

On April 4, 2014, Network-1 filed the 2396 Case alleging infringement of four patents, including the '988 and '237 patents. Appx1001-1010. Several months later, Network-1 filed the 9558 Case alleging infringement of the '464 patent. Appx1140-1147.

In 2015, the parties submitted *Markman* briefing in the 2396 Case, including addressing "non-exhaustive search." Appx1160; Appx1176-1182; Appx1651; Appx1661-1667; Appx2223; Appx2229-2234; Appx2698; Appx2705-2708. Network-1 proposed "non-exhaustive search" be construed as "[a] search using an algorithm designed to locate a match without requiring the query to be compared to every record in the reference data set until a match is identified." Appx1176-1177. Google contended this term was indefinite (Appx1661), *despite proposing an alternative definition earlier in the litigation consistent with Network's proposed construction*: "A search that is not guaranteed to find a match, if one exists" (Appx1155; Appx1157; Appx1176-1177).

#### 2.    2015: Litigation stayed pending PTAB proceedings, including through appeal.

Prior to any *Markman* hearing or ruling, the district court stayed the 2396 Case pending IPRs, including those concerning the '988 and '237 patents. Appx2714. It

likewise stayed the 9558 Case pending a CBM on the '464 patent. Appx2713; Appx2715. At Google's request, it continued both stays pending appeals from those PTAB proceedings. Appx2716-2719.

### 3. 2015-2018: PTAB proceedings and appeals confirmed patentability of the Asserted Claims; construed "non-exhaustive search" under BRI.

The PTAB held the 988 and 237 Asserted Claims "ha[d] not been shown to be unpatentable," and adopted Network-1's proposed construction of "non-exhaustive search"—"a search that locates a match without a comparison of all possible matches." Appx5831; Appx5835-5836; Appx5848; Appx5712; Appx5717; Appx5719; Appx5735.

Google appealed as to claims other than the 988 and 237 Asserted Claims, and this Court held the PTAB's construction of "non-exhaustive search" was too narrow under BRI, instead adopting Google's proposal ("a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*"[2]) because it "is both broader than the Board's and is reasonable" and because nothing in the specification "draw[s] a clear line … in terms of how much data within a record a search must consider." *Google, LLC v. Network-1 Techs., Inc.*, 726 F. App'x 779, 785-86 (Fed. Cir. 2018) (non-precedential). In reaching this construction, this Court expressly recognized: "In order to be found

---

[2] All emphases added unless otherwise indicated.

reasonable [under BRI], it is not necessary that a claim be given its *correct* construction under the framework laid out in *Phillips* ….” *Id.* at 784 (emphasis in original). The panel remanded to the PTAB. *Id.* at 786.

In the CBM, all ’494 patent claims were upheld; this Court affirmed. *Google LLC v. Network-1 Techs., Inc.*, 709 F. App’x 705 (Fed. Cir. 2018) (non-precedential). Although the ’464 patent claims contain “non-exhaustive search,” its meaning was not at issue in the CBM because neither party proposed the term for construction. Appx3763-3752; Appx3976-4063. Google also did not contend “non-exhaustive search” is indefinite, despite being able to do so. Appx3763-3852.

> **4.** **2019: Stays ended; further *Markman* briefing; *Markman* hearing addressing one of three disputed terms.**

After three-and-a-half years, the district court lifted the stay. Appx2722-2730. The parties agreed Network-1 would only assert claim 17 of the ’988 patent and claims 33-35 of the ’237 patent in the 2396 Case (Appx2724), and Google agreed to terminate the remanded PTAB proceedings related to these patents (Appx2727).

A few months later, the parties submitted updated *Markman* briefing[3] in both cases, again addressing “non-exhaustive search,” taking into account the PTAB and appellate proceedings. Appx2736; Appx2749-2757; Appx3132; Appx3146-3154;

---

[3] The same *Markman* and summary judgment briefing, as well as various other filings and orders, were filed in both proceedings. Citations are to the 2396 Case unless otherwise indicated.

Appx3705; Appx3710-3721; Appx3955; Appx3959-3969. Network-1 proposed "non-exhaustive search" be construed as "[a] search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor." Appx2749. Google alleged indefiniteness. Appx3146.

On November 21, 2019, the district court held a *Markman* hearing; only arguments on "non-exhaustive search" were heard. Appx4093; Appx4124-4208. The district court stated it would be "adjourn[ing] until our next date to continue the remaining issues for purposes of claim construction." Appx4208. It neither held a subsequent *Markman* hearing nor issued a *Markman* order. Over six months later, the district court indicated it "will decide claim construction and summary judgment simultaneously." Appx4209.

### 5.     2020: Cross-summary judgment motions.

In 2020, the parties filed cross-summary judgment motions: (1) Google on non-infringement of the 237 and 988 Asserted Claims and indefiniteness of the 988 and 464 Asserted Claims (Appx4223-4302; Appx6444-6477; Appx10280-10301; Appx5125-5150); and (2) Network-1 on Google's invalidity theories (Appx5156-5197; Appx5954-6000; Appx5872-5898). Both sides requested oral argument. Appx10302-10303.

**6. 2021-2022: Supplemental discovery and briefing on Google's motion.**

In 2021, long after the close of discovery and full summary judgment briefing, Google served supplemental interrogatory responses, providing new information concerning Siberia-Content-ID. Despite Network-1's objection to these untimely new contentions, the district court permitted additional discovery and supplemental briefing relating to whether Siberia-Content-ID's search is "sublinear." Appx10319-10327; Appx10412-10415; Appx10398-10409.

**7. 2024: District court erred in granting summary judgment of non-infringement of the 237 Asserted Claims and indefiniteness of the 988 and 464 Asserted Claims.**

While the case dragged on for a decade with no substantive action by the district court, Network-1 made multiple inquiries about the long-pending status of the summary judgment motions, including contacting Chief Judge Swain. Appx10318; Appx10410-10420. On April 24, 2024, without conducting the requested oral hearing, the district court issued an order (Appx1-77) holding (1) Google is "entitled to summary judgment on Plaintiff's infringement claim premised on the asserted claims of the '237 Patent," and (2) "the asserted claims of the '988 and '464 Patents are invalid as indefinite." Appx1. It denied Network-1's summary judgment motion as moot (Appx2) and entered judgment against Network-1 (Appx78). Network-1 timely appealed. Appx10582-10585.

***a. District court erroneously granted summary judgment of non-infringement of the 237 Asserted Claims despite genuine issues of material fact.***

LSH-Content-ID

In holding "Network-1 has not presented evidence sufficient to create a material issue of fact as to whether [LSH-Content-ID] meets the 'sublinear' limitation" (Appx55-56), the district court discussed the various evidence Network-1 presented in opposition to Google's motion, and dismissed each piece by weighing the evidence against *non-movant* Network-1, contrary to established summary judgment law. It characterized Network-1's expert Dr. Michael Mitzenmacher's report as "quite sparse" and "conclusory and lack[ing] an adequate factual basis," but omitted and ignored much of his analysis and the extensive evidence he cited in support of his conclusions. Appx56-57 (selectively quoting Appx4429-4433 (¶¶209-213)).

The district court discounted the evidence and testimony explaining LSH-Content-ID's "inverted index is designed to be a sublinear data structure" and "is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset." Appx56 (quoting Appx4429-4430 (¶¶210-211)). Despite Mitzenmacher unequivocally stating the "search of [LSH-Content-ID] is sublinear" (*id.* (citing Appx4429 (¶209)), the district court chose to draw inferences against Network-1, by inaccurately positing what Mitzenmacher meant by

"sublinear data structure" and "sublinear subset" was not clear and Mitzenmacher allegedly "conflated the resource efficiency of a search with the scaling of the resource costs as a dataset grows." Appx57-61. The district court also summarily rejected Mitzenmacher's three-page description of Google's code (Appx4430-4433 (¶212)) as not supporting his opinion, without any explanation as to why and without citation to any contrary evidence. Appx60-61.

The district court went on to further criticize Mitzenmacher and Network-1's reliance on a document explaining "[t]he match system described in this document would use 'LSH … Tables'" structured as an "inverted index," and erroneously opined this document "does not purport to describe the [LSH-Content-ID] that Google ultimately implemented." Appx58; Appx62-65. The district court also opined even if it does, the document did not "demonstrate that [LSH-Content-ID] ***necessarily*** performed a sublinear search." Appx58. As discussed below, "necessarily" is not the correct burden to impose on Network-1 for direct infringement *at trial*, let alone as the non-movant on *summary judgment*.

Finally, the district court discounted as irrelevant scientific papers and testimony from Google employee Dr. Shumeet Baluja, who even the district court recognized "was part of the Google research team that developed the core matching technology utilized in [LSH-Content-ID]." Appx65-68. One discounted paper stated "LSH … and other mathematical functions are sublinear in the number of elements examined

22

compared to the size of the database." Appx66 (quoting Appx9716). Discounted Baluja testimony confirmed "this LSH approach allows scaling of the system to be sublinear." Appx66-67 (quoting Appx7362). Rather than draw all reasonable inferences in favor Network-1, the district court instead improperly weighed the evidence and concluded "Baluja's references to sublinearity … do not demonstrate that [LSH-Content-ID] performs sublinear searches" because he "has no role in the commercial applications resulting from his research." Appx67-68.

Siberia-Content-ID

With Siberia-Content-ID, the district court again mischaracterized the evidence and failed to draw reasonable inferences in Network-1's favor.

The district court erroneously discarded (1) text in a Google document describing Siberia-Content-ID's search algorithm explicitly stating: "<span style="color:red">algorithm</span> ███████ continues sub-linearity of the <span style="color:red">algorithm</span> ███████ cost-curve for multi-machine datasets" (Appx72 (quoting Appx9842) (emphasis in district court order)); and (2) Mitzenmacher's testimony that this document and a graph contained in it demonstrates Siberia-Content-ID's search scales sublinearly" (*id.*). Rather than recognizing a reasonable juror could rely upon Mitzenmacher's expert analysis of this document, the district court instead engaged in its own lay "technical" analysis, substituting it for that of an actual expert. It erroneously concluded the "[t]he graph does not suggest that any search performed by [Siberia-Content-ID] is sublinear

'assuming computing power is held constant,' because what it shows is an increase in the total amount of computing resources as the size of the dataset increase." Appx73. The district court cited no evidence supporting this wrong conclusion. The graph shows no such thing, and in any event at most raises a triable issue for the jury to ultimately resolve.

And although the district court recognized "[t]he evidence … shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database," it erroneously disregarded this evidence as irrelevant because the specification does not explicitly describe an algorithm that can be adjusted in this manner. Appx71. Unsurprisingly, the district court cited no authority that the specification must describe all potential infringing embodiments because such a requirement is contrary to this Court's precedents.

In addition, the district court also erroneously discounted Mitzenmacher's testimony that the three steps of Siberia-Content-ID's search, when considered collectively, are sublinear. Appx74-76. The testimony is premised on the notion that if the first (Index Lookup) step scales sublinearly, and the second (Sparse) and third (Verifier) steps take roughly a constant amount of time, as a matter of logic the overall search scales sublinearly. Appx75 (citing Appx4448 (¶230 n.197)). The district court first stated incorrectly that Mitzenmacher's testimony concerning Sparse and Verifier is "not supported by any citations to evidence," and further

erroneously opined (without evidence in support) that other of Mitzenmacher's opinions contradicted his "constant amount of time" assertion. Appx75-76.

### b. District court erroneously held the 988 and 464 Asserted Claims invalid for indefiniteness.

In analyzing "non-exhaustive search," the district court first examined the intrinsic record, erroneously concluding it "does not shed light on the correct interpretation of 'non-exhaustive search,'" noting the specification uses neither "exhaustive" nor "non-exhaustive." Appx25-27. It further discounted and largely ignored Mitzenmacher's testimony explaining how a POSITA would understand the term in view of the intrinsic record. Appx32-34.

The district court then concluded extrinsic academic articles "are of limited value here" and are inconsistent with Network-1's construction. Appx34-37. It also stated "the *extrinsic evidence* suggests that a [POSITA] might reasonably define 'non-exhaustive search' in multiple ways, including": (1) Network-1's proposed construction, (2) this Court's BRI from the IPR appeal, and (3) a "definition" the district court plucked from an article submitted by Network-1. Appx38. But it failed to address evidence of record indicating the second option is not the proper *Phillips* construction and was not meant to be as noted by this Court. And no party ever proposed the third option. Nevertheless, the district court concluded, contrary to controlling precedent, the term is indefinite "because different search algorithms could be considered 'exhaustive' or 'non-exhaustive' depending on which definition

25

is applied." *Id.*

## III.   SUMMARY OF THE ARGUMENT

1.     The district court erred when it granted summary judgment of non-infringement of the 237 Asserted Claims by <u>LSH</u>-Content-ID by failing to draw all reasonable inferences in favor of non-moving party Network-1, and improperly acting as the factfinder by weighing the evidence and evaluating expert credibility. When the technical writings and deposition testimony on the subject by Baluja, part of the Google research team that developed the LSH algorithm, other Google technical documents describing the LSH-Content-ID system, and Mitzenmacher's analysis of these documents and Google's source code are construed in the light most favorable to non-movant Network-1, summary judgment was clearly improperly granted, in contravention of a district court's limited role on summary judgment.

2.     The district court similarly erred when it granted summary judgment of non-infringement of the 237 Asserted Claims by <u>Siberia</u>-Content-ID by, again, failing to draw all reasonable inferences in favor of Network-1, and again improperly acting as the factfinder, weighing the evidence, and evaluating expert credibility. The district court improperly substituted its own erroneous technical analysis of Google technical documentation for that of non-movant Network-1's technical expert, and also improperly discarded evidence illustrating Siberia-Content-ID's search has design features that ensure it scales sublinearly, and that Google took

advantage of these sublinear design features.

3.    The district court also erred when it held "non-exhaustive search" rendered the 988 and 464 Asserted Claims invalid as indefinite. The proper construction clear from the intrinsic record alone, and the district court also failed to address critical evidence of record concerning how a POSITA would understand this term in view of the intrinsic evidence.

4.    If consideration of extrinsic evidence is needed, the district court likewise erred by (1) making numerous clearly erroneous factual findings concerning it, and (2) by holding the extrinsic evidence suggested there were three possible *Phillips* constructions of "non-exhaustive search" because such a holding is contrary to controlling precedent, and both the intrinsic and extrinsic evidence counseled to the contrary.

## IV.    ARGUMENT

### A.    Standards of Review

#### 1.    Summary Judgment

"A district court's grant of summary judgment is reviewed under the law of the regional circuit." *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019). "The Second Circuit reviews the grant of summary judgment de novo." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1377 (Fed. Cir. 2017) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)).

"Summary judgment is appropriate [only] if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013) (quoting Rule 56(a)). The movant must meet this burden "even if all material factual inferences are drawn in favor of the non-movant." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991); *see Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (It is a "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Supreme Court has long made clear "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when "he is ruling on a motion for summary judgment." *Id.* at 255. This is because "[t]he right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for

jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all of the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J. concurring).

This Court has similarly recognized "[t]he purpose of the summary process is to avoid a clearly unnecessary trial …; it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial." *Continental Can*, 948 F.2d at 1265. "While facilitating the disposition of legally meritless suits, when summary judgment is improvidently granted the effect is to prolong litigation and increase its burdens." *Id.* at 1265-66.

### 2. Definiteness

For a patent claim to be definite, it must, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art." *Id.* at 908.

"Indefiniteness must be proven by clear and convincing evidence" (*Maxell,*

*Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1372 (Fed. Cir. 2024)), including "any fact critical to a holding on indefiniteness" (*Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (cleaned up)).

This Court "review[s] indefiniteness determinations *de novo*, except necessary subsidiary fact findings, which we review for clear error." *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 37 (Fed. Cir. 2020). "To trigger clear error review, it is not enough that the district court may have heard extrinsic evidence during a claim construction proceeding – rather, the district court must have made a factual finding." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (cleaned up).

"[I]ndefiniteness 'is amenable to resolution by the jury where the issues are factual in nature.'" *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019) (non-precedential) (quoting *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003)).

**B.    Summary judgment of non-infringement should be reversed.**

The issues on appeal are whether Network-1 presented sufficient evidence for a reasonable juror to conclude, making all reasonable inferences in favor of non-movant Network-1, LSH-Content-ID and Siberia-Content-ID's search algorithms are "sublinear" as construed: "[a] search whose execution time scales with less than linear relationship to the size of the data set to be searched, assuming computing

power is held constant." Appx22. Network-1 presented extensive evidence that could lead a reasonable jury to conclude both are "sublinear." Nonetheless, the district court granted summary judgment of non-infringement in Google's favor. Appx 1, Appx50-77.

Rather than considering such evidence in the light most favorable to non-movant Network-1, the district court improperly acted as the fact-finder, weighing the evidence against Network-1, making adverse credibility determinations regarding Network-1's expert, and substituting its own lay technical analysis for that of an actual expert. The entire analysis is in contravention of a district court's long-established role on summary judgment: "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see Rupp v. Buffalo*, 91 F.4th 623, 636 (2d Cir. 2024) ("When the issue is whether a party is entitled to summary judgment, determinations of credibility, choices between permissible inferences, and the weighing of the evidence are beyond the authority of the court."); *Applications in Internet Time, LLC v. Salesforce, Inc.*, No. 2024-1133, 2024 WL 4456271, at *4-7 (Fed. Cir. Oct. 10, 2024) (non-precedential) (reversing summary judgment because "the district court failed to grant every reasonable inference in [the non-moving party]'s favor").

**1. Network-1 presented extensive evidence that would support a jury finding that LSH-Content-ID's search is sublinear.**

*a. Google's technical documentation and witness testimony create a triable factual issue.*

Google's own documents and fact witness testimony, individually or collectively, would support a jury finding that LSH-Content-ID's search is "sublinear," including (i) technical papers and testimony from a Google researcher undisputedly involved in development of the search algorithm; and (ii) design documents expressly discussing LSH-Content-ID. Each is addressed in turn below.

*i. Dr. Baluja's technical papers and testimony*

First, it is undisputed LSH-Content-ID uses LSH, the reference work LSH bands are indexed, and the reference video index is queried using LSH bands of user-uploaded videos. Appx4284-4286 (¶¶72-74, ¶¶80-82). And a full-length technical paper (Appx9714-9751) co-authored by Baluja, who the district court recognized "was part of the Google research team that developed the core matching technology utilized in Content ID" (Appx66), states: "***LSH and other hash functions are sublinear*** in the number of elements examined compared to the size of the database." Appx9716. This statement was not about a particular LSH system, but all LSH systems. Baluja explained his work in this paper was "motivated by the need to retrieve similar audio, image, and video data from extensive corpora of data," and

was "ground[ed] … in a real-world task[ of] determin[ing] from which song [an] audio snippet came." Appx9715. In a second paper (Appx9690-9703), he again describes an LSH audio identification methodology that "provides good scaling characteristics. ***When the database size is increased by 50%***, we see that we can have a ***sub-linear computation increase*** …." Appx9702; Appx9694-9696.

When asked what his second paper meant by "sub-linear computation increase," Baluja explained "using this LSH approach allows ***scaling of the system to be sublinear***" (Appx7362 (138:3-18); Appx7225), just as that term is defined in the agreed-upon construction (Appx22). He further confirmed he intended the same use of "sublinear" in the first paper. Appx7404-7405 (180:23-181:6). This evidence alone would support a reasonable jury finding LSH-Content-ID's search scales sublinearly. But the district court dismissed Baluja's papers and testimony because he "has no role in the commercial applications resulting from his research." Appx67.

Baluja, who developed the search algorithm used in LSH-Content-ID, wrote and testified about LSH in the "real-world" context of digital content recognition. Appx9715. Baluja also made clear LSH methodologies' computation time scales sublinearly as dataset size increases. Appx9716; Appx9702; Appx9694-9696; Appx7362 (138:3-18); Appx7404-7405 (180:23-181:6). It is a perfectly reasonable inference for a fact-finder to conclude Baluja's admissions that any LSH system scales sublinearly applies to LSH-Content-ID.

And nothing in the record indicates or suggests otherwise. But, even if it did, such evidence would also not justify granting summary judgment here. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1313-20 (Fed. Cir. 2005) (reversing summary judgment of infringement because even though reasonable inferences could be drawn in the favor of the *moving* party leading to the conclusion defendant infringed, reasonable inferences could also be drawn in favor of the *non-moving* party leading to the opposite conclusion); *Continental Can*, 948 F.2d at 1267 (vacating summary judgment because district court "found disputed facts adversely to the nonmovant"). The district court's fact-finding on this issue constitutes a clear example of impermissible weighing the evidence, and drawing inferences in favor of Google and against Network-1.

### ii. Google design documents

Network-1 also presented internal Google design documents describing LSH-Content-ID's search algorithm, including that its index is an "inverted index of LSH bands" with sublinear search scaling. Although one such document concerns a system called "CoverCat" (Appx9380-9389), the relevant discussion describes LSH-Content-ID itself because "[i]t is intended that this [CoverCat] system follows the same high level architecture as the ContentID fingerprinting service." Appx9380. The document indicates "[i]n cases where the design or implementation may diverge [from ContentID], a remark is made about the reason for the divergence."

Appx9382.

This document also explains an "█████" implementation is preferable, because with "███████" LSH tables, "*(CPU, RAM) will scale sublinearly*" and as such has "*good scaling characteristics for reference set growth*." Appx9387. Here, both CPU and RAM resources undisputedly reflect the amount of computing power. Appx63. Moreover, an internal Google presentation indicates LSH-Content-ID's LSH tables were in fact "cached *on local disk* for speed." Appx9602; Appx9673. And there are no "remarks" about "divergence" from LSH-Content-ID concerning preference for an ██████ solution. Appx9387. Google did not argue, let alone present any evidence, this document does not accurately describe relevant aspects of LSH-Content-ID.

Rather than accept all reasonable inferences in non-movant Network-1's favor, as required, the district court concluded this document "does not constitute 'specific evidence of direct infringement,' nor does it show [LSH-Content-ID] '*necessarily* infringes the patent[s] in suit.'" Appx65 (quoting *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007)). It held this is so because the document is "marked 'draft,' and Plaintiff has not proffered evidence demonstrating that the design(s) outlined in the document were ever implemented." Appx63.

The district court's analysis is flawed both factually, in misinterpreting the

35

document as irrelevant to LSH-Content-ID, and legally, by improperly imposing a "necessarily infringes" burden of proof on non-movant Network-1 at the summary judgment stage. Indeed, the cited authority for requiring proof of "necessarily infringing" is entirely inapplicable here. *ACCO* is an appeal from a jury trial reversing an induced infringement verdict. 504 F.3d at 1311-14. In the context of inducement, "a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Id.* at 1313. But Network-1 only alleges *direct* infringement. And perhaps more importantly, not only would such a requirement exceed the preponderance of evidence standard of proof at a civil trial, *as well as the reasonable doubt standard of proof at a criminal trial*, but it would also fly in the face of long-standing Supreme Court precedent requiring evidence "be viewed in the light most favorable to the opposing party" at the summary judgment stage. *Adickes*, 398 U.S. at 157.

> **b.    *Mitzenmacher's testimony also creates a triable factual issue concerning whether LSH-Content-ID's search is sublinear.***

Mitzenmacher, a professor of computer science at Harvard, also provided detailed expert testimony concerning why LSH-Content-ID's search is sublinear. Appx4429-4433 (¶¶209-212); Appx4317. Mitzenmacher unequivocally opines the "***search of the Content ID LSH Version is sublinear***," citing Baluja's testimony and articles, the CoverCat design document, and Google's code in support.

Appx4429-Appx4433 (¶¶209-212, citing Appx7362 (138:15-18); Appx7404-7405 (180:23-181:6); Appx9716; Appx7372-7373 (148:21-149:5); Appx9387; numerous code files). Only by discounting the details of Mitzenmacher's analysis and omitting all cited materials could the district court conclude Mitzenmacher's testimony as "quite sparse" and "conclusory and lack[ing] an adequate factual basis." Appx56-57.

He explains: "Starting from the first step, [LSH-Content-ID] is *designed to determine* a very small subset of the reference works in the database, in particular *a sublinear subset*, that could be possible matches to the input work being queried. This is through the creation of what is commonly referred to as an 'inverted index' data structure, based on the LSH bands; only reference works that match in terms of the LSH bands are subject to further analysis." Appx4429-4430 (¶210). In support, Mitzenmacher cites the design document describing LSH-Content-ID's "inverted index of LSH bands" (Appx9381) and explains "[t]he inverted index is designed to be a *sublinear data structure*" (Appx4430 (¶211)). Finally, he provides a detailed code description and opines the code confirms LSH-Content-ID's search is sublinear. Appx4430-4433 (¶212).

Second, the district court claims he does not opine LSH-Content-ID search is sublinear "by virtue of its 'inverted index' structure," apparently because he does not use the exact same words as in the claim construction. Appx57 (criticizing

Mitzenmacher's use of "sublinear data structure" and "sublinear subset"). However, the district court's criticism over word choice ignores the full context of Mitzenmacher's opinions and is not proper on summary judgment. Mitzenmacher makes clear he is applying the parties' agreed construction (Appx4327-4328 (¶37); Appx8689 (166:3-17); Appx8524), and under that construction, the "search of the Content ID LSH Version is sublinear" (Appx4429 (¶209); Appx8689-8691 (166:18-168:7)). That alone is enough to deny summary judgment.

Moreover, contrary to the district court's analysis, it is clear from the context of the report alone that a "sublinear data structure" is a data structure that allows a search to scale sublinearly, and a "sublinear subset" is that search's output. Appx4429-4430 (¶¶210-211). At his deposition, when asked what he meant by "sublinear subset," Mitzenmacher explained "the [computational] work going in to … the number of things in the subset … grow[s] sublinearly in the setting in the context of the claim construction," which is "as the number of references grows." Appx8691-8693 (168:19-170:3). The district court improperly weighed this testimony against non-movant Network-1, deriding it as "gibberish." Appx61. If the district court simply did not believe the testimony, it impinged on the province of the jury by making credibility determinations on summary judgment. *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1351-52 (Fed. Cir. 2016) (vacating summary judgment of anticipation because district court disregarded expert

38

testimony going to the heart of the anticipation issue).

Third, the district court criticizes Mitzenmacher's reliance on the design document because "this document is a draft from 2010 that does not purport to describe [LSH-Content-ID] that Google ultimately implemented." Appx58. That is Google's argumentative characterization of the document, not one a fact-finder is obliged to accept. Appx5138. The face of the document refutes Google's characterization, because as described above, it explicitly states it describes numerous aspects of LSH-Content-ID as implemented. Appx9380-9381; Appx9386-87. The district court cannot simply choose to ignore evidence requiring denial of summary judgment by falsely describing it. *U.S. Water*, 843 F.3d at 1351-52 (reversing summary judgment in part because district court ignored evidence that would support a reasonable jury finding in favor of the non-moving party); *United States v. Rem*, 38 F.3d 634, 645 (2d Cir. 1994) (same).

Fourth, the district court states "[e]ven assuming *arguendo* [LSH-Content-ID] is structured as an inverted index, that … does not demonstrate [LSH-Content-ID] *necessarily* performed a sublinear search." Appx58. But again, it cannot be non-movant Network-1's burden at the summary judgment stage to prove LSH-Content-ID "necessarily" does anything. Mitzenmacher explained the inverted index nature of LSH is sublinear and Google's design documents support that conclusion—that is more than enough evidence, even standing alone, to create a triable issue of fact.

Fifth, the district court criticizes Mitzenmacher's citation of an "inverted index" Wikipedia entry, despite no party relying on it on summary judgment. Appx58-60. The district court conducted its own lay "technical" analysis of this entry, concluding it purportedly shows "Plaintiff has conflated the resource efficiency of a search with the scaling of resource costs as a dataset grows" because a portion of it explains a search of an inverted index is more efficient than a search of a different structure called a forward index. Appx59. Besides being the wrong inquiry, more importantly, comparison of an inverted index to a forward index is not a reason Mitzenmacher contends inverted indexes are sublinear data structures. Rather, Mitzenmacher's opinion is rooted in Google documents, witness testimony, and his analysis of Google's source code. Appx4429-4433 (¶¶209-212).

Sixth, the district court claims Mitzenmacher's assertion that "'review of [Google's] source code confirm[ed]' his view that [LSH-Content-ID] meets the sublinear limitation … is devoid of analysis," and nothing in his code description suggests LSH-Content-ID's search is sublinear. Appx60-61 (quoting Appx4430-4433 (¶212)). But this is refuted by the cited paragraph itself, where Mitzenmacher quotes a code comment stating LSH-Content-ID "***uses the lsh indexes*** to find likely references and offsets which might match," discusses functions and values further confirming LSH-Content-ID uses LSH, and also describes how the code uses LSH indexes to find potential candidates and determines whether or not they are

40

ultimately "matches" across both Stages I and II of the algorithm. Appx4430-4433 (¶212).

Finally, the district court also held "another and independent reason" summary judgment is appropriate is "[i]n arguing [LSH-Content-ID] performs a sublinear search, Plaintiff addresses only Stage I of that system," not both Stages I and II. Appx68 (n.20). Not so. Mitzenmacher explicitly discusses both Stages I and II. Appx4430-4433 (¶212). He confirmed at deposition "the first step it reduces things to a sublinear number of items to consider and then subsequent to that, … you're dealing with a sublinear size data set, and so the total work remains sublinear." Appx8695-8696 (172:9-173:3); Appx8699-8700 (176:19-177:5) ("[What] I'm looking at is the entire system or the entire process sublinear with respect to the number of references in the data set."); Appx8698 (175:7-14).

> **c.** **That the parties' disagreement over operation of LSH code had already been resolved in Network-1's favor provides further evidence of sublinearity.**

As the district court recognized, Google's expert Bhattacharjee opined LSH-Content-ID's search is not sublinear because he claimed the code shows it iterates over every <span style="color:red">certain portion</span> ▮▮▮▮ of the LSH indexes, and Mitzenmacher disagreed because the code showed it does *not* do so. Appx62 (n.19). The district court recognized Bhattacharjee was wrong and Mitzenmacher was correct. *Id.* Mitzenmacher's testimony on this code provides further evidence from which a jury could conclude

41

that LSH-Content-ID's search is sublinear.

But the district court stated "[t]he fact that a search of the LSH index iterates only over [certain] portions ▮▮▮▮ … does not *necessarily* mean that a search of the index is sublinear," and faulted Network-1 for not "explain[ing] why that would *necessarily* be the case." *Id.* Another application of the legally improper "necessarily infringes" standard further highlights the district court's approach flies in the face of summary judgment precedent.

> ### 2. Network-1 also presented extensive evidence that would support a jury finding that Siberia-Content-ID's search is also sublinear.
>
> #### a. *Google's technical documentation and witness testimony create a triable factual issue.*

Google's own documents and fact witness testimony alone would support a jury finding that Siberia-Content-ID's search is sublinear. During its development, Google recognized: "Given the size of the dataset, it is clear that we will need a (customized) distributed searching service and a *sublinear search* with a certain mathematical ▮▮▮▮ representation." Appx10265. It was necessary to use a "*sublinear structure of searching*" for a "speed reason." *Id.* This is consistent with Siberia-Content-ID as implemented. Section II.B.2. The district court did not address this document, despite Network-1 citing it in opposition to Google's motion. Appx6456.

Moreover, Google employee Sanjiv Kumar testified Siberia-Content-ID uses a name of ▮▮▮▮ algorithm for Index Lookup. Appx9290 (157:6-15); Appx9133. And

other Google documentation describes that algorithm as scaling sublinearly. For example, the following graph illustrates both "████████" (lighter grey stepped line) and "███████" (darker grey line) scale sublinearly (less than "Linear Cost" (dashed line)) (Appx9842; Appx9838):



The y-axis, labelled "Query Cost (CPU)," corresponds to the amount of **computing power** required to perform a search—the "computing power" of the agreed construction of "sublinear." The x-axis, labelled "Dataset Scale (# of machines)," corresponds to the **size of the dataset to be searched** of the construction. The number of machines thus refers to machines used to store the reference data set; those are not the "computing resources" of the agreed construction.

The graph illustrates the computing resources required by both ███████ (used by Siberia-Content-ID Appx9290 (157:6-15)) and ███████ scale with less than a linear relationship (less than "Linear Cost") to the Dataset Scale (the size of the

dataset to be searched). Thus, this document explicitly shows Siberia-Content-ID uses an algorithm for which the time to conduct the search scales with less than a linear relationship to the size of the dataset to be searched, as required by the "sublinear" claim construction. Appx22. Indeed, text immediately preceding this graph confirms: "[algorithm ▓▓▓] … has ***query-costs that grow sub-linearly for increases in database size***" and "[algorithm ▓▓▓] continues the sublinearity of the [algorithm ▓▓▓] cost-curve for multi-machine datasets." Appx9482.

Mitzenmacher confirmed this understanding, explaining this graph "illustrat[es] that as the size of the reference index increases, assuming more shards are added, the search scales sublinearly" because "[t]he x-axis of the graph is equivalent to the number of shards in a given index because each shard is stored on a different machine," and "[t]he y-axis of the graph illustrates the total amount of computing power needed for searching the dataset"—the "computing power" of the agreed construction Appx4449 (¶¶232-234). He recognized Kumar indicated Siberia-Content-ID uses [algorithm ▓▓▓], but concluded "[r]egardless of whether [Siberia-Content-ID] is using what is labeled '[algorithm ▓▓▓]' or '[algorithm ▓▓▓],' according to the graph above, the search scales sublinearly." Appx4449-4450 (¶¶235-236).

The district court ignored both the plain text of this document and Mitzenmacher's testimony concerning it, instead engaging in its own improper, and ultimately incorrect, "expert" analysis by accepting Google's argumentative

characterization of this evidence. *Compare* Appx72-73 *with* Appx5131. Without citation to any supporting evidence, the district court concluded "[t]he graph cited by Plaintiff plainly contemplates that as the dataset grows, so does the number of 'machines,'" and as such, "[t]he graph does not suggest that any search performed by [Siberia-Content-ID] is sublinear 'assuming computing power is held constant,' because what it shows is an increase in the total amount of computing resources as the size of the dataset increases." Appx72-73. But the district court incorrectly equated the "# of machines" that store the dataset (what is shown on the x-axis) with the computing power required for a query (what is shown on the y-axis). In other words, the "increase" the district court identified was the *increase in the storage* required to contain an increasing reference dataset, not an *increase in computing resources* required to conduct a search or query. This erroneous "expert" analysis is a perfect illustration of why the Supreme Court repeatedly holds "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

> **b.    *That Google capitalized on Siberia-Content-ID's sublinear design provides further evidence of sublinear scaling.***

The evidence also shows Siberia-Content-ID's search algorithm has different "tunable knobs," including "how many ▆▆▆▆▆," "how many shards," and "how

part of architecture

many ██████ [part of architecture] to scan." Appx9812 (cleaned up). Before Google took advantage of any of these "tunable knobs," Mitzenmacher provided, as an example, a detailed analysis of why increasing the number of ██████ [part of architecture] leads to sublinear scaling (Appx4450-4451 (¶¶237-240)), and explained he was not proposing a hypothetical system, but rather Siberia-Content-ID's "algorithm itself is sublinear because it has this ability to change and adapt to these situations" of growing dataset size. Appx8652 (129:1-8).

Google capitalized on this sublinear design. At one point Index Lookup undisputedly "output[] the ████████████ [certain types of values] (out of ██████ [number]) that are most similar to the query embedding" and "the query embedding [wa]s compared to all of the ████ [maniputed] values that reside on the ██ [number] most similar ██████ [part of architecture]." Appx4281 (¶¶48, 50). Later, Google undisputedly reduced the ████████ [part of architecture] figure to ██ [number]. Appx10335; Appx10378 (30:12-23); Appx10349. Google engineer Matthias Konrad confirmed "[t]hese were changes making the resource costs lower."[4] Appx10379 (31:17-23). Mitzenmacher explained why reducing the number of ██████ [part of architecture] scanned, as Google did, results in sublinear scaling. Appx10395-10396 (¶¶22-24); Appx10390.

_____

[4] The district court concluded "[t]here is no evidence that Google adjusted the number of ██████ [part of architecture] examined in the second step of Index Lookup to account for an increase in the number of references in the database." Appx70 (n.21). But the evidence confirmed the dataset continuously grows over time. Appx7535 (91:14-17); Appx7444. More importantly, the agreed claim construction does not require an actual increase in dataset size over time or otherwise; it merely expresses how the search scales in relation to database size.

Despite recognizing "[t]he evidence … shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database" (Appx71), the district court ignored that evidence, and instead focused on the irrelevant undisputed fact "that if additional references were added *to the existing shard* part of architecture ▇▇▇▇ *structure*, the [Index Lookup] portion of the search would scale linearly." Appx69 (quoting Appx4316 (¶229) (emphasis in original, alternation in district court order)). But the proper inquiry is whether the algorithm *when used as designed* scales sublinearly, and the evidence would allow a reasonable jury to conclude it does. This is yet another example of the district court impermissibly weighing the evidence and drawing inferences in favor of Google, rather than in favor of Network-1 as required.

To make matters worse, it appeared to do so for reasons contrary to this Court's precedents concerning the scope of patent claims. It concluded the specification "lists exemplary sublinear search algorithms," but does not describe a "search algorithm that can be adapted to the problem using parameters – 'tunable knobs' – that can be periodically adjusted to improve the search's consumption of resources." Appx71. But there is, of course, no requirement the specification describe Google's infringing embodiment. Rather, "this court has repeatedly cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification." *Williamson v. Citrix Online, LLC*, 792 F.3d

47

1339, 1346-47 (Fed. Cir. 2015) (cleaned up). If the district court restricted the claims to the examples in the specification, that was error.

**c.**      ***Evidence supports that the overall search algorithm of Siberia-Content-ID, not just Index Lookup, is sublinear.***

Siberia-Content-ID's search undisputedly has three stages: Index Lookup, Sparse, and Verifier. Section II.B.2. There is more than sufficient evidence for a reasonable jury to conclude Index Lookup scales sublinearly. Sections IV.B.2.a-b. Mitzenmacher further explained the "***amount of time the latter two steps take would remain roughly constant*** since the number of index hits [that] comes out of the ScaM step would remain the same." Appx4448 (¶230 n.197). That the Sparse and Verifier steps take a roughly constant amount of time (rather than an amount related to the dataset size) is relevant here because it is undisputed that "a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly." Appx74. In other words, Network-1 submitted extensive evidence that no steps of the search scaled linearly, but rather involve a sublinear step (Index Lookup) and two functionally constant steps (Sparse and Verifier). As such, the overall search scales sublinearly. As explained below, the district court substituted its own erroneous mathematical understanding of this evidence for that of an actual expert in mathematics and search algorithms: Mitzenmacher.

It first faulted Mitzenmacher's analysis as "not supported by any citations to

48

evidence." Appx75. But he provides a detailed discussion with many citations to Google documents and testimony concerning the number of index hits subjected to further consideration in the Sparse and Verifier stages. Appx4440-4445 (¶¶223-226). His additional conclusions in the cited footnote are his expert opinions following from that evidence. Appx4448 (¶230 n.197).

Next, the district court concluded "other portions of Dr. Mitzenmacher's opinion contradict his assertion that the amount of time the Sparse and Verifier steps would take 'would remain roughly constant.'" Appx75. But this statement is based on nothing more than the district court's disbelief in Mitzenmacher's conclusion that Index Lookup scales sublinearly. Indeed, it agreed "the time necessary to execute the Sparse and Verifier steps would be 'constant' such that if the Index Lookup portion is sublinear, the entire Siberia search would also be sublinear." *Id.*

The court takes issue with Mitzenmacher's analysis of Index Lookup and mischaracterizes his opinions concerning it, claiming his "premise for arguing … the Index Lookup step is sublinear, however, is that 'doubling the size of the reference index by simply adding those references to the existing shards[] is not what would be done. … [A]s the size of the reference index increases, so would the number of shards and ▮▮▮▮▮▮▮.'" Appx76 (citing Appx4448 (¶230)). Of course, this was far from the only reason Mitzenmacher offered for why Siberia-Content-ID's search is sublinear, as explained in detail above. Sections IV.B.2.a-b. Moreover,

part of architecture

49

as reflected in the cited paragraph, Mitzenmacher was discussing a specific "hypothetical" example (doubling the reference index size), not generally opining the number of shards and ▮▮▮▮ would necessarily grow with any increase in reference index size.

Based on its misunderstanding of Mitzenmacher's opinions, the district court concluded: "If the number of shards in the index increased, so would the number of references output by the Index Lookup step – ▮▮ embeddings per shard – and examined by the Sparse and Verifier steps." Appx76. No evidence supported this fabricated conclusion. Rather, the evidence indicates the number of embeddings output per shard is a "tunable knob" that can be adjusted to maintain and improve upon sublinearity. Appx9812 ("N in top N"); *see* Appx76 (recognizing same). There is thus nothing "internally inconsistent" about Mitzenmacher's opinions, particularly when viewed in light of the uncontroverted evidence that Siberia-Content-ID's search was ***designed to be sublinear***. Section IV.B.2.a.[5]

---

[5] The district court held "because the Index Lookup stage outputs from each shard the top ▮▮▮▮ values that are most similar to the query embedding – regardless of how similar the embeddings are – it does not involve the uses of a 'defined threshold' as required under the parties' agreed-upon construction of 'nearest neighbor search.'" Appx74 (n.22) (cleaned up). If the district court intended this as a separate reason to grant summary judgment, there is extensive evidence indicating Siberia-Content-ID's search is "an approximate nearest neighbor search" as required by the 237 Asserted Claims. *E.g.*, Appx9935 ("Instead of LSH, ScaM is used to do Approximate Nearest Neighbor Search."); Appx9932 Appx4434-4435 (¶216). Moreover, the district court also ignored Mitzenmacher identified and analyzed numerous "defined thresholds." Appx4439-4445 (¶¶222-226). At a bare minimum,

* * *

At bottom, Network-1 presented extensive evidence that the searches of both LSH-Content-ID and Siberia-Content-ID are "sublinear." "Instead of drawing inferences that were favorable to [non-moving party Network-1], this ruling appears to have weighed the evidence and drawn inferences against [it]." *Rem*, 38 F.3d at 645. Indeed, "[c]onsidered together, the[] facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge evidence offered by the party opposing that motion." *Tolan*, 572 U.S. at 659. Because "the opinion below reflects a clear misapprehension of summary judgment standards in light of [Supreme Court] precedents" (*id.*), summary judgment of non-infringement of the 237 Asserted Claims must be reversed.

**C.** **The district court's finding that "non-exhaustive search" is indefinite should also be reversed.**

**1.** **The intrinsic evidence, when properly viewed from the perspective of a POSITA, makes clear Network-1's construction is the correct *Phillips* construction.**

"To the extent the district court considered extrinsic evidence in its … summary judgment order, that evidence is ultimately immaterial to the outcome because the intrinsic record is clear." *Eidos Display, LLC v. AU Optronics Corp.*,

---

this evidence creates a triable factual issue on whether Siberia-Content-ID's search is an "approximate nearest neighbor search."

779 F.3d 1360, 1365 (Fed. Cir. 2015) (reversing indefiniteness finding "because [plaintiff's] proposed construction … reflects how a [POSITA] would have understood the limitation after reading the intrinsic record"). Here, because the meaning of "non-exhaustive search" is clear to a POSITA from the intrinsic record alone, this Court should reverse the indefiniteness determination and construe the term as "a search designed to locate a [near] neighbor[6] without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor."

### a. The specification makes clear to a POSITA "exhaustive" searches are designed to compare to all possible matches, and "non-exhaustive" searches are designed to <u>not</u> do so.

The specification describes both exhaustive and non-exhaustive searches and differences between them in the context of the invention. The specification explains: "In previous work, it was not uncommon to perform a linear *search of <u>all</u> N entries*, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive." Appx96 (9:24-28); Appx102 (21:24-56) (describing exhaustive searches with millions and billions of comparisons). Mitzenmacher explained a POSITA would understand these portions of the specification as describing exhaustive searches.

---

[6] The district court replaced "[near] neighbor" in this construction with "match." Appx25-26. Because the "match" the "non-exhaustive" search may locate is a "[near] neighbor," this substitution does not change the construction's meaning.

Appx2781-2782 (¶¶41-42); 2764.

The specification then contrasts these exhaustive approaches with "[o]ther forms of matching includ[ing] those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests." Appx96 (9:29-32). Mitzenmacher explained these are all non-exhaustive searches and "[t]he common feature of these different examples … is that they do not potentially require comparing a query to all of the records in the data set" because "they are search strategies that narrow the number of comparisons that must be performed." Appx2783 (¶43).

This conclusion is further supported by books and articles the specification incorporates by reference.[7] Appx95 (7:38-43); Appx96 (9:13-18) ("Duda & Hart"; "Fukunaga"); *id.* (9:32-38) ("Yianilos"). Like the specification, these books and articles are part of the intrinsic record. *E.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).

Duda & Hart describe how "clustering" techniques can be used when "an exhaustive search is completely infeasible." Appx2871-2872; Appx2830-2831. Like the specification, Duda & Hart also describe an exhaustive search in terms of a huge number of potential comparisons, and explain this "approach is unthinkable for all but the simplest problems." Appx2872. As Mitzenmacher explained, "[t]he authors

---

[7] This Court did not discuss the materials incorporated by reference in its prior decision. *Google*, 726 F. A'ppx 779. Neither did the district court. Appx1-77.

distinguish exhaustive and non-exhaustive search methodologies based on whether all records potentially need to be searched." Appx2783 (¶44).

Similarly, also in the context of clustering, Fukunaga explains "an exhaustive search of all … subsets is not computationally feasible. Instead, we will settle for the minimum $J$ subsets …."—a non-exhaustive search. Appx2961; Appx2912; Appx2783 (¶45).

Yianilos similarly describes how kd-trees, vantage point trees, and excluded middle vantage point forests have the ability to perform searches without comparing to all records in the dataset. Appx1400-1411; Appx1413-1422; Appx2783-2784 (¶46).

The intrinsic evidence alone thus makes clear the salient difference to a POSITA between exhaustive and non-exhaustive searches is the former is a "search of all N entries"—all records in the dataset—and the latter is not. Appx2781-2782 (¶41) ("[T]he difference between exhaustive and non-exhaustive searches turns on the number of comparisons that must be performed between the query and the reference data set to be searched."); Appx3946 (¶8); Appx3442. This Mitzenmacher testimony provides additional clarity about how the intrinsic evidence is understood by skilled artisans.

The district court thus erred when it held "the specification does not shed light on the correct interpretation of 'non-exhaustive search,'" relying heavily on the fact

the specification does not use this exact phrase. Appx27. But "the exact terms appearing in the claim need not be used *in haec verba*" in the specification. *E.g., Blue Calypso, LLC v. GroupOn, Inc.*, 815 F.3d 1331, 1345 (Fed. Cir. 2016) (quotation marks omitted).

The district court further held "the specification does not state that 'linear correlation' or 'a linear[8] search of all N entries' should not be used." Appx29 (quoting Appx96 (9:1-25)). But the specification contrasts "a linear ***search of all N entries***," which "[i]n previous work … was not uncommon" but was "computationally very expensive" (exhaustive searches), with search methodologies not requiring a "search of all N entries" and such computational intensity (non-exhaustive searches). Appx96 (9:24-32). Moreover, it is unclear why the district court mentions "linear correlation." No party or expert raised it because it is irrelevant, as it "provide[s] a statistical measure of the confidence of the match." Appx96 (9:3-9). This is yet another example of the district court conducting its own erroneous technical analysis, despite it being inconsistent with the face of the

---

[8] The district court conflates whether a search is exhaustive or non-exhaustive with whether it scales linearly or sublinearly, and whether it searches for exact matches or "neighbors." Appx27-31. Here, "linear search" refers to a type of exhaustive search that examines records in a "fixed order," and has nothing to do with how the search scales. Appx3586 (202:15-204:10); Appx3534. Moreover, that the specification discusses "sublinear" and "neighbor" aspects of searches is unsurprising; there are claim limitations directed to such characteristics. What "sublinear" and "neighbor" searches entail are separate issues addressed by agreed-upon constructions of those terms. Appx22.

document itself. This also illustrates how it did not conduct its analysis from the viewpoint of a POSITA, as required under *Nautilus*, 572 U.S. at 908.

The district court claims "[i]t is also not clear that certain embodiments listed in the specification and claims would meet Plaintiff's proposed construction of 'non-exhaustive search'" because that construction "appears to exclude search methodologies that will always locate a neighbor." Appx30. But the plain language of Network-1's proposed construction—"a search designed to locate a neighbor … *even if* the search does not locate a neighbor"—makes clear it includes both non-exhaustive searches that will always locate a neighbor, and those that do not.

Finally, the district court claims that because certain search methodologies discussed in the specification may "visit[] essentially the entire dataset" for "a worst case query," they may not fall within Network-1's construction. Appx31. But again, the language of the proposed construction—"a search *designed to* locate a neighbor without comparing to all possible matches"—belies the district court's position. The critical aspect is that a non-exhaustive search is *designed to* not look at all possible records; that it may need to come close to doing so in rare cases does not transform it into an exhaustive search.

> **b.    *A POSITA would understand "non-exhaustive search" to turn on the number of records the search is designed to examine, not how much data within each record is examined.***

In the IPR appeal, this Court held the ***BRI construction*** of "non-exhaustive

search" was "a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*." *Google*, 726 F. App'x at 786. That panel also made clear under BRI, "it is not necessary that a claim be given its *correct* construction under the framework laid out in *Phillips*." *Id.* at 784 (emphasis in original). Here, the evidence demonstrates a POSITA would understand the BRI construction is not the proper *Phillips* construction, and Network-1's construction is. This is because, to avoid wasting computing resources, a "skilled artisan would have known not to compare against extraneous, irrelevant, or any data [in a record] beyond what is sufficient to reach a conclusion about the record," regardless of whether that search compared to all records in the dataset (exhaustive) or not (non-exhaustive). Appx3946-3947 (¶9). The district court erred by failing to address this issue in its order.

It is helpful to take a step back and understand the reasoning behind this Court's BRI in the prior appeal. There, the panel explained:

> [T]he linchpin of the claim construction analysis in this case is determining what an "exhaustive search" is. … That is so because a "non-exhaustive" search necessarily is a search that is not "exhaustive." … As a result, in terms of claim construction, what must be determined is the meaning of the word "exhaustive."

*Google*, 726 F. App'x at 782. Under BRI, the panel needed to determine the broadest possible construction for which there are no "***expressions of manifest exclusion or restriction***, representing a clear disavowal of claim scope" in the specification. *In re*

*Am. Academy of Sci. Tech. Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004). This differs from the *Phillips* standard under which the proper construction is "the meaning that the term would have to a [POSITA] … not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Applying BRI, the panel reasoned "the broadest construction of 'non-exhaustive' searching corresponds to the *narrowest* construction of 'exhaustive searching.'" *Google*, 726 F. App'x at 783 (emphasis in original). It then set out to find the narrowest meaning for "exhaustive," and determined such a definition "requires considering the entirety of each potential match." *Id.* The panel found the BRI of "non-exhaustive" search to be the opposite—"a search that locates a match without conducting a brute-force comparison of all possible matches, *and all data within all possible matches*." *Id.* at 786.

The panel did not determine what the proper *Phillips* construction is or rule Network-1's construction was incorrect under *Phillips*. Thus, contrary to the district court's conclusion (Appx26-29), the panel did not reject Network-1's analysis of the intrinsic record presented in Section IV.C.1a. Rather, it merely found, in applying BRI, the specification does not "draw a clear line between 'exhaustive' and 'non-exhaustive' searching in terms of how much data within a record a search must

consider in order to qualify as one or the other." *Google*, 726 F. App'x at 785. The panel was simply looking for, as it had to under BRI, "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" in the specification. *Am. Academy*, 367 F.3d at 1365.

Network-1 agrees the specification does not include an explicit disclaimer regarding how much data *within a record* any search must consider. But testimony before the district court (but not before the PTAB or IPR appeal panel) makes clear a POSITA "would have recognized there is no reason the specification should do so." Appx3946-3947 (¶9). Mitzenmacher further explained the common-sense proposition:

> To avoid examining unnecessary data and using more computer resources than necessary, the skilled artisan would have known not to compare against extraneous, irrelevant, or any data beyond what is sufficient to reach a conclusion about the record—such searches are simply not conducted and therefore are of course not described in the literature.

*Id.* (¶9); *see also* Appx3948-3949 (¶11); Appx3952-3953 (¶16); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1102 (Fed. Cir. 2020) ("A patent need not teach, and preferably omits, what is well known in the art.") (cleaned up). Google presented no evidence showing a POSITA would waste computational resources by comparing extraneous, irrelevant, or any data beyond what is sufficient to reach a conclusion about a given record. The evidence thus illustrates a POSITA would have known "[t]he amount of data in each record compared to the query is

not the relevant distinction; the relevant distinction is the number of records compared." Appx3946-3947 (¶9).

Because the proper *Phillips* construction is clear from a POSITA's understanding of the intrinsic record alone, the Court should reverse the district court's indefiniteness finding, and construe "non-exhaustive search" as proposed by Network-1.

**2. If this Court considers the extrinsic record, it further supports Network-1's construction and the district court's analysis of it is fatally flawed.**

The district court's indefiniteness finding is premised on the legally erroneous conclusion that because "the ***extrinsic evidence*** suggests that a [POSITA] might reasonably define 'non-exhaustive search' in multiple ways," "non-exhaustive search" is indefinite. Appx38. But even assuming there are multiple possible *Phillips* constructions (there are not), that formulation is contrary to controlling precedent. "The test for indefiniteness is whether the claims, viewed in light of the specification and prosecution history, 'inform those skilled in the art about the scope of the invention with reasonable certainty.' ***The test is not merely whether a claim is susceptible to different interpretations. Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction.***" *Nevro*, 955 F.3d at 41 (quoting *Nautilus*, 572 U.S. at 910). *Nautilus* "declin[ed] to adopt a test rendering a patent invalid 'when a claim is ambiguous,

such that reasonably could interpret the claim's scope differently.'" *Id.* (quoting *Nautilus*, 572 U.S. at 909).

Here, the district court posited three "reasonable" constructions in view of the extrinsic evidence: (1) Network-1's proposed *Phillips* construction; (2) this Court's BRI construction from the IPR appeal; and (3) a "definition" from the extrinsic source "Denny," which neither party proposed: "search strategies that traverse the search space more or less at random and thus certain states may never be examined." Appx38 (cleaned up). But only the first definition (Network-1's proposal) is supported by both the intrinsic and extrinsic records; the second definition was determined under a different legal framework (Section IV.C.1.b); and the third "definition" is not a definition at all, but rather a description of how a non-exhaustive search algorithm may operate.

### a. *Extrinsic references offer the same distinction between "exhaustive" and "non-exhaustive" searches as the Asserted Patents.*

Network-1 presented numerous extrinsic references, none of which was before this Court in the prior IPR appeal. For example, Denny explains "***non-exhaustive search*** strategies … traverse the search space more or less at random and thus ***certain states may never be examined***." Appx3011; Appx3003. Denny additionally describes two techniques as "non-exhaustive because it ***cannot be guaranteed that every state within the search space will be examined***." Appx3010;

Appx2786 (¶52). Like the intrinsic record, Denny makes clear the difference between exhaustive and non-exhaustive searches is whether all "states" are examined or not. The district court ignored this relevant point, instead focusing on Denny's description of non-exhaustive searches "travers[ing] the search space more or less at random" (Appx3011), concluding this is a possible construction despite no party or expert proposing it (Appx38), and finding Network-1's proposal "inconsistent" with Denny because it does not contain similar language (Appx35). But this language simply describes *how* a non-exhaustive search may operate, not what it is or what it is designed to do. If the district court's conclusion that "traversing the search space more or less at random" is a possible construction amounts to fact-finding, that was clear error. Section IV.C.2.b.

The district court also points to Denny's "backtracking"/"pruning" and Mitzenmacher's testimony concerning it, concluding both are inconsistent with Network-1's construction. Appx33-36. But Denny states "[b]acktracking is a general term representing a technique for performing an ***exhaustive search***," and describes that backtracking algorithms can "use intelligent pruning techniques, such as rejecting partial feasible solutions which either cannot extend to valid solutions or are equivalent in some way to feasible solutions already considered." Appx3012. Mitzenmacher explained this "search is still exhaustive because … you're implicitly or even in some sense explicitly ***doing the comparison of the [query] against every***

*item*." Appx3579 (175:14-176:8); Appx3582 (186:3-12). Thus, "Denny's 'pruning' relates to the length of time needed for individual comparisons …, not the number of comparisons needing to be performed." Appx2786 (¶52 n.3). If the district court's conclusion that Denny's "backtracking"/"pruning" meets Plaintiff's proposed construction of "<u>non</u>-exhaustive search" amounted to fact-finding, that was also clear error. Section IV.C.2.b.

As another example, Orwant explains "[t]he technique of generating and analyzing all of the possible states of a situation is called an *exhaustive search*. An exhaustive search is the generative analog of linear search—try everything until you succeed or run out of things to try." Appx3017 (emphasis in original); Appx3015. The district court acknowledged "Orwant's definition of exhaustive search appears similar to Plaintiff's," but then points to a portion of Orwant, a reference focused on searches relevant to computer gaming, stating "the definition of exhaustive search is vague. The exact meaning of 'try everything' depends upon the particular problem. Each problem has its own way of trying everything, and often many different ways." Appx36 (quoting Appx3020); Appx2787 (¶53). These statements concern nothing more than the unremarkable proposition that two searches with different goals or applications, even if both exhaustive, may be performed in different ways. Appx3950-3951 (¶¶12-13). They do not indicate that "try everything" (the salient feature of an exhaustive search) is "vague."

Separately, Google's own patents also use this terminology consistent with the Asserted Patents. U.S. Patent No. 7,831,438 states "an ***exhaustive search*** may be performed ***over all $2^n$ T's***," where T corresponds to a dataset of titles. Appx3060 (8:1-18); Appx3041. This is akin to the Asserted Patents' description of a "search of all $N$ entries." Appx96 (9:24-28); Appx2787-2788 (¶54). And like the Asserted Patents, U.S. Patent No. 8,065,733 describes applications where the "solution 'space' is too large to perform an exhaustive search over" because "the number of possible numerical solutions to a given problem exceeds an available or allowed computation capacity." Appx3082 (9:7-12); Appx3067; Appx2787-2788 (¶54). The district court ignored the plain text of these patents, and Mitzenmacher's testimony concerning them, when it held, without explanation, "the use of [exhaustive search] in Google's patents sheds no light on the proper construction of 'non-exhaustive search.'" Appx37 (n.14). If this amounts to fact-finding, this was clear error. Section IV.C.2.b.

> ### b. *The district court's fact-finding on the extrinsic evidence should be vacated for clear error.*

The only fact-finding the district court arguably did was conclude (1) Denny's "traverse the search space more or less at random" was a viable construction (*supra* at 62); (2) Denny's exhaustive "backtracking" algorithm would fall within the scope of Network-1's construction of "non-exhaustive search" (*supra* at 62-63); (3) Google patents that use "exhaustive search" "shed[] no light on the proper

construction of 'non-exhaustive search'" (*supra* at 64); and (4) "the *extrinsic evidence* demonstrates that the term 'non-exhaustive search' has multiple possible meanings" (Appx41). The first three findings were clearly erroneous. *Supra* at 62-64.

The "multiple possible meanings" finding was also clearly erroneous. The alleged "possible meanings" are Network-1's *Phillips* construction, this Court's BRI construction, and Denny's "traverse the search space more or less at random" language. Appx38. But the BRI construction is not the correct *Phillips* construction (Section IV.C.1.b) and the conclusion this language from Denny could be is clearly erroneous (*supra* at 62).

But even if there were three possible constructions, that is not the proper test for indefiniteness. *Nevro*, 955 F.3d at 41; *supra* at 60-61. This Court recently rejected this exact reasoning. In *Neonode Smartphone LLC v. Samsung Electronics Co.*, Samsung argued a term was indefinite because it "has three possible meanings, with no way to choose among them." No. 2023-2304, 2024 WL 3873566, at *4 (Fed. Cir. Aug. 20, 2024). The panel explained "Samsung cannot establish indefiniteness by merely identifying different ways one could interpret the [disputed] limitation. Such a test would render nearly every claim term indefinite so long as a party would manufacture a plausible construction." *Id.* (cleaned up). The panel also found they could "quickly dispose of Samsung's second and third proposed meanings as

inconsistent with the intrinsic record." *Id.* at *5. The Court can do the same here.

Section IV.C.1.b; *supra* at 62. The "multiple possible meanings" finding should be

vacated for clear error.

> ### c. *If this Court remands the definiteness issue, it should remand for a jury trial because there are factual issues concerning the extrinsic evidence that preclude summary judgment.*

The district court's grant of summary judgment of indefiniteness was

inappropriate because there are triable issues of disputed fact requiring resolution by

a jury. The district court held that "Plaintiff's citation to pre-*Teva* case law for the

proposition that the submission of extrinsic evidence creates an issue of fact for the

jury is unpersuasive." Appx40-41 (n.16).

First, it is not Network-1's position that mere submission of extrinsic evidence

creates triable factual issues. Rather, as with any summary judgment issue, the

extrinsic evidence must create genuine disputes of fact. In this case it does. Section

IV.C.2.a-b.

Second, the district court's reliance on *Teva Pharmaceuticals USA, Inc. v.

Sandoz, Inc.*, 574 U.S. 318 (2015) to imply indefiniteness cannot be a jury issue is,

at best, misplaced. In *Teva*, a Hatch-Waxman case in which there is no right to a jury

trial, the Supreme Court held subsidiary fact determinations in claim construction

orders are reviewed for clear error, not *de novo*. *Id.* at 322. It did not address whether

genuine issues of fact preclude summary judgment of indefiniteness in a jury case because that issue was not before it.

This Court has, post-*Teva*, rejected the argument that indefiniteness cannot be a jury issue, confirming "indefiniteness 'is amenable to resolution by the jury where the issues are factual in nature.'" *Bombardier*, 785 F. App'x at 867 (quoting *BJ Servs.*, 338 F.3d at 1372). Here, disputed factual issues concerning the extrinsic record are, for example, (1) whether a POSITA would have understood whether "backtracking"/"pruning" is an "exhaustive" or "non-exhaustive" search; and (2) whether a POSITA would have understood Google's use of "exhaustive search" in its patents as informative of the differences between "exhaustive" and "non-exhaustive" searches.

As in *Bombardier*, "[t]he evidence presented on these topics was almost exclusively extrinsic, in large part encompassing warring expert testimony." *Id.* Indeed, Google's expert James Storer expressly disagreed with Mitzenmacher on how the extrinsic evidence should be viewed. *Compare* Appx3179-Appx3195 (¶¶42-80); Appx3161 *with* Appx2786-Appx2788 (¶¶51-55); Appx3948-3953 (¶¶11-17).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when "he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

Rather, Network-1 has "[t]he right to confront, cross-examine and impeach adverse witnesses" like Storer because this "is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases." *Adickes*, 398 U.S. at 176. If this Court finds evaluation of extrinsic evidence necessary, it should remand for a jury trial on this issue.

## VI. CONCLUSION AND STATEMENT OF RELIEF SOUGHT

This Court should reverse the district court's grant of summary judgment of non-infringement of the 237 Asserted Claims because Network-1 presented more than enough evidence concerning the "sublinear" limitation, for both versions of Content-ID, for the issue to go to the jury.

This Court should also reverse the district court's holding that "non-exhaustive" renders the 988 and 464 Asserted Claims indefinite, and construe it as "a search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor," as it is clear from the intrinsic record that is the proper construction. Alternatively, if this Court finds consideration of extrinsic evidence necessary, it should vacate the district court's clearly erroneous fact-finding and remand for a jury trial, as disputed issues of fact concerning the extrinsic evidence preclude summary judgment, including competing expert testimony.

November 5, 2024

Respectfully submitted,

*/s/ Brian D. Ledahl*
Marc A. Fenster
mfenster@raklaw.com
Brian D. Ledahl
bledahl@raklaw.com
Amy E. Hayden
ahayden@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant*
*Network-1 Technologies, Inc.*

# ADDENDUM

## Addendum Table of Contents

| Page No. | Document |
| --- | --- |
| Appx1-77 | Claim Construction and Summary Judgment Memorandum Opinion and Order (Dkt. No. 303) |
| Appx78 | Judgment (Dkt. No. 309) |
| Appx79-105 | U.S. Patent No. 8,010,988 ("the '988 patent") |
| Appx106-134 | U.S. Patent No. 8,205,237 ("the '237 patent") |
| Appx135-164 | U.S. Patent No. 8,904,464 ("the '464 patent") |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NETWORK-1 TECHNOLOGIES, INC.,

Plaintiff,

-against-

GOOGLE LLC and YOUTUBE, LLC,

Defendants.

**MEMORANDUM
OPINION & ORDER**

14 Civ. 2396 (PGG)
14 Civ. 9558 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Network-1 Technologies, Inc. alleges that Defendants Google LLC and

YouTube LLC (collectively, "Defendants" or "Google") have infringed three of Plaintiff's

patents in connection with Defendants' "Content ID system and its implementation . . . [on] the

YouTube [web]site." (Cmplt. (Dkt. No. 2) ¶¶ 28, 34; 14 Civ. 9558 Cmplt. (Dkt. No. 1) ¶ 28)[1]

Plaintiff alleges that Defendants have infringed the following patents: United States Patent No.

8,010,988 (the "'988 Patent"); U.S. Patent No. 8,205,237 (the "'237 Patent"); and U.S. Patent

No. 8,904,464 (the "'464 Patent").

Pending before the Court are (1) the parties' proposed construction of claims; (2)

Defendants' motion for summary judgment on grounds of non-infringement; (3) Plaintiff's

cross-motion for summary judgment as to certain affirmative defenses; and (4) Plaintiff's appeal

from an October 14, 2022 discovery order issued by Magistrate Judge Sarah Netburn.

For the reasons stated below, the Court concludes that the asserted claims of the

'988 and '464 Patents are invalid as indefinite, and that Defendants are entitled to summary

judgment on Plaintiff's infringement claim premised on the asserted claims of the '237 Patent.

---

[1] Unless otherwise noted, all citations refer to the docket in 14 Civ. 2396.

Plaintiff's cross-motion for summary judgment will be denied, and Plaintiff's appeal from Judge Netburn's discovery order will be denied as moot.

## I.   FACTS[2]

### A.   Plaintiff's Patents

All three patents at issue were originally issued to Dr. Ingemar Cox, a professor of computer science at University College London.  These patents are now owned by Plaintiff. (See Cmplt. (Dkt. No. 2) ¶¶ 7-10)

The patents at issue "link[] traditional media to new interactive media, such as that provided over the [i]nternet," and address the "identif[ication] [of] a [media] work without the need of inserting an identification code into a [media] work." ('988 Patent (Dkt. No. 148-4) col. 1, 4); '237 Patent (Dkt. No. 148-5) col. 1, 4 (same); '464 Patent (Dkt. No. 148-6) col. 1, 4 (same))[3] "[E]mbodiments consistent with the [patents at issue] provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determine an action based

---

[2] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

[3] Except as to deposition transcripts and patents, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  With respect to deposition transcripts, the Court cites to the page numbers originally assigned by the court reporter.  With respect to patents, the Court cites to the internal sheet, figure, and column numbers.

on the identification of the media work determined." ('237 Patent (Dkt. No. 148-5) col. 4; '464 Patent (Dkt. No. 148-6) col. 4 (same); '988 Patent (Dkt. No. 148-4) col. 4 (same))

Claim 15 of the '988 Patent concerns:

A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting features from the electronic work;

b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

('988 Patent (Dkt. No. 148-4) col. 25-26)

Claim 17 of the '988 Patent concerns "[t]he method of claim **15**, wherein the non-exhaustive search is sublinear." (Id. at col. 26 (emphasis in original))

Claim 33 of the '237 Patent concerns:

A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined identification of the media work.

('237 Patent (Dkt. No. 148-5) col. 28)

3

Appx3

Claim 34 of the '237 Patent concerns "[t]he method of claim **33**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work." (<u>Id.</u> (emphasis in original))

Claim 35 of the '237 Patent concerns "[t]he method of claim **34** wherein the additional information is an advertisement." (<u>Id.</u> (emphasis in original))

Claim 1 of the '464 Patent concerns:

A method comprising:

receiving, by a computer system including at least one computer, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

obtaining, by the computer system from the user electronic device, a request related to the associated tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

('464 Patent (Dkt. No. 148-5) col. 24-25)

4

Appx4

Claim 8 of the '464 Patent concerns "[t]he method of claim **1**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another." (Id. at col. 25 (emphasis in original))

Claim 10 of the '464 Patent concerns "[t]he method of claim **1**, wherein the associated information is related to an advertisement." (Id. (emphasis in original))

Claim 16 of the '464 Patent concerns "[t]he method of claim **1**, wherein the machine-readable instructions comprise a hyperlink to a URL." (Id. (emphasis in original))

Claim 18 of the '464 patent concerns:

A method comprising:

receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

receiving, by the computer system, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

5

Appx5

> providing, from the computer system to the first user electronic device, the machine-readable instructions to perform the action in response to the request.

(Id. at col. 25-26).

Claim 25 of the '464 Patent concerns "[t]he method of claim **18**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another." (Id. at col. 26 (emphasis in original))

Claim 27 of the '464 Patent concerns "[t]he method of claim **18**, wherein the associated information is related to an advertisement." (Id. (emphasis in original))

Claim 33 of the '464 Patent concerns "[t]he method of claim **18**, wherein the machine-readable instructions comprise a hyperlink to a URL." (Id. (emphasis in original))

## C. **Defendants' Websites**

Defendants operate the website www.youtube.com and the mobile website m.youtube.com and related mobile applications (collectively, "YouTube"). (See Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 21) YouTube allows internet users to upload content – whether video, audio, or melody – to the internet, where content is generally viewable by the public. (See id. ¶¶ 22-24)

Google employs a "Content ID" system in connection with YouTube. The Content ID system allows content owners – "e.g., individuals and entities that own rights to music, television shows, and movies" – to control how their content is used on YouTube. (Id. ¶ 22) The Content ID system determines "whether videos uploaded by YouTube users contain [] video, audio, or melody content" that "belongs" to another person – for example, a copyright holder. (Id. ¶¶ 23-24; Pltf. R.56.1 Counterstmt. (Dkt. No. 240-61) ¶ 23) "For example, if a

6

YouTube user uploads a video of herself dancing to a popular song, then the Content ID system may generate a match between the . . . user-uploaded video and . . . the popular song (i.e., the reference work)" and take some predetermined action based on that match. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 25) The Content ID system generates matches by comparing uploaded videos ("query works") to a database of reference works. The reference works may have been uploaded to YouTube by users, or otherwise provided to YouTube by the reference work's author or owner, or another rightsholder. (See id. ¶¶ 28, 32)

According to Plaintiff, there are two versions of Google's Content ID system that infringe on Plaintiff's patents: an "older" version known as the "LSH" version, and a "newer" version known as "Siberia." (See id. ¶¶ 26-27) Implementation of the Siberia system began in approximately 2014. (See Pasula Dep. (Dkt. No. 240-5) at 11)

### 1.    The LSH Version of Content ID

The LSH version of Google's Content ID system generates "fingerprints" that each represent an individual piece of "video, audio, [or] melody content . . . uploaded or otherwise provided to YouTube." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 69-70) Each fingerprint is comprised of several "subfingerprints" corresponding to short snippets of that content. (Id. ¶ 70) Subfingerprints for both query works and reference works are generated in the same manner. (Id. ¶¶ 71-72) For indexing purposes, subfingerprints are organized into ███████████ called "locality sensitive hashing" ("LSH") bands. (Id. ¶¶ 73-75) "The number of unique LSH bands is finite; specifically, there are ██ ████████████████ " and the same LSH band could be associated with multiple videos. (Id. ¶¶ 77-78)

"[T]he LSH index [can] be visualized as a 'table' in which each unique LSH band is assigned its own 'row' and each reference video is assigned its own 'column.'" (Id. ¶ 84)

7

Appx7

Indeed, the structure used to store the LSH bands for reference videos is known as Big Table. (Pltf. R. 56.1 Counterstmt (Dkt. No. 240-61) ¶ 159; Erbo Dep. (Dkt. No. 240-3) at 75 ("[The LSH Version of Content ID was] implemented in terms of a Google Technology called Big Table, which is a distributed key value store.")) Each new reference video added to the LSH index represents a new column in the table, reflecting the LSH bands associated with the new reference video. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 91-93)

"Stage I of the LSH version of the Content ID system [begins] by searching [the] index . . . for any LSH bands [associated with reference works] that are exact matches to any of the [query] LSH bands of the user-uploaded video." (Id. ¶ 80) "A search of the LSH index using a particular query LSH band searched only the row assigned to that particular LSH band and did not search any of the other rows in the conceptual table." (Id. ¶ 85) In other words, a search of the LSH index returns only the references associated with a particular LSH band, and

███████████████████████████████████████████████████████████

██████████████████████████████ (Pltf. R. 56.1 Counterstmt (Dkt. No. 240-61) ¶¶ 159-62)

The output for a Stage I search of the LSH version of Content ID is a list of all of the reference videos associated with the query LSH bands of a newly uploaded video, "as well as the pertinent point(s) in time in each reference video with which the LSH band[s] are associated." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 87) "A typical user-uploaded or reference video ████████████████████████████████████████████ ██████████████████, and one subfingerprint corresponds to only a short snippet or frame of video, audio, or melody content." (Id. ¶ 90)

8

Appx8

The "index hits" returned by a Stage I search are then further processed "to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from reference work to features extracted from the [query video]." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 201; see also Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 94) The "projection filter" first analyzes the videos by ███████████████████ ████ to determine whether the query video and a particular reference video share sufficient similarities over time – that is, over enough time of the reference video – to be considered a match.[4] (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 202)

Stage II of the LSH search compares full fingerprints of query videos to each reference video to determine the number of "raw matches." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 96)

The raw matches are then passed through the "claiming logic" to determine whether the owner of the relevant reference video could "claim" the matching portion of the query work and which "match policy" should be applied to the query work. (Id. ¶¶ 97-99)

### 2.    The Siberia Version of Content ID

The Siberia version of Google's Content ID system generates "embeddings" corresponding "to a short snippet or frame of [the] video, audio, or melody content" uploaded to YouTube. (Id. ¶ 29) As explained by Google, each embedding represents a single frame in a video, and represents a point in a ██████████████. (Id. ¶ 30; Pasula Dep. (Dkt. No. 240-

---

[4] The Court understands "Hamming similarities" to refer to a form of "Hamming distance," which generally measures "the number of . . . places in which [works] differ from one another." Andrew Butterfield, et al., A Dictionary of Computer Science (7th ed. 2016). Here, "Hamming similarities" refer to the number of places in which works are similar. (See Mitzenmacher Dep. (Dkt. No. 240-9) at 292 ("[T]he [H]amming similarity . . . essentially counts the number of matching positions. . . . [I]n this case, the score is meant to correspond to a level of similarity between the two objects specifically.")).

9

Appx9

5) at 22-24 ("[An embedding] . . . is a point in a ███████████[,] . . . a vector which is a description of a point in space. . . . [A]n individual embedding    . . . [is] a single frame [in a video].")) For each video uploaded to YouTube, Siberia generates a "'sequence of embeddings' corresponding to the [work's] video, audio, and melody content." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 28 (quoting Pasula Dep. (Dkt. No. 240-5) at 29)) The embeddings are generated by a ██████████ that is part of a Google artificial intelligence project. (Id. ¶ 31) The same process is used to create both the "query" embeddings "corresponding to videos uploaded by YouTube users" and the "reference" embeddings "corresponding to content . . . provided or identified by copyright holders or other YouTube partners." (Id. ¶ 32)

The reference embeddings are then "further manipulated" into uniformly structured ██████████ which are in turn stored in multiple references indices for searching. (Id. ¶¶ 33-35; Pasula Dep. (Dkt. No. 240-5) at 45-46 ████████████ ██████████)) The hashing enables the Siberia system to store the reference embeddings in a smaller form and to search the reference indices more quickly. (See Pasula Dep. (Dkt. No. 240-5) at 47, 56 ████████████ ████████████████████ ████████████)) "The reference indices that are searched as part of the Siberia Version of the Content ID system are ██████████ ████████"[5] (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 35)

---

[5] Plaintiff denies that the indices store only "hash values," and contends that "complete embeddings for the reference work are also retained in the reference index and are used for comparisons as part of the Siberia system search algorithm." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 35) In support of this assertion, Plaintiff cites an excerpt from a report prepared by Dr. Michael Mitzenmacher, its expert witness. The excerpt cited by Plaintiff states, however, that "[t]he ██████████ of each embedding is what is stored in the reference index."

The Siberia Content ID system contains multiple indices that are organized primarily by content type, for example, video as opposed to audio. (See Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 220 ("Each of the reference indices (video, audio, and melody) is comprised of ██████████ of the embeddings."); see also Pasula Dep. (Dkt. No. 240-5) at 32-33 ("A. . . . ██████████████████████████ . . . . There is one index for melody . . . Q. How many indexes for video are there? A. For this copyrighted content, just one. . . . [There are also] ██████ ████████████████████████ ██████ "))

Each of the reference indices is structured in the same manner. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 36) Each index is "sharded," meaning that the index is "divided into a bunch of smaller indexes," known as shards, "that can each fit on one [computer]." (Pasula Dep. (Dkt. No. 240-5) at 39; see Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 39) For example, the large ████████████████████ (the "Video Index") has ██████ . (Pasula Dep. (Dkt. No. 240-5) at 39; Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 39-40) An index for different content might have a different number of shards. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 39-40) ██████████

████████████████████████████

████████████████████

---

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 219; see also id. ¶ 220 ("Each of the reference indices (video, audio, and melody) is comprised of ██████████ of the embeddings.")) And while the Dr. Mitzenmacher states that, at the final step of the search process, query embeddings are compared directly to reference embeddings – rather than to ██████ as in earlier stages of the search (id. ¶¶ 225-26) – that does not mean the indices "retain" "complete embeddings" in addition to hash values for each reference work. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 35) The original query embeddings can be recovered from the indexed hashes. (See Pasula Dep. (Dkt. No. 240-5) at 46-47 ("A. . . . ██████████████████████ . . . . ██████████████ A. Yes."))

(Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 42)  Within the Video Index, for example, ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

(See Pasula Dep. (Dkt. No. 240-5) at 40)

Within each shard, the hash values are further ▇▇▇▇▇▇▇

▇▇▇▇  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 37) ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇ (Pasula Dep. (Dkt. No. 240-5) at 43-44

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ . . ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ Each shard has ▇▇▇▇▇▇. (Id.;

Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 221))

The search performed by the Siberia Content ID system has "three main stages: 'Index Lookup,' 'Sparse,' and 'Verifier.'" (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 43)  As discussed above, when a new video is uploaded to YouTube, the Siberia system generates a sequence of embeddings, with each individual embedding corresponding "to a short snippet or frame of that . . . content." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 29)  Those embeddings may be referred to as the ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (See

Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 219)

Using the Video Index as an example, at the Index Lookup stage – sometimes referred to as the "ScaM" algorithm stage, because it was developed by Google's "Scalable Matching [] research team" team (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 58) – query embeddings

are compared ████████████████████████████████████

████████████████. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 222-223 ("To be clear, the

system examines ████████████████████████████."); Def. R. 56.1 Stmt. (Dkt.

No. 225) ¶¶ 45-47; Pasula Dep. (Dkt. No. 240-5) at 54 ("[U]p to ████████████████ or

something like that would be passed ██████████████")) The Index Lookup

then "████████████████████████████████

████████████" for each shard, and then compares the query embeddings to all of the hash values

in each of those ████████████████. (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 48-49;

Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223 ("The Content ID Siberia Version then examines

each of the ████████████████████████████████"))

In or about August 2020, Google modified the Index Lookup step for one of its

indexes to ████████████████████████ in a YouTube-wide effort to cut costs.

(See Pltf. Ex. 86 (Dkt. No. 274-2) at 6 (YouTube presentation indicating ████████████

████████████████; Supp. Konrad Dep. (Dkt. No. 274-3) at 30-31 (discussing an

internal Google document that ████████████████████████████████

████████████████████████████████████████

████████████████████████████████))

The Index Lookup step outputs the ██ ██-████████████

████████████████████████████████████████

████████████████████████████████. (Def. R.

56.1 Stmt. (Dkt. No. 225) ¶¶ 51-52) Accordingly, for a search in the Video Index, the Index

Lookup step outputs a total of 12,500 hash values. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223)

At the "Sparse" stage, these ███████████ – also referred to as "index hits" – are then further analyzed through a process called "sparse refiner," or "[S]parse." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 59, 60) ████████████████████████████

████████████████████████████████████████████

███████████████████ (Id. ¶ 60; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 224) Some reference works may have ██████████████████████████████

███████████████████. (See Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 224) The Sparse process ████████████████████████████████████

███████████████████. (See id.; Pasula Dep. (Dkt. No. 240-5) at 60, 63, 239-240 (noting that there ████████████████████████████████

███████████████;))

Finally, the reference videos that pass the Sparse process proceed to the "Verifier" stage, where "████████████████████████████

████████████████████████████████." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 61) "The [V]erifier determines whether a portion of any one or more of the references ████████████████████████████████████

████████████████" (Id. ¶ 62)

Google has utilized "at least two versions of the [V]erifier." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 226) An earlier version ██████████████████████

████████████████████████████████

███████████████████████. (Id.) The more recent version ████████████

████████████████████████████████████████

███████████████████████ (Id.) The final matches output

from the Verifier are assigned a ███████████████████████████████████
███████████████████████████████. (Id. ¶ 228)

The Siberia Contact ID's "claiming system" then determines whether ███████
████████████████████████████████████████████████████████
███████████████████████████████████████████████. (Id.)

## II.   PROCEDURAL HISTORY

The Complaint in 14 Civ. 2396 was filed on April 4, 2014, and alleges that Defendants' Content ID system infringes on the '988 and '237 Patents.[6] (Cmplt. (Dkt. No. 2)) The Complaint in 14 Civ. 9558 was filed on December 3, 2014, and alleges that Defendants' Content ID system infringes on the '464 Patent. (14 Civ. 9558, Cmplt. (Dkt. No. 1)) Defendants filed their Answer in 14 Civ. 2396 on May 23, 2014, and filed their Answer in 14 Civ. 9558 on January 23, 2015. (Ans. (Dkt. No. 22); 14 Civ. 9558 Ans. (Dkt. No. 11)) On June 9, 2014, this Court entered a civil case management plan in 14 Civ. 2396. (Dkt. No. 31)

### A.   *Inter Partes* Review

In a June 30, 2015, joint letter, the parties informed the Court that Google had petitioned the U.S. Patent and Trademark Office (the "PTO") to institute inter partes review ("IPR") of, inter alia, the '237 Patent and the '988 Patent.[7] (Dkt. No. 83) Accordingly, on July

---

[6] The Complaint also alleges claims regarding two other patents, but Plaintiff's claims regarding those patents were later dismissed by stipulation. (Dkt. No. 134)

[7] "'[I]nter partes review[]' . . . allows private parties to challenge previously issued patent claims in an adversarial process before the Patent Office that mimics civil litigation." SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1352 (2018). "Once inter partes review is instituted, the Patent Trial and Appeal Board [the "PTAB"] – an adjudicatory body within the [PTO] created to conduct inter partes review – examines the patent's validity. . . . The [PTAB] sits in three-member panels of administrative patent judges. . . . During the inter partes review, the petitioner and the patent owner are entitled to certain discovery . . . ; to file affidavits, declarations, and written memoranda . . . ; and to receive an oral hearing before the Board. . . ." Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC, 138 S. Ct. 1365, 1371 (2018) (citing 35 U.S.C. §§ 6, 316).

15

2, 2015, this Court stayed both actions pending resolution of the PTAB's IPR proceedings.  (Dkt.

No. 85; 14 Civ. 9558 Dkt. No. 35)

The proceedings before the PTAB turned on the disputed claim term "non-

exhaustive search":

> In its decision instituting review of the '179 patent, the [PTAB] construed a "non-exhaustive search" as "a search that locates a match <u>without</u> a comparison of all possible matches." <u>Google Inc. v. Network-1 Techs., Inc.</u>, IPR2015-00343, 2015 WL 3902007, at *3–4 (P.T.A.B. June 23, 2015) ("<u>Institution Decision</u>") (emphasis added).  In so doing, the Board declined to adopt Google's construction of the term: "a search that locates a match without conducting a brute force comparison of all possible matches, and all data within all possible matches." <u>Institution Decision</u> at *3.  Thereafter, in its final decision with respect to the '179 patent, the Board maintained its construction of "non-exhaustive search." <u>Final Decision</u> at *2.  Based upon that construction, the Board determined that Google had failed to demonstrate that the cited prior art rendered the challenged claims of the '179 patent unpatentable as either anticipated or obvious.

<u>Google LLC v. Network-1 Techs., Inc.</u>, 726 F. App'x 779, 781 (Fed. Cir. 2018) (emphasis in

original).[8]

Google appealed the PTAB's decision to the Federal Circuit.  In a March 26, 2018

decision, the Federal Circuit vacated the PTAB's decision, adopted Google's construction of the

claim term "non-exhaustive search," and remanded to the PTAB for further proceedings.  <u>Id.</u> at

786-87.

The Federal Circuit began its analysis by noting that the parties agreed that, "in

conducting its inter partes review of the Network-1 Patents, the Board was required by its rules

---

[8] The Federal Circuit and the PTAB considered four of Plaintiff's patents:  the '988 Patent and '237 Patent at issue here, as well as Patent Nos. 8,640,179 (the "'179 Patent") and 8,656,441 (the "'441 Patent").  <u>See id.</u> at 780.  Because the parties "agree[d] that the written description of the '179 patent is representative, and that [the Federal Circuit's] determination of the correct construction of 'non-exhaustive search,' as it appears in claim 1 of the '179 patent, disposes of the claim construction issue in all four of the Network-1 Patents," the Federal Circuit "focus[ed] [its] discussion on the '179 patent." <u>Id.</u> at 781.

16

Appx16

to apply the broadest reasonable construction of the term 'non-exhaustive search' in light of the patents' specifications." Id. at 782.

The Federal Circuit also noted that the parties agreed,

> as they did before the [PTAB], that the linchpin of the claim construction analysis in this case is determining what an "exhaustive search" is. . . . That is so because a "non-exhaustive" search necessarily is a search that is not "exhaustive." Put another way, the claim limitation at issue does not require a search that employs a stated method (an "exhaustive" search). Rather, it requires a search that does not employ a stated method (a "non-exhaustive" search). As a result, in terms of claim construction, what must be determined is the meaning of the word "exhaustive." In that regard, before the Board, the parties agreed, and the Board concurred, that, generally, an "exhaustive" search means a "brute-force" search that sequentially considers all possible matches revealed in a search. Institution Decision at *3. Further, in the Institution Decision, the Board stated that a "non-exhaustive" search "encompasses anything other than a 'brute-force' search." Id. at *4. Where the parties part company is with respect to the degree of exhaustion required in order for a search to be "exhaustive."

> Google argues that the Board erred in accepting Network-1's contention that a search qualifies as "exhaustive" as long as it considers "any portion of each potential match—even a single bit of a long string." . . . As it did before the Board, Google urges that, instead, an "exhaustive" search must consider all data within each potential match, because only such a search will ensure "find[ing] the correct answer." . . . For example, consider a musical identification system in which each known piece in a database contains two parts, an introduction and a chorus. If the system compares an unknown melody to every known work in the database, but does so only on the basis of the database songs' introductions, the search is not "exhaustive" because it ignores the choruses. Thus, Google would argue, both the introduction (first part) and the chorus (second part) of each song in the database must be checked in order for a search to be "exhaustive."

> Google's argument is based upon the proposition that the broadest construction of "non-exhaustive" searching corresponds to the narrowest construction of "exhaustive" searching. According to Google, the narrowest construction of "exhaustive" searching requires considering the entirety of each potential match, not just a single part of it.

Id. at 782-83 (footnotes omitted) (emphases in original).[9]

_____

[9] The Federal Circuit offered another illustration of the Board's construction v. Google's construction: "[A] database of court names contains a potential match 'Court of Appeals for the Federal Circuit,' and the query is 'Federal Circuit.' The Board's construction would find a search 'exhaustive' if it looked at the first letter of the query, 'F,' determined that it did not match 'C,' and moved on – even if the search was a neighbor search rather than a search for

17

Appx17

The Federal Circuit concluded that "[o]f the two competing constructions, Google's is, in fact, broader." Id. at 784. "That is because Google's construction (through its narrower construction of 'exhaustive') necessarily encompasses all of the searches covered by the Board's construction. The Board's construction (through its broader construction of 'exhaustive'), on the other hand, does not necessarily encompass all of the searches covered by Google's construction." Id. The Federal Circuit went on to find that because the "intrinsic and extrinsic evidence" was "inconclusive as to the broader or narrower construction," Google's construction was the broadest reasonable interpretation of "non-exhaustive search." Id. at 786.

### B.   *Markman* Hearing

On January 2, 2019, the Court entered a stipulation and order lifting the stays that had been in place since July 2, 2015. (Dkt. No. 134; 14 Civ. 9558 Dkt. No. 79) The parties agreed to terminate the IPR proceedings and narrow the claims asserted by Plaintiff in 14 Civ. 2396 to claim 17 of the '988 Patent and claims 33-35 of the '237 Patent. (Dkt. No. 134; 14 Civ. 9558 Dkt. No. 79)

On April 30, 2019, the parties filed an Amended Joint Claim Construction Chart. (Dkt. No. 146) The parties claim construction briefing was fully submitted on August 9, 2019. (See Def. Claim Construction Sur-Reply (Dkt. No. 163))

On November 21, 2019, the Court conducted a Markman hearing. (Markman Tr. (Dkt. No. 204)) In a June 29, 2020 order, the Court informed the parties that it would "decide claim construction and summary judgment simultaneously," and directed the parties to "submit a

---

exact matches only. Similarly, if the query were 'Federal Circuit' and the database entry were 'First Circuit,' considering only the first letter would produce a false positive under the Board's construction. . . . Google's construction avoids false positives and false negatives by considering all the data within a match." Id. at 786.

joint letter that includes an agreed-upon briefing schedule for summary judgment." (Dkt. No. 219)

## C.      Summary Judgment

The parties' cross motions for summary judgment were initially fully briefed on November 11, 2020. (Dkt. Nos. 223-241)  On July 11, 2022, the Court ordered the parties to provide additional briefing addressing the impact of supplemental discovery conducted by the parties after their cross-motions for summary judgment had been filed. (Dkt. No. 266)  Plaintiff filed a supplemental brief in opposition to Defendants' motion for summary judgment on September 23, 2022, and Defendants' filed a response on September 30, 2022. (Dkt. Nos. 274, 278)

## DISCUSSION

## I.      CLAIM CONSTRUCTION

### A.      Legal Standards

Claim construction is a question of law to be determined by the Court. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-89 (1996).  When determining the scope of a patent, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable

19

Appx19

the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention"); Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

There are two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner, 669 F.3d at 1365. Neither exception is relevant here.

The "ordinary and customary meaning" of a claim term should first be determined by the intrinsic evidence, which consists of the claims, the specification, and the prosecution history. See, e.g., Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 847-48 (Fed. Cir. 2006); Kinik Co. v. ITC, 362 F.3d 1359, 1365 (Fed. Cir. 2004). The patent specification is an important guide to claim construction. See, e.g., Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive."); Phillips, 415 F.3d at 1315–16 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.") (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998)). "A fundamental rule of claim construction is that terms . . . are construed with the meaning with which they are presented in the patent document. Thus[,] claims must be construed so as to be consistent with the specification." Merck & Co., Inc. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1370 (Fed. Cir. 2003) (citations omitted).

"Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and

articles." Vitronics, 90 F.3d at 1584.  While a district court may consult extrinsic evidence as part of the claim construction analysis, such evidence is considered less reliable than the intrinsic evidence.  See, e.g., Phillips, 415 F.3d at 1319 ("[T]he court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly.").

"A claim is invalid for indefiniteness if its language, read in light of the specification and prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" HZNP Medicines LLC v. Actavis Labs. UT, Inc., 940 F.3d 680, 688 (Fed. Cir. 2019) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014)).  "The 'reasonable certainty' standard established in Nautilus reflects a delicate balance between the inherent limitations of language and providing clear notice of what is claimed." Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n, 936 F.3d 1353, 1359 (Fed. Cir. 2019) (internal quotation marks omitted).  "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement[, however]." Id. (internal quotation marks omitted).  "At bottom, the indefiniteness test 'mandates clarity, while recognizing that absolute precision is unattainable.'" Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co., Inc., 15 Civ. 10154 (PAE), 2018 WL 3773986, at *7 (S.D.N.Y. Aug. 9, 2018) (quoting One-E-Way, Inc. v. Int'l Trade Comm'n, 859 F.3d 1059, 1063 (Fed. Cir. 2017)).  The party asserting indefiniteness has "the burden of proving indefiniteness by clear and convincing evidence." BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017).

B.    **Agreed-Upon Constructions**

The parties having agreed to the following constructions of claim terms in the asserted patents and claims, this Court adopts these constructions for purposes of this action:

21

Appx21

| Claim Term | Agreed Construction | Asserted Claims in which Term Appears[10] |
|---|---|---|
| "sublinear" [search] | "A search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." | '988 patent: **17** '237 patent: **33**, 34, 35 |
| "neighbor" "near neighbor" | "A close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '988 patent: (**15**), 17 '464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "near neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '464 patent: **1**, 8, 10, 16, **18**, 25, 27, 33 |
| "approximate nearest neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." | '237 patent: **33**, 34, 35 |
| "machine-readable instructions" | "code or pseudocode that is executed using a computer processor, i.e., that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors" | '464 patent: **1**, 8, 10, **16**, **18**, 25, 27, **33** |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2)

---

[10] "Bold numbers indicate claims explicitly reciting the claim term. Non-bold numbers indicate claims depending from claims that explicitly recite the claim term. Numbers in parentheses indicate a claim that is not currently asserted [that] recites the claim term, and a claim depending from that non-asserted claim is asserted." (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2 n.2)

22

C.      **Disputed Terms**

The parties dispute four claim terms:  (1) "non-exhaustive search"; (2)

"correlation information"; (3) "extracted features"; and (4) "extracting features."

As discussed below, Plaintiff proposes constructions for all four terms.

Defendants propose constructions for "extracted features" and "extracting features," but contend

that "non-exhaustive search" and "correlation information" are indefinite.

| Claim Terms | Plaintiff's Construction | Defendants' Construction | Asserted Claims in which Term Appears[11] |
|---|---|---|---|
| "non-exhaustive search" "non-exhaustive . . . search" | "A search designed to locate a [near] neighbor without comparing to all possible matches (i.e., all records in the reference data set), even if the search does not locate a [near] neighbor." | Indefinite | '988 patent: (15), 17<br><br>'464 patent: 1, 8, 10, 16, 18, 25, 27, 33 |
| "correlation information" | Ordinary meaning.<br><br>Alternatively: "information that associates the first electronic media work with an electronic media work identifier" | Indefinite. | '464 patent: 1, 8, 10, 16, 18, 25, 27, 33 |
| "extracted features" | "Electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work." | "Electronic data derived from a work itself, as opposed to from information added or appended to the work." | '988 patent: (15), 17<br><br>'237 patent: 33, 34, 35 |
| "extracting features" | "Sampling, calculating, or otherwise deriving electronic data from a work itself, as opposed to from information added or appended to the work." | "Deriving electronic data from a work itself, as opposed to from information added or appended to the work." | '988 patent: (15), 17 |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

---

[11] See supra n.10.

1.    **"Non-Exhaustive Search"**

The chart below depicts the various constructions of "non-exhaustive search" at issue here:

| Claim Term | Plaintiff's Construction | Defendants' Construction | Federal Circuit's "Broadest Reasonable Construction" |
|---|---|---|---|
| "non-exhaustive search" "non-exhaustive . . . search" | "A search designed to locate a [near] neighbor without comparing to all possible matches (i.e., all records in the reference data set), even if the search does not locate a [near] neighbor." | Indefinite | "A search that locates a match without conducting a brute force comparison of all possible matches, and all data within all possible matches." |

The disputed term "non-exhaustive search" is used in (1) independent claim 15 of the '988 patent, which is not asserted in this case; (2) dependent claim 17 of the '988 patent; and (3) all asserted claims of the '464 patent. (See Pltf. Am. Infringement Contentions (Dkt. No. 226-2) at 2; Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

The relevant claims from the '988 patent, with the disputed term underlined, are as follows:

> **15.** A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:
> a) electronically extracting features from the electronic work;
> b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;
> c) electronically determining an action based on the identification of the electronic work; and
> d) electronically performing the action
>
> **17.** The method of claim **15**, wherein the non-exhaustive search is sublinear.

('988 Patent (Dkt. No. 148-4) at 27)

24

Appx24

Defendants argue that "non-exhaustive search" is indefinite because the term "fails to 'provide objective boundaries for those of skill in the art'" in that (1) the intrinsic evidence does not "define the term's contours" and (2) the extrinsic evidence cited by Plaintiff "only amplifies the ambiguity inherent in the phrase 'non-exhaustive search.'" (Def. Claim Construction Br. (Dkt. No. 151) at 15-16 (quoting Interval Licensing, 766 F.3d at 1371))

### a.   Intrinsic Evidence

#### (i)   Claim Language

While neither side has discussed the claim language, frequently "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314. Here, claim 15 refers to a "non-exhaustive search identifying a neighbor" and claim 17 refers to a "non-exhaustive search [that] is sublinear." ('988 Patent (Dkt. No. 148-4) at 27) The use of this language "strongly implies that the term ['non-exhaustive search'] does not inherently mean" a search that identifies a neighbor or is sublinear. Phillips, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."); see also Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1334 (Fed. Cir. 2010) ("'Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.'" (quoting AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1242 (Fed.Cir. 2003)).

Omitting the "neighbor" limitation from the definition of "non-exhaustive search," Plaintiff's proposed construction is "[a] search designed to locate a [match] . . . without comparing to all possible matches (i.e., all records in the reference data set), even if the search

25

Appx25

does not locate a [match]. . . ." (Pltf. Claim Construction Br. (Dkt. No. 148) at 14)  Aside from this insight, the claims do not shed light on the meaning of "non-exhaustive search."

### (ii)  Specification

As to the specification, Plaintiff cites the following language:

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary.  Since the extracted vectors contain noise or distortions, binary search might not be possible.  Instead, a statistical comparison is often made between an extracted vector and each stored vector.  Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. . . .

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons.  Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal.  This problem is one of nearest neighbor search in a (high dimensional) feature space.  In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found.  On average, this will require N/2 comparisons.  If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later.

. . . .

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods.  Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found.  On average, this will require N/2 comparisons. If N is large, this can be computationally expensive.  Consider a situation in which one out of 100,000 possible commercials is to be identified.  Each 30-second commercial consists of 900 video frames.  If all 900 frames are stored in the database, then N=90,000,000.  Even if only every 10th video frame is stored in the database, its size is still nine million.  While databases of this size are now common, they rely on efficient search to access entries, i.e., they do not perform a linear search.  A

26

Appx26

binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000,000!

. . . .

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in our previous example) so that sublinear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, T. The fixed radius search means that if the database contains a vector that is within X of the query, then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

('988 Patent (Dkt. No. 148-8) at col. 8-9, 21-22 (citations omitted))

While the specification states that the "problem . . . of nearest neighbor search in a (high dimensional) feature space" is best solved by application of a search method that is not "computationally very expensive," these descriptions are addressed by the "nearest neighbor" and "sublinear" limitations on which the parties have agreed-to constructions. (Id.)

The Court concludes that the specification does not shed light on the correct interpretation of "non-exhaustive search." Indeed, the words "exhaustive" and "non-exhaustive" do not appear in the specification. And contrary to Plaintiff's arguments, the specification does not list "binary search, clustering, kd-trees, vantage point trees, excluded middle vantage point forests, and searches for neighbors" as "examples of non-exhaustive search methodologies." (See Pltf. Claim Construction Br. (Dkt. No. 148) at 15) Nor does the specification "explain[]

27

that an exhaustive search potentially requires comparing the query to every record in a data set to be searched" (id.) when discussing a "linear search of all N entries." ('988 Patent (Dkt. No. 148-4) col. 9:25-27) As Google points out, Network-1 made these same arguments during the IPR appeal, and the Federal Circuit rejected them.[12] See Google LLC, 726 F. App'x at 785 ("We do

---

[12] The parties dispute the significance of the Federal Circuit decision to this Court's analysis.

Defendants argue that the "Federal Circuit addressed" the appropriate construction of "non-exhaustive search" in the IPR appeal, "which involved the same claim term and specifications . . . [and] intrinsic record that Network-1 relies upon here." (Def. Claim Construction Br. (Dkt. No. 151) at 16 (citing Google LLC, 726 F. App'x at 780)) According to Defendants, the "Federal Circuit's opinion expressly rejected Network-1's argument that the specification 'identified' a 'non-exhaustive search' through its description of binary search, clustering, kd-trees, and other search techniques." (Id.) While the Court agrees with that characterization, that ruling is not dispositive here, because a different standard applies.

The Federal Circuit reversed the PTAB's construction of the term "non-exhaustive search" under the "broadest reasonable interpretation standard." Google LLC, 726 F. App'x at 782 ("[T]he Board was required by its rules to apply the broadest reasonable construction of the term 'non-exhaustive search' in light of the patents' specifications.") (citing 37 C.F.R. § 42.100(b)). "[U]nder the broadest reasonable construction standard, where two claim constructions are reasonable, the broader construction governs." Id. at 784. And in order for a broader construction "to be found reasonable, it is not necessary that a claim be given its correct construction under the framework laid out in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc)." Id. (emphasis in original).

Under the Phillips framework, however, where two or more "reasonable" constructions of a term exist, it is possible that a "person of ordinary skill in the art" would find the narrower reasonable construction to be "the [claim term's] ordinary and customary meaning." Phillips, 415 F.3d 1303. The Federal Circuit's analysis of the patent's claims and specification, and its conclusion that they do not render Google's broader construction of "non-exhaustive search" unreasonable, is thus not per se incompatible with a different construction under the Phillips standard. See, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, 815 F.3d 747, 756 (Fed. Cir. 2016) ("If we were tasked with reviewing the Board's construction according to Phillips, and in fact if the Board had applied the Phillips standard rather than the broadest reasonable construction, this case would be straight-forward. PPC Broadband's construction is the only construction of the term consistent with the use of the same term throughout the specification. But this case is much closer under the broadest reasonable interpretation standard given the ordinary meanings attributable to the term at issue."); Convolve, Inc. v. Compaq Comput. Corp., 812 F.3d 1313, 1325 (Fed. Cir. 2016) ("Our task is to interpret the scope of the claims per the

28

not agree, however, that these parts of the specification draw a clear line between 'exhaustive'

and 'non-exhaustive' searching in terms of how much data within a record a search must

consider in order to qualify as one or the other.").

Finally, it is worth noting that the specification undermines – rather than supports

– Plaintiff's proposed construction.  While Claims 15 and 17 require a search that "<u>does</u> <u>not</u>

<u>employ</u>" an "exhaustive" method, <u>Google LLC</u>, 726 F. App'x at 782, the specification does not

state that "linear correlation" or "a linear search of all N entries" should not be used.  ('988

Patent (Dkt. No. 148-4) col. 9:1-25)  Indeed, the specification describes "linear correlation" as

among the "[c]ommon statistical measures" used to compare "an extracted vector [to] each

stored vector" (<u>id.</u> col. 9:3-5, 23-25 ("[In solving the] problem . . . of nearest neighbor search in a

(high-dimensional) feature space[] . . . it was not uncommon to perform a linear search of all N

---

<u>Phillips</u> standard. . . . Thus, the examiner's finding under the broadest reasonable interpretation .
. . cannot be dispositive.); <u>Personal Audio, LLC v. Google LLC</u>, 2019 WL 1150576, at *11 (D.
Del. Mar. 13, 2019) ("[W]hile construing the algorithm at issue to encompass any 'conditional'
algorithm might be acceptable under the [broadest reasonable interpretation] standard, it may not
be appropriate under the <u>Phillips</u> standard.").

This Court must thus undertake its own review of the intrinsic and extrinsic evidence to
determine whether "non-exhaustive search" "fail[s] to inform, with reasonable certainty, those
skilled in the art about the scope of the invention." <u>Nautilus</u>, 572 U.S. at 901.

To the extent that Google argues that the "Federal Circuit's decision compels the conclusion that
the term is indeed indefinite" (Def. Claim Construction Br. (Dkt. No. 151) at 13), it is mistaken,
as a footnote in the <u>Google LLC</u> decision makes clear:

> In the district court, Google has advanced the argument that the claim term "non-exhaustive
> search" is indefinite. <u>See</u> <u>Nautilus, Inc. v. Biosig Instruments, Inc.,</u> – U.S. – , 134 S.Ct. 2120,
> 2124, 189 L.Ed.2d 37 (2014) ("a patent is invalid for indefiniteness if its claims, read in light
> of the specification delineating the patent, and the prosecution history, fail to inform, with
> reasonable certainty, those skilled in the art about the scope of the invention").  In an IPR, the
> Board cannot declare claims indefinite. <u>See</u> 35 U.S.C. § 311(b). The issue of indefiniteness
> is therefore not before us, and we express no view on it.

<u>Google LLC</u>, 726 Fed. App'x. at 782 n.3.

29

Appx29

entries.")), and states that a linear search "may be performed." (Id. col. 21:23-27)  And the specification states that a "binary search" – which Plaintiff cites as an exemplary "non-exhaustive" search methodology (Pltf. Claim Construction Br. (Dkt. No. 148) at 15) – is not "possible" in the context of the invention.  ('988 Patent (Dkt. No. 148-4) col. 21:23-27) Similarly, the specification discusses the searches that Plaintiff describes as "non-exhaustive" as "[o]ther forms of matching," without stating that these searches should be used to the exclusion of linear correlation or any other methodology.  (Id. col. 9:29-32)

It is also not clear that certain of the embodiments listed in the specification and claims would meet Plaintiff's proposed construction of "non-exhaustive search."  A "search designed to locate a [near] neighbor without comparing to all possible matches[,] . . . even if the search does not locate a [near] neighbor," (Pltf. Claim Construction Br. (Dkt. No. 148) at 14), appears to exclude search methodologies that will always locate a neighbor, regardless of how dissimilar the "matched" stored vector is from the query.

The specification notes that in contrast to "an excluded middle vantage point forest[,] . . . traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large."  ('988 Patent (Dkt. No. 148-4) col. 22 (emphasis added))  And two of the academic papers that Plaintiff contends are incorporated by reference into the '988 Patent (see Pltf. Claim Construction Br. (Dkt. No. 148) at 15-16 & n.6, n.7) state that, "[f]or a worst case query, kd-tree search visits essentially the entire dataset." (Pltf. Claim Construction Br., Ex. 6, Peter N. Yianilos, Excluded Middle Vantage Point Forests for Nearest Neighbor Search, DIMACS Implementation Challenge: Near Neighbor Searches Workshop (1999) (Dkt. No. 148-17) at 2 ("Yianilos I") (Dkt. No. 148-17) at 3; see also id. Ex. 7 Peter N. Yianilos, Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search,

30

Appx30

Symposium on Discrete Algorithms (SODA, 2000) ("Yianilos II") (Dkt. No. 148-18) at 3 ("[Under certain circumstances] the kd-tree can confidently prune almost nothing." (emphasis in original))) "Traditional vantage point trees" and "kd-trees" are claimed as forms of "non-exhaustive" searches in claims 18 and 19 ('988 Patent (Dkt. No. 148-4) col. 26) despite potentially requiring "visiting essentially the entire dataset" for "a worst case query." (Yianilos I (Dkt. No. 148-17) at 3)

"[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment." In re Katz Interactive Call Processing Pat. Litig., 639 F.3d 1303, 1324 (Fed. Cir. 2011).  While it is not entirely clear that Plaintiff's construction excludes these embodiments, nothing in the specification suggests that these embodiments fall within Plaintiff's proposed construction – i.e., that they do not require comparing a query "to all possible matches" at least some of the time, under "worst case" circumstances.  Indeed, the specification states that these search methodologies may be useful because "on average" they lead to "sub-linear time searches." (See '988 Patent (Dkt. No. 148-4) col. 22)  Sublinearity thus is their salient feature, not "non-exhaustiveness."

In sum, to the extent the specification distinguishes some types of searches from others, the relevant fault line is not "exhaustiveness" as defined in Plaintiff's briefing and proposed construction.

**b.     Extrinsic Evidence**

Having concluded that the intrinsic evidence does not suggest a particular construction of "non-exhaustive search," the Court turns to the extrinsic evidence proffered by the parties.

31

Appx31

Plaintiff cites first to the declaration of Dr. Michael Mitzenmacher, its expert witness. "Extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318 (collecting cases). "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Id.

Here, Dr. Mitzenmacher opines that "'non-exhaustive search' is a term that is well understood by skilled artisans in the field . . . [and that] Network-1's proposed definition accurately reflects the ordinary meaning of this term that would have been understood by persons of ordinary skill in the art at the time of the patents." (Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 40-41) The Mitzenmacher declaration repeats the arguments made in Plaintiff's brief, including that the '988 Patent's specification distinguishes between exhaustive and non-exhaustive searches in its comparison of "linear search" to "several examples of non-exhaustive . . . searches," such as binary search, kd-trees, vantage point trees, and excluded middle vantage point forests. (Id. ¶¶ 42-47) Dr. Mitzenmacher concludes that "the difference between exhaustive and non-exhaustive searches turns on the number of comparisons that must be performed between the query and the reference data set to be searched," and "that an exhaustive search may involve comparing a query to every record in the data set," whereas a non-exhaustive search does not. (Id. ¶¶ 41-43)

Because Dr. Mitzenmacher's declaration largely rehashes arguments made in Plaintiff's briefing, it is of little value as extrinsic evidence. See Bushnell Hawthorne, LLC v.

32

Appx32

Cisco Sys., Inc., 18 Civ. 760, 2019 WL 2745735, at *5 n.5 (E.D. Va. July 1, 2019), aff'd, 813 F. App'x 522 (Fed. Cir. 2020) ("[P]laintiff's expert declaration in large part simply repeats arguments that plaintiff makes in its brief, which do not require the aid of an expert to consider and resolve here.  Accordingly, plaintiff's expert declaration is not entitled to any significant weight.").  Moreover, Dr. Mitzenmacher's "ultimate opinion about the meaning of [non-exhaustive search] is a legal opinion, which is outside his area of expertise." IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc., 18 Civ. 555 (RGA), 2019 WL 3936656, at *6 n.5 (D. Del. Aug. 20, 2019), aff'd, 966 F.3d 1374 (Fed. Cir. 2020); id. ("That is why expert opinions on claim construction are usually worthless.").

In any event, Dr. Mitzenmacher's opinion regarding the meaning of non-exhaustive search – as set forth in his declaration – is undermined by his deposition testimony.

As discussed above, in his declaration Dr. Mitzenmacher states that "an exhaustive search may involve comparing a query to every record in the data set." (Mitzenmacher Decl. (Dkt. No. 148-1) ¶ 42)  At his deposition, however, Dr. Mitzenmacher testified that a search that "prunes" potential matches from a dataset without directly comparing the query to those entries is nonetheless "exhaustive":

> Q.  You used the term "pruning" before.  What did you mean by that?
>
> A. . . . [S]o one way of viewing an exhaustive search is by looking at it as a tree[.] . . . And so if you were saying . . . I need an exact match, I need a word that starts with C, and you said, Okay, well, I'm starting at the dictionary and this page of the dictionary, you know, is the first branch, and all it has are A's on it, then I could say, A-ha, well, I've actually done a comparison against every word on that page because I know that every word on that page starts with A.  But I don't need to actually do . . . 1,000 A comparisons to determine that [a word that starts with C will not appear on that page].  That corresponds to a pruning and then a backtracking approach, where the backtracking means, I can move to the next page.  That's still exhaustive.
>
> Q.  Would that still be exhaustive?

33

Appx33

A. Yes. Yes.

Q. That example you just gave is an exhaustive search?

A. Yes. According to Denny. And that's also how I would describe it also.

(Mitzenmacher Dep. (Dkt. No. 153-12) at 174-75)

Dr. Mitzenmacher's testimony – that an exhaustive search may not "need to actually do . . . 1,000 [] comparisons" to eliminate 1,000 potential matches – is inconsistent with Plaintiff's proposed construction of "non-exhaustive" search. (Id.) Because pruning algorithms can "locate a [match] without comparing to all possible matches (i.e., all records in the reference data set)," (Pltf. Claim Construction Br. (Dkt. No. 148) at 14), they would fall within Network-1's definition of "non-exhaustive" rather than exhaustive searches. Dr. Mitzenmacher's testimony thus highlights the uncertain boundaries between exhaustive and non-exhaustive search methods.

Because (1) Dr. Mitzenmacher's declaration does little more than repeat the arguments in Plaintiff's claim construction briefing; and (2) Dr. Mitzenmacher's deposition testimony undermines Plaintiff's proposed construction and the assertions in Dr. Mitzenmacher's declaration, Dr. Mitzenmacher's opinion is entitled to little weight.

Plaintiff also cites to several academic papers that provide definitions of "exhaustive search" and "non-exhaustive search." These definitions are of limited value here, but it is worth noting that they differ from Plaintiff's proposed construction.

For example, the Denny excerpt – cited by Dr. Mitzenmacher at deposition – defines exhaustive search and non-exhaustive search as follows:

> Exhaustive search is a technique for constructing or examining all possible states within a given search space. . . . In contrast, non-exhaustive search strategies, such as the probabilistic algorithms studied in the previous chapter, traverse the search space more or less at random and thus certain states may never be examined.

34

Appx34

(Pltf. Claim Construction Br., Ex. 8, Paul C. Denny, <u>Search and Enumeration Techniques for Incidence Structures</u> ("Denny") (Dkt. No. 148-19) at 10)

Plaintiff's proposed construction is inconsistent with Denny's in that it does not require that the claimed search methods "traverse the search space more or less at random." (<u>Id.</u>) There is no evidence in the record that binary search, or any of the other search methodologies discussed in the specification, proceed in this fashion. The Denny excerpt proffered by Network-1 also describes "backtracking" as a "technique for performing exhaustive search," wherein partial "feasible solutions" are examined systematically to determine if a dataset contains a match. (<u>Id.</u> at 10-12) Once a "partial solution . . . has been constructed and the feasibility property $F_k(a_1, a_2, \ldots, a_k) = \textit{false}$, then it is known . . . [that] no extension of the partial solution $(a_1, a_2, \ldots, a_k)$ can possibly form a valid complete solution. As soon as this situation is detected, it is then possible to eliminate from consideration [other] infeasible solutions." (<u>Id.</u> at 12) Denny thus describes as "exhaustive" a search technique that can "eliminate from consideration" certain solutions in a dataset without directly comparing them to the search query.[13]

Using as an example a dictionary search regarding the query word "cube," Denny describes a search that could eliminate from the list of possible solutions every word in the

---

[13] Plaintiff attempts to disclaim Denny's description of such "pruning techniques" as exhaustive. According to Plaintiff, "Denny's 'pruning' relates to the length of time needed for individual comparisons (which Denny explains could be stopped early when the search determines that there is no match based on that comparison), not the number of comparisons needing to be performed." (Pltf. Claim Construction Br. (Dkt. No. 148) at 13-14 n.10) Plaintiff's characterization of Denny's "pruning" is incorrect. Denny plainly states that pruning "significantly reduce[s] the required execution time of [backtracking] algorithm[s]" by considering "partial feasible solutions" and eliminating "infeasible solutions," without considering each individual solution. (<u>See</u> Denny (Dkt. No. 148-19) at 11-12) This search – which Denny describes as "exhaustive" – would be considered "non-exhaustive" under Plaintiff's construction, because it does "not potentially require a comparison to all records in a data set." (Pltf. Claim Construction Br. (Dkt. No. 148) at 15-19)

35

Appx35

dictionary beginning with the letters A or B, without any comparison of the query word with a word that begins with one of those letters. The search would likewise eliminate every word beginning with "ca," without comparing the cube query word with, for example, the words "candy" or "crabapple." While Denny would describe this search as exhaustive, it would be "non-exhaustive" under Plaintiff's proposed construction.

Another article cited by Plaintiff in support of its proposed construction defines "exhaustive search" as "[t]he technique of generating and analyzing all of the possible states of a situation." (Pltf. Claim Construction Br., Ex. 9, Jon Orwant et al., Mastering Algorithms with Perl (1999) ("Orwant") (Dkt. No. 148-20) at 4) Orwant's definition of exhaustive search appears similar to Plaintiff's – a search that "potentially requires comparing the query to every record in a data set to be searched." (Pltf. Claim Construction Br. (Dkt. No. 148) at 15) Orwant notes, however, that "the definition of exhaustive search is vague. The exact meaning of 'try everything' depends upon the particular problem. Each problem has its own way of trying everything, and often many different ways." (Orwant (Dkt. No. 148-20) at 7) Orwant's analysis highlights that while the term "exhaustive search" might, in a general sense, mean "try everything" (id.), the '988 and '464 Patents do not discuss what "exhaustive" or "non-exhaustive" search means in the context of a "nearest neighbor search in a high dimensional feature space." ('988 Patent (Dkt. No. 148-4) col. 22)

In sum, the extrinsic evidence does not support Plaintiff's proposed construction. As discussed above, Dr. Mitzenmacher's declaration merely parrots the arguments in Plaintiff's briefing, and the opinions expressed in the declaration are undermined by his testimony that pruning search algorithms are exhaustive, even though these searches do not search the entirety of the reference set, and thus fall within Plaintiff's proposed construction of "non-exhaustive

36

Appx36

search." The limited external sources Plaintiff cites likewise do not support Plaintiff's

construction. Indeed, the extrinsic evidence merely highlight the vague nature of "exhaustive

search" and "non-exhaustive search."[14]

*     *     *     *

The Supreme Court and the Federal Circuit have instructed that "there is an

indefiniteness problem if the claim language 'might mean several different things and no

informed and confident choice is available among the contending definitions.'" Interval

Licensing, 766 F.3d at 1371 (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898,

911 (2014)). Consistent with this guidance, district courts have found claim terms indefinite

where multiple reasonable definitions exist and the evidence does not provide reasonable

certainty as to which definition is correct. See dunnhumby USA, LLC v. emnos USA Corp., 13

Civ. 399, 2015 WL 1542365, at *18 (N.D. Ill. Apr. 1, 2015) ("Based on the lack of guidance in

the intrinsic evidence and the additional meanings of the term in the extrinsic evidence, the Court

finds the term 'selection of a query type' to be indefinite."); Honeywell Int'l Inc. v. ICM Controls

Corp., 45 F. Supp. 3d 969, 985 (D. Minn. 2014) ("Since the two options [for interpreting the

claim] entail differing limitations for the claim, the missing language in claim 1 results in a lack

of reasonable certainty as to its scope."); Light Transformation Techs. LLC v. Lighting Science

Grp. Corp., et al., 12 Civ. 826 (MHS) (RSP), 2014 WL 3402125, at *9 (E.D. Tex. July 11, 2014)

(finding claims indefinite where (1) the term "axis of light direction" was subject to multiple

---

[14] Although Plaintiff cites the use of "exhaustive search" in two Google patents (Pltf. Claim Construction Br. (Dkt. No. 148) at 18-19), the use of this term in Google's patents sheds no light on the proper construction of "non-exhaustive search" as used in Plaintiff's patents. "Exhaustive search" is used once in each of the Google patents in a highly specific context, and the term is not defined in either patent. (U.S. Patent No. 7,831,438 (Dkt. No. 148-21) col. 7-8; U.S. Patent No. 8,065,733 (Dkt. No. 148-22) col. 9) As such, the use of this term in the Google patents does not assist the Court in determining the scope of Plaintiff's asserted patents.

37

Appx37

plausible constructions, and (2) dictionary definitions of axis contradicted plaintiff's proposed construction).

Here, the intrinsic evidence provides no definition of the term "non-exhaustive search," and the extrinsic evidence suggests that a person skilled in the art might reasonably define "non-exhaustive search" in multiple ways, including (1) Plaintiff's proposed construction (modified to remove the reference to locating a "near neighbor") – "[a] search designed to locate a [match] without comparing to all possible matches (i.e., all records in the reference data set), even if the search does not locate a [match]" (Pltf. Claim Construction Br. (Dkt. No. 148) at 14); (2) the Federal Circuit's broadest reasonable interpretation construction – "[a] search that locates a match without conducting a brute force comparison of all possible matches, and all data within all possible matches," Google Inc., 726 F. App'x at 780; and (3) Denny – "search strategies[] [that] . . . traverse the search space more or less at random and thus certain states may never be examined." (Denny (Dkt. No. 148-19) at 10)

The differences in these reasonable definitions are material to the scope of the asserted claims because different search algorithms could be considered "exhaustive" or "non-exhaustive" depending on which definition is applied. As discussed above, Dr. Mitzenmacher testified that pruning was an exhaustive search method – and it would be under Denny's definition. But pruning would not be an exhaustive search method under Plaintiff's proposed construction.

The scope of the asserted claims using the term "non-exhaustive search" is thus uncertain; a reader seeking to avoid infringement would not have the understanding necessary to be reasonably certain that a given search algorithm is exhaustive rather than non-exhaustive within the meaning of the asserted claims.

38

Plaintiff argues, however, that "[e]ven if the term 'non-exhaustive search' did render unasserted claim 15 indefinite[,] . . . it does not follow that dependent claim 17 is indefinite[,] [because] claim 17 narrows 'non-exhaustive search' by specifying [that] its 'non-exhaustive search' is 'sublinear.'" (Pltf. Claim Construction Reply (Dkt. No. 158) at 15) According to Plaintiff, "[b]ecause the execution time of any search that compares to all records N scales linearly with the size of the data set, a sublinear search necessarily compares to less than all records in the data set." (Id. at 16)

As an initial matter, the only case that Plaintiff cites in support of this proposition is not analogous. In Signal IP v. Am. Honda Motor Co., 2015 WL 5768344, at *34 (C.D. Cal. Apr. 17, 2015), the district court found that several claims that used the term "relative weight parameter" were indefinite, because the claims – in using the term "relative" – did not disclose the basis for comparison. Id. The court further concluded, however, that certain dependent claims that used the term "relative weight parameter" were not indefinite, because they provided "detailed embodiments of possible relative weight parameters (the total force, long term average of sensor outputs, and total load rating, respectively)." Id.

Here, dependent Claim 17 does not do this. Instead, Claim 17 introduces an additional limitation "wherein the claimed non-exhaustive search is sublinear." ('988 Patent (Dkt. No. 148-4) col. 26)

And the addition of the sublinear limitation does not clarify the definition of "non-exhaustive." Denny states that "pruning" algorithms – which, as discussed above, Denny and Dr. Mitzenmacher categorize as "exhaustive" – "can significantly reduce the required

39

Appx39

execution time of [backtracking algorithms in general]."[15]  (See Denny (Dkt. No. 148-19) at 11;

see also id. (stating in chapter addressing "exhaustive construction of incidence structures" that

"defining intelligent pruning heuristics to speed up the search can result in an exponential saving

in the required running time"))  Plaintiff's extrinsic evidence thus demonstrates that search

methodologies that would qualify, under at least some definitions, as exhaustive can exhibit

sublinear time and resource scaling.

In sum, the phrase "non-exhaustive search" is indefinite, because "read in light of

the specification and prosecution history, [it] 'fail[s] to inform, with reasonable certainty, those

skilled in the art about the scope of the invention.'"  HZNP Medicines LLC v. Actavis Labs. UT,

Inc., 940 F.3d 680, 688 (Fed. Cir. 2019) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572

U.S. 898, 901 (2014)).  Accordingly, the asserted claims of the '988 and '464 patent are invalid

as indefinite.[16]

---

[15]  In their Local Rule 56.1 Statements, the parties do not dispute that, "[u]nder the parties'
agreed-upon construction of the term 'sublinear,' there are examples of searches that compare to
less than all of the records in a data set that scale linearly, rather than sublinearly," further
suggesting that one limitation has nothing to do with the other.  (See Def. R. 56.1 Stmt. (Dkt. No.
225) ¶ 109; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 109 ("Undisputed."))

[16]  Plaintiff argues that "there are material factual disputes" that preclude a finding that the term
"non-exhaustive search" is indefinite as a matter of law. (Pltf. Claim Construction Reply (Dkt.
No. 158) at 16)  According to Plaintiff, the material issues of fact "includ[e] how one of skill
would (1) understand the specification; (2) view the extrinsic references; and (3) more generally,
understand this phrase." (Id.)  Plaintiff is mistaken.  The parties' disagreements about the
intrinsic evidence and the meaning of a claim term are ultimately legal in nature.  See Teva
Pharms. USA, Inc. v. Sandoz, Inc. ("Teva II"), 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("A party
cannot transform into a factual matter the internal coherence and context assessment of the patent
simply by having an expert offer an opinion on it.  The internal coherence and context
assessment of the patent [and the intrinsic evidence], and whether it conveys claim meaning with
reasonable certainty, are questions of law.").  Moreover, district courts are permitted to make
"factual findings about extrinsic evidence relevant to the question, such as evidence about
knowledge of those skilled in the art." BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360,
1365 (Fed. Cir. 2017); see also Teva I, 574 U.S. at 332 (noting in the context of a dispute

### 2.   "Correlation Information"[17]

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "correlation information" | Ordinary meaning.<br><br>Alternatively: "information that associates the first electronic media work with an electronic media work identifier" | Indefinite. |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3)

As an initial matter, Plaintiff argues that the Court need not construe the term "correlation information" because the "ordinary meaning of this term would have been clear to not only persons of skill in the art, but also to lay persons reading the claims." (Pltf. Claim Construction Br. Dkt. (No. 148) at 23-24) "'In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting Phillips, 415 F.3d at 1312-13 (Fed.Cir.2005)). "However, in many

_____

regarding indefiniteness that "[i]n cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence."); see also Teva II, 789 F.3d at 1339 ("If a district court needs to consult extrinsic evidence, for example, to understand the meaning of a term in the relevant art at the relevant time, the court may need to make subsidiary factual findings about that extrinsic evidence.").

Here, this Court has determined that the extrinsic evidence demonstrates that the term "non-exhaustive search" has multiple possible meanings such that a person skilled in the art could not be reasonably certain as to the scope of the asserted claims. This conclusion flowed from the evidence that Plaintiff proffered, without regard to competing evidence. Plaintiff's citation to pre-Teva case law for the proposition that the submission of extrinsic evidence creates an issue of fact for the jury is unpersuasive. See Rembrandt Data Techs., LP v. AOL, LLC, 641 F.3d 1331, 1335 (Fed. Cir. 2011) (affirming district court's finding of indefiniteness as to eight claims).

[17] This term appears only in the '464 Patent. Although the Court has concluded that all of the asserted claims of the '464 Patent are invalid as indefinite, in the interest of completeness, the Court considers below whether this term is likewise indefinite.

41

Appx41

cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." Id.

For example, in O2 Micro, the Federal Circuit concluded that the district court had erred in not construing the term "only if." While this phrase has a "well understood definition" amongst lay people, the parties had "presented a dispute to the district court regarding the scope of [that claim term]," and the district court – in failing to construe the term – had not resolved the dispute. Id. ("[T]he parties agreed that 'only if' has a common meaning, but then proceeded to dispute the scope of that claim term.").

"Correlation information," unlike "only if," is not a phrase that has a "well understood definition." See id. And contrary to Plaintiff's argument, it matters not that "correlation" and "information" are each well understood words. (See Pltf. Claim Construction Br. (Dkt. No. 148) at 24 (citing dictionary definitions); see also O2 Micro, 521 F.3d at 1361 ("In deciding that "'only if' needs no construction' because the term has a 'well-understood definition,' the district court failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language.").

Here, as in O2 Micro, the parties have presented a dispute as to claim scope. As discussed above, Plaintiff argues for ordinary meaning or, failing that, the following construction: "information that associates the first electronic media work with an electronic media work identifier." (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3) Defendants argue that the claim term is indefinite (id.), i.e., that "correlation information" fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." Nautilus, 572 U.S. at 910. Accordingly, the Court must construe the claim term. See O2 Micro, 521 F.3d at

42

Appx42

1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court . . . must resolve that dispute.").

In arguing that this Court should construe "correlation information" to mean "information that associates the first electronic media work with an electronic media work identifier" (Pltf. Claim Construction Br. (Dkt. No. 148) at 24-25), Plaintiff contends that this definition "is rooted in the claim language itself," in that the '464 patent "states that the 'correlation information associat[es] the first electronic media work and the electronic media work identifier.'" (Id. at 25 (alteration in original))

Defendants counter that the term is indefinite because there is a "complete absence of intrinsic evidence" as to the meaning of "correlation information." (Def. Claim Construction Br. (Dkt. No. 151) at 23-25; id. (arguing that the term "correlation information" does not appear in the specification and that the patent "does not describe the creation or 'storing' of 'correlation information' at all")) Defendants further argue that reference to the preceding element of the asserting claims

> only raises more questions about the scope of the claims. Does the "correlation information" referenced in the next element consist of whichever data is created by "correlating" the "electronic media work" and the "identifier"? Or must the "correlation information" be distinct from the byproducts of the "correlating" step, given that the "storing" step was drafted as a separate element of the claims? Relatedly, does the "correlation information" need to be represented by a distinct and identifiable entry in a database, such as an alphanumeric code indicating that an unknown "electronic media work" has been "correlated" with an "identifier"? And, if not, how and where is the "correlation information" stored?

(Id. at 24-25)

As an initial matter, Defendants err in asserting that there is a "complete absence of intrinsic evidence" (id. at 23), because a patent's claims are a critical component of intrinsic evidence. Immunex Corp. v. Sanofi-Aventis U.S. LLC, 977 F.3d 1212, 1218 (Fed. Cir. 2020) ("When construing claim terms, we first look to, and primarily rely on, the intrinsic evidence,

43

including the claims themselves. . . .'" (quoting Personalized Media Commc'ns, LLC v. Apple Inc., 952 F.3d 1336, 1340 (Fed. Cir. 2020))).

Moreover, the questions posed by Defendants merely reflect an effort to inject uncertainty where none exists on the face of the '464 Patent. "'Mathematical precision'" is not required to avoid invalidation. See Interval Licensing, 766 F.3d at 1370 (quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1384 (Fed.Cir. 2005)). Because the second element provides that an electronic media work must be "correlate[d]" with an electronic media work identifier, it follows logically that the "correlation information" is information that was generated by the previous step. ('464 Patent (Dkt. No. 148-6) col. 24-26) Moreover, the language that immediately follows instructs that the information to be stored "associat[es] the first electronic media work and the electronic media work identifier." (Id. col. 24-25)

Defendants have not responded to Plaintiff's argument that the clause immediately following "correlation information" defines the term. (See Def. Claim Construction Br. (Dkt. No. 151); Def. Claim Construction Sur-Reply (Dkt. No. 163)) The patent clearly teaches that after the two works are correlated, the information "associating the first electronic media work and the electronic media work identifier" should be stored, and the claim refers to that information as "correlation information." ('464 Patent (Dkt. No. 146-6) col. 24-26)

In sum, Defendants have not demonstrated that the term "correlation information" is indefinite. The Court adopts Plaintiff's proposed construction.

44

Appx44

### 3.   "Extracting Features" and "Extracted Features"[18]

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "Extracted features" | "Electronic data **sampled, calculated, or otherwise** derived from a work itself, as opposed to from information added or appended to the work." | "Electronic data derived from a work itself, as opposed to from information added or appended to the work." |
| "Extracting features" | "**Sampling, calculating, or otherwise** deriving electronic data from a work itself, as opposed to from information added or appended to the work." | "Deriving electronic data from a work itself, as opposed to from information added or appended to the work." |

(Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3 (emphasis added))

The disputed terms appear in the following independent claims:

**15.** A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting features from the electronic work;

b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

('988 Patent (Dkt. No. 148-4) col. 26)

**33.** A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined identification of the media work.

---

[18] "Extracted features" appears in the '988 patent and the '237 patent. "Extracting features" appears in the '988 Patent. Although the Court has concluded that the asserted claims of the '988 Patent are invalid as indefinite, in the interest of completeness, the Court considers below whether these terms are likewise indefinite.

45

Appx45

('237 Patent (Dkt. No. 148-5) col. 28)

At an earlier point in this litigation, the parties agreed to the construction of "extracted features" that Defendants propose now: "[e]lectronic data derived from a work itself, as opposed to from information added or appended to the work." (See Jt. Claim Construction Chart (Dkt. No. 53) at 2)

Plaintiff now argues, however, that "it became clear from discovery . . . that the parties have differing views on the scope of 'derived' in the context of 'extracted features' and 'extracting features,'" and that Plaintiff's new proposed construction clarifies "how the 'features' are 'extracted' from a work using computer technology." (Pltf. Claim Construction Br. (Dkt. No. 148) at 25-26 (emphasis in original))

Defendants complain that Plaintiff seeks to renege on the agreed-upon constructions "to broaden the meaning of a claim term after it has engaged in extensive discovery regarding Defendants' Content ID system, out of fear that, under the originally agreed construction, Defendants' Content ID system does not infringe." (Def. Claim Construction Br. (Dkt. No. 151) at 26) According to Defendants, "there is no basis in the specification for regarding 'calculating' as an example of 'extracting' a feature or 'deriving electronic data from a work.'" (Id. at 27 (emphases omitted))

Plaintiff maintains that its proposed construction is consistent with the following language from the '988 Patent's specification, which explains that feature extraction operations derive a representation of the work by, for example, sampling the work or performing a calculation:

> "The purpose of the feature extraction operation is to **derive** a compact electronic representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random **sample** of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a

frequency-based decomposition of the signal, such as produced by the **Fourier, wavelet and or discrete cosine transforms**. It might involve **principal component analysis**. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible."

(Pltf. Claim Construction Br. (Dkt. No. 148) at 26 (quoting '988 Patent (Dkt. No. 148-4) col. 7) (emphasis in Plaintiff's brief); see also '237 Patent (Dkt. No. 148-5) col. 19-20 (containing substantively identical language))

According to Plaintiff, its "proposed constructions make clear for the fact-finder that the sampling actions and mathematical calculations, as disclosed in the specification, are ways in which an electronic representation can be derived from a media work itself." (Pltf. Claim Construction Br. (Dkt. No. 148) at 27)

Defendants counter that the "previously agreed-upon construction is firmly rooted in the specifications, which state that '[t]he purpose of the feature extraction process is to derive a compact representation of the work that can subsequently be used for the purpose of recognition.'" (Def. Claim Construction Br. (Dkt. No. 151) at 26 (quoting '988 Patent (Dkt. No. 148-4) col. 7) (emphasis omitted)) Defendants maintain that "countless examples of 'calculations'. . . would not create an 'extracted feature' in the eyes of a person of skill in the art." (Id. at 27) Although calculations are sometimes part of the extraction operation process, the noteworthy aspect of these operations is not the calculations themselves but the process of deriving information from the work. (Id.)

As an initial matter, the specification excerpts set forth above clearly contemplate that the extracting features process may require sampling from a media work. Indeed, the specification provides as an example a "pseudo-random sample of pixels from the frame" of a

47

Appx47

video uploaded to YouTube. ('237 Patent (Dkt. No. 148-5) col. 19-20) It is likewise clear even to a lay person that "sampling" is a method for "extracting" features from a work. A pixel that is "sampled" from a video frame is also "extracted" from that frame. Defendants do not offer any argument as to why the inclusion of the term "sampling" is overbroad in light of the intrinsic or extrinsic evidence. Accordingly, the Court concludes that its inclusion in the construction is appropriate.

While the specification does not use the word "calculate," it discloses other "feature extraction operation[s]," including "Fourier, wavelet and or discrete cosine transforms" and "principal component analysis." (Id. col. 6) As to whether these operations constitute "calculations," Plaintiff's expert – Dr. Mitzenmacher – offers the following in his declaration:

> A person of skill in the art would have understood that both Fourier, wavelet, and discrete cosine transforms/decompositions and principal component analyses are types of mathematical operations or calculations that can be performed on an electronic work to extract features from it to create a "sketch" or "fingerprint" of the work. Each of these calculations uses computer technology to create a simplified electronic representation of the media work at issue, and do so using data from the work itself.
>
> . . . .
>
> The above computational methods share roughly the same basic framework in terms of generating "sketches" or "fingerprints" of an electronic work such as an audio or video file. These methods involve taking large multi-dimensional data and, using computer technology, transforming that data into a different representation so that the most important aspects of the data correspond to values for a small number of dimensions; these numbers correspond to the sketch or fingerprint. As an example, for images, the discrete cosine transform described in the specification is used in the well-known JPEG compression algorithm. The JPEG compression algorithm takes 8 by 8 blocks of pixels, which can be represented as 64 color values (one for each pixel), and transforms them into another collection of 64 values that represent the same block of pixels in a different, more compact way that conveys the critical information about the file.

(Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 64-65 (footnote omitted))

48

Appx48

In response, Defendants have submitted a declaration from Dr. James Storer, Professor of Computer Science at Brandeis University. (Storer Decl. (Dkt. No. 152)) Dr. Storer states that these paragraphs of the Mitzenmacher declaration demonstrate that

> the defining characteristic of "extracting features" is not that it entails "sampling" or "calculating" from a work. Rather, the process of "extracting features" is defined by the way in which it entails "creat[ing] a simplified electronic representation of the media work at issue . . . using data from the work itself," such "that the most important aspects of the data correspond to values for a small number of dimensions."

(Id. ¶ 131 (quoting Mitzenmacher Decl. (Dkt. No. 148-1) ¶¶ 64-65) (alteration in original))

But Dr. Storer's response does not explain how the addition of the word "calculation" broadens the scope of the claim, or why Dr. Mitzenmacher's explanation of how a calculation can be used to extract features from a media work is incorrect. Nor does Dr. Storer's declaration address Dr. Mitzenmacher's opinion that the specification explicitly contemplates the utilization of "calculations" in order to extract features from a media work.

The Court concludes that Defendants have not rebutted Plaintiff's extrinsic evidence that "extracting features" can include "calculating . . . electronic data from a work" (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 3), and finds no merit in Defendants' argument that there "is no support in the patents or Network-1's own declaration for its proposed broadening of the construction of 'extracting features' and 'extracted features.'" (See Def. Claim Construction Br. (Dkt. No. 151) at 28)

Indeed, Defendants implicitly concede that "calculating" may be a method for extracting features. (See Def. Claim Construction Br. (Dkt. No. 151) at 27 ("[E]very operation performed by a computer entails performing a variety of calculations.") (internal quotation marks omitted)) Defendants argue, however, that "[t]here are countless examples of 'calculations' that could be performed 'on data comprising a work' that would not create an 'extracted feature' in

49

the eyes of a person of skill in the art." (Id.)  For example, "a computer might perform 'calculations on data comprising a work' by (1) determining the number of bits in an image file and (2) multiplying by zero." (Id.)  Acknowledging that this hypothetical calculation would both be meaningless and not represent extracted features – because any number multiplied by zero would sum to zero – Defendants' example is not sufficient to rebut the intrinsic and extrinsic evidence demonstrating that the feature extraction process detailed in the specification contemplates "calculations."  Moreover, Plaintiff's proposed construction provides that extracted features are "sampled, calculated, or underlined derived" from the underlying media work.  (Pltf. Claim Construction Reply (Dkt. No. 158) at 18 (emphasis in original))  This language ties the "sample" or "calculation" to the underlying work.

The Court concludes that Plaintiff's proposed construction of "extracted features" and "extracting features" is consistent with the intrinsic and extrinsic evidence.  Accordingly, the Court adopts Plaintiff's proposed construction.

## II.   SUMMARY JUDGMENT

Having concluded that the asserted claims of the '988 and '464 Patents are invalid as indefinite, the Court considers whether Defendants are entitled to summary judgment on Plaintiff's claims of infringement as to the '237 Patent.

### A.   Legal Standards

#### 1.   Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480

50

Appx50

F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

Appx51

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

### 2.    Patent Infringement

While a patent "[i]nfringement [claim presents] a question of fact," Apple Inc. v. Samsung Elecs. Co., 839 F.3d 1034, 1040 (Fed. Cir. 2016), "a court may grant summary judgment if it concludes that no reasonable jury could find infringement." Kewazinga Corp. v. Microsoft Corp., 558 F. Supp. 3d 90, 102 (S.D.N.Y. 2021), reconsideration denied, 2022 WL 4236301 (S.D.N.Y. Sept. 14, 2022). "The infringement analysis 'entails two steps,' the first of which is construing the claims, and the second of which 'is comparing the properly construed claims to the' accused products." Philip Morris Prod. S.A. v. Int'l Trade Comm'n, 63 F.4th 1328, 1348 (Fed. Cir. 2023) (quoting Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1360 (Fed. Cir. 2019)). "To prove literal infringement, the patentee must show that the accused device contains each and every limitation of the asserted claims." Ericsson, Inc. v. D-Link Systems, Inc., 773 F.3d 1201, 1215 (Fed. Cir. 2014) (emphasis omitted). "For infringement, [Network-1] as the patentee has the burden of persuasion." SIMO Holdings Inc. v. Hong Kong Cloudlink Network Tech. Ltd., 983 F.3d 1367, 1380–81 (Fed. Cir. 2021); Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191, 198-99, (2014) ("[T]he burden of persuasion is with the patentee . . . [in] an infringement suit.").

52

"[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device." Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1047 (Fed. Cir. 2000). Rather, "[t]o satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement[,] . . . with all reasonable inferences drawn in favor of the non-movant." Intellectual Sci. & Technology, Inc. v. Sony Elecs., Inc., 589 F.3d 1179, 1183 (Fed. Cir. 2009); see also SIMO Holdings, 983 F.3d at 1380-81 (same; applying Second Circuit procedural law); Garcia v. Hartford Police Dep't, 706 F.3d 120, 128 (2d Cir. 2013) (expert reports containing "speculative or conclusory" assertions are "inappropriate for consideration on summary judgment"; to defeat summary judgment, an expert report must "add . . . facts to the record that create a genuine dispute as to any material fact" (emphasis omitted)).

**B.    Analysis**

The parties do not dispute how the LSH and Siberia systems function. (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶¶ 28-68) Instead, the parties' dispute centers on whether those systems meet the limitations of step b of claim 33 of the '237 Patent.

Claim 33 of the '237 Patent concerns:

A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

53

Appx53

c) determining, by the computer system, an action based on the determined identification of the media work.

('237 Patent (Dkt. No. 148-5) col. 28)

Google claims that it is entitled to summary judgment on Plaintiff's infringement claim because "neither [the LSH nor the Siberia] version of Google's Content ID system performs [a] 'sublinear' search," and accordingly that limitation of Claim 33 is not met. (Def. Sum. J. Br. (Dkt. No. 224) at 21) Google further argues that – to the extent that a portion of either version of its Content ID system meets the sublinear limitation of the '237 Patent – Plaintiff has not offered evidence that either version of Content ID as a whole performs a search that is at once (1) "sublinear"; (2) an "approximate nearest neighbor search"; and (3) of "reference extracted features." (See id. at 30-37)

As to the construction of "'sublinear' [search]," the parties agree that it "is [a] search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." (Am. Jt. Claim Construction Stmt. (Dkt. No. 146) at 2) The parties further agree that "a search whose execution time scales proportionately with the size of the data set to be searched scales linearly, rather than sublinearly." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 111; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 111); see also Linear, McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003) ("[Linear][:] . . . Having an output that varies in proportion to the input."). Accordingly, the accused versions of Google's Content ID system meet the sublinear limitation if the execution time of the searches they perform scales in a less than proportional relationship to the size of the reference set.

54

Appx54

### 1.   Whether the LSH Version of Content ID Performs a Sublinear Search

Defendants say that "whenever a new reference was added to the LSH index, the LSH bands associated with that video were populated in the index," such that each new reference constituted a new "potential match." (Def. Sum. J. Br. (Dkt. No. 224) at 27)  As a result, the LSH version is not sublinear. (Id. at 26-27)  According to Defendants, "Network-1 has not presented any argument or evidence that the number of matches scales in a way that is less than proportional to the number of references to be searched." (Id. at 28 (emphasis omitted))  Google further argues that Dr. Mitzenmacher's report and testimony demonstrate that "the number of matches is a function of the number of references to be searched because each reference is associated with some of the existing finite set of LSH bands." (Id. (emphasis omitted))  "Dr. Mitzenmacher's statement that the LSH lookup returns its results 'in time proportional to the number of matches' is no different from the observation that it returns its results in time proportional to the number of references to be searched." (Id. (quoting Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 211) (emphasis omitted))  Finally, Google argues that Network-1's other evidence "consists of isolated uses of [the] term ['sublinear'] by a Google witness and in Google documents that are uninformed by the parties' agreed construction[,] and thus do[es] not shed light on whether the LSH version is 'sublinear' under the meaning of that term in this case." (Id. at 29)

While the Court does not agree with Defendants' observation that Dr. Mitzenmacher's report and testimony "lead[] to the ineluctable conclusion that the LSH version of the Content ID system did not meet the 'sublinear' limitation" (see Def. Sum. J. Br. (Dkt. No. 224) at 27), for the reasons explained below, the Court concludes that Network-1 has not presented evidence sufficient to create a material issue of fact as to whether the LSH version of

55

Appx55

Content ID meets the "sublinear" limitation in claim 17 of the '988 Patent and claim 33 of the '237 Patent.

In opposing Defendants' summary judgment motion, Plaintiff cites the following evidence: (1) Dr. Mitzenmacher's report and testimony; (2) a Google 2010 draft document describing a potential update to the Content ID system; and (3) the academic work and testimony of Google research scientist Dr. Shumeet Baluja. (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-12)

### a.     The Mitzenmacher Report

The Mitzenmacher Report's analysis of whether the LSH version of Content ID performed a sublinear search is quite sparse. Omitting references, the entirety of the analysis is as follows:

209. The approximate nearest neighbor (or neighbor or near neighbor) search of the Content ID LSH Version is sublinear.

210. Starting from the first step, the Content ID LSH Version system is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset, that could be possible matches to the input work being queried. This is through the creation of what is commonly referred to as an "inverted index data structure, based on LSH bands: only reference works that match in terms of the LSH bands are subject to further analysis.

211. The inverted index is designed to be a sublinear data structure; that is, the inverted index on a query. Rather in this setting, when given an LSH band, the inverted index can directly return a list of the reference works that match that LSH band, in time proportional to the number of matches. Hence the work done by the inverted index corresponds to the number of index hits, not the number of references. This is a general property of inverted indexes.

212. Review of source code produced by the Defendants in this case confirms my analysis of this claim element . . . [description of Content ID Source Code]

213. It is my opinion that the Content ID LSH Version meets claim element 33b) literally. . . .

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 209-13 (addressing Claim 33 of the '237 Patent); see also id. ¶¶ 144-47 (Claim 17 of the '988 Patent))

56

Appx56

These paragraphs do not state that the LSH version of Content ID, by virtue of its "inverted index" structure, performed a "search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2) Rather, Dr. Mitzenmacher contends that the LSH version was an "inverted index[, ] designed to be a sublinear data structure," and to "determine a very small subset of the reference works in the database, in particular a sublinear subset." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 210-211) But the asserted claims require that the LSH version of Content ID perform a sublinear search, not that it "determine" a "sublinear subset" of the total reference works. Indeed, the "sublinear" claim limitation construed by the parties specifically references a "search." (See Am. Jt. Claim Construction Stmt. (Dkt. No. 146) at 2 (reflecting parties' agreed construction that a "'sublinear search' is [a] search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant")) Dr. Mitzenmacher does not explain in his report or in his testimony what he means in positing a "sublinear subset [of data]."

In any event, to the extent that the Mitzenmacher Report can be read as stating that the LSH version of Content ID performed a sublinear search, any such assertion is – as discussed below – conclusory and lacks an adequate factual basis. See Intellectual Sci. & Technology, Inc., 589 F.3d at 1183 ("To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement[,] . . . with all reasonable inferences drawn in favor of the non-movant.").

57

Appx57

According to Dr. Mitzenmacher, the LSH version of Content ID is structured as an "inverted index." For this proposition, Dr. Mitzenmacher relies on a draft document produced in discovery by Google. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 210 (citing Pltf. Ex. 40 (Dkt. No. 240-15) at 3 ██████████████████████████

████████████████████████████

████████ ⌐ As discussed below, this document is a draft from 2010 that does not purport to describe the LSH version of Content ID that Google ultimately implemented. Even assuming arguendo that the accused LSH version of Content ID is structured as an inverted index, that characteristic does not explain what a "sublinear subset" of a dataset is, nor does it demonstrate that the LSH version of Content ID necessarily performed a sublinear search.

In asserting – in Paragraph 211 of his report – that an "inverted index is designed to be a sublinear data structure," and that it "is a general property of inverted indexes" that "the work done by the inverted index corresponds to the number of index hits, not the number of references," Dr. Mitzenmacher cites only to a Wikipedia entry. (See Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 211)

The Wikipedia entry states that

an inverted index . . . is a database index storing a mapping from content, such as words or numbers, to its locations in a table, or in a document or a set of documents (named in contrast to a forward index, which maps from documents to content). . . .

The inverted index data structure is a central component of a typical search engine indexing algorithm. A goal of a search engine implementation is to optimize the speed of the query: find the documents where word X occurs. Once a forward index is developed, which stores lists of words per document, it is next inverted to develop an inverted index. Querying the forward index would require sequential iteration through each document and to each word to verify a matching document. The time, memory, and processing resources to perform such a query are not always technically realistic. Instead of listing the words per document in the forward index, the inverted index data structure is developed which lists the documents per word.

58

With the inverted index created, the query can be resolved by jumping to the word ID (via random access) in the inverted index.

Inverted Index, Wikipedia.org, https://en.wikipedia.org/wiki/Inverted_index (last visited Apr. 23, 2024).

Accepting the Wikipedia entry's representation that the use of inverted indices is far more efficient in terms of "time, memory, and processing resources" than the use of forward indices for word queries, see id., it does not follow that as the size of the reference set increases, the number of index hits – and thus resources expended on a search of the index – does not also grow proportionally. Indeed, the Wikipedia entry states that inverted indices are designed to "allow fast full-text searches, at a cost of increased processing when a document is added to the database." Id. The Wikipedia entry thus acknowledges that – as the size of the reference set increases – the number of index hits, and the resources expended on a search of the index, will likewise increase. And nothing in the Wikipedia entry suggests that the resources expended will grow at anything less than a linear rate. See id. Finally, the Wikipedia entry does not use the terms "sublinear search" or "sublinear subset." See id.

Plaintiff has conflated the resource efficiency of a search with the scaling of resource costs as a dataset grows. The Wikipedia entry tells us that a query directed to an inverted index structure – such as that allegedly employed in the LSH system – is more efficient (in terms of time and computing resources) at retrieving matches than a query directed to a forward index. But the Wikipedia entry tells us nothing about whether a search of an inverted index is "sublinear" under the parties' agreed upon construction.

Consider the following: assume that a search of an inverted index with 5 million reference records takes 5 minutes. Further assume that computing power is held constant. Does a search of the same index with 10 million records take 10 minutes, and thus scaling linearly, or

59

Appx59

does the search of the 10 million records take between 5 and 9 minutes, thus scaling sublinearly? The fact that a search of a traditional forward index containing 5 million records might take five hours instead of five minutes is irrelevant to this question. And "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a search can scale linearly, rather than sublinearly, even if it 'is designed to determine a very small subset of the reference works in the database.'" (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 110 (quoting Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 210); Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 110)  In short, the Wikipedia entry cited in the Mitzenmacher Report does not support Plaintiff's assertion that the LSH version of Content ID meets the sublinear limitation.

As to Dr. Mitzenmacher's assertion in paragraph 212 that his "review of [Google's] source code . . . confirm[ed]" his view that the LSH version of Content ID meets the sublinear limitation, Dr. Mitzenmacher's assertion is devoid of analysis. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 212)  He merely describes the steps the source code takes to complete a search, listing out each function as it is called. As to Stage I of the search – the LSH index lookup portion of the LSH version on which the Mitzenmacher Report focuses – Dr. Mitzenmacher states only that





(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 212)  Nothing in this recitation suggests that the LSH version of Content ID performed a "search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2)

Plaintiff argues, however, that Dr. Mitzenmacher explained at deposition that "it logically follows from [his discussion of source code in the Mitzenmacher Report] . . . that the number of matches scales in a sublinear (and not in a proportional or linear) fashion as the number of references to be searched increases." (Pltf. Sum. J. Opp. (Dkt. No. 240) at 9) Plaintiff cites the following testimony in support of this assertion:

> Q.  So just explain to me what you mean – what does it mean to say that the Content ID LSH version system determines a sublinear subset [of matches]?
>
> A.  So I think the point is that the work going in to like the number of things in the subset were sublinearly with the corresponding work or execution time to handle such objects, while also grow sublinearly in the setting of the context of claim construction.

(Id. (quoting Mitzenmacher Dep. (Dkt. No. 240-9) at 169)  This gibberish does not clarify anything in the Mitzenmacher Report, nor does it provide a factual basis for concluding that the LSH version of Content ID meets the sublinear limitation.

In sum, nothing in the Mitzenmacher Report, in Dr. Mitzenmacher's testimony, or in the record as a whole would permit a reasonable jury to conclude that the LSH version of

Appx61

Content ID performed the required sublinear search.[19] See Arthur A. Collins, Inc., 216 F.3d at 1047 ("[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device. . . . [T]he affidavit of an expert submitted in opposition to a motion for summary judgment must do more by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986)).

### b.    The CoverCat Draft

In opposing Defendants' summary judgment motion, Network-1 also cites a January 5, 2010 Google "draft" document entitled ███████████████████████.

---

[19] Plaintiff argues that the varying testimony of the parties' experts presents a material issue of fact. In this regard, Plaintiff notes that Defendants' expert, Dr. Samrat Bhattacharjee, opines that "'[t]he search performed by the LSH Version of the Content ID system is not sublinear because the system searches the LSH index ███████████████████████,'" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 10 (quoting Bhattacharjee Decl. (Dkt. No. 240-59) ¶ 290)), while Dr. Mitzenmacher testified that the LSH version's ███████████████████ ████████████████████████. (Id. at 11) Testimony from David Erb – the "tech lead and manager of Content ID" since December 2011 – confirms that Dr. Mitzenmacher's understanding is correct. See Erb Dep. (Dkt. No. 240-3) at 77 ("The BigTable is actually a sparse key value store, meaning that the only columns that actually exist for that row are the ones that have content in them. And the content of each column . . . [is the reference] video ID."))

For purposes of their summary judgment motion, Defendants do not dispute Plaintiff's assertion that "[a] search of the LSH index using a particular LSH band ██████████████████████ ████████████████████████." (Pltf. R. 56.1 Counterstmt (Dkt. No. 240-61) ¶¶ 159-62; Def. Reply R. 56.1 Stmt. (Dkt. No. 232) ¶¶ 159-62 ("Undisputed . . . .")) The fact that a search of the LSH index███████████████████ ██████████████████████ does not necessarily mean that a search of the index is sublinear as that term has been construed by the parties, however. (See Def. R. 56.1 Stmt. Dkt. No. 225) ¶ 109 ("Under the parties' agreed-upon construction of the term 'sublinear,' there are examples of searches that compare to less than all of the records in a data set that scale linearly, rather than sublinearly."); id. ¶ 110 ("Under the parties' agreed-upon construction of the term 'sublinear,' a search can scale linearly, rather than sublinearly, even if it 'is designed to determine a very small subset of the reference works in the database.'") (quoting Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 210); Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶¶ 109-10 ("Undisputed.")) Nor has Plaintiff attempted to explain why that would necessarily be the case.



████████" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 7 (citing Pltf. Ex. 40 (Dkt. No. 240-15))) The stated purpose of this project is to ████████████████████████████ ████████████████████████████████ ████████████████████████ (Pltf. Ex. 40 (Dkt. No. 240-15) at 2 (emphasis omitted)) The document proposes ████████████████████████ ████████████████████████ (Id.) The match system described in this document would use ████████████████████ (Id. at 3)

Plaintiff highlights the following language in this Google document:

(Pltf. Sum. J. Opp. (Dkt. No. 240) at 7 (quoting Pltf. Ex. 40 (Dkt. No. 240-15) at 9) (emphasis in Pltf. Sum. J. Opp.)) Plaintiff argues, and Defendants do not dispute, that "CPU (central processing unit) and RAM (random access memory) resources are related to the amount of computing power" used by a particular search method. (Id.) The more computing resources that are used, the less time that is required to complete a search.

As an initial matter, the Google document quoted by Plaintiff is marked "draft," and Plaintiff has not proffered evidence demonstrating that the design(s) outlined in the document were ever implemented, and if so, to what extent. (Pltf. Ex. 40 (Dkt. No. 240-15) at 1; see MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc., 816 F.3d 1374, 1379 (Fed. Cir. 2016) ("As to the CAD drawing, there is no evidence that it represented the actual product marketed and sold."))

Moreover, Plaintiff has quoted this document out of context. When the relevant language from this 2010 draft document is considered as a whole, it becomes clear that Google

63

was considering two design options, █████████████████████████████████

████████████████████████████████. The record is

silent as to whether either of these options was chosen, or whether Google pursued an entirely

different option.

    As to scaling, the document states that ███████████████████████████

████████████████████████████████████████████████

██████████████████████████████ (Pltf. Ex. 40 (Dkt. No. 240-15) at 9)  The

document's next sentence – omitted by Plaintiff – states that, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (Id.)  By

contrast, if the ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████." (Id. (emphasis added))  The document

thus identifies a tradeoff between (1) ██████████████████████████

███████████████████████████ and (2) █████████

████████████████████████████████████████████████

███████████████). (See id.)  The document concludes by stating that ██████████████

██████████████████████████ between these two options. (Id.)

████████████████████████████████████████████

████████████████████████████ (Id.) ████████████████

██████████████████████████ (Id.)  But Plaintiff has not

proffered evidence that either version of Content ID described in the draft document was actually implemented, much less that the ██████████ ' version was implemented instead of the ████ ██████████ ' version.

Given these circumstances, the Google document cited by Plaintiff does not show that the LSH version of Content ID is "capable of infringing," see ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 520 (Fed. Cir. 2012), much less actual infringement. Even where there is "no dispute" that an accused device is "technically capable" of infringing, the patentee must present evidence that it is "more likely than not [that] . . . the accused system[] [] perform[s] the [specific claim limitation]." See id. "Unless the claim language only requires the capacity to perform a particular claim element, . . . it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1329 (Fed. Cir. 2010); see also ACCO Brands, Inc. v. ABA Locks Mfrs. Co., 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit.").

For the reasons explained above, the CoverCat draft does not constitute evidence of "specific instances of direct infringement," nor does it show that the LSH system "necessarily infringes the patent[s] in suit." Acco Brands, 501 F.3d at 1313.

c.     **Dr. Baluja's Scientific Papers and Deposition Testimony**

In arguing that there are material issues of fact as to whether the LSH version of the Content ID system performs a sublinear search, Plaintiff also cites to a scientific abstract written by two Google employees, Drs. Shumeet Baluja and Michele Covell, entitled "Learning to Hash: Forgiving Hash Functions and Applications," and to Dr. Baluja's deposition testimony.

65

Appx65

(Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-8)  The abstract – published in 2008 – addresses the problem of "retriev[ing] examples from a database that are similar to a [query] example in a manner that is [] efficient."  (Pltf. Ex. 56 (Dkt. No. 240-31) at 4; Baluja Dep. (Dkt. No. 240-4) at 178-81)  The paper discusses several then-existing forms of hashing and notes that "LSH [locality-sensitive hashing] and other hash functions are sublinear in the number of elements examined compared to the size of the database."  (Pltf. Ex. 56 (Dkt. No. 240-31) at 4)

Dr. Baluja has been employed at Google since 2003 as a staff research scientist. (Baluja Dep. (Dkt. No. 240-4) at 10, 16)  He holds a bachelor's degree in computer science and philosophy from the University of Virginia, and a Ph.D from Carnegie Mellon in computer science and robotics.  (Id. at 10-11)  He held a variety of research and scientific positions at tech companies prior to joining Google.  (Id. at 12-16)  At Google, Dr. Baluja has held a variety of basic research positions in the areas of wireless communications, image processing, social networks advertising, and video recognition.  (Id. at 16-26, 135)  Dr. Baluja was part of the Google research team that developed the core matching technology utilized in Content ID.  (Id. at 116)  Dr. Baluja is not involved in the commercial applications resulting from his research. (Id. at 26 ("One could always hope that your research is used in the real world, but that's not my concern."))

At deposition, Dr. Baluja was first asked about a 2008 paper he and Covell published in the scientific journal Pattern Recognition in May 2008.  The paper is entitled "Waveprint: Efficient Wavelet-based Audio Fingerprinting."  (Pltf. Ex. 54 (Dkt. No. 240-29))  Baluja testified that the locality sensitive hashing approach in matching technology permits the scaling of the matching system to be sublinear:

> Q  Toward the end of the first paragraph, it says, "The system also provides good scaling characteristics.  When the database size is increased by 50 percent, we see

that we can have a sublinear computation increase while having no significant impact on recognition." Do you see that?

A  Yes, yes.

Q  What does that mean?

A  So what that means is we will still consider all the elements in our repository without having to examine them in detail.

Q  So using this LSH approach allows the scaling of the system to be sublinear in that sense? Is that what you're saying?

A  Yes.

(Baluja Dep. (Dkt. No. 240-4) at 138)

Dr. Baluja was then questioned about the 2008 abstract entitled "Learning to Hash: Forgiving Hash Functions and Applications," in which he states that "LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database." (Pltf. Ex. 56 (Dkt. No. 240-31) at 4; Baluja Dep. (Dkt. No. 240-4) at 180-181) Dr. Baluja confirmed that this reference to sublinear is "the same sublinearity that we discussed earlier." (Id. at 181)

Plaintiff argues that Dr. Baluja's references to sublinearity in the abstract and journal article, as well as his deposition testimony, create a material issue of fact as to whether the LSH version of the Content ID system performs a sublinear search. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 7-8)

As an initial matter, while Dr. Baluja was part of the Google research team that developed the core matching technology utilized in Content ID (Baluja Dep. (Dkt. No. 240-4) at 116), he is a scientist who does basic research. He is not an engineer and has no role in the commercial applications resulting from his research. At deposition, he was not asked about – and did not testify regarding – the functioning of the LSH version of Content ID. (See id. at 99 ("But I'm not an engineer. . . . [I]f I wrote a system for Google, it would probably crash entire

67

Appx67

Google.  So that's why I do research.")) Similarly, the journal article and abstract that he was questioned about at deposition do not address or describe the LSH version of Content ID (see Pltf. Ex. 56 (Dkt. No. 240-31) at 4 (proposing a hashing system that "far surpasses, in terms of both efficiency and accuracy, a state-of-the-art Locality-Sensitive-Hashing-based technique for the same problem and data set")), and say nothing about whether the LSH version of Content ID performed a "search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." (Am. Jt. Claim Construction Stmt. (Dkt. No. 246) at 2)

For these reasons, Dr. Baluja's references to sublinearity in his scientific papers do not demonstrate that the LSH version of Content ID performs sublinear searches.

*   *   *   *

In sum, the evidence cited by Plaintiff does not create a material issue of fact as to whether the LSH version of Content ID performs a sublinear search.[20]  Accordingly, Defendants

---

[20]  Plaintiff's infringement claim fails for another and independent reason.  In arguing that the LSH version of Content ID performs a sublinear search, Plaintiff addresses only Stage I of that system.  It is undisputed, however, that there are two stages in the LSH version of the Content ID system, and that it is the combination of these two stages that result in a complete search.  (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 24-25 ("The search algorithm of the LSH version of the system has two main stages referred to as 'Stage I' and 'Stage II.' . . . Defendants' documents explain the combination of these stages as a complete search. . . .")) And "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 107; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 107 ("Undisputed.")) Accordingly, in order for this Court to conclude that the LSH version of Content ID performs a sublinear search, there would have to be evidence that at both Stage I and Stage II the system performs a sublinear search.  There is no such evidence.

While Plaintiff argues that paragraph 209 of the Mitzenmacher Report "explains that the entire search (involving two stages) is sublinear" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 24), Paragraph 209 merely states that "[t]he approximate nearest neighbor (or neighbor or near neighbor) search of the Content ID LSH Version is sublinear." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 209) The

68

Appx68

are entitled to summary judgment on Plaintiff's infringement claim to the extent it is premised on the LSH version of Content ID.

### 2.   Siberia Version of Content ID

#### a.   Whether the Siberia Version of Content ID Performs a Sublinear Search at the Index Lookup Stage

The parties dispute whether the Siberia version of Content ID meets the sublinear limitation. Google argues that Dr. Mitzenmacher "admitted in his report and confirmed at his deposition that the Siberia search algorithms scale linearly, rather than sublinearly." (Def. Sum. J. Br. (Dkt. No. 224) at 21) Plaintiff responds that Dr. Mitzenmacher testified that the "'the [Siberia] algorithm [] is sublinear because it has [the] ability to change and adapt'" by adjusting the number of shards and partitions as the data set size grows. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 12-13 (quoting Mitzenmacher Dep. (Dkt. No. 240-9) at 128-29) (emphasis omitted))

In his report, Dr. Mitzenmacher states that he "generally agree[s]" "that if additional references were added to the existing shard/partition structure, the [Index Lookup] portion of the search would scale linearly." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 229

---

subsequent paragraphs in the Mitzenmacher Report – which are discussed above – address only the Index Lookup portion of Stage I, and the evidence cited in Paragraph 209 does not concern the issue of whether Stage II performs a linear or sublinear search. (See id. (citing Dr. Baluja's deposition and the CoverCat draft document)) Accordingly, to the extent that Dr. Mitzenmacher expresses an opinion in his report that the entire search conducted by the LSH Version of Content ID is sublinear, any such opinion is unsupported and conclusory. See Arthur A. Collins, Inc., 216 F.3d at 1047 ("[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device. . . . [T]he affidavit of an expert submitted in opposition to a motion for summary judgment must do more by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'") (quoting Celotex, 477 U.S. at 323, 325). Nor has Plaintiff articulated any theory for why, even assuming Stage I of the LSH Version performs a sublinear search, Stage II must likewise be found to perform a sublinear search. Because Plaintiff has offered no evidence that the entire search performed by the LSH version of Content ID is sublinear, Defendants are entitled to summary judgment on Plaintiff's infringement claim to the extent it is premised on the LSH version of Content ID.

69

(emphasis in original))  Dr. Mitzenmacher further acknowledges that "doubling the size of a reference index by simply adding references to the existing shards . . . could result in the [Index Lookup] portion of the search taking approximately twice as long."  (Id. ¶ 230)  Despite these concessions, Plaintiff contends that "the search algorithm Content ID Siberia Version was designed to be used" in a way that makes the entire system sublinear, and that the number of partitions per shard is a "turnable knob" that makes "the search algorithm Content ID Siberia Version" sublinear.  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 14-16; see also Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 ("[D]oubling the size of a reference index by simply adding those references to the existing [structure] is not what would be done."); id. ¶¶ 238-39 ("[I]ncreasing the ███████████████████████ as the size of the data set [] increases would result in sublinear scaling."))

Plaintiff also points to an ████████████████████████████

██████████████████████████████████████████████████████

███████.  (See Pltf. Supp. Sum. J. Opp. (Dkt. No. 274) at 3-5)  According to Plaintiff, this development "confirms that the Siberia version of Google's Content ID system uses a sublinear search."  (Id. at 3 (capitalization altered))

Plaintiff is mistaken.  Assuming arguendo that reducing the ███████████████

████████████ also reduced the time or computing resources needed to perform a search,[21] Plaintiff does not dispute that if additional references were added to the index as it existed as of

---

[21]  There is no evidence that Google ████████████████████████████████████████████████████████████████████████

Accordingly, standing alone, ██████████ does not demonstrate that the Siberia Version of Content ID performs a sublinear search.

████████████████████████████, search execution time would still scale linearly.

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 229)

The '237 Patent teaches that the invention must perform a "sublinear . . . search." ('237 Patent (Dkt. No. 148-5) col. 28)  The specification states that "a linear search of all N entries" in a database is "computationally expensive," and lists exemplary sublinear search algorithms and data structures with sublinear search times, including binary search, kd-trees, vantage point trees, and middle vantage point forest.  (Id. col. 21)  The specification does not suggest, however, that a linear search algorithm can be adapted to the problem using parameters – "turnable knobs" – that can be periodically adjusted to improve the search's consumption of resources.  Indeed, Plaintiff conflates the Siberia system as a whole – which conceptually encompasses multiple steps that map onto the '237 Patent, including indexing and taking an action after finding a match – with the required search step.  (Pltf. Sum. J. Opp. (Dkt. No. 240) at 16 (referring to the entirety of the Siberia Version of Content ID as "the search algorithm Content ID Siberia Version"))

In sum, the undisputed evidence is that the Siberia version of Content ID uses search algorithms that scale linearly as the size of the database increases.  The evidence also shows that Google can periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database.  But that fact does not transform a linear search algorithm or database architecture into a sublinear one.

71

Appx71

In arguing to the contrary, Plaintiff places great weight on the following graph and similar documents produced by Google during discovery:



(Id. at 14; Pltf. Ex. 67 (Dkt. No. 240-42) at 6)  Plaintiff asserts that the graph depicts ███████



████████ (Pltf. Sum. J. Opp. (Dkt. No. 240) at 14)  The two solid lines represent ███████

████████████████████████. According to Dr. Mitzenmacher, the currently implemented version ███████' algorithm.  But "[r]egardless" of which algorithm is used, the graph demonstrates that "the search scales sublinearly."  (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶¶ 157-58)

The graph cited by Plaintiff plainly contemplates that as the dataset grows, so does the number of "machines."  As discussed above, in the Siberia system, data is stored in shards on individual "machines," or computers.  (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 39; Pasula Dep. (Dkt. No. 240-5) at 39, 77; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 153 ███████

72

████████████████████████████████████████████

████████████████ ) The graph does not suggest that any search performed by the Siberia system is sublinear "assuming computing power is held constant," because what it shows is an increase in the total amount of computing resources as the size of the dataset increases. (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2) Plaintiff does not address the fact that – in the graph it cites – computing power is not "held constant," nor does Plaintiff attempt to explain why the Court should ignore this fact. (Pltf. Sum. J. Opp. (Dkt. No. 240) at 14) Nor does the mere use of the term "sublinear" on the graph demonstrate that the claim limitation is meant. Finally, because Dr. Mitzenmacher, Plaintiff's expert witness, concedes that the index-lookup algorithm scales linearly, the graph and other documents containing the word "sublinear" are not sufficient to create a material issue of fact.

> **b.      Whether the Siberia Version Performs the
> Required Nearest Neighbor Search**

Defendants argue that even that assuming the Index Lookup portion of the search is sublinear, Plaintiff has not shown that "the allegedly sublinear Siberia Index Lookup uses media work extracted features to perform an 'approximate nearest neighbor search of reference extracted features.'" (Def. Sum. J. Br. (Dkt. No. 224) at 30-31) According to Defendants, "Dr. Mitzenmacher admits that the Index Lookup does not meet those limitations and, instead, [impermissibly] tries to mix and match different aspects of the Siberia system to show infringement." (Id. (emphasis omitted))

The parties agree that the Siberia version of Content ID "has three main stages": Index Lookup, Sparse, and Verifier. (See Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 43; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 43) Neither side has argued that any one stage constitutes a single "search" for purposes of proving infringement. And Plaintiff does not argue that an

73

"approximate nearest neighbor search" is performed at the Index Lookup stage.[22] (Pltf. Sum. J. Opp. (Dkt. No. 240) at 17-23)  Similarly, Defendants do not contend that an "approximate nearest neighbor search" is performed at the Sparse and Verifier stages, whether separately or together.  (See Def. Sum. J. Reply (Dkt. No. 227))

Moreover, and as discussed above, "[u]nder the parties' agreed-upon construction of the term 'sublinear,' a multi-step search scales linearly, rather than sublinearly, if at least one of the steps of the multi-step search scales linearly." (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 107; Pltf. R. 56.1 Counterstmt. (Dkt. No. 240-61) ¶ 107; Mitzenmacher Dep. (Dkt. No. 240-9) at 105-09 (noting that a function with a linear term and a logarithmic term scales linearly))

According to Plaintiff, the Mitzenmacher Report "explains that the entire, three stage, search algorithm of" the Siberia Version of Content ID "is a sublinear search algorithm." (Pltf. Sum. J. Opp. (Dkt. No. 240) at 17-18)

The Mitzenmacher Report addresses the alleged sublinearity of the Sparse and Verifier stages as follows:

> The time that the overall search takes (e.g., the combination of [Index Lookup], Sparse, and Verifier steps) would increase by less than a factor of two if the number of hashed embeddings in the reference index were doubled.  This is because the amount the latter two steps take would remain roughly constant since the number of index hits [coming] out of the [Index Lookup] step would remain the same.  In other words, the data set size and the search time of the Content ID Version do not have a one to one relationship.

(Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 n.197)  The remainder of Dr. Mitzenmacher's report is directed to the Index Lookup stage.  (Id. ¶¶ 229-46)

---

[22] Because the Index Lookup stage ███████████████████████████████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶ 52) – it does not involve the use of a "defined threshold" as required under the parties agreed-upon construction of "nearest neighbor search." (Am. Jt. Claim Construction Chart (Dkt. No. 146) at 2)

As an initial matter – because Dr. Mitzenmacher's remarks concerning the Sparse and Verifier stages are not supported by any citations to evidence – he has not "set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement." Intell. Sci. & Tech., Inc., 589 F.3d at 1183.

Moreover, other portions of Dr. Mitzenmacher's opinion contradict his assertion that the amount of time the Sparse and Verifier steps would take "would remain roughly constant." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230 n.197)  As discussed above, it is undisputed that for the Video Index, the Index Lookup step █████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 48-49; Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223))  The system then ███████████████████████████████████

█████████████████████████ (Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 51-52) Accordingly, for a search of the Video Index, the Index Lookup step outputs ██████████████

███████████████████████████ and passes those on to the Sparse and Verifier steps. (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 223; see Def. R. 56.1 Stmt. (Dkt. No. 225) ¶¶ 59, 60)  It is correct that in the example given above -███████████████████████████

███████████████████████████████████████████████

█████████████████████████████ Thus, the time necessary to execute the Sparse and Verifier steps would be "constant" such that if the Index Lookup portion is sublinear, the entire Siberia search would also be sublinear. (See Pltf. Sum. J. Opp. (Dkt. No. 240) at 18-19 (explaining the "basic mathematical principle" that "$y = \sqrt{x} + 1 + 1$ is still a sublinear function"

75

Appx75

where "y" is the time it takes to execute a search, "x" is the number of references in the data set, "√x" is the time it takes to complete the Index Lookup step for a given search, and "1 + 1" represents the time taken to complete the Sparse and Verifier steps))

Dr. Mitzenmacher's premise for arguing in his Report that the Index Lookup step is sublinear, however, is that "doubling the size of the reference index by simply adding those references to the existing shards[] is not what would be done. . . . [A]s the size of the reference index increases, so would the number of shards and partitions." (Mitzenmacher Rpt. (Dkt. No. 226-6) ¶ 230)  If the number of shards in the index increased, so would the number of references output by the Index Lookup step – ██████████████ – and examined by the Sparse and Verifier steps.  Moreover, to the extent that the number of shards and partitions examined at various stages of Siberia's search are "turnable knob[s]" (Pltf. Sum. J. Opp. (Dkt. No. 240) at 15) the number *k* of embeddings per shard output by the Index Lookup step is also presumably "turnable."  The Mitzenmacher Report's assertion that the time necessary to complete the Sparse and Verifier portions of the search is a constant in thus not only unsupported, but internally inconsistent with the argument that as the size of the data set increases so would the number of partitions and shards.

In sum, even if the Court concluded that the evidence demonstrated that the Index Lookup portion of the Siberia search is sublinear, that evidence itself would preclude an inference that the Sparse and Verifier portions of the search are "constants" for purposes of sublinearity.

The unsupported, conclusory, and internally inconsistent assertion in footnote 197 of the Mitzenmacher Report is insufficient to create a material issue of fact as to the alleged sublinearity of the three-stage Siberia search.  See Power Integrations, Inc. v. ON Semiconductor

76

Appx76

<u>Corp.</u>, 396 F. Supp. 3d 851, 886 (N.D. Cal. 2019) (rejecting expert witness's "conclusory" and "internally inconsistent statements" at summary judgment).

## CONCLUSION

For the reasons stated above, the asserted claims of the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are construed as set forth above. Defendants' motion for summary judgment is granted as to Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims in this case. Plaintiff's cross-motion for summary judgement is denied.[23] The Clerk of Court is directed to terminate the motions (Dkt. Nos. 223, 233), to enter judgment for Defendants, and to close this case.

Dated: New York, New York
       April 24, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[23]  As noted above, Plaintiff has appealed Magistrate Judge Netburn's October 14, 2022 order striking portions of Plaintiff's Supplemental Expert Report concerning a "late-proposed non-infringing alternative that Google was allowed to introduce through [] supplemental discovery." According to Plaintiff, its Supplemental Expert Report demonstrates that Google's "non-infringing alternative . . . is not viable." (<u>See</u> Oct. 14, 2022 Discovery Order (Dkt. No. 283); Pltf. Discovery Appeal Br. (Dkt. No. 235) at 4)  Plaintiff states, however, that "neither the Magistrate's Order, nor [Plaintiff's] Objection, bear on the parties' [] motions for summary judgment." (Pltf. Discovery Appeal Br. (Dkt. No. 235) at 4)  Given this Court's decision granting Defendants' motion for summary judgment, Plaintiff's appeal of the magistrate judge's discovery order is denied as moot.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
NETWORK-1 TECHNOLOGIES, INC.,

                    Plaintiff,

    -against-                                         14 **CIVIL** 2396 (PGG)
                                                   14 **CIVIL** 9558 (PGG)

                                                         **__JUDGMENT__**

GOOGLE, LLC and YOUTUBE, LLC,

                    Defendants.
-------------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Memorandum Opinion & Order dated April 26, 2024, the asserted claims of

the '988 and '464 Patents are invalid as indefinite, and the remaining disputed terms are

construed as set forth in the order. Defendants' motion for summary judgment is granted as to

Plaintiff's claim for infringement of the '237 Patent. The Court's rulings with respect to

indefiniteness and Defendants' motion for summary judgment dispose of all the asserted claims

in this case. Plaintiff's cross-motion for summary judgement is denied. Judgment is entered for

Defendants; accordingly, the case is closed.

**Dated:** New York, New York

     April 26, 2024

                                        **RUBY J. KRAJICK**

                                    _____
                                        **Clerk of Court**

              **BY:**              K. mango

                                      _____
                                          **Deputy Clerk**



US008010988B2

## (12) United States Patent
### Cox

(10) Patent No.: **US 8,010,988 B2**
(45) Date of Patent: **Aug. 30, 2011**

(54) **USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK**

(76) Inventor: **Ingemar J. Cox**, London (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 797 days.

(21) Appl. No.: **11/445,928**

(22) Filed: **Jun. 2, 2006**

(65) **Prior Publication Data**

US 2007/0041667 A1      Feb. 22, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
*H04N 7/173* (2011.01)
(52) **U.S. Cl.** ...................................................... **725/110**
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,919,479 A | 11/1975 | Moon et al. |
| 4,230,990 A | 10/1980 | Lert, Jr. et al. |
| 4,450,531 A | 5/1984 | Kenyon et al. |
| 4,495,526 A | 1/1985 | Baranoff-Rossine |
| 4,499,601 A | 2/1985 | Matthews |
| 4,511,917 A | 4/1985 | Kohler et al. |
| 4,547,804 A | 10/1985 | Greenberg |
| 4,634,966 A | 1/1987 | Nakatani et al. |
| 4,639,779 A | 1/1987 | Greenberg |
| 4,677,455 A | 6/1987 | Okajima |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. |
| 4,682,370 A | 7/1987 | Matthews |
| 4,697,209 A | 9/1987 | Kiewit et al. |
| 4,739,398 A | 4/1988 | Thomas et al. |
| 4,776,017 A | 10/1988 | Fujimoto |
| 4,805,020 A | 2/1989 | Greenberg |
| 4,843,562 A | 6/1989 | Kenyon et al. |
| 4,918,730 A | 4/1990 | Schulze |
| 5,210,820 A | 5/1993 | Kenyon |
| 5,283,819 A | 2/1994 | Glick et al. |
| 5,437,050 A | 7/1995 | Lamb et al. |
| 5,481,294 A | 1/1996 | Thomas et al. |
| 5,581,658 A | 12/1996 | O'Hagan et al. |
| 5,594,934 A | 1/1997 | Lu et al. |

(Continued)

OTHER PUBLICATIONS

Peter N. Yianilos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.*

(Continued)

*Primary Examiner* — Brian T Pendleton
*Assistant Examiner* — Cai Chen
(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57) **ABSTRACT**

Information about an audio or video file played on a device is provided by (a) extracting features from the audio or video file, (b) communicating the features to a database, and (c) receiving the information about the audio or video file from the database. The information might include a song title, an album title, and/or a performer name. The information might include a title of a video work, a director of the video work, and/or names of performers in the video work. The information might be rendered on an output of the device. The information might be stored (e.g., persistently) locally on the device.

**52 Claims, 10 Drawing Sheets**



### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,629,739 A | 5/1997 | Dougherty | |
| 5,692,213 A | 11/1997 | Godlberg et al. | |
| 5,701,452 A | 12/1997 | Siefert | |
| 5,701,542 A | 12/1997 | Seifert | |
| 5,724,605 A | 3/1998 | Wissner | |
| 5,745,900 A | 4/1998 | Burrows | |
| 5,798,785 A * | 8/1998 | Hendricks et al. | 725/46 |
| 5,850,490 A | 12/1998 | Johnson | |
| 5,918,223 A | 6/1999 | Blum et al. | |
| 5,953,415 A | 9/1999 | Nielsen | |
| 6,006,256 A | 12/1999 | Zdepski et al. | |
| 6,011,758 A | 1/2000 | Dockes et al. | |
| 6,026,439 A | 2/2000 | Chowdhury et al. | |
| 6,044,402 A | 3/2000 | Jacobson et al. | |
| 6,052,693 A | 4/2000 | Smith et al. | |
| 6,061,056 A | 5/2000 | Menard et al. | |
| 6,088,455 A | 7/2000 | Logan et al. | |
| 6,088,707 A | 7/2000 | Bates et al. | |
| 6,118,450 A | 9/2000 | Proehl et al. | |
| 6,119,124 A | 9/2000 | Broder et al. | |
| 6,169,986 B1 | 1/2001 | Bowman | |
| 6,173,406 B1 | 1/2001 | Wang | |
| 6,240,409 B1 | 5/2001 | Aiken | |
| 6,243,725 B1 | 6/2001 | Hempleman et al. | |
| 6,247,133 B1 | 6/2001 | Palage et al. | |
| 6,253,193 B1 | 6/2001 | Ginter et al. | |
| 6,263,348 B1 | 7/2001 | Kathrow et al. | |
| 6,330,593 B1 | 12/2001 | Roberts et al. | |
| 6,345,256 B1 | 2/2002 | Milsted et al. | |
| 6,349,296 B1 | 2/2002 | Broder et al. | |
| 6,360,215 B1 | 3/2002 | Judd et al. | |
| 6,363,377 B1 | 3/2002 | Kravets et al. | |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. | |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. | |
| 6,385,596 B1 | 5/2002 | Wiser et al. | |
| 6,408,128 B1 * | 6/2002 | Abecassis | 386/68 |
| 6,418,421 B1 | 7/2002 | Hurtado et al. | |
| 6,449,226 B1 | 9/2002 | Kumagai | |
| 6,452,874 B1 | 9/2002 | Otsuka et al. | |
| 6,477,704 B1 | 11/2002 | Cremia | |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. | |
| 6,505,160 B1 | 1/2003 | Levy et al. | |
| 6,550,001 B1 | 4/2003 | Corwin et al. | |
| 6,550,011 B1 | 4/2003 | Sims, III | |
| 6,577,746 B1 | 6/2003 | Evans et al. | |
| 6,591,245 B1 | 7/2003 | Klug | |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. | |
| 6,609,105 B2 | 8/2003 | Van Zoest et al. | |
| 6,654,757 B1 | 11/2003 | Stern | |
| 6,665,661 B1 | 12/2003 | Crow et al. | |
| 6,675,174 B1 | 1/2004 | Bolle et al. | |
| 6,834,308 B1 * | 12/2004 | Ikezoye et al. | 709/231 |
| 6,873,982 B1 | 3/2005 | Bates et al. | |
| 6,931,451 B1 * | 8/2005 | Logan et al. | 709/231 |
| 6,941,275 B1 | 9/2005 | Swierczek | |
| 6,973,461 B1 | 12/2005 | Fleming, III et al. | |
| 6,978,419 B1 | 12/2005 | Kantrowitz | |
| 6,990,453 B2 | 1/2006 | Wang et al. | |
| 7,013,301 B2 | 3/2006 | Holm et al. | |
| 7,058,223 B2 * | 6/2006 | Cox | 382/190 |
| 7,106,904 B2 | 9/2006 | Shima | |
| 7,155,449 B2 | 12/2006 | Pingel et al. | |
| 7,158,929 B2 | 1/2007 | Wouters et al. | |
| 7,168,083 B2 | 1/2007 | Kalker et al. | |
| 7,302,574 B2 | 11/2007 | Conwell et al. | |
| 7,366,718 B1 | 4/2008 | Pugh et al. | |
| 7,421,723 B2 | 9/2008 | Harkness et al. | |
| 7,477,739 B2 | 1/2009 | Haitsma et al. | |
| 7,523,312 B2 | 4/2009 | Kalker et al. | |
| 7,587,728 B2 | 9/2009 | Wheeler et al. | |
| 7,647,604 B2 | 1/2010 | Ramaswamy | |
| 7,650,616 B2 | 1/2010 | Lee | |
| 7,757,248 B2 | 7/2010 | Harkness et al. | |
| 2001/0001160 A1 * | 5/2001 | Shoff et al. | 725/51 |
| 2001/0003818 A1 | 6/2001 | Pingel et al. | |
| 2002/0023020 A1 | 2/2002 | Kenyon et al. | |
| 2002/0032698 A1 | 3/2002 | Cox | |
| 2002/0120925 A1 * | 8/2002 | Logan | 725/9 |
| 2002/0156760 A1 | 10/2002 | Lawrence et al. | |
| 2003/0106017 A1 | 6/2003 | Kanchirayappa et al. | |
| 2003/0146940 A1 * | 8/2003 | Ellis et al. | 345/811 |
| 2004/0199387 A1 * | 10/2004 | Wang et al. | 704/243 |
| 2005/0160363 A1 | 7/2005 | Bhogal et al. | |
| 2006/0101069 A1 | 5/2006 | Bell et al. | |
| 2006/0206462 A1 | 9/2006 | Barber | |
| 2007/0041667 A1 | 2/2007 | Cox | |
| 2007/0083510 A1 | 4/2007 | McArdle | |
| 2007/0118375 A1 | 5/2007 | Kenyon et al. | |
| 2008/0091684 A1 | 4/2008 | Ellis et al. | |
| 2008/0250241 A1 | 10/2008 | Ginter et al. | |

### OTHER PUBLICATIONS

Baum, L., et al., "A Maximation Technique Occurring in the Statistical Analysis of Probabilistic Functions of Markov Chains", *The Annals of Mathematical Statistics*, vol. 41, No. 1, pp. 164-171 (1970).

Dempster, A. P., et al., "Maximum Likelihood from Incomplete Data via the $EM$ Algorithm", *Journal of the Royal Statistical Society*, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).

Reynolds, D., et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models", *IEEE Transactions on Speech and Audio Processing*, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

Nievergelt, J., et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," *ACM Transactions on Database Systems*, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Heintze, N., "Scalable Document Fingerprinting," *Proc. USENIX Workshop on Electronic Commerce* (1996).

Wold, E., et al., "Content-Based Classification, Search, and Retrieval of Audio," *IEEE Multimedia*, vol. 3, Issue 3, pp. 27-63 (1996).

Bhanu, B., et al., "Learning Feature Relevance and Similarity Metrics in Image Databases", *Proceedings of the IEEE Workshop on Content—Based Access of Image and Video Libraries*, pp. 14-19 (1998).

Del Bimbo, A., et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents", *Image Description and Retrieval*, pp. 161-192 (1998).

Indyk, P., and Motwani, R., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality," *Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing*, pp. 604-613 (1998).

La Cascia, M., et al., "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web", *Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries*, pp. 24-29 (1998).

Yianilos, N. P., "Excluded Middle Vantage Point Forests for Nearest Neighbor Search," *DIMACS Implementation Challenge*, ALENEX'99 (1999).

Yoshitaka, A., et al., "A Survey on Content-Based Retrieval for Multimedia Databases", *IEEE Transactions on Knowledge and Data Engineering*, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Lawrence, S., et al., "Digital Libraries and Automonous Citation Indexing," *IEEE Computer*, pp. 67-71 (Jun. 1999).

Yianilos, N. P., "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search," *Symposium on Discrete Algorithms, Proceeding of the Eleventh Annual ACM-SIAM symposium on Discrete Algorithms*, pp. 361-370 (2000).

Kimura, A., et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," *IEEE Conf. on Acoustics, Speech and Signal Processing*, (ICASSP '01), vol, 3, pp. 1429-1432 (2001).

Chavez, E., et al., "Searching in Metric Spaces", (Sep. 2001) *ACM Computing Surveys*, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Haitsma, J., et al., "Robust Audio Hashing for Content Identification, Int." *Workshop on Content Based Multimedia Indexing*, Brescia, Italy (Sep. 19-21, 2001).

Haitsma, J., and Walker, T., "A Highly Robust Audio Fingerprinting System," *Journal of New Music Research*, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Schleimer, Saul, et al., "Winnowing: Local Algorithms for Document Fingerprinting ACM SIGMOD" (Jun. 9-12, 2003).

"Searching Near-Replicas of Images via Clustering" Edward Chang, Chen Li, James Wang, Peter Mork, Gio Wiederhold Proc. SPIE Symposium of Voice, Video, and Data Communications, 1999.

"Rime: A Replicated Image Detector for the World-Wide Web" Edward Y. Chang, James Ze Wang, Chen Li, and Gio Wiederhold, SPIE 1998.

"Safeguarding and charging for information on the internet," H. Garcia-Molina, S. Ketchpel, and N. Shivakumar, Proceedings of ICDE, 1998.

"Copy detection mechanisms for digital documents," S. Brin and H. Garcia-Molina, Proceedings of ACM SIG-MOD, May 1995.

"The x-tree: An index structure for high-dimensional data," S. Berchtold, Proceedings of the 22nd VLDB, Aug. 1996.

"The sr-tree: An index structure for high-dimensional nearest neighbor queries," N. Katayama and S. Satoh, Proceedings of ACM SIGMOD, May 1997.

"The k-d-b-tree: A search structure for large multidimensional dynamic indexes," J. T. Robinson, Proceedings of ACM SIGMOD, Apr. 1981.

"Query by image and video content: the QBIC system," M. Flickner, H. Sawhney, W. Niblack, J. Ashley, Q. Huang, and et al, IEEE Computer 28(9), pp. 23{32, 1995.

"Visual information retrieval," A. Gupta and R. Jain, Communications of the ACM 40(5), pp. 69-79, 1997.

"Visualseek: A fully automated content-based image query system," J. R. Smith and S.-F. Chang, ACM Multimedia Conference, 1996.

"Similarity indexing: Algorithms and performance," D. A. White and R. Jain, Proc. SPIE vol. 2670, San Diego, 1996.

"The r*-tree: an efficient and robust access method for points and rectangles," N. Beckmann, H.-P. Kriegel, R. Schneider, and B. Seeger, Proceedings of ACM Sigmod, May 1990.

"R-trees: a dynamic index structure for spatial searching," A. Guttman, Proceedings of ACM Sigmod, Jun. 1984.

"Similarity indexing with the ss-tree," D. A. White and R. Jain, Proceedings of the 12th ICDE, Feb. 1996.

"The tv-tree: an index structure for high-dimensional data," K.-L. Lin, H. V. Jagadish, and C. Faloutsos, VLDB Journal 3 (4), 1994.

"M-tree: An efficient access method for similarity search in metric spaces," P. Ciaccia, M. Patella, and P. Zezula, Proceedings of the 23rd VLDB, Aug. 1997.

"Nearest neighbor queries," N. Roussopoulos, S. Kelley, and F. Vincent, Proceedings of ACM Sigmod , May 1995.

"An extensible hashing index for high-dimensional similarity search," C. Li, E. Chang, and J. Z. Wang, Stanford Technical Report , Aug. 1998. [NOT AVAILABLE].

"Two algorithms for nearest-neighbor search in high dimensions" J. M. Kleinberg, Proc 29th STOC, 1997.

"A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise" Martin Ester, Hans-Peter Kriegel, Jörg Sander, Xiaowei Xu Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

"Adaptive Color Image Embeddings for Database Navigation" Yossi Rubner, Carlo Tomasi and Leonidas J. Guibas, Proceedings of the 1998 IEEE Asian Conference on Computer Vision.

A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces R. Weber, H-J Schek, S. Blott Proc., 24th VLDB Conf. 1998.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



UNIQUE ID: 15642    1010

PRODUCT: COCA COLA    1020

CATEGORY: SODA    1030

MANUFACTURER: COCA COLA    1040

URL http://www.cocacola.com    1050

OTHER DATA    1060

1000

# FIGURE 10

# USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK

## §0. RELATED APPLICATIONS

The present application is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference), titled "IDENTIFYING WORKS FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001 now U.S. Pat. No. 7,058,223, and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorporated herein by reference), titled "Identifying and linking television, audio, print and other media to the Internet", filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

## §1. BACKGROUND OF THE INVENTION

### §1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement delivered via print media, or via a radio or television broadcast) without the need to modify the work.

### §1.2 Related Art

#### §1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request discount vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applications also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be automatically enabled using the invention described herein.

In the context of facilitating audience interaction or participation, there is much interest in the convergence of television and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also interest in enhancing the television viewing experience. To this end, there have been a number of experiments with interactive television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the competition.

#### §1.2.2 Embedding Work Identifying Code or Signals within Works

Known techniques of linking works delivered via traditional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such traditional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) watermarks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed implementations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be considered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a proprietary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technology and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blanking interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to television viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-captioning information as well as other information, while in the UK, the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking interval is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, OR embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of broadcast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It

should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, UT embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of barcode and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic or fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naïve user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed directly into a sound card in a PC. This requires a physical connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

### §1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §2. SUMMARY OF THE INVENTION

This patent application describes an alternative solution that does not suffer from the problems outlined above. The solution is based on direct or indirect recognition of the media itself. Direct or indirect recognition refers to the fact that a number of possible configurations are possible, some of which directly recognize the work on the equipment in a user's home while other configurations perform this recognition indirectly by transmitting work-specific information to one or more remote sites. Neither technique requires the embedding of any form of active signal. Instead, when media in the form of music, print, television or multimedia is presented to a personal computer (PC), set-top-box or other device, such devices directly or indirectly recognize the media and initiate an action. The set of possible actions is potentially infinite and includes, for example, retrieving further information, interacting with a live broadcast, registering the user for a service or product, purchasing a product or service and/or receiving discount coupons or certificates that can be used towards a purchase.

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio (or video) file played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video

work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

### §4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

### §4.1 FUNCTIONS

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work informa-

tion to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §4.2 EMBODIMENTS

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

#### §4.2.1 Embodiments in which Work is Recognized Based on Intra-Work Information, Such as a Feature Vector

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

#### §4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK$_{@t1}$), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK$_{@t2}$), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a

7 8

matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

### §4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also K. Fukunaga, *Introduction to Statistical Pattern Recognition,* 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480× 720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or bare a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," *IEEE Transactions on Image Processing* (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518,

5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

### §4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

### §4.2.1.1.3 Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent

9                                                        10

to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", *Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop*, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.)

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a work's feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

### §4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database **130** that contains information **136** associated with the particular work **134**. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such as initiating an e-commerce transaction. After looking up the work identifier **134** in the WIDAT database **130**, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database **130** allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive the advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

### §4.2.1.2 Exemplary Architectures

Three alternative architectural embodiments in which the first technique may be employed are now described with reference to FIGS. **2**, **3**, and **4**.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device **210**, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer **210** performs the operations **140**a, **150**a, **160**a and **170**a, such as those shown in FIG. **1**. To reiterate, these operations include a feature extraction operation(s) **140**a, feature vector lookup or matching operation(s) **150**a in connection with items or records **112**a in a work-identification (WID) database **110**a. If a matching feature vector **114**a is found, the work-associated information lookup operation(s) **160**a can use the associated work identifier **116**a to accessing a work identification-action translation (WIDAT) database **130**a to retrieve associated information **136**a, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

        

An example illustrating operations that can occur in the first embodiment of FIG. **1**, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database **110***a*. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Estimates of the size of the WIDAT database **130***a* depend on what associated information (recall fields **136**) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database **130***a* would be less than 1 Mbyte.

The configuration just described with reference to FIG. **2** places all of the processing and data on each user's local machine **210**. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider **240** must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet **230** in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer **210** might also transmit information to a central monitoring center **240** informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. **2**, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database **130***b* is at a remote location **340**. In this arrangement, illustrated in FIG. **3**, after the local computer **310** identifies the work, it sends a query to the remote WIDAT database **130***b*. The query may contain the work identifier. The remote site **340** may then return the associated information **136**. Although the remote WIDAT database **130***b* needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers **310**.

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database **130***b* might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, overloading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database may be small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1 Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally **410**, the one or more vectors are transmitted to a central site **440** at which is stored the WID and WIDAT databases **110***c* and **130***c* together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. **4**. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation **140***c* that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site **440** which can resolve the request.

After successfully matching the feature vector, the central site **440** can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site **440** might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction **140***c* in digital set-top-boxes and in video recorders **410**. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement,

        

the video recorder would extract one or more feature vectors and transmit them to a central site **440**. This site **440** would determine if a match existed between the query vector and the database of pre-stored vectors **110**c. If a match is found, the central server **440** would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device **410**. Of course, a consumer device **410** such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device **410** could store the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

### §4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCR's. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information").

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) **210/310/410** to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

### §4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, pref-

erably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action information (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT) information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. Such information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market) **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

### §4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be

necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

### §4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database **510** maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140***d*, as well as the work identification operation(s) **150***d* and other databases **110***d*, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4×35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophis-

ticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

### §4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, and most TV's do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

### §4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540***a* may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510***a*, **530***a*, and **110***e*, as well as the database generation operation(s) **520***a*/**538***a*, the lookup operation(s) **550***a* and the work-associated information lookup operation(s) **560***a* may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to

17

the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740***a* and query resolution center **740***b* are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and especially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which are sold to interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

18

§4.2.3 Exemplary Apparatus for Audience Member
(User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. **6** and **7**, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This information can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCR's and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. **6** and **7**, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities. Of course, the two-way commu-

nication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

### §4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §4.3 OPERATIONAL EXAMPLES

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in

§4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

### §4.3.1 Operational Example where Intra-Work Information is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed.

The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the n×n blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of 480×720 pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with 16×16 blocks, then the number of blocks per frame is 345,600/256=1350. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 16×16 blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the 100×10=1000 DCT coefficients. Many other variations are also possible. In many media applications, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the

21

22

transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not yet present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000,000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sub-linear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, T. The fixed radius search means that if the database contains a vector that is within X of the query, then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10×50× 30 queries per second.

§4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840a**. These centers **840a** may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840a** is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840a** update one or more database centers **840b**, informing them of the time, place, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840b** updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840b** can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a

classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840***a*. The database centers **840***b* are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries in memory. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to 3600×100×100=36,000,000 entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work.

An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**, the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840***b*. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840***b*. This might happen hours or even days later.

The query contains information that the database center **840***b* uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840***b* receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840***b* may simply function as a form of proxy server, mapping the audience member's initial query into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840***b* may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840***b* to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, CA or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840***b* using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840***a* where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840***b* is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

### §4.4 CONCLUSIONS

None of the embodiments of the invention require modification to the work or content, i.e. no active signal is embed-

ded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

What is claimed is:

1. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting within a portable client device features from the electronic work;

b) transmitting the extracted features from the portable client device to one or more servers;

c) receiving at the portable client device from the one or more servers an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

d) electronically determining an action based on the identification of the electronic work; and

e) electronically performing the action on the portable client device.

2. A method of claim 1, wherein the identification is based on a non-exhaustive search identifying a neighbor within a fixed radius.

3. The method of claim 1, wherein the non-exhaustive search is sublinear.

4. The method of claim 1, wherein the non-exhaustive search is based on kd-trees.

5. The method of claim 1, wherein the non-exhaustive search is based on vantage point trees.

6. The method of claim 1, wherein the non-exhaustive search is based on excluded middle vantage point forest.

7. The method of claim 1, wherein the electronic work is an audio work.

8. The method of claim 7, wherein the audio work is obtained from at least one of a broadcast and an audio file format.

9. The method of claim 7, wherein the identification includes at least one of a song title, an album title, and a performer name.

10. The method of claim 1, wherein the electronic work is a video work.

11. The method of claim 10, wherein the video work is obtained from at least one of a broadcast and a video file format.

12. The method of claim 10, wherein the identification includes at least one of a title of the video work, a director of the video work, and names of performers in the video work.

13. The method of claim 1, wherein the step of electronically determining the action includes receiving at the portable client device an action based on the identification of the electronic work from the one or more servers.

14. The method of claim 1, wherein the step of electronically extracting the features is performed by at least one of a microprocessor of the portable client device and a digital signal processor of the portable client device.

15. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting features from the electronic work;

b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

16. A method of claim 15, wherein the identification is based on a non-exhaustive search identifying a neighbor within a fixed radius.

17. The method of claim 15, wherein the non-exhaustive search is sublinear.

18. The method of claim 15, wherein the non-exhaustive search is based on kd-trees.

19. The method of claim 15, wherein the non-exhaustive search is based on vantage point trees.

20. The method of claim 15, wherein the non-exhaustive search is based on excluded middle vantage point forest.

21. The method of claim 15, wherein the electronic work is an audio work.

22. The method of claim 21, wherein the audio work is obtained from at least one of a broadcast and an audio file format.

23. The method of claim 21, wherein the identification includes at least one of a song title, an album title, and a performer name.

24. The method of claim 15, wherein the electronic work is a video work.

25. The method of claim 24, wherein the video work is obtained from at least one of a broadcast and a video file format.

26. The method of claim 24, wherein the identification includes at least one of a title of the video work, a director of the video work, and names of performers in the video work.

27. The method of claim 15, wherein the action promotes e-commerce.

28. The method of claim 15, wherein the action promotes interaction.

29. The method of claim 1, wherein the action promotes e-commerce.

30. The method of claim 1, wherein the action promotes interaction.

31. The method of claim 15, wherein the action comprises providing and/or displaying additional information in association with the electronic work.

32. The method of claim 31, wherein the additional information is an advertisement.

33. The method of claim 32, wherein the action comprises providing a link to a site on the World Wide Web associated with the advertisement.

34. The method of claim 32, wherein the action comprises electronically registering a user with at least one of a service and a product related to the advertisement.

35. The method of claim 32, wherein the action comprises electronically providing at least one of a coupon and a certificate related to the advertisement.

36. The method of claim 32, wherein the action comprises automatically dialing a telephone number associated with the advertisement.

37. The method of claim 32, wherein the action comprises collecting competitive market research data related to the advertisement.

38. The method of claim 32, wherein the action comprises purchasing a product or service related to the advertisement.

**39**. The method of claim **32**, wherein the action comprises allowing a user to interact with a live broadcast related to the advertisement.

**40**. The method of claim **1**, wherein the action comprises providing and/or displaying additional information in association with the electronic work.

**41**. The method of claim **40**, wherein the additional information is an advertisement.

**42**. The method of claim **41**, wherein the action comprises providing a link to a site on the World Wide Web associated with the advertisement.

**43**. The method of claim **41**, wherein the action comprises electronically registering a user with at least one of a service and a product related to the advertisement.

**44**. The method of claim **41**, wherein the action comprises electronically providing at least one of a coupon and a certificate related to the advertisement.

**45**. The method of claim **41**, wherein the action comprises automatically dialing a telephone number associated with the advertisement.

**46**. The method of claim **41**, wherein the action comprises collecting competitive market research data related to the advertisement.

**47**. The method of claim **41**, wherein the action comprises purchasing a product or service related to the advertisement.

**48**. The method of claim **41**, wherein the action comprises allowing a user to interact with a live broadcast related to the advertisement.

**49**. The method of claim **40**, wherein the electronic work is an audio work and the additional information comprises at least one of a song title, an album title, and a performer name.

**50**. The method of claim **40**, wherein the electronic work is a video work and the additional information comprises at least one of a title of the video work, a director of the video work, and names of performers in the video work.

**51**. The method of claim **31**, wherein the electronic work is an audio work and the additional information comprises at least one of a song title, an album title, and a performer name.

**52**. The method of claim **31**, wherein the electronic work is a video work and the additional information comprises at least one of a title of the video work, a director of the video work, and names of performers in the video work.

* * * * *



US008205237B2

## (12) United States Patent
### Cox

(10) Patent No.: **US 8,205,237 B2**

(45) Date of Patent: **\*Jun. 19, 2012**

(54) **IDENTIFYING WORKS, USING A SUB-LINEAR TIME SEARCH, SUCH AS AN APPROXIMATE NEAREST NEIGHBOR SEARCH, FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET**

(76) Inventor: **Ingemar J. Cox**, London (GB)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 594 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/977,202**

(22) Filed: **Oct. 23, 2007**

(65) **Prior Publication Data**

US 2008/0060036 A1 Mar. 6, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 11/445,928, filed on Jun. 2, 2006, which is a continuation-in-part of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
*H04N 7/173* (2011.01)
(52) **U.S. Cl.** ..................................................... **725/110**
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,919,479 A | 11/1975 | Moon et al. | |
| 4,230,990 A | 10/1980 | Lert, Jr. et al. | |
| 4,450,531 A | 5/1984 | Kenyon et al. | |
| 4,495,526 A | 1/1985 | Baranoff-Rossine | |
| 4,499,601 A | 2/1985 | Matthews | |
| 4,511,917 A | 4/1985 | Kohler et al. | |
| 4,547,804 A | 10/1985 | Greenberg | |
| 4,634,966 A | 1/1987 | Nakatani et al. | |
| 4,639,779 A | 1/1987 | Greenberg | |
| 4,677,455 A | 6/1987 | Okajima | |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. | |
| 4,682,370 A | 7/1987 | Matthews | |
| 4,697,209 A | 9/1987 | Kiewit | |
| 4,739,398 A | 4/1988 | Thomas et al. | |
| 4,776,017 A | 10/1988 | Fujimoto | |
| 4,805,020 A | 2/1989 | Greenberg | |

(Continued)

OTHER PUBLICATIONS

Peter N. Yianilos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.\*

(Continued)

*Primary Examiner* — Brian Pendleton

*Assistant Examiner* — Cai Chen

(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57) **ABSTRACT**

A media work may be associated with an action by (a) extracting features from the media work, (b) determining an identification of the media work, based on the features extracted, using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determining an action based on the identification of the media work determined. The media work may be an audio work. The features extracted from the work may include (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and/or (D) information from frequencies of the audio work.

**40 Claims, 10 Drawing Sheets**



Appx106

U.S. PATENT DOCUMENTS

| 4,843,526 A | 6/1989 | Price, III |
| 4,843,562 A | 6/1989 | Kenyon et al. |
| 4,918,730 A | 4/1990 | Schulze |
| 5,210,820 A | 5/1993 | Kenyon |
| 5,283,819 A | 2/1994 | Glick et al. |
| 5,437,050 A | 7/1995 | Lamb et al. |
| 5,481,294 A | 1/1996 | Thomas et al. |
| 5,581,658 A | 12/1996 | O'Hagan et al. |
| 5,594,934 A | 1/1997 | Lu et al. |
| 5,629,739 A | 5/1997 | Dougherty |
| 5,692,213 A | 11/1997 | Goldberg et al. |
| 5,701,452 A | 12/1997 | Siefert |
| 5,701,542 A | 12/1997 | Sasayama |
| 5,724,605 A | 3/1998 | Wissner |
| 5,745,900 A | 4/1998 | Burrows |
| 5,798,785 A | 8/1998 | Hendricks et al. |
| 5,850,490 A | 12/1998 | Johnson |
| 5,918,223 A | 6/1999 | Blum et al. |
| 5,953,415 A | 9/1999 | Nielsen |
| 6,006,256 A | 12/1999 | Zdepski et al. |
| 6,011,758 A | 1/2000 | Dockes et al. |
| 6,026,439 A | 2/2000 | Chowdhury et al. |
| 6,044,402 A | 3/2000 | Jacobson et al. |
| 6,052,693 A | 4/2000 | Smith et al. |
| 6,061,056 A * | 5/2000 | Menard et al. ................ 715/704 |
| 6,088,455 A | 7/2000 | Logan et al. |
| 6,088,707 A | 7/2000 | Bates et al. |
| 6,118,450 A | 9/2000 | Proehl et al. |
| 6,119,124 A | 9/2000 | Broder et al. |
| 6,169,986 B1 | 1/2001 | Bowman et al. |
| 6,173,406 B1 | 1/2001 | Wang et al. |
| 6,240,409 B1 | 5/2001 | Aiken |
| 6,243,725 B1 | 6/2001 | Hempleman et al. |
| 6,247,133 B1 | 6/2001 | Palage et al. |
| 6,253,193 B1 | 6/2001 | Ginter et al. |
| 6,263,348 B1 | 7/2001 | Kathrow et al. |
| 6,330,593 B1 | 12/2001 | Roberts et al. |
| 6,345,256 B1 | 2/2002 | Milsted et al. |
| 6,349,296 B1 | 2/2002 | Broder |
| 6,360,215 B1 | 3/2002 | Judd et al. |
| 6,363,377 B1 | 3/2002 | Kravets et al. |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. |
| 6,385,596 B1 | 5/2002 | Wiser et al. |
| 6,408,128 B1 | 6/2002 | Abecassis |
| 6,418,421 B1 | 7/2002 | Hurtado et al. |
| 6,446,068 B1 | 9/2002 | Kortge |
| 6,449,226 B1 | 9/2002 | Kumagai |
| 6,452,874 B1 | 9/2002 | Otsuka et al. |
| 6,477,704 B1 | 11/2002 | Cremia |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. |
| 6,505,160 B1 | 1/2003 | Levy |
| 6,550,001 B1 | 4/2003 | Corwin et al. |
| 6,550,011 B1 | 4/2003 | Sims, III |
| 6,577,746 B1 | 6/2003 | Evans et al. |
| 6,591,245 B1 | 7/2003 | Klug |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. |
| 6,609,105 B2 | 8/2003 | Van Zoest et al. |
| 6,654,757 B1 | 11/2003 | Stern |
| 6,665,661 B1 | 12/2003 | Crow et al. |
| 6,675,174 B1 | 1/2004 | Bolle et al. |
| 6,834,308 B1 * | 12/2004 | Ikezoye et al. ................ 709/231 |
| 6,873,982 B1 | 3/2005 | Bates et al. |
| 6,931,451 B1 | 8/2005 | Logan et al. |
| 6,941,275 B1 | 9/2005 | Swierczek |
| 6,978,419 B1 | 12/2005 | Kantrowitz |
| 6,978,461 B2 | 12/2005 | Shapiro et al. |
| 6,990,453 B2 | 1/2006 | Wang et al. |
| 7,013,301 B2 | 3/2006 | Holm et al. |
| 7,058,223 B2 | 6/2006 | Cox |
| 7,106,904 B2 | 9/2006 | Shima |
| 7,155,449 B2 | 12/2006 | Pingel et al. |
| 7,158,929 B2 | 1/2007 | Wouters et al. |
| 7,168,083 B2 | 1/2007 | Kalker et al. |
| 7,302,574 B2 | 11/2007 | Conwell et al. |
| 7,366,718 B1 | 4/2008 | Pugh et al. |
| 7,421,723 B2 | 9/2008 | Harkness et al. |
| 7,477,739 B2 | 1/2009 | Haitsma et al. |
| 7,523,312 B2 | 4/2009 | Kalker et al. |
| 7,587,728 B2 | 9/2009 | Wheeler et al. |
| 7,647,604 B2 | 1/2010 | Ramaswamy |
| 7,650,616 B2 | 1/2010 | Lee |
| 7,757,248 B2 | 7/2010 | Harkness et al. |
| 2001/0001160 A1 * | 5/2001 | Shoff et al. ..................... 725/51 |
| 2001/0003818 A1 | 6/2001 | Pingel et al. |
| 2002/0023020 A1 | 2/2002 | Kenyon et al. |
| 2002/0032698 A1 | 3/2002 | Cox |
| 2002/0120925 A1 | 8/2002 | Logan |
| 2002/0156760 A1 | 10/2002 | Lawrence et al. |
| 2003/0106017 A1 | 6/2003 | Kanchirayappa et al. |
| 2003/0146940 A1 | 8/2003 | Ellis |
| 2004/0199387 A1 * | 10/2004 | Wang et al. ................... 704/243 |
| 2005/0160363 A1 | 7/2005 | Bhogal et al. |
| 2006/0101069 A1 | 5/2006 | Bell et al. |
| 2006/0206462 A1 | 9/2006 | Barber |
| 2007/0041667 A1 | 2/2007 | Cox |
| 2007/0083510 A1 | 4/2007 | McArdle |
| 2007/0118375 A1 | 5/2007 | Kenyon et al. |
| 2008/0091684 A1 | 4/2008 | Ellis et al. |
| 2008/0250241 A1 | 10/2008 | Ginter et al. |

OTHER PUBLICATIONS

Peter N. Yianlos, Excluded Middle Vantage Point Forest for Nearest Neighbor Search, Aug. 1, 1999, pp. 1-12.*

P.N. Yianilos, "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search" SODA 2000, pp. 361-370.

Baum, L., et al., "A Maximation Technique Occurring in the Statistical Analysis of Probabilistic Functions of Markov Chains", The Annals of Mathematical Statistics, vol. 41, No. 1, pp. 164-171 (1970).

Dempster, A. P., et al., "Maximum Likelihood from Incomplete Data via the $EM$ Algorithm", Journal of the Royal Statistical Society, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).

Reynolds, D., et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models", IEEE Transactions on Speech and Audio Processing, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

Nievergelt, J. et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," ACM Transactions on Database Systems, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Heintze, N, "Scalable Document Fingerprinting," Proc. USENIX Workshop on Electronic Commerce (1996).

Wold, E, et al., "Content-Based Classification, Search, and Retrieval of Audio," IEEE Multimedia, vol. 3, Issue 3, pp. 27-63 (1996).

Bhanu, B., et al., "Learning Feature Relevance and Similarity Metrics in Image Databases", Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 14-19 (1998).

Del Bimbo, A., et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents", Image Description and Retrieval, pp. 161-192 (1998).

Indyk, P., and Motwani, R., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality," Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing, pp. 604-613 (1998).

La Cascia, M., et al., "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web", Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 24-29 (1998).

Yoshitaka, A., et al., "A Survey on Content-Based Retrieval for Multimedia Databases", IEEE Transactions on Knowledge and Data Engineering, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Lawrence, S., et al., "Digital Libraries and Automonous Citation Indexing," IEEE Computer, pp, 67-71 (Jun. 1999).

Kimura, A, et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," IEEE Conf on Acoustics, Speech and Signal Processing, (ICASSP '01), vol. 3, pp, 1429-1432 (2001).

Chavez, E., et al., "Searching in Metric Spaces", ACM Computing Surveys, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Haitsma, J., et al., "Robust Audio Hashing for Content Identification, Int" Workshop on Content Based Multimedia Indexing, Brescia, Italy (Sep. 19-21, 2001).

Haitsma, J., and Walker, T, "A Highly Robust Audio Fingerprinting System," Journal of New Music Research, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Schleimer, Saul, et al., "Winnowing: Local Algorithms for Document Fingerprinting ACM SIGMOD" (Jun. 9-12, 2003).

"Searching Near-Replicas of Images via Clustering" Edward Chang, Chen Li, James Wang, Peter Mork, Gio Wiederhold Proc. SPIE Symposium of Voice, Video, and Data Communications, 1999.

"RIME: A Replicated Image Detector for the World-Wide Web" Edward Y. Chang, James Ze Wang, Chen Li, and Gio Wiederhold, SPIE 1998.

"Safeguarding and charging for information on the internet," H. Garcia-Molina, S. Ketchpel, and N. Shivakumar, Proceedings of ICDE , 1998.

"Detection mechanisms for digital documents," S. Brin and H. Garcia-Molina, Proceedings of ACM SIG-MOD , May 1995.

"The x-tree: An index structure for high-dimensional data," S. Berchtold, Proceedings of the 22nd VLDB , Aug. 1996.

"The sr-tree: An index structure for high-dimensional nearest neighbor queries," N. Katayama and S. Satoh, Proceedings of ACM SIGMOD , May 1997.

"The k-d-b-tree: A search structure for large multidimensional dynamic indexes," J. T. Robinson, Proceedings of ACM SIGMOD , Apr. 1981.

"Query by image and video content: The QBIC system," M. Flickner, H. Sawhney, W. Niblack, J. Ashley, Q. Huang, and et al, IEEE Computer 28(9), pp. 23{32, 1995.

"Visual information retrieval," A. Gupta and R. Jain, Communications of the ACM 40(5), pp. 69-79, 1997.

"Visualseek: A fully automated content-based image query system," J. R. Smith and S.-F. Chang, ACM Multimedia Conference , 1996.

"Similarity indexing: Algorithms and performance," D. A. White and R. Jain, Proc. SPIE vol. 2670, San Diego, 1996.

"The r*-tree: an efficient and robust access method, for points and rectangles," N. Beckmann, H.-P. Kriegel, R. Schneider, and B. Seeger, Proceedings of ACM Sigmod , May 1990.

"R-trees: a dynamic index structure for spatial searching," A. Guttman, Proceedings of ACM Sigmod , Jun. 1984.

"Similarity indexing with the ss-tree," D. A. White and R. Jain, Proceedings of the 12th ICDE , Feb. 1996.

"The tv-tree: an index structure for high-dimensional data," K.-L. Lin, H. V. Jagadish, and C. Faloutsos, VLDB Journal 3 (4), 1994.

"M-tree: An efficient access method for similarity search in metric spaces," P. Ciaccia, M. Patella, and P. Zezula, Proceedings of the 23rd VLDB , Aug. 1997.

"Nearest neighbor queries," N. Roussopoulos, S. Kelley, and F. Vincent, Proceedings of ACM Sigmod , May 1995.

"An extensible hashing index for high-dimensional similarity search," C. Li, E. Chang, and J. Z. Wang, Stanford Technical Report , Aug. 1998.

"Two algorithms for nearest-neighbor search in high dimensions" J. M. Kleinberg, Proc 29th STOC, 1997.

"A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise" Martin Ester, Hans-Peter Kriegel, Jörg Sander, Xiaowei Xu Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

"Adaptive Color Image Embeddings for Database Navigation" Yossi Rubner, Carlo Tomasi and Leonidas J. Guibas, Proceedings of the 1998 IEEE Asian Conference on Computer Vision.

A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces R. Weber, H-J Schek, S. Blott Proc., 24th VLDB Conf. 1998.

Bouktache, D, "A fast algorithm for the nearest neighbor classifier", IEEE Transactions on Pattern Analysis and Machine Intelligence, Mar. 1997, pp. 277-282.

Nene et al., "A simple algorithm for nearest neighbor search in high dimensions", IEEE Transactions on Pattern Analysis and Machine Intelligence; Sep. 1997, pp. 989-1003.

Arya et al. "Approximate nearest neighbor queries in fixed dimensions", Proceedings of the 4th annual ACM-SIAM Symposium on Discrete algorithms, 1993; pp. 271-280.

K. Fukunaga and P. M. Narendra. A branch and bound algorithm for computing k-nearest neighbors. IEEE Trans. Comput., C-24:750{753, Jul. 1975.

C.D. Feustel and L. G. Shapiro. The nearest neighbor problem in an abstract metric space. Pattern Recognition Letters, pp. 125{128, Dec. 1982.

Dennis Shasha and Tsong-Li Wang. New techniques for best-match retrieval. ACM Transactions on Information Systems, 8(2):140{158, Apr. 1990.

J. Uhlmann. Satisfying general proximity/similarity queries with metric trees. Information Processing Letters, 40 (4):175{9, Nov. 1991.

Sergey Brin, "Near Neighbor Search in Large Metric Spaces", Proceedings of the 21st VLDB Conference, Zurich, Switzerland, Sep. 1995.

D. P. Huttenlocher, et al. Comparing images using the hausdorff distance. IEEE Transactions on Pattern Analysis and Machine Intelligence, 15(3):850{63, Sep. 1993.

Seidl et al. "Optimal multi-step k-nearest neighbor search", Proceedings of ACM SIGMOD international conference on Managemet of data, 1998, pp. 154-165.

W.A. Burkhard and R.M. Keller. Some Approaches to Best-Match File Searching. Communications of the ACM. vol. 16, No. 4, Apr. 1973.

Kushilevitz et al. "Efficient search for approximate nearest neighbor in high dimensional spaces", Proceedings of the 30th annual ACM Symposium on Theory of computing, 1998, pp. 614-623.* ;annual ACM Symposium on Theory of computing, 1998, pp. 614-623.

Yianilos, P, "Data structures and algorithms for nearest neighbor search in general metric spaces", Proceedings of the ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 311-321.

Ardizzone, Edoardo et al., "Motion and Color-Based Video Indexing and Retrieval," Universita di palermo, Departimento di Ingegneria Elettrica, pp. 135-139, Viale delle Scienze, Palermo, Italy, IEEE 1996.

Deng, Yining et al., "Content-based Search of Video Using Color, Texture, and Motion," Dept. of Electrical and Computer Engineering, University of California, Santa Barbara, CA, pp. 534-537, IEEE 1997.

Fang, Min et al., "Computing Iceberg Queries Efficiently," Dept. of Computer Science, Stanford, CA, Paper No. 234, pp. 1-25.

Flickner, Myron et al., "Query by Image and Video Content: The QBIC System," IBM Almaden Research Center, Sep. 1995, pp. 23-32, IEEE 1995.

Gargi, U et al., "Performance Characterization and Comparison of Video Indexing Algorithms," Dept. of Computer Science and Engineering, The Pennsylvania State University, University Park, PA.

Gionis, Aristides et al., "Similarity Search in High Demensions via Hashing," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 518-529, Proceeding the 25th VLDB Conference, Edinburgh, Scotland, 1999.

Indyk, Piotr et al., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality" (preliminary version) Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13 & i-vii, Jul. 21, 1999.

Iyengar, Giridharan et al., "Models for automatic classification of video sequences," MIT Media Laboratory, Cambridge, MA.

Jain, Anil K., et al., "Image Retrieval using Color and Shape," Dept. of Computer Science, Michigan State University, Eas Lansing, MI, pp. 1-24, May 15, 1995.

Ogle, Virginia E., et al., "Chabot: Retrieval from a Relational Database of Images," University of California at Berkeley, Computer pp. 40-48, IEEE 1995.

Pentland, A. et al., "Photobook: Content-Based Manipulation of Image Databases," Perceptual Computing Section, The Media Laboratory, Massachusetts Institute of Tech., International Jorunal of Computer Vision 18(3), pp. 233-254 (1996), 1996 Kluwer Academic Publishers. Manuf. in The Netherlands.

Shivakumar, Narayanan et al., "SCAM: A Copy Detection Mechanism for Digital Documents," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13.

Shivakumar, Narayanan et al., "Building a Scalable and Accurate Copy Detection Mechanism," Dept. of Computer Science, Stanford University, Stanford, CA.

Srihari, Rohiini K., "Automatic Indexing and Content-Based Retrieval of Captioned Images," State University of New York, Buffalo, Theme Feature, pp. 49-56, Sep. 1995, IEEE 1995.

Swain, Michael and Ballard, Dana H., "Color Indexing," International Journal of Computer Vision 7:1, p. 11-32 (1991), 1991 Kluwer Academic Publishers. Manuf. in The Netherlands.

Wactlar, Howard D. et al., "Intelligence Access to Digital Video: Informedia Project," Carnegie Mellon University, Digital Library Initiative: Carnegie Mellon University, Computer, pp. 46-52, IEEE 1996.

Yeo, Boon-Lock et al., "Rapid Scene Analysis on Compressed Video," IEEE Transactions on Circuits and Systems for Video Technology, vol. 5, No. 6, pp. 533-544, Dec. 1995, Dept. of Electrical Engineering, Princeton University, Princeton, NJ, IEEE Log No. 9415901.

Indyk, Piotr et al., "Finding pirated video sequences on the Internet," Dept. of Computer Science, Stanford University, Palo Alto, CA, Paper No. 199.

* cited by examiner



WORK @t1

WORK @t2

122 — FEATURE EXTRACTION OPERATION(S)

FEATURE TO WORK ID TAGGING OPERATION(S) ⌐ 124

FEATURE (VECTOR) EXTRACTION OPERATION(S) ⌐ 140

DATABASE GENERATION OPERATION(S)
120

150

WID INFORMATION ⌐ 110

FEATURE (VECTOR) LOOKUP OPERATION(S)

114  116

| FEATURE(S) (VECTOR) | WORK ID |
|---|---|
| : | : |
| : | : |

112

138

160

WORK-ASSOCIATED INFORMATION LOOKUP OPERATION(S)

WID-ACTION INFORMATION ⌐ 130

DATABASE GENERATION OPERATION(S)

134  136

| WORK ID | ASSOCIATED INFORMATION (e.g., ACTION) |
|---|---|
| : | : |
| : | : |

132

ACTION INITIATION OPERATION(S)

170

100

FIGURE 1



**FIGURE 2**



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



| | |
|---|---|
| UNIQUE ID: 15642 | 1010 |
| PRODUCT: COCA COLA | 1020 |
| CATEGORY: SODA | 1030 |
| MANUFACTURER: COCA COLA | 1040 |
| URL http://www.cocacola.com | 1050 |
| OTHER DATA | 1060 |

1000

# FIGURE 10

# IDENTIFYING WORKS, USING A SUB-LINEAR TIME SEARCH, SUCH AS AN APPROXIMATE NEAREST NEIGHBOR SEARCH, FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET

## §0. RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 11/445,928 (incorporated herein by reference), titled "USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK," filed on Jun. 2, 2006, and listing Ingemar J. Cox as the inventor, which is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference, issued as U.S. Pat. No. 7,058,223 on Jun. 6, 2006), titled "IDENTIFYING WORKS FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001, now U.S. Pat. No. 7,058,223 and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorporated herein by reference), titled "Identifying and linking television, audio, print and other media to the Internet", filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

## §1. BACKGROUND OF THE INVENTION

§1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement delivered via print media, or via a radio or television broadcast) without the need to modify the work.

§1.2 Related Art

§1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request discount vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applications also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be automatically enabled using the invention described herein.

In the context of facilitating audience interaction or participation, there is much interest in the convergence of television and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also interest in enhancing the television viewing experience. To this end, there have been a number of experiments with interactive television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the competition.

§1.2.2 Embedding Work Identifying Code or Signals Within Works

Known techniques of linking works delivered via traditional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such traditional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) watermarks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed implementations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be considered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a proprietary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technology and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blanking interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to television viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-captioning information as well as other information, while in the UK, the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking interval is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, Oreg. embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of

broadcast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, Utah embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of barcode and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic or fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naïve user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed directly into a sound card in a PC. This requires a physical connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

§1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §2. SUMMARY OF THE INVENTION

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

5

6

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

### §4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

### §4.1 FUNCTIONS

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work information to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

### §4.2 EMBODIMENTS

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

#### §4.2.1 Embodiments in Which Work is Recognized Based on Intra-Work Information

#### Such as a Feature Vector

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

#### §4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK$_{@t1}$), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK$_{@t2}$), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

#### §4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of

feature vectors. The recognition literature contains many different representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also K. Fukunaga, *Introduction to Statistical Pattern Recognition,* 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480× 720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or bare a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," *IEEE Transactions on Image Processing* (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518, 5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

### §4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These

possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

### §4.2.1.1.3. Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, *Pattern Classification and Scene Analysis* (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage

Point Forests for nearest Neighbor Search", *Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop*, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" *SODA* 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" *SODA* 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. A nearest neighbor search always finds the closest point to the query. An approximate nearest neighbor search does not always find the closest point to the query. For example, it might do so with some probability, or it might provide any point within some small distance of the closest point.

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a work's feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

### §4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database **130** that contains information **136** associated with the particular work **134**. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such as initiating an e-commerce transaction. After looking up the work identifier **134** in the WIDAT database **130**, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database **130** allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive the advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do

so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

### §4.2.1.2 Exemplary Architectures

Three alternative architectural embodiments in which the first technique may be employed are now described with reference to FIGS. **2**, **3**, and **4**.

FIG. **2** is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device **210**, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer **210** performs the operations **140***a*, **150***a*, **160***a* and **170***a*, such as those shown in FIG. **1**. To reiterate, these operations include a feature extraction operation(s) **140***a*, feature vector lookup or matching operation(s) **150***a* in connection with items or records **112***a* in a work-identification (WID) database **110***a*. If a matching feature vector **114***a* is found, the work-associated information lookup operation(s) **160***a* can use the associated work identifier **116***a* to accessing a work identification-action translation (WIDAT) database **130***a* to retrieve associated information **136***a*, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

An example illustrating operations that can occur in the first embodiment of FIG. **1**, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database **110***a*. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neigh-

bor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. Estimates of the size of the WIDAT database 130a depend on what associated information (recall fields 136) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database 130a would be less than 1 Mbyte.

The configuration just described with reference to FIG. 2 places all of the processing and data on each user's local machine 210. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider 240 must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet 230 in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer 210 might also transmit information to a central monitoring center 240 informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. 3 is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. 2, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database 130b is at a remote location 340. In this arrangement, illustrated in FIG. 3, after the local computer 310 identifies the work, it sends a query to the remote WIDAT database 130b. The query may contain the work identifier. The remote site 340 may then return the associated information 136. Although the remote WIDAT database 130b needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers 310.

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database 130b might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, over-loading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. 4 is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database may be small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1 Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally 410, the one or more vectors are transmitted to a central site 440 at which is stored the WID and WIDAT databases 110c and 130c together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. 4. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation 140c that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site 440 which can resolve the request.

After successfully matching the feature vector, the central site 440 can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site 440 might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction 140c in digital set-top-boxes and in video recorders 410. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement, the video recorder would extract one or more feature vectors and transmit them to a central site 440. This site 440 would determine if a match existed between the query vector and the database of pre-stored vectors 110c. If a match is found, the central server 440 would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device 410. Of course, a consumer device 410 such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device 410 could store

13

the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

### §4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCR's. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information")

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) **210/310/410** to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

### §4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, preferably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action information (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT)

14

information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. Such information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market) **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

#### §4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

#### §4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database

**510** maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140***d*, as well as the work identification operation(s) **150***d* and other databases **110***d*, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4×35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophisticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

### §4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, and most TV's do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

### §4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540***a* may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510***a*, **530***a*, and **110***e*, as well as the database generation operation(s) **520***a*/**538***a*, the lookup operation(s) **550***a* and the work-associated information lookup operation(s) **560***a* may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740***a* and query resolution center **740***b* are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and espe-

17

cially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which are sold to interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

§4.2.3 Exemplary Apparatus for Audience Member (User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. 6 and 7, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This infor-

18

mation can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCR's and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. 6 and 7, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities of course, the two-way communication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

§4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or com-

puter-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

### §4.3 OPERATIONAL EXAMPLES

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in §4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

### §4.3.1 Operational Example where Intra-Work Information is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed. The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average

intensities of n×n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the n×n blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of 480×720 pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with 16×16 blocks, then the number of blocks per frame is 345, 600/256=1350. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 16×16 blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the 100×10=1000 DCT coefficients. Many other variations are also possible. In many media applications, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not yet present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and

Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000,000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sublinear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, $\tau$. The fixed radius search means that if the database contains a vector that is within $\tau$ of the query,

then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10×50× 30 queries per second.

### §4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840**$a$. These centers **840**$a$ may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840**$a$ is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840**$a$ update one or more database centers **840**$b$, informing them of the time, place, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840**$b$ updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840**$b$ can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840**$a$. The database centers **840**$b$ are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create

a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to 3600×100×100=36,000,000 entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work.

An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**, the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840***b*. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840***b*. This might happen hours or even days later.

The query contains information that the database center **840***b* uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840***b* receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840***b* may simply function as a form of proxy server, mapping the audience member's initial query into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840***b* may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840***b* to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, Calif. or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840***b* using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840***a* where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840***b* is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

### §4.4 CONCLUSIONS

None of the embodiments of the invention require modification to the work or content, i.e., no active signal is embedded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

What is claimed is:

1. A computer-implemented method comprising:

a) receiving, by a computer system including at least one computer, features that were extracted from a media work by a client device;

b) determining, by the computer system, an identification of the media work using the received features extracted from the media work to perform a sub-linear time search of extracted features of identified media works to identify a neighbor; and

c) transmitting, by the computer system, information about the identified media work to the client device.

2. The computer-implemented method of claim 1 wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and wherein the audio work is one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

3. The computer-implemented method of claim 1 wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

4. The computer-implemented method of claim 1 further comprising performing an action including at least one of promoting commerce or enhancing interest in the work.

5. Apparatus comprising:

a) at least one processor; and

b) at least one storage device storing processor-executable instructions which, when executed by the at least one processor, perform a method of

1) receiving features that were extracted from a media work by a client device,

2) determining, by the computer system, an identification of the media work using the features extracted from the media work to perform a sub-linear time search of extracted features of identified media works to identify a neighbor, and

3) transmitting information about the identified media work to the client device.

6. The apparatus of claim 5 wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and wherein the audio work is one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

7. The apparatus of claim 5 wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

8. The apparatus of claim 5 wherein the method further includes performing an action including at least one of promoting commerce or enhancing interest in the work.

9. A computer-implemented method comprising:

a) receiving, by a computer system including at least one computer, features what were extracted from media work by a client device;

b) determining, by the computer system, an identification of the media work using the received features extracted from the media work to perform an approximate nearest neighbor search of extracted features of identified media works; and

c) transmitting, by the computer system, information about the identified media work to the client device.

10. The method of claim 9 wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and wherein the audio work one of (A) a broadcast, (B) a digital file, or (C) an MP3 file.

11. The method of claim 9 wherein the information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

12. The method of claim 9 further comprising performing an action including at least one of promoting commerce or enhancing interest in the work.

13. Apparatus comprising:

a) at least one processor; and

b) at least one storage device storing processor-executable instructions which, when executed by the at least one processor, perform a method of

1) receiving features what were extracted from a media work by a client device,

2) determining, by the computer system, an identification of the media work using the received features extracted from the media work to perform an approximate nearest neighbor search of extracted features of identified media works, and

3) transmitting information about the identified media work to the client device.

14. The apparatus of claim 13 wherein the media work is an audio work,

wherein the features extracted from the work comprise at least one selected from a group consisting of (A) a frequency decomposition of a signal of the audio work, (B) information samples of the audio work, (C) average intensities of sampled windows of the audio work, and (D) information from frequencies of the audio work, and wherein the audio work is one of (A) a broadcast, (8) a digital file, or (C) an MP3 file.

15. The apparatus of claim 13 information about the identified media work transmitted to the client device includes at least one of (A) a title, or (B) an author.

16. The apparatus of claim 13 wherein the method further includes performing an action including at least one of promoting commerce or enhancing interest in the work.

17. The computer-implemented method of claim 1 wherein the media work is a video signal.

18. The computer-implemented method of claim 17 wherein the video signal is obtained from at least one of (A) a broadcast or (B) a video file format.

19. The computer-implemented method of claim 9 wherein the media work is a video signal.

20. The computer-implemented method of claim 19 wherein the video signal is obtained from at least one of (A) a broadcast or B) a video file format.

21. The computer-implemented method of claim 1 wherein at least one of the acts of receiving or transmitting is performed via a direct communication between the client device and the computer system.

22. The computer-implemented method of claim 1 wherein at least one of the acts of receiving or transmitting is per-

**27**

formed via an indirect communication between the client device and the computer system.

23. The computer-implemented method of claim **9** wherein at least one of the acts of receiving or transmitting is performed via a direct communication between the client device and the computer system.

24. The computer-implemented method of claim **9** wherein at least one of the acts of receiving or transmitting is performed via an indirect communication between the client device and the computer system.

25. A computer-implemented method comprising:
a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;
b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a nonexhaustive search of reference extracted features of reference media works to identify a near neighbor; and
c) determining, by the computer system, an action based on the determined identification of the media work.

26. The method of claim **25**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

27. The method of claim **26**, wherein the additional information is an advertisement.

28. The method of claim **25**, wherein the action comprises providing a coupon.

29. The method of claim **25**, wherein the action comprises providing a link to a Web site.

30. The method of claim **25**, wherein the action comprises initiating an e-commerce transaction.

**28**

31. The method of claim **25**, wherein the action comprises initiating a telephone call.

32. The method of claim **25**, wherein the action comprises logging an event relating to competitive market research data.

33. A computer-implemented method comprising:
a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work uploaded from a client device;
b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and
c) determining, by the computer system, an action based on the determined identification of the media work.

34. The method of claim **33**, wherein the action comprises providing to and/or displaying, at another client device, additional information in association with the media work.

35. The method of claim **34**, wherein the additional information is an advertisement.

36. The method of claim **33**, wherein the action comprises providing a coupon.

37. The method of claim **33**, wherein the action comprises providing a link to a Website.

38. The method of claim **33**, wherein the action comprises initiating an e-commerce transaction.

39. The method of claim **33**, wherein the action comprises initiating a telephone call.

40. The method of claim **33**, wherein the action comprises logging an event relating to competitive market research data.

\* \* \* \* \*

# CERTIFICATE OF CORRECTION

PATENT NO.      : 8,205,237 B2                                                Page 1 of 1
APPLICATION NO.  : 11/977202
DATED            : June 19, 2012
INVENTOR(S)     : Cox

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 25, line 64, claim 9, "what" should read --that--.

Column 26, line 14, claim 10, "work one" should read --work is one--.

Column 26, line 27, claim 13, "what" should read --that--.

Column 26, line 44, claim 14, "(8)" should read --(B)--.

Column 26, line 46, claim 15, "claim 13 information" should read --claim 13 wherein information--.

Column 26, line 61, claim 20, "B)" should read --(B)--.

Signed and Sealed this
Sixth Day of May, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Appx134


US008904464B1

(12) **United States Patent**
Cox

(10) **Patent No.:** **US 8,904,464 B1**
(45) **Date of Patent:** *****Dec. 2, 2014**

(54) **METHOD FOR TAGGING AN ELECTRONIC MEDIA WORK TO PERFORM AN ACTION**

(71) Applicant: **Network-1 Security Solutions, Inc.,** New York, NY (US)

(72) Inventor: **Ingemar J. Cox**, London (GB)

(73) Assignee: **Network-1 Technologies, Inc.,** New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/800,573**

(22) Filed: **Mar. 13, 2013**

**Related U.S. Application Data**

(63) Continuation of application No. 13/338,079, filed on Dec. 27, 2011, which is a continuation of application No. 11/977,202, filed on Oct. 23, 2007, now Pat. No. 8,205,237, which is a continuation of application No. 11/445,928, filed on Jun. 2, 2006, now Pat. No. 8,010,988, which is a continuation of application No. 09/950,972, filed on Sep. 13, 2001, now Pat. No. 7,058,223.

(60) Provisional application No. 60/232,618, filed on Sep. 14, 2000.

(51) **Int. Cl.**
*H04N 7/173* (2011.01)
*G06Q 30/02* (2012.01)

(52) **U.S. Cl.**
CPC .................................. *G06Q 30/0256* (2013.01)
USPC ............ **725/115**; 725/110; 725/114; 725/116

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,919,479 A | 11/1975 | Moon et al. | |
| 4,230,990 A | 10/1980 | Lert, Jr. et al. | |
| 4,450,531 A | 5/1984 | Kenyon et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0849946 A2 | 6/1998 |
| EP | 1 354 276 B1 | 12/2007 |

(Continued)

OTHER PUBLICATIONS

Martin Ester et al., "A Density-Based Algorithm for Discovering Clusters in Large Spatial Databases with Noise," Proceedings of 2nd International Conference on Knowledge Discovery and Data Mining (KDD-96), 1996.

(Continued)

*Primary Examiner* — Cai Chen
(74) *Attorney, Agent, or Firm* — Amster, Rothstein & Ebenstein LLP

(57) **ABSTRACT**

A computer-implemented method comprising the steps of receiving, by a computer system including at least one computer, a media work; receiving, by the computer system, a tag associated with the media work having a media work identifier; storing, by the computer system, the media work identifier and the associated tag; obtaining, by the computer system from a user electronic device, a query related to the associated tag; correlating, by the computer system, the query with associated information related to an action to be performed; and providing, from the computer system to the user electronic device, the associated information to be used in performing the action.

**34 Claims, 10 Drawing Sheets**



Appx135

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,454,594 A | 6/1984 | Heffron et al. |
| 4,495,526 A | 1/1985 | Baranoff-Rossine |
| 4,499,601 A | 2/1985 | Matthews |
| 4,511,917 A | 4/1985 | Kohler et al. |
| 4,547,804 A | 10/1985 | Greenberg |
| 4,634,966 A | 1/1987 | Nakatani et al. |
| 4,639,779 A | 1/1987 | Greenberg |
| 4,677,455 A | 6/1987 | Okajima |
| 4,677,466 A | 6/1987 | Lert, Jr. et al. |
| 4,682,370 A | 7/1987 | Matthews |
| 4,697,209 A | 9/1987 | Kiervit et al. |
| 4,739,398 A | 4/1988 | Thomas et al. |
| 4,776,017 A | 10/1988 | Fujimoto |
| 4,805,020 A | 2/1989 | Greenberg |
| 4,843,526 A | 6/1989 | Price, III |
| 4,843,562 A | 6/1989 | Kenyon et al. |
| 4,918,730 A | 4/1990 | Schulze |
| 5,210,820 A | 5/1993 | Kenyon |
| 5,283,819 A | 2/1994 | Glick et al. |
| 5,437,050 A | 7/1995 | Lamb et al. |
| 5,438,355 A | 8/1995 | Palmer |
| 5,465,353 A | 11/1995 | Hull et al. |
| 5,481,294 A | 1/1996 | Thomas et al. |
| 5,504,518 A | 4/1996 | Ellis et al. |
| 5,550,735 A | 8/1996 | Slade et al. |
| 5,581,658 A | 12/1996 | O'Hagan et al. |
| 5,594,934 A | 1/1997 | Lu et al. |
| 5,607,356 A | 3/1997 | Schwartz |
| 5,629,739 A | 5/1997 | Dougherty |
| 5,634,012 A | 5/1997 | Stefik et al. |
| 5,638,443 A | 6/1997 | Stefik et al. |
| 5,692,213 A | 11/1997 | Goldberg et al. |
| 5,701,452 A | 12/1997 | Siefert |
| 5,701,542 A | 12/1997 | Sasayama |
| 5,706,364 A | 1/1998 | Kopec et al. |
| 5,724,605 A | 3/1998 | Wissner |
| 5,745,900 A | 4/1998 | Burrows |
| 5,748,783 A | 5/1998 | Rhoads |
| 5,768,426 A | 6/1998 | Rhoads |
| 5,798,785 A | 8/1998 | Hendricks et al. |
| 5,809,471 A | 9/1998 | Brodsky |
| 5,818,441 A | 10/1998 | Throckmorton et al. |
| 5,818,935 A | 10/1998 | Maa |
| 5,822,436 A | 10/1998 | Rhoads |
| 5,832,119 A | 11/1998 | Rhoads |
| 5,832,182 A | 11/1998 | Zhang et al. |
| 5,841,978 A | 11/1998 | Rhoads |
| 5,850,490 A | 12/1998 | Johnson |
| 5,855,008 A | 12/1998 | Goldhaber et al. |
| 5,862,260 A | 1/1999 | Rhoads |
| 5,874,686 A | 2/1999 | Ghias et al. |
| 5,892,536 A | 4/1999 | Logan et al. |
| 5,903,816 A | 5/1999 | Broadwin et al. |
| 5,905,865 A | 5/1999 | Palmer et al. |
| 5,905,988 A | 5/1999 | Schwartz et al. |
| 5,907,322 A | 5/1999 | Kelly et al. |
| 5,918,223 A | 6/1999 | Blum et al. |
| 5,929,849 A | 7/1999 | Kikinis |
| 5,929,850 A | 7/1999 | Broadwin et al. |
| 5,931,908 A | 8/1999 | Gerba et al. |
| 5,937,331 A | 8/1999 | Kalluri et al. |
| 5,953,415 A | 9/1999 | Nielsen |
| 5,961,603 A | 10/1999 | Kunkel et al. |
| 5,963,966 A | 10/1999 | Mitchell et al. |
| 5,973,685 A | 10/1999 | Schaffa et al. |
| 5,973,723 A | 10/1999 | DeLuca |
| 5,978,791 A | 11/1999 | Farber et al. |
| 5,983,171 A | 11/1999 | Yokoyama et al. |
| 5,983,176 A | 11/1999 | Hoffert et al. |
| 5,999,689 A | 12/1999 | Iggulden |
| 6,006,256 A | 12/1999 | Zdepski et al. |
| 6,006,265 A | 12/1999 | Rangan et al. |
| 6,009,410 A * | 12/1999 | LeMole et al. ............. 705/14.54 |
| 6,011,758 A | 1/2000 | Dockes et al. |
| 6,021,433 A | 2/2000 | Payne et al. |
| 6,023,693 A | 2/2000 | Masuoka et al. |
| 6,026,439 A | 2/2000 | Chowdhury et al. |
| 6,044,376 A | 3/2000 | Kurtzman, II |
| 6,044,402 A | 3/2000 | Jacobson et al. |
| 6,047,327 A | 4/2000 | Tso et al. |
| 6,052,693 A | 4/2000 | Smith et al. |
| 6,057,872 A * | 5/2000 | Candelore ...................... 725/23 |
| 6,061,056 A | 5/2000 | Menard et al. |
| 6,067,369 A | 5/2000 | Kamei |
| 6,088,455 A | 7/2000 | Logan et al. |
| 6,088,707 A | 7/2000 | Bates et al. |
| 6,096,961 A | 8/2000 | Bruti et al. |
| 6,098,106 A | 8/2000 | Philyaw et al. |
| 6,118,450 A | 9/2000 | Proehl et al. |
| 6,119,124 A | 9/2000 | Broder et al. |
| 6,121,530 A | 9/2000 | Sonoda |
| 6,154,737 A | 11/2000 | Inaba et al. |
| 6,169,986 B1 | 1/2001 | Bowman et al. |
| 6,173,406 B1 | 1/2001 | Wang et al. |
| 6,188,010 B1 | 2/2001 | Iwamura |
| 6,195,693 B1 | 2/2001 | Berry et al. |
| 6,201,176 B1 | 3/2001 | Yourlo |
| 6,215,483 B1 | 4/2001 | Zigmond |
| 6,229,922 B1 | 5/2001 | Sasakawa et al. |
| 6,233,682 B1 | 5/2001 | Fritsch |
| 6,236,758 B1 | 5/2001 | Sodagar et al. |
| 6,240,409 B1 | 5/2001 | Aiken |
| 6,243,725 B1 | 6/2001 | Hempleman et al. |
| 6,247,133 B1 | 6/2001 | Palage et al. |
| 6,253,193 B1 | 6/2001 | Ginter et al. |
| 6,263,348 B1 | 7/2001 | Kathrow et al. |
| 6,263,505 B1 | 7/2001 | Walker et al. |
| 6,269,275 B1 | 7/2001 | Slade |
| 6,279,010 B1 | 8/2001 | Anderson |
| 6,285,407 B1 | 9/2001 | Yasuki et al. |
| 6,317,885 B1 | 11/2001 | Fries |
| 6,326,982 B1 | 12/2001 | Wu et al. |
| 6,330,593 B1 | 12/2001 | Roberts et al. |
| 6,345,256 B1 | 2/2002 | Milsted et al. |
| 6,349,296 B1 | 2/2002 | Broder et al. |
| 6,360,215 B1 | 3/2002 | Judd et al. |
| 6,363,377 B1 | 3/2002 | Kravets et al. |
| 6,374,225 B1 | 4/2002 | Hejna, Jr. |
| 6,374,260 B1 | 4/2002 | Hoffert et al. |
| 6,381,601 B1 | 4/2002 | Fujiwara et al. |
| 6,385,596 B1 | 5/2002 | Wiser et al. |
| 6,400,407 B1 | 6/2002 | Zigmond et al. |
| 6,407,680 B1 | 6/2002 | Lai et al. |
| 6,408,128 B1 | 6/2002 | Abecassis |
| 6,415,280 B1 | 7/2002 | Farber et al. |
| 6,415,438 B1 | 7/2002 | Blackketter et al. |
| 6,418,421 B1 | 7/2002 | Hurtado et al. |
| 6,438,556 B1 | 8/2002 | Malik et al. |
| 6,446,068 B1 | 9/2002 | Kortge |
| 6,449,226 B1 | 9/2002 | Kumagai |
| 6,452,874 B1 | 9/2002 | Otsuka et al. |
| 6,453,252 B1 | 9/2002 | Laroche |
| 6,460,050 B1 | 10/2002 | Pace et al. |
| 6,460,180 B1 | 10/2002 | Park et al. |
| 6,469,749 B1 | 10/2002 | Dimitrova |
| 6,473,804 B1 | 10/2002 | Kaiser et al. |
| 6,477,704 B1 | 11/2002 | Cremia |
| 6,490,279 B1 | 12/2002 | Chen et al. |
| 6,496,802 B1 | 12/2002 | Van Zoest et al. |
| 6,496,857 B1 | 12/2002 | Dustin et al. |
| 6,505,160 B1 | 1/2003 | Levy et al. |
| 6,542,869 B1 | 4/2003 | Foote |
| 6,550,001 B1 | 4/2003 | Corwin et al. |
| 6,550,011 B1 | 4/2003 | Sims, III |
| 6,552,254 B2 | 4/2003 | Hasegawa et al. |
| 6,563,515 B1 | 5/2003 | Reynolds et al. |
| 6,564,379 B1 | 5/2003 | Knudson et al. |
| 6,567,982 B1 | 5/2003 | Howe et al. |
| 6,571,392 B1 | 5/2003 | Zigmond et al. |
| 6,577,746 B1 | 6/2003 | Evans et al. |
| 6,591,245 B1 | 7/2003 | Klug |
| 6,597,405 B1 | 7/2003 | Iggulden |
| 6,598,228 B2 | 7/2003 | Hejna, Jr. |
| 6,604,242 B1 | 8/2003 | Weinstein et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,609,105 B2 | 8/2003 | Van Zoest et al. |
| 6,615,408 B1 | 9/2003 | Kaiser et al. |
| 6,631,523 B1 | 10/2003 | Matthews, III et al. |
| 6,636,247 B1 | 10/2003 | Hamzy et al. |
| 6,654,757 B1 | 11/2003 | Stern |
| 6,658,423 B1 | 12/2003 | Pugh et al. |
| 6,665,661 B1 | 12/2003 | Crow et al. |
| 6,668,378 B2 | 12/2003 | Leak et al. |
| 6,675,174 B1 | 1/2004 | Bolle et al. |
| 6,675,385 B1 | 1/2004 | Wang |
| 6,693,236 B1 | 2/2004 | Gould et al. |
| 6,698,020 B1 | 2/2004 | Zigmond et al. |
| 6,766,523 B2 | 7/2004 | Herley |
| 6,774,926 B1 * | 8/2004 | Ellis et al. .................. 348/14.01 |
| 6,785,902 B1 | 8/2004 | Zigmond et al. |
| 6,810,388 B1 | 10/2004 | Sato |
| 6,833,865 B1 | 12/2004 | Fuller et al. |
| 6,834,308 B2 | 12/2004 | Ikezoye et al. |
| 6,850,252 B1 | 2/2005 | Hoffberg |
| 6,871,200 B2 | 3/2005 | MacQueen et al. |
| 6,871,231 B1 | 3/2005 | Morris |
| 6,873,982 B1 | 3/2005 | Bates et al. |
| 6,912,571 B1 | 6/2005 | Serena |
| 6,928,423 B1 | 8/2005 | Yamanaka |
| 6,928,442 B2 | 8/2005 | Farber et al. |
| 6,931,451 B1 | 8/2005 | Logan et al. |
| 6,937,766 B1 | 8/2005 | Wilf et al. |
| 6,938,270 B2 | 8/2005 | Blackketter et al. |
| 6,941,275 B1 | 9/2005 | Swierczek |
| 6,941,574 B1 | 9/2005 | Broadwin et al. |
| 6,944,632 B2 | 9/2005 | Stern |
| 6,968,337 B2 | 11/2005 | Wold |
| 6,970,886 B1 | 11/2005 | Conwell et al. |
| 6,978,419 B1 | 12/2005 | Kantrowitz |
| 6,978,461 B2 | 12/2005 | Shapiro et al. |
| 6,983,371 B1 | 1/2006 | Hurtado et al. |
| 6,990,453 B2 | 1/2006 | Wang et al. |
| 6,999,111 B2 | 2/2006 | McIntyre et al. |
| 7,013,301 B2 | 3/2006 | Holm et al. |
| 7,020,635 B2 | 3/2006 | Hamilton et al. |
| 7,035,914 B1 | 4/2006 | Payne et al. |
| 7,039,935 B2 | 5/2006 | Knudson et al. |
| 7,043,473 B1 | 5/2006 | Rassool et al. |
| 7,058,223 B2 | 6/2006 | Cox |
| 7,065,709 B2 | 6/2006 | Ellis et al. |
| 7,092,953 B1 | 8/2006 | Haynes |
| 7,096,486 B1 | 8/2006 | Ukai et al. |
| 7,103,906 B1 | 9/2006 | Katz et al. |
| 7,106,904 B2 | 9/2006 | Shuma |
| 7,140,033 B1 | 11/2006 | Durden et al. |
| 7,146,631 B1 | 12/2006 | Tanaka et al. |
| 7,152,236 B1 | 12/2006 | Wugofski et al. |
| 7,155,449 B2 | 12/2006 | Pingel et al. |
| 7,158,929 B2 | 1/2007 | Wouters et al. |
| 7,165,266 B2 | 1/2007 | Zigmond |
| 7,168,083 B2 | 1/2007 | Kalker et al. |
| 7,171,016 B1 | 1/2007 | Rhoads |
| 7,174,293 B2 | 2/2007 | Kenyon et al. |
| 7,181,756 B1 | 2/2007 | Zigmond et al. |
| 7,184,100 B1 | 2/2007 | Wilf et al. |
| 7,188,353 B1 | 3/2007 | Crinon |
| 7,191,190 B2 | 3/2007 | Debique et al. |
| 7,225,455 B2 | 5/2007 | Bennington et al. |
| 7,237,253 B1 | 6/2007 | Blackketter et al. |
| 7,243,139 B2 | 7/2007 | Ullman |
| 7,243,153 B2 | 7/2007 | McIntyre et al. |
| 7,251,475 B2 | 7/2007 | Kawamoto |
| 7,254,829 B1 | 8/2007 | Brown et al. |
| 7,272,788 B2 | 9/2007 | Anderson et al. |
| 7,302,574 B2 | 11/2007 | Conwell et al. |
| 7,305,693 B2 | 12/2007 | Blackketter et al. |
| 7,308,413 B1 | 12/2007 | Tota et al. |
| 7,313,805 B1 | 12/2007 | Rosin et al. |
| 7,334,250 B2 | 2/2008 | Blackketter et al. |
| 7,340,763 B1 | 3/2008 | Harris |
| 7,346,472 B1 | 3/2008 | Moskowitz et al. |
| 7,349,668 B2 | 3/2008 | Ilan et al. |
| 7,363,278 B2 | 4/2008 | Schmelzer et al. |
| 7,366,718 B1 | 4/2008 | Pugh et al. |
| 7,366,787 B2 | 4/2008 | Salas et al. |
| 7,369,677 B2 | 5/2008 | Petrovic et al. |
| 7,370,017 B1 | 5/2008 | Lindeman et al. |
| 7,386,512 B1 | 6/2008 | Allibhoy et al. |
| 7,404,200 B1 | 7/2008 | Hailey et al. |
| 7,409,437 B2 | 8/2008 | Ullman et al. |
| 7,421,723 B2 | 9/2008 | Harkness et al. |
| 7,423,771 B2 | 9/2008 | Ohata et al. |
| 7,426,558 B1 | 9/2008 | Allibhoy et al. |
| 7,444,353 B1 | 10/2008 | Chen et al. |
| 7,477,739 B2 | 1/2009 | Haitsma et al. |
| 7,483,958 B1 | 1/2009 | Elabbady et al. |
| 7,487,527 B2 | 2/2009 | Ellis et al. |
| 7,493,643 B2 | 2/2009 | Ellis |
| 7,500,007 B2 | 3/2009 | Ikezoye et al. |
| 7,506,352 B2 | 3/2009 | Blackketter et al. |
| 7,523,312 B2 | 4/2009 | Kalker et al. |
| 7,523,478 B2 | 4/2009 | Blackketter et al. |
| 7,529,659 B2 | 5/2009 | Wold |
| 7,562,012 B1 | 7/2009 | Wold et al. |
| 7,562,392 B1 | 7/2009 | Rhoads et al. |
| 7,565,327 B2 | 7/2009 | Schmelzer |
| 7,587,728 B2 | 9/2009 | Wheeler et al. |
| 7,595,914 B2 | 9/2009 | Haining |
| 7,606,883 B1 | 10/2009 | Allibhoy et al. |
| 7,624,337 B2 | 11/2009 | Sull et al. |
| 7,631,072 B2 | 12/2009 | Allibhoy et al. |
| 7,647,604 B2 | 1/2010 | Ramaswamy |
| 7,650,616 B2 | 1/2010 | Lee |
| 7,660,700 B2 | 2/2010 | Moskowitz et al. |
| 7,707,088 B2 | 4/2010 | Schmelzer |
| 7,711,652 B2 | 5/2010 | Schmelzer |
| 7,712,125 B2 | 5/2010 | Herigstad et al. |
| 7,738,704 B2 | 6/2010 | Lienhart et al. |
| 7,743,092 B2 | 6/2010 | Wood |
| 7,757,248 B2 | 7/2010 | Harkness et al. |
| 7,757,254 B2 | 7/2010 | Shoff et al. |
| 7,765,575 B2 | 7/2010 | Zigmond |
| 7,783,489 B2 | 8/2010 | Kenyon et al. |
| 7,797,249 B2 | 9/2010 | Schmelzer et al. |
| 7,802,281 B1 | 9/2010 | Tani et al. |
| 7,818,768 B2 | 10/2010 | Blackketter et al. |
| 7,840,975 B2 | 11/2010 | Matheny et al. |
| 7,849,226 B2 | 12/2010 | Zigmond et al. |
| 7,853,664 B1 | 12/2010 | Wang et al. |
| 7,861,275 B1 | 12/2010 | Vellaikal et al. |
| 7,870,088 B1 | 1/2011 | Chen et al. |
| 7,877,438 B2 | 1/2011 | Schrempp et al. |
| 7,882,518 B2 | 2/2011 | Finseth et al. |
| 7,917,645 B2 | 3/2011 | Ikezoye et al. |
| 7,930,719 B2 | 4/2011 | Ellis et al. |
| 7,941,816 B2 | 5/2011 | Harkness et al. |
| 7,949,494 B2 | 5/2011 | Moskowitz et al. |
| 7,949,749 B2 | 5/2011 | Allibhoy et al. |
| 7,962,414 B1 | 6/2011 | Allibhoy et al. |
| 7,996,565 B2 | 8/2011 | Allibhoy et al. |
| 8,001,569 B2 | 8/2011 | Marler et al. |
| 8,006,264 B2 | 8/2011 | Reynolds et al. |
| 8,006,314 B2 | 8/2011 | Wold |
| 8,065,615 B2 | 11/2011 | Murray et al. |
| 8,082,150 B2 | 12/2011 | Wold |
| 8,086,445 B2 | 12/2011 | Wold et al. |
| 8,090,605 B2 | 1/2012 | Tota et al. |
| 8,094,949 B1 | 1/2012 | Rhoads |
| 8,108,886 B1 | 1/2012 | Murahashi et al. |
| 8,112,776 B2 | 2/2012 | Schein et al. |
| 8,171,509 B1 | 5/2012 | Girouard et al. |
| 8,171,510 B2 | 5/2012 | Kamen et al. |
| 8,185,923 B2 | 5/2012 | Slaney et al. |
| 8,214,175 B2 | 7/2012 | Moskowitz et al. |
| RE43,578 E | 8/2012 | Sorensen |
| 8,255,952 B2 | 8/2012 | Boylan, III et al. |
| RE43,671 E | 9/2012 | Sorensen |
| 8,272,011 B2 | 9/2012 | Yuen et al. |
| 8,296,792 B2 | 10/2012 | Sahota et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,301,758 | B2 | 10/2012 | Allibhoy et al. |
| 8,340,994 | B2 | 12/2012 | Tota et al. |
| 8,479,233 | B2 | 7/2013 | Ellis et al. |
| 8,572,279 | B2 | 10/2013 | Payne et al. |
| 8,601,154 | B2 | 12/2013 | Payne et al. |
| 2001/0001160 | A1 | 5/2001 | Shoff et al. |
| 2001/0003818 | A1 | 6/2001 | Pingel et al. |
| 2001/0037376 | A1 | 11/2001 | Ullman |
| 2001/0047298 | A1 | 11/2001 | Moore et al. |
| 2001/0049625 | A1 | 12/2001 | Mowry |
| 2002/0023020 | A1 | 2/2002 | Kenyon et al. |
| 2002/0026369 | A1 | 2/2002 | Miller et al. |
| 2002/0032698 | A1 | 3/2002 | Cox |
| 2002/0035600 | A1 | 3/2002 | Ullman |
| 2002/0035601 | A1 | 3/2002 | Ullman |
| 2002/0035614 | A1 | 3/2002 | Ullman |
| 2002/0035615 | A1 | 3/2002 | Ullman |
| 2002/0038296 | A1 | 3/2002 | Margolus et al. |
| 2002/0038383 | A1 | 3/2002 | Ullman et al. |
| 2002/0042813 | A1 | 4/2002 | Ullman et al. |
| 2002/0049832 | A1 | 4/2002 | Ullman et al. |
| 2002/0056091 | A1* | 5/2002 | Bala et al. .................. 725/34 |
| 2002/0056123 | A1 | 5/2002 | Liwerant et al. |
| 2002/0056129 | A1 | 5/2002 | Blackketter et al. |
| 2002/0059610 | A1* | 5/2002 | Ellis ....................... 725/58 |
| 2002/0082731 | A1 | 6/2002 | Pitman et al. |
| 2002/0083005 | A1 | 6/2002 | Lowenstein et al. |
| 2002/0087885 | A1 | 7/2002 | Peled et al. |
| 2002/0088336 | A1 | 7/2002 | Stahl |
| 2002/0099555 | A1 | 7/2002 | Pitman et al. |
| 2002/0112002 | A1 | 8/2002 | Abato |
| 2002/0120925 | A1 | 8/2002 | Logan |
| 2002/0133499 | A1 | 9/2002 | Ward et al. |
| 2002/0150164 | A1 | 10/2002 | Felts et al. |
| 2002/0156760 | A1 | 10/2002 | Lawrence et al. |
| 2002/0156909 | A1 | 10/2002 | Harrington |
| 2002/0178276 | A1 | 11/2002 | McCartney et al. |
| 2002/0186887 | A1 | 12/2002 | Rhoads |
| 2002/0188699 | A1 | 12/2002 | Ullman et al. |
| 2003/0005151 | A1 | 1/2003 | Ullman et al. |
| 2003/0028489 | A1 | 2/2003 | Williamson |
| 2003/0037010 | A1 | 2/2003 | Schmelzer |
| 2003/0061490 | A1 | 3/2003 | Abajian |
| 2003/0065719 | A1 | 4/2003 | Ullman |
| 2003/0088674 | A1 | 5/2003 | Ullman |
| 2003/0093790 | A1 | 5/2003 | Logan et al. |
| 2003/0095660 | A1 | 5/2003 | Lee et al. |
| 2003/0101144 | A1 | 5/2003 | Moreno |
| 2003/0101232 | A1 | 5/2003 | Ullman |
| 2003/0106017 | A1 | 6/2003 | Kanchirayappa et al. |
| 2003/0146940 | A1 | 8/2003 | Ellis et al. |
| 2003/0167300 | A1 | 9/2003 | Ullman |
| 2003/0182113 | A1 | 9/2003 | Huang |
| 2003/0202660 | A1 | 10/2003 | Zhou et al. |
| 2003/0233930 | A1 | 12/2003 | Ozick |
| 2004/0003398 | A1 | 1/2004 | Donian et al. |
| 2004/0010602 | A1 | 1/2004 | Van Vleck et al. |
| 2004/0015608 | A1 | 1/2004 | Ellis et al. |
| 2004/0025174 | A1 | 2/2004 | Cerrato |
| 2004/0030759 | A1 | 2/2004 | Hidary |
| 2004/0163106 | A1 | 8/2004 | Schrempp et al. |
| 2004/0170335 | A1 | 9/2004 | Pearlman et al. |
| 2004/0199387 | A1* | 10/2004 | Wang et al. .................. 704/243 |
| 2004/0221118 | A1 | 11/2004 | Slater et al. |
| 2004/0236865 | A1 | 11/2004 | Ullman |
| 2004/0243540 | A1 | 12/2004 | Moskowitz et al. |
| 2005/0015815 | A1* | 1/2005 | Shoff et al. .................. 725/135 |
| 2005/0044189 | A1 | 2/2005 | Ikezoye et al. |
| 2005/0080846 | A1 | 4/2005 | McCleskey et al. |
| 2005/0097622 | A1 | 5/2005 | Zigmond et al. |
| 2005/0102515 | A1 | 5/2005 | Jaworski et al. |
| 2005/0154892 | A1 | 7/2005 | Mihcak et al. |
| 2005/0160363 | A1 | 7/2005 | Bhogal et al. |
| 2005/0193016 | A1 | 9/2005 | Seet et al. |
| 2005/0213826 | A1 | 9/2005 | Neogi |
| 2005/0246752 | A1 | 11/2005 | Liwerant et al. |
| 2005/0289065 | A1 | 12/2005 | Weare |
| 2006/0031870 | A1 | 2/2006 | Jarman et al. |
| 2006/0080356 | A1 | 4/2006 | Burges et al. |
| 2006/0085816 | A1 | 4/2006 | Funk et al. |
| 2006/0101069 | A1 | 5/2006 | Bell et al. |
| 2006/0110137 | A1 | 5/2006 | Tsuda et al. |
| 2006/0187358 | A1 | 8/2006 | Lienhart et al. |
| 2006/0195859 | A1 | 8/2006 | Konig et al. |
| 2006/0195860 | A1 | 8/2006 | Eldering et al. |
| 2006/0206462 | A1 | 9/2006 | Barber |
| 2006/0212927 | A1 | 9/2006 | Riku et al. |
| 2006/0271947 | A1 | 11/2006 | Lienhart et al. |
| 2007/0041667 | A1 | 2/2007 | Cox |
| 2007/0071330 | A1 | 3/2007 | Oostveen et al. |
| 2007/0083510 | A1 | 4/2007 | McArdle |
| 2007/0101360 | A1 | 5/2007 | Gutta et al. |
| 2007/0118375 | A1 | 5/2007 | Kenyon et al. |
| 2007/0124698 | A1 | 5/2007 | Majumder |
| 2007/0130580 | A1 | 6/2007 | Covell et al. |
| 2007/0180537 | A1 | 8/2007 | He et al. |
| 2007/0203911 | A1 | 8/2007 | Chiu |
| 2007/0282472 | A1 | 12/2007 | Seldman |
| 2007/0288518 | A1 | 12/2007 | Crigler et al. |
| 2007/0294173 | A1 | 12/2007 | Levy et al. |
| 2008/0052783 | A1 | 2/2008 | Levy |
| 2008/0091684 | A1 | 4/2008 | Ellis et al. |
| 2008/0162478 | A1 | 7/2008 | Pugh et al. |
| 2008/0250241 | A1 | 10/2008 | Ginter et al. |
| 2009/0052784 | A1 | 2/2009 | Covell et al. |
| 2009/0328236 | A1 | 12/2009 | Schmelzer |
| 2010/0211969 | A1 | 8/2010 | Schein et al. |
| 2010/0290666 | A1 | 11/2010 | Rhoads |
| 2011/0167449 | A1 | 7/2011 | Klosterman et al. |
| 2011/0173660 | A1 | 7/2011 | Schein et al. |
| 2012/0078871 | A1 | 3/2012 | Pugh et al. |
| 2013/0086608 | A1 | 4/2013 | Slaney et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1354276 | B1 | 12/2007 |
| EP | 1 485 815 | B1 | 7/2009 |
| GB | 2369203 | A | 5/2002 |
| JP | 2003-242281 | | 8/2003 |
| WO | 94/06084 | A1 | 3/1994 |
| WO | 9841020 | A1 | 9/1998 |
| WO | 9904568 | A1 | 1/1999 |
| WO | 99/50778 | A1 | 10/1999 |
| WO | WO0122730 | A1 | 3/2001 |
| WO | WO 02/11033 | A1 | 2/2002 |
| WO | WO 02/103968 | A1 | 12/2002 |

OTHER PUBLICATIONS

Yossi Rubner et al., "Adaptive Color Image Embeddings for Database Navigation," Proceedings of the 1998 IEEE Asian Conference on Computer Vision.

Roger Weber et al., "A Quantitative Analysis and Performance Study for Similarity-Search Methods in High-Dimensional Spaces," Proceedings of 24th VLDB Conference, 1998.

P. Yianilos, "Data Structures and Algorithms for Nearest Neighbor Search in General Metric Spaces," Proceedings of the ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 311.321.

U.S. Appl. No. 60/222,023, filed Jul. 31, 2000; Avery Li-Chun Wang and Julius O. Smith III, Inventors; Palo Alto, CA.

Peter N. Yianlos, Excluded Middle Vantage Point Forests for Nearest Neighbor Search, Jul. 20, 1998, pp. 1-12.

Peter N. Yianlos "Locally Lifting the Curse of Dimensionality for Nearest Neighbor Search" SODA 2000, pp. 361-370.

L. Baum et al., "A Maximation Technique Occuring in the Statistical Analysis of Probabilistic Functions of Markov Chains," The Annals of Mathematical Statistics, vol. 41, No. 1, pp. 164-171 (1970).

A. P. Dempster et al., "Maximum Likelihood from Incomplete Data via the \$EM\$ Algorithm," Journal of the Royal Statistical Society, Series B (Methodological), vol. 39, Issue 1, pp. 1-38 (1977).

D. Reynolds et al., "Robust Text-Independent Speaker Identification Using Gaussian Mixture Speaker Models," IEEE Transactions on Speech and Audio Processing, vol. 3, No. 1, pp. 72-83 (Jan. 1995).

(56)        **References Cited**

OTHER PUBLICATIONS

D. Bouktache, "A fast Algorithm for the nearest neighbor classifier," IEEE Transactions on Pattern Analysis and Machine Intelligence, Mar. 1997, pp. 277-282.

Nene et al., "A simple algorithm for nearest neighbor search in high dimensions," IEEE Transactions on Pattern Analysis and Machine Intelligence, Sep. 1997, pp. 989-1003.

Sunil Arya et al., "Approximate Nearest Neighbor Queries in Fixed Dimensions," Proceedings of the 4th annual ACM-SIAM Symposium on Discrete algorithms, 1993, pp. 271-280.

K. Fukunaga et al., A branch and bound algorithm for computing k-nearest neighbors, IEEE Trans. Comput., C24:750-753, Jul. 1975.

Charles D. Feustel et al., "The nearest neighbor problem in an abstract metric space," Pattern Recognition Letters, pp. 125-128, Dec. 1982.

Dennis Shasha et al., "New Techniques for Best-Match Retrieval," ACM Transactions on Information Systems, 8(2); 140{158, Apr. 1990.

J. Uhlmann, "Satisfying general proximity / similarity queries with metric trees", Information Processing Letters, 40 (4): 175{9, Nov. 1991.

Sergey Brin, "Near Neighbor Search in Large Metric Spaces," Proceedings of the 21st VLDB Conference, Zurich, Switzerland, Sep. 1995.

Daniel P. Huttenlocher, et al., "Comparing Images Using the Hausdorff Distance," IEEE Transactions on Pattern Analysis and Machine Intelligence, vol. 15, No. 9, pp. 850-863, Sep. 1993.

Thomas Seidl et al., "Optimal Multi-Step K-Nearest Neighbor Search," Proceedings of ACM SIGMOD International Conference of Management of Data, Jun. 1998, pp. 154-165.

W. A. Burkhard et al., "Some Approaches to Best-Match File Searching," Communications of the ACM, vol. 16, No. 4, Apr. 1973.

Eyal Kushilevitz et al., "Efficient Search for Approximate Nearest Neighbor in High Dimensional Spaces," Proceedings of the 30th annual ACM Symposium on the Theory of computing, 1998, pp. 457-474, vol. 30, No. 2.

J. Nievergelt et al., "The Grid File: An Adaptable, Symmetric Multikey File Structure," ACM Transactions on Database Systems, vol. 9, No. 1, pp. 38-71 (Mar. 1984).

Nevin Heintze, "Scalable Document Fingerprinting," Proc. USENIX Workshop on Electronic Commerce (1996).

Erling Wold et al., "Content-Based Classification, Search, and Retrieval of Audio," IEEE Multimedia, vol. 3, Issue 3, pp. 27-63 (1996).

Bir Bhanu et al., "Learning Feature Relevance and Similarity Metrics in Image Databases," Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 14-19 (1998).

A. Del Bimbo et al., "Using Weighted Spatial Relationships in Retrieval by Visual Contents," Image Description and Retrieval, pp. 161-192 (1998).

P. Indyk et al "Approximate Nearest Neighbors: Towards Removing The Curse of Dimensionality," Proceeding of the Thirtieth Annual ACM Symposium on Theory of Computing, pp. 604-613 Jul. 21, 1999.

Marco La Cascia, "Combining Textual and Visual Cues for Content-based Image Retrieval on the World Wide Web," Proceedings of the IEEE Workshop on Content-Based Access of Image and Video Libraries, pp. 24-29 (1998).

Atsuo Yoshitaka et al., "A Survey on Content-Based Retrieval for Multimedia Databases," IEEE Transactions on Knowledge and Data Engineering, vol. 11, No. 1, pp. 81-93 (Jan./Feb. 1999).

Steve Lawrence et al., "Digital Libraries and Automonous Citation Indexing," IEEE Computer, pp. 67-71 (Jun. 1999).

Akisato Kimura et al., "Very Quick Audio Searching: Introducing Global Pruning to the Time-Series Active Search," IEEE Conf on Acoustics, Speech and Signal Processing, (ICASSP '01), vol. 3, pp. 1429-1432, 2001.

Edgar Chavez et al., "Searching in Metric Spaces," ACM Computing Surveys, vol. 33, No. 3, pp. 273-321 (Sep. 2001).

Jaap Haitsma et al., "Robust Audio Hashing for Content Identification," Workshop on Content Based Multimedia Indexing, Brescia, Italy (Sep. 19-21, 2001).

Jaap Haitsma et al., "A Highly Robust Audio Fingerprinting System," Journal of New Music Research, 1744-5027, vol. 32, Issue 2, pp. 211-221 (2003).

Saul Schleimer et al., "Winnowing: Local Algorithms for Document Fingerprinting," ACM SIGMOD, Jun. 9-12, 2003.

Edward Chang et al., "Searching Near-Replicas of Images via Clustering," SPIE Symposium of Voice, Video and Data Communications, 1999.

Edward Y. Chang et al., "RIME: A Replicated Image Detector for the World-Wide Web," SPIE, 1998.

Hector Garcia-Molina et al., "Safeguarding and Charging for Information on the Internet," Proceedings of ICDE, 1998.

Sergey Brin et al., "Copy Detection Mechanisms for Digital Documents," Proceedings of ACM SIG-MOD, May 1995.

Stefan Berchtold "The x-tree: An Index Structure for High-Dimensional Data," Proceedings of the 22nd VLDB, Aug. 1996.

Norio Katayama et al., "The SR-tree: An Index Structure for High-Dimensional Nearest Neighbor Queries," Proceedings of ACM SIGMOD, May 1997.

John T. Robinson, "The K-D-B-Tree: A Search Structure for Large Multidimensional Dynamic Indexes," Proceedings of ACM SIGMOD, Apr. 1981.

Myron Flickner et al., "Query by Image and Video Content: The QBIC System," IEEE Computer 28(9), pp. 23-32, 1995.

Amarnath Gupta et al., "Visual Information Retrieval," Communications of the ACM, vol. 40, No. 5, pp. 69-79, May 1997.

John R. Smith et al., "VisualSEEk: A fully automated content-based image query system," ACM Multimedia Conference, 1996.

David A. White et al., "Similarity Indexing: Algorithms and Performance," Proc. SPIE, vol. 2670, San Diego, 1996.

Norbert Beckmann et al., "The R*-tree: An Efficient and Robust Access Method for Points and Rectangles," Proceedings of ACM Sigmod, May 1990.

A. Guttman, "R-Trees: A Dynamic Index Structure for Spatial Searching," Proceedings of ACM Sigmod, Jun. 1984.

David A. White et al., "Similarity Indexing with the SS-tree*," Proceedings of the 12th ICDE, Feb. 1996.

King Lin et al., "The TV-Tree: An Index Structure for High-Dimensional Data," VLDB, Journal 3, No. 4, 1994, pp. 517-542.

Paolo Ciaccia et al., "M-tree: An Efficient Access Method for Similarity Search in Metric Spaces," Proceedings of the 23rd VLDB, Aug. 1997.

Nick Roussopoulos et al., Nearest Neighbor Queries, Proceedings of ACM Sigmod, May 1995.

C. Li et al., "An extensible hashing index for high-dimensional similarity search," Stanford Techncial Report, Aug. 1998.

Jon M. Kleinberg, "Two Algorithms for Nearest-Neighbor Search in High Dimensions," Proc 29th STOC, Feb. 7, 1997.

Liu et al., "An Investigation of Practical Approximate Nearest Neighbor Algorithms", Advances in Neural Information Processing Systems (NIPS) 2004.

K. L. Clarkson, "Nearest-Neighbor Searching and Metric Space Demensions", Nearest-Neighbor Methods for Learning and Vision: Theory and Practice: Apr. 2005.

Swaminathan et al., "Robust an Secure Image Hashing", IEEE Transactions on Information Forensics and Security, Jun. 2006, pp. 215-230, vol. 1, No. 2.

Burges et al., "Duplicate Detection and Audio Thumbnails with Audio Fingerprinting" [online]. 2004, [retrieved on Nov. 11, 2006]. Retrieved on the internet: <URL: www.research.microsoft.com/~cburges/tech_reports/tr-2004-19.pdf>, 5 pages.

Cano et al., "A Review of Algorithms for Audio Fingerprinting" [online]. 2002, [retrieved on Nov. 21, 2006], Retrieved from the Internet: <URL: www.iua.upl.es/mtg/publications/MMSP-2002-pcano.pdf>, 5 pages.

Haitsama and Kalker, "A Highly Robus Audio Fingerprinting System" [online]. 2002, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <url: www.ismir2002.ismir.net/proceedings/02-FP04-2.pdf>, 9 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Jacobs et al., "Fast Multiresolution Image Querying" [online]. 1995, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.grail.cs.washington.edu/projects/query.pdf>, 10 pages.

Ke et al., "Computer Vision for Music Identification" [online]. 2005, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.cs.cmu.edu/~yke/musicretrieval/cvpr2005-mr.pdf>, 8 pages.

Shazam, Shazam Entertainment Brings Music Recognition to Windows 5.U Powered Smartphones [retrieved on Nov. 16, 2006]. Retrieved from the Internet. <URL: www.shazam.com/music/portals/p/s/media-type/html/user/anon/pages/default/template/pages/p/company_release30.html>, 1 page.

Stanford, "CS276 Information Retrieval and Web Mining" [online], 2005, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <URL: www.stanford.edu/class/cs276/handouts/lecture19.pdf>, 8 pages.

Stanford, "Data Mining: Associations" [online]. 2002, [retrieved on Nov. 16, 2006]. Retrieved from the Internet: <URL: www.stanford.edu/class/cs206/cs206-2.pdf>, 11 pages.

Stollinz et al., Wavelets for Computer Graphics: A Primer, Part 1: [online], 1995, [retrieved on Nov. 21, 2006]. Retrieved from the internet: <URL: www.grail.cs.washington.edu/pub/stoll/wavelet1.pdf>, 8 pages.

Stollnitz et al., Wavelets for Computer Graphics: A Primer, Part 2: [online]. 1995, [retrieved on Nov. 21, 2006]. Retrieved from the Internet: <URL: www.grail.cs.washington.edu/pub/stoll/wavelet2.pdf>, 9 pages.

Yang, "MACS: Music Audio Characteristic Sequence Indexing for Similarity Retrieval", Oct. 21-24, 2001, New Paltz, New York.

Viola and Jones, Robust Real-Time Object Detection, Int. J. Computer Vision, 2002.

Burges et al., "Using Audio Fingerprinting for Duplicate Detection and Thumbnail Generation," Mar. 2005, 4 pages.

Lin et al., Input Data Representation for Self-Organizing Map in Software Classification, Knowledge Acquisition and Modeling, 2009. KAM '09. Second International Symposium on vol. 2, Digital Object Identified: 10.11 09/KAM.2009.151 Publication Year: 2009, pp. 360-353.

Baluja et al., "Content Fingerprinting Using Wavelets", 3rd European Conference on Visual Media Production, 2006, pp. 198-207.

Cohen et al., "Finding Interesting Associations without Support Pruning", IEEE Transactions on Knowledge and Data Engineering, 2001, pp. 64-78, vol. 13, Issue 1.

Yang, Efficient Video Identification based on locality sensitive hashing and triangle inequality, National University of Singapore, 2005, pp. 1-64.

U.S. Appl. No. 60/304,647, filed Jul. 10, 2001.

U.S. Appl. No. 60/281,881, filed Apr. 5, 2001.

Metadata Mediation: Representation and Protocol, Tsuyoshi Sakata, Hiroyuki Tada, Tomohisa Ohtake, Digital Vision Laboratories, 7-3-37 Akasaka, Minato, Tokyo, Japan.

U.S. Appl. No. 13/800,573, filed Mar. 13, 2013.

U.S. Appl. No. 13/800,890, filed Mar. 13, 2013.

U.S. Appl. No. 13/829,717, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,447, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,626, filed Mar. 14, 2013.

U.S. Appl. No. 13/830,986, filed Mar. 14, 2013.

U.S. Appl. No. 13/842,068, filed Mar. 15, 2013.

U.S. Appl. No. 13/338,079, filed Dec. 27, 2011.

U.S. Appl. No. 60/134,782, filed May 19, 1999.

U.S. Appl. No. 60/193,948, filed Mar. 31, 2000.

U.S. Appl. No. 60/195,535, filed Apr. 7, 2000.

U.S. Appl. No. 60/206,384, filed May 23, 2000.

U.S. Appl. No. 60/221,843, filed Jul. 28, 2000.

Ardizzone, Edoardo et al., "Motion and Color-Based Video Indexing and Retrieval," Universita di palermo, Departimento di Ingegneria Elettrica, pp. 135-139, Viale delle Scienze, Palermo, Italy, IEEE 1996.

Deng, Yining et al., "Content-based Search of Video Using Color, Texture, and Motion," Dept. of Electrical and Computer Engineering, University of California, Santa Barbara, CA, pp. 534-537, IEEE 1997.

Fang, Min et al., "Computing Iceberg Queries Efficiently," Dept. of Computer Science, Stanford, CA, Paper No. 234, pp. 1-25.

Flickner, Myron et al., "Query by Image and Video Content: The QBIC System," IBM Almaden Research Center, Sep. 1995, pp. 23-32, IEEE 1995.

Gargi, U et al., "Performance Characterization and Comparison of Video Indexing Algorithms," Dept. of Computer Science & Engineering, The Pennsylvania State University, University Park, PA.

Gionis, Aristides et al., "Similarity Search in High Dimensions via Hashing," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 518-529, Proceeding of the 25th VLDB Conference, Edinburgh, Scotland, 1999.

Indyk, Piotr et al., "Approximate Nearest Neighbors: Towards Removing the Curse of Dimensionality" (preliminary version) Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13 & i-vii, Jul. 21, 1999.

Iyengar, Giridharan et al., "Models for automatic classification of video sequences," MIT Media Laboratory, Cambridge, MA.

Jain, Anil K., et al., "Image Retrieval using Color and Shape," Dept. of Computer Science, Michigan State University, Eas Lansing, MI, pp. 1-24, May 15, 1995.

Ogle, Virginia E., et al., "Chabot: Retrieval from a Relational Database of Images," University of California at Berkeley, Computer pp. 40-48, IEEE 1995.

Pentland, A. et al., "Photobook: Content-Based Manipulation of Image Databases," Perceptual Computing Section, The Media Laboratory, Massachusetts Institute of Tech., International Journal of Computer Vision 18(3), pp. 233-254 (1996), 1996 Kluwer Academic Publishers. Manuf. in The Netherlands.

Shivakumar, Narayanan et al., "SCAM: A Copy Detection Mechanism for Digital Documents," Dept. of Computer Science, Stanford University, Stanford, CA, pp. 1-13.

Shivakumar, Narayanan et al., "Building a Scalable and Accurate Copy Detection Mechanism," Dept. of Computer Science, Stanford University, Stanford, CA.

Srihari, Rohini K., "Automatic Indexing and Content-Based Retrieval of Captioned Images," State University of New York, Buffalo, Theme Feature, pp. 49-56, Sep. 1995, IEEE 1995.

Swain, Michael and Ballard, Dana H., "Color Indexing," International Journal of Computer Vision 7:1, p. 11-32 (1991), 1991 Kluwer Academic Publishers. Manuf. in The Netherlands.

Wactlar, Howard D. et al., "Intelligent Access to Digital Video: Informedia Project," Carnegie Mellon University, Digital Library Initiative: Carnegie Mellon University, Computer, pp. 46-52, IEEE 1996.

Yeo, Boon-Lock et al., "Rapid Scene Analysis on Compressed Video," IEEE Transactions on Circuits and Systems for Video Technology, vol. 5, No. 6, pp. 533-544, Dec. 1995, Dept. of Electrical Engineering, Princeton University, Princeton, NJ, IEEE Log No. 9415901.

Indyk, Piotr et al., "Finding pirated video sequences on the Internet," Dept. of Computer Science, Stanford University, Palo Alto, CA, Paper No. 199.

U.S. Appl. No. 60/133,247, filed May 5, 1999.

U.S. Appl. No. 60/155,064, filed Sep. 21, 1999.

U.S. Appl. No. 60/218,824, filed Jul. 18, 2000.

Indyk, Piotr et al., "Locality-Preserving Hashing in Multidimensional Spaces," Feb. 25, 1997.

Gibson, David, "Name That Clip: Music retrieval using audio clips," Aug. 19, 1999.

Declaration of David A. Gibson, Inter Partes Review of U.S. Patent 7,174,293, Aug. 30, 2013.

Declaration of David A. Gibson, Inter Partes Review of U.S. Patent 7,783,489, Aug. 30, 2013.

Intersil, "Glossary of Communication Terms," Dec. 1996.

Declaration of Dr. Ton Kalker, Inter Partes Review of U.S. Patent 7,174,293, Aug. 30, 2013.

Declaration of Dr. Ton Kalker, Inter Partes Review of U.S. Patent 7,783,489, Aug. 30, 2013.

(56) **References Cited**

OTHER PUBLICATIONS

Brin Sergey et al. "Copy Detection Mechanisms for Digital Documents" Proc. of ACM SIGMOD 44 Annual Conf. (San Jose 1995) http://www-db.stanford.edu!~sergey/copy.html on Nov. 27, 2000 21 pages.

Broder Andrei Z. "Some applications of Rabin's fingerprinting method" R. Capocelli A. 47 DeSantis U. Vaccaro Eds; Sequences II: Methods in Communications Security and Computer Science pp. 143-152 (Springer-Verlag 1993) 10 pages.

U.S. Appl. No. 60/230,931, filed Sep. 13, 2000.

*Network-1 Technologies, Inc.* v. *Google, Inc. et al.*, No. 1:14-cv-02396 (S.D.N.Y. filed Apr. 4, 2014).

Turau, Volker, "Fixed-Radius Near Neighbors Search", Information Processing Letters, Aug. 30, 1991, 201-203, vol. 39.

Uitdenbogerd, Alexandra L. et al, "Manipulation of Music for Melody Making", MULTIMEDIA '98 Proceedings of the sixth ACM international conference on Multimedia, 1998, pp. 235-240.

Fuller, Chuck, "Deploying Video on the Web", Web Techniques, Dec. 1999, 67-71, 4(12), United Business Media LLC, San Francisco.

"ImaginOn to Showcase Instant Interactive Internet 'Television Station in a Box' at PC EXPO 2000!," Business Wire, Jun. 22, 2000.

Jacso, Peter et al., "Now Featuring . . . Movie Databases, Part II: The Software," Database, Apr./May 1995, pp. 29-39; 18(2); ProQuest Technology Collection.

"Smarter TV to Add $25B in Revenues: Holy Grail of Advertising Coming in the Form of Metadata," Broadcaster, Aug. 2000; 8(59), Business Information Group, Canada.

"The Future of Internet Multimedia on Display at Streaming Media West '99," Business Wire, Nov. 30, 1999; 11 (27), Business Wire, San Jose, California.

Bohm, Christian, et al., "Efficient Similarity Search in Digital Libraries," IEEE Advances in Digital Libraries, ADL May 22-24, 2000, Washington DC.

Hall, Patrick, et al., "Approximate String Matching," ACM Computing Surveys, Dec. 1980, 12(4).

Arya, Sunil, et al., "An Optimal Algorithm for Approximate Nearest Neighbor Searching in Fixed Dimensions," Journal of the ACM, Nov. 1998, 891-923, 45(6).

Berchtold, Stefan, et al., "Using Extended Feature Objects for Partial Similarity Retrieval," The VLDB Journal, Mar. 28, 1997, 333-348 (6).

Schwartz, David M., "ImaginOn Technology and Interactive Television," Imaginon—White Papers, May 11, 1998, available at http://www.imaginon.com/nn/content/white_papers/i_tv.html (last accessed Sep. 29, 2014).

Schwartz, David M. et al., "Internet Television The Economics of Webcasting," Imaginon—White Papers, Mar. 14, 2000, available at http://www.imaginon.com/nn/content/white_papers/econ_web. html (last accessed Sep. 29, 2014).

"ImaginAuthor—Streaming Video Branching Seamlessly From Clip to Clip," ImaginOn, Inc., available at http://www.imaginon.com/imon/page5.html (last accessed Sep. 29, 2014).

"ImOn.comTV Internet Television," ImOn.comTV, available at http://www.imaginon.com/imon/page4.html (last accessed Sep. 29, 2014).

"ImOn.comTV TurnKey Package," ImOn.comTV, available at http://www.imaginon.com/imon/page1.html (last accessed Sep. 29, 2014).

"ImaginOn presents ImOn.comTV," ImOn.comTV, available at http://www.imaginon.com/imon/index1.html (last accessed Sep. 29, 2014).

Alvear, Jose., "ImOn.comTV To Debut Webcasting Solution," Streaming Media Magazine, Apr. 10, 2000, available at http://www.streamingmedia.com/Articles/ReadArticle.aspx?ArticleID=62301 (last accessed Sep. 29, 2014).

"Press Release—ImOn.comTV Technology Will Change Television Advertising Forever," ImOn.comTV, available at http://www.imaginon.com/pressrel/p1999/advertising.html (last accessed Sep. 29, 2014).

*Google Inc. and YouTube, LLC's Corrected Preliminary Invalidity Contentions, Network-1 Technologies, Inc., v. Google, Inc. and YouTube, LLC*, No. 1:14-cv-02396-PGG (S.D.N.Y. Sep. 8, 2014).

Appendix 1 to Google's Responses to Network-1's Second Interrogatories dated Oct. 20, 2014.

Google Inc. and YouTube, LLC'S Responses and Objections to Plaintiffs Second Set of Interrogatories (Nos. 7-13) dated Oct. 20, 2014.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



SATELLITE, CABLE
OR TERRESTRIAL
TV BROADCAST

420

USER COMPUTER,
SET-TOP-BOX OR
EQUIVALENT

170c

140c

FEATURE
(VECTOR)
EXTRACTION
OPERATION(S)

ACTION
INITIATION
OPERATION(S)

430

INTERNET

410

440

150a

160c

FEATURE
(VECTOR) LOOKUP
OPERATION(S)

WORK-ASSOCIATED
INFORMATION LOOKUP
OPERATION(S)

120c/
138c

DATABASE
GENERATION
OPERATION(S)

110c

WID
DATABASE

WIDAT
DATABASE

130c

MONITORING CENTER

FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



| | |
|---|---|
| UNIQUE ID: 15642 | 1010 |
| PRODUCT: COCA COLA | 1020 |
| CATEGORY: SODA | 1030 |
| MANUFACTURER: COCA COLA | 1040 |
| URL http://www.cocacola.com | 1050 |
| OTHER DATA | 1060 |

1000

FIGURE 10

# METHOD FOR TAGGING AN ELECTRONIC MEDIA WORK TO PERFORM AN ACTION

## §0. RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 13/338,079 (incorporated herein by reference), titled "METHOD FOR USING EXTRACTED FEATURES FROM AN ELECTRONIC WORK," filed on Dec. 27, 2011, and listing Ingemar J. Cox as the inventor, which is a continuation of U.S. patent application Ser. No. 11/977,202 (incorporated herein by reference, issued as U.S. Pat. No. 8,205,237 on Jun. 19, 2012), titled "IDENTIFYING WORKS, USING A SUB-LINEAR TIME SEARCH, SUCH AS AN APPROXIMATE NEAREST NEIGHBOR SEARCH, FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET", filed Oct. 23, 2007, and listing Ingemar J. Cox as the inventor, which is a continuation of U.S. patent application Ser. No. 11/445,928 (incorporated herein by reference, issued as U.S. Pat. No. 8,010,988 on Aug. 30, 2011), titled "USING FEATURES EXTRACTED FROM AN AUDIO AND/OR VIDEO WORK TO OBTAIN INFORMATION ABOUT THE WORK," filed on Jun. 2, 2006, and listing Ingemar J. Cox as the inventor, which is a continuation-in-part of U.S. patent application Ser. No. 09/950,972 (incorporated herein by reference, issued as U.S. Pat. No. 7,058,223 on Jun. 6, 2006), titled "IDENTIFYING WORKS FOR INITIATING A WORK-BASED ACTION, SUCH AS AN ACTION ON THE INTERNET," filed on Sep. 13, 2001, and listing Ingemar J. Cox as the inventor, which application claims benefit to the filing date of provisional patent application Ser. No. 60/232,618 (incorporated herein by reference), titled "IDENTIFYING AND LINKING TELEVISION, AUDIO, PRINT AND OTHER MEDIA TO THE INTERNET", filed on Sep. 14, 2000 and listing Ingemar J. Cox as the inventor.

## §1. BACKGROUND OF THE INVENTION

§1.1 Field of the Invention

The present invention concerns linking traditional media to new interactive media, such as that provided over the Internet for example. In particular, the present invention concerns identifying a work (e.g., content or an advertisement delivered via print media, or via a radio or television broadcast) without the need to modify the work.

§1.2 Related Art

§1.2.1 Opportunities Arising from Linking Works Delivered Via Some Traditional Media Channel or Conduit to a More Interactive System

The rapid adoption of the Internet and associated World Wide Web has recently spurred interest in linking works, delivered via traditional media channels or conduits, to a more interactive system, such as the Internet for example. Basically, such linking can be used to (a) promote commerce, such as e-commerce, and/or (b) enhance interest in the work itself by facilitating audience interaction or participation. Commerce opportunities include, for example, facilitating the placement of direct orders for products, providing product coupons, providing further information related to a product, product placement, etc.

In the context of e-commerce, viewers could request discount vouchers or coupons for viewed products that are redeemable at the point of purchase. E-commerce applications also extend beyond advertisements. It is now common for television shows to include product placements. For example, an actor might drink a Coke rather than a Pepsi brand of soda, actors and actresses might wear designer-labeled clothing such as Calvin Klein, etc. Viewers may wish to purchase similar clothing but may not necessarily be able to identify the designer or the particular style directly from the show. However, with an interactive capability, viewers would be able to discover this and other information by going to an associated Web site. The link to this Web site can be automatically enabled using the invention described herein.

In the context of facilitating audience interaction or participation, there is much interest in the convergence of television and computers. Convergence encompasses a very wide range of capabilities. Although a significant effort is being directed to video-on-demand applications, in which there is a unique video stream for each user of the service, as well as to transmitting video signals over the Internet, there is also interest in enhancing the television viewing experience. To this end, there have been a number of experiments with interactive television in which viewers can participate in a live broadcast. There are a variety of ways in which viewers can participate. For example, during game shows, users can answer the questions and their scores can be tabulated. In recent reality-based programming such as the ABC television game show, "Big Brother", viewers can vote on contestants who must leave the show, and be eliminated from the competition.

§1.2.2 Embedding Work Identifying Code or Signals within Works

Known techniques of linking works delivered via traditional media channels to a more interactive system typically require some type of code, used to identify the work, to be inserted into the work before it is delivered via such traditional media channels. Some examples of such inserted code include (i) signals inserted into the vertical blanking interval ("VBI") lines of a (e.g., NTSC) television signal, (ii) watermarks embedded into images, (iii) bar codes imposed on images, and (iv) tones embedded into music.

The common technical theme of these proposed implementations is the insertion of visible or invisible signals into the media that can be decoded by a computer. These signals can contain a variety of information. In its most direct form, the signal may directly encode the URL of the associated Web site. However, since the alphanumeric string has variable length and is not a particularly efficient coding, it is more common to encode a unique ID. The computer then accesses a database, which is usually proprietary, and matches the ID with the associated web address. This database can be considered a form of domain name server, similar to those already deployed for network addresses. However, in this case, the domain name server is proprietary and the addresses are unique ID's.

There are two principal advantages to encoding a proprietary identifier into content. First, as previously mentioned, it is a more efficient use of the available bandwidth and second, by directing all traffic to a single Web site that contains the database, a company can maintain control over the technology and gather useful statistics that may then be sold to advertisers and publishers.

As an example of inserting signals into the vertical blanking interval lines of a television signal, RespondTV of San Francisco, Calif. embeds identification information into the vertical blanking interval of the television signal. The VBI is part of the analog video broadcast that is not visible to television viewers. For digital television, it may be possible to encode the information in, for example, the motion picture experts group ("MPEG") header. In the USA, the vertical blanking interval is currently used to transmit close-captioning information as well as other information, while in the UK,

the VBI is used to transmit teletext information. Although the close captioning information is guaranteed to be transmitted into the home in America, unfortunately, other information is not. This is because ownership of the vertical blanking interval is disputed by content owners, broadcasters and local television operators.

As an example of embedding watermarks into images, Digimarc of Tualatin, Oreg. embeds watermarks in print media. Invisible watermarks are newer than VBI insertion, and have the advantage of being independent of the method of broadcast. Thus, once the information is embedded, it should remain readable whether the video is transmitted in NTSC, PAL or SECAM analog formats or newer digital formats. It should be more reliable than using the vertical blanking interval in television applications. Unfortunately, however, watermarks still require modification of the broadcast signal which is problematic for a number of economic, logistical, legal (permission to alter the content is needed) and quality control (the content may be degraded by the addition of a watermark) reasons.

As an example of imposing bar codes on images, print advertisers are currently testing a technology that allows an advertisement to be shown to a camera, scanner or bar code reader that is connected to a personal computer ("PC"). The captured image is then analyzed to determine an associated Web site that the PC's browser then accesses. For example, GoCode of Draper, Utah embeds small two-dimensional bar codes for print advertisements. The latter signal is read by inexpensive barcode readers that can be connected to a PC. AirClic of Blue Bell, Pa. provides a combination of barcode and wireless communication to enable wireless shopping through print media. A so-called "CueCat" reads bar codes printed in conjunction with advertisements and articles in Forbes magazine. Similar capabilities are being tested for television and audio media.

Machine-readable bar codes are one example of a visible signal. The advantage of this technology is that it is very mature. However, the fact that the signal is visible is often considered a disadvantage since it may detract from the aesthetic of the work delivered via a traditional media channel or conduit.

As an example of embedding tones into music, Digital Convergence of Dallas, Tex. proposes to embed identification codes into audible music tones broadcast with television signals.

All the foregoing techniques of inserting code into a work can be categorized as active techniques in that they must alter the existing signal, whether it is music, print, television or other media, such that an identification code is also present. There are several disadvantages that active systems share. First, there are aesthetic or fidelity issues associated with bar codes, audible tones and watermarks. More importantly, all media must be processed, before it is delivered to the end user, to contain these active signals. Even if a system is enthusiastically adopted, the logistics involved with inserting bar codes or watermarks into, say every printed advertisement, are formidable.

Further, even if the rate of adoption is very rapid, it nevertheless remains true that during the early deployment of the system, most works will not be tagged. Thus, consumers that are early-adopters will find that most media is not identified. At best, this is frustrating. At worst, the naive user may conclude that the system is not reliable or does not work at all. This erroneous conclusion might have a very adverse effect on the adoption rate.

Further, not only must there be modification to the production process, but modifications must also be made to the equipment in a user's home. Again, using the example of watermarking of print media, a PC must be fitted with a camera and watermark detection software must be installed. In the case of television, the detection of the identification signal is likely to occur at the set-top-box—this is the equipment provided by the local cable television or satellite broadcasting company. In many cases, this may require modifications to the hardware, which is likely to be prohibitively expensive. For example, the audible tone used by Digital Convergence to recognize television content, must be fed directly into a sound card in a PC. This requires a physical connection between the television and the PC, which may be expensive or at least inconvenient, and a sound card may have to be purchased.

§1.2.3 Unmet Needs

In view of the foregoing disadvantages of inserting an identification code into a work, thereby altering the existing signal, there is a need for techniques of identifying a work without the need of inserting an identification code into a work. Such an identification code can then be used to invoke a work-related action, such as work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

## §2. SUMMARY OF THE INVENTION

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable programs for linking a media work to an action. Such embodiments might (a) extract features from the media work, (b) determine an identification of the media work based on the features extracted using a sub-linear time search, such as an approximate nearest neighbor search for example, and (c) determine an action based on the identification of the media work determined. In some embodiments consistent with the present invention, the media work is an audio signal. The audio signal might be obtained from a broadcast, or an audio file format. In other embodiments consistent with the present invention, the media work is a video signal. The video signal might be obtained from a broadcast, or a video file format.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

## §3. BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work.

FIG. 2 is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. 3 is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work.

FIG. 4 is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work.

5

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work.

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work.

FIG. **8** is a block diagram illustrating an environment in which the present invention may operate.

FIG. **9** is an exemplary data structure in which extra-work information is associated with a work identifier.

FIG. **10** is an exemplary data structure including work-related actions.

§4. DETAILED DESCRIPTION

The present invention may involve novel methods, apparatus and data structures for identifying works without the need of embedding signals therein. Once identified, such information can be used to determine a work-related action. The following description is presented to enable one skilled in the art to make and use the invention, and is provided in the context of particular embodiments and methods. Various modifications to the disclosed embodiments and methods will be apparent to those skilled in the art, and the general principles set forth below may be applied to other embodiments, methods and applications. Thus, the present invention is not intended to be limited to the embodiments and methods shown and the inventors regard their invention as the following disclosed methods, apparatus, data structures and any other patentable subject matter to the extent that they are patentable.

§4.1 Functions

The present invention functions to identify a work without the need of inserting an identification code into a work. The present invention may do so by (i) extracting features from the work to define a feature vector, and (ii) comparing the feature vector to feature vectors associated with identified works. Alternatively, or in addition, the present invention may do so by (i) accepting extra-work information, such as the time of a query or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and (ii) use such extra-work information to lookup an identification of the work. In either case, an identification code may be used to identify the work.

The present invention may then function to use such an identification code to initiate a work-related action, such as for work-related commerce methods and/or to increase audience interest by facilitating audience interaction and/or participation.

§4.2 Embodiments

As just introduced in §4.1 above, the present invention may use intra-work information and/or extra-work information to identify a work. Once identified, such identification can be used to initiate an action, such as an action related to commerce, or facilitating audience participation or interaction. Exemplary embodiments of the present invention, in which work is recognized or identified based on intra-work information, are described in §4.2.1. Then, exemplary embodiments of the present invention, in which work is recognized or identified based on extra-work information, are described in §4.2.2.

§4.2.1 Embodiments in which Work is Recognized Based on Intra-Work Information, Such as a Feature Vector

6

Operations related to this embodiment are described in §4.2.1.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.1.2.

§4.2.1.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **1** is a process bubble diagram of operations that may be performed in accordance with one version of the present invention, in which intra-work information is used to identify the work. As shown, a work-identification information storage **110** may include a number of items or records **112**. Each item or record **112** may associate a feature vector of a work **114** with a, preferably unique, work identifier **116**. The work-identification information storage **110** may be generated by a database generation operation(s) **120** which may, in turn, use a feature extraction operation(s) **122** to extract features from a work at a first time (WORK.sub.@t1), as well as a feature-to-work identification tagging operation(s) **124**.

Further, work identifier-action information storage **130** may include a number of items or records **132**. Each item or record **132** may associate a, preferably unique, work identifier **134** with associated information **136**, such as an action for example. The work identifier-action information storage **130** may be generated by a database generation operation(s) **138** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the work-information storage **110** records **112** and the work identification-action **130** records **132** can be combined into a single record. That is, there need not be two databases. A single database is also possible in which the work identifier, or a feature vector extracted from the work, serves as a key and the associated field contains work-related information, such as a URL for example.

The feature extraction operation(s) **140** can accept a work, such as that being rendered by a user, at a second time (WORK.sub.@t2), and extract features from that work. The extracted features may be used to define a so-called feature vector.

The extracted features, e.g., as a feature vector, can be used by a feature (vector) lookup operation(s) **150** to search for a matching feature vector **114**. If a match, or a match within a predetermined threshold is determined, then the associated work identifier **116** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **160** to retrieve associated information, such as an action, **136** associated with the work identifier. Such information **136** can then be passed to action initiation operation(s) **170** which can perform some action based on the associated information **136**.

§4.2.1.1.1 Exemplary Techniques for Feature Extraction

When the user initiates a request, the specific television or radio broadcast or printed commercial, each of which is referred to as a work, is first passed to the feature extraction operation. The work may be an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal. The purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition. In the case of images and video, this feature vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n.times.n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, wavelet and or discrete cosine transforms. It might involve principal component analysis. It might also be a combination of these. For television and audio signals, recognition might also rely on a temporal sequence of feature vectors. The recognition literature contains many dif-

7

ferent representations. For block-based methods, blocks may be accessed at pseudo-random locations in each frame or might have a specific structure. For audio, common feature vectors are based on Fourier frequency decompositions, but other representations are possible. See, e.g., R. O. Duda and P. E. Hart, Pattern Classification and Scene Analysis (Wiley-Interscience, New York, 1973). See also K. Fukunaga, Introduction to Statistical Pattern Recognition, 2nd Ed. (Academic Press, New York, 1990). (These references are incorporated herein by reference.)

As previously stated, one object of the vector extraction stage is to obtain a more concise representation of the frame. For example, each video frame is initially composed of 480.times.720 pixels which is equivalent to 345,600 pixels or 691,200 bytes. In comparison, an exemplary feature vector might only consist of 1 Kbyte of data.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e., horizontal and or vertical translation, or may undergo lossy compression such as by MPEG-2. It is advantageous that these and other processes do not adversely affect the extracted vectors. For still images there has been considerable work on determining image properties that are invariant to affine and other geometric distortions. For example, the use of Radon and Fourier-Mellin transforms have been proposed for robustness against rotation, scale and translation, since these transforms are either invariant or bare a simple relation to the geometric distortions. See, e.g., C. Lin, M. Wu, Y. M. Lui, J. A. Bloom, M. L. Miller, I. J. Cox, "Rotation, Scale, and Translation Resilient Public Watermarking for Images," IEEE Transactions on Image Processing (2001). See also, U.S. Pat. Nos. 5,436,653, 5,504,518, 5,582,246, 5,612,729, and 5,621,454. (Each of these references is incorporated herein by reference.)

§4.2.1.1.2 Exemplary Techniques for Database Generation and Maintenance

A number of possibilities exist for generating and maintaining work identification (WID) and identification-action translation (WIDAT) databases. However, in all cases, works of interest are processed to extract a representative feature vector and this feature vector is assigned a unique identifier. This unique identifier is then entered into the work identification (WID) database **110** as well as into the WIDAT database **130** together with all the necessary associated data. This process is referred to as tagging. For example, in the case of an advertisement, the WIDAT database **130** might include the manufacturer (Ford), the product name (Taurus), a product category (automotive) and the URL associated with the Ford Taurus car together with the instruction to translate the query into the associated URL.

The determination of all works of interest and subsequent feature vector extraction and tagging depends on whether content owners are actively collaborating with the entity responsible for creating and maintaining the database. If there is no collaboration, then the database entity must collect all works of interest and process and tag them. While this is a significant effort, it is not overwhelming and is certainly commercially feasible. For example, competitive market research firms routinely tabulate all advertisements appearing in a very wide variety of print media. Newspapers and magazines can be scanned in and software algorithms can be applied to the images to identify likely advertisements. These possible advertisements can then be compared with advertisements already in the WID database **110**. If there is a match, nothing further need be done. If there is not a match, the

8

image can be sent to a human to determine if the page does indeed contain an advertisement. If so, the operator can instruct the computer to extract the representative feature vector and assign it a unique identifier. Then, the operator can insert this information into the content identification database and as well as update the corresponding WIDAT database **130** with all the necessary associated data. This is continually performed as new magazines and papers include new advertisements to maintain the databases. This is a cost to the database entity. Television and radio broadcasts can also be monitored and, in fact, broadcast monitoring is currently performed by companies such as Nielsen Media research and Competitive Media Reporting. Television and radio broadcasts differ from print media in the real-time nature of the signals and the consequent desire for real-time recognition.

In many cases, advertisers, publishers and broadcasters may wish to collaborate with the database provider. In this case, feature extraction and annotation and/or extra-work information may be performed by the advertiser, advertisement agency, network and/or broadcaster and this information sent to the database provider to update the database. Clearly, this arrangement is preferable from the database provider's perspective. However, it is not essential.

§4.2.1.1.3. Exemplary Techniques for Matching Extracted Features with Database Entries

The extracted feature vector is then passed to a recognition (e.g., feature look-up) operation, during which, the vector is compared to entries of known vectors **114** in a content identification (WID) database **110**. It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search might not be possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used including mutual information, Euclidean distance and Lp-norms. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and false negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match. See, e.g., R. O. Duda and P. E. Hart, Pattern Classification and Scene Analysis (Wiley-Interscience, New York, 1973). See also, U.S. Pat. No. 3,919,474 by W. D. Moon, R. J. Weiner, R. A. Hansen and R. N. Linde, entitled "Broadcast Signal Identification System". (Each of these references is incorporated herein by reference.)

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. Unfortunately, binary search is not possible when taking a noisy signal and trying to find the most similar reference signal. This problem is one of nearest neighbor search in a (high-dimensional) feature space. In previous work, it was not uncommon to perform a linear search of all N entries, perhaps halting the search when the first match is found. On average, this will require N/**2** comparisons. If N is large, this search can be computationally very expensive.

Other forms of matching include those based on clustering, kd-trees, vantage point trees and excluded middle vantage point forests are possible and will be discussed in more detail later. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, (Jan. 15, 1999). See also, P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these ref-

9

erences is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. A nearest neighbor search always finds the closest point to the query. An approximate nearest neighbor search does not always find the closest point to the query. For example, it might do so with some probability, or it might provide any point within some small distance of the closest point.

If the extracted vector "matches" a known vector in the content identification database, then the work has been identified. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when the vector extracted from a work is not matched to the database even though the work is present in the database. There are several reasons why a works feature vector may fail to match a feature vector database entry. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will often contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible.

Finally, there is the case where the observed work is not present in the database. In this case, the work can be sent to an operator for identification and insertion in the database.

§4.2.1.1.4 Exemplary Work Based Actions

Assuming that the work is correctly identified, then the identifier can be used to retrieve associated information from the second work identification-action translation (WIDAT) database 130 that contains information 136 associated with the particular work 134. This information may simply be a corresponding URL address, in which case, the action can be considered to be a form of network address translation. However, in general, any information about the work could be stored therein, together with possible actions to be taken such as initiating an e-commerce transaction. After looking up the work identifier 134 in the WIDAT database 130, an action is performed on behalf of the user, examples of which has been previously described.

In addition to using the system to allow audience members of a work to connect to associated sites on the Internet, a number of other uses are possible. First, the work identification database 130 allows competitive market research data to be collected (e.g., the action may include logging an event). For example, it is possible to determine how many commercials the Coca Cola Company in the Chicago market aired in the month of June. This information is valuable to competitors such as Pepsi. Thus, any company that developed a system as described above could also expect to generate revenue from competitive market research data that it gathers.

Advertisers often wish to ensure that they receive advertising time that was purchased. To do so, they often hire commercial verification services to verify that the advertisement or commercial did indeed run at the expected time. To do so, currently deployed systems by Nielsen and CMR embedded active signals in the advertisement prior to the broadcast. These signals are then detected by remote monitoring facilities that then report back to a central system which commercials were positively identified. See for example U.S. Pat. No. 5,629,739 by R. A. Dougherty entitled "Apparatus and method for injecting an ancillary signal into a low energy

10

density portion of a color television frequency spectrum", U.S. Pat. No. 4,025,851 by D. E. Haselwood and C. M. Solar entitled "Automatic monitor for programs broadcast", U.S. Pat. No. 5,243,423 by J. P. DeJean, D. Lu and R. Weissman, entitled "Spread spectrum digital data transmission over TV video", and U.S. Pat. No. 5,450,122 by L. D. Keene entitled "In-station television program encoding and monitoring system and method". (Each of these patents is incorporated herein by reference.) Active systems are usually preferred for advertisement verification because the required recognition accuracy is difficult to achieve with passive systems. The passive monitoring system described herein supports commercial verification.

§4.2.1.2 Exemplary Architectures

Three alternative architectural embodiments in which the first technique may be employed are now described with reference to FIGS. 2, 3, and 4.

FIG. 2 is a block diagram illustrating a first embodiment of the present invention, in which intra-work information is used to identify the work and in which a audience member device 210, such as a PC for example, receives and renders a work that is consumed by an audience member (user). At some point, the user may wish to perform a work-specific action such as traversing to an associated Web site. Upon initiation of this request, the computer 210 performs the operations 140a, 150a, 160a and 170a, such as those shown in FIG. 1. To reiterate, these operations include a feature extraction operation(s) 140a, feature vector lookup or matching operation(s) 150a in connection with items or records 112a in a work-identification (WID) database 110a. If a matching feature vector 114a is found, the work-associated information lookup operation(s) 160a can use the associated work identifier 116a to accessing a work identification-action translation (WIDAT) database 130a to retrieve associated information 136a, possibly including determining what action should be performed.

As described above, the two databases might be integrated into a single database. However, conceptually, they are described here as separate.

An example illustrating operations that can occur in the first embodiment of FIG. 1, is now described. Consider a print application, in which say 10,000 advertisements are to be recognized that appear in national newspapers and magazines. If 1 Kbyte is required to store each feature vector then approximately 10 Mbytes of storage will be required for the work identification database 110a. Such a size does not represent a serious problem, in either memory or disk space, to present personal computers.

An important issue then becomes recognition rate. While this may be problematic, all the images are two-dimensional—three-dimensional object recognition is not required. Of course, since a low cost camera captures the printed advertisement, there may be a number of geometric distortions that might be introduced together with noise. Nevertheless, the application is sufficiently constrained that adequate recognition rates should be achievable with current state-of-the-art computer vision algorithms. See, e.g., P. N. Yianilos "Excluded Middle Vantage Point Forests for nearest Neighbor Search", Presented at the Sixth DIMACS Implementation Challenge: Near Neighbor Searches workshop, Jan. 15, 1999. See also, P. N. Yianilos "Locally lifting the curse of Dimensionality for nearest Neighbor Search" SODA 2000: 361-370. (Each of these references is incorporated herein by reference.) Thus, for example, a sub-linear search time can be achieved. Unlike the kd-tree method which finds the nearest neighbor with certainty, randomized constructions, like the one described in P. N. Yianilos, "Locally lifting the curse of

Dimensionality for nearest Neighbor Search" SODA 2000: 361-370, that succeed with some specified probability may be used. One example of a sub-linear time search is an approximate nearest neighbor search. Estimates of the size of the WIDAT database **130**$a$ depend on what associated information (recall fields **136**) is stored. If, for example, only a URL address is needed, about 20 characters can typically represent most URLs. Thus, the size of the WIDAT database **130**$a$ would be less than 1 Mbyte.

The configuration just described with reference to FIG. **2** places all of the processing and data on each user's local machine **210**. A number of alternative embodiments, in which some or all of the storage and processing requirements are performed remotely, will be described shortly.

As new works are created and made publicly available, the databases residing on a user's local computer become obsolete. Just as the database provider **240** must continually update the databases in order to remain current, there is also a need to update local databases on devices at audience member premises. This update process can be performed over the Internet **230** in a manner very similar to how software is currently upgraded. It is not necessary to download an entirely new database although this is an option. Rather, only the changes need to be transmitted. During this update process, the user's computer **210** might also transmit information to a central monitoring center **240** informing it of which advertisements the computer user has queried. This type of information is valuable to both advertisers and publishers. Of course, care must be taken to ensure the privacy of individual users of the system. However, it is not necessary to know the identity of individual users for the system to work.

FIG. **3** is a block diagram illustrating a second embodiment of the present invention, in which intra-work information is used to identify the work. Although the WIDAT database can be quite small, as illustrated in the exemplary embodiment described above with respect to FIG. **2**, there is still the problem of keeping this database current. While periodic updates of the local databases may be acceptable, they become unnecessary if the WIDAT database **130**$b$ is at a remote location **340**. In this arrangement, illustrated in FIG. **3**, after the local computer **310** identifies the work, it sends a query to the remote WIDAT database **130**$b$. The query may contain the work identifier. The remote site **340** may then return the associated information **136**. Although the remote WIDAT database **130**$b$ needs to be updated by the database provider, this can be done very frequently without the need for communicating the updates to the local computers **310**.

The second embodiment is most similar to active systems in which an embedded signal is extracted and decoded and the identifier is used to interrogate a central database. Consequently it has many of the advantages of such systems, while avoiding the need to insert signals into all works. One such advantage, is that the database provider receives real-time information relating to users' access patterns.

The WIDAT database **130**$b$ might physically reside at more than one location. In such a case, some requests will go to one site, and other requests will go to another. In this way, over-loading of a single site by too many users can be avoided. Other load balancing techniques are also applicable.

FIG. **4** is a block diagram illustrating a third embodiment of the present invention, in which intra-work information is used to identify the work. Recall that the WIDAT database may be small relative to that work identification database (WID). As the size of the work recognition (WID) database increases, the foregoing embodiments may become impractical. Consider, for example, a music application in which it is desired to identify 100,000 song titles. If it is again assumed that a 1

Kbyte vector can uniquely represent each song, then on the order of 100 Mbytes is now needed. This size is comparable to large application programs such as Microsoft's Office 2000 suite. Although this still does not represent an inordinate amount of disk space, if this data needs to reside in memory at all times, then very few present machines will have adequate resources. Clearly, at some point, the proposed architectures scales to a point where requirements become impractical. In this case, a further modification to the architecture is possible.

Since the storage and searching of the work-identifier (WID) database require the most computation and storage, it may be more economical to perform these actions remotely. Thus, for example, if a user is playing an MP3 music file and wants to go to a corresponding website, the MP3 file is passed to an operation that determines one or more feature vectors. In the third embodiment, instead of performing the matching locally **410**, the one or more vectors are transmitted to a central site **440** at which is stored the WID and WIDAT databases **110**$c$ and **130**$c$ together with sufficiently powerful computers to resolve this request and those of other computer users. This configuration is illustrated in FIG. **4**. Similarly, if a user is playing an MPEG or other video file and wants to initiate a work-related action, the video file is passed to an operation **140**$c$ that extracts one or more feature vectors. The entire video file need not be processed. Rather, it may be sufficient to process only those frames in the temporal vicinity to the users request, i.e., to process the current frame and or some number of frames before and after the current frame, e.g. perhaps 100 frames in all. The extracted feature vector or feature vectors can then be transmitted to a central site **440** which can resolve the request.

After successfully matching the feature vector, the central site **440** can provide the user with information directly, or can direct the user to another Web site that contains the information the user wants. In cases where the recognition is ambiguous, the central site **440** might return information identifying one of several possible matches and allow the user to select the intended one.

The third embodiment is particularly attractive if the cost of extracting the feature vector is small. In this case, it becomes economical to have feature vector extraction **140**$c$ in digital set-top-boxes and in video recorders **410**. The latter may be especially useful for the new generation of consumer digital video recorders such as those manufactured by TIVO and Replay TV. These devices already have access to the Internet via a phone line. Thus, when someone watching a recorded movie from television reacts to an advertisement, the video recorder would extract one or more feature vectors and transmit them to a central site **440**. This site **440** would determine if a match existed between the query vector and the database of pre-stored vectors **110**$c$. If a match is found, the central server **440** would transmit the associated information, which might include a Web site address or an 800 number for more traditional ordering, back to the audience user device **410**. Of course, a consumer device **410** such as a digital video recorder might also store personal information of the owner to facilitate online e-commerce. Such a device **410** could store the owner's name, address, and credit card information and automatically transmit them to an on-line store to complete a purchase. Very little user interaction other than to authorize the purchase might be needed. This type of purchasing may be very convenient to consumers.

Another advantage of the third embodiment is that it obviates the need to update local databases while, at the same time, the centrally maintained databases can be kept current with very frequent updating.

**13**

§4.2.2 Embodiments in which Work is Recognized Based on Extra-Work Information

Operations related to this embodiment are described in §4.2.2.1 below. Then, various architectures which may be used to effect such operations are described in §4.2.2.2.

If the cost of extracting a feature vector is too large, then the cost of deploying any of the embodiments described in §4.2.1 above may be prohibitive. This is particularly likely in very cost sensitive consumer products, including set-top-boxes and next generation digital VCRs. Acknowledging this fact, a different technique, one that is particularly well suited for broadcasted media such as television and radio as well as to content published in magazines and newspapers, is now described. This technique relies on the fact that a work need not be identified by a feature vector extracted from the work (which is an example of "intra-work information"), but can also be identified by when and where it is published or broadcast (which are examples of "extra-work information")

An example serves to illustrate this point. Consider the scenario in which a viewer sees a television commercial and responds to it. The embodiments described in §4.2.1 above required the user device (e.g., a computer or set-top-box) **210/310/410** to extract a feature vector. Such an extracted vector was attempted to be matched to another feature vector(s), either locally, or at a remote site. In the embodiments using a remote site, if the central site is monitoring all television broadcasts, then the user's query does not need to include the feature vector. Instead, the query simply needs to identify the time, geographic location and the station that the viewer is watching. A central site can then determine which advertisement was airing at that moment and, once again, return the associated information. The same is true for radio broadcasts. Moreover, magazines and newspapers can also be handled in this manner. Here the query might include the name of the magazine, the month of publication and the page number.

§4.2.2.1 Operations and Exemplary Methods and Techniques for Effecting Such Operations

FIG. **5** is a process bubble diagram of operations that may be performed in accordance with another version of the present invention, in which extra-work information is used to identify the work. As shown, a query work-identification (QWID) information storage **510** may include a number of items or records **512**. Each item or record **512** may associate extra-work information **514**, related to the work, with a, preferably unique, work identifier **516**. The query work-identification (QWID) information storage **510** may be generated by a database generation operation(s) **520**.

Further, work identifier-action information (WIDAT) storage **530** may include a number of items or records **532**. Each item or record **532** may associate a, preferably unique, work identifier **534** with associated information **536**, such as an action for example. The work identifier-action (WIDAT) information storage **530** may be generated by a database generation operation(s) **538** which may, for example, accept manual entries.

As can be appreciated from the foregoing, the query work-information (QWID) storage **510** records **512** and the work identification-action (WIDAT) storage **530** records **532** can be combined into a single record.

The extra-work information aggregation (e.g., query generation) operation(s) **540** can accept a information related to a work, such as the time of a user request or of a rendering of the work, the geographic location at which the work is rendered, and the station that the audience member has selected, and generate a query from such extra-work information.

**14**

The query including the extra-work information can be used by a lookup operation(s) **550** to search for a "matching" set of information **514**. If a match, or a match within a pre-determined threshold is determined, then the associated work identifier **516** is read.

The read work identifier can then be used by a work-associated information lookup operation(s) **560** to retrieve associated information, such as an action, **536** associated with the work identifier. Such information **536** can then be passed to action initiation operation(s) **570** which can perform some action based on the associated information **536**.

If the extra-work information of a work is known (in advance), generating the query work identifier (QWID) information **510** is straight-forward. If this were always the case, an intra-work information-based recognition operation would not be needed. However, very often this is not the case. For example, local television broadcasts typically have discretion to insert local advertising, as well as national advertising. Thus, it often is not possible to know in advance when, on what station, and where a particular advertisement will play.

In such instances, a real-time (e.g., centralized) monitoring facility **580** may be used to (i) extract feature vectors from a work, (ii) determine a work identifier **116** from the extracted features, and (iii) communicate one or more messages **590** in which extra-work information (e.g., time, channel, geographic market) **592** is associated with a work identifier **594**, to operation(s) **520** for generating query work identification (QWID) information **510**.

§4.2.2.1.1 Exemplary Extra-Work Information

In the context of national broadcasts, geographic information may be needed to distinguish between, for example, the ABC television broadcast in Los Angeles and that in New York. While both locations broadcast ABC's programming, this programming airs at different times on the East and West coasts of America. More importantly, the local network affiliates that air ABC's shows have discretion to sell local advertising as well as a responsibility to broadcast the national commercials that ABC sells. In short, the works broadcast by ABC in Los Angeles can be different from that in other geographic locations. Geographic information is therefore useful to distinguish between the different television markets. In some circumstances, geographic information may not be necessary, especially in parts of the world with highly regulated and centralized broadcasting in which there are not regional differences.

§4.2.2.1.2 Exemplary Techniques for Generating Databases

FIG. **5** illustrates a third database **510** referred to as the query to work identification (QWID) database. This database **510** maps the query (e.g., in the form of time, location and channel information) into a unique ID that identifies the perceived work. The QWID **510** and WIDAT **530** databases might not be separate, but for clarity will be considered so. After retrieving the unique work identifier **512** from the QWID database **510**, the identifier can be used to access the WIDAT database **530**. This is discussed in more detail later.

As introduced above, although it appears that this architecture does not require a recognition facility, such a facility may be needed. The feature extraction operation(s) **140**d, as well as the work identification operation(s) **150**d and other databases **110**d, may be moved to one or more remote sites **580**.

Although TV Guide and other companies provide detailed information regarding what will be broadcast when, these scheduling guides do not have any information regarding what advertisements will air when. In many cases, this information is unknown until a day or so before the broadcast. Even then, the time slots that a broadcaster sells to an advertiser only provide a time range, e.g. 12 pm to 3 pm. Thus it is

unlikely that all commercials and aired programming can be determined from TV schedules and other sources prior to transmission. Further, occasionally programming schedules are altered unexpectedly due to live broadcasts that overrun their time slots. This is common in sports events and awards shows. Another example of interrupts to scheduled programming occurs when a particularly important news event occurs.

During transmission, it may therefore be necessary for a central site **580** to determine what work is being broadcast and to update its and/or other's database **520** accordingly based on the work identified **594** and relevant extra-work information **592**. There are a variety of ways that this can be accomplished.

First, it may be economically feasible to manually monitor all television stations that are of interest, and manually update the database with information regarding the work being monitored. In fact, Nielsen used such procedures in the early 1960's for the company to tabulate competitive market data. More than one person can be employed to watch the same channel in order to reduce the error rate. It should be noted that the recent ruling by the FCC that satellite broadcasters such as DirecTV, DishTV and EchoStar can carry local stations significantly reduces the cost of monitoring many geographic markets. Currently, DirecTV, for example, carries the four main local stations in each of the 35 largest markets. Thus, these 4.times.35=140 channels can all be monitored from a single site **580**. This site would be provided with satellite receivers to obtain the television channels.

Unfortunately, however, humans are error prone and the monitoring of many different stations from many different geographic locations can be expensive. In order to automate the recognition process, a central site **580** could employ a computer-based system to perform automatic recognition. Because the recognition is centralized, only one or a few sites are needed. This is in comparison with the first architecture we described in which a complete recognition system was required in every user's home or premise. This centralization makes it more economic to employ more expensive computers, perhaps even special purpose hardware, and more sophisticated software algorithms. When video frames or clips cannot be identified or are considered ambiguous, this video can be quickly passed to human viewers to identify. Further, it should be possible for the automated recognition system to use additional information such as television schedules, time of day, etc in order to improve its recognition rate.

§4.2.2.1.2 Exemplary Techniques for Generating Queries Based on Extra-Work Information

At the audience member (user) premises, all that is needed is for the device to send a query to a database-server with information that includes extra-work information, such as geographic location, time and channel. Usually, this extra-work information would be transmitted in real-time, while the work (e.g., an advertisement) is being broadcast. However, this is not necessary. If the television does not have access to the Internet, and most TVs do not yet, then an audience member (user) may simply remember or record which channel he or she was viewing at what time. In fact, the user device could store this information for later retrieval by the user. At a convenient later time, the user might access the Internet using a home PC. At this time, he or she can query the database by entering this extra-work information (e.g., together with geographic information) into an application program or a web browser plug-in.

Another possibility is allowing an audience member (user), at the time he or she is consuming (e.g., viewing, reading, listening to, etc.) the work, to enter query information into a handheld personal digital assistant ("PDA") such as a Palm

Pilot, so as not to forget it. This information can then be manually transferred to a device connected to a network, or the information can be transferred automatically using, for example, infrared communications or via a physical link such as a cradle. Recently, PDAs also have some wireless networking capabilities built in, and thus might support direct access to the information desired. Further, software is available that allows a Palm Pilot or other PDA to function as a TV remote control device. As such, the PDA already knows the time of day and channel being viewed. It also probably knows the location of the audience member, since most PDA users include their own name and address in the PDA's phonebook and identify it as their own. Thus, with one or a few clicks, an audience member PDA user could bookmark the television content he or she is viewing. If the PDA is networked, then the PDA can, itself, retrieve the associated information immediately. Otherwise, the PDA can transfer this bookmarked data to a networked device, which can then provide access to the central database.

§4.2.2.2 Exemplary Architectures

FIG. **6** is a block diagram illustrating a fourth embodiment of the present invention, in which extra-work information is used to identify the work. As shown, an extra-work information aggregation operation **540a** may be effected on a device **610**, such as a PC, at the audience member (user) premises. The various databases **510a**, **530a**, and **110e**, as well as the database generation operation(s) **520a/538a**, the lookup operation(s) **550a** and the work-associated information lookup operation(s) **560a** may be provided at one or more centralized monitoring and query resolution centers **640**.

FIG. **7** is a block diagram illustrating a fifth embodiment of the present invention, in which extra-work information is used to identify the work. This fifth embodiment is similar to the fourth embodiment illustrated in FIG. **6** but here, the monitoring center **740a** and query resolution center **740b** are separate.

These embodiments have many advantages for television and radio broadcasters who desire to provide Internet links or other action. First, the audience member (user) equipment, whether it is a computer, set-top-box, television, radio, remote control, personal digital assistant (pda), cell phone or other device, does not need to perform any processing of the received signal. As such, there is almost no cost involved to equipment manufacturers.

These last embodiments have some similarity with services such as those provided by the companies Real Names of Redwood City, Calif., America Online ("AOL") and especially iTag from Xenote. The popular press has reported on the difficulties associated with assigning domain names. The simplest of these problems is that almost all the one-word names in the ".com" category have been used. Consequently, domain names can often be difficult to remember. To alleviate this problem, RealNames and AOL provide alternative, proprietary name spaces (AOL calls these keywords). For a fee, a company may register a name with these companies. Thus, rather than type the URL http://www.bell-labs.com, the simple keyword "bell" might be sufficient to access the same Web site. These capabilities are convenient to users. However, these systems are very different from the fourth and fifth embodiments described. First, and foremost, these systems are not designed to identify content. Rather, they are simply alternative network address translation systems based on easily remembered mnemonics which are sold to interested companies. As such, the user is still expected to type in an address, but this address is easier to remember than the equivalent URL. In contrast, while a user may manually enter the information describing the work, the preferred embodiment is for

the computer, set-top-box or other device to automatically generate this information. Further, the mapping of keywords to network addresses is an arbitrary mapping maintained by AOL or Real Names. For example, the keyword "bell" might just as reasonably point to the Web site for Philadelphia's Liberty Bell as to Lucent's Bell Labs. In contrast, the query used in the fourth and fifth embodiments is designed to contain all the necessary data to identify the work, e.g. the time, place and television channel during which the work was broadcast. There is nothing arbitrary about this mapping. It should also be pointed out that the proposed system is dynamic—the same work, e.g. a commercial, potentially has an infinite number of addresses depending on when and where it is broadcast. If an advertisement airs 100,000 unique times, then there are 100,000 different queries that uniquely identify it. Moreover, the exemplary query includes naturally occurring information such as time, place, channel or page number. This is not the case for AOL or RealNames, which typically assigns one or more static keywords to the address of a Web site.

Xenote's iTag system is designed to identify radio broadcasts and uses a query similar to that which may be used in the fourth and fifth embodiments, i.e. time and station information. However, the work identification information is not dynamically constructed but is instead based on detailed program scheduling that radio stations must provide it. As such, it suffers from potential errors in scheduling and requires the detailed cooperation of broadcasters. While the fourth and fifth embodiments might choose to use program scheduling information and other ancillary information to aid in the recognition process, they do not exclusively rely on this. The concept of resolving a site name by recognizing the content is absent from the above systems.

§4.2.3 Exemplary Apparatus for Audience Member (User) Premise Device

While personal computers may be the primary computational device at a user's location, it is not essential to use a PC. This is especially true of the embodiments depicted in FIGS. **6** and **7**, which do not require the content, e.g. video signal, to be processed. Instead, only a unique set of identification parameters such as time, location and channel are provided to identify the perceived Work. Many forms of devices can therefore take advantage of this configuration.

As previously noted, personal digital assistants (PDAs) can be used to record the identification information. This information can then be transferred to a device with a network communication such as a PC. However, increasingly, PDAs will already have wireless network communication capabilities built-in, as with the Palm VII PDA. These devices will allow immediate communication with the query resolution center and all information will be downloaded to them or they can participate in facilitating an e-commerce transaction. Similarly, wireless telephones are increasingly offering web-enabled capabilities. Consequently, wireless phones could be programmed to act as a user interface.

New devices can also be envisaged, including a universal remote control for home entertainment systems with a LCD or other graphical display and a network connection. This connection may be wireless or the remote control might have a phone jack that allows it to be plugged directly into an existing phone line. As home networks begin to be deployed, such devices can be expected to communicate via an inexpensive interface to the home network and from there to access the Internet.

In many homes, it is not uncommon for a computer and television to be used simultaneously, perhaps in the same room. A person watching television could install a web browser plug-in or applet that would ask the user to identify his location and the station being watched. Then, periodically, every 20 seconds for example, the plug-in would update a list of web addresses that are relevant to the television programs being watched, including the commercials. The audience member would then simply click on the web address of interest to obtain further information. This has the advantage that the viewer does not have to guess the relevant address associated with a commercial and, in fact, can be directed to a more specialized address, such as www.fordvehicles.com/ibv/tausrus2kflash/flash.html, rather than the generic www-.ford.com site. Of course, this applet or plug-in could also provide the database entity with information regarding what is being accessed from where and at what time. This information, as noted earlier, is valuable to advertisers and broadcasters. For PC's that have infra-red communication capabilities, it is straightforward to either control the home entertainment center from the PC or for the PC to decode the signals from a conventional remote control. Thus, as a user changes channels, the PC is able to automatically track the channel changes.

Recording devices such as analog VCRs and newer digital recording devices can also be exploited in the embodiments depicted in FIGS. **6** and **7**, especially if device also record the channel and time information for the recorded content. When a user initiates a query, the recorded time and channel, rather than the current time and channel, then form part of the identification information.

Digital set-top-boxes are also expected to exploit the capabilities described herein. In particular, such devices will have two-way communication capabilities and may even include cable modem capabilities of course, the two-way communication need not be over a television cable. For example, satellite set-top-boxes provide up-link communications via a telephone connection. Clearly, such devices provide a convenient location to enable the services described herein. Moreover, such services can be provided as part of the OpenCable and DOCSIS (data over cable service interface specification) initiatives.

§4.2.4 Information Retrieval Using Features Extracted from Audio and/or Video Works

Some embodiments consistent with the present invention provide a computer-implemented method, apparatus, or computer-executable program for providing information about an audio file or (a video file) played on a device. Such embodiments might (a) extract features from the audio (or video) file, (b) communicate the features to a database, and (c) receive the information about the audio (or video) file from the database. In some embodiments consistent with the present invention, the act of extracting the features is performed by a microprocessor of the device, and/or a digital signal processor of the device. The received information might be rendered on an output (e.g., a monitor, a speaker, etc.) of the device. The received information might be stored (e.g., persistently) locally on the device. The information might be stored on a disk, or non-volatile memory.

In some of the embodiments pertaining to audio files, the audio file might be an mp3 file or some other digital representation of an audio signal. The information might include a song title, an album title, and/or a performer name.

In some of the embodiments pertaining to video files, the video file might be an MPEG file or some other digital representation of a video signal. The video file might be a video work, and the information might include a title of the video work, a director of the video work, and names of performers in the video work.

**19**

§4.3 Operational Examples

An example illustrating operations of an exemplary embodiment of the present invention, that uses intra-work information to identify the work, is provided in §4.3.1. Then, an example illustrating operations of an exemplary embodiment of the present invention, that uses extra-work information to identify the work, is provided in §4.3.2.

§4.3.1 Operational Example where Intra-Work Information is Used to Identify the Work

A generic system for monitoring television commercials is now described. Obviously, the basic ideas extend beyond this specific application.

The process of recognition usually begins by recognizing the start of a commercial. This can be accomplished by looking for black video frames before and after a commercial. If a number of black frames are detected and subsequently a similar number are detected 30 seconds later, then there is a good chance that a commercial has aired and that others will follow. It is also well known than the average sound volume during commercials is higher than that for television shows and this too can be used as an indicator of a commercial. Other methods can also be used. The need to recognize the beginning of a commercial is not essential. However, without this stage, all television programming must be assumed to be commercials. As such, all video frames must be analyzed. The advantage of determining the presence of a commercial is that less video content must be processed. Since the percentage of advertising time is relatively small, this can lead to considerable savings. For example, commercials can be buffered and then subsequently processed while the television show is being broadcast. This reduces the real-time requirements of a system at the expense of buffering, which requires memory or disk space. Of course, for the applications envisioned herein, a real-time response to a user requires real-time processing.

Once it is determined that an advertisement is being broadcast, it is necessary to analyze the video frames. Typically, a compact representation of each frame is extracted. This vector might be a pseudo-random sample of pixels from the frame or a low-resolution copy of the frame or the average intensities of n.times.n blocks of pixels. It might also be a frequency-based decomposition of the signal, such as produced by the Fourier, Fourier-Mellin, wavelet and or discrete cosine transforms. It might involve principal component analysis or any combination thereof. The recognition literature contains many different representations. For block-based methods, the n.times.n blocks may be located at pseudo-random locations in each frame or might have a specific structure, e.g. a complete tiling of the frame. The feature vector might then be composed of the pixels in each block or some property of each block, e.g. the average intensity or a Fourier or other decomposition of the block. The object of the vector extraction stage is to obtain a more concise representation of the frame. Each frame is initially composed of 480.times.720 pixels which is equivalent to 345,600 bytes, assuming one byte per pixel. In comparison, the feature vector might only consist of 1 Kbyte of data. For example, if each frame is completely tiled with 16.times.16 blocks, then the number of blocks per frame is 345,600/256=1350. If the average intensity of each block constitutes the feature vector, then the feature vector consists of 1350 bytes, assuming 8-bit precision for the average intensity values. Alternatively, 100 16.times.16 blocks can be pseudo-randomly located on each frame of the video. For each of these 100 blocks, the first 10 DCT coefficients can be determined. The feature vector then consists of the 100.times.10=1000 DCT coefficients. Many other variations are also possible. In many media applica-

**20**

tions, the content possesses strong temporal and spatial correlations. If necessary, these correlations can be eliminated or substantially reduced by pre-processing the content with a whitening filter.

A second purpose of the feature extraction process is to acquire a representation that is robust or invariant to possible noise or distortions that a signal might experience. For example, frames of a television broadcast may experience a small amount of jitter, i.e. horizontal and or vertical translation, or may undergo lossy compression such as MPEG-2. It is advantageous, though not essential, that these and other processes do not adversely affect the extracted vectors.

Each frame's feature vector is then compared with a database of known feature vectors. These known vectors have previously been entered into a content recognition database together with a unique identifier. If a frame's vector matches a known vector, then the commercial is recognized. Of course, there is the risk that the match is incorrect. This type of error is known as a false positive. The false positive rate can be reduced to any desired value, but at the expense of the false negative rate. A false negative occurs when a frame's vector is not matched to the database even though the advertisement is present in the database. There are several reasons why a frame's feature vector may fail to match. First, the recognition system may not be capable of 100% accuracy. Second, the extracted vector will contain noise as a result of the transmission process. This noise may alter the values of a feature vector to the extent that a match is no longer possible. Finally, there is the case where the observed commercial is not yet present in the database. In this case, it is necessary to store the commercial and pass it (e.g., to a person) for identification and subsequent entry in the database.

It is important to realize that the matching of extracted and known vectors is not equivalent to looking up a word in an electronic dictionary. Since the extracted vectors contain noise or distortions, binary search is often not possible. Instead, a statistical comparison is often made between an extracted vector and each stored vector. Common statistical measures include linear correlation and related measures such as correlation coefficient, but other methods can also be used, including clustering techniques. See, e.g., the Duda and Hart reference. These measures provide a statistical measure of the confidence of the match. A threshold can be established, usually based on the required false positive and negative rates, such that if the correlation output exceeds this threshold, then the extracted and known vectors are said to match.

If binary search was possible, then a database containing N vectors would require at most log(N) comparisons. However, in current advertisement monitoring applications there is no discussion of efficient search methods. Thus, a linear search of all N entries may be performed, perhaps halting the search when the first match is found. On average, this will require N/2 comparisons. If N is large, this can be computationally expensive. Consider a situation in which one out of 100,000 possible commercials is to be identified. Each 30-second commercial consists of 900 video frames. If all 900 frames are stored in the database, then N=90,000,000. Even if only every 10.sup.th video frame is stored in the database, its size is still nine million. While databases of this size are now common, they rely of efficient search to access entries, i.e., they do not perform a linear search. A binary search of a 90,000,000-item database requires less than 20 comparisons. In contrast, a linear search will require an average of 45,000, 000!

With 9 million entries, if each vector is 1 Kbyte, then the storage requirement is 9 Gigabytes. Disk drives with this

capacity are extremely cheap at this time. However, if the database must reside in memory due to real-time requirements, then this still represents a substantial memory requirement by today's standards. One reason that the data may need to be stored in memory is because of the real-time requirements of the database. If 10 channels are being simultaneously monitored within each of 50 geographic areas, then there will be 15,000 queries per second to the content recognition database, assuming each and every frame is analyzed. This query rate is low. However, if a linear search is performed then 675 billion comparisons per second will be required. This is an extremely high computational rate by today's standards. Even if only key frames are analyzed, this is unlikely to reduce the computational rate by more than an order of magnitude.

If an advertisement is not recognized, then typically, the remote monitoring system will compress the video and transmit it back to a central office. Here, the clip is identified and added to the database and the remote recognition sites are subsequently updated. Identification and annotation may be performed manually. However, automatic annotation is also possible using optical character recognition software on each frame of video, speech recognition software, close captioning information and other information sources. As these methods improve in accuracy, it is expected that they will replace manual identification and annotation.

The recognition system described can be considered to be a form of nearest neighbor search in a high dimensional feature space. This problem has been very well studied and is known to be very difficult as the dimensionality of the vectors increases. A number of possible data structures are applicable including kd-trees and vantage point trees. These data structures and associated search algorithms organize a N-point dataset (N=90,000,000 in out previous example) so that sublinear time searches can be performed on average. However, worst-case search times can be considerably longer. Recently, Yianilos proposed an excluded middle vantage point forest for nearest neighbor search. See, e.g., the Yianilos reference. This data structure guarantees sub-linear worst-case search times, but where the search is now for a nearest neighbor within a fixed radius, .tau.. The fixed radius search means that if the database contains a vector that is within .tau. of the query, then there is a match. Otherwise, no match is found. In contrast, traditional vantage point trees will always return a nearest neighbor, even if the distance between the neighbor and the query is very large. In these cases, if the distance between the query and the nearest neighbor exceeds a threshold, then they are considered not to match. This is precisely what the excluded middle vantage point forest implicitly does.

Using an excluded middle vantage point forest, will allow accurate real-time recognition of 100,000 broadcasted advertisements. This entails constructing an excluded middle vantage point forest based on feature vectors extracted from say 90,000,000 frames of video. Of course, using some form of pre-filtering that eliminates a large number of redundant frames or frames that are not considered to be good unique identifiers can reduce this number. One such pre-filter would be to only examine the I-frames used when applying MPEG compression. However, this is unlikely to reduce the work identification database (WID) size by more than one order of magnitude. Assuming 10 channels are monitored in each of 50 geographic regions, then the query rate is 15,000=10.times.50.times.30 queries per second.

§4.3.2 Operational Example where Extra-Work Information is Used to Identify the Work

FIG. **8** depicts a satellite television broadcast system **800**, though cable and traditional broadcast modes are also applicable. Block **810** represents audience members (users) watching a TV channel in their home, which also has a connection **812** to the Internet **820**. Other networks are also possible. The satellite broadcasts are also being monitored by one or more television monitoring centers **840**a. These centers **840**a may monitor all or a subset of the television channels being broadcast. They are not restricted to monitoring satellite TV broadcasts but may also monitor cable and traditional terrestrial broadcasts. The primary purpose of these monitoring centers **840**a is to identify the works being broadcasted. Of particular interest are television advertisements. However, other works, or portions thereof, may also be identified. Each time a new segment of a work is identified, the monitoring system or systems **840**a update one or more database centers **840**b, informing them of the time, place, channel and identity of the identified segment. The segment may be a complete thirty second commercial or, more likely, updates will occur more frequently, perhaps at a rate of 1 update per second per channel per geographic location. The database center **840**b updates its database so that queries can be efficiently responded to in sub-linear time.

The database centers **840**b can use traditional database technology. In general, the query search initiated by an audience member is not a nearest neighbor search but can be a classical textual search procedure such as a binary search. The nearest neighbor search is appropriate for the monitoring sub-system **840**a. The database centers **840**b are continually updated as each new advertisement, television show or portion thereof is recognized. Standard updating algorithms can be used. However, random new entries to the database are unlikely. Rather, each new entry, or set of entries, denotes a new time segment that is later than all previously inserted items. As such, each new entry can be appended to the end of the database while still maintaining an ordered data structure that is amenable to binary and other efficient search techniques. If two entries have the same time in their time field, items can be sorted based on secondary fields such as the channel and geographic location, as depicted in FIG. **9**. Since the number of such entries will be relatively small compared with the entire database, it may be sufficient to simply create a linear linked list of such entries, as depicted in FIG. **9**. Of course, the size of the database is constantly increasing. As such, it may become necessary to have several levels of storage and caching. Given the envisaged application, most user queries will be for recent entries. Thus, the database may keep the last hours worth of entries in memory. If there is one entry per second for each of 100 channels in 100 geographic locations, this would correspond to 3600.times.100.times.100=36,000,000 entries which is easily accommodated in main memory. Entries that are older than one hour may be stored on disk and entries older than one week may be archived (e.g., backed up on tape) for example. The entries to this database can include time, location and channel information together with a unique identifier that is provided by the monitoring system. Of course, additional fields for each entry are also possible.

When a user query is received, the time, channel and geographic information are used to retrieve the corresponding unique identifier that is then used to access a second database that contains information associated with the identified work. An entry **1000** in this second database is depicted in FIG. **10**, which shows that associated with the unique identifier **1010**, the name of a product **1020**, a product category **1030**,

the manufacturer **1040** and the commercial's associated web site **1050**. Many other data fields **1060** are also possible. Such additional fields may include fields that indicate what action should be taken on behalf of the requesting user. Example actions include simply redirecting a request to an associated Web site, or initiating an e-commerce transaction or providing an associated telephone number that may be automatically dialed if the querying device is a cell phone or displaying additional information to the user. This database is likely to be updated much less frequently, perhaps only as often as once or twice a day, as batches of new advertisements are added to the system. Alternatively, it might be updated as each new advertisement is added to the system.

An audience member (user) **810** watching a television commercial for example may react to the advertisement by initiating a query to the database center **840***b*. The device whereby the user initiates the query might be a television or set-top-box remote control, or a computer or a wireless PDA or a (WAP-enabled) cell phone or a specialized device. Typically, the query will occur during the airing of the commercial or a shortly thereafter. However, the time between the broadcasting of the advertisement and the time of the associated query is not critical and can, in some instances be much longer. For example, the audience member might bookmark the query information in a device such as a PDA or a specialized device similar to those developed by Xenote for their Itag radio linking. Later, the audience member may transmit the query to the database center **840***b*. This might happen hours or even days later.

The query contains information that the database center **840***b* uses to identify the work being viewed. This information might include the time and place where the audience member was, together with the channel being viewed. Other identifying information is also possible. The query may also contain additional information that may be used to facilitate the user's transaction and will include the return address of the user. For example, if the user is intending to order a pizza after seeing a Pizza Hut advertisement, the query may also contain personal information including his or her identity, street address and credit card information.

When the database center **840***b* receives a query, data in the query is used to identify the work and associated information. A number of possible actions are possible at this point. First, the database center **840***b* may simply function as a form of proxy server, mapping the audience member's initial query into a web address associated with the advertisement. In this case, the audience member will be sent to the corresponding Web site. The database center **840***b* may also send additional data included in the initial query to this Web site **850** in order to facilitate an e-commerce transaction between the audience member and the advertiser. In some cases, this transaction will not be direct, but may be indirect via a dealer or third party application service provider. Thus, for example, though an advertisement by Ford Motor Company may air nationally, viewers may be directed to different Web sites for Ford dealerships depending on both the audience member's and the dealerships' geographic locations. In other cases, advertisers may have contracted with the database center **840***b* to provide e-commerce capabilities. This latter arrangement has the potential to reduce the amount of traffic directed over the public Internet, restricting it, instead to a private network associated with the owner of the database center.

If the audience member (user) is not watching live television but is instead watching a taped and therefore time-shifted copy, then additional processes are needed. For the new generation of digital video recorders, irrespective of the recording media (tape or disk), it is likely to be very easy to include

information identifying the location of the recorder, as well as the time and channel recorded. Location information can be provided to the recorder during the setup and installation process, for example. Digital video recorders, such as those currently manufactured by TIVO of Alviso, Calif. or Replay TV of Santa Clara, Calif. have a network connection via telephone, which can then send the query of an audience member to the database center **840***b* using the recorded rather than the current information.

In cases where query information has not been recorded, it is still possible to initiate a successful query. However, in this case, it may be necessary to extract the feature vector from the work of interest and send this information to the monitoring center **840***a* where the feature vector can be identified. This form of query is computationally more expensive but the relative number of such queries compared to those sent to the database centers **840***b* is expected to be small. It should also be noted that the physical separation of the monitoring and database centers, depicted in FIGS. **6** and **7**, is not crucial to operation of the system and simply serves to more clearly separate the different functionality present in the overall system configuration.

Although the implementation architectures described above focus on the television media, it is apparent that the present invention is applicable to audio, print and other media.

§4.4 Conclusions

None of the embodiments of the invention require modification to the work or content, i.e., no active signal is embedded. Consequently, there is no change to the production processes. More importantly, from a user perspective, deployment of this system need not suffer from poor initial coverage. Provided the database is sufficiently comprehensive, early adopters will have comprehensive coverage immediately. Thus, there is less risk that the consumer will perceive that the initial performance of the deployed system is poor. Further, the present invention permits statistics to be gathered that measure users' responses to content. This information is expected to be very useful to advertisers and publishers and broadcasters.

What is claimed is:

1. A method comprising:

receiving, by a computer system including at least one computer, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

obtaining, by the computer system from the user electronic device, a request related to the associated tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

25

providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

2. The method of claim **1**, wherein the associated information is related to one or more products or services.

3. The method of claim **2**, wherein the associated information is related to names of the one or more products or services.

4. The method of claim **2**, wherein the associated information is related to a product category associated with the one or more products or services.

5. The method of claim **2**, wherein the associated information is related to a manufacturer of the one or more products or services.

6. The method of claim **2**, wherein the associated information is related to a website associated with the one or more products or services.

7. The method of claim **1**, wherein the first electronic media work comprises at least one of an audio, a video, or an image.

8. The method of claim **1**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another.

9. The method of claim **1**, wherein the user electronic device is at least one of a television, a set-top-box, a video recorder, a computer, a cell phone, a remote control, or a portable device.

10. The method of claim **1**, wherein the associated information is related to an advertisement.

11. The method of claim **10**, wherein the action comprises electronically registering a user associated with the user electronic device with at least one of a service or a product related to the advertisement.

12. The method of claim **10**, wherein the action comprises electronically providing at least one of a coupon or a certificate related to the advertisement.

13. The method of claim **10**, wherein the action comprises allowing a user associated with the user electronic device to interact with a video stream related to the advertisement.

14. The method of claim **1**, wherein the action comprises presenting a user associated with the user electronic device questions about the media work.

15. The method of claim **1**, wherein the action comprises displaying additional information on the user electronic device.

16. The method of claim **1**, wherein the machine-readable instructions comprise a hyperlink to a URL.

17. The method of claim **1**, wherein the machine-readable instructions comprise instructions to dial a telephone number.

18. A method comprising:

receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;

receiving, by the computer system, a first electronic media work;

correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with the first electronic media work identifier;

storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;

26

generating, by the computer system, a tag associated with the first electronic media work;

providing, from the computer system to a first user electronic device, the first electronic media work and the tag;

receiving, at the computer system, a request generated at the first user electronic device and related to the tag;

generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at a user electronic device, the action; and

providing, from the computer system to the first user electronic device, the machine-readable instructions to perform the action in response to the request.

19. The method of claim **18**, wherein the associated information is related to one or more products or services.

20. The method of claim **19**, wherein the associated information is related to names of the one or more products or services.

21. The method of claim **19**, wherein the associated information is related to a product category associated with the one or more products or services.

22. The method of claim **19**, wherein the associated information is related to a manufacturer of the one or more products or services.

23. The method of claim **19**, wherein the associated information is related to a website associated with the one or more products or services.

24. The method of claim **18**, wherein the first electronic media work comprises at least one of an audio, a video, or an image.

25. The method of claim **18**, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the first user electronic device are different from one another.

26. The method of claim **18**, wherein the first user electronic device is at least one of a television, a set-top-box, a video recorder, a computer, a cell phone, a remote control, or a portable device.

27. The method of claim **18**, wherein the associated information is related to an advertisement.

28. The method of claim **27**, wherein the action comprises electronically registering a user associated with the first user electronic device with at least one of a service or a product related to the advertisement.

29. The method of claim **27**, wherein the action comprises electronically providing at least one of a coupon or a certificate related to the advertisement.

30. The method of claim **27**, wherein the action comprises allowing a user associated with the first user electronic device to interact with a video stream related to the advertisement.

31. The method of claim **18**, wherein the action comprises presenting a user associated with the first user electronic device questions about the media work.

32. The method of claim **18**, wherein the action comprises displaying additional information on the first user electronic device.

33. The method of claim **18** wherein the machine-readable instructions comprise a hyperlink to a URL.

34. The method of claim **18**, wherein the machine-readable instructions comprise instructions to dial a telephone number.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

The undersigned hereby certifies that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and the Federal Circuit Rules because the brief has been prepared using a proportionally-spaced typeface using Microsoft Word in 14-point or larger Times New Roman font or another proportionally-spaced typeface with serifs and includes 13,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), Federal Circuit Rule 32(b)(2), and Federal Circuit Rule 28(a)(12).

November 5, 2024

*/s/ Brian D. Ledahl*
Marc A. Fenster
mfenster@raklaw.com
Brian D. Ledahl
bledahl@raklaw.com
Amy E. Hayden
ahayden@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant*
*Network-1 Technologies, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 5, 2024, the foregoing 2nd Corrected Principal Brief of Plaintiff-Appellant Network-1 Technologies, Inc. was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Appellees' counsel, who are registered CM/ECF users, will thus be served the 2nd Corrected Non-Confidential Principal brief by the appellate CM/ECF system.

The undersigned further certifies that on this same date that the 2nd Corrected Confidential Principal Brief will be served by electronic mail to the following:

Andrew V. Trask
Michael Xun Liu
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.
Washington, DC 20024
Tel: (202) 434-5023
atrask@wc.com
mliu@wc.com
GoogleNetwork1@wc.com

Kevin Hardy
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
Tel: (202) 538-8240
kevinhardy@quinnemanuel.com

*Counsel for Appellees Google LLC and YouTube, LLC*

The undersigned additionally certifies that on October 2, 2024, Appellees' counsel consented in writing to electronic service at the above email addresses.

November 5, 2024

*/s/ Brian D. Ledahl*
Marc A. Fenster
mfenster@raklaw.com
Brian D. Ledahl
bledahl@raklaw.com
Amy E. Hayden
ahayden@raklaw.com
Russ, August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474

*Counsel for Appellant*
*Network-1 Technologies, Inc.*