# In the United States Court of Appeals
## for the Federal Circuit

---

NETWORK-1 TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

*v.*

GOOGLE LLC, YOUTUBE, LLC,

*Defendants-Appellees,*

---

Appeals from the United States District Court for the Southern District of New York in Nos. 1:14-cv-09558-PGG-SN, 1:14-cv-02396-PGG-SN, Judge Paul G. Gardephe

---

**NON-CONFIDENTIAL RESPONSE BRIEF OF DEFENDANTS-APPELLEES GOOGLE LLC AND YOUTUBE, LLC**

---

ANDREW V. TRASK
MICHAEL XUN LIU
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*

KEVIN HARDY
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
  *1300 I Street, NW, Suite 900*
  *Washington, DC 20005*
  *(202) 538-8000*

*Attorneys for Defendants-Appellees*

JANUARY 24, 2025

# EXEMPLARY PATENT CLAIMS AT ISSUE

## U.S. Patent No. 8,010,988

15.   A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:

a) electronically extracting features from the electronic work;

b) electronically determining an identification of the electronic work based on the extracted features, wherein the identification is based on a non-exhaustive search identifying a neighbor;

c) electronically determining an action based on the identification of the electronic work; and

d) electronically performing the action.

17.   The method of claim 15, wherein the non-exhaustive search is sublinear.

## U.S. Patent No. 8,205,237

33.   A computer-implemented method comprising:

a) obtaining, by a computer system including at least one computer, media work extracted features that were extracted from a media work, the media work loaded from a client device;

b) determining, by the computer system, an identification of the media work using the media work extracted features to perform a sublinear approximate nearest neighbor search of reference extracted features of reference identified media works; and

c) determining, by the computer system, an action based on the determined identification of the media work.

1.  A method comprising:

    receiving, by a computer system including at least one computer, a first electronic media work;

    correlating, by the computer system using a non-exhaustive, near neighbor search, the first electronic media work with an electronic media work identifier;

    storing, by the computer system, correlation information associating the first electronic media work and the electronic media work identifier;

    accessing, by the computer system, associated information related to an action to be performed in association with one or more electronic media works corresponding to the electronic media work identifier;

    generating, by the computer system, a tag associated with the first electronic media work;

    providing, from the computer system to a user electronic device, the first electronic media work and the associated tag;

    obtaining, by the computer system from the user electronic device, a request related to the associated tag;

    generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and

    providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.

# CERTIFICATE OF INTEREST

Counsel for Appellees Google LLC and YouTube, LLC certify the following:

1. The full names of the parties represented by undersigned counsel are:

    Google LLC and YouTube, LLC

2. The name of the real party in interest represented by undersigned counsel is:

    Not applicable

3. Parent corporations and publicly held companies that own 10% or more of stock in the party:

    YouTube, LLC is a subsidiary of Google LLC, which is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in originating court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

    Bruce R. Genderson, Thomas H. L. Selby, Jessica Bodger Rydstrom, Daniel P. Shanahan, Graham Safty, and Melissa Collins, of Williams & Connolly LLP

    Samuel Bryant Davidoff, Christopher Alan Suarez, Eli S. Schlam, and Sumeet P. Dang, formerly of Williams & Connolly LLP

    Douglas R. Nemec, Ian Chen, and James J. Elacqua, of Skadden, Arps, Slate, Meagher & Flom, LLP

    Andrew D. Gish and Marti Alan Johnson, formerly of Skadden, Arps, Slate, Meagher & Flom, LLP

5. The title and number of any case known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

Reexamination No. 90/019,459 (*Ex Parte* Reexamination of U.S. Patent No. 8,010,988)

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

Not applicable

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1

INTRODUCTION ............................................................................................3

STATEMENT OF THE ISSUES..........................................................................5

STATEMENT OF THE CASE.............................................................................6

    I.     Patents-in-Suit ...................................................................................6

    II.    Google's Content-ID System .............................................................8

        A.     The LSH Version ...................................................................8

        B.     The Siberia Version ...........................................................10

    III.    Procedural History.........................................................................11

        A.     PTAB Proceedings.............................................................12

        B.     This Court's Prior Decision ...............................................13

        C.     The District Court's Claim Construction and Summary Judgment Decision.......................................................................15

SUMMARY OF ARGUMENT ...........................................................................21

ARGUMENT ..................................................................................................22

    I.     Standard of Review ........................................................................22

    II.    "Non-Exhaustive Search" Is Indefinite.............................................23

        A.     As this Court Previously Concluded, "Non-Exhaustive Search" Has Multiple Reasonable Meanings and the Intrinsic Evidence Provides No Guidance To Choose from Among Them............23

        B.     The Intrinsic Evidence Does Not Support Network-1's Proposed Construction.......................................................26

        C.     The Extrinsic Evidence Does Not Support Network-1's Proposed Construction.......................................................33

        D.     Indefiniteness Is a Question of Law Properly Resolved by the Court ...............................................................................38

    III.    The District Court Correctly Entered Summary Judgment of Non-Infringement .........................................................................41

        A.     The LSH Version Is Not "Sublinear" ......................................43

B.     The Siberia Version Is Not "Sublinear" ...................................53

C.     The Siberia Version's "Overall Search," as Alleged by
Network-1, Is Not Sublinear .....................................................61

CONCLUSION ..............................................................................................64

**CONFIDENTIAL MATERIAL OMITTED**

Material on pages 8, 9, 10, 11, 19, 20, 44, 45, 48, 49, 54, 55, 56, 57, 58, 59, 60, 62, 63, and 64 has been redacted in the Non-Confidential Response Brief of Defendants-Appellees Google LLC and YouTube, LLC. The redacted material reflects confidential aspects of the algorithms and architectures of Google's Content-ID system, and are covered by the protective order entered by the district court.

# TABLE OF AUTHORITIES

## CASES

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*
707 F.3d 1318 (Fed. Cir. 2013) ...............................................................54, 60

*Adv. Display Sys., Inc. v. Kent State Univ.*
212 F.3d 1272 (Fed. Cir. 2000) ...............................................................29, 30

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*
338 F.3d 1368 (Fed. Cir. 2003) ....................................................................39

*Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*
785 F. App'x 858 (Fed. Cir. 2019) ...............................................................39

*Cunningham v. Cornell Univ.*
86 F.4th 961 (2d Cir. 2023) ...................................................................22, 43

*Dow Chemical Co. v. Nova Chemicals Corp.*
803 F.3d 620 (Fed. Cir. 2015) ..............................................23, 24, 26, 32, 38

*Dynacore Holdings Corp. v. U.S. Philips Corp.*
363 F.3d 1263 (Fed. Cir. 2004) ....................................................................64

*E-Pass Techs., Inc. v. 3Com Corp.*
473 F.3d 1213 (Fed. Cir. 2007) ....................................................................53

*ePlus, Inc. v. Lawson Software, Inc.*
700 F.3d 509 (Fed. Cir. 2012) .....................................................................59

*Fujitsu Ltd. v. Netgear Inc.*
620 F.3d 1321 (Fed. Cir. 2010) ...............................................................59, 64

*Glaxo Grp. Ltd. v. TorPharm, Inc.*
153 F.3d 1366 (Fed. Cir. 1998) ....................................................................41

*Golden Bridge Tech., Inc. v. Nokia, Inc.*
527 F.3d 1318 (Fed. Cir. 2008) ....................................................................49

*Google LLC v. Network-1 Techs., Inc.*
726 F. App'x 779 (Fed. Cir. 2018) ...........................................................passim

*Infinity Computer Prods., Inc. v. Oki Data Americas, Inc.*
987 F.3d 1053 (Fed. Cir. 2021) ....................................................................38

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*
589 F.3d 1179 (Fed. Cir. 2009) ....................................................................50

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*
902 F.3d 1372 (Fed. Cir. 2018) ....................................................................32

*Interval Licensing LLC v. AOL, Inc.*
766 F.3d 1364 (Fed. Cir. 2014) ....................................................................32

*Knight v. U.S. Fire Ins. Co.*
804 F.2d 9 (2d Cir. 1986) .............................................................................45

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996) ......................................................................................38

*Medgraph, Inc. v. Medtronic, Inc.*
843 F.3d 942 (Fed. Cir. 2016) ......................................................................22

*MyMail, Ltd. v. Am. Online, Inc.*
476 F.3d 1372 (Fed. Cir. 2007) ..............................................................42, 53

*Nautilus, Inc. v. Biosig Instruments, Inc.*
572 U.S. 898 (2014) ................................................................................23, 32

*Neonode Smartphone LLC v. Samsung Electronics Co.*
No. 23-2304, 2024 WL 3873566 (Fed. Cir. Aug. 20, 2024) ..........................37

*Nevro Corp. v. Boston Scientific Corp.*
955 F.3d 35 (Fed. Cir. 2020) ........................................................................37

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*
119 F.4th 1355 (Fed. Cir. 2024) ..............................................................33, 34

*Papst Licensing GMBH v. Samsung Elecs. Am., Inc.*
924 F.3d 1243 (Fed. Cir. 2019) ....................................................................28

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*
587 F.3d 1324 (Fed. Cir. 2009) ....................................................................40

*Philips Petroleum Co. v. Huntsman Polymers Corp.*
157 F.3d 866 (Fed. Cir. 1998) ...................................................................42, 47, 53

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir 2005) (en banc) ...................... 12, 14, 16, 26, 33, 34, 36

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*
725 F.3d 1377 (Fed. Cir. 2013) ..............................................................42, 47, 53

*Saso Golf, Inc. v. Nike, Inc.*
843 F. App'x 291 (Fed. Cir. 2021) .................................................................24, 39

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*
172 F.3d 836 (Fed. Cir. 1999) ............................................................................23

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*
983 F.3d 1367 (Fed. Cir. 2021) ..........................................................................43

*Sonix Tech. Co. v. Publications Int'l, Ltd.*
844 F.3d 1370 (Fed. Cir. 2017) ..........................................................................23

*Synchronoss Techs., Inc. v. Dropbox, Inc.*
987 F.3d 1358 (Fed. Cir. 2021) ..........................................................................38

*Telemac Cellular Corp. v. Topp Telecom, Inc.*
247 F.3d 1316 (Fed. Cir. 2001) .....................................................................23, 60

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*
789 F.3d 1335 (Fed. Cir. 2015) .....................................................................24, 40

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*
574 U.S. 318 (2015).........................................................................25, 26, 38, 39

*Vargas v. Pfizer, Inc.*
352 F. App'x 458 (2d Cir. 2009) ........................................................................34

**STATUTES**

35 U.S.C. § 112 ...................................................................................................22

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5(a)(1), counsel for Google LLC and YouTube, LLC state that no other appeal in or from the same cases in the district court was previously before this or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(a)(2), counsel states that *Ex Parte* Reexamination No. 90/019,459 is pending before the United States Patent and Trademark Office, and involves claim 17 of the '988 patent.

Pursuant to Federal Circuit Rule 47.5(b), counsel further states that the following appeal involved U.S. Patents 8,205,237 and 8,010,988: *Google LLC v. Network-1 Technologies, Inc.*, C.A. No. 16-2509 (Fed. Cir.). The merits panel that decided the appeal consisted of Federal Circuit Judges Dyk, Schall, and Reyna. The parties involved were Google LLC (represented by Dan L. Bagatell and Robert D. Swanson of Perkins Coie LLP, and Andrew D. Gish and Douglas R. Nemec of Skadden Arps Slate Meagher & Flom LLP) and Network-1 Technologies, Inc. (represented Gregory S. Dovel, Jonas B. Jacobson, Matthaeus Martino-Weinhardt, and Sean Luner of Dovel & Luner LLP; and Charles R. Macedo and Jung S. Hahm of Amster Rothstein & Ebenstein LLP).

Counsel further states that the following appeal involved U.S. Patent 8,904,464: *Google LLC v. Network-1 Technologies, Inc.*, C.A. No. 17-1379 (Fed. Cir.). The merits panel that decided the appeal consisted of Federal Circuit Judges

Lourie, Taranto, and Chen.  The parties involved were Google LLC (represented by Erika Arner, Joshua Goldberg, and J. Michael Jakes of Finnegan, Henderson, Farabow, Garrett & Dunner, LLP) and Network-1 Technologies, Inc. (represented Gregory S. Dovel, Jonas B. Jacobson, Matthaeus Martino-Weinhardt, and Sean Luner of Dovel & Luner LLP; and Charles R. Macedo and Jung S. Hahm of Amster Rothstein & Ebenstein LLP).

**INTRODUCTION**

In a thorough, 77-page summary judgment decision, the district court found that (1) the asserted claims of the '988 and '464 patents are invalid because the claim term "non-exhaustive search" is indefinite, and (2) Network-1 failed to adduce infringement evidence creating a genuine dispute of material fact that either version of Google's Content-ID system is "sublinear" as that term is used in the '237 and '988 patents. The district court's decision is correct, and this Court should affirm.

*First*, the term "non-exhaustive search" is indefinite because it is susceptible to multiple reasonable interpretations, but the intrinsic evidence provides no guidance as to which interpretation should apply. The specification never uses the terms "non-exhaustive" or "exhaustive" at all. In a prior appeal involving the same patent family, this Court concluded that the shared specification does not "draw a clear line between 'exhaustive' and 'non-exhaustive' searching" or identify "how much data within a record a search must consider in order to qualify as one or the other." *Google LLC v. Network-1 Techs., Inc.*, 726 F. App'x 779, 785 (Fed. Cir. 2018). While these deficiencies should have been fatal to the claims then, indefiniteness was not before this Court because the prior appeal originated from an IPR, where the Board could not declare invalidity for indefiniteness. *Id.* at 782, n.3. Unlike the prior appeal, however, indefiniteness is squarely presented here. This

Court's reasoning in the prior appeal applies with equal force here and compels affirmance of the district court's finding that "non-exhaustive search" is indefinite.

*Second*, Network-1 fails to show the district court erred in granting summary judgment of non-infringement. Tellingly, Network-1 devotes little attention to how either version of Content-ID actually operates, even though Network-1 had access to the source code for both versions. That is because the record reflects how, in both versions of Content-ID, the execution time of a given search *scales proportionately with the size of the data set*, which the parties agree means the search is linear, not sublinear.

Instead of basing its arguments on evidence of how Content-ID actually functions, Network-1 focuses on a few stray documents that mention the term "sublinear" but do so in a way that differs from the parties' agreed-upon construction and are unconnected to either of the Content-ID versions that were actually implemented. With respect to the Siberia Version specifically, Network-1's own expert admits that the search it performs scales linearly, and Network-1 resorts instead to arguing that Google has the ability to *modify* Siberia to make it sublinear. That is not a legally cognizable theory of infringement, and the district court properly rejected it. In view of the fundamental gaps in Network-1's proof, the district court's grant of summary judgment of non-infringement should be affirmed.

4

## STATEMENT OF THE ISSUES

1. Whether this Court should affirm the judgment of invalidity because "non-exhaustive search," as used in the asserted claims of U.S. Patents 8,010,988 ("the '988 patent") and 8,904,464 ("the '464 patent"), is indefinite, as that term is susceptible to multiple reasonable meanings but the specification never uses the term and provides no guidance as to which meaning applies.

2. Whether this Court should affirm summary judgment of non-infringement with respect to Content-ID's LSH Version, where the evidence showed that the LSH Version performed a linear search, and Network-1 did not proffer evidence that the LSH Version performed a "sublinear" search, as that term is used in U.S. Patent 8,205,237 ("the '237 patent") and the '988 patent.

3. Whether this Court should affirm summary judgment of non-infringement with respect to Content-ID's Siberia Version, where (a) Network-1's expert confirmed that Siberia performs a linear, not "sublinear," search, but Network-1 nevertheless argues that Google may *modify* Siberia to make it sublinear; and, as a separate basis for affirmance, (b) Network-1's theory for why Siberia meets the "sublinear approximate nearest neighbor search" limitation in the '237 patent lacks factual support and is internally contradictory.[1]

---

[1] The district court held that neither accused Content-ID version performed a "sublinear" search and granted summary judgment of non-infringement for the '237 patent. Appx50-77. Because the district court already found the '988 patent invalid,

5

## I.    Patents-in-Suit

Network-1 accuses Google's Content-ID system of infringing three related patents: the '988 patent, the '237 patent, and the '464 patent. Appx1. All three share a common specification and claim priority to the same provisional application. Appx79, Appx106, Appx135.

Broadly speaking, the patents describe how it may be desirable to "link[]" media delivered from traditional channels (*i.e.*, television) to a "more interactive system" such as the Internet. Appx92 (1:36-46). This could, for example, allow users to place "direct orders for products" they see on television. *Id.* To facilitate this process, the patents describe a technique for identifying media works without relying on extraneous information (i.e. a bar code) inserted into the media. Appx93 (4:18-36).

The patents describe three steps for identifying media works. *Id.* (4:37-49). The first involves extracting features from a media work, such as an audio or video file. *Id.* At the second step, the process attempts to identify the media work by searching for a match between the extracted features and features extracted from

---

it did not enter summary judgment of non-infringement for that patent, even though it required the same "sublinear" search as the '237 patent. *See infra* 41-43. Accordingly, if this Court does not affirm indefiniteness for the '988 patent, it should enter summary judgment of non-infringement for that patent. *Id.*

known media works. *Id.* The patents do not purport to describe any novel techniques for conducting such a search, but simply list known techniques such as "clustering, kd-trees, vantage point trees and excluded middle vantage point forests." Appx96 (9:29-38). At the final step, the patents contemplate taking some type of action after identifying the media work, such as "registering the user for a service or product." Appx93 (4:30-36).

Over nine years after filing the provisional application, Network-1 amended the pending claims to introduce a new term: "non-exhaustive search." Appx3243-3264. The patents' specifications do not contain this term or any variation thereof; nor do they categorize any given technique for comparing extracted features as "exhaustive" or "non-exhaustive." Nevertheless, the term now appears in the asserted claims of the '988 and '464 patents, all of which require identifying an electronic media work through a "non-exhaustive" search. Appx104-105; Appx163-64.

The asserted claims from the '237 and '988 patents also require a "sublinear" search, Appx132-133, Appx104, which the parties agreed means "[a] search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." Appx54; Appx2733.

## II.   Google's Content-ID System

The accused Content-ID system is a set of tools on YouTube that permits content owners to control how their content is used. Appx6-7. For example, the owner of a musical composition may provide their copyrighted work to YouTube and specify policies that dictate what happens when the Content-ID system determines that some or all of their composition has been included in another video uploaded to YouTube. *Id.* If a YouTube user subsequently uploads a video that includes an excerpt of the content owner's musical composition, Content-ID's match system can automatically "match" the content owner's composition to the newly uploaded video and apply the content owner's specified policy for reuse of its composition. *Id.* Google has used two different Content-ID systems: an older, now-deprecated version that used locality sensitive hashing ("LSH") called the "LSH Version," and a newer "Siberia Version." Appx7.

### A.   The LSH Version

The prior LSH Version used an index of references called the LSH index. Appx7. To generate the LSH index, the LSH Version chopped copyrighted videos into short snippets of video, audio, and melody content. *Id.* Each snippet was used to generate a vector called a "subfingerprint." *Id.* The subfingerprints were further broken down into distinct "LSH bands," each of which was a string of ██ zeros and ones. *Id.*

The LSH index could be conceptualized as a large two-dimensional table. *Id.*
The rows of the table represented every possible LSH band, which was finite because
there are only so many ways to arrange ▮ zeros and ones. *Id.* Each ▮▮▮
represented an individual reference work, *e.g.*, a movie, music video, or TV show.
Appx8. As the number of reference works increased, so too would the number of
▮▮▮ *Id.* If a given LSH band was associated with a particular reference video,
then the corresponding cell in the ▮▮▮ associated with that video would indicate
as such; otherwise, the cell would be empty. Appx8845-8846 (268:9-269:8).

When a YouTube user uploaded a new video, Content-ID's LSH Version
generated subfingerprints and LSH bands for the uploaded video. Appx7. The LSH
Version then looked up the rows in the LSH index that corresponded to the LSH
bands associated with the newly uploaded video to determine if any reference videos
are associated with those same LSH bands. Appx8.

For any ▮▮▮ that warranted further investigation, the LSH Version
retrieved the full set of subfingerprints associated with the reference video (*i.e.*, the
fingerprint) and compared the fingerprint of the reference video against the
fingerprint of the user-uploaded video to determine whether there was a match.
Appx9.

Assuming there was a match, Content-ID determined whether any portion of
the newly uploaded video may be "claimed" by the owner of content in the reference

9

index.  *Id.*  If so, the content owner's policy may be applied, for example, to block or monetize the video.  Appx4458-4460 (¶251).

## B.    The Siberia Version

Content-ID's Siberia Version also involves searching reference indices corresponding to copyrighted material, such as video or audio content.

Whereas a reference index in the LSH Version can be conceptualized as a two-dimensional table, a reference index in Siberia is a vast, ███████████ space. Appx9-10.  To generate the reference index, each frame of copyrighted material is used to produce a vector called an "embedding."  *Id.*  Every embedding is further processed to produce a corresponding ██████████ that occupies a unique location in this multi-██████████ space.  *Id.*  The reference index is ██████████ into ██████████ ██████████ each of which has a single "██████████" representing that ██████████ Appx11-12.  The ██████████ are replicated on a set number of machines (*i.e.*, computers) known as "██████████  *Id.*

When a YouTube user uploads a video, Siberia creates "query embeddings" from the user-uploaded video.  Appx12.  After generating the query embeddings, Siberia compares each one against *all* ██████████ to identify a predetermined number of ██████████ most similar to the query embedding.  Appx12-13.  Next, Siberia compares the query embedding against *every* ██████████ located in the selected ██████████ and returns a predetermined number of ██████████ on each

10

*component*

███ that most closely match the query embedding. *Id.* The system repeats this process for the other query embeddings from the user-uploaded video. *Id.* The output of this "Index Lookup" step is a collection of *calculations* ███████, each corresponding in some sense to a snippet of copyrighted content. Appx13.

At the next step, called "Sparse," Siberia analyzes the *calculations* ███████ from the Index Lookup to determine if there is a roughly continuous period of time when the user-uploaded video matches a copyrighted video. Appx14. If so, the *calculation* ███████ corresponding to this period of time are passed to the final "Verifier" step. *Id.*

At the Verifier step, the system retrieves the full reference embeddings corresponding to the *calculations* ███████ from the Sparse step, and compares the reference embeddings to the query embeddings associated with the newly uploaded video. Appx14. The purpose of this step is to verify whether the sequence of reference embeddings sufficiently matches the sequence of query embeddings. *Id.* Like in the LSH Version, the Siberia Version then determines whether any of the relevant matches should be claimed by a copyright owner. Appx15.

## III. Procedural History

In 2014, Network-1 filed two cases alleging that Content-ID infringed 30 claims across five patents. Appx15. In the first suit, Network-1 alleged that Content-ID infringes claims of the '988 patent, the '237 patent, and two other patents later

11

dismissed by stipulation. *Id.* Network-1's second suit alleged that Content-ID infringes claims of the '464 patent. *Id.*

### A. PTAB Proceedings

In response, Google filed IPR petitions against the '988 and '237 patents, among others. Appx5831; Appx5712. The PTAB instituted review, causing the district court to stay the litigation, Appx15-16, and ultimately invalidated some but not all of the challenged claims, Appx5848; Appx5735.

As relevant here, certain challenged claims recited "non-exhaustive search," and Google and Network-1 disputed the construction of this term under the broadest-reasonable-interpretation ("BRI") standard.[2] The PTAB rejected Google's proposed BRI construction, "a search that locates a match without conducting a brute force comparison of all possible matches, *and all data within all possible matches.*" Appx5813-5814 (emphasis added); Appx5835-5836. Instead, the PTAB accepted Network-1's construction: "a search that locates a match *without a comparison of all possible matches.*" *Id.* Applying that construction, the PTAB concluded that claims containing the term "non-exhaustive search" were not invalid based on the evidence advanced in the IPRs. Appx5848. Google appealed.

---

[2] While Google proposed a construction for "non-exhaustive search" under the BRI standard, Google has consistently maintained that this term is indefinite under the standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir 2005) (en banc). Appx1157 (claim chart submitted in district court).

**B.    This Court's Prior Decision**

This Court held that the PTAB erred in construing "non-exhaustive search." *Google LLC v. Network-1 Techs., Inc.*, 726 F. App'x 779, 786 (Fed. Cir. 2018) ("the IPR Appeal").  As this Court explained, "the linchpin of the claim construction analysis in this case is determining what an 'exhaustive search' is.  That is so because a 'non-exhaustive' search necessarily is a search that is not 'exhaustive.'" *Id.* at 782 (citations omitted).  Determining the *broadest* reasonable interpretation of "non-exhaustive" thus depended on determining the *narrowest* reasonable interpretation of "exhaustive." *Id.* at 783.  To that end, this Court found that Google's interpretation of "exhaustive" was narrower, as it required searching "all data within all possible matches," whereas the Board's and Network-1's construction of "exhaustive" was broader because it required searching all records, but *not* all data within all records. *Id.* at 786.

To illustrate this difference, this Court provided an example of "a musical identification system in which each known piece in a database contains two parts, an introduction and a chorus." *Id.* at 783.  Under Google's construction, "[i]f the system compares an unknown melody to every known work in the database, but does so only on the basis of the database songs' introductions, the search is not 'exhaustive' because it ignores the choruses." *Id.*  By contrast, under the PTAB's construction, such a search would be exhaustive because it considers every song in

the database (*i.e.*, all matches), even if it does not consider all data within those matches. *Id.*

This Court concluded that "both the intrinsic and extrinsic evidence regarding the meaning of the foundational claim term 'exhaustive' [is] inconclusive as to the broader or narrower construction of the limitation 'non-exhaustive search.'" *Id.* at 786. Crucially for purposes of the current appeal, this Court expressly rejected Network-1's argument that the specification provides examples of exhaustive and non-exhaustive searches, stating that "[w]e do not agree, however, that these parts of the specification draw a clear line between 'exhaustive' and 'non-exhaustive' searching in terms of how much data within a record a search must consider in order to qualify as one or the other." *Id.* at 785. This Court also acknowledged that Google had "advanced the argument that the claim term 'non-exhaustive search' is indefinite," but because the PTAB cannot declare claims indefinite, "the issue of indefiniteness is therefore not before us." *Id.* at 782, n.3.

Although finding that the intrinsic evidence provides no guidance on the meaning of "non-exhaustive search," this Court explained that, under the BRI, "it is not necessary that a claim be given its correct construction under the framework laid out in *Phillips*. In other words, under the broadest reasonable construction standard, where two claim constructions are reasonable, the broader construction governs." *Id.* at 784-85 (citations omitted).

This Court thus held that Google's interpretation of "non-exhaustive search" was correct under the BRI, vacated the PTAB's decision based on Network-1's erroneous construction, and remanded. *Id.* at 786-87.

## C. The District Court's Claim Construction and Summary Judgment Decision

After this Court's decision in the IPR Appeal, the district court lifted the stay. Appx16, Appx18. Network-1 then narrowed its asserted claims to those now on appeal here—claim 17 of the '988 patent; claims 33-35 of the '237 patent; and claims 1, 8, 10, 16, 18, 25, 27, and 33 of the '464 patent. Appx3-6, Appx18.

At claim construction, Google argued that "non-exhaustive" is indefinite, whereas Network-1 once again argued—as it did previously on appeal to this Court—that "non-exhaustive" means "[a] search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor." Appx24. Google also sought summary judgment of non-infringement of the '988 and '237 patents' asserted claims, including because neither the LSH Version nor Siberia performs the required "sublinear" search under the parties' agreed construction. Appx53-54; Appx4243.

In a detailed, 77-page opinion, the court determined that "non-exhaustive search" is indefinite, granting summary judgment of invalidity of the '988 and '464 patents' claims on that basis. Appx24-40. With respect to the '237 patent, which recited "a sublinear approximate nearest neighbor search," the court found no

genuine factual dispute that neither the LSH Version nor Siberia performed a "sublinear" search, granting summary judgment of non-infringement. Appx50-77.

### 1. The Indefiniteness Decision

Recognizing that this Court's prior decision addressed the meaning of "non-exhaustive" under the BRI, the district court undertook its own review of the intrinsic and extrinsic evidence under the *Phillips* standard and concluded that "non-exhaustive search" is indefinite. Appx25-40. The court first determined that the intrinsic evidence shed no light on the correct interpretation of "non-exhaustive" search, noting that "the words 'exhaustive' and 'non-exhaustive' do not appear in the specification." Appx25-27. Just as this Court did in the IPR Appeal, the district court rejected Network-1's argument that the specification identifies particular searches as being exhaustive or non-exhaustive. Appx27.

The court then addressed the extrinsic evidence, which only "highlight[ed] the vague nature" of the term. Appx37. The court found that the declaration of Network-1's expert, Dr. Mitzenmacher, was conclusory and contradicted by his own deposition testimony. Appx33-34. The court also observed that academic articles on which Network-1 relied used "non-exhaustive" or "exhaustive" in ways different from Network-1's proposed construction. Appx31-37.

Because "the intrinsic evidence provides no definition of the term 'non-exhaustive search' and the extrinsic evidence suggests that a person skilled in the art

might reasonably define 'non-exhaustive search' in multiple ways," the court held this term indefinite and granted summary judgment of invalidity. Appx37-40.

### 2. The Non-Infringement Decision

The district court's indefiniteness finding rendered invalid all asserted claims of the '988 and '464 patents, leaving only the '237 patent. The asserted claims from the '237 patent (as well as the now-invalidated '988 patent's asserted claim) each required a "sublinear" search, which the parties agreed means the following in both patents: "[a] search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." Appx22. Applying that construction, the court found no genuine dispute of material fact that the LSH and Siberia Versions did not meet the "sublinear" limitation, and thus granted summary judgment of non-infringement on the '237 patent. Appx50-77.

### a. The LSH Version

With respect to the LSH Version, the court determined "that Network-1 has not presented evidence sufficient to create a material issue of fact as to whether the LSH version of Content ID meets the 'sublinear' limitation." Appx55-56. The court addressed all of Network-1's cited evidence: (1) a report and testimony from Dr. Mitzenmacher; (2) a draft document from Google; and (3) academic papers and related testimony from a Google research scientist, Dr. Baluja. Appx56.

Starting with Dr. Mitzenmacher's report, the court addressed its assertion that the LSH version "determine[s] a very small subset of the reference works in the database, in particular a sublinear subset." Appx56-57. As the court found, the report does not explain how or why determining a "sublinear subset" corresponds to conducting a "sublinear search," and Dr. Mitzenmacher never opined that the LSH Version conducts a "sublinear" search under the agreed construction. Appx56-57.

As the court also found, to the extent Dr. Mitzenamcher's report asserted that the LSH Version performs a sublinear search, this opinion lacked an adequate factual basis. Appx58-62. Likewise, the court noted that Dr. Mitzenmacher's analysis of Google's source code "merely describes the steps the source code takes to complete a search," but "is devoid of analysis" suggesting that the LSH Version conducts a sublinear search. Appx60-61. The court also found that Dr. Mitzenmacher's deposition testimony provided no "factual basis for concluding that the LSH version of Content ID meets the sublinear limitation." *Id.*

Next, the court considered Network-1's reliance on a draft 2010 document about Google's "CoverCat" system. Appx62-63. The court found that Network-1 adduced no evidence that Google ever implemented the features described in the draft document into the LSH Version. Appx62-65. Moreover, the court noted that the draft document discussed at least two design possibilities for CoverCat, only one

of which is purportedly "sublinear." Appx63-64. The court found nothing in the record to show which possibility, if any, was implemented. Appx64.

Finally, the court addressed Network-1's reliance on two academic papers by Dr. Baluja, a research scientist at Google who testified that he was not involved in the commercial implementation of Content-ID. Appx65-68. The court found that these papers "do not address or describe the LSH version," and "say nothing about whether the LSH version of Content ID performed" a sublinear search under the agreed construction. Appx68-69.

The district court thus found that none of the evidence relied on by Network-1 created a triable issue of fact regarding infringement by the LSH Version.

### b. The Siberia Version

The district court also found no genuine dispute of material fact that Siberia does not perform a "sublinear" search. Appx69-73. Network-1's own expert unambiguously testified that Siberia would scale linearly—*i.e.*, not sublinearly. Appx69; Appx4447-4448 (¶229) (agreeing that "if additional references were added to the existing ██████████ [software architecture] structure, the [Index Lookup] portion of the search *would scale linearly*"). The court thus found "the undisputed evidence is that the Siberia Version of Content ID uses search algorithms that scale linearly as the size of the database increases." Appx71.

19

Network-1 nevertheless theorized that Siberia is "sublinear" because Google can *modify* certain parameters, such as the number of ████ and ████ to reduce search time in response to an increase in database size. Appx69-71. The court rejected this theory, finding that an ability to "periodically adjust certain parameters to lower the resource costs imposed by the increased size of the database . . . does not transform a linear search algorithm or database architecture into a sublinear one." Appx71.

The court likewise found that Network-1's reliance on a Google graph comparing "Query Cost" against "Dataset Scale" for various search algorithms did not create a genuine dispute of material fact. Appx72-73. The court emphasized that "the mere use of the term 'sublinear' on the graph" does not mean the claim is met, particularly where Network-1's own expert admitted that Siberia scales linearly. *Id*.

As a separate basis for summary judgment of non-infringement, the court concluded that Network-1 failed to show that Siberia conducts a "sublinear approximate nearest neighbor search," as the '237 patent's claims require. Appx73-77. Network-1 relied on the Index Lookup step to meet the "sublinear" limitation, but it relied on two additional steps, Sparse and Verifier, to meet the "approximate nearest neighbor search." Appx73-74. This theory, however, required the Sparse and Verifier steps to take a constant amount of time regardless of the reference

index's size; and as the court found, Network-1 provided no evidence for this assertion. Appx74-75. Moreover, Network-1's theory for why Sparse and Verifier are constant is inconsistent with its theory that the Index Lookup is sublinear. Appx75-77.

## SUMMARY OF ARGUMENT

1. This Court should affirm the determination that "non-exhaustive search" in the '988 and '464 patents is indefinite. Consistent with this Court's decision in the prior IPR Appeal, the term "non-exhaustive search" can reasonably be interpreted by the person of ordinary skill in the art ("POSA") in multiple ways, but the specification never uses this term and provides no guidance as to which of its multiple meanings should apply.

2. Regarding the LSH Version, this Court should affirm the judgment of non-infringement, as there is no genuine dispute that it does not perform a "sublinear" search. Instead of pointing to evidence of the accused system's actual operation, Network-1 relies on documents and expert testimony that (a) do not apply the agreed-upon construction of "sublinear" and (b) are untethered to the commercial LSH Version that Network-1 accused of infringement. As the district court correctly concluded, these documents do not create a triable issue.

3. Regarding Siberia, this Court also should affirm the judgment of non-infringement finding no genuine dispute that it does not perform a "sublinear"

search. Network-1's reliance on documents that do not apply the agreed construction cannot create a triable issue, particularly where the record shows that Siberia, as implemented, scales linearly. Network-1's assertion that Google can *modify* Siberia to make it sublinear is not a legally cognizable infringement theory, nor is it factually correct. Independently, this Court also should affirm the district court's judgment that Siberia does not conduct a "sublinear *approximate nearest neighbor search*," as Network-1's theory of infringement lacks factual support and is internally contradictory.

## ARGUMENT

### I. Standard of Review

This Court reviews a grant of summary judgment under the law of the relevant regional circuit. *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 947 (Fed. Cir. 2016). The Second Circuit "review[s] a grant of summary judgment *de novo* and may affirm on any basis that finds support in the record." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023). Summary judgment is appropriate "when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Id.*

This Court "review[s] a district court's determination that a claim is invalid as indefinite under 35 U.S.C. § 112 ¶2 *de novo*, although, as with claim construction, any factual findings by the district court based on extrinsic evidence are reviewed

for clear error." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

"To show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). Summary judgment is appropriate if "the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

## II. "Non-Exhaustive Search" Is Indefinite

This Court should affirm the judgment that "non-exhaustive search" is indefinite, and thus that all asserted claims of the '988 and '464 patents are invalid.

### A. As this Court Previously Concluded, "Non-Exhaustive Search" Has Multiple Reasonable Meanings and the Intrinsic Evidence Provides No Guidance To Choose from Among Them

A claim term is indefinite if it is susceptible to multiple reasonable constructions and the intrinsic evidence does not enable a person of skill in the art to select among them. For example, in *Dow Chemical Co. v. Nova Chemicals Corp.*,

this Court found the term "slope of strain hardening coefficient" indefinite because there were four different ways to measure it, and the intrinsic evidence provided no guidance as to which method should be used.  803 F.3d 620, 634 (Fed. Cir. 2015). Similarly, in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, this Court held "molecular weight" indefinite because "[t]here are three different measures of molecular weight" and "[e]ach measure is calculated in a different manner."  789 F.3d 1335, 1338 (Fed. Cir. 2015); *see also Saso Golf, Inc. v. Nike, Inc.*, 843 F. App'x 291, 296-97 (Fed. Cir. 2021) (holding "radius of curvature" indefinite where the specification provided no guidance regarding the "multiple methods" of determining this parameter).

The term "non-exhaustive search" suffers from the same infirmity.  In the prior IPR Appeal, this Court observed that, in order to construe "non-exhaustive search," "what must be determined is the meaning of the word 'exhaustive.'" *Google*, 726 F. App'x at 782.  This Court identified at least two reasonable interpretations of "exhaustive":  it could require comparing the query to (1) "all possible matches, and all data within all possible matches," or (2) merely all records in the reference data set, even if it does not compare "all data within all possible matches." *Id.* at 786.

To illustrate the difference, this Court described a hypothetical search for the term "Federal Circuit" in a database of court names. *Id.* at 786.  This search would

compare the term "Federal Circuit" against every court name in the database, but only examine whether the first letter, "F," matches. *Id.* Under interpretation (2) above, if a search is "exhaustive" so long as it compares the query against all records in the data set but not necessarily all data within each record, then this search would be "exhaustive" because it compares "Federal Circuit" against every court name in the database even though it examines only the first letter. *Id.* By contrast, under interpretation (1) above, if an exhaustive search must compare "all possible matches, and *all data within all possible matches*," then this search would *not* be exhaustive because it does not compare "Federal Circuit" against *every* letter of every court name in the database. *Id.* (emphasis added).

Although "exhaustive" is susceptible to multiple reasonable interpretations, Network-1's patents provide no guidance as to which interpretation applies. The term "exhaustive," "non-exhaustive," or any variations thereof never appear in the specification. *See* Appx25-29; *Google*, 726 F. App'x at 785. Indeed, the term "non-exhaustive search" was first added to the claims nine years after the filing of the priority application. Appx3243-3264. Nor does the specification provide any examples of "exhaustive" or "non-exhaustive" searches. Appx27. Absent such disclosure, the POSA would not know which of the different reasonable interpretations should apply—*i.e.*, precisely the type of ambiguity that rendered indefinite the claims in *Dow Chemicals* and *Teva*.

This Court's reasoning in the IPR Appeal confirms the indefiniteness of "non-exhaustive search." "[B]oth the intrinsic and extrinsic evidence regarding the meaning of the foundational claim term 'exhaustive' [were] *inconclusive as to the broader or narrower construction of the limitation 'non-exhaustive search.'*" *Google*, 726 F. App'x at 786 (emphasis added). Without any basis to select from the two reasonable interpretations, this Court adopted the broader one—as the BRI standard required. *Id.* But as this Court acknowledged, that was *not* necessarily the "*correct* construction under the framework laid out in *Phillips*." *Id.* at 784 (citing *Phillips*, 415 F.3d at 1303).

Under *Phillips*, this Court may not simply default to the broader construction when faced with multiple reasonable interpretations but no corresponding guidance in the intrinsic evidence. *Dow Chem.*, 803 F.3d at 634; *Teva*, 789 F.3d at 1345. Instead, under this Court's precedent, such claims are indefinite. *Id.* Thus, the sound reasoning that led this Court to the broader construction of "non-exhaustive search" under the BRI in the prior IPR Appeal compels a determination of indefiniteness under *Phillips* here.

### B. The Intrinsic Evidence Does Not Support Network-1's Proposed Construction

Contravening the district court's detailed analysis and this Court's prior reasoning, Network-1 argues that non-exhaustive search should be construed as "a search designed to locate a [near] neighbor without comparing to all possible

matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor." Br. 52. Network-1 thus contends that an "exhaustive search" requires comparing to all possible matching records, but *not* all data within all possible matches. Br. 58-59; Appx3710-11. This Court should reject Network-1's unfounded construction.

### 1. As this Court Concluded, the Specification Does Not Identify Examples of "Exhaustive" or "Non-Exhaustive" Searches

Unable to point to anything in the specification explaining the meaning of "non-exhaustive," Network-1 argues instead that a POSA would have interpreted "exhaustive" based on examples of search strategies referenced in the patents. Br. 52. According to Network-1, a POSA knew that "a linear search of all N entries" is exhaustive, whereas techniques including "clustering, kd-trees, vantage point trees and excluded middle vantage point forests" are non-exhaustive. Br. 52-53.

As this Court found, *nothing* in the specification identifies binary search, clustering, kd-trees, a linear search of all N entries, or any other type of search as "exhaustive" or "non-exhaustive." *Google*, 726 F. App'x at 785. Indeed, this Court expressly rejected Network-1's argument that the paragraphs in the specification discussing "a linear search of all *N* entries" and other search techniques including clustering and kd-trees "draw a clear line between 'exhaustive' and 'non-exhaustive' searching." *Id.* ("We do not agree, however, that these parts of the specification

draw a clear line between 'exhaustive' and 'non-exhaustive' searching in terms of how much data within a record a search must consider in order to qualify as one or the other.") That finding is dispositive here: The '988 and '464 patents share the same specification as the related '179 patent previously analyzed by this Court, and this Court addressed the exact same paragraphs relied on by Network-1 here. *Compare id. with* Br. 52-53.

There is no basis for relitigating the same issue in this appeal. *Papst Licensing GMBH v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1250 (Fed. Cir. 2019) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.") (quotation marks omitted). Even if there were, the district court independently found that nothing in the specification identifies which search techniques are "exhaustive" or "non-exhaustive." Appx27-31. The court likewise observed that the specification explains that a "linear search" (which Network-1 asserts is "exhaustive") may be compatible with the invention, whereas a "binary search" (which Network-1 asserts is "non-exhaustive") may not, further underscoring how the specification fails to support Network-1's attempt to distinguish "exhaustive" from "non-exhaustive." Appx29-30 (citing Appx96 (9:19-27), Appx102 (21:23-27)).

Moreover, even if (counterfactually) the specification identified "a linear search of all N entries" as an exhaustive search, that still would not address *how much data* within each entry must be examined for the search to be considered exhaustive, as Network-1 admits. Br. 59 ("Network-1 agrees the specification does not include an explicit disclaimer regarding how much data within a record any search must consider.").

Thus, Network-1's proposed construction lacks intrinsic support.

### 2. The Publications Cited in the Specification Do Not Clarify the Meaning of "Non-Exhaustive Search"

Because the specification does not explain the meaning of "exhaustive" or "non-exhaustive," Network-1 relies on three publications cited in the specification in which the term "exhaustive" appears—Duda & Hart, Fukunaga, and Yianilos. Br. 53-54.

As a preliminary matter, contrary to Network-1's assertions, the mere citation of these documents does not make their *entire disclosures* intrinsic evidence. "To incorporate material by reference, the host document must identify with detailed particularity *what specific material it incorporates* and *clearly indicate where that material is found in the various documents*." *Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (emphasis added). This standard is not met here. Network-1 cherry-picked these three references during litigation from over a dozen publications referenced in the specification; nothing suggests that any

of them were cited for their passing, uninformative use of the term "exhaustive." Appx3199-200.  Nor does the specification "clearly indicate where" the allegedly incorporated material is found.  Appx95 (7:37-42, 7:63-8:2); Appx96 (9:13-18, 9:32-38).

In any event, these publications do not resolve the ambiguity at the heart of "non-exhaustive."  Duda & Hart recites "exhaustive search" in passing but offers no explanation differentiating "exhaustive" from "non-exhaustive."  Appx2871-2872; Appx3200-3201.  Nor does it address whether an "exhaustive search" must consider all data within each reference.  Appx3200-3201.  Fukunaga also makes a passing reference to "exhaustive," but does not explain how much data an "exhaustive search" must examine within each reference.  Appx2961; Appx3201-3202.

Finally, Yianilos uses "exhaustive" without demarcating a line between "exhaustive" and "non-exhaustive."  Appx1404; Appx1413-1420; Appx3202-3203. Yianilos describes an "exhaustive search" in terms of increasing the "radius of interest" for the search, which is different from Network-1's proposed construction. Appx3203 (¶95).  If anything, Yianilos highlights the ambiguity between "exhaustive" and "non-exhaustive."  *Id*.  Yianilos explains that a "vantage point forest" search can be exhaustive, whereas Network-1 categorizes it as non-exhaustive. *Id*.; Appx1404-1405; Br. 52-53.  Likewise, as the district court correctly observed, Yianilos also explains that a kd-tree search, another technique that

Network-1 categorizes as non-exhaustive, Br. 53, will examine *all* possible matches under some conditions, *see* Appx30, Appx1401, conflicting with Network-1's construction of "non-exhaustive" as a search that does *not* "compar[e] to all possible matches," Appx30.

Network-1 waves away these inconsistencies, arguing that its construction only requires a search "*designed to* locate a [near] neighbor without comparing to all possible matches," and thus encompasses techniques that in fact examine all possible matches. Br. 56. That misses the point. What Yianilos confirms is that a given search technique (*e.g.*, kd-tree or vantage point forest) may be "exhaustive" or "non-exhaustive" depending on the nuances of how those terms are interpreted. Appx3202-3204. Despite this ambiguity, nothing in the specification categorizes these search techniques as one or the other, nor is there any guidance on which interpretation of "non-exhaustive" search should apply in the claims.

**3. Without Guidance in the Intrinsic Evidence, a POSA Could Not Interpret "Non-Exhaustive Search" with Reasonable Certainty**

Network-1 admits, as it must, that the specification does not address the ambiguity this Court identified in the IPR Appeal, *i.e.*, "how much data within a record any search must consider." Br. 59. Attempting to side-step this deficiency, Network-1 argues that this basic information is unnecessary because the POSA

would not consider "any data beyond what is sufficient to reach a conclusion about a given record." *Id.* at 59.

Network-1, however, articulates no objective criteria for "what is sufficient to reach a conclusion," which is a subjective determination that depends on the goals and preferences of the user. As this Court previously found, any search that stops short of examining all data within all records could potentially return a false-positive (finding an incorrect match) or a false-negative (missing an existing match). *Google*, 726 F. App'x at 786; *see also* Appx3173 (¶25). Whether a search is "sufficient to reach a conclusion about a given record"—despite the risk of false-positives or false-negatives—depends on the purpose of the search and the desired exactitude of the results. In Network-1's view, however, a search may or may not be "exhaustive" depending on whether a given user deems it "sufficient to reach a conclusion" for a given purpose. The requirement for reasonable certainty under *Nautilus*, 572 U.S. at 901, does not permit the meaning of "non-exhaustive" to turn on such subjectivity. *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (claim term "defined by what network performance characteristic is most important to a particular user" is indefinite); *see also Dow Chem.*, 803 F.3d at 633; *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## C. The Extrinsic Evidence Does Not Support Network-1's Proposed Construction

Finally, Network-1 attempts to rely on the opinions of its expert and publications using the term "exhaustive." This extrinsic evidence not only fails to support Network-1's construction, it also underscores the lack of a commonly understood meaning. Network-1 cannot show that the district court's analysis of the extrinsic evidence was clearly erroneous. *See NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1364 (Fed. Cir. 2024).

### 1. Dr. Mitzenmacher's Testimony Is Unreliable and Contradicts Network-1's Proposed Construction

Dr. Mitzenmacher's declaration does not show that a POSA would have understood "non-exhaustive search" with reasonable certainty. Br. 61-64. As an initial matter, the declaration's analysis is a near-verbatim copy of a different declaration from someone whom Dr. Mitzenmacher had never consulted with or even met. *Compare, e.g.,* Appx2781-88 (¶¶40-55) *with* Appx1638-1645 (¶¶55-72); Appx3551 (62:4-63:23). Dr. Mitzenmacher could not recall independently finding *any* extrinsic evidence to support his understanding of "non-exhaustive" search. Appx3555 (79:20-81:15). His declaration thus epitomizes this Court's concerns about the reliability of litigation-driven testimony for interpreting patent claims. *Phillips*, 415 F.3d at 1318; Appx32 ("Because Dr. Mitzenmacher's declaration

33

largely rehashes arguments made in Plaintiff's briefing, it is of little value as extrinsic evidence.")

As the district court found, Dr. Mitzenmacher's testimony underscores that "exhaustive" has no commonly accepted meaning. Appx33-34. Dr. Mitzenmacher testified that exhaustive searches can involve "pruning," which eliminates certain records in the reference data before they are compared against the query. Appx3579 (174:3-175:7); Appx33-34. He explained that, if he was conducting an exhaustive search of a dictionary for a word starting with "C," he could simply set aside every word that starts with "A." *Id.* But this understanding of "exhaustive search" conflicts with Network-1's interpretation, which requires searching "all records in the reference data set," Br. 52, and does not permit categorically setting aside entire sections of the reference data set. In view of this inconsistency, the court's decision to afford little weight to Dr. Mitzenmacher's testimony was not clearly erroneous. *See NexStep*, 119 F.4th at 1365 (expert testimony that contradicts underlying evidence was properly rejected); *Vargas v. Pfizer, Inc.*, 352 F. App'x 458, 460 (2d Cir. 2009) (internally inconsistent expert testimony is insufficient to create a triable issue).

Faced with this inconsistency, Network-1 argues that pruning is exhaustive because "you're implicitly or even in some sense explicitly doing the comparison of the [query] against every item." Br. 62-63. But this only injects more ambiguity:

Network-1 cites no evidence of how a POSA would understand an "implicit" versus "explicit" comparison, or how a POSA could distinguish an "implicit" comparison from no comparison at all.

### 2. Network-1's Own Cherry-Picked Extrinsic References Do Not Support Its Construction

As the district court correctly found, Network-1's cited extrinsic references do not aid the POSA in understanding "non-exhaustive" and further underscore the ambiguity of this term. Appx31-37.

Denny, for instance, states that "non-exhaustive search strategies . . . traverse the search space more or less at random." Appx3011. As the court correctly observed, this description differs from Network-1's proposed construction. Appx34-35. Network-1 downplays Denny as providing a non-definitional description of "how a non-exhaustive search may operate." Br. 61-62. But Denny's characterization of "non-exhaustive search" as "travers[ing] the search space more or less at random" is Denny's basis for "contrast[ing]" exhaustive searches from non-exhaustive searches, Appx3011, and represents a line of demarcation far removed from what Network-1 proposes. *See* Appx34-35.

Denny's description of non-exhaustive search also is inconsistent with Dr. Mitzenmacher's understanding. Denny explains that "[o]ne drawback of *any* non-exhaustive strategy is that if no solution is found . . . then *no conclusions can be drawn about the existence of a solution*." Appx3010 (emphasis added);

Appx3193.  Dr. Mitzenmacher, however, agreed that some non-exhaustive searches can "*guarantee*[] there is, in fact, no solution" if no solution is found.  Appx 3585-3586 (201:14-202:9) (emphasis added).  This contradiction underscores the problem with the absence of guidance in Network-1's specification.

Nor does Orwant support Network-1's position.  Orwant states "[t]he technique of generating and analyzing all of the possible states of a situation is called *exhaustive search*."  Appx3017-3018.  But Orwant does not address whether "analyzing all of the possible states of a situation" requires evaluating "all data within all possible matches" or merely some data within "all records in the reference data set." If anything, its reference to "all possible states" suggests that an exhaustive search must evaluate "all data within all possible matches," contradicting Network-1's construction.  Appx3183 (¶53).

Orwant also confirms that "exhaustive search" has no commonly understood meaning, stating that "*the definition of exhaustive search is vague.  The exact meaning of 'try everything' depends upon the particular problem*."  Appx3020 (emphasis added); Appx36.  As Orwant explains, "[e]ach problem has its own way of trying everything, and often many different ways."  Appx3020.  Thus, even after Network-1 selected "the pieces of extrinsic evidence most favorable to its cause," from "a virtually unbounded universe of potential extrinsic evidence," *Phillips*, 415

F.3d at 1318, the most it could muster is evidence that expressly concedes the ambiguity of the precise term at issue.

Finally, Network-1 points to two Google patents using the term "exhaustive." Br. 64. But Network-1 never explains why the POSA would have consulted these unrelated patents, and as the court correctly found, Google's patents "shed[] no light on the proper construction of 'non-exhaustive search' as used in Plaintiff's patents." Appx37 (n.14). The Google patents do not define "exhaustive," instead simply using the term in connection with particular algorithms without foreclosing other meanings. *Id.*; Appx3060 (8:1); Appx3082 (9:9).

At bottom, as the district court correctly concluded, Network-1's extrinsic evidence demonstrates that "non-exhaustive search" may have multiple reasonable meanings. Appx38. Network-1 nonetheless argues that "even if there were three possible constructions, that is not the proper test for indefiniteness." Br. 65; *see* Br. 60-61. But the decisions Network-1 cites for that proposition are inapposite. In *Nevro Corp. v. Boston Scientific Corp.*, the intrinsic evidence provided "detailed guidance and examples" about the meaning of the disputed term; "[t]hus, the patents provide[d] reasonable certainty about the claimed inventions' scope." 955 F.3d 35, 39 (Fed. Cir. 2020). And in *Neonode Smartphone LLC v. Samsung Electronics Co.*, "[t]he intrinsic record resolve[d] [the] inquiry," because only one meaning was consistent with the specification and prosecution history. No. 23-2304, 2024 WL

37

3873566, at *4-5 (Fed. Cir. Aug. 20, 2024) (non-precedential). Unlike in those cases, the intrinsic record here provides no guidance as to which reasonable meaning of "non-exhaustive" governs. The claim term is therefore indefinite. *Dow Chem*, 803 F.3d at 634.

**D.** **Indefiniteness Is a Question of Law Properly Resolved by the Court**

Finally, Network-1 urges this Court to remand for an indefiniteness determination by the jury rather than the court. Br. 66-68. Network-1's assertion that it is entitled to a jury trial on indefiniteness is legally unfounded.

*First*, precedent dictates that indefiniteness is an issue for the court. In *Teva*, the Supreme Court explained that "claim construction falls 'exclusively within the province of the court,' not that of the jury." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). Indefiniteness is an issue of "claim construction with 'evidentiary underpinnings,'" *id.* at 321—and as with claim construction, subsidiary factual issues, including "any credibility determinations," should be resolved by the court, *see Markman*, 517 U.S. at 389. This Court's cases are in accord. *See Infinity Computer Prods., Inc. v. Oki Data Americas, Inc.*, 987 F.3d 1053, 1061 (Fed. Cir. 2021) (affirming district court's finding of indefiniteness and rejecting patentee's reliance on expert testimony); *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366 (Fed. Cir. 2021) (affirming district court's grant of summary judgment

38

of indefiniteness based on expert and fact testimony).  Indeed, this Court rejected the argument that "because [indefiniteness] was a factual question, it should have gone to the jury," emphasizing *Markman*'s holding that the "meaning of a patent term is a question for the judge, even though some of the questions underlying claim construction may involve credibility determinations."  *Saso Golf*, 843 F. App'x at 295.[3]

*Second*, even under its own erroneous standard, Network-1 is not entitled to a jury trial.  Network-1 contends that indefiniteness can be decided by the jury if it turns on "almost exclusively extrinsic" evidence.  Br. 67.  That standard is not met here.

Network-1 argues the evidence largely encompasses "warring expert testimony."  Br. 66-77.  But "[a] party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it."  *Teva*, 789 F.3d at 1342.  As the district court found, Dr.

---

[3] Network-1's reliance on *Bombardier* and *BJ Services* is misplaced.  Br. 67.  Unlike here and in *Teva*, neither of those cases involved an indefiniteness inquiry undertaken as part of a court's claim construction.  *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1373 (Fed. Cir. 2003) ("[Defendant] did not request that the court construe 'about 0.06.'"); *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 863 (Fed. Cir. 2019) (district court construed disputed claim before jury trial).  Thus, at most, those cases suggest that indefiniteness *can*, in specific circumstances different from those involved here, be "amenable to resolution by the jury"—not that it *must* be resolved by a jury whenever it implicates an underlying factual issue.  *BJ Servs.*, 338 F.3d at 1372 (Fed. Cir. 2003); *Bombardier*, 785 F. App'x at 860.

Mitzenmacher's report simply rehashes attorney argument and is contradicted by his own testimony, Appx32, which is no basis for avoiding summary judgment. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1331 (Fed. Cir. 2009) (summary judgment was appropriate where expert's deposition testimony revealed deficiencies in opinion).

Network-1 wants a jury to resolve (1) whether backtracking/pruning is "exhaustive," and (2) the meaning of non-exhaustive in two unrelated Google patents. Br. 67. Neither informs indefiniteness. On the first issue, even assuming that backtracking/pruning is "exhaustive," that leaves unanswered how much data within each record must be examined. *See supra* 23-26. On the second, Network-1 offered no evidence why a POSA would have considered two unrelated *Google* patents as informing the meaning of "non-exhaustive" in *Network-1's* claims; nor does Network-1 explain how Google's patents clarify "non-exhaustive search." *See* Br. 67. More fundamentally, the use of a claim term in an extrinsic document does not spontaneously transform indefiniteness into a jury issue; otherwise, a party could turn any indefiniteness question into a jury issue by finding the term in another patent or a dictionary, thereby rendering *Teva*'s guidance a nullity. 789 F.3d at 1342.

* * *

For the foregoing reasons, this Court should affirm summary judgment that the asserted claims of the '988 and '464 patents are invalid as indefinite.

40

## III. The District Court Correctly Entered Summary Judgment of Non-Infringement

This Court also should affirm the district court's grant of summary judgment of non-infringement. Every asserted claim of the '237 and '988 patents requires a "sublinear" search, but neither the LSH nor the Siberia Version of Content-ID meets the agreed construction of "sublinear": "A search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." Appx22. The record instead reflects that in both Content-ID versions, the execution time *scales proportionately with the size of the reference index*, which the parties agreed means the search is linear—not sublinear. Appx54. Summary judgment of non-infringement thus was appropriate. And although the district court declined to enter summary judgment of non-infringement on the '988 patent given its invalidity ruling, *see* Appx50, this Court can and should enter such judgment in the event it disagrees on indefiniteness. *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371-72 (Fed. Cir. 1998) ("When a matter comes before an appellate court following a summary judgment, the appellate court is free to adopt a ground advanced by the appellee in seeking summary judgment but not adopted by the trial court.").

Unable to dispute the actual functionality of either Content-ID version, Network-1 attacks the court's decision using Google documents that do not apply the agreed construction of "sublinear" and are not even directed to the Content-ID

versions accused of infringement. "Sublinear" has multiple meanings in the field of computer science. Appx4919; Appx8692 (169:5-14). Usage of a claim term having a meaning that differs from the correct construction does not create a genuine dispute of material fact. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1383 (Fed. Cir. 2013) (affirming exclusion of defendant's internal document that used a claim term divorced from its agreed-upon construction); *Philips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876-77 (Fed. Cir. 1998) (use of a construed claim term in "internal documents and product formulation sheets" is "insufficient to raise a genuine issue of material fact"); *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378, n.1 (Fed. Cir. 2007) (expert declaration applying a definition of the disputed claim term differing from the correct construction "does not create a genuine issue of material fact").

On this record, the district court correctly found no genuine dispute of material fact that neither the LSH nor the Siberia Version conducts a "sublinear" search. Network-1 mischaracterizes the court's decision by suggesting it required proof that Network-1 "necessarily infringes." *E.g.*, Br. 35-36. Not so. The court understood that the "more likely than not" preponderance standard governs infringement, Appx65, with "all reasonable inferences drawn in favor of the non-movant" at summary judgment, Appx53. Applying those standards, the court found that Network-1's cited documents do not show the LSH version is "capable of infringing,

much less actual infringement," Appx65 (citations omitted), and "the undisputed evidence is that the Siberia version of Content ID uses search algorithms that scale linearly as the size of the database increases," Appx71. These determinations did not entail "weighing the evidence against Network-1" or "making adverse credibility determinations." Br. 31. The court correctly concluded that Network-1 failed to adduce *any* evidence that either accused version of Content-ID employs a "sublinear search" under the agreed construction. Appx65-68; *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1380 (Fed. Cir. 2021). Accordingly, summary judgment of non-infringement should be affirmed.

## A.     The LSH Version Is Not "Sublinear"

There is no genuine dispute that the LSH Version does not practice a "sublinear search." This Court may affirm summary judgment on one of two independent bases. *Cunningham*, 86 F.4th at 980. First, summary judgment is appropriate because the record shows the LSH Version scaled linearly, not sublinearly. Second, summary judgment also is appropriate under the district court's sound reasoning—*i.e.*, that Network-1's reliance on documents that are unconnected to the accused LSH Version and use "sublinear" in a sense different from the agreed construction do not demonstrate a genuine dispute of material fact. Appx55-69. Indeed, Network-1's choice to base its infringement theory on a jumble of irrelevant

documents underscores its inability to manufacture a dispute regarding the linear scaling of the LSH Version.

### 1. The Record Demonstrates that the LSH Index Lookup Scales Linearly

The district court opted to grant summary judgment based on Network-1's failure to adduce evidence that the LSH Version scaled sublinearly. Appx55-56. That reasoning is correct, as explained in Section III.A.2. But as a preliminary matter, this Court also may affirm because the record demonstrates no genuine dispute that the LSH Version scaled *linearly*, even though the district court declined to grant summary judgment on this basis. Appx55. That is because, as explained below, the record showed that the execution time of the LSH Index Lookup increased *proportionally* with the number of matches, which in turn increased *proportionally* with the size of the reference index. As a result, the execution time also increased proportionally with the total size of the reference index, making the search linear under the agreed construction.

As Dr. Mitzenmacher conceded, the LSH Index Lookup returned its results "in time proportional to the number of matches." Appx4430 (¶211). The record also shows that the number of matches in turn increased proportionally with the total number of reference videos. As Dr. Mitzenmacher agreed, every reference video received its own component ███ in the index and became a new potential "match" when performing a search or lookup. Appx8847-8848 (270:12-271:4); Appx8849 (272:7-

12); Appx8851-8852 (274:7-275:2). Thus, as the number of reference videos increased, the number of potential matches for a given LSH band also increased proportionally. For example, doubling the number of reference videos from 20 million to 40 million would double the ███████ [components] in the index, as each reference video receives its own ██████ [component] Because the search looks for matches in both the original 20 million reference videos, as well as the newly added 20 million reference videos, *see* Appx4861-4862 (78:7-79:20); Appx8849 (272:7-18), the average number of matches for a given LSH band (*i.e.*, a specific row in the index) would likewise double.

Unable to identify evidence showing how the LSH Version scaled sublinearly, Network-1 instead quibbles about whether the LSH Index Look-up skips the empty ██████ [components] in the index or compares the query LSH band against every ██████ [component] Br. 41-42. This purported distinction makes no difference for whether a search of the LSH Version is "sublinear"; thus, it cannot defeat summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986) (immaterial factual issues do not defeat summary judgment). There is no evidence to suggest that skipping the empty ██████ [component] would somehow render the system sublinear. To the contrary, the execution time in the LSH Version was *proportional to the number of matches*, whereas empty ██████ [components] are by definition not matches. Appx4430 (¶211); Appx8845-8846 (268:9-269:8). Skipping the empty ██████ [components] therefore would not

impact *the number of matches* in the index, and there is no evidence that doing so somehow rendered the system sublinear.

### 2. Documents Using "Sublinear" with No Demonstrated Connection to the Functionality of the Accused Product Do Not Create a Triable Issue

As detailed above, the record shows that the LSH Version scales linearly. Network-1 did not adduce evidence suggesting otherwise, but instead relies primarily on a hodgepodge of documents mentioning the term "sublinear." As the district court correctly found, none of these documents shows that the LSH Version scaled sublinearly under the agreed construction. Appx55-69.

### a. The Baluja Research Papers

Network-1 first relies on two academic papers by Dr. Baluja, a Google researcher, that contain the word "sublinear." Br. 32-34. Neither creates a triable issue of infringement.

*First*, as the court found, neither paper purports to describe the commercial implementation of the LSH Version—*i.e.*, the product that Network-1 accuses of infringement. Appx67-68; Appx9690-9703; Appx9714-9751. The first paper describes a system called "Waveprint," which used computer-vision techniques for identifying audio. Appx9690. Network-1 cites this paper for its statement that "[w]hen the database size is increased by 50%, we see that we can have a sub-linear computation increase." Br. 33 (quoting Appx9702). But that quote, like the rest of

46

the paper, describes Waveprint—not the accused LSH Version of Content-ID. Appx9702. Likewise, the second paper describes hash functions and applications generally, but never addresses the LSH Version. Appx9714. Network-1 identified no evidence connecting these papers' use of the word "sublinear" to the system accused of infringement by Network-1. The evidence also shows that Dr. Baluja was not even involved in the commercial implementation of Content-ID. Appx7399 (175:4-12) ("To be clear, I haven't had any involvement in the implementation of anything at YouTube."); Appx7322-7323 (98:19-99:11). Because the Baluja research papers do not describe the functioning of the LSH Version, they do not create a triable issue on infringement.

*Second*, the district court also correctly observed that Network-1 did not show that the Baluja research papers use the word "sublinear" in the same way as its agreed construction. Appx67-68. The use of the word in a way that is not tied to the pertinent construction does not evidence infringement. *See Philips Petroleum*, 157 F.3d at 877; *Rembrandt*, 725 F.3d at 1383. In asserting otherwise, Network-1 misconstrues Dr. Baluja's testimony. Br. 33 (quoting Appx7362). Dr. Baluja was clear that he used "sublinear" to mean that "we will still consider all the elements in our repository without having to examine them in detail." Appx7362 (138:12-14). That statement plainly refers to the extent to which elements in the repository are considered, not the execution time of the search. Dr. Baluja was not asked about,

47

and did not offer any testimony regarding, whether the *execution time* scales sublinearly; nor was he even shown the agreed construction of "sublinear search." The Baluja research papers therefore do not create a triable issue.

### b. The CoverCat Draft

Network-1 next argues that a draft Google document describing the "CoverCat" system creates a factual dispute. Br. 34-36. Like the Baluja research papers, however, the CoverCat Draft is not evidence that the accused LSH Version scales sublinearly. Although the document states that the contemplated design for CoverCat "follows the same *high level* architecture" as Content-ID, Appx9380 (emphasis added), the district court correctly concluded that Network-1 identified no evidence that the proposed CoverCat search methodology was the same as the accused commercial implementation of Content-ID. Appx62-63. Moreover, this document is explicitly marked as a "Draft," Appx9380, and Network-1 produced no evidence that any purportedly "sublinear" search referenced in this draft was ever implemented in the accused Content-ID system. Appx63.

Even looking past these deficiencies, the CoverCat Draft still creates no genuine dispute on infringement. In the section quoted by Network-1, the CoverCat Draft identifies "two possibilities" for storing LSH tables. Appx9387. The first possibility, " storage location for ██████ LSH tables," allows "other resources (CPU, RAM) [to] scale sublinearly." *Id.* The other, " storage location for ████████ LSH tables," does not include components

that scale sublinearly. *Id.* The draft, however, says nothing about whether either of these "possibilities" was used in the LSH Version, and the district court thus found that Network-1 "has not proffered evidence that either version of Content ID described in the draft document was actually implemented, much less that the [storage location] version was implemented instead of the [storage location] version." Appx65.

For the first time, Network-1 argues on appeal that the LSH version uses the [storage location] option because a separate presentation from Google states that "[storage location] [are] cached [storage location] local [ ] for speed." Br. 35 (citing Appx9602; Appx9673). Network-1 never made this argument below and thus forfeited it. *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322-33 (Fed. Cir. 2008). Regardless, the presentation slide is dated "Oct 2007," whereas the CoverCat Draft is dated "Jan 2010." Appx9673; Appx9380. If Google already had resolved to store LSH tables "[storage location] [storage location] [storage location]" in 2007, it would not have presented "[storage location]" and "[storage location]" as separate "possibilities" more than two years later. Thus, even assuming this argument was preserved, it still fails to create a genuine dispute about whether Google implemented a "sublinear" search in the accused LSH Version.

### 3. Dr. Mitzenmacher's Opinion Does Not Create a Triable Issue

The court also correctly concluded that Dr. Mitzenmacher's opinions do not create a triable issue. Appx56-62.

Despite Network-1's reliance on Dr. Mitzenmacher's report, Br. 36-41, it never stated that the *execution time* of a search performed by the LSH Version scaled sublinearly. Instead, it stated only that the LSH Version is "designed to determine a very small subset of the reference works in the database, in particular *a sublinear subset*." Appx4429-4430 (¶210) (emphasis added). But the asserted claims do not recite a "sublinear subset," and Dr. Mitzenmacher did not explain why examining a "sublinear subset" means the *execution time* of a search of the LSH Version would scale sublinearly, as the agreed construction requires. Appx56-57. *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) (expert testimony must "support a finding of infringement under the claim construction adopted by the court"). Nor does his report show how the source code makes the LSH Version sublinear. *Contra* Br. 37 (citing Appx4430-4433 (¶212)). Instead, as the court observed, it is "devoid of analysis," simply reciting a list of software functions without mentioning the execution time of the LSH Version at all, much less explaining how it scales sublinearly. Appx60.

As the court found, Dr. Mitzenmacher's use of the word "sublinear" does not correspond with the parties' agreed-upon construction. Appx57. He opined that the LSH Version was "sublinear" because it examined a "very small subset" of the available reference works. Appx4429-4430 (¶210); Appx57. But examining only a subset of works does not mean the search's *execution time* will increase sublinearly.

Suppose, for example, that a given search is programmed to examine 50% of all reference works. As the data set grows, the time required to search a 50% subset grows proportionally to the total number of reference works. Dr. Mitzenmacher confirmed as much, opining that "a search that compares to *a random half of the records* does not compare against all records, but *the time required for such a search scales linearly with the size of the data set, since it always compares against half of the records*." Appx3953-3954 (emphasis added).

Attempting to bridge the gap between Dr. Mitzenmacher's opinion and the agreed "sublinear" construction, Network-1 argued that his testimony showed how "it logically follows from [his report] . . . that the number of matches scales in a sublinear . . . fashion." Appx61. But the district court carefully considered this testimony and determined, correctly, that it was incomprehensible:

> Q. [W]hat does it mean to say that the Content ID LSH version system determines a sublinear subset?
>
> A. So I think the point is that the work going into like the number of things in the subset were sublinearly with the corresponding work or execution time to handle such objects, while also grow sublinearly in the setting of the context of the claim construction.

Appx8692; Appx61. In challenging the court's determination, Network-1 tries to cobble together a coherent sentence from Dr. Mitzenmacher's transcript through generous reliance on ellipses and bracketed text. Br. 38. But Dr. Mitzenmacher's conclusory assertion speaks for itself. No contortion of his testimony alters the

reality that he offered no opinion addressing the crucial question of how *execution time* scales sublinearly, as the claims require. Appx8692; Appx61-62.

Network-1 also cites Dr. Mitzenmacher's testimony that the LSH Version uses an "inverted index," but provides no evidence that an "inverted index" rendered the search "sublinear" either. Br. 37-38; Appx58-59. As the district court observed, Dr. Mitzenmacher cited only the "inverted index" Wikipedia page, Appx58; Appx4430 (¶211), which does not suggest that execution time will scale sublinearly, nor does it "use the terms 'sublinear search' or 'sublinear subset.'" Appx59. On appeal, Network-1 disavows "relying on [the Wikipedia page] on summary judgment," Br. 40, arguing instead that the CoverCat Draft supports its assertion, Br. 37; but Dr. Mitzenmacher never cited the CoverCat Draft in the "inverted index" paragraph of his report, and this document says nothing about whether searching an "inverted index" is sublinear under the agreed construction. Appx4430 (¶211); Appx9380.

Finally, because nothing in the record shows the LSH Version performs a "sublinear" search as construed, Network-1 baldly asserts that "it cannot be nonmovant Network-1's burden at the summary judgment stage to prove LSH-Content-ID 'necessarily' does anything." Appx39. That turns the summary-judgment standard on its head. "[I]t is hornbook law that to survive the defendants' motions for summary judgment, [the plaintiff] must make a showing sufficient to

establish the existence of each element essential to its case." *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (cleaned-up). Given the absence of evidence that the LSH Version meets the asserted claims, the district court's decision granting summary judgment of non-infringement was proper and should be affirmed.[4]

## B. The Siberia Version Is Not "Sublinear"

The evidence also shows no genuine dispute that Siberia conducts a linear, not sublinear, search of the reference index. Network-1's arguments here follow the same flawed playbook as those regarding the LSH Version. That is, in lieu of relying on Google's source code demonstrating the accused system's functionality, Network-1 instead cites two internal design documents using the word "sublinear," Br. 42-48, even though these documents do not use the term "sublinear" in accordance with the agreed construction and do not describe the implementation of Siberia accused of infringement. *See Rembrandt*, 725 F.3d at 1383; *MyMail*, 476 F.3d at 1378, n.1; *Philips Petroleum*, 157 F.3d at 877.

Given the agreement by Network-1's expert that Siberia scales linearly, Network-1 resorts to arguing that Google has an *ability to modify* Siberia in ways

---

[4] As the district court noted, Network-1 did not cite evidence that "Stage II" of the LSH Version is sublinear. Appx68-69 n.20. Network-1 disputes this finding, again pointing to paragraph 212 of Dr. Mitzenmacher's report and his testimony. Br. 41. But as explained, Dr. Mitzenmacher does not show how *any* portion of the LSH Version, including Stage II, scales sublinearly under the agreed construction.

that purportedly would make its search sublinear.  Br. 45-48.  But infringement must be based on the accused product as implemented—not what a defendant *might* have done or *could* do.  *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1327 (Fed. Cir. 2013) ("A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").  Because Network-1 has not shown a genuine dispute of material fact with respect to Siberia, summary judgment of non-infringement should be affirmed.

### 1. The Evidence Demonstrates that Siberia Performs a Linear Search

The district court correctly found no genuine dispute that Siberia conducts a linear search because it searches a *predetermined fraction* of the reference index. Appx69-70.  When a user uploads content to YouTube, Siberia first scans all number of components ▮▮▮▮▮▮ of the reference index to identify a predetermined fraction of components ▮▮▮▮ for further processing, and then scans *all* the components ▮▮▮ on those components ▮▮▮  Appx4440-4441 (¶223); Appx4920-21 (¶302) (explaining that the algorithm searches a fixed fraction number ▮▮▮ of components ▮▮▮  Appx7536 (92:8-22) ("[T]he way the ScaM algorithm is set up, you always have to search a fixed portion of the index.")

There is no genuine dispute that searching a fixed fraction of the data set, as Siberia does, is a "linear" search.  Dr. Mitzenmacher admitted as much in his declaration.  Appx3953 (search that compares to random half of the records will

54

"*scale[] linearly with the size of the data set*") (emphasis added). This makes sense intuitively—as the number of <span style="color:orange">calculations</span> █████████ in the reference index increases, the number of <span style="color:orange">calculations</span> ████████ in the fixed fraction of the reference index grows proportionally. And provided computing power remains constant (as the agreed construction requires), the time taken to search the fixed fraction scales proportionally with the size of the data set. Appx9183-9184; Appx4447-4448 (¶229). As one Google engineer testified about the Siberia Version, "[i]f you double the number of videos in the data set," then "[i]t will slow down by half." Appx9183 (50:19-20). Crucially, Dr. Mitzenmacher agreed that Siberia scales linearly: "Defendants' technical witnesses testified that if additional references were added to the existing <span style="color:orange">software architecture</span> █████████ structure, the ScaM portion of the search would scale linearly. *I generally agree with this notion*." Appx4447-4448 (¶229) (emphasis added). Dr. Mitzenmacher further explained that "doubling the size of a reference index by simply adding those references to the existing <span style="color:orange">components</span> ██████ could "result in the ScaM portion of the search taking approximately twice as long, or an (unnecessary) doubling of computing resources could be consumed for that portion of the search," Appx4448 (¶230), again admitting that Siberia scales linearly under the agreed construction.[5]

---

[5] Network-1 argues that it would have been an error "[i]f" the court restricted the claims to the specification's examples, Br. 48; but the court plainly applied the parties' agreed construction, Appx54, and Network-1 never argues to the contrary.

55

**2.** **Google's Internal Documents Do Not Demonstrate That Siberia Performs A "Sublinear" Search Under the Court's Construction**

Despite its own expert's agreement that Siberia conducts a linear search, Network-1 nevertheless argues there is a triable issue because two internal Google documents—neither of which specifically addresses Siberia's search algorithm—use the term "sublinear." Br. 42-45. The court correctly found that neither document defeats summary judgment. Appx69-73.

Network-1 first cites a document titled "ContentID ScaM Searcher," Appx10265. This document was generated during the design phase for Content-ID and does not describe the commercial implementation of Siberia. Appx8118-8119 (170:10-171:8). Network-1 points to a single sentence stating that "[g]iven the size of the dataset, it is clear that we will need a (customized) distributed searching service and a sublinear search with [████ type of calculation] representation." Appx10265. But because the quote describes what Google "will need," it plainly is referring to a potential strategy, not Siberia as implemented. Appx10265. Indeed, as Google's lead engineer for Content-ID testified, this document does "not really reflect[] what [Google] ended up doing" and describes an algorithm that was ultimately rejected in favor of a different approach. Appx8118-8119 (170:10-171:8). Network-1 identified no evidence that Siberia implemented any proposal from this document.

Nor did Network-1 advance evidence that this document uses "sublinear" consistently with its agreed construction. Accordingly, this document does not create a triable issue.

Network-1's second cited document is a draft Google document describing software infrastructure for search functions generally. Appx9837-38. Network-1 points to a graph allegedly showing that Siberia's "ScaM" search component is sublinear. Appx9842.



Network-1 argues that Siberia uses either the "███████" or "███████" algorithm shown in the graph, both of which it contends are sublinear.[6] Br. 42-45. To be clear, the graph does not mention Siberia or Content-ID, much less state that

---

[6] Although not necessary to affirm the district court's decision, the "███████" line in this figure appears *linear* because the "query cost" on the y-axis of the "███████" line increases proportionately (albeit in a stepwise manner) with the "dataset scale (# of machines)" on the x-axis.

Siberia's search scales as shown in any of the lines in the graph. Appx9842. Moreover, as the district court explained, the use of the term "sublinear" in this graph is plainly inconsistent with the agreed construction, which "assum[es] computing power is held constant." Appx72-73. The x-axis of the graph reflects an increase in the "# of machines"—*i.e.*, computing power is *not* held constant.

Network-1 tries to sidestep this problem by arguing that the x-axis refers only to the size of the reference data set, not computing resources. Br. 44-45. Not only is this interpretation unsupported, it also requires the Court to make the counterintuitive assumption that increasing the number of machines would not impact computing power in any way. Adding more machines also would require modifying the architecture of Siberia, which stores the ▮calculations▮ across a predetermined number of ▮components▮, each of which is a *single* machine. Appx12; Appx4438-4439 (¶¶220-221); Appx4449 (¶233). At bottom, there is no evidence that this graph reflects what happens to execution time when the size of Siberia's reference index increases if computing power (including the number of ▮components▮/machines) is held constant. Appx72-73. And in all events, the use of "sublinear" in a document does not create a triable issue where Network-1's own expert agrees that the accused Siberia Version, as implemented, scales linearly. Appx4447-4448 (¶229).

### 3. Network-1's Assertion that Google Could Modify Siberia To Make It "Sublinear" Does Not Create a Triable Issue on Infringement.

Network-1's argument that Siberia is sublinear because Google could modify its search algorithm through a series of "tunable knobs" is also unavailing.  Br. 45-48.  For example, Network-1 argues that Google's engineers could redesign Siberia so that it searches *fewer* components ▇▇▇▇▇▇▇ as the size of the reference index increases.  Br. 46.  In that scenario, Network-1 argues, the search time would decrease because the algorithm is searching a smaller fraction of the index.  Network-1's theory of infringement is legally untenable and factually erroneous.

*First*, as a legal matter, the possibility that Google might modify the system is insufficient for infringement.  "[I]t is not enough to simply show that a product is capable of infringement."  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010).  Network-1 was required to come forward with evidence that the claimed methods actually were practiced by Google, which it failed to do.  *See ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 521 (Fed. Cir. 2012) (no infringement where "systems are technically capable of infringing [patentee's] method claims," but no evidence infringing method was actually practiced).  Siberia does not infringe the "sublinear" limitation "simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim."  *Accent Packaging*, 707 F.3d at 1327 (Fed. Cir. 2013); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d

1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement"). Network-1 does not cite a *single* case suggesting otherwise; its "tunable knobs" theory thus fails as a legal matter.

*Second*, as a factual matter, Network-1's argument that reducing the number of scanned ▮▮▮▮ [components] would make the search sublinear is simply wrong. *See* Br. 46-47. Even if Google reduced the number of searched ▮▮▮▮ [components] Siberia would still search a predetermined proportion of all ▮▮▮▮ [components] and thus scale linearly. Appx4447-4448 (¶229). To illustrate, suppose that Google modified the system to search ▮▮▮▮ [numeric value] instead of ▮▮▮▮ [numeric value] of the reference index, as Network-1 asserts that it once did with respect to a particular index.[7] Although the modified system would search half as much data as it did before, the amount of data corresponding to ▮▮▮▮ [numeric value] of the reference index would still increase in proportion to the total size of the reference index. *See* Appx7536 (92:12-22) (explaining how the search of Siberia would still be linear "even if [Google] decided to take a different number of ▮▮▮▮ [results]"). Even if Network-1's "tunable knobs" theory

---

[7] Network-1 argues that Google altered Siberia in 2020 to search ▮▮▮▮ [number of components] instead of ▮▮▮▮ [number of components], and suggests this change indicates Siberia conducts a "sublinear" search. The district court correctly found no record evidence that the change was made to account for an increase in the number of references in the index. Appx70.

of infringement were legally cognizable, it still fails to show Siberia scales sublinearly.

### C.   The Siberia Version's "Overall Search," as Alleged by Network-1, Is Not Sublinear

Because Siberia's Index Lookup scales linearly, this Court need not go further to affirm the district court's finding of non-infringement.  But even if, contrary to the evidence, the Index Lookup scaled sublinearly, Network-1's theory of infringement still fails because there is no evidence that the "overall search," as alleged by Network-1, is sublinear.  Network-1's failure to adduce evidence on this point is a separate and independent basis for this Court to affirm the district court's summary judgment of non-infringement.

Siberia includes three main steps—Index Lookup, Sparse, and Verifier.  *Supra* 10-11.  Although Network-1 contends that Index Lookup is sublinear, it does not rely on Index Lookup to meet the "approximate nearest neighbor search" limitation.  Appx73-74; Br. 48-51.  Instead, Network-1 argues that Index Lookup should be considered together with the two subsequent steps as "the overall search," which in turn meets the "approximate nearest neighbor search" limitation.  *Id.*, *see also* Appx6460-6461.

But even if this Court considered all three steps as a single "search" for infringement, Network-1's argument still fails.  There is no dispute that, if *any* step in Siberia scales linearly, then the execution time of the algorithms taken together

necessarily scales linearly. Appx8628-8632. For example, if the execution time for either Sparse or Verifier increases proportionally with the database size, then the alleged "overall search" would scale linearly—even if the Index Lookup scaled sublinearly. Network-1 attempts to avoid this result by arguing that Sparse and Verifier do not scale linearly, but rather "take a roughly constant amount of time" regardless of the size of the reference index. Br. 48. Thus, Network-1 asserts, because the Index Lookup is allegedly sublinear, the "overall search" is sublinear. *Id.* This argument fails for at least two reasons.

*First*, even assuming the Index Lookup were sublinear, the record lacks evidence supporting Network-1's assertion that Sparse and Verifier "take a roughly constant amount of time" regardless of the reference index size. Network-1's position rests on a footnote in Dr. Mitzenmacher's report stating "[t]he time that the overall search takes (e.g. the combination of ScaM, Sparse, and Verifier steps)" would be sublinear "because the amount of time the latter two steps take would remain roughly constant since the number of results ███████ [that] comes out of the ScaM step would remain the same." Appx4448 (¶230 n.197). But this citation-free footnote provides no analysis or factual support for the proposition that Sparse and Verifier "would remain roughly constant."

Network-1 contends that paragraphs 223-226 of the report contain a "detailed discussion . . . concerning the number of results ██████ subjected to further consideration

62

in the Sparse and Verifier stages." Br. 49 (citing Appx4440-4445). But it never explains how those paragraphs support its assertion that the Sparse and Verifier steps are constant. In reality, the cited paragraphs simply describe Siberia at a high level; they never state that either Sparse or Verifier is constant, and lack any analysis supporting Network-1's assertion. *See* Appx4440-4442 (¶¶223-224) (explaining how Index Lookup examines [component ███████] and sorts [results ███████]); Appx4442-4445 (¶¶225-226) (describing how Sparse and Verifier reveal potential matches).

Second, as the district court correctly recognized, Network-1's rationale for why the execution time for Sparse and Verifier is constant conflicts with its argument for why the Index Lookup step is sublinear. Appx76. *On one hand*, Network-1 argues that Index Lookup is sublinear because Google's engineers can alter the algorithm by changing the number of [components ███████ ███████] and scanned [component ███████] Br. 45. But were that to happen, the number of [component ███████] generated by the Index Lookup also would change. *On the other hand*, Network-1's theory for why the execution time for Sparse and Verifier is constant relies on the notion that "the number of [results ███████] [that] comes out of the [Index Lookup]" step *will remain the same*. Br. 48; Appx4448 (¶230 n.197). These two propositions simply do not hold together. That is, if the Index Lookup were altered in the manner proposed, then it would generate a different number of [results ███████] and undercut Network-1's rationale for why Sparse

63

and Verifier would remain constant. The district court rightly rejected this infringement theory as "internally inconsistent." Appx76.

Faced with this dilemma, Network-1 baldly asserts that "the number of embeddings output per [component] . . . can be adjusted to maintain and improve upon sublinearity." Br. 50. In other words, Network-1 postulates that Google would (1) change the number of [component] and [component] at the Index Lookup step to make that search "sublinear," Br. 45, but then (2) modify the output per [component] so the Sparse and Verifier steps remain constant. *Id.* Network-1's argument simply heaps speculation upon speculation; it does not create a triable infringement issue. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277 (Fed. Cir. 2004) ("[A] theoretical possibility' . . . is insufficient to create a genuine issue of material fact."). Network-1 does not even identify the specific modifications supposedly required to "maintain and improve upon sublinearity," much less identify anything in the record suggesting that Google made these modifications. *See Fujitsu*, 620 F.3d at 1329. Network-1 failed to adduce evidence that Siberia's alleged "overall search" is a "sublinear *approximate nearest neighbor search*," which is an independent reason to affirm summary judgment of non-infringement.

## CONCLUSION

The district court's determination of indefiniteness and its grant of summary judgment of non-infringement should be affirmed.

Dated:  January 24, 2024

Respectfully submitted,

*/s/ Andrew V. Trask*

Andrew V. Trask
Michael Xun Liu
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, SW*
*Washington, DC 20024*
*(202) 434-5000*

Kevin Hardy
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
*1300 I Street, NW, Suite 900*
*Washington, DC 20005*
*(202) 538-8000*

*Attorneys for Defendants-Appellees*
*Google LLC and YouTube, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,963 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2) and Rule 32(f) of the Federal Rules of Appellate Procedure.

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  January 24, 2025              */s/ Andrew V. Trask*

                                                Andrew V. Trask

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1893, 2024-1948 ⊞

**Short Case Caption:** Network-1 Technologies, Inc. v. Google LLC et al.

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains __13__ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 01/24/2025          Signature: /s/ Andrew V. Trask

Name: Andrew V. Trask

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 24, 2025, the foregoing Response Brief of Google LLC and YouTube, LLC was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. Plaintiff-Appellant's counsel will be served with the Non-Confidential Responsive Brief by the CM/ECF system.

The undersigned further certifies that on January 24, 2025, the Confidential Response Brief will be served by electronic mail on the following counsel of record for Plaintiff-Appellant:

> Marc A. Fenster (mfenster@raklaw.com)
> Brian D. Ledahl (bledahl@raklaw.com)
> Amy E. Hayden (ahayden@raklaw.com)
>
> Russ, August & Kabat
> 12424 Wilshire Blvd., 12th Floor
> Los Angeles, CA 90025
> Counsel for Network-1 Technologies, Inc.

The undersigned additionally certifies that Plaintiff-Appellant's counsel consented in writing on October 2, 2024 to electronic service at the above email addresses.

Dated: January 24, 2025        */s/ Andrew V. Trask*

                                                Andrew V. Trask